UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FEDERAL INSURANCE COMPANY,                    06 CV 2455 (JSR)(JCF)

               Plaintiff,

     - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

               Defendant.

-------------------------------------------------------------X


**FEDERAL INSURANCE COMPANY'S MEMORANDUM OF LAW
IN OPPOSITION TO KEYBANK NATIONAL ASSOCIATION'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**


Respectfully submitted,


NICOLETTI HORNIG CAMPISE & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830


Of Counsel
John A.V. Nicoletti (JN-7176)
Terry L. Stoltz (TS-7650)
Thomas M. Rittweger (TR-6796)
William M. Fennell (WF-8895)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ............................................................................................1

LEGAL ARGUMENT ..................................................................................................6

POINT I
    KEYBANK'S MOTION FOR PARTIAL SUMMARY
    JUDGMENT SHOULD BE DENIED DUE TO
    THE EXISTENCE OF NUMEROUS GENUINE
    ISSUES OF MATERIAL FACT ...........................................................................6

POINT II
    THE MOTION FOR PARTIAL SUMMARY
    JUDGMENT IS PREMATURE ...........................................................................7

POINT III
    FEDERAL MARITIME LAW GOVERNS THIS
    MARINE INSURANCE COVERAGE DISPUTE.............................................9

POINT IV
    AS A LOSS PAYEE, KEYBANK CAN ONLY
    RECOVER TO THE EXTENT PGG/ASHKENAZY
    CAN RECOVER .................................................................................................12

POINT V
    KEYBANK CANNOT RECOVER UNDER THE
    BREACH OF WARRANTY ENDORSEMENT .................................................14

POINT VI
    KEYBANK BREACHED ITS OBLIGATIONS
    AS AN ADDITIONAL INSURED .....................................................................21

POINT VII
    KEYBANK IS NOT ENTITLED TO
    PRE-JUDGMENT INTEREST AT 9%................................................................22

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Acadia Ins. Co. v. Allied Marine Tranp. LLC,*
   151 F. Supp. 2d 107 (D. Me. 2001) ............................................................. 17

*Acadia Ins. Co. v. McNeil,*
   116 F.3d 599 (1st Cir. 1997) .......................................................................... 9

*Advani Enters. v. Underwriters at Lloyds,*
   140 F.3d 157 (2d Cir. 1998) ........................................................................ 10

*Aetna Ins. Co. v. Houston Oil & Transp. Co.,*
   49 F.2d 121 (5th Cir. 1931) ......................................................................... 12

*In re Balfour MacLaine Intern. Ltd.,*
   85 F.3d 68 (2d Cir. 1996) .............................................................................. 11

*BBS Norwalk One, Inc. v. Raccolta, Inc.,*
   117 F.3d 674 (2d Cir. 1997) ........................................................................... 6

*Berne Street Enters. v. American Export Isbrandtsen Co.,*
   289 F. Supp. 195 (S.D.N.Y. 1968) .............................................................. 8, 9

*Best Concrete Mix Corp. v. Lloyd's of London Underwriters,*
   413 F. Supp. 2d 182 (E.D.N.Y. 2006) ......................................................... 21

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,*
   945 F. Supp. 693 (S.D.N.Y. 1996) ................................................................ 9

*BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.,*
   147 F. Supp. 2d 333 (D.N.J. 2001) ............................................................. 23

*Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,*
   769 F.2d 919 (2d Cir. 1985) ........................................................................... 9

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................... 6

*Certain Underwriters at Lloyd's v. Johnston,*
   124 F. Supp. 2d 763 (D.P.R. 1999) ........................................................ 12, 17

*China Union Lines, Ltd. v. American Marine Underwriters, Inc.,*
   755 F.2d 26 (2d Cir. 1985) ........................................................................... 24

*CIAS, Inc. v. Alliance Gaming Corp.,*
    424 F. Supp. 2d 678 (S.D.N.Y. 2006) .................................................................................. 6

*Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.,*
    No. CV-93-2259, 1997 WL 382108 ............................................................................... 16, 17

*Commercial Union Ins. Co. v. Detyens Shipyard, Inc.,*
    147 F. Supp. 2d 413 (D.S.C. 2001) .......................................................................... 10, 11-12

*Continental Ins. Co. v. Garrison,*
    54 F. Supp. 2d 874 (E.D. Wis. 1999) .............................................................................. 13

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia),*
    952 F. Supp. 1046 (S.D.N.Y. 1997) .................................................................... 10, 11, 22

*Dreiling v. Maciuszek,*
    780 F. Supp. 535 (N.D. Ill. 1991) .................................................................................. 17

*Employers Insurance of Wausau v. Occidental Petroleum Corporation,*
    978 F.2d 1422 (5th Cir. 1992) .......................................................................... 11, 16, 22

*Felham Enters (Cayman) Ltd. v. Certain Underwriters at Lloyds, London Cos.,*
    No. Civ.A. 02-3588, 2005 WL 167585 (E.D. La. Jan. 24, 2005) ............................................ 13

*Fields v. Western Millers Mut. Fire Ins. Co.,*
    290 N.Y. 209, 48 N.E.2d 489 (N.Y. 1943) ...................................................................... 12

*Florida Marine Towing, Inc. v. United Nat'l Ins. Co.,*
    686 So. 2d 711 (Fla. Dist. Ct. App. 1997) ........................................................................ 12

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,*
    891 F.2d 414 (2d Cir. 1989) .......................................................................................... 9

*Hygrade Operations, Inc. v. Clifford,*
    2000 A.M.C. 1732 (S.D.N.Y. 2000) ............................................................................... 23

*Independent Bulk Transport, Inc. v. The MORANIA ABACO,*
    676 F.2d 23 (2d Cir. 1982) ...................................................................................... 23-24

*Ingersoll-Rand Financial Corp. v. Employers Insurance of Wausau,*
    771 F.2d 910 (5th Cir. 1985) ............................................................................ 14, 15, 20

*International Ore & Fertilizer Corp. v. SGS Control Servs., Inc.,*
    828 F. Supp. 1098 (S.D.N.Y. 1993) ............................................................................... 24

*Jackson v. Corporategear, LLC*, No. 04-Civ-10132,
   2005 WL 3527148 (S.D.N.Y. Dec. 21, 2005) .......................................................... 8

*Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*,
   795 F.2d 940 (11th Cir. 1986) .......................................................... 11

*Knight v. U.S. Fire Ins. Co.*,
   804 F.2d 9 (2d Cir. 1986)........................................................ 13, 17, 18

*L&L Marine Service, Inc. v. Insurance Co. of N. America*,
   796 F.2d 1032 (8th Cir. 1986) .......................................................... 11

*La Reunion Francaise S.A. v. Barnes*,
   247 F.3d 1022 (9th Cir. 2001) .......................................................... 10

*LaSalle Nat'l Bank v. FEMA*, No. 84-C-9066,
   1985 WL 2081 (N.D. Ill. July 26, 1985)........................................................ 15-16

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)........................................................ 6

*McAllister Lighterage Line, Inc. v. Insurance Co. of N. America*,
   244 F.2d 867 (2d Cir. 1957)........................................................ 12, 13

*Myers v. Fidelity & Cas. Co. of New York*,
   759 F.2d 1542 (11th Cir. 1985) .......................................................... 16, 21

*National Communications Ass'n v. American Tel. & Tel. Co.*,
   No. 93 CIV. 3707, 2001 WL 99856 (S.D.N.Y. Feb. 5, 2001).................................................. 23

*Neubros Corp. v. Northwestern Nat'l Ins. Co.*,
   359 F. Supp. 310 (E.D.N.Y. 1972) .......................................................... 12

*New York & P.R.S.S. Co. v. Aetna Ins. Co.*,
   204 F. 255 (2d Cir. 1913)........................................................ 13

*Paddington Partners v. Bouchard*,
   34 F.3d 1132 (2d Cir. 1994)........................................................ 9

*Physicians Comm. For Responsible Med. v. Horinko*,
   285 F. Supp. 2d 430 (S.D.N.Y. 2003)........................................................ 8

*Puritan Ins. Co. v. Eagle S.S. Co., S.A.*,
   779 F.2d 866 (2d. Cir. 1985)........................................................ 11, 18

*Reliance Nat'l Ins. Co. (Europe) Ltd. v. Hanover,*
  246 F. Supp. 2d 126 (D. Mass 2003) ........................................................................ 22

*Ressler v. White,* 968 F.2d 1478 (2d Cir. 1992) .............................................................. 12-13

*Robinson v. Transworld Airlines, Inc.,*
  947 F.2d 40 (2d Cir. 1991) .......................................................................................... 8

*Rocco v. Continental Ins. Co.,*
  2003 A.M.C. 1237 (Conn. Super. Ct. 2003) ............................................................... 11

*Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,*
  242 F.2d 385 (5th Cir. 1957) ...................................................................................... 11

*Sereika v. Patel,*
  411 F. Supp. 2d 397 (S.D.N.Y. 2006) .......................................................................... 8

*Sirius Ins. Co. (UK) Ltd. v. Collins,*
  16 F.3d 34 (2d Cir. 1994) ............................................................................................ 9

*Skandinaviska Enskilda Banken v. Rathaus,*
  624 F. Supp. 207 (S.D.N.Y. 1985) .............................................................................. 9

*Sun Mutual Insurance Co. v. Ocean Insurance Co.,*
  107 U.S. 485, 1 S. Ct. 582, 27 L. Ed. 337 (1883) ..................................................... 10-11

*The Caledonia,*
  157 U.S. 124, 15 S. Ct. 537, 39 L. Ed. 644 (1895) ..................................................... 22

*Thomas v. NASL Corp.,* No. 99-Civ-11901,
  2000 WL 1725011 (S.D.N.Y. Nov. 20, 2000) ........................................... 11, 14, 15, 16

*Transamerica Leasing, Inc. v. Institute of London Underwriters,*
  267 F.3d 1303 (11th Cir. 2001) .................................................................................. 13

*Transatlantic Marine Claims Agency, Inc. v. M/V OOCL INSPIRATION,*
  137 F.3d 94 (2d Cir. 1998) .......................................................................................... 24

*Trebor Sportswear Co. v. The Limited Stores, Inc.,*
  865 F.2d 506 (2d Cir. 1989) ........................................................................................ 8

*United States v. Commercial Union Insurance Companies,*
  821 F.2d 164 (2d Cir. 1987) ........................................................................................ 15

*United States v. Diebold, Inc.,*
  369 U.S. 654, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) ................................................... 6

*Washington Int'l Ins. Co. v. Mellone,*
    773 F. Supp. 189 (C.D. Cal. 1990) ................................................................ 17

*Wells Fargo Bank Int'l Corp. v. London S.S. Owners' Mut. Ins. Ass'n,*
    408 F. Supp. 626 (S.D.N.Y. 1976) ........................................................... 10, 15

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.,*
    348 U.S. 310, 75 S. Ct. 368, 99 L. Ed. 337 (1955) ...................................... 10

*Wometco Home Theatre, Inc. v. Lumbermens Mut. Cas. Co.,*
    97 A.D.2d 715, 468 N.Y.S.2d 625 (N.Y. App. Div. 1st Dept. 1983) ..................... 12

*Zurich Ins. Co. v. Wheeler,*
    838 F.2d 338 (9th Cir. 1988) ................................................................ 15, 19

## **STATUTES**

28 U.S.C.A. § 1961 (West Supp. 2006) .............................................................. 24

Fed. R. Civ. P. 56 .............................................................................. 6, 8, 9

N.Y. C.P.L.R. § 5004 (McKinney 1992) ............................................................. 23

## **OTHER SOURCES**

Restatement (Second) of Contracts § 350 .............................................................. 23

I Alex L. Parks, *The Law and Practice of Marine Insurance and Average* (1987) ....................... 20

## PRELIMINARY STATEMENT

In the early morning hours of February 6, 2006, while on a voyage from Fort Lauderdale, Florida to St. Maartin, the Netherlands Antilles, the Motor Yacht PRINCESS GIGI capsized, resulting in a total loss. Plaintiff Federal Insurance Company seeks a declaratory judgment that it is not liable under a marine insurance policy covering the Motor Yacht PRINCESS GIGI. (Ex. 1.) Defendant KeyBank National Association counterclaims for $5,812,574.76 as both the loss payee under the breach of warranty clause and an additional assured under the policy.[1] (Ex. 20.)

KeyBank has moved for partial summary judgment dismissing Federal's Amended Complaint and granting judgment to it as the loss payee. The motion is silent on KeyBank's claim that it is an additional assured under the policy. Federal submits this memorandum of law in opposition to KeyBank's motion for partial summary judgment.

## STATEMENT OF FACTS

The yacht, previously known as FULL BLOOM, was custom built by Trident Shipworks in Tampa, Florida and owned by Sea Quest International, Ltd. (Ex. 8 at p.3.) In 2005, Sea Quest sought to sell the yacht for $9,499,000. (Ex. 28.)

Ashkenazy entered into a Purchase Agreement on November 15, 2005 to buy the yacht for $7,800,000. (Ex. 7 ¶ 2.) The agreement was subject to a "sea trial, survey and inventory inspection satisfactory to" Ashkenazy. (*Id.* ¶ 4.) In connection with the purchase, Ashkenazy sought financing from KeyBank. As a condition of a loan, KeyBank required him to provide a survey of the yacht. (Ramos Decl. ¶ 6; Boosinger Decl. ¶ 4.)

---

[1] Co-defendants PGG Realty, LLC and Ben Ashkenazy counterclaim for $7,023,000 plus punitive damages of $20,000,000. (Ex. 27.) The claims of PGG and Ashkenazy are the subject of a separate motion for summary judgment.

In late November, Ashkenazy approached William E. Kelly Agency, Inc. about insuring the yacht. (Ex. 13 p.56-57.) In response, Kelly sought quotes from multiple insurance companies, including ACE. (Ex. 13 p.70-71.) Also, on November 28, 2005 Kelly sent a Megayacht Worksheet to the Personal Lines Yacht Unit of Chubb & Son, a division of Federal Insurance Company, seeking a quotation. (Ex. 14.) On November 30, Chubb issued a quote on behalf of Federal to insure the yacht. (Ex. 15.) On December 7, KeyBank approached Kelly directly seeking to be included as an additional assured and loss payee on the insurance and advising that the policy had to include a breach of warranty endorsement for a minimum amount of $5,850,000. (Ex. 29.)

Ashkenazy had a condition and valuation survey performed by Patton Marine, Inc. (Ex. 8.) The vessel was surveyed at a dock on November 21 and 22, 2005. A sea trial was held on Biscayne Bay on November 23, 2005. The yacht was hauled out of the water and inspected on December 1, 2005. (Ex. 8 at p.1.) On or about December 7, 2005, Patton issued a 32 page survey report which reported, *inter alia*, that PRINCESS GIGI:

> is a good yacht with good gear and equipment. *Once her few safety and asterisked "RECOMMENDATIONS" have been complied with*, and structural modification and stability documentation presented, *she should be considered a good marine risk* for the East Coast of the United States, coastwise waters and inland waters, the Gulf Coast of Mexico, U.S. waters coastwise and inland waterways, and the Bahamas *in fair weather cruising.* Any extended limits and extensions would have to be set by an arrangement with the underwriters.

(Ex. 8 at p.31 (emphasis added.)) Patton also issued 15 pages of Recommendations (Ex. 9) as "an integral part of the report" (Ex. 8 p.1). The Recommendations included, *inter alia*:

**GENERAL**

> 1.      The yacht has been modified before final acceptance and delivery approximately four years ago, owing to vessel trim problems.... It is recommended that the original naval architects or engineers on this project be

2

contacted, if possible, and calculations and drawings be presented verifying the structural integrity, and enhancements for new ballast loads on the structure.

\* \* \*

3.    [T]here are three watertight bulkheads on the yacht.  All watertight bulkheads (forepeak, forward and aft engine room) have been compromised by plumbing penetrations and unfilled cut-throughs.   Verify a proper seal at all penetrations on both sides of the bulkheads.

\* \* \*

**SAFETY EQUIPMENT**

\* \* \*

6.    Engine room found with three (3) VDC submersible bilge pumps in aft compartments.  These must be activated manually.  Install automatic float activations switched to these pumps and increase their capacity.

\* \* \*

**HULL**

1.    The lateral stiffener forward of the starboard anchor pocket appears to have been crooked and repaired over.  In general, lamination and fairing on this side is bowed out more substantially than port side, and is not symmetrical.  Work is poorly done….

\* \* \*

3.    PVC pipe is protruding into water tight forepeak bulkhead at eye level, and may be bilge drain plumbing from bow thruster compartment.  Identify pipe and route down directly to the chain bin.  Seal penetration at bulkhead.

\* \* \*

6.    There is evidence of water above the overhead panels port side aft deck.  Investigate source of water intrusion, correct as necessary, clean overhead panel and monitor.

(Ex. 9 at p.1-4.)

The Patton Report and Recommendations were forwarded to KeyBank's Fort Lauderdale Luxury Yacht Lending Office on December 7, 2005.  (Ramos Decl. ¶ 7.)  On the same day, the Report and Recommendations were forwarded to KeyBank's Recreational Lending Office in Cleveland (*id.* ¶ 8; Boosinger Decl. ¶ 10), who had the final authority on whether to approve the loan (Ramos Decl. ¶ 4).

In the meantime, Ashkenazy used the survey report to negotiate a substantial reduction in the $7,800,000 purchase price as reflected in the Acceptance of Vessel and the Amendment to that document.  (Ex. 10.)  Ashkenazy agreed to purchase the yacht for the reduced price of

3

$7,535,400, with the seller remaining responsible to comply at its own expense with a large number of the Patton Recommendations within ninety days of the closing. (*Id.* ¶ 3.) Attached to the Acceptance Agreement was an annotated copy of the Recommendations identifying which items remained the responsibility of the seller after the closing. The Acceptance Agreement and Amendment (without the annotated Recommendations) were provided to KeyBank prior to the closing (Ramos Decl. ¶ 3), but KeyBank did not forward these documents to Kelly or Federal.

The closing on the purchase of the yacht took place on December 13, 2005 with Ashkenazy arranging for title to the yacht to be transferred to PGG, a limited liability company wholly owned by him. The Marine Note and Security Agreement with Disclosure Statement executed by Ashkenazy on behalf of PGG (Ex. 12) provided, *inter alia*, that PGG:

> shall, at its own expense, maintain the Vessel at all times in good condition, working order and repair, in all respects seaworthy, and shall comply with all material recommendations of marine surveyors and make all proper renewals and replacements. Without limiting the foregoing, [PGG] shall be obligated to correct, within one hundred twenty (120) days after the disbursement of the Loan, all of the Safety Equipment items except 3, 6, 10, 15 and 18 survey items listed in the "Finding and Recommendations" list appended to and made a part of the survey report presented to [KeyBank] by Patton Marine, Inc. with respect to the Vessel.

(*Id.* ¶ 34.) The Marine Note further provided that PGG would be in default if it:

> fails, within ten (10) days after notice from [Key Bank] (or such longer period not to exceed one hundred twenty (120) days if the nature of the cure is such that it cannot be done in ten (10) days) properly to maintain and repair the Vessel as required herein, including, without limitation, the timely correction of asterisked survey items referred to in Clause 34....

(*Id.* ¶ 42(c).) KeyBank never provided any of the loan documents or a copy of the Patton Survey and Recommendations with "asterisked survey items" to Federal.

On or before December 12, Federal bound the coverage and authorized Kelly to sign and forward a binder, valid for sixty days, for insurance on the yacht commencing at 12:01 a.m. on

December 13, 2005. The binder identified KeyBank as the loss payee and an additional assured and included breach of warranty coverage. (Ex. 16.)

After the close of business on December 12, 2005, Kelly received an e-mail forwarding the Patton Survey and Recommendations. (Ex. 13 at p.246; Ex. 30.) However, it never received either the annotated version of the report attached to the Acceptance Agreement or the version with "asterisked survey items" referred to in the Marine Note. Kelly never forwarded the Patton Survey and Recommendations to Federal. (Ex. 13 at p.136.)

On January 4, 2006, Kelly forwarded a copy of the insurance policy issued by Federal to Ashkenazy insuring the yacht for one year commencing on December 13, 2005 at 12:01 a.m. (Ex. 19.) Although the policy identified KeyBank as the loss payee and contained a Breach of Warranty endorsement, it did not identify KeyBank as an additional assured.

On February 4, 2006, PRINCESS GIGI sailed from Fort Lauderdale, Florida to St. Maartin in the Netherlands Antilles with eight persons on board. (Ex. 21 at p.35.) The yacht was sailing in 8 foot following seas with winds of 15 to 20 knots. (*Id.* at p.28 & 51.) At approximately 8:30 p.m. on February 5, a crew member discovered seawater in the port bilge area of the engine room. (Ex. 1 ¶ 41.) In the early morning hours of February 6, after the yacht, without any power, had taken on significantly more water and was listing perilously to port, the U.S. Coast Guard convinced the captain to abandon the yacht at a position approximately 135 to 145 miles south of Eleuthera and San Salvador islands. (Ex. 21 at p.36 & 82.) Thanks to the actions of the Coast Guard in effecting a helicopter rescue, no loss of life occurred when the yacht capsized shortly after the crew abandoned the yacht. (*Id.* at p.84-86.)

## LEGAL ARGUMENT

### POINT I

### KEYBANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED DUE TO THE EXISTENCE OF NUMEROUS GENUINE ISSUES OF MATERIAL FACT

Summary judgment is only granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there are no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 91 L. Ed. 2d 265 (1986).  "This is a heavy burden, and it cannot be met with equivocal evidence." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997).  In determining whether the moving party has met its burden, a court must resolve all ambiguities, and draw all reasonable inferences, in favor of the nonmoving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962); *CIAS, Inc. v. Alliance Gaming Corp.*, 424 F. Supp. 2d 678, 682 (S.D.N.Y. 2006).  KeyBank's motion for summary judgment should be denied because there are numerous issues of disputed material facts, including, but not limited to:

- what did the defendants know about the prior history of the yacht
- what caused the yacht to capsize
- whether the capsizing was caused by a fortuitous event
- whether the capsizing of the yacht was caused by the defective, deteriorated and decayed condition of the yacht or from ordinary wear and tear
- whether any of Patton's Recommendations were "asterisked" as indicated in the Marine Note
- whether any of Patton's Recommendations were "starred" to indicate that they should be taken care of for safe operation and/or insurability
- what, if anything, was done by defendants to comply with the Patton Recommendations before the attachment of the policy

6

- what, if anything, was done by defendants to comply with the Patton Recommendations before the commencement of the last voyage of PRINCESS GIGI
- whether the yacht was unseaworthy at the time the Federal policy attached
- whether KeyBank had knowledge of the unseaworthy condition of the yacht at the time the Federal policy attached
- whether the yacht was unseaworthy before the commencement of the last voyage of PRINCESS GIGI
- whether defendants had knowledge of the unseaworthy condition of the yacht at the commencement of her last voyage
- whether the yacht capsized in normal expected conditions, thereby giving rise to a presumption of unseaworthiness
- whether Kelly is an agent or an independent contractor of Federal for purposes of imputing knowledge
- whether a fiduciary relationship exists between Federal and Kelly
- whether Federal exercised any physical control over Kelly
- whether Federal bound coverage for the yacht prior to Kelly receiving the Patton Survey Report and Recommendations

KeyBank's motion for partial summary judgment must be denied.

## POINT II

## THE MOTION FOR PARTIAL SUMMARY
## JUDGMENT IS PREMATURE

KeyBank's motion for partial summary judgment is premature. To date, the parties have only exchanged Rule 26 disclosures and served requests for production and interrogatories on each other. (Rittweger Rule 56(f) Aff. ¶ 3.) On July 19, KeyBank answered the interrogatories addressed to it and produced some documents in response to Federal's requests. PGG/Ashkenazy have yet to answer interrogatories and produce documents. (*Id.* ¶ 4.) The only deposition conducted to date was of the non-party Kelly, although the parties have agreed to a schedule to conduct depositions of thirteen (13) party and non-party witnesses between July 31 and September 7, 2006. (*Id.* ¶ 5.) Although Federal maintains that KeyBank is not entitled to partial summary judgment because of the material fact issues in dispute (*see* Point I above), Federal also contends that KeyBank's motion is premature.

Before granting summary judgment, "[t]he nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, 106 S. Ct. 2505, 2511 n.5, 91 L. Ed. 2d 202 (1986)). "The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment." *Id.*

Rule 56(f) "requires that [the nonmoving party] be afforded an opportunity to utilize the discovery devices provided by the Federal Rules of Civil Procedure." *Berne Street Enters. v. American Export Isbrandtsen Co.*, 289 F. Supp. 195, 197 (S.D.N.Y. 1968). The rule exists to protect the non-moving party from premature motions for summary judgment. It allows the non-moving party to obtain the facts, documents, and testimony necessary to oppose the motion, particularly when a motion for summary judgment is made before substantial discovery has been conducted, and when facts necessary to oppose the motion are in the possession of the moving party. *See Robinson v. Transworld Airlines, Inc.*, 947 F.2d 40, 43 (2d Cir. 1991)(reversed granting of summary judgment where opposing party had not had an opportunity to conduct discovery); *Sereika v. Patel*, 411 F. Supp. 2d 397, 405 (S.D.N.Y. 2006)(summary judgment premature where plaintiff had not had an adequate opportunity to conduct discovery); *Jackson v. Corporategear, LLC*, No. 04-Civ-10132, 2005 WL 3527148, at *6 (S.D.N.Y. Dec. 21, 2005)(summary judgment premature where parties had not had a "full opportunity for discovery"); *Physicians Comm. For Responsible Med. v. Horinko*, 285 F. Supp. 2d 430, 442 (S.D.N.Y. 2003)(opposing party should have an opportunity to compile and present the facts needed to oppose the motion and "the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion" (internal quotation marks));

*Skandinaviska Enskilda Banken v. Rathaus*, 624 F. Supp. 207, 209 (S.D.N.Y. 1985)(parties should be "given a reasonable opportunity to make their record complete" before the court rules on a motion for summary judgment"); *Berne Street Enter.*, 289 F. Supp. at 196-97 (summary judgment denied pursuant to Rule 56(f) because no discovery had been conducted, non-moving party averred that it could not present "specific facts" in admissible form to oppose motion, and allegedly material facts in possession of moving party).

Summary judgment should be denied where the opposing party "cannot for reasons stated present by affidavit facts essential to justify the party's opposition . . . ." Fed. R. Civ. P. 56(f). To defeat summary judgment pursuant to Rule 56(f), the opposing party must describe: (1) the information sought in discovery and how it will be obtained; (2) how that information is reasonably expected to raise a genuine issue of material fact; (3) the efforts to date to obtain the information; and (4) why those efforts have been unsuccessful. *See Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 926 (2d Cir. 1985); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994); *see also Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 706 (S.D.N.Y. 1996).   The Rule 56(f) declaration of Thomas M. Rittweger, Esq. filed herewith sets forth the facts required to meet that standard.

### POINT III

### FEDERAL MARITIME LAW GOVERNS THIS
### MARINE INSURANCE COVERAGE DISPUTE

Disputes under marine insurance contracts are within the admiralty and maritime jurisdiction of the federal courts. *See Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994); *Acadia Ins. Co. v. McNeil*, 116 F.3d 599 (1st Cir. 1997), *certified question answered by* 711 A.2d 873 (N.H. 1998), *answer to certified question conformed to* 144 F.3d 881 (1st Cir.

1998); *La Reunion Francaise S.A. v. Barnes*, 247 F.3d 1022 (9th Cir. 2001); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1067 (S.D.N.Y. 1997), *aff'd*, 134 F.3d 103 (2d Cir. 1998); *Wells Fargo Bank Int'l Corp. v. London S.S. Owners' Mut. Ins. Ass'n*, 408 F. Supp. 626, 628 (S.D.N.Y. 1976).

Marine insurance contracts are governed and controlled by the general federal maritime law of the United States. *See Advani Enters. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998); *Commercial Union Ins. Co. v. Detyens Shipyard, Inc.*, 147 F. Supp. 2d 413, 420 (D.S.C. 2001)("[F]ederal maritime law will govern the construction and interpretation of the policy on those issues where a judicially established federal maritime rule exists."). Only, in the absence of a well-established federal admiralty rule ***and*** a determination by the court that a new rule should not be fabricated, is state law applied to construe a marine insurance policy. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314, 75 S. Ct. 368, 370, 99 L. Ed. 337 (1955).

At least for purposes of the present motion for partial summary judgment, Federal and KeyBank agree that if state law is applicable, the law of New York should be applied. (KeyBank's Mem. at p.10 n.6.)

There are certain duties and obligations of an insured that are unique to marine insurance. These include, *inter alia*, the doctrine of *uberrimae fidei* (utmost good faith), the absolute implied warranty of seaworthiness, and the negative implied warranty of seaworthiness.

Contracts of marine insurance are governed by the doctrine of *uberrimae fidei*, or utmost good faith, which imposes upon an insured a strict obligation to reveal fully and truthfully all circumstances within its knowledge which may influence the terms of the risk. In *Sun Mutual*

*Insurance Co. v. Ocean Insurance Co.*, 107 U.S. 485, 510-511, 1 S. Ct. 582, 600, 27 L. Ed. 337

(1883), the United States Supreme Court defined the doctrine of *uberrimae fidei*, stating:

> It is the duty of the assured to place the underwriter in the same situation as
> himself; to give him the same means and opportunity of judging of the value of
> the risks; and when any circumstance is withheld, however slight and immaterial
> it may have seemed to himself, that, if disclosed, would probably have influenced
> the terms of the insurance, the concealment vitiates the policy.

The doctrine of utmost good faith (*uberrimae fidei*) has been fully embraced by the

Second Circuit. *See Puritan Ins. Co. v. Eagle S.S. Co., S.A.*, 779 F.2d 866, 870 (2d. Cir. 1985).

Accordingly, the well established federal maritime doctrine of utmost good faith governs this

action to the exclusion of any inconsistent state law.[2]  *See Thomas v. NASL Corp.*, No. 99-Civ-

11901, 2000 WL 1725011, at *4 (S.D.N.Y. Nov. 20, 2000)("Because this case falls within this

Court's federal admiralty jurisdiction, this Court must apply federal admiralty law to an issue if

there is a federal admiralty rule relevant to resolving that issue. . . . The doctrine of utmost good

faith is in fact a well established federal admiralty rule that governs the formation of marine

insurance contracts and must be applied in this case."); *see also Rocco v. Continental Ins. Co.*,

2003 A.M.C. 1237, 1244-47 (Conn. Super. Ct. 2003).

Similarly, there are two implied warranties of seaworthiness incorporated into the policy.

As the court noted in *Continental Insurance Co.*, "under federal admiralty law, there are two

separate warranties of seaworthiness implied in time hull insurance contracts — the absolute

implied warranty of seaworthiness and the negative implied warranty."[3]  952 F. Supp. at 1067

---

[2]  In fact, New York state law also applies the doctrine of utmost good faith to marine insurance
contracts. *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 81 (2d Cir. 1996).

[3]  Numerous federal circuit and district courts are in accord. *See Employers Ins. of Wausau v.
Occidental Petroleum Corp.*, 978 F.2d 1422, 1431-32 (5th Cir. 1992); *Saskatchewan Gov't Ins.
Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957); *L&L Marine Service, Inc. v.
Insurance Co. of N. America*, 796 F.2d 1032, 1035 (8th Cir. 1986); *Kilpatrick Marine Piling v.
Fireman's Fund Ins. Co.*, 795 F.2d 940, 945 (11th Cir. 1986); *Commercial Union Ins. Co.*,

(internal footnote omitted). The absolute implied warranty of seaworthiness applies at the moment the time hull policy comes into effect and is not dependent on the knowledge of the insured. *See id.* at 1068. If the vessel is in fact not seaworthy at the inception of the policy, the warranty is breached and the insurer is discharged. *See id.* Under the negative implied warranty of seaworthiness, the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. *See id.* at 1070. The underwriter is not liable for any losses resulting from a known unseaworthy condition. *See id.*

## POINT IV

### AS A LOSS PAYEE, KEYBANK CAN ONLY RECOVER TO THE EXTENT PGG/ASHKENAZY CAN RECOVER

KeyBank is the "Loss Payee" under the Policy. (Ex. 19.) A loss payee is not an insured under the policy, but merely the person designated to receive the insurance proceeds following an insured loss. *See Aetna Ins. Co. v. Houston Oil & Transp. Co.*, 49 F.2d 121, 124-25 (5th Cir. 1931); *see also Fields v. Western Millers Mut. Fire Ins. Co.*, 290 N.Y. 209, 212-13, 48 N.E.2d 489, 490-91 (N.Y. 1943); *Wometco Home Theatre, Inc. v. Lumbermens Mut. Cas. Co.*, 97 A.D.2d 715, 716, 468 N.Y.S.2d 625, 626 (N.Y. App. Div. 1st Dept. 1983), *aff'd*, 62 N.Y.2d 614, 464 N.E.2d 484, 476 N.Y.S.2d 116 (N.Y. 1984). "If a mortgagee is simply a loss payee on the insurance policy, then the mortgagee's right of recovery would be no greater than the right of the mortgagor." *Florida Marine Towing, Inc. v. United Nat'l Ins. Co.*, 686 So. 2d 711, 714 (Fla. Dist. Ct. App. 1997)(citing I Alex L. Parks, *The Law and Practice of Marine Insurance and Average* 199 (1987)); *see also Ressler v. White*, 968 F.2d 1478, 1479-80

---

147 F. Supp. 2d at 422 n.10 (D.S.C. 2001); *Certain Underwriters at Lloyd's, London v. Johnston*, 124 F. Supp. 2d 763, 771-72 (D.P.R. 1999); *see also McAllister Lighterage Line, Inc. v. Insurance Co. of N. America*, 244 F.2d 867, 870 (2d Cir. 1957)(recognizing that under a term policy, a warranty of seaworthiness arises at the time the insurance becomes effective); *Neubros Corp. v. Northwestern Nat'l Ins. Co.*, 359 F. Supp. 310, 315-16 (E.D.N.Y. 1972).

(2d Cir. 1992)(collecting New York cases); *Continental Ins. Co. v. Garrison*, 54 F. Supp. 2d 874, 883 (E.D. Wis. 1999). "[A] loss payee can only recover to the extent the named insured can recover." *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 267 F.3d 1303, 1307-09 (11th Cir. 2001); *see also Felham Enters (Cayman) Ltd. v. Certain Underwriters at Lloyds, London Cos.*, No. Civ.A. 02-3588, 2005 WL 167585, at *1 (E.D. La. Jan. 24, 2005).

Thus, KeyBank's claim as a loss payee is wholly dependent upon PGG/Ashkenazy's right to coverage. *See, e.g., Transamerica Leasing, Inc.*, 267 F.3d at 1309 (holding that loss payee's coverage depended on the jury's decision whether the named insured's failure to disclose material facts negated coverage). Of course, an insured's breach of the implied absolute warranty of seaworthiness negates coverage. *See McAllister Lighterage Line v. Insurance Co. of N. America*, 244 F.2d 867, 870-71 (2d Cir. 1957); *New York & P.R.S.S. Co. v. Aetna Ins. Co.*, 204 F. 255, 258 (2d Cir. 1913). Similarly, the doctrine of *uberrimae fidei* applies to contracts of marine insurance and the insured's breach of its duty of utmost good faith voids the insurance contract. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986). As more fully set forth in Federal's Memorandum of Law in Opposition to PGG's Motion for Summary Judgment, genuine issues of material fact exist concerning whether, *inter alia*, PGG/Ashkenazy breached the absolute warranty of seaworthiness and the negative implied warranty of seaworthiness, as well as its duty of utmost good faith. KeyBank is not entitled to partial summary judgment as a mere loss payee.

## POINT V

## KEYBANK CANNOT RECOVER UNDER THE
## BREACH OF WARRANTY ENDORSEMENT

The Breach of Warranty endorsement provides in pertinent part:

> Regarding the interest of the Loss Payee . . ., this insurance will not be invalidated by any act or negligence or breach of warranty by you or the owner of the yacht. *However, we will not pay the Loss Payee if your act, negligence or breach of warranty occurred with the consent or knowledge of the Loss Payee.*

(Ex. 19 (emphasis added.)) KeyBank correctly notes that the Breach of Warranty endorsement creates a separate contract between itself and Federal. *See Thomas*, 2000 WL 1725011, at *9-10 (mortgagee endorsement created a separate contract for the lenders). As KeyBank concedes, however, the Breach of Warranty endorsement does not extend unfettered coverage to itself. (KeyBank's Mem. at p.12.) The extension of coverage does not relieve KeyBank of its core obligations under the Policy, and it does not apply if KeyBank knew or consented to PGG/Ashkenazy's breach.

KeyBank's argument that it has no obligations under the Breach of Warranty endorsement is based entirely on its contention that the Breach of Warranty endorsement is the "marine version" of the standard mortgage clause used in land-based risks. KeyBank asserts that *Ingersoll-Rand Financial Corp. v. Employers Insurance of Wausau*, 771 F.2d 910, 913 (5th Cir. 1985), supports its contention that the endorsement to Federal's yacht policy is the same as land-based mortgagee clauses. The clause in *Ingersoll-Rand* admitted the seaworthiness of the vessel and provided:

> [T]he interest of the mortgagee shall not be impaired or invalidated by any act of or omission or neglect of the mortgagor, owner, master, agent, crew, of the vessel(s) insured by this Policy or by any failure to comply with any warranty or condition over which the mortgagee had no control or over which the mortgagee could, but has not exercised such control, or by any change in the title, ownership, or management of such vessel(s).

*Id.* Even if the clause in *Ingersoll-Rand* is the "standard" land-based risk mortgage clause, it is not the same as Federal's Breach of Warranty endorsement in the Policy. In *Thomas*, 2000 WL 1725011, the court did not hold that the endorsements at issue were standard mortgage clauses. In fact, the clause differed significantly from the clause in *Ingersoll-Rand*.[4] Even if the clause in *Thomas* was similar to the land-based risk mortgage clauses, it does not follow, as KeyBank contends, that the Breach of Warranty endorsement in Federal's Policy has the trappings of the land-based mortgagee clauses so that only the mortgagee's actual knowledge of the insured's breach of warranties negates coverage. (KeyBank's Mem. at p.12-13.) KeyBank's reliance upon state court decisions involving other lines of insurance are "irrelevant to marine insurance which has its own special history and is to a large extent still guided by British precedent and practice." *Zurich Ins. Co. v. Wheeler*, 838 F.2d 338, 341 (9th Cir. 1988).

Although the Breach of Warranty endorsement creates an additional contract between KeyBank and Federal, KeyBank is still bound by all the terms, conditions, and warranties contained in the Policy.[5] In *Wells Fargo Bank Int'l Corp. v. London Steam-Ship Owners' Mut. Ins. Ass'n*, 408 F. Supp. 626, 630 n.9 (S.D.N.Y. 1976), the court stated:

---

[4] The endorsements provided:

> This insurance, as to the interest of the financier shall not be impaired nor invalidated by any act or neglect of the named insured nor by failure to comply with warranty or condition over which the Financier has no control and this policy shall not be canceled nor materially changed as to the interest of the Financier unless ten (10) days written notice of such change or cancellation shall have been given to the Financier except with respect to war, strikes, riots and civil commotions which are subject to cancellation upon forty eight (48) hours notice.

*Thomas*, 2000 WL 1725011, at *2.

[5] Even in the case cited by KeyBank, *United States v. Commercial Union Insurance Companies*, 821 F.2d 164, 166 (2d Cir. 1987), which involved a personal property policy, the Second Circuit noted that a mortgagee still owed duties to the insurer and the mortgagee's breach of those duties would negate coverage. *See id.* (quoting in citation *Wholesale Sports Warehouse Co. v. Pekin Ins. Co.*, 587 F. Supp. 916, 920 (S.D. Iowa 1984)); *see also LaSalle Nat'l Bank v. FEMA*,

Even if plaintiff's interest arose under a so-called 'standard' mortgagee clause . . . plaintiff would still be bound by such conditions in the contract, whether or not literally confined to 'the insured,' as are not inconsistent with its status as mortgagee.  All that a standard mortgagee clause accomplishes for a mortgagee is to preserve its interests despite defaults by the insured.  It does not relieve the mortgagee from the responsibility of complying with the conditions in the contract.

The doctrine of *uberrimae fidei* is a part of every marine insurance policy.  Thus it has been held that:  "A marine mortgagee is not exempt from the disclosure requirements set forth under *uberrimae fidei*, and maritime law imposes a duty upon a mortgagee to inform a marine insurer of all facts known to it which are adverse to the risk insured against in the policy." *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, No. CV-93-2259, 1997 WL 382108, at *6 (C.D.Cal. Feb. 20, 1997), *aff'd*, 159 F.3d 412 (9th Cir. 1998).  *Cf. Myers v. Fidelity & Cas. Co. of New York*, 759 F.2d 1542, 1547 (11th Cir. 1985)("there are facts and circumstances which would create a duty upon a mortgagee to inform an insurance company of facts known to it which are adverse to the risk insured against in the policy"); *Employers Insurance of Wausau v. Occidental Petroleum Corporation*, 978 F.2d 1422, 1440 (5th Cir. 1992)("Separate Policy Clause 'requires *each assured* to comply with policy requirements 'as if a separate policy of insurance was issued' to that assured individually.'  Thus, under Occidental's hypothetical separate time hull policy, it would have been required . . . to independently comply with the absolute warranty of seaworthiness implied at the moment the policy attached.").

KeyBank contends, contrary to the established case law cited above, that it does not owe the duty of utmost good faith under the Breach of Warranty endorsement.  (KeyBank's Mem. at p.13-14.)  *Cf. Cigna Prop. & Cas. Ins. Co.*, 1997 WL 382108, at *6.  The sole case cited for KeyBank's novel theory is *Thomas*, 2000 WL 1725011.  Whether the mortgagee owed a duty of

No. 84-C-9066, 1985 WL 2081, at *4 (N.D. Ill. July 26, 1985)(interpreting flood insurance policies and stating mortgagee cannot recover if it breaches its contract with the insurer).

good faith was not even argued in that case. *See id.* at *7 ("The Complaint alleges wrongdoing

by the insured NASL in failing to disclose material facts relating to the risks insured, but it

makes no such allegations against the [mortgagee] Financiers."). The court stated that utmost

good faith applied to the party seeking insurance, *see id.* at *4, but did not state that it was

inapplicable to mortgagees. In fact, utmost good faith is owed not only by the party seeking

insurance, but by all insureds and, indeed, all of the parties to a marine insurance contract. *See*

*Knight*, 804 F.2d at 13; *Acadia Ins. Co. v. Allied Marine Tranp. LLC*, 151 F. Supp. 2d 107, 128

(D. Me. 2001)(stating "every insured is under an obligation of 'utmost good faith'"); *Cigna*

*Prop. & Cas. Ins. Co.*, 1997 WL 382108, at *6. In any case, KeyBank did approach Kelly

directly to see that its interests were insured, so it was one of the parties seeking insurance.

(Ex. 29.)

Furthermore, PGG was acting as KeyBank's agent in placing the insurance with

KeyBank named as the loss payee and obtaining Breach of Warranty coverage. "[B]rokers act as

the agents of the insured when seeking or placing insurance coverage, and failure on the part of

the broker to comply with the obligation to disclose all facts material to the risk is imputed to the

insured." *Certain Underwriters at Lloyd's v. Johnston*, 124 F. Supp. 2d 763 (D.P.R. 1999); *see*

*also Dreiling v. Maciuszek*, 780 F. Supp. 535 (N.D. Ill. 1991); *Washington Int'l Ins. Co. v.*

*Mellone*, 773 F. Supp. 189 (C.D. Cal. 1990).

KeyBank "acknowledges that it had possession of the Patton Survey report on

December 7, 2005." (KeyBank's Mem. at p. 16). Yet, it did not disclose the contents of the

Patton Survey Report and Recommendations to Federal before the binder was signed and

forwarded by Kelly on December 12, 2005.[6]  Furthermore, KeyBank did not disclose that the

seller had 90 days to correct many of the recommendations nor that PGG was granted 120 days

under the Marine Note to correct recommendations.

It cannot be denied that these non-disclosed facts were material.  Under admiralty law, a

fact is material if "it is 'something which would have controlled the underwriter's decision.'"

*Puritan Ins. Co.*, 779 F.2d at 871 (quoting *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir.

1931); *Knight*, 804 F.2d at 13 (same).  If KeyBank had disclosed the true facts as to the condition

of the yacht and that the yacht would be cruising while completion of the Recommendations was

deferred, the insurance coverage would have been limited to Port Risk only.  (Ex. 18 ¶ 12.)

Therefore, the separate contract of insurance in favor of KeyBank under the Breach of

Warranty endorsement is void because KeyBank breached its duty of utmost good faith.

KeyBank also contends that its separate and independent coverage under the Breach of

Warranty endorsement is excluded only if it had "actual" knowledge of PGG/Ashkenazy's

breaches of warranty.  (KeyBank's Mem. at p.12-13.)  However, the Breach of Warranty

endorsement does not state that only "actual" knowledge negates coverage.  KeyBank does not

rely on the actual language of the endorsement, but rather on the assertion that the Breach of

Warranty endorsement at issue is the "marine equivalent" of the standard mortgage clause.  (*Id.*)

However, no legal support is offered for the contention that in a marine policy, subject to the

doctrine of *uberrimae fidei*, the contractual term "knowledge" should be construed so narrowly

as to mean only actual knowledge.  KeyBank's reliance upon state court decisions involving

---

[6]  The defendants contend that the Patton Survey Report and Recommendations were sent to
Kelly before the binder was signed and fowarded.  Furthermore, they contend that notice to
Kelly constitutes notice to Federal.  Both of these arguments are discussed in detail in Federal's
Memorandum in Opposition to PGG/Ashkenazy's Motion for Partial Summary Judgment.

other lines of insurance are "irrelevant," *Zurich Insurance Co.*, 838 F.2d at 341, in light of the doctrine of *uberrimae fidei*.

In any event, it is undisputed that KeyBank had the Patton Survey Report and Recommendations, the Acceptance Agreement and Amendment and the Marine Note. KeyBank's only basis for arguing that this does not constitute actual knowledge of the condition of the yacht is that it did not understand the Survey Report.[7]  Taken to its logical extreme, KeyBank would be well served if it hired utterly incompetent workers to read (or not read) all of its marine survey reports.  According to KeyBank's legal construct, it could receive and review a survey report that stated in bold print "this vessel is unseaworthy," fail to provide that information to the insurer, and still collect under the insurance policy all because its employees were incompetent.  The law does not condone such intentional ignorance.  At a minimum, a mortgagee must be held to the standard of a reasonable man.  That is, what would a reasonable, competent marine lender know if he reviewed the Patton Survey Report and Recommendations? The answer is that he would have known that the yacht was unsuitable security.  (Ex. 31 ¶¶ 7 & 11.)

To be sure, the market has already addressed the fact that marine lenders may lack the degree of knowledge required to fully comprehend a marine survey report.  It is common to find in breach of warranty endorsements to marine policies that the seaworthiness of the vessel is admitted by the insurer as to the lender.  According to one of the leading marine insurance commentators:

> In the United States, breach of warranty endorsements [are] not uncommon in marine policies (particularly at the instance of the federal government), whereby underwriters agree that the interest of the mortgagee in the policy will not be

---

[7] If KeyBank  really had no idea how serious the Recommendations were, why did it insert manuscript provisions in the Marine Note for complying with Recommendations?

> impaired or invalidated by reason of any act or neglect of the mortgagor, owner, master, agent, or crew of the vessel insured, *admitting the seaworthiness of the vessel as between the underwriters and the mortgagee* and denying to underwriters the right to cancel the policy without prior written consent of the mortgagee. Such endorsements usually entail the payment of an additional premium.

I Alex L. Parks, *The Law and Practice of Marine Insurance and Average* 200 (1987). In fact, in the one case cited by KeyBank that refers to the (purported) "standard" mortgagee clause in a marine policy, the endorsement stated that "seaworthiness of the vessel was admitted." *Ingersoll-Rand*, 771 F.2d at 912-13. Unfortunately for KeyBank, the Breach of Warranty endorsement in the Federal Policy does not admit the seaworthiness of the vessel and, therefore, the implied absolute warranty of seaworthiness remains a requirement of KeyBank's coverage.

"Anyone in the marine industry, reading the entire Patton Marine Survey Report, with its 15 pages of Recommendations, noting 158 deficiencies, would reach the conclusion that this oceangoing mega-yacht is not safe or seaworthy." (Ex. 4 ¶ 35.) The absolute implied warranty of seaworthiness at the inception of the Policy was not waived in the separate contract under the Breach of Warranty endorsement. If the warranty was breached, the Policy is void.

Furthermore, KeyBank effectively consented to PGG's operation of the yacht in violation of the negative implied warranty of seaworthiness. Although KeyBank knew the information contained in the Patton Survey Report and Recommendations — information which would have alerted a reasonable marine lender to the unseaworthy condition of the yacht (Ex. 31 ¶¶ 7 & 11; Ex. 4 ¶ 35) — it consented to PGG operating PRINCESS GIGI without any cruising restrictions even though it knew that the seller had 90 days to correct many of the recommendations and PGG had 120 days to correct numerous safety recommendations. Thus KeyBank consented to PGG operating the yacht without exercising due diligence to make her seaworthy. Having

consented to PGG's breach of the negative implied warranty, KeyBank is not entitled to partial summary judgment.

**POINT VI**

**KEYBANK BREACHED ITS OBLIGATIONS
AS AN ADDITIONAL INSURED**

Completely ignored in KeyBank's motion is that, in addition to enjoying a separate and independent contract with Federal under the Breach of Warranty endorsement, it has also asserted counterclaims on the basis that it was an "Additional Insured." "'Upon being named as additional assured, the mortgagee assumes the same contractual obligations as that of the assured in that he too is responsible for premium payments and must comply with all terms, conditions, *and warranties* contained in the insuring agreement.'" *Myers*, 759 F.2d at 1546 (emphasis added)(quoting Harry M. Mack, *The Hull Policy: Additional Assured; Loss Payees; Waiver of Subrogation; The Mortgagee's Position; Premiums; Deductibles and Franchises*, 41 Tul. L. Rev. 381, 385 (1967)). As an additional insured seeking to avail itself of the benefits of the Policy, KeyBank is bound by the terms and conditions of the Policy, *see Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182, 187 (E.D.N.Y. 2006), including the duty of utmost good faith, absolute implied warranty of seaworthiness, the negative implied warranty, and the navigational limits warranty. *Cf Employers Insurance of Wausau*, 978 F.2d at 1440 (under Separate Policy Clause, each co-insured had to comply with the implied absolute warranty of seaworthiness).

If KeyBank is an additional insured, then it impliedly warranted the absolute seaworthiness of the yacht. KeyBank's knowledge, therefore, of PGG/Ashkenazy's breaches of warranty becomes irrelevant. So too is KeyBank's own knowledge of the seaworthiness of the vessel because the unseaworthiness of the vessel at the time the policy attached voids coverage

21

regardless of knowledge or fault. *See Employers Ins. of Wausau*, 978 F.2d at 1436; *Continental*, 952 F. Supp. at 1068; *The Caledonia*, 157 U.S. 124, 133-34, 15 S. Ct. 537, 541, 39 L. Ed. 644 (1895)(holding that if it if the vessel is unseaworthy at the time the policy attaches, there is no contract of insurance because the policy is wholly void); *Reliance Nat'l Ins. Co. (Europe) Ltd. v. Hanover*, 246 F. Supp. 2d 126, 136 (D. Mass 2003)("[A] finding of unseaworthiness is not dependant upon an owner's negligence or fault."). As fully set forth in Federal's Opposition to PGG/Ashkenazy's motion, there are genuine issues of material facts as to whether the yacht was unseaworthy at the inception of the Policy and, therefore, whether KeyBank breached the implied absolute warranty of seaworthiness and thereby voided its coverage.

Furthermore, KeyBank knew that the seller had 90 days to comply with many of the Patton Recommendations under the Acceptance Agreement and Amendment (Ex. 10 ¶ 3) and that PGG had 120 days to comply with Patton Recommendations under the Marine Note (Ex. 12 ¶ 34). Nonetheless, it allowed PGG to begin unrestricted cruising without requiring a certification that the problems noted in the Recommendations had been corrected. Thus, KeyBank breached the implied negative warranty of seaworthiness. If the capsizing was a result of a problem noted in an outstanding Recommendation, then Federal is not liable for the loss. *Continental Ins. Co.*, 952 F. Supp. at 1070.

## POINT VII

### KEYBANK IS NOT ENTITLED TO
### <u>PRE-JUDGMENT INTEREST AT 9%</u>

If KeyBank is ever entitled to a money judgment in this action, which is denied, it is not entitled to pre-judgment interest at 9%.

Admiralty courts traditionally award pre-judgment interest to compensate a party for the loss of use of the money. However, the Court may limit or deny pre-judgment interest "when

there are 'peculiar' or 'exceptional' circumstances present which would make the award of pre-judgment interest inequitable." *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.*, 147 F. Supp. 2d 333, 345-46 (D.N.J. 2001).

In this case, KeyBank is already accruing interest at 6.39% under the Marine Note. (Ex. 12 ¶ 6.) Indeed, the claimed amount of $5,812,574.76 includes interest earned under the Marine Note through July 13, 2006 (Bush Decl. ¶ 12) and KeyBank is continuing to accrue that interest.

Furthermore, KeyBank is only without the use of the funds because it has failed to use an available remedy to extinguish its claim. As PGG is deliberately defaulting in its monthly payments under the Marine Note (PGG Mem. at p.24), KeyBank is entitled to an immediate judgment for the full outstanding amount, together with all accrued interest (Ex. 12 ¶¶ 43(a) & 44(a)). Furthermore, Ashkenazy is liable for PGG's debt under his personal guaranty. (Ex. 26.) It is curious that KeyBank has filed a patently meritless partial summary judgment motion against Federal, but has taken no action to enforce its undisputed rights against PGG and Ashkenazy. KeyBank should not be awarded any interest against Federal under the doctrine of avoidable consequences. *See National Communications Ass'n v. American Tel. & Tel. Co.*, No. 93 CIV. 3707, 2001 WL 99856, at *6 (S.D.N.Y. Feb. 5, 2001); Restatement (Second) of Contracts § 350.

If KeyBank is to be awarded any interest, this Court is not obliged to apply the statutory rate under N.Y. C.P.L.R. § 5004 (McKinney 1992). *See Hygrade Operations, Inc. v. Clifford*, 2000 A.M.C. 1732, 1738-39 (S.D.N.Y. 2000). The rate of 9% is excessive in light of the current interest rates. As the Second Circuit has stated, the rate of interest should be "measured by interest on short-term, risk-free obligations." *Independent Bulk Transport, Inc. v. The*

*MORANIA ABACO*, 676 F.2d 23, 27 (2d Cir. 1982)(upholding an award of interest of 12% at a time when the treasury bill rate was running up to 14%); *see also* Table of T-Bill Rates printed after 28 U.S.C.A. § 1961 (West Supp. 2006). Therefore, the court should exercise its discretion to award interest at the average treasury bill rate. *Cf.* 28 U.S.C § 1961; *see also Transatlantic Marine Claims Agency, Inc. v. M/V OOCL INSPIRATION*, 137 F.3d 94, 104 (2d Cir. 1998)(interest rate on short-term, risk-free obligations); *China Union Lines, Ltd. v. American Marine Underwriters, Inc.*, 755 F.2d 26, 30-31 (2d Cir. 1985)(three-month treasury bill rate); *International Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 828 F. Supp. 1098, 1105 (S.D.N.Y. 1993)(interest rate on 52-week treasury bill during the applicable period).

Alternatively, the Court could look to the Marine Note to set the rate of interest. The purpose of awarding pre-judgment interest is to compensate for lost earning on the amount of the judgment. In this case, KeyBank's earning on the amount of the outstanding loan to PGG would have been 6.39%. Any award of interest at a greater rate would amount to an unwarranted windfall to KeyBank.

## CONCLUSION

For the foregoing reasons, KeyBank's motion for partial summary judgment should be denied.

Dated: New York, New York
       July 24, 2006

                                        Respectfully submitted,

                                        NICOLETTI HORNIG CAMPISE & SWEENEY
                                        Attorneys for Plaintiff
                                        FEDERAL INSURANCE COMPANY

                                        By: _____
                                            Terry L. Stoltz (TS-7650)
                                            Wall Street Plaza
                                            88 Pine Street, 7th Floor
                                            New York, New York 10005-1801
                                            (212) 220-3830
                                            (FILE NO.: 25000011 JAVN/TMR)

**TO:**

WEG & MYERS, P.C.
Attorneys for Defendants
PGG Realty and Ben Ashkenazy
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210
Attention: Dennis D'Antonio, Esq.


THOMPSON HINE, LLP
Attorneys for Defendant
KeyBank National Association
335 Madison Avenue, 12th Floor
New York, New York 100017
Attention:    Joseph B. Koczko, Esq.

X:\Public Word Files\25\11\LEGAL\Motion for Summary Judgment (KeyBank) -- Opp MOL (FINAL).wmf.s.vc.doc

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                       : s.s.:
COUNTY OF NEW YORK   )

        VALERIE A. CLUNE, being duly sworn, deposes and says:

        1.    I am employed by the firm of NICOLETTI HORNIG CAMPISE &

SWEENEY, attorneys for plaintiff. I am not a party to this action, am over 18 years of age and

reside in Queens County, New York.

        2.    On July 24, 2006, I served the annexed FEDERAL INSURANCE

COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO KEYBANK NATIONAL

ASSOCIATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT upon the following:

WEG & MYERS, P.C.
Attorneys for Defendants
PGG Realty and Ben Ashkenazy
52 Duane Street, 2nd Floor
New York, New York 10007

Attention: Dennis D'Antonio, Esq.

THOMPSON HINE, LLP
Attorneys for Defendant
KeyBank National Association
335 Madison Avenue, 12th Floor
New York, New York 100017

Attention: Joseph B. Koczko, Esq.

at the addresses designated by said attorneys for that purpose, by depositing true copies of same

enclosed in postpaid, properly addressed wrappers in an official depository under the exclusive

care and custody of the United States Postal Services within the State of New York.

_Valerie Clune_

VALERIE A. CLUNE

Sworn to before me this
24th day of July, 2006

_Michelle Mariscalco_

Notary Public

**MICHELLE MANISCALCO**
**Notary Public, State of New York**
**No. 01MA6088438**
**Qualified in Kings County**
**Certificate Filed in New York County**
**Commission Expires March 3, 20 ___ 7**