UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FEDERAL INSURANCE COMPANY,                    06 CV 2455 (JSR)(JCF)

             Plaintiff,

   - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

             Defendant.

-------------------------------------------------------------X

## FEDERAL INSURANCE COMPANY'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1, Plaintiff Federal Insurance Company "(Federal")" contends that as to the following material facts, there is no genuine issue to be tried:

1.     The yacht PRINCESS GIGI (formerly FULL BLOOM) was specially built for SeaQuest International and its principal, Warren Lovell. (Ex. 39, Lovell Dep. at 8-9).

2.     Construction was commenced by Trident Shipworks, Inc. pursuant to a hull design by Dr. Sergio Cutalo and a general arrangement layout by Donald Starkey. (Ex. 39, Lovell Dep. at 8-9; Ex. 33, Hains Dep. at 11-14).

3.     Problems arose with Trident's performance and eventually SeaQuest took over the construction and completed building the yacht. (Ex. 39, Lovell Dep. at 11).

4.     Contrary to its contract with SeaQuest, Trident did not arrange for an original hull design by Cutalo. (Ex. 39, Lovell Dep. at 9-10; Ex. 33, Hains Dep. at 11-12). Instead, they adapted a prior Cutalo design for a 2 ½ deck yacht, without garages at her stern

and used this design to add a high third deck with garages at her stern. (Ex. 33, Hains Dep. at 16; Ex. 39, Lovell Dep. at 10).

5.      As a result of adding garages to the layout, the engines had to be moved forward in the hull. (Ex. 33, Hains Dep., p. 16-17). As no other weight adjustments were made to compensate for the garages or the third deck, the vessel was significantly trimmed down by the bow. (Ex. 33, Hains Dep. p. 19). To correct this, a false bow was added to increase buoyancy forward. (Ex. 39, Lovell Dep. at 14; Ex. 43, Patton Report p. 1).

6.      After the yacht was put in use with the false bow, it was determined that she was "tender" – i.e. she was slow to come back to the upright position when pushed over by a wave. (Ex. 35, R. Moore Dep. at 58).

7.      SeaQuest had an incline experiment performed by unlicensed naval architect Arthur M. Barbeito ("Barbeito"). (Ex. 33, Hains Dep. at 50-51; Ex. 39, Lovell Dep. at 18-19).

8.      Although Barbeito allegedly performed the incline test to determine the vessel's stability pursuant to the Det Norske Veritas ("DNV") Rules for Classification for High Speed and Light Craft (Exs. 34, 86, Barbeito letters 6/4/01), in fact it was not performed to DNV standards because only one weight move was performed while DNV required six separate moves. (Ex. 33, Hains Dep. at 53-54).

9.      Barbeito was unable to take into account "severe wind and rolling criteria" due to a lack of necessary construction drawings. (Exs. 34, 86).

10.     Barbeito's conclusion was that it was "necessary to add 13.5 mt of ballast in the bilge to meet minimum" stability requirements. (Exs. 34, 86).

11.     The only reports on Barbeito's incline test are incomplete copies of two versions of a letter dated June 4, 2001 to Mr. Lovell. (Exs. 34, 86).  Barbeito's calculations have never been produced.

12.     Until the ballast could be added, the vessel could not sail with less than 4,200 gallons of fuel on board. (Exs. 34, 86).

13.     Eventually, Barbeito prepared plans for modifying the hull form by adding a new keel to install the additional ballast. (Ex. 33, Hains Dep. at 66; Ex. 39, Lovell Dep. at 22-23).

14.     A further incline test was never performed after the ballast was added to confirm that the yacht met minimum stability requirements. (Ex. 35, R. Moore Dep. at 35; Ex. 39, Lovell Dep. at 23).

15.     In late 2004, SeaQuest took the yacht to the Ft. Lauderdale boat show to try to sell her. (Ex. 33, Hains Dep. at 41-42).

16.     At the show, the yacht's captain, Captain Robert Moore had discussions with a licensed naval architect, Drew Hains of Murray & Associates, about performing another incline test. (Ex. 33, Hains Dep. at 119).  Capt. Moore has been retained as an expert by PGG/Ashkenazy in this case.

17.     Murray & Associates presented a formal quotation for performing the test, but nothing ever came of that proposal. (Ex. 87; Ex. 33, Hains Dep. at 27).

18.     Several months later, SeaQuest's broker sought another quote from Murray & Associates to perform a new incline test (Ex. 88).  Again, nothing ever came of this because Mr. Lovell, concerned about the cost of the test and possible damage to his teak wood

decks, was told by Barbeito, an unlicensed naval architect, that it was not necessary. (Ex. 39, Lovell Dep. at 33, 36).

19.     In November 2005, Ashkenazy negotiated to purchase the yacht.  When he heard about a possible problem with hull flexing of the vessel, his yacht broker made inquiries and reported to him some of the troubled history of the yacht. (Ex. 65; Ex. 62, Chamberlain Dep. at 41).

20.     Ashkenazy signed a Purchase Agreement with SeaQuest on November 15, 2005 to buy the PRINCESS GIGI for $7,800,000.00. (Ex. 66, 89).

21.     The Purchase Agreement was subject to "sea trial, survey and inventory inspection satisfactory to" Ashkenazy (Ex. 66, 89).

22.     Ashkenazy retained Patton Marine, Inc. ("Patton") to conduct a condition and valuation survey of the yacht. (Ex. 61, Ashkenazy Dep. at 62-63).

23.     Based upon the deficiencies noted in Patton's December 1, 2005 preliminary recommendations, Ashkenazy negotiated a price reduction to $7,535,400.00, with SeaQuest remaining responsible to comply, at its own expense, with a large number of the Patton Recommendations within 90 days of the closing. (Exs. 72, 74).

24.     In addition to Patton, Ashkenazy, through his broker, Kent Chamberlain, also had three other surveys performed and completed before Federal agreed to insure the yacht. (Ex. 61, Ashkenazy Dep. at 66-68; Ex. 62, Chamberlain Dep. at 55-58, 132-33).

25.     Wards Marine Electric performed an electrical survey and produced a list of recommended repairs with an "X" indicating hazardous items. (Ex. 69; Ex. 62, Chamberlain Dep. at 113-14).

26.     Frank Griffin performed an engine survey. (Ex. 90; Ex. 62, Chamberlain Dep. at 57-58).

27.     RPM Diesel Engine Co. Inc. prepared an estimate as to the cost to make repairs to the yacht. (Ex. 62, Chamberlain Dep. at 116; Ex. 23, Acceptance Agreement ¶ 3(c)). That estimate has never been produced in this case.

28.     A-1 Marine Surveyors ("A-1") performed a survey for the government of St. Vincent & Grenadines to determine what was required to obtain a commercial registration which would allow PGG to charter the PRINCESS GIGI for hire. (Ex. 70; Ex. 62, Chamberlain Dep. at 133-34).

29.     The A-1 report noted that an incline experiment needed to be performed and a stability book provided. (Ex. 70, item 1).

30.     A-1 also reported that a Barbeito plan, sighted on the yacht, stated:

> Due to the fact that there is very little structural information on this vessel, it is not possible to perform a thorough and complete structural analysis to ascertain residual longitudinal strength of the hull.  It has been assumed that the new bottom is providing some longitudinal and local strength.  Therefore, Arthur M. Barbeito & Associates cannot assume responsibility for internal structural failure.

(Ex. 70, p. 2).

31.     In response to the Barbeito plan disclaimer, A-1 required that, to confirm that the yacht was suitable for open seagoing service as originally designed, calculations and drawings must be provided by a qualified naval architect to show that the structural integrity of the hull has not been compromised by the bow modification and the addition of the ballast. (Ex. 70, p. 2; Ex. 33, Hains Dep. at 16).

32.     Ashkenazy formed PGG to own and operate the PRINCESS GIGI.

(Ex. 82, Kriss Dep. at 23).

33.     PGG/Ashkenazy obtained a loan of $5,850,000.00 from KeyBank to purchase the PRINCESS GIGI. (Ex. 29).

34.     Prior to closing, Patton's final survey Report and Recommendations, dated December 7, 2005, were received and reviewed by PGG, Ashkenazy and KeyBank. (Ex. 43, Ex. 50, Ex. 61, Ashkenazy Dep. at 187-88, 191; Ex. 28, Kline Dep. at 45).

35.     Patton specifically declined to declare the yacht seaworthy. (Ex. 51, Riley Dep. at 173-74; Ex. 14, Patton Report, p. 31).

36.     The PRINCESS GIGI, a 124' tri-deck megayacht, was built for use in the open sea (Ex. 52. Hipple Dep. at 23; Ex. 33, Hains Dep. at 16).

37.     KeyBank's customary template for its Marine Note and Security Agreement would have required PGG to comply with all of Patton's material recommendations within 30 days of the closing. (Ex. 85, KeyBank Template).

38.     At the request of PGG/Ashkenazy's attorney, KeyBank agreed to modify the Marine Note and Security Agreement to allow PGG 120 days to correct all but 5 of Patton's Safety Equipment recommendations. (Ex. 28, Kline Dep. at 26, 29-30; Ex. 29, Marine Note).

39.     The Marine Note and Security Agreement was silent as to how long PGG had to comply with the other material recommendations. (Ex. 28, Kline Dep. at 37-38).

40.     In November, 2005, Ashkenazy approached William E. Kelly Agency, Inc. ("Kelly") to obtain insurance for the PRINCESS GIGI. (Ex. 61, Ashkenazy Dep. at 72-74).

41.     Kelly completed a megayacht worksheet insurance application in which it advised that a single survey report existed for the vessel and that PGG/Ashkenazy intended to charter out the yacht for 8 weeks a year. (Ex. 6).

42.     The application did not reveal the existence of multiple surveys.   The worksheet application directed Kelly to attach a copy of the survey report and/or forward a copy to Federal within 30 days. (Ex. 6).

43.     On November 30, 2005, Federal's underwriter, Donna Capiga, issued a quote setting forth the coverage limits and premium specifications under which Federal was willing to provide insurance on the PRINCESS GIGI. (Ex. 7).  The quote sheet again requested a copy of the survey report. (*Id.*).

44.     At 1:15 p.m. on December 12, 2005, on instructions from Federal, Kelly signed and forwarded a binder for the PRINCESS GIGI risk, effective 12:01 a.m. on December 13, 2005 (Ex. 21, M. Moore Dep. at 72-73; Ex. 24, 12/12/05 Fax).

45.     Subsequently, after business hours on December 12 and after binding, Ashkenazy's attorney, David Kriss, e-mailed Kelly the December 7, 2005 Patton report and recommendations (Ex. 4, Kelly Dep. at 120-21, 246-47; Ex. 10).

46.     The e-mail was not seen by Kelly until the morning of December 13, after the inception of the policy. (Ex. 4, Kelly Dep. at 246-47, 255-56).

47.     Kelly never forwarded a copy of the Report or Recommendations to Federal.  Kelly never received copies of the other prior survey reports done by Wards, Griffin or A-1 or the repair estimate by RPM Diesel. (Ex. 4, Kelly Dep. at 136-137; Ex. 19, Capiga Decl 11/17/06 ¶ 17, 18, 22, 26).

48.     Neither Kelly nor Federal were advised that there were different versions of the Patton Report and Recommendations nor that because of the number and complexity of the recommended repairs, PGG allowed SeaQuest 90 days to make many of the recommended repairs and KeyBank granted PGG/Ashkenazy's request for 120 days to effect the safety

equipment repairs set forth in the Patton Report. (Exs. 23, 29).

49.     On January 4, 2006, Federal issued the formal policy, effective from December 13, 2005, to insure the Hull of the yacht for $7,023,000.00 and to insure certain Protection and Indemnity liabilities up to $10,000,000.00 (Ex. 12).

50.     PGG/Ashkenazy hired Charles Papa as Captain of the PRINCESS GIGI. (Ex. 61, Ashkenazy Dep. at 267-68).

51.     Ashkenazy delegated to Papa complete responsibility for hiring the balance of the crew and insuring that the vessel was properly maintained. (Ex. 61, Ashkenazy Dep. at 34-35, 24-27; Ex. 77, Papa Dep. at 18).

52.     On February 4, 2006, the PRINCESS GIGI broke ground on a voyage from Fort Lauderdale, Florida to St. Maarten, Netherlands Antilles, with 8 crewmembers onboard (Ex. 79, Gorin Dep. at 122-23).

53.     Before sailing, Papa informed Ashkenazy that there were problems with the yacht that needed to be corrected (Ex. 81, Mitchell Dep. at 154-55).

54.     On February 4, Captain Papa was making only his second voyage on the yacht; the prior trip was a short (40 mile) voyage to the Bahamas, with SeaQuest's engineer still serving aboard the yacht. (Ex. 77, Papa Dep. at 22).

55.     Papa did not know the yacht had manual steering capability even without A/C power. (Ex. 77, Papa Dep. at 99; Ex. 79, Gorin Dep. at 70).

56.     It was the first voyage of the "engineer," Jacob Rese, who was not a licensed engineer and had no formal training as an engineer. (Ex. 78, Rese Dep. at 4).

57.     Mr. Rese, who had only signed on for a single voyage, had only joined the yacht 5 days earlier, after the prior SeaQuest engineer had already left the vessel. (Ex. 78,

Rese Dep. at 7).

58.     There was no engineer-to-engineer turnover or explanation of the yacht's engineering systems. (Ex. 78, Rese Dep. at 10).

59.     Rese was not familiar with the full transfer system and did not use the computank system to determine the amount of fuel in the day tank. (Ex. 78, Rese Dep. at 29).

60.     Rese's time in the engine room was limited as he had to stand watches on the bridge. (Ex. 78, Rese Dep. at 8).

61.     Nathalie Gorin, who had worked with Papa as a hostess on another yacht, was on her first voyage, serving as an unlicensed watchstander, despite having absolutely no watch training. (Ex. 79, Gorin Dep. at 11, 17-18, 25).

62.     Gorin was not provided with any training by Papa in either watch standing or radar observation. (Ex. 79, Gorin Dep. at 34).

63.     Gorin never stood watch with the same person twice. (Ex. 79, Gorin Dep. at 26, 31-33).

64.     On Gorin's second watch, she served with the cook, another unlicensed crewmember. (Ex. 79, Gorin Dep. at 32-33).

65.     Papa never conducted any onboard training drills, such as fire drills, flooding drills, life boat drills or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).

66.     Gorin observed that there was a problem with the stabilizer and the steering gear malfunctioned due to a faulty cooling pump. (Ex. 79, Gorin Dep. at 43-45).

67.     Gorin observed a heated argument between Papa and Rese. Rese wanted to turn the yacht around while the vessel was still in sight of the Florida coast, but Papa refused. (Ex. 79, Gorin Dep. at 46-47, 49).

68.    At approximately 8:30 p.m. on February 5, 2006, seawater was discovered in the engine room bilges (Ex. 78, Rese Dep. at 37-38).

69.    The crew did not close the fire damper on the engine room exhaust vent even though there were indications water was entering the engine room through the vent. (Ex. 78, Rese Dep. at 39).

70.    Papa failed to alter course in a timely manner to minimize flooding. (Ex. 79, Gorin Dep. at 67; Ex. 35, R. Moore Dep. at 219-20).

71.    Papa went to the engine room and improperly lined up the piping on the engines to pump the bilges with the eductor pump, resulting in greater flooding, and he never told Rese what he had done. (Ex. 77, Papa Dep. 60; Ex. 35, R. Moore Dep. at 157-58, 214-16; Ex. 36, R. Moore Report p. 6).

72.    Shortly thereafter, the day tank ran out of fuel and the vessel lost her engines and all AC power. (Ex. 77, Papa Dep. at 196-98).  The crew did not know that the day tank could be re-filled by gravity feed.

73.    In the early morning hours of February 6, 2006, after the vessel had taken on a significant amount of water and was perilously listing to port without power, the U.S. Coast Guard convinced the captain to abandon the distressed vessel with his crew. (Ex. 77, Papa Dep. at 82, 84).

74.    The Coast Guard was able to save the entire crew, via helicopter rescue, shortly before the vessel capsized without any serious injury or loss of life (Ex. 77, Papa Dep at 82, 84; Ex. 79, Gorin Dep. at 85).

75.    On March 29, 2006, Federal declined the claim submitted by PGG/Ashkenazy and returned the premium previously paid to Federal. (Ex. 1).

Contemporaneously, Federal instituted this action.

76.    PGG/Ashkenazy failed to disclose to Federal that SeaQuest was allowed 90 days (approximately ¼ of the policy period) to make numerous substantial and material repairs to the PRINCESS GIGI (Ex. 23, Acceptance of Vessel pp. 2-3; Ex. 21, M. Moore Dep. at 42-43; Ex. 62, Chamberlain Dep. at 181-186; Ex. 61, Ashkenazy Dep. at 250-253; Ex. 39, Lovell Dep. at 45-47).

77.    PGG/Ashkenazy failed to disclose that KeyBank granted PGG's request and allowed 120 days after the closing (approximately 1/3 of the policy period) for PGG/Ashkenazy to comply with most of the Safety Equipment recommendations made by Patton.  (Ex. 29, Marine Note ¶¶ 34, 43(c); Ex. 28, Kline Dep. at 23-24).

78.    The standard form KeyBank Marine Note language was revised to increase the amount of time for these repairs to be completed from 30 to 120 days. (Ex. 28, Kline Dep. at 23-24, 27-31; Ex. 85).

79.    PGG/Ashkenazy also failed to disclose the survey report prepared by A-1, which required an incline experiment to be done due to concerns about the stability of the vessel (Ex. 70, A-1 Marine Survey Report p. 1; Ex. 62, Chamberlain Dep. at 134-136) and raised questions as to the structural integrity of the yacht which could only be answered by a qualified naval architect.

80.    The A-1 report was prepared because PGG/Ashkenazy was considering chartering out the vessel (Ex. 62, Chamberlain Dep. at 132-133) as discussed in the application sent to Federal (Ex. 6).

81.    PGG chartered the vessel to Chamberlain Yachts for one week in return for a reduced commission (Ex. 62, Chamberlain Dep. at 195-196; Ex. 91).  However, the yacht

capsized before the charter was performed (Ex. 62, Chamberlain Dep. at 196).

82.   PGG/Ashkenazy also did not disclose the survey report prepared by Ward's Marine Electric which noted numerous hazardous conditions aboard the vessel. (Ex. 69, Ward's "Worklist").

83.   In the Ward's Marine Electric report, 18 of the 37 listed items concerning the engine and electrical system were marked with an "X", indicating that those particular items were most likely hazardous and could cause equipment failure, physical harm and/or property damage. (Ex. 69, Ward's Worklist; Ex. 30, Albers Dep. at 30-32; Ex. 62, Chamberlain Dep. at 113-115).

84.   PGG/Ashkenazy failed to disclose that there were at least 4 different versions of the Patton Report: (1) the November 29, 2005 Report (Ex. 46); (2) the December 7, 2005 31-page Report (Ex. 47); (3) the December 7, 2005 32-page report (Ex. 43); and (4) the December 7, 2005 33-page Final Report (Ex. 45).

85.   Kelly only received the December 7, 2005 32-page version after the binder had been issued and could not have seen the report until the inception of the insurance. (Ex. 4, Kelly Dep. at 121-122).

86.   PGG/Ashkenazy failed to disclose that there were at least 4 different versions of the Patton Recommendations: (1) the November 25, 2005 rough draft (Ex. 44); (2) the December 1, 2005 Preliminary Recommendations (Ex. 48); (3) the December 1, 2005 annotated Preliminary Recommendations (Ex. 92); and (4) the December 7, 2005 Recommendations (Ex. 42).

87.   The December 7, 2005 Patton Recommendations was the only version provided to Kelly, but not until after the binder was issued. (Ex. 4, Kelly Dep. at 121-122).

88.    The Patton survey report notes that the three (3) watertight bulkheads "have been compromised by plumbing penetrations and unfilled, cut-throughs." (Ex. 42; Patton Recommendations p. 2).

89.    Watertight bulkheads are vital in oceangoing vessels in order to prevent the spread of water between compartments which, if it occurs, would affect the vessel's stability and cause the ship to be unsafe and unfit for its intended use, *i.e.*, unseaworthy. (Ex. 55, Dolan Decl. ¶ 20).

90.    PGG/Ashkenazys' own expert, William Hipple, conceded that the various watertight bulkhead breaches should be repaired before the PRINCESS GIGI went to sea again.  (Ex. 52, Hipple Dep. at 66-67).

91.    The Patton survey report lists other safety equipment deficiencies, such as the fact that the engine room had three (3) manual submersible bilge pumps, rather than automated bilge pumps, in an unoccupied automated engine room (Ex. 42, Patton Recommendations p. 2).

92.    Respecting the hull itself, Patton found that the fiberglass lamination work in the area of the forward portside of the vessel had been poorly performed and may constitute a structural problem, compromising the integrity of the vessel, i.e. seaworthiness. (Ex. 42, Patton Recommendations pp. 3-4).

93.    Patton also found plastic piping sticking out of the forward watertight bulkhead, which opens up the bow thruster compartment into the next watertight compartment aft and affects the safety, watertight integrity and seaworthiness of the vessel. (Ex. 42, Patton Recommendations p. 4).

94.    Patton also noted evidence of a water leak on the portside (left side) aft,

but it was unclear as to how the water was entering into the vessel. (Ex. 42, Patton Recommendations at 4). Ultimately, this would be expected to drain into the engine room bilge area, making automatic bilge pumps even more necessary in order to pump out water that is entering the vessel from unknown sources. (Ex. 55, Dolan Decl. ¶ 32).

95.    Anyone in the marine industry, reading any of the versions of the Patton Report, with its 15 pages of recommendations, noting 158 separate deficiencies, would reach the conclusion that this oceangoing megayacht was not safe or seaworthy. (Ex. 55, Dolan Decl. ¶35).

96.    The Patton Report & Recommendations was only received by Kelly after the insurance binder was issued and they were not looked at until after the insurance was already in effect. (Ex. 4, Kelly Dep. at 120-21, 246-47).

97.    The signed insurance binder was sent by Kelly to PGG/Ashkenazy's closing agent, Moore & Co., on December 12, 2005 at 1:15 p.m. (Ex. 21, M. Moore Dep. at 72-73; Ex. 24, 12/12/05 Fax).

98.    The Patton Report and Recommendations were e-mailed to Kelly by PGG's New York attorney on December 12, 2005 at 6:35 p.m., which was after the close of business and after Kelly had left for the day. (Ex. 4, Kelly Dep. at 120-121, 246-247; Ex. 10, E-mail 12/12/05).

99.    The Policy went into effect on December 13, 2005 at 12:01 a.m. (Ex. 24, Signed Insurance Binder).

100.    The earliest Kelly could have opened the e-mail to receive the report was at 8:30 a.m. on December 13, 2005, which was after the insurance coverage was already in effect. (Ex. 4, Kelly Dep. at 246-247, 255-256).

101.   Federal Senior Yacht Underwriter, Donna Capiga, would not have bound coverage on the same terms or for the same premium had Federal known of the aforementioned deficiencies identified in the Patton survey report prior to the inception of the policy. (Ex. 17, Capiga Decl. ¶ 11).

102.   Capiga would not have bound the PRINCESS GIGI insurance on the same terms and conditions if she had known of the 90-day or 120-day windows provided for the various deficiencies of the vessel to be repaired.  (Ex. 19, Capiga Decl. 11/17/06 ¶¶ 12, 16).

103.   Capiga would not have bound coverage on the same terms and conditions if she had received a copy of the Ward's Marine work list prior to the inception of the policy.  (Ex. 19, Capiga Decl. 11/17/06 ¶ 18, 21).

104.   Since the megayacht worksheet indicates that the vessel was to be chartered, the A-1 Surveyor's Report is necessary documentation which should have been provided to Federal. (Ex. 19, Capiga Decl. 11/17/06 ¶¶ 23-24).

105.   The A-1 report is material to assessing the risk because it specifically states that the stability documentation "must be provided" for review by a "qualified naval architect." (Ex. 70, A-1 Marine Survey Report p. 3).

106.   Capiga would not have bound the risk on the same terms and conditions if she had received the A-1 Marine Survey Report prior to the inception of the policy.  (Ex. 19, Capiga Decl. 11/17/06 ¶¶ 26, 27).

107.   At most, the PRINCESS GIGI risk would have remained on Port Risk only coverage until Federal received certification from the vessel owner that an incline experiment and the stability and structural integrity concerns had been satisfied.  (Ex. 19, Capiga Decl. 11/17/06 ¶ 28).

108.    Based upon the numerous deficiencies, if all the material information had been disclosed to Federal, the PRINCESS GIGI would have been insured for Port Risk only, which would have only provided coverage while the vessel remained within the protected confines of the repair port. (Ex. 17, Capiga Decl. ¶¶ 12-13; Ex. 19, Capiga 11/17/06 Decl. ¶¶ 13-14, 19-20, 27; Ex. 20; O'Sullivan Dep. at 7, 42, 74-75).

109.    In the past, Federal had received a survey report noting deficiencies with a vessel and, as a result, placed the yacht on port risk only until the surveyors confirmed that the deficiencies had been corrected. (Ex. 20, O'Sullivan Dep. at 165-167).

110.    The material in the Patton Report would be material to an underwriter's decision as to whether to insure the yacht, and if so, on what terms. (Ex. 25, Prendergast Dep. p. 121-122).

111.    The PRINCESS GIGI was designed for voyage on the open ocean. (Ex. 33, Hains Dep. at 16).

112.    The Cutalo hull design was for a 2½ deck vessel without huge garages aft. (Ex. 33, Hains Dep. at 14 & 16).

113.    The PRINCESS GIGI was built without modifying the design. (Ex. 33, Hains Dep. at 15).

114.    The placement of the engines, which were moved because of the garages, affected the vessel's stability. (Ex. 33, Hains Dep. at 17).

115.    The extra deck was located up high. (Ex. 33, Hains Dep. at 13).

116.    The vessel construction contributed to the weight imbalance and the vessel was trimmed down by the bow. (Ex. 33, Hains Dep. at 19).

117.    As a result of a Trident stability analysis, the shipyard naval architect

had "grave concerns" regarding the stability of the vessel. (Ex. 33, Hains Dep. at 20).

118.    Robert Connell, a Patton marine surveyor, served as an arbitrator in the case between the prior owner of the yacht and the shipyard that designed her (*i.e.*, between Sea Quest International and Trident). (Ex. 41, Connell Dep. at 8-10, 25, 55-56).

119.    The panel found for the owner because the vessel did not float properly in that "[i]t was down by the bow probably two feet." (Ex. 41, Connell Dep. at 56).

120.    The panel also found that the FULL BLOOM had stability problems. (Ex. 41, Connell Dep. at 57-58).

121.    After the arbitration, additional litigation involving Sea Quest and Trident resulted in a "Bench Order" from the United States District Court of the Middle District of Florida. (Ex. 40).

122.    In the Order, the Court identified over 80 items on the yacht that were either negligently constructed or defective as a result of intentional misconduct. (Ex. 40, p.8-13).

123.    A false bow was added to the PRINCESS GIGI ex FULL BLOOM to correct the improper trim. (Ex. 41, Connell Dep. at 59; Ex. 51, Riley Dep. at 82-83).

124.    Even after the yacht was put in use with the false bow, it was determined that she was "tender" – i.e. she was slow to come back to the upright position when pushed over by a wave. (Ex. 35, Moore Dep. at 58).

125.    Unlicensed naval architect Arthur M. Barbeito performed an incomplete incline experiment to assess vessel stability, and not in accordance with any appropriate standards. (Ex. 33, Hains Dep. at 50-54).

126.    The analysis performed by Barbeito did not address the "severe wind and

rolling criteria" which would require additional ballast because they did not have the necessary construction drawings. (Ex. 34).

127.    Barbeito recommended adding 13.5 MT of ballast, modifying the shape of the hull. (Ex. 34).  Adding the ballast was intended to "stiffen" the vessel; make it "less tender, make it less rolly." (Ex. 51, Riley Dep. at 83).

128.    The addition of some 13.5 tons of lead ballast is considered "a lot" although not "excessive." (Ex. 41, Connell Dep. at 61).

129.    Accurate information regarding the shape of the hull is important to properly determine the vessel stability. (Ex. 33, Hains Dep. at 32).

130.    No further stability analysis was ever performed after the hull modification. (Ex. 35, Moore Dep. at 35; Ex. 39, Lovell Dep. at 23).

131.    Both Patton Marine and A-1 Marine Surveyors agreed that the vessel stability documentation needed to be presented and reviewed. (Ex. 41, Connell Dep. at 96; Ex. 70).

132.    The PRINCESS GIGI should have been able to survive "dead ship condition" prior to the capsizing until help arrived. (Ex. 57, Randall Dep. at 262-63).

133.    The garage doors aboard the PRINCESS GIGI were not watertight (Ex. 57, Randall Dep. at 196-97), and the location of the engine room exhaust ducting was too close to the vessel waterline. (Ex. 57, Randall Dep. at 275-77; Ex. 52, Hipple Dep. at 71-72; Ex. 78, Rese Dep. at 39; Ex. 77, Papa Dep. at 44).

134.    The weight of the water in the garages caused the engine room exhaust ducting to be even closer to the water line. (Ex. 58, p.7; Ex. 77, Papa Dep. at 90).

135.    The fact that water was in the port garage is demonstrated by the water

was coming in the "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36).

136.    The vessel was also unseaworthy due to a breach in her watertight integrity. (Ex. 58, p.5).

137.    The vessel was designed with three (3) watertight bulkheads, which are necessary for the safety of the vessel. (Ex. 54, Dolan Dep. at 137-38).

138.    The Patton Report with Recommendations documents the breaches of watertight integrity, as follows:

> [T]here are three watertight compartments on the yacht.  All watertight bulkheads (forepeak, forward and aft engine room) have been compromised by plumbing penetrations and unfilled cut-throughs.  Verify a proper seal at all penetrations on both sides of these bulkheads. (Ex. 42, p.2).

139.    Defendant's expert, William Hipple, admitted that the compromised watertight bulkheads should be repaired before the vessel goes to sea. (Ex. 52, Hipple Dep. at 66-67).

140.    The integrity of the watertight bulkheads is a material safety issue, since the compromised bulkheads would allow water to transverse from one watertight compartment to another. (Ex. 54, Dolan Dep. at 137-38; Ex. 52, Hipple Dep. at 64).

141.    Watertight bulkheads are vital in oceangoing vessels in order to prevent the spread of water between compartments which, if it occurs, affect the vessel's stability. (Ex. 54, Dolan Dep. at 137-38).

142.    Absent watertight bulkheads, water inside a vessel would reduce the vessel's intact stability and, coupled with the sloshing effect of free water, could cause a ship to capsize. (Ex. 55, Dolan Decl. ¶ 20).

143.    Breaches or holes in watertight bulkheads allow water gaining access

into the vessel in one compartment to penetrate longitudinally or transversely and to slosh around, affecting the stability. (Ex. 54, Dolan Dep. at 137-38).

144.   Breaches in watertight bulkheads will cause the ship to be unsafe and unfit for its intended use, i.e., unseaworthy. (Ex. 52, Hipple Dep. at 64-67).

145.   The Vessel Acceptance documents indicate that the breaches in the watertight bulkheads were not fixed before the sale of the vessel. (Ex. 23; Ex. 43).

146.   A continuing lack of watertight integrity in the aft engine room bulkhead existing at the time of the voyage is established by the evidence of water was leaking through the "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36).

147.   There was no DC fuel pump aboard the vessel to use in the event of a loss of AC power.  This is an essential piece of equipment, required for long voyages (over 400 miles). (Ex. 36, R. Moore Expert Report).

148.   The vessel was operating on a backup fuel transfer system.  Normally, a fuel centrifuge is used on long voyages to constantly feed fuel to the day tank as used, eliminating the need for repeated transfers of fuel to the day tank. (Ex. 36, R. Moore Expert Report p.4).

149.   The weather and sea conditions encountered were expectable in that area of the Atlantic Ocean. (Ex. 60, Raguso Dep. at 76).

150.   The weather and sea conditions were forecast prior to the February 4th voyage. (Ex. 60, Raguso Dep. at 56-57).

151.   Papa has admitted that the weather was not the cause of the sinking. (Ex. 77, Papa Dep. at 83).

152.   Defendants' expert Robert Moore admitted that the PRINCESS GIGI

had sailed without incident in worse conditions than those encountered on the date of the capsizing. (Ex. 35, R. Moore Dep. at 101, 199-200).

153. The Feb. 4th voyage of the PRINCESS GIGI was only Papa's second voyage aboard the vessel, the prior trip being a short voyage to the Bahamas, with the prior owner's engineer continuing to work on the vessel. (Ex. 77, Papa Dep. at 22).

154. The February 4th trip was the very first voyage of the "engineer," Jacob Rese, who was not a licensed engineer and had no formal training as an engineer. (Ex. 78, Rese Dep. at 4).

155. Mr. Rese had only signed on to the voyage on January 30, 2006, a mere 5 days prior to departure and after the prior owner's engineer had already left the vessel. (Ex. 78, Rese Dep. at 7).

156. There was no engineer-to-engineer turnover or explanation of vessel systems. (Ex. 78, Rese Dep. at 10).

157. Rese had only signed on for this particular voyage, not as the permanent engineer. (Ex. 78, Rese Dep. at 7).

158. Rese was not familiar with the fuel transfer system aboard the PRINCESS GIGI, not knowing the day tank could be gravity fed. (Ex. 78, Rese Dep. at 29).

159. Rese failed to use the computank system to determine the amount of fuel in the day tank. (Ex. 35, R. Moore Dep. at 187-88).

160. The PRINCESS GIGI ran out of fuel because her day tank ran dry. (Ex. 80, Fudge Dep. at 33; Ex. 77, Papa Dep. 97-98).

161. Rese failed to close the engine room exhaust damper when water was first noted coming into the engine room through the exhaust duct.  (Ex. 78, Rese Dep. at 39).

162.    In addition to his engineering duties, Rese also stood watches in the pilothouse on the bridge. (Ex. 78, Rese Dep. at 8).

163.    Rese failed to alter vessel course in a timely fashion to minimize flooding. (Ex. 79, Gorin Dep. at 67; Ex. 35, Moore Dep. at 219-20).

164.    Papa did not know he had manual steering capability after he lost AC power. (Ex. 77, Papa Dep. at 99; Ex. 79, Gorin Dep. at 70).

165.    Papa went down to the engine room and improperly lined up the engines to evacuate the bilges using the eductor pump without telling the engineer. (Ex. 77, Papa Dep. at 60; Ex. 35, Moore Dep. at 157-58, 214-16; Ex. 36, R. Moore Expert Report p. 6).

166.    PGG/Ashkenazys' own expert, Robert Moore, supports the evidence of crew incompetence in his expert report, as follows:

> Knowledge of the main engine and generator fuel systems would have indicated to experience personnel that when the generator ran out of fuel this is a direct sign [of] a day tank low issue. (Ex. 36, p.5).
>
> * * *
>
> The engineer in his interview complained directly about the lack of gravity flow on the vessel, he was misguided. (*Id.*, p.2).
>
> * * *
>
> No testimony was given to indicate that there was a fuel transfer performed post 2pm on the event day. Fuel was lost @ 2030, this calculation is reasonable and consistent with a forget to fuel day tank scenario. (*Id.*, p.4).
>
> * * *
>
> At no time was the air intake damper deployed, this would have greatly reduced the ingress [of seawater] and given much more time to address the root fuel problem. (*Id.*).
>
> * * *
>
> The main A/C bilge pump was utilized but no one testified to closing the pickups in the event of power loss, this created a 2" sign ingress of water, which would have caused catastrophic downflooding over a 4-hour period. (*Id.*).
>
> * * *
>
> Pumping of the bilge with the main engine inductor would have dewatered at 300 to 400 gallons per minute, this would have cleared the bilge in a very short period. This was employed incorrectly and could not have functioned. Valves are shown to be inconsistent with proper operation in inspection pictures. (*Id.*).
>
> * * *

I believe that night the actions of the crew did much more to forward the problems as did to resolve them. They were unfamiliar with their vessel and this proved fatal. (*Id.*, p.6).

167.   The February 4th voyage was Nathalie Gorin's first voyage aboard the vessel. (Ex. 79, Gorin Dep. at 29).

168.   It was deckhand Boris Stropnik's first trip aboard the PRINCESS GIGI. (Ex. 79, Gorin Dep. at 29; Ex. 77, Papa Dep. at 48).

169.   Gorin, who previously worked on another yacht with Papa as a hostess (Ex. 79, Gorin Dep. at 11), was hired to work aboard the PRINCESS GIGI as an unlicensed watch-stander, despite having absolutely no watch-standing training and no experience aboard this vessel (Ex. 79, Gorin Dep. at 17-18 & 25).

170.   Papa provided Gorin with no watch-standing training or radar training. (Ex. 79, Gorin Dep. at 34).

171.   The watches aboard the GIGI were completely disorganized. (Ex. 79, Gorin Dep. at 26 & 30).

172.   Gorin never stood watch with the same person twice. (Ex. 79, Gorin Dep. at 26, 31-33).

173.   Gorin's second watch was with the cook, another unlicensed crewmember. (Ex. 79, Gorin Dep. at 32-33).

174.   The three (3) watches were constantly rotating on three (3) hour shifts. (Ex. 79, Gorin Dep. at 27; Ex. 77, Papa Dep. at 37).

175.   Captain Papa never conducted any onboard training drills, such as fire drills, flooding drills, lifeboat drills, or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).

176.   After the rescue, Papa advised Gorin to say she was only a passenger,

rather than a crewmember, for "insurance purposes." (Ex. 79, Gorin Dep. at 91-92).

177.    Papa also advised Gorin not to talk about anything that happened aboard the vessel. (Ex. 79, Gorin Dep. at 91).

178.    Gorin testified that "We did our watches constantly disorganized because of alarms of all kinds." (Ex. 79, Gorin Dep. at 53).

179.    There was a stabilizer problem and the steering gear malfunctioned due to a faulty cooling pump. (Ex. 79, Gorin Dep. at 43-45).

180.    Gorin observed a heated argument between engineer Rese and Papa after Rese asked Papa to turn the vessel around while the vessel was still in sight of the Florida coast. (Ex. 79, Gorin Dep. at 46-47, 49).  Papa refused to turn the vessel around. (Ex. 79, Gorin Dep. at 46).

181.    Papa admitted to the salvor that there were numerous problems aboard the vessel prior to the commencement of the voyage. (Ex. 81, Mitchell Dep. at 154-55).

182.    According to PGG/Ashkenazys' own expert, Robert Moore, the capsizing of the PRINCESS GIGI resulted from "inexperience of the crew" which caused:  (1) the loss of power to the vessel due to low fuel in the day tank; (2) the failure to close the damper in the engine room exhaust ventilation to stem flooding; (3) the open A/C bilge priming line and eductor valves which added to the engine room flooding; and (4) the failure to alter the vessel's course in an timely fashion such that the sea conditions would not directly strike the port engine room exhaust ports. (Ex. 35, R. Moore Dep. at 219-20; *see also* Ex. 52, Hipple Dep. at 68).

183.    The engine room exhaust ducting exited the port side of the vessel at a position too close to the waterline.  (Ex. 78, Rese Dep. at 39; Ex. 77, Papa Dep. at 44).

184.    The weight of the water in the garages caused the engine room exhaust ducting to be even closer to the water line. (Ex. 77, Papa Dep. at 90).

185.    The presence of water in the garages is established by the fact that water was coming into the engine room through the supposedly watertight aft engine room bulkhead from an "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36).

186.    PGG/Ashkenazys' own expert, Robert Moore, confirms the following:

> Upon sailing from Fort Lauderdale, the vessel was manned by personnel who were generally unfamiliar with the vessel. (Ex. 36, p.2).
>
> * * *
>
> No D.C. fuel pump was located aboard, this is a standard piece of essential equipment for the vessel and required for long passages. (Over 400 miles). The vessel left port on a backup fuel transfer system, a fuel centrifuge was normally used on crossings to throttle fuel to the day tank as used, eliminating the need for repeated transfer. (*Id.*, p.4).

187.    Ashkenazy is the sole shareholder and manager of PGG. He hired Patton to survey the vessel. Patton's Report with Recommendations was received and reviewed by Ashkenazy. (Ex. 62, Chamberlain Dep. at 94-95).

188.    KeyBank granted PGG's request to be allowed 120 days to correct all but 5 of the Safety Equipment recommendations made by Patton. (Ex. 29).

189.    PGG/Ashkenazy also had knowledge of the information contained in the Ward, Griffin, and A-1 surveys and the RPM Diesel estimate. (Ex. 62, Chamberlain Dep. at 82-83, 91-92, 100-101, 114, 141, 144).

190.    Ashkenazy was specifically advised by Papa of the problems with the "systems" on the yacht before the yacht sailed from Fort Lauderdale on February 4th. (Ex. 81, Mitchell Dep. at 154-55).

191.    Ashkenazy hired Chamberlain yachts to help him purchase the PRINCESS GIGI. Kent Chamberlain forwarded all documents, including the various survey

reports, to Ashkenazy and made sure to explain everything to Ashkenazy.   (Ex. 62, Chamberlain Dep. at 144, 214).

192.    Ashkenazy hired Papa and relied solely on Papa to properly maintain the yacht. (Ex. 61, Ashkenazy Dep. at 34-35, 24-27).

193.    Papa informed Ashkenazy of everything regarding the vessel. (Ex. 77, Papa Dep. at 23-24; Ex. 81, Mitchell Dep. at 154-55).

Dated:    New York, New York
          November 17, 2006

                    NICOLETTI HORNIG CAMPISE & SWEENEY
                    Attorneys for Plaintiff
                    FEDERAL INSURANCE COMPANY

          By:       _____
                    Thomas M. Rittweger (TR-6796)
                    Wall Street Plaza
                    88 Pine Street, 7th Floor
                    New York, New York 10005-1801
                    (212) 220-3830
                    (FILE NO.:  25000011 JAVN/TMR)

X:\Public Word Files\25\111\LEGAL\Federal Rule 56.1 Statement.SJ.11.17.06.vw.s.mm.doc