UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

FEDERAL INSURANCE COMPANY,                    06 CV 2455 (JSR)(JCF)

               Plaintiff,

     - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

              Defendants.

-----------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF FEDERAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

NICOLETTI HORNIG CAMPISE & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

Of Counsel:
    John A. V. Nicoletti (JN-7174)
    Thomas M. Rittweger (TR-6796)
    Terry L. Stoltz (TS-7650)
    Val Wamser (VW-0511)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii, iii

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS .....................................................................................1

LEGAL ARGUMENT.............................................................................................9

POINT I

      THE STANDARD FOR SUMMARY JUDGMENT .........................................9

POINT II

      THE SUBJECT POLICY IS VOID *AB INITIO*
      DUE TO THE INSURED'S BREACH OF THE
      DUTY OF UTMOST GOOD FAITH..................................................................10

POINT III

      DEFENDANTS BREACHED THE ABSOLUTE
      IMPLIED WARRANTY OF SEAWORTHINESS...............................................17

POINT IV

      DEFENDANTS BREACHED THE NEGATIVE
      IMPLIED WARRANTY OF SEAWORTHINESS...............................................22

      A.    Vessel Unseaworthiness.........................................................................23

      B.    The Unseaworthy Condition Existed at the
            Time the Vessel Broke Ground.............................................................30

      C.    Owner's Knowledge of the Unseaworthy Condition...............................30

CONCLUSION.......................................................................................................31

## **TABLE OF AUTHORITIES**

**Cases**

*Acadia Ins. Co. v. Allied Marine Transport LLC,*
  151 F.Supp.2d 107 (D.Me. 2001) ................................................................ 22

*Advani Enterprises, Inc. v. Underwriters at Lloyds,*
  140 F.3d 157 (2d Cir. 1998) ...................................................................... 10

*Albany Ins. Co. v. Horak,*
  1994 A.M.C. 273, 1993 WL 269620 (E.D.N.Y. 1993) ...................................... 11, 12

*In re Balfour MacLaine Intern. Ltd.,*
  85 F.3d 68 (2d Cir. 1996) ......................................................................... 10

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ......................................... 9

*Certain Underwriters at Lloyds v. Johnston,* 124 F.Supp.2d 770, 771 ........................ 18

*Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.,*
  159 F.3d 412 (9th Cir. 1998) ..................................................................... 11

*Commercial Union Ins. Co. v. Detyens Shipyard,*
  147 F.Supp. 2d 413 (D.S.C. 2001) ............................................................... 11

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia),*
  952 F.Supp. 1046 (S.D.N.Y. 1997) ....................................................... 17, 18, 23

*Continental Oil Co. v. Pennzoil Corp.,*
  706 F.2d 1365 (5th Cir. 1983) .................................................................... 31

*Crane v. Diamond Offshore Drilling, Inc.,*
  743 So.2d 780 (La. App. 5th Cir. 1999 ........................................................... 24

*Employers Ins. of Wausau v. Occidental Petroleum Corp.,*
  978 F. 2d 1422 (5th Cir. 1992) ............................................................ 17, 18, 23

*Gulfstream Cargo Ltd. v. Reliance Ins. Co.,*
  409 F.2d 974 (5th Cir. 1969) ..................................................................... 11

*Hercules Carriers, Inc. v. Claimant State of Florida,*
  768 F.2d 1558 (11th Cir. 1985) ................................................................... 23

*HIH Marine Services, Inc. v. Fraser,*
  211 F.3d 1359 (11th Cir. 2000) ................................................................... 10

*Hudson Val. Lightweight Aggregate Corp. v. Windsor Bldg. & Supply Co.,*
  446 F.2d 750 (2d Cir. 1971) ...................................................................... 22

*Insurance Co. of N.A. v. Board of Commissioners of the Port of New Orleans,*
  733 F.2d 1161 (5th Cir. 1984) .................................................................... 25

*Keen v. Overseas Tankship Corp.,*
  194 F.2d 515 (2nd Cir. 1952) ..................................................................... 23

*Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,*
    795 F.2d 940 (11th Cir. 1986) ............................................................................ 11

*Knight v. United States Fire Ins. Co.,*
    804 F.2d 9 (2d Cir.1986) ............................................................................ 9, 11, 12

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ............................................ 9

*In the Matter of the Complaint of Armatur S.A., and Tourship Co. S.A.,*
    710 F.Supp. 390 (D.P.R. 1988) ......................................................................... 23

*In re New England Fish Co.,*
    465 F.Supp. 1003 (W.D. Wash. 1979) ................................................................ 26

*Orient Mid-East Lines, Inc. v. S.S. Orient Transporter,*
    496 F.2d 1032 (5th Cir. 1974) ...................................................................... 24, 25

*In re Potomac Transport, Inc.,*
    909 F.2d 42 (2d Cir. 1990) ............................................................................... 24

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.,*
    779 F.2d 866 (2d Cir. 1985) ....................................................................... 10, 12

*Reliance Nat'l Ins. Co. v. Hanover,*
    246 F.Supp.2d 126 (D.Mass. 2003) .................................................................. 18

*Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,*
    242 F.2d 385 (5th Cir. 1957) ........................................................................... 23

*Steelmet, Inc. v. Caribe Towing Corp.,*
    747 F.2d 689 (11th Cir. 1984) ....................................................................... 11

*Sun Mutual Insurance Co. v. Ocean Insurance Co.,*
    107 U.S. 485, 1 S. Ct. 582, 27 L. Ed. 337 (1883) ................................................ 10

*In re Ta Chi Navigation (Panama) Corp. S.A.,*
    513 F.Supp. 148 (E.D. La. 1981) ...................................................................... 24

*The Caledonia,* 157 U.S. 124 (1895) ............................................................... 17, 18

*Thomas v. NASL Corp.,*
    2000 WL 1725011 (S.D.N.Y. Nov. 20, 2000) .................................................... 10

*Underwriters at Lloyd's v. Labarca,*
    260 F.3d 3 (1st Cir. 2001) ............................................................................ 22

*Verdin v. C&B Boat Co., Inc.,*
    1986 WL 15241 (W.D.La. Dec 31, 1986) ...................................................... 24, 25

*In re Warrior & Gulf Navigation Co.,*
    1997 A.M.C. 1432, 1996 WL 904752 (S.D.Ala. 1996) ........................................ 25

**Rules**

Fed. R. Civ. P. 56(c) ....................................................................................... 9

## PRELIMINARY STATEMENT

Plaintiff Federal Insurance Company ("Federal") seeks summary judgment on the grounds that there are no genuine issues of material fact that defendants PGG Realty, LLC and Ben Ashkenazy (collectively "PGG/Ashkenazy") breached the duty of utmost good faith; the implied absolute warranty of seaworthiness; and the negative implied warranty of seaworthiness. This Memorandum of Law is submitted in support of that Motion.

## STATEMENT OF FACTS

The yacht PRINCESS GIGI (formerly FULL BLOOM) was specially built for SeaQuest International ("SeaQuest") and its principal, Warren Lovell. Construction was commenced by Trident Shipworks, Inc. ("Trident") pursuant to a hull design by Dr. Sergio Cutalo and a general arrangement layout by Donald Starkey. (Ex. 39, Lovell Dep. at 8-9; Ex. 33, Hains Dep. at 11-14). Problems arose with Trident's performance and eventually SeaQuest took over the construction and completed building the yacht. (Ex. 39, Lovell Dep. at 11).

Contrary to its contract with SeaQuest, Trident did not arrange for an original hull design by Cutalo. (Ex. 39, Lovell Dep. at 9-10; Ex. 33, Hains Dep. at 11-12). Instead, they adapted a prior Cutalo design for a 2 ½ deck yacht, without garages at her stern, and used this design adding a high third deck, with garages at her stern. (Ex. 33, Hains Dep. at 16; Ex. 39, Lovell Dep. at 10). As a result of adding garages to the layout, the engines had to be moved forward in the hull. (Ex. 33, Hains Dep., p. 16-17). As no other weight adjustments were made to compensate for the garages or the third deck, the vessel was trimmed significantly down by the bow. (Ex. 33, Hains Dep. p. 19). To correct this, a false bow was added to increase buoyancy forward. (Ex. 39, Lovell Dep. at 14; Ex. 43, Patton Report p. 1).

1

After the yacht was put in use with the false bow, it was determined that she was "tender"[1] – i.e. she was slow to come back to the upright position when pushed over by a wave. (Ex. 35, R. Moore Dep. at 58). SeaQuest had an incline experiment performed by unlicensed naval architect Arthur M. Barbeito ("Barbeito") (Ex. 33, Hains Dep. at 50-51; Ex. 39, Lovell Dep. at 18-19). Although Barbeito allegedly performed the incline test to determine the vessel's stability pursuant to the Det Norske Veritas ("DNV") Rules for Classification for High Speed and Light Craft (Exs. 34, 86, Barbeito letters 6/4/01), in fact, it was not performed to DNV standards because only one weight move was performed while DNV required six separate moves. (Ex. 33, Hains Dep. at 53-54). Further, Barbeito was unable to take into account "severe wind and rolling criteria" due to a lack of necessary construction drawings. (Exs. 34, 86). Barbeito's conclusion[2] was that it was "necessary to add 13.5 mt of ballast in the bilge to meet minimum" stability requirements. (Exs. 34, 86). Until the ballast could be added, the vessel could not sail with less than 4,200 gallons of fuel on board. (Exs. 34, 86). Eventually, Barbeito prepared plans for modifying the hull form by adding a new keel to install additional ballast. (Ex. 33, Hains Dep. at 66; Ex. 39, Lovell Dep. at 22-23). However, a further incline test was never performed after the ballast was added to confirm that the yacht met minimum stability requirements. (Ex. 35, R. Moore Dep. at 35; Ex. 39, Lovell Dep. at 23).

In late 2004, SeaQuest took the yacht to the Ft. Lauderdale boat show to try to sell her. (Ex. 33, Hains Dep. at 41-42). At the show, the yacht's captain, Captain Robert Moore[3] had discussions with a licensed naval architect, Drew Hains of Murray & Associates, about

---

[1] A "tender" vessel is susceptible to rolling over and capsizing.

[2] The only reports on Barbeito's incline test are incomplete copies of two versions of a letter dated June 4, 2001 to Mr. Lovell. (Exs. 34, 86). Barbeito's calculations have never been produced.

[3] Capt. Moore has been retained as an expert by PGG/Ashkenazy in this case.

2

performing another incline test. (Ex. 33, Hains Dep. at 119).  Murray & Associates presented a formal quotation for performing the test, but nothing ever came of that proposal. (Ex. 87; Ex. 33, Hains Dep. at 27).  Several months later, SeaQuest's broker sought another quote from Murray & Associates to perform a new incline test (Ex. 88).  Again, nothing ever came of this because Lovell, concerned about the cost of the test and possible damage to his teak wood decks, was told by Barbeito, an unlicensed naval architect, that it was not necessary. (Ex. 39, Lovell Dep. at 33, 36).

In November 2005, Ashkenazy negotiated to purchase the yacht.  When he heard about a possible problem with hull flexing of the vessel, his yacht broker made inquiries and reported to him some of the troubled history of the yacht. (Ex. 65; Ex. 62, Chamberlain Dep. at 41).

Ashkenazy signed a Purchase Agreement with SeaQuest on November 15, 2005 to buy the PRINCESS GIGI for $7,800,000.00. (Ex. 66, 89).  The Agreement was subject to "sea trial, survey and inventory inspection satisfactory to" Ashkenazy (*Id.*).  Ashkenazy retained Patton Marine, Inc. ("Patton") to conduct a condition and valuation survey of the yacht. (Ex. 61, Ashkenazy Dep. at 62-63).  Based upon the deficiencies noted in Patton's December 1, 2005 preliminary recommendations, Ashkenazy negotiated a price reduction to $7,535,400.00, with SeaQuest remaining responsible to comply, at its own expense, with a large number of the Patton Recommendations within 90 days of the closing. (Exs. 72, 74).

In addition to Patton, Ashkenazy, through his broker, Kent Chamberlain, also had three other surveys performed and completed before Federal agreed to insure the yacht. (Ex. 61, Ashkenazy Dep. at 66-68; Ex. 62, Chamberlain Dep. at 55-58, 132-33).  Ward's Marine Electric ("Ward's") performed an electrical survey and produced a list of recommended repairs with an "X" indicating hazardous items. (Ex. 69; Ex. 62, Chamberlain Dep. at 113-14).  Frank Griffin

performed an engine survey.[4] (Ex. 90; Ex. 62, Chamberlain Dep. at 57-58).  A-1 Marine

Surveyors ("A-1") performed a survey for the government of St. Vincent & Grenadines to

determine what was required to obtain a commercial registration which would allow PGG to

charter the PRINCESS GIGI for hire. (Ex. 70; Ex. 62, Chamberlain Dep. at 133-34).  The A-1

report noted that an incline experiment needed to be performed and a stability book provided.

(Ex. 70, item 1).  A-1 also reported that a Barbeito plan, sighted on the yacht, stated:

> Due to the fact that there is very little structural information on this vessel, it is
> not possible to perform a thorough and complete structural analysis to ascertain
> residual longitudinal strength of the hull.  It has been assumed that the new
> bottom is providing some longitudinal and local strength.  Therefore, Arthur M.
> Barbeito & Associates cannot assume responsibility for internal structural failure.

(Ex. 70, p. 2).  In response to this disclaimer, A-1 required that, to confirm that the yacht was

suitable for open seagoing service as originally designed, calculations and drawings must be

provided by a qualified naval architect to show that the structural integrity of the hull has not

been compromised by the bow modification and the addition of the ballast. (Ex. 70, p. 2; Ex. 33,

Hains Dep. at 16).

Ashkenazy formed PGG to own and operate the PRINCESS GIGI. (Ex. 82, Kriss Dep. at

23).  PGG/Ashkenazy obtained a loan of $5,850,000.00 from KeyBank to purchase the

PRINCESS GIGI. (Ex. 29).   Prior to closing, Patton's final survey Report and

Recommendations, dated December 7, 2005, were received and reviewed by PGG, Ashkenazy

and KeyBank. (Ex. 43, Ex. 50, Ex. 61, Ashkenazy Dep. at 187-88, 191; Ex. 28, Kline Dep.

at 45).  Patton specifically declined to declare the yacht seaworthy. (Ex. 51, Riley Dep. at 173-

---

[4] Apparently, on the basis of the engine survey, RPM Diesel Engine Co. Inc. prepared an
estimate as to the cost to make repairs to the yacht (Ex. 62, Chamberlain Dep. at 116; Ex. 23,
Acceptance Agreement, ¶3(c)).  That estimate has never been produced in this case.

74; Ex. 14, Patton Report, p. 31).[5]

KeyBank's customary template for its Marine Note and Security Agreement would have required PGG to comply with all of Patton's material recommendations within 30 days of the closing. (Ex. 85, KeyBank Template). However, at the request of PGG/Ashkenazy's attorney, KeyBank agreed to modify the Marine Note and Security Agreement to allow PGG 120 days to correct all but 5 of Patton's Safety Equipment recommendations.[6] (Ex. 28, Kline Dep. at 26, 29-30; Ex. 29, Marine Note).

In November, 2005, Ashkenazy approached William E. Kelly Agency, Inc. ("Kelly") to obtain insurance for the PRINCESS GIGI. (Ex. 61, Ashkenazy Dep. at 72-74). Kelly completed a megayacht worksheet insurance application in which it advised that a single survey report existed for the vessel and that PGG/Ashkenazy intended to charter the yacht for 8 weeks a year. (Ex. 6). The application did not reveal the existence of multiple surveys. The worksheet application directed Kelly to attach a copy of the survey report and/or forward a copy to Federal within 30 days. (Ex. 6). On November 30, 2005, Federal's underwriter, Donna Capiga, issued a quote setting forth the coverage limits and premium specifications under which Federal was willing to provide insurance on the PRINCESS GIGI. (Ex. 7). The quote sheet again requested a copy of the survey report. (*Id.*).

At 1:15 p.m. on December 12, 2005, on instructions from Federal, Kelly signed and

---

[5] The term "seaworthiness" means that a vessel must be fit for the intended use. Seaworthiness is a comprehensive and relative term in that the vessel must not only be staunch and strong, but must also be fitted with all proper equipment, in good order and with a sufficient and competent crew. If a vessel is not seaworthy, people may die. A special-purpose vessel or a vessel specifically designed for use in sheltered waters is held to a different standard than a vessel built for use in the open sea. The PRINCESS GIGI, a 124' tri-deck megayacht, was built for use in the open sea (Ex. 52, Hipple Dep. at 23; Ex. 33, Hains Dep. at 16).

[6] The Marine Note and Security Agreement was silent as to how long PGG had to comply with the other material recommendations (Ex. 28, Kline Dep. at 37-38).

forwarded a binder for the PRINCESS GIGI, effective 12:01 a.m. on December 13, 2005 (Ex. 21, M. Moore Dep. at 72-73; Ex. 24, 12/12/05 Fax). Subsequently, after business hours on December 12, David Kriss, Ashkenazy's attorney, e-mailed Kelly the December 7, 2005 Patton Report and Recommendations (Ex. 4, Kelly Dep. at 120-21, 246-47; Ex. 10). The e-mail was not seen by Kelly until the morning of December 13, after the inception of the policy. (Ex. 4, Kelly Dep. at 246-47, 255-56). Kelly never forwarded a copy of the Report or Recommendations to Federal. Federal never received copies of the other prior survey reports done by Ward's, Griffin or A-1 or the repair estimate by RPM Diesel. (Ex. 19, Capiga Decl. 11/17/06 ¶¶ 17, 18, 22, 26).

Neither Kelly nor Federal were advised that there were different versions of the Patton Report and Recommendations nor that because of the number and complexity of the recommended repairs, PGG allowed SeaQuest 90 days to make many of the recommended repairs and KeyBank granted PGG/Ashkenazy's request for 120 days to effect the safety equipment repairs set forth in the Patton Report. (Exs. 23, 29). Unfortunately, the vessel capsized and was a total loss within those 90/120-day windows, just 56 days after policy inception.

On January 4, 2006, Federal issued the formal policy, effective from December 13, 2005, to insure the Hull of the yacht for $7,023,000.00 and to insure certain Protection and Indemnity liabilities up to $10,000,000.00 (Ex. 12).

PGG/Ashkenazy hired Charles Papa as Captain of the PRINCESS GIGI (Ex. 61, Ashkenazy Dep. at 267-68). Ashkenazy then delegated to Papa complete responsibility for hiring the balance of the crew (Ex. 77, Papa Dep. at 18), and ensuring that the vessel was properly maintained. (Ex. 61, Ashkenazy Dep. at 34-35, 24-27). On February 4, 2006, the PRINCESS GIGI broke ground on a voyage from Fort Lauderdale, Florida to St. Maartin,

Netherlands Antilles, with 8 crewmembers onboard (Ex. 79, Gorin Dep. at 122-23).   Before

sailing, Papa informed Ashkenazy that there were problems with the yacht that needed to be

corrected (Ex. 81, Mitchell Dep. at 154-55).

When the vessel broke ground on February 4, the crew of the PRINCESS GIGI was

unqualified, inexperienced and improperly trained.   Captain Papa was making only his second

voyage on the yacht; the prior trip was a short voyage to the Bahamas, with SeaQuest's engineer

still serving aboard the yacht. (Ex. 77, Papa Dep. at 22).   Papa did not know the yacht had

manual steering capability even without AC power. (Ex. 77, Papa Dep. at 99; Ex. 79, Gorin Dep.

at 70).   It was the first voyage of the "engineer," Jacob Rese, who was not a licensed engineer

and had no formal training as an engineer. (Ex. 78, Rese Dep. at 4).   Mr. Rese, who had only

signed on for a single voyage, had only joined the yacht 5 days earlier, after the prior SeaQuest

engineer had already left the vessel. (Ex. 78, Rese Dep. at 7).   There was no engineer-to-engineer

turnover or explanation of the yacht's engineering systems. (Ex. 78, Rese Dep. at 10).   Rese was

not familiar with the fuel transfer system and did not use the computank system to determine the

amount of fuel in the day tank. (Ex. 78, Rese Dep. at 29).   Further, Rese's time in the engine

room was limited as he had to stand watches on the bridge. (Ex. 78, Rese Dep. at 8).

Nathalie Gorin, who had worked with Papa as a hostess on another yacht, was likewise

on her first voyage aboard the PRINCESS GIGI, serving as an unlicensed watchstander, despite

having absolutely no watchstanding training. (Ex. 79, Gorin Dep. at 11, 17-18, 25).   She was not

provided with any training by Papa in either watchstanding or radar observation. (Ex. 79, Gorin

Dep. at 34).   The watches were disorganized; Gorin never stood watch with the same person

twice. (Ex. 79, Gorin Dep. at 26, 31-33).   On her second watch, she served with the cook,

another unlicensed crewmember. (Ex. 79, Gorin Dep. at 32-33).

Papa never conducted any onboard training drills, such as fire drills, flooding drills, life boat drills or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).

Gorin observed numerous problems aboard the vessel at the start of the voyage. There was a problem with the stabilizer and the steering gear malfunctioned due to a faulty cooling pump. (Ex. 79, Gorin Dep. at 43-45). She observed a heated argument between Papa and Rese. Rese wanted to turn the yacht around while the vessel was still in sight of the Florida coast, but Papa refused. (Ex. 79, Gorin Dep. at 46-47, 49).

At approximately 8:30 p.m. on February 5, 2006, seawater was discovered in the engine room bilges (Ex. 78, Rese Dep. at 37-38). The crew did not close the fire damper on the engine room exhaust vent even though there were indications water was entering the engine room through that vent. (Ex. 78, Rese Dep. at 39). Papa failed to alter course in a timely manner to minimize flooding. (Ex. 79, Gorin Dep. at 67; Ex. 35, R. Moore Dep. at 219-20). Also, Papa went to the engine room and improperly lined up the piping to the engines to pump the bilges with the eductor pump, resulting in greater flooding, and he never told Rese what he had done. (Ex. 77, Papa Dep. 60; Ex. 35, R. Moore Dep. at 157-58, 214-16; Ex. 36, p. 6). Shortly thereafter, the day tank[7] ran out of fuel and the vessel lost her engines and all AC power. (Ex. 77, Papa Dep. at 196-98). The crew did not even know that the day tank could be refilled by gravity feed.

In the early morning hours of February 6, 2006, after the vessel had taken on a significant amount of water and was perilously listing to port without power, the U.S. Coast Guard convinced the Captain to abandon the distressed vessel with his crew. (Ex. 77, Papa Dep. at 82 &

---

[7] The fuel transfer system aboard this vessel is designed so that the various fuel storage tanks supply diesel fuel to a day tank in the engine room. This day tank then provides fuel to the main engines and generators. There is no direct piping from the various fuel storage tanks to the engine room machinery.

84). Fortunately, the Coast Guard was able to save the entire crew, via helicopter rescue, shortly before the vessel capsized without any serious injury or loss of life (*Id.*; Ex. 79, Gorin Dep. at 85).

On March 29, 2006, Federal declined the claim submitted by PGG/Ashkenazy and returned the premium previously paid to Federal. (Ex. 1). Contemporaneously, Federal instituted this action.

## LEGAL ARGUMENT

### POINT I

### THE STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *Id.* at 11, and must be supported by admissible evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## POINT II

### THE SUBJECT POLICY IS VOID *AB INITIO* DUE TO THE INSURED'S BREACH OF THE DUTY OF UTMOST GOOD FAITH

Contracts of marine insurance are governed by the doctrine of *uberrimae fidei*, or utmost good faith, which imposes upon an insured a strict obligation to reveal <u>fully</u> and truthfully all circumstances within its knowledge which may influence the terms of the risk.[8]  In *Sun Mutual Insurance Co. v. Ocean Insurance Co.*, 107 U.S. 485, 510-511, 1 S. Ct. 582, 600, 27 L. Ed. 337 (1883), the United States Supreme Court defined the doctrine of *uberrimae fidei*, stating:

> It is the duty of the assured to place the underwriter in the same situation as himself; to give him the same means and opportunity of judging of the value of the risks; and when any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy.

The doctrine of utmost good faith (*uberrimae fidei*) has been fully embraced by the Second Circuit. *See Puritan Ins. Co. v. Eagle S.S. Co., S.A.*, 779 F.2d 866, 870 (2d. Cir. 1985);[9] *Thomas v. NASL Corp.*, No. 99-Civ-11901, 2000 WL 1725011, at *4 (S.D.N.Y. Nov. 20, 2000)("The doctrine of utmost good faith is in fact a well established federal admiralty rule that governs the formation of marine insurance contracts and must be applied in this case.").

The doctrine of utmost good faith requires an insured to fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk, <u>whether or not inquired into by the insurer</u>. *See HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000);

---

[8] It is undisputed that this action is governed by the general federal maritime law of the United States.  *See Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998).  Under general maritime law, there are certain duties and obligations of an insured that are unique to marine insurance, which include, *inter alia*, the doctrine of *uberrimae fidei* (utmost good faith), the absolute implied warranty of seaworthiness, and the negative implied warranty of seaworthiness.

[9] New York state law also applies the doctrine of utmost good faith to marine insurance contracts. *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 81 (2d Cir. 1996).

*Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 420 (9th Cir. 1998),

*cert. denied*, 528 U.S. 815, 120 S.Ct. 53 (1999). An insured's failure to make such a disclosure,

"whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance,

avoids the policy." *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984);

*Commercial Union Ins. Co. v. Detyens Shipyard*, 147 F.Supp. 2d 413, 423 (D.S.C. 2001). The

doctrine of utmost good faith is based upon the principle that "[s]ince the insured is in the best

position to know any circumstances material to the risk, the insured must reveal those facts to the

underwriter, rather than wait for the underwriter to inquire." *Knight v. U.S. Fire Ins. Co.*, 804

F.2d 9, 13 (2d Cir. 1986).

A fact is material if it "could possibly influence the mind of a prudent and intelligent

insurer in determining whether he would accept the risk." *Kilpatrick Marine Piling v. Fireman's

Fund Ins. Co.*, 795 F.2d 940, 942-43 (11th Cir. 1986). In *Gulfstream Cargo Ltd. v. Reliance Ins.

Co.*, 409 F.2d 974 (5th Cir. 1969), the Court stated:

> All facts are material which would affect the mind of a rational underwriter,
> governing himself by the principles on which underwriters in practice act, as to
> either of the following points: 1st, whether he will take the risk at all; 2nd, at what
> premium will he take it... The duty attaches at the time of effecting the
> insurance, *** for the effect of a concealment in avoiding the policy is to be
> determined not by its eventual relation to the nature of the risk, but with reference
> to its immediate influence on the judgment of the underwriter.

*Id.* at 981, n.22. *See also Albany Ins. Co. v. Horak*, 1994 A.M.C. 273, 282, 1993 WL 269620, *7

(E.D.N.Y. 1993) ("materiality in insurance context is whether fact or omission could reasonably

have affected the insurer's decision to enter into the contract, or its evaluation of the degree or

character of the risk, or its calculation of the premium") (citing *John Jovino Co. v. Fireman's

Fund Ins. Co.*, 1992 WL 176956, *7 (S.D.N.Y. 1992)).

Courts define materiality in the subjective context of the effect on the particular

underwriter's decisions. *See Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985)("A fact is not material unless it is 'something which would have controlled the underwriter's decision,'") (quoting *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir. 1931)); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)(same). *See Albany Ins. Co. v. Horak*, 1993 WL 269620, *7 (E.D.N.Y. 1993).

PGG/Ashkenazy failed to disclose numerous material facts to Federal concerning the condition of the PRINCESS GIGI which would have influenced Federal's decision to issue the Policy and on what terms and conditions. PGG/Ashkenazy failed to disclose to Federal that SeaQuest was allowed 90 days (approximately ¼ of the policy period) to make numerous substantial and material repairs to the PRINCESS GIGI (Ex. 23, Acceptance of Vessel pp. 2-3; Ex. 21, M. Moore Dep. at 42-43; Ex. 62, Chamberlain Dep. at 181-186; Ex. 61, Ashkenazy Dep. at 250-253; Ex. 39, Lovell Dep. at 45-47).

PGG/Ashkenazy also failed to disclose that KeyBank granted PGG's request and allowed 120 days after the closing (approximately 1/3 of the policy period) for PGG/Ashkenazy to comply with most of the Safety Equipment recommendations made by Patton. (Ex. 29, Marine Note ¶¶ 34, 43(c); Ex. 28, Kline Dep. at 23-24). Importantly, the standard form KeyBank Marine Note language was revised to increase the amount of time for these repairs to be completed from 30 to 120 days. (Ex. 28, Kline Dep. at 23-24, 27-31; Ex. 85).

PGG/Ashkenazy also failed to disclose the survey report prepared by A-1,[10] which required an incline experiment to be done due to concerns about the stability of the vessel

---

[10] The A-1 report was prepared because PGG/Ashkenazy was considering chartering out the vessel (Ex. 62, Chamberlain Dep. at 132-133) as disclosed in the application sent to Federal (Ex. 6). Indeed, PGG chartered the vessel to Chamberlain Yachts for one week in return for a reduced commission (Ex. 62, Chamberlain Dep. at 195-196; Ex. 91). However, the yacht capsized before the charter was performed (Ex. 62, Chamberlain Dep. at 196).

(Ex. 70, A-1 Marine Survey Report p. 1; Ex. 62, Chamberlain Dep. at 134-136) and raised questions as to the structural integrity of the yacht which could only be answered by a qualified naval architect (Ex. 70, A-1 Marine Survey Report p. 2).

PGG/Ashkenazy also did not disclose the survey report prepared by Ward's which noted numerous hazardous conditions aboard the vessel. (Ex. 69, Ward's "Worklist"). In fact, 18 of the 37 listed items concerning the engine and electrical system were marked with an "X", indicating that those particular items were most likely hazardous and could cause equipment failure, physical harm and/or property damage. (Ex. 69, Ward's Worklist; Ex. 30, Albers Dep. at 30-32; Ex. 62, Chamberlain Dep. at 113-115).

PGG/Ashkenazy failed to disclose that there were at least 4 different versions of the Patton Report: (1) the November 29, 2005 Report (Ex. 46), (2) the December 7, 2005 31-page Report (Ex. 47), (3) the December 7, 2005 32-page report (Ex. 43) and (4) the December 7, 2005 33-page Final Report (Ex. 45). Kelly only received the December 7, 2005 32-page version after the binder had been issued and could not have seen the report until after the inception of the insurance. (Ex. 4, Kelly Dep. at 121-122).

PGG/Ashkenazy failed to disclose that there were at least 5 different versions of the Patton Recommendations: (1) the November 25, 2005 rough draft (Ex. 44); (2) the December 1, 2005 Preliminary Recommendations (Ex. 48); (3) the December 1, 2005 annotated Preliminary Recommendations (Ex. 92); (4) the December 7, 2005 Preliminary Recommendations (Ex. 50); and (5) the December 7, 2005 Recommendations (Ex. 42). The December 7, 2005 Patton Recommendations was the only version provided to Kelly, but not until after the binder was issued. (Ex. 4, Kelly Dep. at 121-122).

The Patton survey report notes that the three (3) watertight bulkheads "have been

compromised by plumbing penetrations and unfilled, cut-throughs." (Ex. 42; Patton Recommendations p. 2). Watertight bulkheads are vital in oceangoing vessels in order to prevent the spread of water between compartments which, if it occurs, would affect the vessel's stability and cause the ship to be unsafe and unfit for its intended use, *i.e.*, unseaworthy. (Ex. 55, Dolan Decl. ¶ 20). Indeed, even PGG/Ashkenazys' own expert, William Hipple, conceded that the various watertight bulkhead breaches should be repaired before the PRINCESS GIGI went to sea again. (Ex. 52, Hipple Dep. at 66-67). The Patton survey report lists other safety equipment deficiencies, such as the fact that the engine room had three (3) manual submersible bilge pumps, rather than automated bilge pumps, in an unoccupied automated engine room (Ex. 42, Patton Recommendations p. 2).

Respecting the hull itself, Patton found that the fiberglass lamination work in the area of the forward portside of the vessel had been poorly performed and may indicate a structural problem, compromising the integrity of the vessel, i.e. seaworthiness. (Ex. 42, Patton Recommendations pp. 3-4). Patton also found plastic piping sticking out of the forward watertight bulkhead, which opens up the bow thruster compartment into the next watertight compartment aft and affects the safety, watertight integrity and seaworthiness of the vessel. (Ex. 42, Patton Recommendations p. 4).

Patton also noted evidence of a water leak on the portside (left side) aft, but it was unclear as to how the water is entering into the vessel. (Ex. 42, Patton Recommendations at 4). Ultimately, this would be expected to drain into the engine room bilge area, making automatic bilge pumps even more necessary in order to pump out water that is entering the vessel from unknown sources. In short, anyone in the marine industry, reading any of the versions of the Patton Report, with its 15 pages of recommendations, noting 158 separate deficiencies, would

reach the conclusion that this oceangoing megayacht was not safe or seaworthy. (Ex. 55, Dolan Decl. ¶35).

The Patton Report & Recommendations was only received by Kelly after the insurance binder was issued and they were not looked at until after the insurance was already in effect. The signed insurance binder was sent by Kelly to PGG/Ashkenazy's closing agent, Moore & Co., on December 12, 2005 at 1:15 p.m. (Ex. 21, M. Moore Dep. at 72-73; Ex. 24, 12/12/05 Fax).  The Patton Report and Recommendations were e-mailed to Kelly by PGG's New York attorney on December 12, 2005 at 6:35 p.m., which was after the close of business and after Kelly had left for the day. (Ex. 4, Kelly Dep. at 120-121, 246-247; Ex. 10, E-mail 12/12/05). The Policy went into effect on December 13, 2005 at 12:01 a.m. (Ex. 24, Signed Insurance Binder).  The earliest Kelly could have opened the e-mail to receive the report was at 8:30 a.m. on December 13, 2005, which was after the insurance coverage was already in effect. (Ex. 4, Kelly Dep. at 246-247, 255-256).

All of the undisclosed information concerning the deficiencies of the PRINCESS GIGI was material to Federal's decision whether to issue the subject policy and on what terms and conditions.  Federal Senior Yacht Underwriter, Donna Capiga, would not have bound coverage on the same terms or for the same premium had Federal known of the aforementioned deficiencies identified in the Patton survey report prior to the inception of the policy.[11] (Ex. 17, Capiga Decl. ¶ 11).  Capiga would not have bound the PRINCESS GIGI insurance on the same terms and conditions if she had known of the 90-day or 120-day windows provided for repair of the various deficiencies of the vessel.  (Ex. 19, Capiga Decl. 11/17/06 ¶¶ 12, 16).  Additionally, Capiga would not have bound coverage on the same terms and conditions if she had received a

---

[11] The information in the Patton Report would be material to an underwriter's decision as to whether to insure the yacht, and if so, on what terms. (Ex. 25, Prendergast Dep. p. 121-122).

copy of the Ward's worklist prior to the inception of the policy. (*Id.* ¶ 18, 21). Since the megayacht worksheet indicates that the vessel was to be chartered, the A-1 report is necessary documentation which should have been provided to Federal. (*Id.* at ¶¶ 23-24). Moreover, the A-1 report is also material to assessing the risk because it specifically states that the stability documentation "must be provided" for review by a "qualified naval architect." (Ex. 70, A-1 Marine Survey Report p. 3). Capiga would not have bound the risk on the same terms and conditions if she had received the A-1 report prior to the inception of the policy. (*Id.* at ¶¶ 26, 27). At most, the PRINCESS GIGI risk would have remained on Port Risk only coverage until Federal received certification from the vessel owner that an incline experiment and the stability and structural integrity concerns had been satisfied. (*Id.* ¶ 28).

Based upon the numerous deficiencies, if all the material information had been disclosed to Federal, the PRINCESS GIGI would have been insured for Port Risk only, which would have only provided coverage while the vessel remained within the protected confines of the repair port. (Ex. 17, Capiga Decl. ¶¶ 12-13; Ex. 19, Capiga 11/17/06 Decl. ¶¶ 13-14, 19-20, 27; Ex. 20; O'Sullivan Dep. at 7, 42, 74-75). In the past, Federal had received a survey report noting deficiencies with a vessel and, as a result, placed the yacht on Port Risk only until the surveyors confirmed that the deficiencies had been corrected. (Ex. 20, O'Sullivan Dep. at 165-167).

Defendants breached the duty of utmost good faith owed to Federal by failing to disclose information material to Federal's decision to accept the risk and on what terms and conditions. Accordingly, defendants breached the duty of utmost good faith thereby voiding the policy *ab initio*. Federal is entitled to summary judgment on the First Cause of Action of the Second Amended Declaratory Judgment Complaint.

## POINT III

### DEFENDANTS BREACHED THE ABSOLUTE
### IMPLIED WARRANTY OF SEAWORTHINESS

An absolute warranty of seaworthiness is implied at the moment the policy attaches. *See*

*Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F. 2d 1422 (5th Cir. 1992)

(holding that an implied warranty of seaworthiness in a time hull policy attaches at the inception

of the risk and is absolute in nature); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*,

952 F.Supp. 1046, 1067 (S.D.N.Y. 1997) (holding that the absolute implied warranty of

seaworthiness applies at the moment the hull policy comes into effect). This warranty requires

that the vessel be, in every respect, fit to encounter the normal hazards of maritime travel at the

time insurance is procured.[12]  *See The Caledonia*, 157 U.S. 124, 131 (1895) (holding that every

person who seeks to insure his ship against sea perils impliedly warrants that his ship is, in every

respect, in a suitable condition to proceed and continue on the voyage, and to safely encounter all

common perils and dangers); *Continental*, 952 F.Supp. at 1065 ("'Seaworthiness is the ability of

a vessel adequately to perform the particular services required of her on the voyage she

undertakes.'" (quoting *McAllister Lighterage Line, Inc. v. Insurance Co. of N. Am.*, 244 F.2d

867, 870 (2d Cir. 1957), *cert. denied*, 355 U.S. 871, 78 S.Ct. 123, 2 L.Ed.2d 76 (1957))). The

---

[12] It should be noted that the absolute implied warranty of seaworthiness is not just some arcane maritime doctrine with little or no applicability to modern insurance disputes. The purpose of the implied warranty of seaworthiness is to *protect lives*. If a vessel is unseaworthy, people may die. "The warranty is intended to take 'away all temptation to expose life and property to the dangers of the seas in vessels not fitted to encounter or avoid them.'" *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422 (5th Cir. 1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (5th Cir. 1992). The imposition of the warranty is justified in that the insured is in the best position to know the condition of the vessel and the intended use of the vessel during the period of insurance. *Continental*, 952 F.Supp. at 1067. The warranty is also appropriate because "the insured is in the best position to ensure that the vessel is seaworthy -- that is, able adequately to perform the services required of her -- before the vessel undertakes a voyage." *Id.*

warranty of seaworthiness is an absolute and *non-delegable* duty owed to the insurer which encompasses the integrity of the vessel's physical structure, as well as its equipment and working procedures. *Reliance Nat'l Ins. Co. v. Hanover*, 246 F.Supp.2d 126 (D.Mass. 2003) (citing *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir. 2001)).

In order to successfully decline coverage based on the insured's breach of the absolute implied warranty of seaworthiness, the insurer does not need to demonstrate that the insured had knowledge or was somehow at fault in not discovering the unseaworthy condition.  It is enough that the vessel was not seaworthy at the time the policy attached. *See Employers Ins. of Wausau*, 178 F.2d at 1436; *Continental*, 952 F.Supp. at 1068; *Certain Underwriters at Lloyds v. Johnston*, 124 F.Supp.2d 770, 771 (holding that an insurance policy will be deemed void where insured failed to reveal to insurer that survey found vessel unseaworthy and repairs were not performed); *The Caledonia*, 157 U.S. at 131 (1895) (holding that if it if the vessel is unseaworthy at the time the policy attaches, there is no contract of insurance because the policy is wholly void); *Reliance Nat'l*, 246 F.Supp.2d at 136 ("a finding of unseaworthiness is not dependant upon an owner's negligence or fault").

The evidence establishes that the PRINCESS GIGI was unseaworthy at the inception of the policy.  The vessel was designed for voyage on the open ocean. (Ex. 33, Hains Dep. at 16).  The Cutalo hull design was for a 2½ deck vessel without huge garages aft. (Ex. 33, Hains Dep. at 14, 16).  However, the PRINCESS GIGI was built without modifying the design. (Ex. 33, Hains Dep. at 15).  The placement of the engines, which were moved because of the garages, affected the vessel's stability. (Ex. 33, Hains Dep. at 17).  Additionally, the extra deck was located up high. (Ex. 33, Hains Dep. at 13).  Moreover, the vessel construction contributed to the weight imbalance and the vessel was trimmed down by the bow. (Ex. 33, Hains Dep. at 19).  As

a result of a Trident stability analysis, the shipyard naval architect had "grave concerns" regarding the stability of the vessel.  (Ex. 33 Hains Dep. at 20).

Robert Connell, a Patton marine surveyor, served as a arbitrator in the case between the prior owner of the yacht and the shipyard that designed her (*i.e.*, between SeaQuest and Trident). (Ex. 41, Connell Dep. at 8-10, 25, 55-56).  The arbitration panel found for the owner because the vessel did not float properly in that "[i]t was down by the bow probably two feet." (Ex. 41, Connell Dep. at 56).  The panel also found that the FULL BLOOM had stability problems. (Ex. 41, Connell Dep. at 57-58).

After the arbitration, additional litigation involving SeaQuest and Trident resulted in a "Bench Order" from the United States District Court of the Middle District of Florida. (Ex. 40). In the Order, the Court identified over 80 items on the yacht that were either negligently constructed or defective as a result of intentional misconduct. (Ex. 40, p.8-13).

Furthermore, the PRINCESS GIGI had ongoing trim and stability issues.  A false bow was added to the vessel to correct the improper trim. (Ex. 41, Connell Dep. at 59; Ex. 51, Riley Dep. at 82-83).  Even after the yacht was put in use with the false bow, it was determined that she was "tender" – i.e. she was slow to come back to the upright position when pushed over by a wave. (Ex. 35, Moore Dep. at 58).

Unlicensed naval architect Arthur M. Barbeito performed an incomplete incline experiment to assess vessel stability, and not in accordance with any appropriate standard. (*See* Ex. 33, Hains Dep. at 50-54).  Further, the analysis performed by Barbeito did not address the "severe wind and rolling criteria," which would require additional ballast, because they did not have the necessary construction drawings. (Ex. 34).  Barbeito recommended adding 13.5 MT of ballast, modifying the shape of the hull. (Ex. 34).  Adding the ballast was intended to "stiffen"

the vessel; make it "less tender, make it less rolly." (Ex. 51, Riley Dep. at 83).  The addition of some 13.5 tons of lead ballast is considered "a lot." (Ex. 41, Connell Dep. at 61).

Accurate information regarding the shape of the hull is important to properly determine the vessel stability.  (Ex. 33, Hains Dep. at 32).  No further stability analysis was ever performed after the hull modification. (Ex. 35, Moore Dep. at 35; Ex. 39, Lovell Dep. at 23).  Both Patton and A-1 agreed that the vessel stability documentation needed to be presented and reviewed. (Ex. 41, Connell Dep. at 96; Ex. 70).

Furthermore, the PRINCESS GIGI should have been able to survive "dead ship condition" prior to the capsizing until help arrived. (Ex. 57, Randall Dep. at 262-63).

The PRINCESS GIGI was also unseaworthy by virtue of design defects.  Specifically, the garage doors were not watertight (Ex. 57, Randall Dep. at 196-97), and the engine room exhaust ducting was too close to the vessel waterline. (Ex. 57, Randall Dep. at 275-77; Ex. 52, Hipple Dep. at 71-72; Ex. 78, Rese Dep. at 39; Ex. 77, Papa Dep. at 44).  The weight of the water in the garages[13] caused the engine room exhaust ducting to be even closer to the water line. (Ex. 58, p.7; Ex. 77, Papa Dep. at 90).

The vessel was also unseaworthy due to a breach in her watertight integrity. (Ex. 58, p.5).  The vessel was designed with three (3) watertight bulkheads, which are necessary for the safety of the vessel. (Ex. 54, Dolan Dep. at 137-38).

The Patton Report with Recommendations documents the breaches of watertight integrity.  For example, Patton notes:

> [T]here are three watertight compartments on the yacht.  All watertight bulkheads (forepeak, forward and aft engine room) have been compromised by plumbing penetrations and unfilled cut-throughs.  Verify a proper seal at all penetrations on

---

[13] The fact that water was in the port garage is demonstrated by the water coming in the "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36).

both sides of these bulkheads. (Ex. 42, p.2).

Defendant's expert, William Hipple, admitted that the compromised watertight bulkheads should be repaired before the vessel goes to sea. (Ex. 52, Hipple Dep. at 66-67). The integrity of the watertight bulkheads is a material safety issue, since the compromised bulkheads would allow water to transverse from one watertight compartment to another. (Ex. 54, Dolan Dep. at 137-38; Ex. 52, Hipple Dep. at 64).

Watertight bulkheads are vital in oceangoing vessels in order to prevent the spread of water between compartments which, if it occurs, affect the vessel's stability. (Ex. 54, Dolan Dep. at 137-38). Absent watertight bulkheads, water inside a vessel would reduce the vessel's intact stability and coupled with the sloshing effect of free water, could cause a ship to capsize. (Ex. 55, ¶ 20). Breaches or holes compromise watertight bulkheads by allowing water gaining access into the vessel in one compartment to penetrate longitudinally or transversely and to slosh around, affecting the stability. (Ex. 54, Dolan Dep. at 137-40). Breaches in watertight bulkheads will cause the ship to be unsafe and unfit for its intended use, i.e., unseaworthy. (Ex. 52, Hipple Dep. at 64-67; Ex. 56, p. 5).

The Vessel Acceptance documents indicate that the breaches in the watertight bulkheads were not fixed before the sale of the vessel. (Ex. 23; *see also* Ex. 43). A continuing lack of watertight integrity in the aft engine room bulkhead existed at the time of the Feb. 4th voyage as evidenced by water leaking through the "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36). The lack of watertight integrity rendered the PRINCESS GIGI unseaworthy at the time the Federal policy was issued.

Although there is substantial evidence establishing the unseaworthiness of the PRINCESS GIGI, Federal is also entitled to a presumption of unseaworthiness due to the fact

that the vessel capsized under normal and expected conditions that the vessel could reasonably have been expected to withstand. *See Hudson Val. Lightweight Aggregate Corp. v. Windsor Bldg. & Supply Co.*, 446 F.2d 750, 752 (2d Cir. 1971); *Acadia Ins. Co. v. Allied Marine Transport LLC*, 151 F.Supp.2d 107, 124 (D.Me. 2001). The insured must rebut the presumption by producing competent evidence that the vessel sank for some reason other than the alleged unseaworthy condition. *See Underwriters at Lloyd's v. Labarca*, 260 F.3d 3 (1st Cir. 2001).

The weather and sea conditions encountered were expectable in that area of the Atlantic Ocean in any February. (Ex. 60, Raguso Dep. at 76). Additionally, the weather and sea conditions were forecast prior to the February 4th voyage. (Ex. 60, Raguso Dep. at 56-57). Indeed, Papa has admitted that the weather was not the cause of the sinking. (Ex. 77, Papa Dep. at 83). Finally, defendants' expert Robert Moore admitted that the PRINCESS GIGI had sailed without incident in worse conditions than those encountered on the date of the capsizing. (Ex. 35, Moore Dep. at 101, 199-200). Thus, defendants have not rebutted the presumption that the yacht capsized due to unseaworthiness.

PGG/Ashkenazy breached the absolute implied warranty of seaworthiness. Therefore, Federal is entitled to summary judgment on the Third Cause of Action in the Second Amended Declaratory Judgment Complaint.

**POINT IV**

**DEFENDANTS BREACHED THE NEGATIVE
IMPLIED WARRANTY OF SEAWORTHINESS**

PGG/Ashkenazy have also breached the negative implied warranty of seaworthiness because they had knowledge at the time she left on her fateful voyage in early February, 2006 of the unseaworthy condition of the PRINCESS GIGI which was the proximate cause of her

capsizing.[14]

The negative implied warranty of seaworthiness applies after the attachment of the risk and requires that the vessel owner refrain from allowing the vessel to leave port in an unseaworthy condition. *See Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957) (holding that a warranty of seaworthiness applies at the inception of each voyage during the policy term). Under the negative implied warranty of seaworthiness, the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. *Continental*, 952 F.Supp. at 1070. The consequence of a violation of this "negative" burden is a denial of liability for loss or damage proximately caused by such unseaworthiness. *Id.*; *Employers Ins. of Wausau*, 978 F.2d at 1432.

## A.    Vessel Unseaworthiness

The crew of the PRINCESS GIGI at the time of the capsizing was incompetent, and therefore, the vessel was unseaworthy. A shipowner has a non-delegable duty to provide a competent crew for its vessel. *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1565 (11th Cir. 1985). Incompetence of the crew is an unseaworthy condition of the vessel. *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 517-18 (2nd Cir. 1952). ("It has long been settled that the assured's warranty of his ship's seaworthiness in a maritime policy is broken if the master or the crew are not competent for their duties"); *In the Matter of the Complaint of Armatur S.A., and Tourship Co. S.A.*, 710 F.Supp. 390 (D.P.R. 1988). ("The shipowner has a duty to properly train the crew in the operation and capacities of the vessel and its navigational equipment.") "[A] vessel crew that is inadequately trained, that is not instructed

---

[14] Even if Kelly is deemed to have received the Patton survey report prior to issuing the binder, and Federal is deemed to have constructive knowledge of the findings in the survey report, defendants still breached the negative implied warranty of seaworthiness by allowing the PRINCESS GIGI to leave port in an unseaworthy condition.

in the use of equipment, or that engages in unsafe methods of work, can constitute unseaworthiness." *Crane v. Diamond Offshore Drilling, Inc.*, 743 So.2d 780 (La. App. 5th Cir. 1999) (citations omitted); *see also Orient Mid-East Lines, Inc. v. S.S. Orient Transporter*, 496 F.2d 1032, 1040 (5th Cir. 1974) ("[A]n inadequate crew, of course, may create an unseaworthy condition. An inadequate crew may be due either to insufficient manning or due to an incompetent crew."); *Verdin v. C&B Boat Co., Inc.*, No. 85-CV-1306, 1986 WL 15241 (W.D. La. Dec 31, 1986) ("The failure to provide an adequately trained and licensed crew was the result of [the owner's] negligence, and rendered the [vessel] unseaworthy.") (*citing Insurance Co. of N.A. v. Board of Commissioners*, 733 F.2d 1161 (5th Cir. 1984).

In *In re Potomac Transport, Inc.*, 909 F.2d 42 (2d Cir. 1990), the court found that numerous instances of crew error and negligence constituted gross negligence and created a presumption of crew incompetence. The captain failed to observe the "rules of the road" for passing vessels, failed to contact the other vessel via radio to confirm course information, and was grossly negligent in executing a turn to port rather than starboard to avoid a collision. The court found that these acts raised a presumption of crew incompetence, relying upon the aggregation principle set forth in *Ta Chi Navigation*.

In *In re Ta Chi Navigation (Panama) Corp. S.A.*, 513 F.Supp. 148, 159 (E.D. La. 1981), the court recognized that errors in navigation or management can be so extreme as to raise a presumption of incompetence. The court found numerous instances of conduct that it considered gross negligence on the part of the crew, including the captain's mistaking the lights of a naval fleet for that of a fishing fleet, his failure to monitor the fleet's navigation lights, and his making a turn contrary to the rules of navigation, placing the vessel directly on a collision course with other vessels with which she ultimately collided. The court found that the errors were of such an

"aggravated nature" that they transcended ordinary fault and constitute proof of incompetence. *Id.* at 160.

In *In re Warrior & Gulf Navigation Co.*, 1997 A.M.C. 1432, 1996 WL 904752 (S.D. Ala. 1996), the court found the vessel unseaworthy because the crew was incompetent. The deckhands had little overall maritime experience and no experience navigating in the river where they were operating. Indeed, one of the deckhands stationed as a lookout admitted that he did not know what a lookout was or what a lookout was supposed to do. The vessel was damaged when the inexperienced third mate, who was piloting the vessel, ran it aground while the master was eating in the galley, where he remained even after the vessel was grounded.

In *Orient Mid-East Lines, Inc. v. S.S. Orient Transporter*, 496 F.2d 1032 (5th Cir. 1974), the vessel was unseaworthy because she was manned with an inexperienced crew. The crew member in question was a janitor who was pressed into service as a fireman and placed in charge of monitoring the water level in the boiler — a task he had never been trained to do. The vessel was badly damaged when the boiler exploded because the janitor misread the gauge and, believing the water level to be dangerously low, dumped cold water directly into the boiler.

Courts have found that the failure to have a properly licensed crew creates a presumption of unseaworthiness. "The failure to provide an adequately trained and licensed crew was the result of [the owner's] negligence, and rendered the [vessel] unseaworthy." *Verdin v. C&B Boat Co., Inc.*, No. 85-CV-1306, 1986 WL 15241 (W.D. La. Dec 31, 1986) (citing *Insurance Co. of N.A. v. Board of Commissioners*, 733 F.2d 1161 (5th Cir. 1984)). In *Insurance Co. of N.A. v. Board of Commissioners of the Port of New Orleans*, 733 F.2d 1161 (5th Cir. 1984), the court found that the owner's failure to have a licensed captain aboard the tug involved in a collision

rendered the tug unseaworthy. *See also In re New England Fish Co.*, 465 F.Supp. 1003 (W.D. Wash. 1979).

Similarly, the crew aboard the PRINCESS GIGI on her last voyage was woefully unqualified and committed numerous errors which rendered the yacht unseaworthy. The Feb. 4th voyage of the PRINCESS GIGI was only Papa's second voyage aboard the vessel, the first trip being a short voyage to the Bahamas, with the prior owner's engineer continuing to work on the vessel. (Ex. 77, Papa Dep. at 22). To make matters worse, this ill-fated trip was the very first voyage of the "engineer," Jacob Rese, who was not a licensed engineer and had no formal training as an engineer. (Ex. 78, Rese Dep. at 4). Mr. Rese had only signed on to the voyage on January 30, 2006, a mere 5 days prior to departure and after the prior owner's engineer had already left the vessel. (Ex. 78, Rese Dep. at 7). Therefore, there was no engineer-to-engineer turnover or explanation of vessel systems. (Ex. 78, Rese Dep. at 10). Rese had only signed on for this particular voyage, not as the permanent engineer. (Ex. 78, Rese Dep. at 7).

Rese was not familiar with the fuel transfer system aboard the PRINCESS GIGI, not knowing the day tank could be gravity fed. (Ex. 78, Rese Dep. at 29). He failed to use the computank system to determine the amount of fuel in the day tank. (Ex. 35, R. Moore Dep. at 187-88). Not surprisingly, the PRINCESS GIGI ran out of fuel because her day tank ran dry. (Ex. 80, Fudge Dep. at 33; Ex. 77, Papa Dep. 97-98). Rese also failed to close the engine room exhaust damper when water was first noted coming into the engine room through the exhaust duct. (Ex. 78, Rese Dep. at 39). In addition to his engineering duties, Rese also stood watches in the pilothouse on the bridge. (Ex. 78, Rese Dep. at 8).

The evidence further establishes that Papa was grossly negligent and/or incompetent. He failed to alter vessel course in a timely fashion to minimize flooding. (Ex. 79, Gorin Dep. at 67;

Ex. 35, R. Moore Dep. at 219-20).  Papa did not know he had manual steering capability after he

lost AC power. (Ex. 77, Papa Dep. at 99; Ex. 79, Gorin Dep. at 70).  He went down to the engine

room and improperly lined up the engines to evacuate the bilges using the eductor pump without

telling the engineer. (Ex. 77, Papa Dep. at 60; Ex. 35, R. Moore Dep. at 157-58, 214-16; Ex. 36,

p. 6).

PGG/Ashkenazys' own expert, Robert Moore, supports the evidence of crew

incompetence in his expert report, as follows:

> Knowledge of the main engine and generator fuel systems would have indicated
> to experienced personnel that when the generator ran out of fuel this is a direct
> sign [of] a day tank low issue. (Ex. 36, p.5).
> * * *
> The engineer in his interview complained directly about the lack of gravity flow
> on the vessel, he was misguided. (*Id.*, p.2).
> * * *
> No testimony was given to indicate that there was a fuel transfer performed post
> 2 pm on the event day.  Fuel was lost @ 2030, this calculation is reasonable and
> consistent with a forget to fuel day tank scenario. (*Id.*, p.4).
> * * *
> At no time was the air intake damper deployed, this would have greatly reduced
> the ingress [of seawater] and given much more time to address the root fuel
> problem. (*Id.*).
> * * *
> The main AC bilge pump was utilized but no one testified to closing the pickups
> in the event of power loss, this created a 2" ingress of water, which would have
> caused catastrophic downflooding over a 4-hour period. (*Id.*).
> * * *
> Pumping of the bilge with the main engine inductor would have dewatered at 300
> to 400 gallons per minute, this would have cleared the bilge in a very short period.
> This was employed incorrectly and could not have functioned.  Valves are shown
> to be inconsistent with proper operation in inspection pictures. (*Id.*).
> * * *
> I believe that night the actions of the crew did much more to forward the
> problems as did to resolve them.  They were unfamiliar with their vessel and this
> proved fatal. (*Id.*, p.6).

Gorin further establishes the incompetence of the crew.  Like the engineer, this was her

first voyage aboard the vessel.[15]  Gorin, who previously worked on another yacht with Papa as a

hostess (Ex. 79, Gorin Dep. at 11), was hired to work aboard the PRINCESS GIGI as an

unlicensed watchstander, despite having absolutely no watchstanding training (Ex. 79, Gorin

Dep. at  17-18 & 25).  Papa provided Gorin with no watchstanding training or radar training.

(Ex. 79, Gorin Dep. at 34).   Moreover, the watches aboard the GIGI were completely

disorganized. (Ex. 79, Gorin Dep. at 26 & 30).  Gorin never stood watch with the same person

twice. (Ex. 79, Gorin Dep. at 26, 31-33).  In fact, her second watch was with the cook, another

unlicensed crewmember. (Ex. 79, Gorin Dep. at 32-33).  Moreover, the three (3) watches were

constantly rotating on three (3) hour shifts. (Ex. 79, Gorin Dep. at 27; Ex. 77, Papa Dep. at 37).[16]

Captain Papa never conducted any onboard training drills, such as fire drills, flooding

drills, lifeboat drills, or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).[17]

There were numerous problems aboard the vessel at the beginning of the voyage.  "We

did our watches constantly disorganized because of alarms of all kinds." (Ex. 79, Gorin Dep. at

53).  There was a stabilizer problem and the steering gear malfunctioned due to a faulty cooling

pump. (Ex. 79, Gorin Dep. at 43-45).  Gorin observed a heated argument between engineer Rese

and Papa after Rese asked Papa to turn the vessel around while the vessel was still in sight of the

Florida coast. (Ex. 79, Gorin Dep. at 46-47, 49).  Papa refused to turn the vessel around. (Ex. 79,

Gorin Dep. at 46).  Furthermore, Papa admitted to the salvor that there were numerous problems

---

[15] It was also deckhand Boris Stropnik's first trip aboard the PRINCESS GIGI. (Ex. 79, Gorin Dep. at 29; Ex. 77, Papa Dep. at 48).

[16] This leads to sleep deprivation issues.  If initially standing a noon-3:00 p.m. watch, the next watch to be stood would be a 9:00 p.m.-midnight watch, followed by a 6:00 a.m.-9:00 a.m. watch, followed by a 3:00 p.m.-6:00 p.m. watch, followed by a midnight-3:00 a.m. watch, etc. Therefore, the watchstanders could not establish a consistent sleep routine.

[17] After the rescue, Papa advised Gorin to say she was only a passenger, rather than a crewmember, for "insurance purposes." (Ex. 79, Gorin Dep. at 91-92).  Papa also advised Gorin not to talk about anything that happened aboard the vessel. (Ex. 79, Gorin Dep. at 91).

aboard the vessel prior to the commencement of the voyage. (Ex. 81, Mitchell Dep. at 154-55).

According to PGG/Ashkenazys' own expert, Robert Moore, the capsizing of the PRINCESS GIGI resulted from "inexperience of the crew" which caused: (1) the loss of power to the vessel due to low fuel in the day tank; (2) the failure to close the damper in the engine room exhaust ventilation to stem flooding; (3) the open AC bilge priming line and eductor valves which added to the engine room flooding; and (4) the failure to alter the vessel's course in a timely fashion such that the sea conditions would not directly strike the port engine room exhaust ports. (Ex. 35, R. Moore Dep. at 219-20; *see also* Ex. 52, Hipple Dep. at 68). Therefore, contributing proximate causes of the casualty were multiple occasions of negligence and crew inexperience. Taken together, these constitute crew incompetence, making the yacht unseaworthy.

The PRINCESS GIGI was also unseaworthy at the commencement of the voyage because of a design defect involving the location of the engine room exhaust ducting, which was a cause of the capsizing of the vessel. The engine room exhaust ducting exited the port side of the vessel at a position too close to the waterline. (Ex. 78, Rese Dep. at 39; Ex. 77, Papa Dep. at 44). The weight of the water in the garages caused the engine room exhaust ducting to be even closer to the water line. (Ex. 77, Papa Dep. at 90). The presence of water in the garages is established by the fact that water was coming into the engine room through the supposedly watertight aft engine room bulkhead from an "I" beam penetration. (Ex. 78, Rese Dep. at 41-42; Ex. 80, Fudge Dep. at 35-36).

Additional unseaworthy conditions at the start of the voyage were admitted by PGG/Ashkenazys' own expert. There was no DC fuel pump aboard the vessel to use in the event of a loss of AC power. This is an essential piece of equipment, required for long voyages (over

400 miles). (Ex. 36, p. 4).  The vessel was operating on a backup fuel transfer system.  Normally, a fuel centrifuge is used on long voyages to constantly feed fuel to the day tank, eliminating the need for repeated transfers of fuel to the day tank. (Ex. 36, p.4).

**B.     The Unseaworthy Condition Existed at the Time the Vessel Broke Ground**

PGG/Ashkenazys' own expert, Robert Moore, confirms that the unseaworthy condition of PRINCESS GIGI existed at the time the vessel "broke ground" and left Fort Lauderdale on her last voyage as follows:

> Upon sailing from Fort Lauderdale, the vessel was manned by personnel who were generally unfamiliar with the vessel.  (Ex. 36, p.2).
>                                    * * *
> No D.C. fuel pump was located aboard, this is a standard piece of essential equipment for the vessel and required for long passages.  (Over 400 miles).  The vessel left port on a backup fuel transfer system, a fuel centrifuge was normally used on crossings to throttle fuel to the day tank as used, eliminating the need for repeated transfer. (*Id.*, p.4).

**C.     Owner's Knowledge of the Unseaworthy Condition**

Defendants cannot dispute that PGG/Ashkenazy had knowledge of the unseaworthy condition of the PRINCESS GIGI at the time she left on her final voyage.  Ashkenazy is the sole shareholder and manager of PGG.  He hired Patton to survey the vessel.  Patton's Report with Recommendations was received and reviewed by Ashkenazy. (Ex. 61, Ashkenazy Dep. at 187-88, 191, 198; Ex. 62, Chamberlain Dep. at 94-95).   Significantly, KeyBank granted PGG's request to be allowed 120 days to correct all but 5 of the Safety Equipment recommendations made by Patton. (Ex. 29).  PGG/Ashkenazy also had knowledge of the information contained in the Ward's, Griffin, and A-1 surveys and the RPM Diesel estimate. (Ex. 62, Chamberlain Dep. at 82-83, 91-92, 100-101, 114, 141, 144).  Further, Ashkenazy was specifically advised by Papa of the problems with the "systems" on the yacht before the yacht sailed from Fort Lauderdale on February 4th. (Ex. 81, Mitchell Dep. at 154-55).

Ben Ashkenazy hired Chamberlain Yachts to assist him with the purchase of the PRINCESS GIGI. Kent Chamberlain forwarded all documents, including the various survey reports, to Ashkenazy and made sure to explain everything to Ashkenazy. (Ex. 62, Chamberlain Dep. at 144, 214).

Ben Ashkenazy hired Papa and relied solely on Papa to properly maintain the yacht. (Ex. 61, Ashkenazy Dep. at 34-35, 24-27). Therefore, Papa's knowledge is imputed to PGG/Ashkenazy. Moreover, Papa informed Ashkenazy of everything regarding the vessel. (Ex. 77, Papa Dep. at 23-24; Ex. 81, Mitchell Dep. at 154-55). As PGG delegated authority to Papa to make decisions for the corporation, his decisions are binding on PGG and are deemed to be within the privity and knowledge of the corporation. *See, e.g., Continental Oil Co. v. Pennzoil Corp.*, 706 F.2d 1365, 1377 (5th Cir. 1983) (holding that knowledge of master, who was delegated general management of vessel, was sufficient to deny limitation).

Since PGG/Ashkenazy had knowledge of the unseaworthy condition of the PRINCESS GIGI at the time she left on her last voyage, they breached the negative implied warranty of seaworthiness. Federal is entitled to summary judgment on the Fourth Cause of Action of the Second Amended Declaratory Judgment Complaint.

## CONCLUSION

Based upon the foregoing, Plaintiff Federal Insurance Company respectfully requests that this Court grant Federal's Motion for Summary Judgment together with such other and further relief as this Court deems just and proper.

Dated:    New York, New York
           November 17, 2006

                                 NICOLETTI HORNIG CAMPISE & SWEENEY
                                 Attorneys for Plaintiff
                                 FEDERAL INSURANCE COMPANY

By:          _____

                                 Thomas M. Rittweger (TR-6796)
                                 Wall Street Plaza
                                 88 Pine Street, 7th Floor
                                 New York, New York 10005-1801
                                 (212) 220-3830
                                 (FILE NO.: 25000011 JAVN/TMR)

X:\Public Word Files\25\11\LEGAL\DRAFTS\MOL in Support Motion for Summary Judgment.Federal.11.15.06.vw.x.mm (FINAL).doc