06-112

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL INSURANCE COMPANY,     )
    )    06 CV 2455 (JSR)
    Plaintiff,    )
    )
    -against-    )
    )
PGG REALTY, LLC, BEN ASHKENAZY     )
and KEYBANK NATIONAL ASSOCIATION,     )
    )
    Defendants.    )
    )

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
## PGG REALTY, LLC AND BEN ASHKENAZY'S SECOND MOTION
## FOR PARTIAL SUMMARY JUDGMENT

---

WEG AND MYERS, P.C.
Attorneys for Defendants
PGG REALTY, LLC
and BEN ASHKENAZY
52 Duane Street
New York, New York 10007
(212) 227-4210

On the Brief:

Dennis T. D'Antonio, Esq.
Joshua L. Mallin, Esq.
William H. Parash, Esq.
Patrick M. Leathem, Esq.

# **TABLE OF CONTENTS**

**Page**

**TABLE OF AUTHORITIES**………………………………………………… iv

**PRELIMINARY STATEMENT**…………………………………………….. 2

**STATEMENT OF FACTS**………..………………………………………. 4

The Yacht's Condition Prior to Its Initial Voyage
and Prior to the Loss …………………………………………………….. 6

The Loss ……………………………………………………………… 7

The Investigation and Litigation Strategy …………………………………… 9

The Claim ……………………………………………………………. 10

The Prior Summary Judgment Motion ……………………………………. 11

**ARGUMENT** …………………………………………………………….. 12

**POINT I**

DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY
JUDGMENT GRANTING THEIR FIRST, SECOND, THIRD
AND FOURTH COUNTERCLAIMS ……………………………………... 12

    A. DEFENDANTS HAVE ESTABLISHED THEIR PRIMA FACIE
    CASE, SHIFTING THE BURDEN TO PLAINTIFF TO
    ESTABLISH A LEGALLY OR FACTUALLY COGNIZABLE
    BASIS FOR DENYING COVERAGE  ……………………………… 13

    B. PLAINTIFF'S CAUSES OF ACTION SEEKING TO VOID
    POLICY BASED ON VIOLATION OF THE DUTY OF UTMOST
    GOOD FAITH ("*UBERRIMAE FIDEI*") MUST BE DISMISSED ……. 16

        1.   No Material Issue Of Fact Exists To Dispute That Defendants
           Fully Complied With The Doctrine Of *Uberrimae Fidei*
           By Providing The Patton Survey To The Kelly Agency ………… 17

i

|  | a. | Disclosure of the Patton Survey to the Kelly Agency fulfilled the Insured's Obligations under the doctrine of *uberrimae fidei* ……………………….................. | 17 |

|  | b. | Only material facts known by the insured must be disclosed under uberrimae fidei, and Defendants disclosed any material facts they knew by providing the Patton Survey ……………………………………… | 19 |

## POINT II

DEFENDANTS ARE ENTITLED TO SUMMARY
JUDGMENT DISMISSING COUNTS III AND IV
OF PLAINTIFF'S COMPLAINT …………………………………………   20

A.  PLAINTIFF LACKS ANY EVIDENCE IN ADMISSIBLE
FORM TO ESTABLISH THE UNSEAWORTHINESS OF
THE YACHT …………………………………………………...   21

B.  PLAINTIFF'S EXPERT TESTIMONY ON SEAWORTHINESS
IS EITHER INADMISSIBLE BASED UPON PRINCIPLES OF
ESTOPPEL OR TOO SPECULATIVE AND CONJECTURAL
TO BE ADMISSIBLE, THUS PLAINTIFF CANNOT MEET
ITS BURDEN OF PROOF ………………………………………   23

   1.  Plaintiff's Experts Are Estopped From Basing Their
   Opinions On Seaworthiness Of The Yacht On The Findings
   Contained In The Patton Survey …………………………………   24

   2.  Plaintiff's Experts' Testimony Is Too Speculative To Meet Its
   Burden Under the Negative Implied Warranty of Seaworthiness..  26

## POINT III

DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
GRANTING THEIR EIGHTH COUNTERCLAIM AND DISMISSING
PLAINTIFF'S SEVENTH CLAIM FOR SALVAGE COSTS……………………28

A.  DEFENDANT BEN ASHKENAZY IS NOT LIABLE FOR
SALVAGE COSTS AS HE IS NOT A NAMED INSURED ON
THE POLICY ……………………………………………………  28

B.  PLAINTIFF DID NOT PERFORM THE SALVAGE FOR

DEFENDANTS' BENEFIT AND THEREFORE MUST BEAR
ITS OWN COSTS  ..................................................  29


**CONCLUSION**............................................................................ 30

## TABLE OF AUTHORITIES

### Cases

*Allied Van Lines Intern. Corp. v. Centennial Ins. Co.*,
   685 F. Supp. 344, 345-346 (S.D.N.Y. 1988). ......................................................... 14, 18

*American Home Assur. Co. v. Masters' Ships Mgmt S.A.*,
   423 F. Supp.2d 193, 220 (S.D.N.Y. 2006)...................................................................... 23

*American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation*,
   269 F. 768, 770 (2d Cir. 1920)....................................................................................... 29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 251, 106 S.Ct. 2505, 2511 (1986)........................................................... 25

*Austin v. Servac Shipping Line*,
   794 F. 2d 941, 945 (5th Cir. 1986).................................................................................. 25

*Balfour MacLaine Intern. Ltd.*,
   85 F.3d 68, 77-78 (2d Cir. 1996); ................................................................................. 14

*Boucher v. Suzuki Motor Corp.*,
   734 F.3d 18, 21 (2d Cir. 1996)....................................................................................... 27

*Bowles v. New York City Transit Authority*,
   2006 WL 1418602 (S.D.N.Y. May 23, 2006) .............................................................. 13

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 322-323 (1986......................................................................................... 25

*City of Burlington v. Indemnity Ins. Co. of North America*,
   332 F.3d 38, 49 (2d Cir. 2003)....................................................................................... 15

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*,
   982 F. Supp. 310, 313 (S.D.N.Y. 1997)......................................................................... 18

*Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*
   944 F. Supp. 986, 1003 (D.Mass.1996) ............................................................. 21,22, 28

*Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.*, 277 U.S. 66,
   *78, 48 S.Ct. 459, 462 (1928)......................................................................................... 28

*Compania Transatlantica Centro-Americana, S A, v. Alliance Assur. Co.*, 50 F.
   Supp. 986 (D.C.N.Y. 1943) .......................................................................................... 15

iv.

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*,
952 F. Supp. 1046, 1066 (S.D.N.Y. 1997), *aff'd* 134 F.3d 103 (2d Cir. 1998) ...... 23, 27

*Contractors Realty Co., Inc. v. Ins. Co. of North America*,
469 F. Supp. 1287 (S.D.N.Y. 1979) .............................................................................. 21

*CPH Intern., Inc. v. Phoenix Assur. Co. of New York*,
1994 WL 259810 at *6 (S.D.N.Y. 1994); ..................................................................... 14

*Dister v. Continental Group, Inc.*,
859 F.2d 1108, 1116-17 (2d Cir. 1988) ........................................................................ 12

*Dister v. Continental Group, Inc.*,
859 F.2d 1108, 116-1117 (2d Cir. 1988) ...................................................................... 12

*Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.*,
19 F.2d 493, 495 (5th Cir. 1927) ............................................................................ 26, 27

*Folger Coffee Co. v. Olivebank*,
01 F.3d 632, 638 (5th Cir. 2000) .................................................................................. 30

*Ingersoll Milling Machine Company v. M/V Bodena*,
829 F.2d 293, 307 (2d Cir. 1987) ................................................................................. 15

*Johnson Bros. Boat Works v. Conrad*,
156 A.2d 175 (N.J. Super. 1959) .................................................................................. 24

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*,
480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) ................................................ 21

*Macaluso v. Herman Miller, Inc.*,
2005 WL 563169 at *8 (S.D.N.Y. March 10, 2005) ............................................... 27, 32

*Mathis v. Hanover Ins. Co.*,
192 S.E.2d 510 (Ga. Ct. App. 1972) ............................................................................ 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 575, 586, 106 S.Ct. 1348 (1986) ................................................................... 13

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ............................................................ 12

*New York Univ. v. First Financial Ins. Co.*,
322 F.3d 750, 753 ......................................................................................................... 20

*New York, New Haven and Hartford Railway Co. v. Gray*,
240 F.2d 460, 464-465 (2d Cir. 1957) .......................................................................... 16

*Pan American World Air., Inc. v. Aetna Casualty & Surety Co.*,
   505 F.2d 989, 999 (2d Cir. 1974)...................................................................... 15

*Prohaska v Dofamor, S.N.C.*,
   138 F. Supp. 2d 422, 428 (W.D.N.Y. 2001) .................................................... 25

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.*,
   779 F.2d 866, 870 (2d Cir. 1985)...................................................................... 22

*R.G. Group v. Horn & Hardart Co.*,
   751 F.2d 69, 77 (2d Cir. 1984)........................................................................... 13

*Reliance Ins. Co. v. Certain Member Cos. at Lloyds*,
   885 F. Supp. 1147, 1153 (S.D.N.Y 1995)........................................................ 18

*Reynolds v. Canton Ins. Office, Ltd.*,
   98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917) .................................... 28

*Royal Ins. Co. of America v. Cathy Daniels, Ltd.*,
   684 F. Supp. 786, 792 (S.D.N.Y. 1988)........................................................... 21

*Thebaud v. Great Western Ins. Co.*,
   155 N.Y. 516, 524 (N.Y. 1898) ......................................................................... 28

**Treatises**

Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-14
   (4th ed. 2004) ..................................................................................................... 19

06-112

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL INSURANCE COMPANY, | ) |
| | ) 06 CV 2455 (JSR) |
| Plaintiff, | ) |
| | ) |
| -against- | ) |
| | ) |
| PGG REALTY, LLC, BEN ASHKENAZY | ) |
| and KEYBANK NATIONAL ASSOCIATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PGG REALTY, LLC AND BEN ASHKENAZY'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants PGG Realty, LLC ("PGG") and Ben Ashkenazy ("Ashkenazy")

(collectively referred to herein as "Defendants"), by their attorneys, Weg and Myers,

P.C., submit this memorandum of law, together with the Declaration of Dennis T.

D'Antonio ("D'Antonio Decl."), the affidavits of Charles Papa ("Papa Aff.") and Robert

Moore ("Moore Aff.") and the Declaration of David Kriss ("Kriss Decl.") in support of

their motion for an Order, pursuant to Fed. R. Civ. P. 56(c): (i) dismissing Plaintiff's

Second Amended Declaratory Judgment Complaint in its entirety; (ii) on Defendants'

first and second counterclaims, entering a judgment declaring that Plaintiff Federal

Insurance Company ("Plaintiff") breached the subject yacht insurance policy (the

"Policy") and as a result owes Defendants $7,023,000.00 in money damages (iii)

declaring that Defendants have no liability for the costs associated with locating and

towing the wreck; (iv) dismissing all claims against Ben Ashkenazy personally; and (v)

for such other and further relief as this Court deems just and proper.

## **PRELIMINARY STATEMENT**

On or about February 6, 2006, the subject Yacht owned by Defendant PGG capsized in the 50 miles off of the coast of the Town of San Salvador in the Bahamas. On that same date, Plaintiff immediately declared the Yacht a "total loss". In December 2005, the Yacht, which had been purchased for $7.5 million, was insured by Plaintiff for the agreed amount of $7,023,000.00. Notwithstanding the facts that the Yacht policy was in full force and effect at the time of the loss and that the loss took place in a geographical area covered by the policy, Plaintiff did not pay PGG the insurance proceeds due it under the subject policy. Rather Plaintiff chose to commence the instant Declaratory Judgment Action against it, as well as the managing member of the LLC, Ben Ashkenazy (who is not an insured under the subject policy) and PGG's mortgagee, KeyBank National Association ("KeyBank"). The thrust of the instant Declaratory Judgment Action was that (a) PGG violated the doctrine of *uberrimae fidei* by failing to disclose to the insurer the Yacht's condition and work that needed to be done to the Yacht prior to binding of the policy, (b) the Yacht was unseaworthy at the time coverage incepted and (c) the Yacht was unseaworthy at the time that it capsized. Plaintiff also charged KeyBank with knowledge of the Yacht's condition, and therefore sought to relieve itself of any liability it would have to the insured's mortgagee.

By Order dated September 13, 2006, this Court, in ruling on motions for summary judgment filed by all defendants, derailed the major supposition relied upon by Plaintiff to fuel its Complaint. Specifically, this Court held that PGG disclosed the 32-page Patton Survey and accompanying 15 pages of recommendations to the Kelly Agency, the entity that procured the subject policy, prior to the inception of the policy, and that the Kelly

2

Agency was in fact an agent of Plaintiff for all purposes. Moreover, given the substance of the recommendations contained in the survey, there was no evidence to suggest that Keybank knew or should have known that the Patton Survey's conclusions and recommendations rendered the Yacht unseaworthy. Accordingly, this Court granted KeyBank's motion in its entirety as well as imputed the insurance agent's knowledge of the condition of the Yacht to Plaintiff. The balance of Defendants' motion was denied, presumably because at that early stage in the litigation, Plaintiff raised sufficient issues of fact so as to deny Defendants their ultimate relief.

Discovery has now been completed in this action and as a result, whatever theoretical issues of fact Plaintiff was able to assert to stave off summary judgment initially, have now evaporated under the light of the critical examination that the discovery process brings to assertions that cannot be substantiated.

With respect to its claim that PGG[1] violated the doctrine of *uberrimae fidei*, there is little left to this argument given this Court's determination that Plaintiff, through its agent, had knowledge of all of the conclusions and recommendations contained in the Patton Survey Report.

Plaintiff fairs no better with its allegations that the Yacht was unseaworthy as of the time coverage began or at the time that it capsized. Given the fact that Plaintiff has the burden of proof with respect to both of these issues, one would have expected Plaintiffs to be in possession of evidence or solid analytical opinions that lead credence to this theory. However, discovery in this matter has revealed a complete absence of proof

---

[1] While Plaintiff names PGG and Ashkenazy as insureds under the policy, as set forth in Point III.A. *infra*, Ashkenazy, in not a named insured and has no personal insurable interest in the Yacht. Accordingly, all allegations made by Plaintiff as to the failure of the insured to disclose or sail the Yacht in a seaworthy condition must be understood to be made solely against PGG and not against Ashkenazy.

3

on this issue. Rather, at best Plaintiff can only offer mere conjecture based upon assumptions and suppositions, none of which would be admissible at trial so as to carry its burden of proof. This alleged proof fails as a matter of law, especially in light of the direct evidence establishing the condition of the Yacht both prior to its maiden voyage and prior to the voyage leading to its capsize.

Moreover, to the extent that any of Plaintiff's experts rely upon the conclusions or recommendations contained in the Patton Survey, such reliance is legally impermissible because Plaintiff is estopped from relying on this data since it was in its possession prior to binding coverage herein.

Finally, without any legal or factual support, Plaintiff seeks to charge PGG and Ashkenazy for costs associated with a salvage operation that Defendants did not request and was initiated for the sole benefit of Plaintiff.

Consequently, once Plaintiff's excuses for its declination are stripped from its veneer it will become apparent to this Court that there exists no bona fide reason that this claim was denied. As a result, Defendants' motion for partial summary judgment should be granted in all respects.

## STATEMENT OF FACTS

In December 2005, PGG purchased a 124-foot Trident yacht, the "M/Y Princess Gigi" (the "Yacht"), which they moored in Fort Lauderdale, Florida. A copy of the Yacht's Bill of Sale is annexed to the D'Antonio Decl. as Exhibit "A" (all Exhibits referred to herein are attached to the D'Antonio Decl.). The sellers, Warren Lovell and Seaquest International, sold the Yacht to PGG for $7,535,400. See Exhibit "A", Bill of Sale; deposition of Kent Chamberlain at p. 194, attached as Exhibit "B". PGG financed its purchase via a $5,850,000.00 mortgage with KeyBank.

4

The Yacht, far from being some ragtag sailing vessel, as Plaintiff insinuates, had an impressive history. The Yacht was completed in 2000 at a cost of $12,000,000.00. See deposition of Lovell p. 55-56, attached as Exhibit "C" and photo compendium that is attached as Appendix "B". Over four years, Lovell sailed the Yacht over 38,000 miles to destinations like Maine, Panama, Costa Rica, the Bahamas, and Alaska, with a single day out of service, from a burnt-out starter. (*Id.* p. 63-65) The vessel always had a full-time engineer keeping it up so it could be sailed on a moment's notice. (*Id.* p. 64-65) Even in bad sea conditions the Yacht was very stable, having the most sophisticated stabilizing system available. (*Id.* p. 61-63)

PGG retained Patton Marine, Inc. ("Patton") a respected marine survey firm, to conduct a written survey (the "Patton Survey") of the Yacht, which ultimately set forth Patton's opinions and recommendations regarding the Yacht's condition. See Exhibit "B", 56-57; deposition of Robert Riley p. 18-19, attached hereto as Exhibit "E". A copy of the Patton Survey is as Exhibit "F".

The front page of its December 7, 2005 Patton Survey, sets forth a legend which states that the "items marked with a *star*.... should be taken care of for [the Yacht's] safe operation and/or insurability." (Exhibit "F", FED 00080) (emphasis added). Most noteworthy is the fact that Robert Riley, the author of the Survey, chose *not* place a "star" next to any of the items listed in the reports conclusion or subsequent recommendations. (Exhibit "E", 129-130)

Although no safety or insurability issues were indicated in the Patton Survey or Recommendations, the buyer and seller used the recommendations contained in the Patton Survey as a maintenance check list and divided up what tasks each of the parties would complete before closing. See Ex. C, 44, 47; deposition of Ben Ashkenazy at p.

5

209-210, attached as Exhibit "G". The Yacht's previous captain and builder Robert Moore, who supervised the work performed on the vessel, testified that 90% of the items had been completed by closing. See Moore Aff. ¶ 16; deposition of Robert Moore at p. 128, attached as Exhibit "H".

On December 12, 2005, after the Patton Survey had been completed, David Kriss, counsel for Defendants, who had assisted it in procuring insurance for the Yacht, e-mailed a copy of the Survey to Peter Kelly of the Kelly Agency. See Kriss Decl. ¶ 2, attached as Exhibit and the e-mail to Kelly which is annexed thereto.[2]

The Yacht's Condition Prior to Its Initial Voyage and Prior to the Loss

Everyone onboard the Yacht at the time of the survey and pre-purchase sea trial testified that it was not only seaworthy, but an excellent vessel. (Moore Aff. ¶ 16, 19; Exhibit "C", 64-65; Exhibit "E", Riley Dep. p. 151; Exhibit "B", 218-219; deposition of Jacob Rese p. 9, attached as Exhibit "K"; deposition of Charles Papa p.17, attached as Exhibit "L") Surveyor Riley, who took a more critical assessment of her than anyone, summarized his opinion by agreeing with the statement that it was a "good boat, a good risk and a seaworthy boat." (Exhibit "E", 151; see other important commentary by Riley at Appendix "A")

During the 2005 holiday season, her new Captain Charles Papa sailed the Yacht on its initial voyage from Florida to Atlantis in the Bahamas without any problems arising. (Papa Aff. ¶ 9) After returning, the Yacht returned to port in Ft. Lauderdale for routine maintenance and further upgrades. (Papa Aff. ¶ 10) The Yacht did not cruise again until February 4, 2006. (Papa Aff. ¶ 9) Before each departure, Captain Charles

---

[2] The Kriss Decl. was submitted with the prior summary judgment motion and therefore cites the exhibits to that motion. The referenced exhibits used in the prior motion are an email (which is now annexed to the Kriss Decl. submitted herewith), the Patton Survey (D'Antonio Decl., Ex. "F"), and the Policy (D'Antonio Decl., Ex. "I").

6

Papa inspected the Yacht to make sure she was fit for the voyage. (Papa Aff. ¶ 13) The Yacht was fit each time. (*Id.*) As part of his standard pre-voyage dockside inspection, Papa verified that a 1-5/8 inch PVC pipe through the bulkhead separating the port garage from the engine room was properly sealed with a watertight mechanical plug. (*Id.*)

## The Loss

On or about February 6, 2006, while experiencing one of the worst storms the Coast Guard pilot had seen (*see* deposition of Lt. Marcus Wong, p.11-16, 20 attached as Exhibit "M"), the Yacht began to take on water. (Ex "K", 15-16) She then lost power and was now adrift in a storm without propulsion, steering or pumping capacity. As a consequence of losing power in these conditions, she eventually capsized. She had been en route from Ft. Lauderdale, Fla. to St. Maarten. (Ex. "L", 34-35) Captain Charles Papa, who had previously inspected the Yacht prior to it setting sail, together with six crew members and two guests were on board the Yacht when it left sail from Fort Lauderdale on February 4, 2006 (Ex. "L", 35-36). Its course was through Northeast Providence Channel then south around Eleuthera Island, a common route for yachts and commercial shipping. (Ex. "L", 36-37) The seas were approximately 4 feet at departure, but by February 5, 2006, a cold front with unexpectedly severe weather and wave conditions had caught up to the Yacht with winds at 20 knots, seas at 8-10 feet and 30 foot swells. (Ex. "L", 35, 51, 56; Ex. "M" p. 15-16)

On February 5, 2006, at 3:00 p.m., Jacob Rese, a 56-year old yacht captain who was serving as engineer on this voyage went down to the engine room to transfer fuel from storage tanks to the Yacht's 550-gallon "day tank," which fed the Yacht's AC generators and engines. (Ex. "K", 15, 31-32) Rese noted that some water had been entered the vessel from the 24 inch wide engine room exhaust vent which opened to the

7

aft port side of the Yacht. (Ex. "K", 15-16) The outside end of this vent was approximately 5 feet above the water line in calm seas. (Ex. "L", 43) The water had been dripping on the battery charger directly below the duct. (Ex. "K", 15-16) Rese turned the exhaust fan on; stopping the water from entering the engine room (*Id.*) The Yacht continued to sail toward its destination.

At about 8:30 p.m. lights began flickering and the port generator shut down. (Ex. "K", 16) Just as Rese went to the engine room to investigate, the engine room center bilge high water alarm went off. (Ex. "K", 9-21) This alarm was set to go off if there was six to eight inches of water in the center bilge. (Ex. "L", p. 94) Rese found three to four inches of water in the center bilge and four to six inches in the port bilge. (Ex. "L" p. 23) The automatic DC pumps in the bilge were working.

The starboard generator was turned on for about an hour and a half before it turned off; leaving the Yacht dark in 8-10 foot seas over 30 foot swells. (Ex. "L", 59; Ex. "M", 16-17) The port engine then sputtered and died, followed by the starboard engine. These events effectively left the Yacht with no power to fight the 30 foot swells and 6-8 foot seas it was trapped in. (Ex. "K", 20, 23-24) The Yacht continued to take on a large amount of water through the port exhaust ducts. (Ex. "K", 39; Ex. "L", 91)

As the ingress of water continued, the blacked-out Yacht was severely rolling in the storm and took on a port list. (Ex. "K", 45) Wind and sea conditions continued to deteriorate. (Ex. "L", 83) A United States Coast Guard Helicopter was dispatched. (Ex. "K", 43-44). Lt. Marcus Wong, the co-pilot, reported the conditions were very unusual for the Bahamas, posing a hazard for most yachts and small vessels. (Ex. "M", 16-17) Lt. Wong saw, and his instruments reported, that seas were at 8-10 feet over thirty (30) foot high swells that raised up the drifting Yacht and then dropped it into the trough. (*Id.* p.

8

16-17) After valiantly trying to restart the engines and generators, the crew was forced to evacuate via hoist onto the U.S. Coast Guard Helicopter. The Yacht capsized soon thereafter.

### The Investigation and Litigation Strategy

Plaintiff received notice of the loss the same day, wrote off the hull as a total loss, and directed that the hull be salvaged for the purpose of performing a cause-and-origin investigation and to explore possible subrogation. See deposition of Paul Richard p. 250, 349, attached as Exhibit "N". However, the manner in which the salvage effort was carried out, far from preserving the Yacht for forensic and analytical inspection, ended up doing such significant damage to the Yacht that any post-loss analysis of the Yacht's pre-loss condition can only be deemed as rank speculation. Plaintiff enlisted Overseas Salvage to locate and take possession of the capsized Yacht, and then to transport it to land for investigation and analysis. (Ex. "N", 152-156, 317-321) For reasons that have not been explained to date, Overseas Salvage chose to tow the Yacht upside down and backwards on the way to its destination, Cat Island, about 100 miles away. See deposition of Marcus Mitchell p. 46 attached hereto as Exhibit "O". As a result of this "salvage" operation, the force of the water blew out a large portion of the vessel's superstructure and destroyed evidence that was critical in determining the precise cause of loss. See deposition of Christopher Karentz p. 36, attached hereto as Exhibit "GG".

While the cause of los was being investigated, on March 29, 2006, Senior Claims Manager Vincent Corteselli wrote to Worldwide Manager of Recovery and Special Operations Donald Seagrist in an email, attached as Exhibit "R", discussing bringing a declaratory judgment:

9

If you are going to bring the dec. action I urge you to do it now. … [T]he owner's lawyer Michael Moore is [sic] smart maritime practitioner. My guess is he is preparing a suit in Florida right now. That is something we do not want.

Ex. R. Corteselli Email; see deposition of Vincent Corteselli. p. 151-152, attached as Exhibit "S". Corteselli testified that there are a number of Florida insurance and marine statutes that make that venue "less than attractive." (Ex. "S", 141).

The Claim

On August 28, 2006 Plaintiff served its Second Amended Declaratory Judgment Complaint. A copy of the Second Amended Declaratory Judgment Complaint is annexed hereto as Exhibit "V". In its Complaint, Plaintiff alleges: (1) breach of the duty of utmost good faith by not providing the Patton Survey; (2) the loss was not covered due to Defendants' intentional failure and/or neglect and/or omission to correct deficiencies in as recommended in the Patton Survey; (3) breach of the implied absolute warranty of seaworthiness; (4) breach of the implied absolute warranty of seaworthiness; (5) breach of the Policy's navigational limits; (6) that Defendant KeyBank has no rights or standing under the Policy at issue herein and is not entitled to recover any claim; and (7) that Plaintiff has declined coverage and Defendants are responsible for salvage and wreck removal costs.

On September 5, 2006, Defendants filed their Amended Answer and Counterclaims to the Second Amended Complaint in which they sought a judgment dismissing the complaint and (1) declaring that as a result of Plaintiff's failure to indemnify Defendants for their loss, it is liable to Defendants for the Yacht's agreed value of $7,023,000.00, plus $200,000 for its contents; (2) awarding money damages from Plaintiff for its breach of the Policy in the amount of $7,023,000.00; (3) awarding

10

money damages for personal property damages from Plaintiff for its breach of the Policy;

(4) declaring that Plaintiff must indemnify KeyBank, in the amount of $5,850,000.00; (5)

$5,850,000.00 in money damages to be paid to KeyBank for Plaintiff's breach; (6)

awarding punitive damages in the amount of $20,000,000 for violation of Florida Bad

Faith statutes; (7) awarding damages for the loss of the Yacht's residual value, due to

Plaintiff's improper salvage; (8) declaring that the costs incurred by Plaintiff in locating

and towing the vessel were for the sole purpose of conducting an investigation in the

cause and origin of the loss, and should be borne solely to Plaintiff; and (9) estopping

Plaintiff from offering any evidence at trial into the cause and origin of the subject loss or

the condition of the vessel just prior to its loss, because Plaintiff materially altered the

condition of the vessel and hampered Defendants' right to conduct their own

investigation. A copy of Defendants September 5, 2006 Answer and Counterclaim is

annexed as Exhibit "W".

## The Prior Summary Judgment Motion

On September 13, 2006, the Court issued an Order (i) granting summary

judgment to KeyBank in its entirety, dismissing count six of the amended complaint and

granting its counterclaims; and (ii) granting Defendants' motion for partial summary

judgment "as to the imputation of the insurance agent's knowledge of the condition of the

yacht to plaintiff", but otherwise denying Defendants' motion. A copy of this Court's

Order in annexed as Exhibit "X".

The significance of this Court's prior Order, which now acts as law of the case

cannot be overstated. Not only does the imputation of knowledge of the Kelly Agency to

Plaintiff virtually wipeout its claim that PGG violated its duties under the doctrine of

*uberrimae fidei*, but the conduct of its agent, in reviewing the Survey and

11

recommendations and finding them insignificant for the purpose of binding coverage deals a fatal blow to Plaintiff's ability to rely upon the Patton Survey as a basis for concluding that the Yacht was unseaworthy, either at the time of its maiden voyage or prior to its capsizing on February 6, 2006. Accordingly, because PGG can establish its prima facie case for recovery as a matter of law and Plaintiff cannot offer admissible evidence to support any of the specious basis that it has relied upon to deny this claim, Defendants motion for partial summary judgment must be granted. It should also be noted, if only incidentally, that the insurance application submitted to Plaintiff's underwriter affirmatively disclosed to Plaintiff that there was a survey and it was available. See Megayacht Worksheet attached hereto as Exhibit "II".

## ARGUMENT
### I.
### DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT GRANTING THEIR FIRST, SECOND, THIRD AND FOURTH COUNTERCLAIMS

When the evidence that has been adduced in discovery is coupled with the effect of this Court's September 13, 2006 Order, it becomes clear that Plaintiff will be unable to offer any evidence that can seriously stave off summary judgment in favor of Defendants. As will be developed in more detail below, the party opposing summary judgment cannot defeat such a motion by offering purely conclusory allegations or by offering evidence in opposition that is merely speculative. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116-17 (2d Cir. 1988). It also must do more than simply attempt to raise some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 575, 586, 106 S.Ct. 1348 (1986). Accordingly, to defeat summary judgment, the opposing party must set forth concrete particulars by means of admissible evidence, demonstrating that a genuine

12

issue of material fact remains. *See Bowles v. New York City Transit Authority*, 2006 WL

1418602 (S.D.N.Y. May 23, 2006) (*citing R.G. Group v. Horn & Hardart Co.*, 751 F.2d

69, 77 (2d Cir. 1984)).

A.   DEFENDANTS HAVE ESTABLISHED THEIR PRIMA FACIE CASE,
     SHIFTING THE BURDEN TO PLAINTIFF TO ESTABLISH A LEGALLY OR
     FACTUAL COGNIZABLE BASIS FOR DENYING COVERAGE

In order to recover under an "all-risk" policy, the burden of proof is on the insured

to prove: 1) that a policy was issued; 2) that the insured suffered a fortuitous loss in

which it had an insurable interest; and 3) that the loss was an event that fell within the

terms and conditions of coverage. *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 77-78

(2d Cir. 1996); *Reliance Ins. Co. v. Keystone Shipping Co.*, 102 F. Supp.2d 181,

187 (S.D.N.Y. 2000); *Allied Van Lines Intern. Corp. v. Centennial Ins. Co.*, 685 F. Supp.

344, 345-346 (S.D.N.Y. 1988).

Defendants have sustained their burden. First, the documentary evidence and

testimony that an all-risk policy of insurance is undisputed. See Exhibit "I"; Kriss Decl.,

Email to Kelly; Exhibit "V", ¶ 21; deposition of Donna Capiga p. 97, attached as Exhibit

"Y".

Second, the evidence establishing that PGG had an insurable interest in the Yacht

is also undisputed. See Exhibit "A", Bill of Sale; Assignment of Purchase Contract

attached as Exhibit "Z"; Exhibit "T", Proof of Loss.

With respect to fortuity, a loss is fortuitous if it does not result from a known

inherent defect that would make a loss inevitable, or is a result of ordinary wear and tear

or intentional misconduct of the insured. *See id.*; *CPH Intern., Inc. v. Phoenix Assur. Co.

of New York*, 1994 WL 259810 at \*6 (S.D.N.Y. 1994); *Balfour*, 85 F. 3d at 77. A

fortuitous event has been defined as:

13

an event which *so far as the parties to the contract are aware*, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, *provided that the fact is unknown to the parties*.

*City of Burlington v. Indemnity Ins. Co. of North America*, 332 F.3d 38, 49 (2d Cir. 2003)

(emphasis in original) (quotation omitted). Thus, in determining whether an insurance

loss is fortuitous, the Court must gauge its inevitability by standing in the shoes of the

parties at the time the contract of insurance is made. While the insured must prove the

loss is fortuitous, it has no burden to prove the exact cause of the loss. *Id.*; *Ingersoll*

*Milling Machine Company v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir. 1987); *Pan*

*American World Air., Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 999 (2d Cir.

1974). Pertinent to the case at bar is the Court's holding in *Compania Transatlantica*

*Centro-Americana, S A, v. Alliance Assur. Co.*, 50 F. Supp. 986 (D.C.N.Y. 1943) wherein

it held that the unintentional incursion of water into a vessel constitutes a fortuitous loss:

I think the casualty was the result of a fortuitous entry of the sea water; that it was an event which might and did happen, not one which must happen. The very fact that the vessel had been voyaging without mishap attributable to the valve, whereas the defect of the valve as testified by respondents' witnesses, must have affected it for a long time, is proof positive that the casualty was in the realm of the possibilities and not of the inevitabilities.

True it is that neither storm nor abnormal wave nor weather contributed to the disaster. But these are not the only perils of the sea. Small waves are likewise 'of the sea.'

*Id. at* 991; s*ee also New York, New Haven and Hartford Railway Co. v. Gray*, 240 F.2d

460, 464-465 (2d Cir. 1957)

It is also clear that the loss was within the terms of the Policy, which provided

coverage for all risks of loss that were not otherwise excluded in the Policy, in the

amount of $7,023,000 for physical damage and $200,000 for Personal Effects. (Exhibit

14

"I", FED 00001 and FED 00003) By the admission of Plaintiff's witnesses, covered causes of loss include captain's error, crew error, weather, and running dry of fuel. (Exhibit "N", 136; deposition of Thomas Prendergast p. 199-201, attached as Exhibit "AA"; rough transcript of deposition of Andrew Calandriello. p. 120-122, attached as Exhibit "BB").

Finally, that the Yacht was sailing within the Navigational Limits, as set forth in the policy, has been established by the testimony of witnesses representing both Plaintiff and Defendants. To begin with, Plaintiff's underwriter, Donna Capiga testified that the Navigational limit extension applies to the Caribbean, not south of Venezuela, including the Bahamas. (Exhibit "Y", p. 218) Capiga also admitted that a boat in the normal shipping channels from the Bahamas to St. Bart's would be within the subject policy's territorial limit extension. (Exhibit "Y", 218-220) Matthew Schmahl, Plaintiff's investigator testified that the Yacht's route prior to the loss and location when it capsized were both typical pleasure yacht traffic ways from South Florida to the Caribbean. See deposition of Matthew Schmahl p. 34, 189, 190, attached as Exhibit "CC". In fact, Schmahl testified that he has investigated casualties covered by Plaintiff's in this area before. (*Id*. p. 34) Plaintiff's expert Raguso said the same in his deposition.

In addition, Defendants' expert, Michael Christian, testified that the Yacht did not leave the Policy's Navigational limits and was within the coastal/tidal waters of the Bahamas when it capsized. See deposition of Michael Christian p. 164-165, attached as Exhibit "DD". William Hipple, another of Defendants' expert testified that the boat was well within the limits set forth within the Navigational limit extension of the policy. See deposition of William Hipple p. 56-57, attached as Exhibit "EE". Finally, none of the experts identified and put forward by Plaintiff, either in a report or in deposition

15

testimony, has opined that the location where the Yacht capsized was not within the

Navigational limits extension contained in the Policy.[3]

Accordingly, Defendants have established their prima facie case for relief. As a

result, in order to avoid liability, the burden then switches to the insurer to establish either

that (a) PGG violated the doctrine of *uberrimae fidei* by not disclosing material

information to it of which it had knowledge; (b) that the Yacht was unseaworthy at the

time of its maiden voyage or (c) that the Yacht was unseaworthy at the time of the loss

and that the unseaworthiness of the Yacht caused the loss to occur. *See Allied*, 685 F.

Supp. at 346; *Pan American*, 505 F.2d at 999-1000.

## B. PLAINTIFF'S CAUSES OF ACTION SEEKING TO VOID POLICY BASED ON VIOLATION OF THE DUTY OF UTMOST GOOD FAITH ("*UBERRIMAE FIDEI*") MUST BE DISMISSED

As this Court has pointed out previously, the doctrine of *uberrimae fidei* is an

anachronistic notion. S*ee Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*,

982 F. Supp. 310, 313 (S.D.N.Y. 1997). The doctrine as developed requires that parties

to an insurance contract owe each other the duty of utmost good faith. Under *uberrimae*

*fidei,* "the party seeking insurance is required to disclose all circumstances known to him

which materially affect the risk." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866,

870 (2d Cir. 1985). An insured's failure to disclose a fact that is both known to him and

material to the risk can void the Policy, but "the principle of *uberrimae fidei* does not

require the voiding of the contract unless the undisclosed facts were material and relied

upon." *Id.* A fact is not "material" unless a reasonable person in the assured's position

would know that the particular fact is "something which would have controlled the

---

[3] It should also be noted that Plaintiff produced the two decision-makers for deposition, William Turnbull and Andrew Calandriello. When asked why the claim was denied, neither mentioned any violation of the Navigational limits extension. Nor was Plaintiff's claim for breach of that provision included in the original complaint.

16

underwriter's decision". *Reliance Ins. Co. v. Certain Member Cos. at Lloyds*, 885 F.

Supp. 1147, 1153 (S.D.N.Y 1995). A carrier asserting this defense to avoid its coverage

obligations bears the burden of proving that the undisclosed information would have

induced a reasonable, prudent underwriter to issue a policy or insure at a particular

premium (the objective test). 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, §

19-14, at p. 312-14 (4th ed. 2004). The carrier also bears the separate burden of proving

that the undisclosed information did, in fact, induce its underwriter to issue a policy or

insure at a particular premium (the subjective test). *Id.*

     1.     No Material Issue Of Fact Exists To Dispute That Defendants Fully
             Complied With The Doctrine Of *Uberrimae Fidei* By Providing The
             Patton Survey To The Kelly Agency

          a.     Disclosure of the Patton Survey to the Kelly Agency fulfilled the
                Insured's Obligations under the doctrine of *uberrimae fidei*

In deposition testimony taken one day prior to the filing of these papers, Andrew

Calandriello testified that the basis for denial of PGG's claim was two-fold. (Exhibit

"BB", 126). Firstly, it was based upon Plaintiff's determination that it was not in

possession of the Patton Survey and Recommendations prior to binding. Secondly, it was

based upon Plaintiff's allegation that the Patten Survey and Recommendations contained

indications that the Yacht was unseaworthy. (Exhibit "BB", p. 126) In reaching theses

conclusions, and as set forth in detail in Point II *infra*, he agreed that if Plaintiff was

deemed to be in possession of the Patton Survey, then it could not claim that there was a

violation of PGG's duty to disclose and Plaintiff could not claim a lack of seaworthiness

of the Yacht based upon information that was contained in the Patton Survey and

furnished to Plaintiff prior to binding. (Exhibit "BB", 157-159) With this admission on

the Record, and based upon this Court's prior ruling, Defendants motion for summary

judgment on their counterclaims must be granted.

While the insured did not provide the Patton Survey directly to the carrier's underwriters, it provided this survey to the carrier's agent. That the Kelly Agency was Plaintiff's agent has already been determined by this Court. (Exhibit "X")  Consequently, that the Survey was forwarded to Plaintiff's agent as opposed to Plaintiff itself is legally immaterial because it is well settled that knowledge obtained by an agent while acting within the scope of his agency is imputed to its principal, and the latter is bound by such knowledge, even if the relevant information is never actually communicated to the principal. *See New York Univ. v. First Financial Ins. Co.,* 322 F.3d 750, 753 (2d Cir. 2003).

While Plaintiff may attempt to assert that specific conditions were not contained in the Patton Survey, even if true, such allegations would not be sufficient to defeat Defendants' instant motion. This is so because once a disclosed fact puts an insurer on inquiry notice, the insurer has a corresponding duty to request further information that it needs to assess the risk[4]. As explained by the Court in *Commercial Union*:

---

[4] Although Defendants dispute that any of the following items are material, the Patton Survey disclosed, among other things, that: there were engine and electrical surveys that the underwriters can request (Ex. "F", FED 00048, FED 00070, FED 00088); the Yacht was not built to Classification Society standards (Ex. "F", FED 00050); the Yacht had previous floatation problems that 11 tons of ballast were added to correct, and the surveyor had not seen stability test results (Ex. "F", FED 00052, FED 00081); there were no proven low-fuel alarms (Ex. "F", 00057, FED 00085); a DC bilge pump was not working (Ex. "F", FED 00064, FED 00081); engine room bilge pumps were not automatic (Ex. "F", FED 00066); a possible hull structure issue existed with the lateral stiffener (Ex. "F", FED 00082); and the fuel cleaning system was unproven (Ex. "F", FED 00085). All of these conditions had been disclosed such that the underwriter could have requested information about them before insuring the Yacht, thereby negating a claim of breach of the doctrine of *uberrimae fidei.* It should also be noted that Patton did not identify any of these items as items that would have affected the safe operation or insurability of the Yacht.

18

> "The assured complies with the rule [of *uberrimae fidei*] if he discloses
> sufficient to call the attention of the underwriter in such a way that, if the
> latter requires further information, he can ask for it." [Puritan Ins. Co. v.
> Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir.1985)]. See [*Knight v. U.S.
> Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*, 480 U.S. 932,
> 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)]; *Contractors Realty Co., Inc. v.
> Ins. Co. of North America*, 469 F. Supp. 1287 (S.D.N.Y. 1979).
> Commercial Union had its own good faith duty to read what it had
> requested, especially when the insurance coverage for the individual
> licensees was expressly made subject to their provision of such requested
> documents… See also *Compagnie de Reassurance d'Ile de France v. New
> England Reinsurance Corp.*, 944 F. Supp. 986, 1003 (D.Mass.1996) ("The
> duty of *uberrimae fidei* is a reciprocal one"); *Royal Ins. Co. of America v.
> Cathy Daniels, Ltd.*, 684 F. Supp. 786, 792 (S.D.N.Y. 1988).

982 F. Supp. at 314.

The disclosures in the Patton Survey are sufficient, at a minimum, "to call the

attention of the underwriter in such a way that, if the latter requires further information,

he can ask for it." *See Commercial Union*, 982 F. Supp. at 314. As *Commercial Union*,

*Puritan*, and *Knight* recognize, the duty requires no more. Nor should it, in light of an

insurer's own duty of *uberrimae fidei* to review the information disclosed, and the harsh

consequences for an insured who has not complied with their duty. *See Compagnie de

Reassurance*, 944 F. Supp. at 1003; *Royal Ins.*, 684 F. Supp. at 792.

With these principles in mind, Defendants can easily dispose of Plaintiff's claims

of non-disclosure of the Patton Survey as the basis for its *uberrimae fidei* claim. (Exhibit

"V", ¶ 49) However, because the Patton Survey was disclosed, clearly the Patton Survey

certainly gave the carrier sufficient information to prompt it into requesting further

information.

> b.  Only material facts known by the insured must be disclosed under
> uberrimae fidei, and Defendants disclosed any material facts they
> knew by providing the Patton Survey

19

The only other condition Plaintiff takes issue with is its unawareness of the non-waterproof design of the garage doors. However, the duty of utmost good faith is complied with when disclosure is made as to all "circumstances known to him which materially affect the risk." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985). "It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks." *American Home Assur. Co. v. Masters' Ships Mgmt S.A.*, 423 F. Supp.2d 193, 220 (S.D.N.Y. 2006).

Defendants did not know about, and therefore did not have to disclose the non-waterproof design for a simple reason: the Patton Survey never even commented on the design because it is safe and immaterial. (See Exhibit "H", 139-140) The lack of materiality of the garage doors is underscored in the deposition of Andrew Calandriello taken on November 16, 2006 wherein he attaches no significance to any conditions of the Yacht not referred to in the Patton Survey and Recommendations when Plaintiff decided to disclaim this loss. Accordingly, the fact that the garage doors were designed not to be waterproof does not constitute a material fact, thereby negating the application of *uberrimae fidei* to the issues at bar.

## II.
## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNTS III AND IV OF PLAINTIFF'S COMPLAINT,

While the absolute warranty of seaworthiness and the negative implied warranty of seaworthiness attach at different times to the Yacht[5], Plaintiff has the burden to

---

[5] The absolute warranty of seaworthiness attaches at the inception of coverage whereas the negative implied warranty of seaworthiness attaches at the time of the voyage resulting in a loss. *See Continental Ins. Co. V. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1066 (S.D.N.Y. 1997), *aff'd* 134 F.3d 103 (2d Cir. 1998)

establish this unseaworthiness.[6] In addition, with respect to the negative implied warranty

of seaworthiness, Defendant must also establish that the nature of the unseaworthiness

established proximately caused the Yacht to capsize. Moreover, to the extent that Plaintiff

was aware of any of the allegedly unseaworthy conditions prior to its decision to bind the

risk, it is estopped from relying on same to support its denial of a claim after the loss.

Because discovery has revealed that Plaintiff cannot make out its burden of proof to

establish any of these necessary elements, Defendants are entitled to summary dismissal

of Counts III and IV of Plaintiff's complaint and consequently a granting of its motion

for summary judgment.

## A. PLAINTIFF LACKS ANY EVIDENCE IN ADMISSIBLE FORM TO ESTABLISH THE UNSEAWORTHINESS OF THE YACHT

Since it is the Plaintiffs burden to establish an unseaworthy condition, in opposing

the instant motion for summary judgment, it must come forward with proof in admissible

form to support this contention. The Supreme Court has held that summary judgment is

appropriate where the non moving party cannot produce evidence sufficient to show it

can sustain its burden of proof on any element of its claim at trial:

---

[6] It is not at all clear that the implied warranty of seaworthiness even applies to pleasure boats in the first place. *See Contractors Realty, 469 F. Supp at 1294; Mathis v. Hanover Ins. Co.*, 192 S.E.2d 510 (Ga. Ct. App. 1972); *Johnson Bros. Boat Works v. Conrad*, 156 A.2d 175 (N.J. Super. 1959). In these cases, the Court rejected the warranties applicability to pleasure boat owners, finding that they did not possess, and therefore should not be charged with, the knowledge of an owner of a commercial vessel. This is especially the case where the warranties are not contained in the Policy itself but is implied. The reason for the lack of such disclosure was bluntly admitted to by Plaintiff's insurance expert, Thomas Prendergast, when he testified if there was an express warranty of seaworthiness place in pleasure yacht policies, insurers would sell fewer of these policies unless such warranties were eliminated. (Ex. AA, 167)

[T]he plain language of Rule 56(c) mandates the entry of summary
judgment, after adequate time for discovery and upon motion, against a
party who fails to make a showing sufficient to establish the existence of
an element essential to that party's case, and on which that party will bear
the burden of proof at trial. In such a situation, there can be "no genuine
issue as to any material fact," since a complete failure of proof concerning
an essential element of the nonmoving party's case necessarily renders all
other facts immaterial. The moving party is "entitled to a judgment as a
matter of law" because the nonmoving party has failed to make a
sufficient showing on an essential element of her case with respect to
which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). S*ee also Prohaska v Dofamor,*

*S.N.C.*, 138 F. Supp. 2d 422, 428 (W.D.N.Y. 2001).  "[I]n every case, before the evidence

is left to the jury, there is a preliminary question for the judge, not whether there is

literally no evidence, but whether there is any upon which a jury could properly proceed

to find a verdict for the party producing it, upon whom the onus of proof is imposed."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511 (1986)

(citations omitted).

Plaintiff cannot meet this standard and cannot demonstrate that the Yacht was

unseaworthy either when insurance attached or when the Yacht left port for its last

voyage. "*The law presumes that every vessel is seaworthy until the contrary is proved,*

*and the burden of proving unseaworthiness lies with the insurance company.*"  *Austin v.*

*Servac Shipping Line*, 794 F. 2d 941, 945 (5th Cir. 1986) (emphasis added).  As the

United States Supreme Court has stated, "The standard [for seaworthiness] is not

perfection, but reasonable fitness; not a ship that will weather every conceivable storm or

withstand every imaginable peril of the sea, but a vessel reasonably suitable for her

intended service." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*,

376 U.S. 315, 322 (1964) (citations omitted). "[A]lthough unseaworthiness is a broader

22

form of liability than negligence and has been characterized as 'a form of absolute liability,' … it does not impose a duty of perfection on shipowners." *Morton v. Berman Enterprises, Inc.*, 669 F.2d 89, 92 (2d Cir. 1982). "The insured's warranty of seaworthiness is Not [sic] a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards." *Contractors Realty*, 469 F. Supp at 1293.

While Plaintiffs experts have testified as to ways the Yacht might have been designed or constructed in a better manner, this is of no moment. "Even though a better design might have been achievable, [that] did not render the vessel unseaworthy." *Thornton v. Deep Sea Boats*, 399 F. Supp. 933, 935 (S.D. Ala. 1975). A vessel does not become uninsurable just because it has room for improvement. "It is, of course, true that a given ship, applying for insurance, may be considered a better risk, and better able to withstand even perils of the sea, than another seaworthy ship. But that fact does not preclude the idea that both ships must be seaworthy." *Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.*, 19 F.2d 493, 495 (5th Cir. 1927).

B.    PLAINTIFF'S EXPERT TESTIMONY ON SEAWORTHINESS IS EITHER INADMISSIBLE BASED UPON PRINCIPLES OF ESTOPPEL OR TOO SPECULATIVE AND CONJECTURAL TO BE ADMISSIBLE, THUS PLAINTIFF CANNOT MEET ITS BURDEN OF PROOF

On a summary judgment motion, the district court may only consider evidence that would be admissible at trial. *Eisemann v. Greene*, 205 F.3d 1322, 2000 WL 233694 at *4 (2d Cir. 2000). Plaintiff bears the burden to show that its expert's opinions are stated with a level of certainty sufficient to assure the Court that the opinion is not based on supposition or speculation. *Id.* at *3. Expert testimony should be excluded if it is speculative or conjectural. *Boucher v. Suzuki Motor Corp.*, 734 F.3d 18, 21 (2d Cir. 1996). Expert testimony that is inconsistent with the facts of the case should also be

23

excluded. *See Macaluso v. Herman Miller, Inc.*, 2005 WL 563169 at \*8 (S.D.N.Y. March 10, 2005).

> 1. Plaintiff's Experts Are Estopped From Basing Their Opinions On Seaworthiness Of The Yacht On The Findings Contained In The Patton Survey

The predicate facts underlying all of the experts identified by Plaintiff as to the seaworthiness of the Yacht at the inception of coverage, which is the time the absolute warranty of seaworthiness attaches (*see Continental Ins. Co.*, 952 F. Supp. at 1066), relate to the conditions contained in the Patton Survey and recommendations. However, because the Patton Survey and recommendations were in the possession of Plaintiff prior to the inception of the policy, Plaintiff is estopped from relying on this evidence and therefore is not a basis upon which they can opine in an attempt to establish unseaworthiness and defeat Defendants' motion for summary judgment.

An insurance company is estopped from asserting the invalidity of a policy for the violation of any condition in that policy if, at the time it was issued, *the carrier or its authorized agent had knowledge of that condition. Reynolds v. Canton Ins. Office, Ltd.*, 98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917) (emphasis added). Accepting arguendo that the Patton Survey revealed unseaworthiness, Plaintiff's agent, after receipt of the Survey, bound coverage without any limitations or warranties. In reliance, the insured entered an insurance contract that Plaintiff now claims was void from its inception; and in reliance the insured paid premiums and allowed the Yacht to go to sea, never suspecting that Plaintiff would deem the Survey and Recommendations as evidence of the Yacht's unseaworthiness. "[T]o permit [Plaintiff], after receiving the premium, to defeat a recovery, on the ground that she was not seaworthy in consequence of alleged defects of construction, known to it at the time of taking the risk, would scarcely be

24

consistent with commercial morality." *Thebaud v. Great Western Ins. Co.,* 155 N.Y. 516, 524 (N.Y. 1898). *See also Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.*, 277 U.S. 66, \*78, 48 S.Ct. 459, 462 (1928) ("The Mackey was undoubtedly very old and somewhat decayed, but her condition, her history and all the facts regarding her were fully known to the company at the time the policy was executed, a written record stating all the particulars being on file with the company.")(citation omitted); *American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation*, 269 F. 768, 770 (2d Cir. 1920).

Because it is estopped from relying on the Patton Survey, all of Plaintiff's claims relating to seaworthiness fail. First, even Plaintiff's former executive who was charged with the responsibility for determining whether to deny coverage was forced to admit that it would not be able to establish that the Yacht was unseaworthy at the time that the policy incepted. This conclusion is further underscored by the sailing history of the Yacht and the maintenance and improvements rendered to Yacht prior to the policy incepting. It is undisputed that prior to the Yacht even being sold to PGG it traveled over 30,000 miles without problems. (Exhibit "C", 63-65; Moore Aff. ¶ 10)

Second, the Patton Survey that Plaintiff has relied upon as evidence of unseaworthiness plainly state to the contrary; to wit: that the Yacht had no problems affecting safety or insurability. Patton's surveyor Riley testified that he was working for the buyer and had no reason to hold back criticism. (Exhibit "E", 126) Nevertheless, Patton's surveyors did not find a single condition that they believed would affect the safe operation or insurability of the Yacht. (Exhibit "E", 129) The Recommendations stated that an asterisk would be used to indicate items "that needed to be taken care of for safe operation and/or insurability." (Exhibit "F", FED 00080). The survey says the Yacht is a

25

good marine risk (once her starred recommendations were dealt with) in coastwise waters for fair weather cruising.[7] (Exhibit "F", FED 00078) Not a single recommendation is starred. (Exhibit "F", FED 00080-00094).

Third, although the Patton Survey indicated that the Yacht was not unseaworthy, Defendants wanted a high quality vessel so the seller and buyer used the Recommendations to improve the Yacht, complying with substantially all of the Recommendations prior to closing. Robert Moore testified and wrote in his expert report that 90% of the work on the Patton Survey preliminary recommendations was done. (Moore Aff. ¶ 16) Warren Lovell, the seller, testified that almost all of the work was done. (Exhibit "C", 47) Captain Papa testified that most of the work was done before completing the sale. (Exhibit "L", 20-23)

2. Plaintiff's Experts' Testimony Is Too Speculative To Meet Its Burden Under the Negative Implied Warranty of Seaworthiness

To establish a breach of the negative implied warranty of seaworthiness, Plaintiff must also prove a proximate causal relationship between the unseaworthy condition and the loss. *Continental Ins. Co.*, 952 F. Supp. at 1070; *Folger Coffee Co. v. Olivebank*, 201 F.3d 632, 638 (5th Cir. 2000).

Plaintiff's only expert[8] offering an opinion on the element of causation has admitted that he is not even certain that the conditions that he concluded caused the loss existed on the night that the Yacht capsized. George Randall stated in his report that "The explanation for the loss lies in the lack of watertight integrity of the hull and the

---

[7] Riley defined fair-weather cruising as anything but anything but foul-weather cruising, referring to gale force winds, which would be 45 knots or more. (Ex. "E", p. 109)
[8] Inexplicably, Plaintiff's expert witnesses as to the cause of the loss, and seaworthiness of the vessel are not the personnel retained by it to do a cause-and-origin investigation, Messrs. Schmahl, Karentz, Taylor and Weil (*see* Ex. "P", 12-13), but rather witnesses who were hired long after the denial and long after this action was filed.

internal watertight bulkheads," explaining that if not for "the non-weathertight *openings*, namely the lower edge of the garage closing lid and the [1-5/8 inch] short pipe, the [3x5 penetration] and the gap around the I-beam and the open engine room exhaust duct" being open, the vessel "would not have flooded and been lost." See Randall Report p. 5, attached as Exhibit "FF" (emphasis added).

Randall has since admitted under oath that he cannot state to a reasonable degree of professional certainty that the 1-5/8 inch penetration was a source of water entering the engine room through the garage. See deposition of George Randall p. 231-232, 302, 306, attached as Exhibit "Q". Randall further stated that the 3x5 inch penetration was reportedly packed with foam and there was insufficient evidence to conclude that water got into the garage through that penetration. (Exhibit "Q", 215, 216, 231, 306)    Randall further admitted he could not rule out that whatever water entered the garage had not exited, as the Yacht's designer intended, through the drain in the garage and the non-watertight garage doors. (*Id.* p. 206-208) In light of these admissions of uncertainty, Randall's opinion is speculative and inadmissible to meet Plaintiff's burdens of proof on unseaworthiness and the cause of loss.

Randall's opinion must further be excluded because his views are inconsistent with the direct evidence in the case, which uniformly indicates that the three "openings" in the port garage bulkhead were sealed at the time of the loss. *See Macaluso*, 2005 WL 563169 at *8. As opposed to Randall's analysis that was based upon the condition of the Yacht post-loss (Exhibit "FF"), after it had been improperly salvaged by a company retained by Plaintiff, pre-loss direct evidence directly refutes Randall's suppositions. For example, the 1-5/8 inch PVC pipe that existed at the time of the Patton Survey was sealed with a sturdy mechanical plug prior to the Yacht going to sea. (Exhibit "H", 142-144)

27

Captain Papa confirmed that this penetration was plugged before the Yacht's last voyage. (Papa Aff. ¶ 13) Christopher Karentz also ruled out the 1-5/8 inch penetration as the cause of the loss based on the volume of water. (Exhibit "GG", 271-273) Karentz also agreed that the 3x5 inch penetration was plugged with foam prior to the loss. (Exhibit "GG", 269-271) No statements of crew members state that the 1-5/8 inch PVC pipe or the 3x5 penetration were open or letting in water at the time that the Yacht capsized, notwithstanding the fact that it was within 12 inches of where the crew was working in the engine room.

Another of Plaintiff's experts, whose expert report stated that the absolute and negative implied warranties of seaworthiness were violated, has entirely retracted his opinion that the Yacht was unseaworthy. Plaintiff's insurance expert Thomas Prendergast under cross examination has recanted his statements and admits that he does not have an opinion on whether the Yacht was seaworthy. (Exhibit "AA", 184)

### III
### DEFENDANTS ARE ENTITLED TO
### SUMMARY JUDGMENT GRANTING THEIR
### EIGHTH COUNTERCLAIM AND DISMISSING
### PLAINTIFF'S SEVENTH CLAIM FOR SALVAGE COSTS

A.   DEFENDANT BEN ASHKENAZY IS NOT LIABLE FOR SALVAGE COSTS AS HE IS NOT A NAMED INSURED ON THE POLICY

As PGG is the only named insured on the Policy, Ashkenazy is a stranger to the Policy and, as a result, should not be a party to this action. The Policy defines itself as "a contract between You [the insured] and Us [the insurer]". (Exhibit "I", FED 00012) "You means an entity named in the Coverage Summary, and a spouse that lives with that person." (*Id.*) Ashkenazy only appears in the coverage summary as a "c/o" mailing address. He has no more right to the proceeds than a manager named in an "Attn:" line.

Ashkenazy is not the owner of the Yacht and has no insurable interest in the Yacht, so he
is not an insured under the Policy.

## B.  PLAINTIFF DID NOT PERFORM THE SALVAGE FOR DEFENDANTS' BENEFIT AND THEREFORE MUST BEAR ITS OWN COSTS

As a result of the admissions of Plaintiff's own witnesses, Defendant is not
responsible for the costs of the salvage operation engaged in by Plaintiff. Plaintiff's
claims agent Paul Richard testified that what Plaintiff did to salvage the hull was for
Plaintiff's sole benefit. (Exhibit "N", 329) His superior, Vincent Corteselli, directed that
the hull be salvaged for a cause and origin investigation and for subrogation purposes.
(Exhibit "N", 349) Moreover, William Turnbull, Worldwide Manager of Property
Claims, agreed that the insured was not responsible for the cost of Plaintiff's
investigation and that Plaintiff should have borne its own costs. See deposition of
William Turnbull p. 247, attached as Exhibit "HH". Accordingly, there is no factual basis
upon which Plaintiff can base its Seventh Claim.

## CONCLUSION

For the foregoing reasons, Defendants PGG Realty, LLC and Ben Ashkenazy respectfully request that the Court grant their motion for partial summary judgment in favor of their first, second, third and fourth Counterclaims in their Answer to Plaintiff's Second Amended Complaint, and dismissing Plaintiff's first, second, third, fourth, fifth and seventh causes of action in its Second Amended Complaint, along with such other and further relief as this Court deems just and proper.

Dated: November 17, 2006

WEG AND MYERS, P.C.

By: _____

William H. Parash (WP9711)
Dennis T. D'Antonio (DD0973)
Attorneys for Defendants
PGG Realty, LLC and Ben Ashkenazy
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210

30