UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FEDERAL INSURANCE COMPANY,                    06 CV 2455 (JSR)(JCF)

        Plaintiff,

   - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

        Defendants.

-------------------------------------------------------------X

### FEDERAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PGG/ASHKENAZYS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

NICOLETTI HORNIG CAMPISE & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

Of Counsel
    John A. V. Nicoletti (JN-7174)
    Thomas M. Rittweger (TR-6796)
    Terry L. Stoltz (TS-7650)
    Val Wamser (VW-0511)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii-v

PRELIMINARY STATEMENT ..................................................................................1

POINT I

      DEFENDANTS' MOTION FOR PARTIAL
      SUMMARY JUDGMENT SHOULD BE DENIED ...............................................1

POINT II

      THE CAPSIZING OF THE PRINCESS GIGI WAS NOT A
      FORTUITOUS EVENT, THEREFORE, PGG/ASHKENAZY
      HAVE FAILED TO ESTABLISH THEIR *PRIMA FACIE* CASE ........................................2

POINT III

      PGG/ASHKENAZY HAVE BREACHED THEIR DUTIES
      OF UTMOST GOOD FAITH AND THE WARRANTIES
      OF SEAWORTHINESS, IRRESPECTIVE OF THE
      "DISCLOSURE" OF THE PATTON REPORT ....................................................8

      A.    Defendants Breached Their Duties of Utmost Good
             Faith by Failing to Disclose Material Information
             Not Contained in the Patton Report ....................................................8

      B.    Defendants Breached the Absolute Implied
             Warranty of Seaworthiness ...............................................................15

      C.    Defendants Breached the Negative Implied
             Warranty of Seaworthiness ...............................................................18

POINT IV

      FEDERAL IS NOT ESTOPPED FROM VOIDING
      THE POLICY FOLLOWING KELLY'S RECEIPT
      OF THE PATTON REPORT....................................................................24

      A.    Kelly Did Not Receive the Patton Report
             Until After Coverage Was Bound........................................................24

      B.    Federal is Not Barred By Waiver or Estoppel
             From Denying Coverage.....................................................................25

POINT V

FEDERAL IS ENTITLED TO RECOVER THE
COSTS OF THE SALVAGE OPERATION ........................................................................28

CONCLUSION .................................................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Acadia Ins. Co. v. Allied Marine Transport LLC,*
   151 F.Supp.2d 107 (D.Me. 2001) ............................................................ 7

*Accord Sipowicz v. Wimble,*
   370 F.Supp. 442 (S.D.N.Y. 1974) ........................................................... 3

*Albany Ins. Co. v. Horak,*
   1994 A.M.C. 273, 1993 WL 269620 (E.D.N.Y. 1993) ......................... 14

*American Home Assur. Co. v. Masters' Ships Management S.A.,*
   423 F.Supp.2d 193 (S.D.N.Y. 2006) ..................................................... 14

*American Merchant Marine Ins. Co. v. Margaret M. Ford Corp.,*
   269 F. 768 (2d Cir. 1920) ...................................................................... 26

*BBS Norwalk One, Inc. v. Raccolta, Inc.,*
   117 F.3d 674 (2d Cir. 1997) .................................................................... 1

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).......................... 1

*Certain Underwriters at Lloyd's, London v. Giroire,*
   27 F.Supp.2d 1306 (S.D. Fla. 1998) ...................................................... 28

*CIAS, Inc. v. Alliance Gaming Corp.,*
   424 F. Supp. 2d 678 (S.D.N.Y. 2006) ..................................................... 1

*Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.,*
   159 F.3d 412 (9th Cir. 1998) ................................................................... 8

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,*
   190 F.3d 26 (2d Cir. 1999) .................................................................... 16

*Commercial Union Ins. Co. v. Flagship Marine Services,* Inc.,
   982 F.Supp. 310 (S.D.N.Y. 1997) ........................................................... 9

*Commercial Union Ins. Co. v. Lord,*
   392 F.Supp.2d 402 (D.Conn. 2005)........................................................ 11

*Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.,*
   277 U.S. 66, 48 S. Ct. 459, 72 L.Ed. 787 (1928)................................... 26

*Compania Transatlantica Centro-Americana, S.A. v. Alliance Assurance Co.,*
   50 F. Supp. 986 (S.D.N.Y. 1943) ........................................................... 3

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia),*
   952 F.Supp. 1046 (S.D.N.Y. 1997) ......................................... 2, 15, 16, 18, 19

*Continental Oil Co. v. Pennzoil Corp.,*
   706 F.2d 1365 (5th Cir. 1983) ............................................................... 23

*Contractors Realty Co., Inc. v. Insurance Co. of N. Am.*,
  469 F.Supp. 1287 (S.D.N.Y. 1979) ........................................................... 15

*Crane v. Diamond Offshore Drilling, Inc.*,
  743 So.2d 780 (La. App. 5th Cir. 1999) .................................................... 19

*Employers Ins. of Wausau v. Occidental Petroleum Corp.*,
  978 F.2d 1422 (5th Cir. 1992) ...................................................... 15, 16, 18

*Farmers' Feed Co. v. Insurance Co. of N. Am.*,
  166 F. 111 (2d Cir. 1908) ......................................................................... 26

*Farr Man Coffee, Inc. v. Chester*,
  No. 88 Civ. 1692, 1993 WL 248799 (S.D.N.Y. 1993) ............................. 2, 3

*Fireman's Fund Ins. Co. v. Cia. De Navegaceon, Interior, S.A.*,
  19 F.2d 493 (5th Cir. 1927) ....................................................................... 8

*Goodman v. Fireman's Fund Ins. Co.*,
  600 F.2d 1040 (4th Cir. 1979) .................................................................... 2

*Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*,
  1966 A.M.C. 385 (S.D.Fla. 1966) ....................................................... 12, 28

*Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*,
  409 F.2d 974 (5th Cir. 1969) .............................................................. 12, 14

*HIH Marine Services, Inc. v. Fraser*,
  211 F.3d 1359 (11th Cir. 2000) ............................................................ 8, 28

*Hudson Val. Lightweight Aggregate Corp. v. Windsor Bldg. & Supply Co.*,
  446 F.2d 750 (2d Cir. 1971) ....................................................................... 7

*Ingersoll Milling Mach. Co. v. M/V Bodena*,
  829 F.2d 293 (2d Cir. 1987) ....................................................................... 2

*Insurance Co. of N.A. v. Board of Commissioners*,
  733 F.2d 1161 (5th Cir. 1984) ................................................................... 19

*John Jovino Co. v. Fireman's Fund Ins. Co.*,
  1992 WL 176956 (S.D.N.Y. 1992) ............................................................ 14

*Keen v. Overseas Tankship Corp.*,
  194 F.2d 515 (2nd Cir. 1952) .................................................................... 19

*Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*,
  795 F.2d 940 (11th Cir. 1986) ................................................................... 14

*Knight v. U.S. Fire Ins. Co.*,
  804 F.2d 9 (2d Cir. 1986) ........................................................................... 9

*Levine v. Aetna Ins. Co.*,
  139 F.2d 217 (2d Cir. 1943) ..................................................................... 16

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ........................... 1

*Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.,*
   632 F.2d 424 (5th Cir. 1980) ................................................................................ 2

*New York Univ. v. First Financial Ins. Co.,*
   322 F.3d 750 (2d Cir. 2003) ........................................................................... 13, 23

*New York, New Haven & Hartford R.R. Co. v. Gray,*
   240 F.2d 460 (2d Cir. 1957) ............................................................................... 3, 4

*Northfield Ins. Co. v. Berlow,*
   983 F.Supp. 1376 (N.D.Fla. 1997) ..................................................................... 29

*Orient Mid-East Lines, Inc. v. S.S. Orient Transporter,*
   496 F.2d 1032 (5th Cir. 1974) ............................................................................ 19

*Reynolds v. Canton Insurance Office,*
   167 P. 1115 (Wash. 1917) ................................................................................... 27

*Ronalds v. Leiter,*
   109 F. 905 (2d Cir. 1901) ................................................................................... 16

*Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,*
   242 F.2d 385 (5th Cir. 1957) .............................................................................. 18

*Sisson v. Ruby,*
   497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 ............................................... 16

*Sun Mut. Ins. Co. v. Ocean Ins. Co.,*
   107 U.S. 485 (1883) ........................................................................................... 12

*The Caledonia,* 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644 (1895) ............................... 15

*Thebaud v. Great Western Ins. Co.,*
   155 N.Y. 516, 50 N.E. 284 (N.Y. 1898) ................................................. 25, 26, 27

*Underwriters at Lloyd's v. Labarca,*
   260 F.3d 3 (1st Cir. 2001) ................................................................................ 7, 16

*United States v. Diebold, Inc.,*
   369 U.S. 654, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) ........................................... 1

*Verdin v. C&B Boat Co., Inc.,*
   1986 WL 15241 (W.D.La. 1986) ........................................................................ 19

*Youell v. Exxon Corp.,*
   48 F.3d 105 (2d Cir. 1995) ................................................................................... 2

**Other Authorities**

2 MICHAEL J. MUSTILL & JONATHAN C.B. GILMAN,
   ARNOULD'S LAW OF MARINE INSURANCE AND AVERAGE § 784 (16th ed. 1981) ..................... 4

45 C.J.S. Insurance § 650, at 555 ................................................................................ 16

Fed. R. Civ. P. 56(c) ...................................................................................................... 1

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of plaintiff Federal Insurance Company ("Federal") in opposition to the defendants' Motion for Partial Summary Judgment.[1]

## POINT I

### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED

Summary judgment is only granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "This is a heavy burden, and it cannot be met with equivocal evidence." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997). In determining whether the moving party has met its burden, a court must resolve all ambiguities, and draw all reasonable inferences, in favor of the nonmoving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962); *CIAS, Inc. v. Alliance Gaming Corp.*, 424 F. Supp. 2d 678, 682 (S.D.N.Y. 2006).

---

[1] In lieu of a detailed fact statement, Federal incorporates by reference Federal's Response and Counterstatement to Defendants' Rule 56.1 Statement of Material Facts filed herewith and Federal's Rule 56.1 Statement of Uncontested Facts and the Statement of Facts set forth in the Memorandum of Law in Support of Federal Insurance Company's Motion for Summary Judgment, both filed on November 17, 2006.

## POINT II

### THE CAPSIZING OF THE PRINCESS GIGI WAS NOT A FORTUITOUS EVENT, THEREFORE, PGG/ASHKENAZY HAVE FAILED TO ESTABLISH THEIR *PRIMA FACIE* CASE

Under an all risk policy, the insured bears the burden of proving that a loss was fortuitous. *See Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir. 1987); *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980). A loss is fortuitous (unforeseen and unanticipated) unless it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured. *See Youell v. Exxon Corp.*, 48 F.3d 105, 110 (2d Cir. 1995); *Ingersoll Milling*, 829 F.2d at 307; *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1060 (S.D.N.Y. 1997).

To sustain its burden of proving that a loss is fortuitous, an insured must prove that the loss did not result from an inherent defect, ordinary wear and tear, or intentional misconduct. Consequently, even under an all risk policy, the insured clearly has the initial and ultimate burden of proving that the loss was fortuitous, *i.e.*, that the loss was not the result of ordinary wear and tear, deterioration, inherent defect, or intentional misconduct. *See Farr Man Coffee, Inc. v. Chester*, No. 88 Civ. 1692, 1993 WL 248799, *27 (S.D.N.Y. 1993)("In order to show a fortuitous loss, an insured simply must show that one of three factors did not produce the loss: inherent defect, ordinary wear and tear, or intentional misconduct of the insured."), *aff'd*, 19 F.3d 9 (2d Cir. 1994).

PGG/Ashkenazys' reliance on decisions involving "all risk" cargo polices (defendants' MOL at 13-14) is misplaced. All risk cargo policies contain clauses where the underwriter admits that the carrying vessel is seaworthy. There is no similar clause contained in Federal's

policy.

PGG/Ashkenazy have failed to sustain their burden to demonstrate that the ingress of seawater into the PRINCESS GIGI and her subsequent capsizing was not the result of inherent design defects. *See Farr Man Coffee, Inc.*, 1993 WL 248799 at *27. Relying upon two cases,[2] PGG/Ashkenazy leave the Court to do their heavy lifting and to speculate as to what a factfinder could reasonably conclude. However, the evidence establishes that the ingress of seawater and capsizing were caused by inherent defects. Therefore, the loss was not fortuitous.

The *Compania Transatlantica* case cited by PGG/Ashkenazy (Defendants' MOL at 14) is distinguishable because the court applied English law and was acting as the ultimate finder of fact rather than considering the insured's argument in the context of a motion for summary judgment. *See Compania Transatlantica*, 50 F. Supp. at 989. More importantly, the court explained:

> It does not follow that the insurer is liable for loss attributable to every incursion of sea water. The underwriter may show that the loss was not caused by a peril of the sea but by the intentional scuttling of the vessel, by the inherent unfitness of the vessel, by the exhaustion of the vessel's useful life through wear and tear . . . .

*Id.* at 990 (internal citations omitted). In other words, the incursion of seawater into a vessel's hull owing to the defective or unseaworthy condition of the vessel cannot be said to be fortuitous. *Accord Sipowicz v. Wimble*, 370 F.Supp. 442, 447-48 (S.D.N.Y. 1974). A leading maritime commentator concurs:

> In cases of loss by foundering and of damage occasioned by leakage of seawater into the vessel, the point which has to be determined is whether the entry of the water was due to any fortuitous occurrence, or merely to the unseaworthiness of the vessel on sailing....Where the vessel was

---

[2] *See Compania Transatlantica Centro-Americana, S.A. v. Alliance Assurance Co.*, 50 F. Supp. 986 (S.D.N.Y. 1943); *New York, New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460 (2d Cir. 1957).

> initially in such a state of general debility or decay that the <u>water enters</u> <u>without her having encountered any adverse or unusual conditions of the</u> <u>seas, that event cannot be said to be fortuitous</u> and does not constitute loss by perils of the seas.

2 MICHAEL J. MUSTILL & JONATHAN C.B. GILMAN, ARNOULD'S LAW OF MARINE INSURANCE AND AVERAGE § 784 (16th ed. 1981) (emphasis added).

Similarly, *New York, New Haven & Hartford Railroad Co.* (defendants' MOL, p. 14), involved an appeal after trial and, therefore, the issue of fortuity was not decided as a matter of law. 240 F.2d at 463. Further, the court found that the loss was the result of "a concatenation of fortuitous circumstances," and did not consider whether the vessel was seaworthy because the insurer expressly disavowed "an express or implied warranty of seaworthiness." *Id.* at 465-66.

A reasonable factfinder could conclude that the capsizing of the PRINCESS GIGI was not fortuitous because the inherent vessel design defects made the capsizing foreseeable and expected.[3] Specifically, the engine room exhaust ducting was too close to the vessel's waterline. (Ex. 57, Randall Dep. at 275-77; Ex. 52, Hipple Dep. at 71-72; Ex. 78, Rese EUO at 39; Ex. 77, Papa EUO at 44).[4] Moreover, because the garage doors were not watertight (Ex. 57, Randall Dep. at 196-97), in following seas the additional weight of the seawater in the garages[5] caused the engine room exhaust ducting to be even closer to the waterline. (Ex. 58, p.7; Ex. 77, Papa EUO at 90).

---

[3] Indeed, with the substantial evidence set forth in Federal's Memorandum of Law in support of its Motion for Summary Judgment, the inescapable conclusion is that the PRINCESS GIGI was unseaworthy.

[4] The exhibits referenced herein are annexed to the Affidavit of Thomas M. Rittweger, Esq. in Support of Federal's Motion for Summary Judgment, dated November 17, 2006 (Exhibits "1" through "92"), the Rittweger Affidavit dated December 1, 2006 (Exhibits "93" through "96"), and the D'Antonio Declaration dated November 17, 2006 (Exhibits "A" through "II"). "EUO" refers to Examinations Under Oath conducted shortly after the casualty.

[5] The fact that water was in the port garage is demonstrated by the water coming into the engine room through the port garage "I" beam penetration. (Ex. 78, Rese EUO at 41-42; Ex. 80, Fudge EUO at 35-36).

Additionally, defendants' own expert, Robert Moore, noted that there was no DC fuel pump aboard the vessel to use in the event of a loss of AC power. "This is an essential piece of equipment, required for long voyages (over 400 miles)." (Ex. 36, p. 4). Thus, the vessel left port on a backup fuel transfer system. Normally, a fuel centrifuge is used on long voyages to constantly feed fuel to the day tank, eliminating the need for repeated transfers of fuel to the day tank. (Ex. 36, p.4). The PRINCESS GIGI lost power and propulsion because the day tank ran out of fuel. (Ex. 80, Fudge EUO at 33; Ex. 77, Papa EUO at 97-98).

There is substantial evidence establishing the instability of the vessel. The yacht was designed for voyage on the open ocean. (Ex. 33, Hains Dep. at 16). The original Cutalo hull design used to construct the yacht was for a 2½ deck vessel without garages aft. (Ex. 33, Hains Dep. at 14, 16). The PRINCESS GIGI is a 3 deck yacht with garages aft. However, the vessel was built without modifying the hull design. (Ex. 33, Hains Dep. at 15). The placement of the engines, which were moved forward because of the garages, affected the vessel's stability. (Ex. 33, Hains Dep. at 17). The additional deck was located up high. (Ex. 33, Hains Dep. at 13). Finally, poor vessel construction contributed to the weight imbalance, causing the vessel to be trimmed down by the bow. (Ex. 33, Hains Dep. at 19). As a result of a Trident stability analysis, the shipyard naval architect had "grave concerns" regarding the stability of the vessel. (Ex. 33 Hains Dep. at 20).

PGG/Ashkenazy's surveyor was fully aware of the vessel's stability problems (even though these facts were never communicated to Federal or the Kelly Agency). Robert Connell, a Patton surveyor retained by PGG/Ashkenazy, served as an arbitrator in a dispute between the prior owner of the yacht (SeaQuest) and the shipyard that designed her (Trident). (Ex. 41, Connell Dep. at 8-10, 25, 55-56). The arbitration panel found for the owner because the vessel

did not float properly in that "[i]t was down by the bow probably two feet." (Ex. 41, Connell Dep. at 56). The panel also found that the FULL BLOOM had stability problems. (Ex. 41, Connell Dep. at 57-58).

After the arbitration, additional litigation[6] involving SeaQuest and Trident resulted in a "Bench Order" from the United States District Court for the Middle District of Florida. (Ex. 40). In that Order, the Court identified over 80 items, including some relating to the stability, of the yacht that were either negligently constructed or defective as a result of intentional misconduct. (Ex. 40, p.8-13).

Furthermore, the PRINCESS GIGI had ongoing trim and stability issues. A false bow was added to the vessel in an attempt to correct the improper trim. (Ex. 41, Connell Dep. at 59; Ex. 51, Riley Dep. at 82-83). Even after the yacht was put in use with the false bow, it was determined that she was "tender," *i.e.*, she was slow to come back to the upright position when pushed over by a wave. (Ex. 35, Moore Dep. at 58).

To assess the yacht's stability, unlicensed naval architect Arthur M. Barbeito performed an incomplete incline experiment, which was not in accordance with any appropriate standard. (Ex. 33, Hains Dep. at 50-54). Barbeito admitted that his analysis did not address the "severe wind and rolling criteria," which would require additional ballast, because he did not have the necessary construction drawings. (Ex. 34). Barbeito recommended adding 13.5 MT of ballast, (Ex. 34), which was accomplished by adding a new keel, thereby modifying the shape of the hull. Adding the ballast was intended to "stiffen" the vessel; make it "less tender, make it less rolly." (Ex. 51, Riley Dep. at 83). The addition of some 13.5 tons of lead ballast is considered "a lot." (Ex. 41, Connell Dep. at 61).

---

[6] Whether or not the yacht's performance can be described as an "impressive history" (Defendants' MOL at 5), she certainly has had an impressive litigation history!

Accurate information regarding the shape of the hull is important to properly determine the yacht's stability. (Ex. 33, Hains Dep. at 32). However, no further stability analysis was ever performed after the hull was modified by adding a new keel. (Ex. 35, Moore Dep. at 35; Ex. 39, Lovell Dep. at 23). While Patton generally noted that the vessel's stability documentation needed to be reviewed (Ex. 43, at 31), A-1 went even further and specifically required that another stability test be performed and the vessel's overall strength be assessed by a qualified naval architect. (Ex 70, at 1, 2).

In any event, the PRINCESS GIGI should have been able to survive in a "dead ship condition" without capsizing until help arrived. (Ex. 57, Randall Dep. at 262-63).

The capsizing of the PRINCESS GIGI was also not a fortuitous event because it occurred in expectable weather conditions. Federal is entitled to a presumption of unseaworthiness due to the fact that the vessel capsized under sea conditions that the vessel could reasonably have been expected to withstand. *See Hudson Val. Lightweight Aggregate Corp. v. Windsor Bldg. & Supply Co.*, 446 F.2d 750, 752 (2d Cir. 1971); *Acadia Ins. Co. v. Allied Marine Transport LLC*, 151 F.Supp.2d 107, 124 (D.Me. 2001). The insured must rebut the presumption by producing competent evidence that the vessel sank for some reason other than a presumed unseaworthy condition. *See Underwriters at Lloyd's v. Labarca*, 260 F.3d 3 (1st Cir. 2001).

The weather and sea conditions encountered were expectable in that area of the Atlantic Ocean in any February. (Ex. 60, Raguso Dep. at 76). Additionally, the weather and sea conditions were forecast prior to the February 4th voyage. (Ex. 60, Raguso Dep. at 56-57). Indeed, Captain Papa has admitted that the weather was not the cause of the sinking. (Ex. 77, Papa EUO at 83). Finally, defendants' expert Robert Moore admitted that the PRINCESS GIGI had sailed without incident in worse conditions than those encountered on the date of the

capsizing. (Ex. 35, R. Moore Dep. at 101, 199-200). Thus, defendants have not rebutted the presumption that the yacht capsized due to unseaworthiness. *See Fireman's Fund Ins. Co. v. Cia. De Navegaceon, Interior, S.A.*, 19 F.2d 493, 495 (5th Cir. 1927)(vessel found to be unseaworthy because it sank in expectable conditions).

The factfinder could reasonably conclude that the capsizing of the vessel was due to the inherent design defects of the PRINCESS GIGI. Accordingly, defendants have not met their burden of establishing that the capsizing of the vessel was a fortuitous event under the Policy. Defendants' motion for partial summary judgment must be denied.[7]

## POINT III

### PGG/ASHKENAZY HAVE BREACHED THEIR DUTIES OF UTMOST GOOD FAITH AND THE WARRANTIES OF SEAWORTHINESS, IRRESPECTIVE OF THE "DISCLOSURE" OF THE PATTON REPORT

**A.     Defendants Breached Their Duties of Utmost Good Faith by Failing to Disclose Material Information Not Contained in the Patton Report**

The doctrine of utmost good faith requires an insured to fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk, whether or not inquired into by the insurer. *See HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000); *Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 420 (9th Cir. 1998), *cert. denied*, 528 U.S. 815, 120 S.Ct. 53 (1999). The doctrine of utmost good faith is based upon the principle that "[s]ince the insured is in the best position to know any circumstances material

---

[7] If the Court determines that the capsizing of the vessel constitutes a fortuitous event, defendants are still not entitled to coverage under the Policy due to their breaches of the duties of utmost good faith; the absolute implied warranty of seaworthiness; and the negative implied warranty of seaworthiness.

to the risk, the insured must reveal those facts to the underwriters, rather than wait for the underwriter to inquire." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir. 1986).[8]

PGG/Ashkenazy failed to disclose to Federal that SeaQuest (the seller) was allowed 90 days (approximately ¼ of the policy period) to make numerous substantial and material repairs to the PRINCESS GIGI (Ex. 23, Acceptance of Vessel pp. 2-3; Ex. 21, M. Moore Dep. at 42-43; Ex. 62, Chamberlain Dep. at 181-186; Ex. 61, Ashkenazy Dep. at 250-253; Ex. 39, Lovell Dep. at 45-47).[9] PGG/Ashkenazy also failed to disclose that KeyBank (the lender) granted PGG's request and modified the standard form KeyBank "Marine Note" language to increase the amount of time from 30 to 120 days (Ex. 28, Kline Dep. at 23-24, 27-31; Ex. 85) after the closing (approximately 1/3 of the policy period) to allow PGG/Ashkenazy to comply with most of Patton's Safety Equipment recommendations. (Ex. 29, Marine Note ¶¶ 34, 43(c); Ex. 28, Kline Dep. at 23-24). Unfortunately, the vessel capsized and was a total loss within those 90/120-day windows, just 56 days after policy inception.

In addition to the Patton report, Ashkenazy, through his broker, Kent Chamberlain, had at least three other pre-purchase surveys performed, but never provided them to Federal before it agreed to insure the yacht.[10] (Ex. 61, Ashkenazy Dep. at 66-68; Ex. 62, Chamberlain Dep. at 55-58, 132-33).

---

[8] Although this Court has previously characterized the doctrine of *uberrimae fidei* as "seemingly anachronistic," this Court nevertheless recognized that the doctrine "still governs every marine insurance contract." *Commercial Union Ins. Co. v. Flagship Marine Services,* Inc., 982 F.Supp. 310, 314 (S.D.N.Y. 1997).

[9] Defendants rely upon their expert, Robert Moore for the proposition that some 90% of the Patton recommendations were addressed. (Defendants' MOL at 6). However, Moore admitted that the 90% number was an estimate without support. (Ex. 35, Moore Dep. at 128-29). Furthermore, Moore crossed out and deemed as "inconsequential" numerous Patton recommendations. (Ex. 35, Moore Dep. at 114-15).

[10] The three other pre-purchase surveys include: (1) A-1 Marine Surveyors & Consultants, Inc. report, dated December 2, 2005 (Ex. 70); (2) Ward's Marine Electric "Worklist," dated

PGG/Ashkenazy failed to disclose the A-1 survey report,[11] which required an incline experiment to be performed due to concerns about the stability of the vessel (Ex. 70, A-1 Marine Survey Report p. 1; Ex. 62, Chamberlain Dep. at 134-136) and raised questions as to the structural integrity of the yacht which could only be answered by a qualified naval architect (Ex. 70, A-1 Marine Survey Report p. 2).

PGG/Ashkenazy may argue that the A-1 survey report was only relevant if PGG actually applied for a commercial registry to allow it to charter out the vessel for hire, which was apparently never done. However, the application for insurance indicated that PGG intended to charter out the yacht eight weeks a year (Ex. 6). In fact PGG did charter the PRINCESS GIGI to Chamberlain Yachts for one week (Ex. 62, Chamberlain Dep. at 195-196; Ex. 91), although it had not been performed before the yacht capsized (Ex. 62, Chamberlain Dep. at 196). Although PGG never applied for the commercial registration – either because Ashkenazy decided that it was too difficult or too expensive to comply with the requirements set forth in the A-1 survey or because the yacht capsized before PGG could apply – the A-1 report was clearly material to the risk and should have been disclosed to Federal. (*See* Ex. 19, Capiga Decl. 11/17/06).

PGG/Ashkenazy also did not disclose the existence of the survey report prepared by Ward's Marine Electric ("Ward's"). (Ex. 69, Ward's "Worklist"). Ward's performed an electrical survey and produced a list of recommended repairs with an "X" indicating hazardous items. (Ex. 69; Ex. 62, Chamberlain Dep. at 113-14). In fact, 18 of the 37 listed items

---

November 29, 2005 and Estimates for Repairs on the FULL BLOOM, dated December 2, 2005 (Ex. 69; Ex. 93); and (3) Frank Griffin, Inc. Diesel Engine Survey, dated November 23, 2005. (Ex. 90).

[11] The A-1 report was prepared because PGG/Ashkenazy were considering chartering out the yacht (Ex. 62, Chamberlain Dep. at 132-133) as disclosed in the application sent to Federal (Ex. 6). Indeed, PGG chartered the vessel to Chamberlain Yachts for one week in return for a reduced brokerage commission (Ex. 62, Chamberlain Dep. at 195-196; Ex. 91). However, the yacht capsized before the charter could be performed (Ex. 62, Chamberlain Dep. at 196).

concerning the ship's electrical system were marked with an "X", indicating that those particular items were most likely hazardous and could cause equipment failure, physical harm and/or property damage. (Ex. 69, Ward's Worklist; Ex. 30, Albers Dep. at 30-32; Ex. 62, Chamberlain Dep. at 113-115).

Although the Ward's report is innocuously referenced in the Patton Report, Federal did not have a duty to inquire further concerning the Ward's report. "[T]he onus is on the insured to disclose those circumstances or facts that a reasonable person in the insured's position would know are material, rather than wait for the insurer to investigate." *Commercial Union Ins. Co. v. Lord*, 392 F.Supp.2d 402, 405 (D.Conn. 2005) (emphasis added). The insured is in the best position to know all of the circumstances material to a risk and has a duty under the doctrine of *uberrimae fidei* to reveal all of those facts to an underwriter without waiting or requiring the underwriter to make further inquiries or to determine the truth from incomplete, inaccurate or misleading information.

The leading Supreme Court case on the doctrine of utmost good faith describes the insured's obligation to disclose as follows:

> The insured will not be allowed to protect himself against the charge of an undue concealment, by evidence that he had disclosed to the underwriters, in general terms, the information he possessed. Where his own information is specific, it must be communicated in the terms in which it was received. General terms may include the truth, but fail to convey it with its proper force and in all its extent. Nor will the assured be permitted to urge, as an excuse for his omission to communicate material facts, that they were actually known to underwriters, unless it appears that their knowledge was as particular and full as his own information. It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging the value of the risks; and when any circumstances is withheld, however, slight and immaterial it may have seemed to himself, that, if disclosed, would have probably influenced the terms of the insurance, the concealment vitiates the policy.

*Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485 (1883) (emphasis added).

The doctrine of *uberrimae fidei* obligates an applicant for marine insurance to provide truthful information so that the underwriter is as knowledgeable as the insured. However, selective disclosure is tantamount to a misrepresentation. In *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974 (5th Cir. 1969), the Fifth Circuit affirmed the district court's decision voiding a yacht policy due to the insured's failure to disclose a survey report to the insurer, despite the fact that the insured disclosed another survey report regarding the same vessel. *See Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 1966 A.M.C. 385 (S.D.Fla. 1966). The insured sent the insurer a copy of a survey report which concluded that the vessel was seaworthy, but never delivered a copy of another survey report which detailed certain repairs necessary to make the vessel seaworthy. *Id.* at 386-87. The insured argued that the insurer was placed on notice that the vessel was undergoing repairs and that the insurance agent requested that the insurer survey the vessel. *Id.* at 389. The district court rejected the insured's argument:

> Assuming *arguendo* that [the insurance agent's] testimony is accepted as true, and the [insurer] was asked to conduct a survey and was informed of the repair work, the [insured] cannot escape its failure to provide the [insurer] with the [other] survey report. The marine insurance contract is *uberrimae fidei* – requiring the highest degree of good faith. That standard can hardly be complied with by concealing from the assurer a current survey report which shows that the vessel is unseaworthy at the time of the application, particularly when the assurer is given an earlier report showing the vessel seaworthy. Neither is the Plaintiff excused by the fact that the assure[r] did not conduct its own survey or ask for a current report, for the insured was under an affirmative obligation to disclose all material facts affecting the risk that the [insurer] was undertaking. The obligation of the assured to disclose could not be waived by implication nor can the failure of the [insurer] to make inquiry excuse the failure of the [insured] to disclose.

*Id.* at 389 (emphasis added).

There is absolutely no requirement under the doctrine of utmost good faith that an insurer must presume that statements in applications are incomplete or only partially true, thereby requiring further investigation to determine the real truth. Rather, PGG/Ashkenazy had the duty to disclose the existence of the A-1 and Ward's survey reports and the conclusions therein.

Defendants speciously argue that Ashkenazy had no actual knowledge of the findings of the various surveys, other than the Patton report, and therefore, cannot be found to have violated the duty of utmost good faith based on the failure to disclose information he did not possess. (Defendants' MOL at 20). However, this assertion is belied by the fact the information contained in these various surveys contributed to defendants' request to the lender to extend the repair window from 30 days to 120 days. (Ex. 28, Kline Dep. at 23-24, 27-31; Ex. 85). Furthermore, Ben Ashkenazy hired Chamberlain Yachts as his broker in connection with the purchase of the PRINCESS GIGI. Kent Chamberlain forwarded all the survey reports to Ashkenazy and explained everything to Ashkenazy. (Ex. 62, Chamberlain Dep. at 144, 214). Moreover, Kent Chamberlain was PGG/Ashkenazy's agent for all purposes with regard to the purchase of the vessel and had full knowledge of the various survey reports. (Ex. 62, Chamberlain Dep. at 144, 214). Accordingly, Chamberlain's knowledge is imputed to PGG/Ashkenazy. *See New York Univ. v. First Financial Ins. Co.*, 322 F.3d 750, 753 (2d Cir. 2003) ("knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it").

Ashkenazy's subjective opinion regarding what information should be considered important to an underwriter is irrelevant. A fact is material for purposes of *uberrimae fidei* if it "could possibly influence the mind of a prudent and intelligent insurer in determining whether he

13

would accept the risk." *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 942-43 (11th Cir. 1986); *Gulfstream Cargo Ltd. v. Reliance Ins. Co.*, 409 F.2d 974 (5th Cir. 1969); *Albany Ins. Co. v. Horak*, 1994 A.M.C. 273, 282, 1993 WL 269620, *7 (E.D.N.Y. 1993); *John Jovino Co. v. Fireman's Fund Ins. Co.*, 1992 WL 176956, *7 (S.D.N.Y. 1992). "An objective standard of disclosure applies, 'that is, whether a reasonable person in the assured's position would know that the particular fact is material.'" *American Home Assur. Co. v. Masters' Ships Management S.A.*, 423 F.Supp.2d 193, 221 (S.D.N.Y. 2006) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)). A reasonable insured in PGG/Ashkenazy's position would or should have known that the information contained in the other survey reports was material to whether Federal would issue the policy and on what terms. The information was clearly material to Federal's decision to issue the subject policy. (Ex. 19, Capiga Decl. 11/17/06). Indeed, the information contained in these various surveys contributed to defendants' request to the lender to extend the repair window from 30 to 120 days.

Even if this Court determines that Federal was somehow under a duty to inquire further by virtue of its knowledge of the existence of the Patton report, any further inquiry of Patton on Federal's part would not have revealed the existence of the numerous design defects and other information concerning the vessel's unseaworthiness. The deposition testimony of the Patton surveyors demonstrates what Federal would have learned from such an inquiry. (Exs. 41, 51). Riley incredulously maintains that the PRINCESS GIGI was a "good boat, a good risk and a seaworthy boat" and that there was not a single condition that would affect the safe operation of the vessel. (Ex. E, Riley Dep. at 129, 151).[12] Any further inquiry by Federal to the Patton

---

[12] However, even defendants' expert, William Hipple, admits that the compromised watertight bulkheads referenced in the Patton Recommendations should have been repaired before the vessel returned to sea. (Ex. 52, Hipple Dep. at 66-67).

surveyors would not have revealed the existence of the various hazardous conditions, design defects and stability issues. Moreover, it would not have revealed the existence of the A-1 report.

Defendants also argue that Federal is precluded from asserting additional grounds for disclaiming coverage because Andrew Calandriello testified as to the importance of the Patton report. (Defendants' MOL at 17). However, Calandriello's involvement with the PRINCESS GIGI ended on June 6, 2006. (Ex. AA, Calandriello Dep. at 6). As of that date, Federal did not know of the existence of the other survey reports or the various hazardous conditions and design defects of the vessel, which were revealed only during discovery in this litigation.

**B.      Defendants Breached the Absolute Implied Warranty of Seaworthiness**

An absolute warranty of seaworthiness is implied into the policy at the moment it attaches. (*See* Federal's MOL in Support at 17-18). Importantly, the absolute implied warranty of seaworthiness does not require the insured to have knowledge of the unseaworthy condition. *See Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422 (5th Cir. 1992); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1067 (S.D.N.Y. 1997).

The United States Supreme Court has stated that the warranty of seaworthiness is implied in "every" marine insurance policy. *The Caledonia*, 157 U.S. 124, 132, 15 S.Ct. 537, 541, 39 L.Ed. 644 (1895). Defendants' suggestion that perhaps the warranty does not apply to pleasure craft is based on state court authority[13] that is inconsistent with current admiralty jurisprudence. The Supreme Court has held that the protection of maritime commerce "cannot be fully

---

[13] In the only federal case cited by PGG/Ashkenazy, the court did not decide one way or the other whether the seaworthiness warranty applied to pleasure craft. *See Contractors Realty Co., Inc. v. Insurance Co. of N. Am.*, 469 F.Supp. 1287, 1293 (S.D.N.Y. 1979).

vindicated unless all operators of vessels on navigable waters are subject to uniform rules of conduct.    The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Sisson v. Ruby*, 497 U.S. 358, 367, 110 S.Ct. 2892, 2898, 111 L.Ed.2d 292 (internal quotations omitted; emphasis in original); *see also Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 9 (1st Cir. 2001)(insured breached implied warranty of seaworthiness due to faulty equipment aboard sport fishing yacht); *Ronalds v. Leiter*, 109 F. 905, 907-08 (2d Cir. 1901)(stating that insurance policy was presumptively avoided because the yacht, which was chartered for a pleasure cruise, was unseaworthy).

In marine insurance, an insured's breach of a warranty results in the insurance being voided *ab initio*.    It does not matter whether there is causal connection between the breach and the damages for which coverage is claimed. *See Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 190 F.3d 26, 32 (2d Cir. 1999)("[C]ompliance with the warranty was a condition precedent to liability [under the contract of marine insurance] and afforded a complete defense irrespective of any question of causation'" quoting *Levine v. Aetna Ins. Co.*, 139 F.2d 217, 218 (2d Cir. 1943)).

> If there is any breach of a warranty the policy is null and void, and...the underwriters are relieved of their liability notwithstanding the loss is not connected with the breach of the breach is cured prior to the loss.

45 C.J.S. Insurance § 650, at 555.    Similarly, breach of the absolute implied warranty of seaworthiness voids the insurance *ab initio*.    In order to succeed in asserting this implied warranty, the insurer need only demonstrate that the vessel is in fact not seaworthy at the inception of the policy. *See Employers Ins. of Wausau*, 978 F.2d at 1428; *Continental Ins. Co. v. Lone Eagle Shipping Ltd.*, 955 F.Supp. 1046, 1070 (S.D.N.Y. 1997)("a breach of a warranty of

continuing seaworthiness, whether express or implied,...voids the policy altogether"). In any event, in this matter the unseaworthiness of the vessel at the policy inception, *e.g.,* lack of stability, lack of watertight integrity of the garage doors, and the improper location of the engine room exhaust ducts, all were contributory causes of the capsizing.

The evidence establishes that the PRINCESS GIGI was unseaworthy at the inception of the policy. While Patton generally noted that the vessel's stability documentation need to be reviewed (Ex. 43, at 31). A-1 went even further and specifically required that another stability test be performed and the vessel's overall strength be assessed by a qualified naval architect. (Ex. 70, at 1, 3). Indeed, as discussed earlier, *see* pp. 6-7 *above*, the yacht was unstable.

The PRINCESS GIGI was also unseaworthy due to inherent design defects. Specifically, the garage doors were not watertight (Ex. 57, Randall Dep. at 196-97), and the engine room exhaust ducting was too close to the vessel waterline. (Ex. 57, Randall Dep. at 275-77; Ex. 52, Hipple Dep. at 71-72; Ex. 78, Rese EUO at 39; Ex. 77, Papa EUO at 44). The weight of the water in the garages[14] caused the engine room exhaust ducting to be even closer to the waterline. (Ex. 58, p.7; Ex. 77, Papa EUO at 90).

The vessel was also unseaworthy due to a breach in the watertight integrity of the bulkheads. (Ex. 58, p.5). The vessel was designed with three (3) watertight bulkheads, which are necessary for the safety of the vessel. (Ex. 54, Dolan Dep. at 137-38). Defendants' own expert, William Hipple, admitted that the compromised watertight bulkheads should be repaired before the vessel returns to sea. (Ex. 52, Hipple Dep. at 66-67). A continuing lack of watertight integrity in the aft engine room bulkhead existed at the time of the Feb. 4th voyage as evidenced by water leaking through the port garage "I" beam penetration. (Ex. 78, Rese EUO at 41-42;

---

[14] The fact that water was in the port garage is demonstrated by the water coming into the engine room from the "I" beam penetration. (Ex. 78, Rese EUO at 41-42; Ex. 80, Fudge EUO at 35-36).

Ex. 80, Fudge EUO at 35-36). Breaches in watertight bulkheads meant the ship was unsafe and unfit for its intended use, *i.e.*, unseaworthy. (Ex. 52, Hipple Dep. at 64-67; Ex. 56, p. 5).

The evidence establishes that the PRINCESS GIGI was unseaworthy at the time the policy was bound. Accordingly, PGG/Ashkenazy breached the absolute implied warranty of seaworthiness. Defendants' motion for partial summary judgment should be denied.

**C.    Defendants Breached the Negative Implied Warranty of Seaworthiness**

PGG/Ashkenazy have also breached the negative implied warranty of seaworthiness because they had knowledge at the time she left on her fateful voyage in early February, 2006 of the unseaworthy conditions of the PRINCESS GIGI which were the proximate cause of her capsizing.

The negative implied warranty of seaworthiness applies after the attachment of the risk and requires that the vessel owner refrain from allowing the vessel to leave port in an unseaworthy condition. *See Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957) (holding that a warranty of seaworthiness applies at the inception of each voyage during the policy term). Under the negative implied warranty of seaworthiness, the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. *Continental*, 952 F.Supp. at 1070. The consequence of a violation of this "negative" burden is a denial of liability for loss or damage proximately caused by such unseaworthiness. *Id.*; *Employers Ins. of Wausau*, 978 F.2d at 1432.

A shipowner has a non-delegable duty to provide a competent crew for its vessel. *See Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1565 (11th Cir. 1985).

Incompetence of the crew constitutes an unseaworthy condition.[15]   *See Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 517-18 (2nd Cir. 1952). "[A] vessel crew that is inadequately trained, that is not instructed in the use of equipment, or that engages in unsafe methods of work, can constitute unseaworthiness." *Crane v. Diamond Offshore Drilling, Inc.*, 743 So.2d 780 (La. App. 5th Cir. 1999) (citations omitted); *see also Orient Mid-East Lines, Inc. v. S.S. Orient Transporter*, 496 F.2d 1032, 1040 (5th Cir. 1974); *Verdin v. C&B Boat Co., Inc.*, 1986 WL 15241 (W.D.La. 1986); *Insurance Co. of N.A. v. Board of Commissioners*, 733 F.2d 1161 (5th Cir. 1984).

The crew aboard the PRINCESS GIGI on her last voyage was woefully unqualified and committed numerous errors which rendered the yacht unseaworthy. The Feb. 4th voyage of the PRINCESS GIGI was only Papa's second voyage aboard the vessel, the first trip being a short voyage to the Bahamas, with the prior owner's engineer continuing to work on the vessel. (Ex. 77, Papa EUO at 22). To make matters worse, this ill-fated trip was the very first voyage of the "engineer," Jacob Rese, who was not a licensed engineer and had no formal training as an engineer. (Ex. 78, Rese EUO at 4). Rese had only signed on to the voyage on January 30, 2006, a mere 5 days prior to departure and after the prior owner's engineer had already left the vessel. (Ex. 78, Rese EUO at 7). Therefore, there was no engineer-to-engineer turnover or explanation of vessel systems. (Ex. 78, Rese EUO at 10). Rese had only signed on for this particular voyage, not as the permanent engineer. (Ex. 78, Rese EUO at 7).

Rese was not familiar with the fuel transfer system aboard the PRINCESS GIGI, not knowing the day tank could be gravity fed. (Ex. 78, Rese EUO at 29). He failed to use the

---

[15] The negative implied warranty of seaworthiness requires that the insured not knowingly allow the vessel to leave port in an unseaworthy condition. *See Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1070 (S.D.N.Y. 1997).

computank system to determine the amount of fuel in the day tank. (Ex. 35, R. Moore Dep. at 187-88). Not surprisingly, the PRINCESS GIGI ran out of fuel because her day tank ran dry. (Ex. 80, Fudge EUO at 33; Ex. 77, Papa EUO at 97-98). Rese also failed to close the engine room exhaust damper when water was first noted coming into the engine room through the exhaust duct. (Ex. 78, Rese EUO at 39). The time he could devote to his engineering duties was limited because Rese also stood watches in the pilothouse on the bridge. (Ex. 78, Rese EUO at 8).

The evidence further establishes that Papa was grossly negligent and/or incompetent. He failed to alter vessel course in a timely fashion to minimize flooding. (Ex. 79, Gorin Dep. at 67; Ex. 35, R. Moore Dep. at 219-20). Papa did not know he had manual steering capability after he lost AC power. (Ex. 77, Papa EUO at 99; Ex. 79, Gorin Dep. at 70). Papa went down to the engine room and improperly lined up the engines to evacuate the bilges using the eductor pump without telling the engineer. (Ex. 77, Papa EUO at 60; Ex. 35, R. Moore Dep. at 157-58, 214-16; Ex. 36, p. 6).

Like the engineer, this was Nathalie Gorin's first voyage aboard the vessel.[16] Gorin, who previously worked on another yacht with Papa as a hostess (Ex. 79, Gorin Dep. at 11), was hired to work aboard the PRINCESS GIGI as an unlicensed watchstander, despite having absolutely no watchstanding training (Ex. 79, Gorin Dep. at 17-18 & 25). Papa provided Gorin with no watchstanding training or radar training. (Ex. 79, Gorin Dep. at 34). Moreover, the watches aboard the GIGI were completely disorganized. (Ex. 79, Gorin Dep. at 26 & 30). Gorin never stood watch with the same person twice. (Ex. 79, Gorin Dep. at 26, 31-33). In fact, her second watch was with the cook, another unlicensed crewmember. (Ex. 79, Gorin Dep. at 32-33).

---

[16] It was also deckhand Boris Stropnik's first trip aboard the PRINCESS GIGI. (Ex. 79, Gorin Dep. at 29; Ex. 77, Papa EUO at 48).

Moreover, the three (3) watches were constantly rotating on three (3) hour shifts. (Ex. 79, Gorin Dep. at 27; Ex. 77, Papa EUO at 37). Captain Papa never conducted any onboard training drills, such as fire drills, flooding drills, lifeboat drills, or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).[17]

There were numerous problems aboard the vessel at the beginning of the voyage. There was a stabilizer problem and the steering gear malfunctioned due to a faulty cooling pump. (Ex. 79, Gorin Dep. at 43-45). Gorin observed a heated argument between engineer Rese and Papa after Rese asked Papa to turn the vessel around while the vessel was still in sight of the Florida coast. (Ex. 79, Gorin Dep. at 46-47, 49). Papa refused to turn the vessel around. (Ex. 79, Gorin Dep. at 46). Furthermore, Papa admitted to the salvor that there were numerous problems aboard the vessel prior to the commencement of the voyage. (Ex. 81, Mitchell Dep. at 154-55).

According to PGG/Ashkenazys' own expert, Robert Moore, the capsizing of the PRINCESS GIGI resulted from "inexperience of the crew" which caused: (1) the loss of power to the vessel due to low fuel in the day tank; (2) the failure to close the damper in the engine room exhaust ventilation to stem flooding; (3) the open AC bilge priming line and eductor valves which added to the engine room flooding; and (4) the failure to alter the vessel's course in a timely fashion such that the sea conditions would not directly strike the port engine room exhaust ports. (Ex. 35, R. Moore Dep. at 219-20; Ex. 52, Hipple Dep. at 68). Therefore, a contributing proximate cause of the casualty was crew incompetence.

The PRINCESS GIGI was also unseaworthy at the commencement of the voyage because of a design defect involving the location of the engine room exhaust ducting, which was a cause

---

[17] After the rescue, Papa advised Gorin to say she was only a passenger, rather than a crewmember, for "insurance purposes." (Ex. 79, Gorin Dep. at 91-92). Papa also advised Gorin not to talk about anything that happened aboard the vessel. (Ex. 79, Gorin Dep. at 91).

of the capsizing of the vessel. The engine room exhaust ducting exited the port side of the vessel at a position too close to the waterline. (Ex. 78, Rese EUO at 39; Ex. 77, Papa EUO at 44). The weight of the water in the garages caused the engine room exhaust ducting to be even closer to the waterline. (Ex. 77, Papa EUO at 90). The presence of water in the garages is established by the fact that water was coming into the engine room through the supposedly watertight aft engine room bulkhead from a garage "I" beam penetration. (Ex. 78, Rese EUO at 41-42; Ex. 80, Fudge EUO at 35-36).

Additional unseaworthy conditions at the start of the voyage were admitted by PGG/Ashkenazys' own expert. There was no DC fuel pump aboard the vessel to use in the event of a loss of AC power. This is an essential piece of equipment, required for long voyages (over 400 miles). (Ex. 36, p. 4). The vessel was operating on a backup fuel transfer system. Normally, a fuel centrifuge is used on long voyages to constantly feed fuel to the day tank, eliminating the need for repeated transfers of fuel to the day tank. (Ex. 36, p.4). The PRINCESS GIGI lost power and propulsion because the day tank ran out of fuel. (Ex. 80, Fudge EUO at 33; Ex. 77, Papa EUO at 97-98).

PGG/Ashkenazys' own expert, Robert Moore, confirms that the unseaworthy condition of PRINCESS GIGI existed at the time the vessel "broke ground" and left Fort Lauderdale on her last voyage as follows:

> Upon sailing from Fort Lauderdale, the vessel was manned by personnel who were generally unfamiliar with the vessel. (Ex. 36, p.2).
>
> * * *
>
> No D.C. fuel pump was located aboard, this is a standard piece of essential equipment for the vessel and required for long passages. (over 400 miles). The vessel left port on a backup fuel transfer system, a fuel centrifuge was normally used on crossings to throttle fuel to the day tank as used, eliminating the need for repeated transfer. (*Id.*, p.4).

Defendants cannot dispute that PGG/Ashkenazy had knowledge of the unseaworthy condition of the PRINCESS GIGI at the time she left on her final voyage. Ashkenazy is the sole shareholder and manager of PGG. He hired Patton, A-1 and Ward's to survey the vessel. Patton's Report with Recommendations was received and reviewed by Ashkenazy. (Ex. 61, Ashkenazy Dep. at 187-88, 191, 198; Ex. 62, Chamberlain Dep. at 94-95). Significantly, KeyBank granted PGG's request to be allowed 120 days to correct all but 5 of the Safety Equipment recommendations made by Patton. (Ex. 29). PGG/Ashkenazy also had knowledge of the information contained in the Ward's and A-1 surveys. (Ex. 62, Chamberlain Dep. at 82-83, 91-92, 100-101, 114, 141, 144). Further, Ashkenazy was specifically advised by Papa of the problems with "systems" on the yacht before the yacht sailed from Fort Lauderdale on February 4th. (Ex. 81, Mitchell Dep. at 154-55).

Ashkenazy hired Chamberlain Yachts to assist him with the purchase of the PRINCESS GIGI. Kent Chamberlain forwarded all documents, including the various survey reports, to Ashkenazy and made sure to explain everything to Ashkenazy. (Ex. 62, Chamberlain Dep. at 144, 214). Ashkenazy also hired Papa and relied solely on Papa to properly maintain the yacht. (Ex. 61, Ashkenazy Dep. at 34-35, 24-27). Therefore, Chamberlain's and Papa's knowledge is imputed to PGG/Ashkenazy. *New York Univ. v. First Financial Ins. Co.*, 332 F.2d at 753. Moreover, Papa informed Ashkenazy of everything regarding the vessel. (Ex. 77, Papa Dep. at 23-24; Ex. 81, Mitchell Dep. at 154-55).

As PGG delegated authority to Papa to make decisions for the corporation, his decisions are binding on PGG and are deemed to be within the privity and knowledge of the corporation. *See Continental Oil Co. v. Pennzoil Corp.*, 706 F.2d 1365, 1377 (5th Cir. 1983) (holding that knowledge of master, who was delegated general management of vessel, was sufficient to deny

limitation).

Since PGG/Ashkenazy had knowledge of the unseaworthy conditions of the PRINCESS GIGI at the time she left on her last voyage, they breached the negative implied warranty of seaworthiness.   Therefore, PGG/Ashkenazy's motion for partial summary judgment must be denied.

**POINT IV**

**FEDERAL IS NOT ESTOPPED FROM VOIDING THE POLICY FOLLOWING KELLY'S RECEIPT OF THE PATTON REPORT**

**A.** **Kelly Did Not Receive the Patton Report Until After Coverage Was Bound**

Despite defendant's repeated assertion to the contrary (MOL pp. 17, 24)[18], Kelly did not receive a copy of the Patton report until after insurance coverage for the PRINCESS GIGI had already been bound.   The assertion that Kelly reviewed the Patton recommendations and found them insignificant to binding coverage (defendants' MOL, pp. 11-12) is blatantly false.   The signed insurance binder was sent by Kelly to PGG/Ashkenazy's closing agent, Moore & Co., on December 12, 2005 at 1:15 p.m. (Ex. 21, M. Moore Dep. at 72-73; Ex. 24, 12/12/05 Fax). However, the Patton Report and Recommendations were only e-mailed to Kelly by PGG's New York attorney, David Kriss, on December 12, 2005 at 6:35 p.m., which was after the close of business and after Kelly had left for the day. (Ex. 4, Kelly Dep. at 120-121, 246-247; Ex. 10, E-mail 12/12/05).   The earliest Kelly could have opened the e-mail to receive the report was at 8:30

---

[18] Similarly, the implication in the affidavit of David Kriss that Kelly was in possession of the Patton survey before the coverage was bound (Kriss Aff., ¶ 5, 6) is misleading.   At 5:19pm on December 12, Kriss sent an e-mail to Kelly asking Kelly if he had "a copy of the survey for Ben's boat" (Ex. 10, E-mail 12/12/05).   Five minutes later Kelly replied that he did not have it and "I do need it but it is not a requirement of binding" (Ex. 10, E-mail 12/12/05).   Indeed, the signed binder had been sent out more than four hours earlier (Ex. 24, 12/12/05 fax).   It was not until 6:35 pm, after Kelly left the office, that the survey report was belatedly sent to Kelly (Ex. 10, E-mail 12/12/05).

a.m. on December 13, 2005, which was after the insurance coverage was already in effect. (Ex. 4, Kelly Dep. at 246-247, 255-256). Kelly did not actually review the Patton report until after the vessel had capsized. (Ex. 4, Kelly Dep. at 74).

**B.    Federal is Not Barred By Waiver or Estoppel From Denying Coverage**

PGG/Ashkenazy contend that Federal is estopped from relying on any unseaworthy conditions identified in the Patton Report, ignoring the fact that defendants failed to disclose the A-1 and Ward's survey reports that called into question the seaworthiness of the PRINCESS GIGI. However, even if this Court deems Federal to have knowledge of the contents of the Patton Report before the inception of the policy, which is denied, the Patton Report does not address items concerning certain unseaworthy conditions of the PRINCESS GIGI, which were revealed only through discovery in this litigation, *e.g.*, the incompetence of the crew, the lack of watertight integrity of the garage doors, the low-lying engine room exhaust, and the lack of a DC fuel pump.

Incredibly, PGG/Ashkenazy asserts that disclosure of the Patton survey — which by their contention is evidence that the PRINCESS GIGI was seaworthy — estops Federal from asserting that they breached either of the warranties of seaworthiness.    The cases cited by PGG/Ashkenazy, however, present factual situations completely unlike the "hide the ball" approach of PGG/Ashkenazy in this case and, in fact, support Federal's position.

For example, in *Thebaud v. Great Western Ins. Co.*, 155 N.Y. 516, 518, 50 N.E. 284 (N.Y. 1898), the insured sought coverage for a vessel not designed for the open seas on a single voyage from Philadelphia to Mexico, a point fully disclosed to and understood by the insurer. As the court explained:

> The parties knew perfectly well that the subject of the insurance was not a
> seagoing vessel, but, for the purposes of the trip, the defendant was

> evidently willing to take the risk, in consideration of the payment of <u>a</u>
> <u>double premium,</u> and <u>after inspecting the vessel</u> and acquiring <u>full</u>
> <u>knowledge as to her construction and capacity</u>. . . .   Generally, the
> question as to whether a vessel, covered by a policy of marine insurance,
> was or was not at the time seaworthy, is one of fact for the jury. . . .   But
> we do not regard that question as controlling, since, as already stated, both
> parties to the contract knew that the vessel was not a seagoing craft, or
> suitable for the navigation of the high seas, and, under the circumstances,
> <u>the implied warranty upon which the defendant relies should not be</u>
> <u>construed in such a way as to be repugnant to the general purpose</u> which
> the parties had in view at the time of the execution of the contract.

*Id.* at 520-21, 50 N.E. at 285 (emphasis added).[19]   Significantly, the insurer in *Thebaud* also

argued that the vessel was unseaworthy as a result of insufficient crew, and was not estopped

from raising that unseaworthiness defense, which was submitted to the jury.  *See id.* at 522,

50 N.E. at 286.[20]

     Here, of course, there is ample evidence of crew incompetence to support a finding that

the vessel was unseaworthy.   Captain Papa was making only his second voyage on the yacht; the

prior trip was a short voyage to the Bahamas, with SeaQuest's engineer still serving aboard the

---

[19] The full sentence, from which PGG/Ashkenazy provide only an incomplete excerpt, states:
"<u>The defendant concluded to take that risk in consideration of a double premium,</u> and to permit it
now, after receiving the premium, to defeat a recovery, on the ground that she was not seaworthy
in consequence of alleged defects of construction, known to it at the time of taking the risk,
would scarcely be consistent with commercial morality." *Thebaud*, 155 N.Y. at 524, 50 N.E. at
287 (emphasis added).   Like *Thebaud*, *Compania de Navegacion* involved an insurance policy
for a specific voyage by tow and whether the insurer knew the vessel was seaworthy for that
particular voyage.   *Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.*,
277 U.S. 66, 70 & 75-77, 48 S. Ct. 459, 459 & 461-62, 72 L.Ed. 787 (1928).   Furthermore,
PGG/Ashkenazy's parenthetical for *Compania de Navegacion* is actually a quote from *Farmers'
Feed Co. v. Insurance Co. of N. Am.*, 166 F. 111, 112 (2d Cir. 1908), where the court specifically
found that "[t]he underwriters knew that she was not a desirable risk, they knew that they were
taking more than the ordinary hazard and they guarded themselves against it by charging more
than the ordinary premium."   Here, of course, Federal did not charge additional premium and
PGG/Ashkenazy failed to disclose survey reports that seriously called into question the vessel's
seaworthiness for the open seas.

[20] PGG/Ashkenazy's reliance upon *American Merchant Marine Ins. Co. v. Margaret M. Ford
Corp.*, 269 F. 768 (2d Cir. 1920), is similarly misplaced because the issues of seaworthiness and
the insurer's knowledge of the vessel's condition were decided by a jury.

yacht. (Ex. 77, Papa EUO at 22).  It was the first voyage of the "engineer," Jacob Rese, who was not a licensed engineer, had no formal training as an engineer, and who did not have an engineer-to-engineer turnover period with the prior engineer. (Ex. 78, Rese EUO at 4 & 10).  Likewise, it was Nathalie Gorin's first voyage aboard the PRINCESS GIGI, serving as an unlicensed watchstander, despite having absolutely no watchstanding training. (Ex. 79, Gorin Dep. at 11, 17-18, 25).  Significantly, Captain Papa never conducted any onboard training drills, such as fire, flooding, life boat, or abandon ship drills. (Ex. 79, Gorin Dep. at 38-39).

The Washington Supreme Court decision in *Reynolds v. Canton Insurance Office*, 167 P. 1115 (Wash. 1917), is also distinguishable.  In that case, the insured disclosed in its application for insurance its planned voyage to Cook's Inlet, informed the insurer's surveyor at the time the vessel was inspected of the intended voyage to Cook's Inlet, and the voyage was noted in the survey report. *See id.* at 1116.  However, when the insurer issued the policy, which the insured did not receive prior to setting sail, it included a navigation warranty excluding voyages around Cook's Inlet. *See id.*  The court upheld the jury's finding that the insurer's knowledge of the voyage to Cook's Inlet and the insured's lack of knowledge of the navigation warranty entitled the insured to a recovery under the policy. *See id.*

The navigation warranty is, of course, not at issue in these motions, unlike the warranties of seaworthiness and the insured's duty of utmost good faith.  Unlike *Reynolds*, Federal was unaware of the A-1 survey report documenting the PRINCESS GIGI's instability.  Even if Federal is deemed to have constructive knowledge of the content of the Patton survey report, neither Federal nor Kelly knew of the incompetent crew, the lack of watertight integrity of the garage doors, low-lying engine room exhaust or lack of DC fuel pump.

Finally, neither *Thebaud* nor *Reynolds* involved claims of breach of the duty of

*uberrimae fidei*, which requires disclosure of "those material facts not directly inquired into by the insurer," as was the case in *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000). The doctrine of utmost good faith does not permit principles of waiver or estoppel to provide coverage where there has been a material misrepresentation or non-disclosure. *See HIH Marine Services, Inc.*, 211 F.3d at 1363; *Certain Underwriters at Lloyd's, London v. Giroire*, 27 F.Supp.2d 1306 (S.D. Fla. 1998).

For example, in *HIH Marine Services, Inc.* the insured argued that because the insurer knew of one fact (the actual ownership of the vessel), they were on notice and responsible for requesting additional information (in particular, a charter party agreement) and their failure to request such information was a waiver. 211 F.3d at 1363. The court rejected the insured's argument that the failure to investigate resulted in a waiver because the insured had the burden of "full and voluntary disclosure of facts." *Id.*; *see also Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 1966 A.M.C. 385, 389 (S.D.Fla. 1965) ("The obligation of the assured to disclose could not be waived by implication nor can the failure of the Defendant to make inquiry excuse the failure of the Plaintiff to disclose."), *aff'd*, 409 F.2d 974 (5th Cir. 1969); *Certain Underwriters at Lloyd's, London*, 27 F.Supp.2d at 1310 ("[U]berrimae fidei does not permit the use of the principles of waiver and estoppel to provide coverage where there has been a material misrepresentation on the application."). Therefore, Federal is not estopped from voiding the policy following Kelly's receipt of the Patton survey.

## POINT V

### FEDERAL IS ENTITLED TO RECOVER THE COSTS OF THE SALVAGE OPERATION

Federal is entitled to recover the costs incurred in the salvage of the PRINCESS GIGI. Federal originally paid for the salvage operation pursuant to the "Wreck Removal" clause of the

subject policy.  However, since there is no coverage under the policy by virtue of the defendants' breaches of the duty of utmost good faith, the absolute implied warranty of seaworthiness and the negative implied warranty seaworthiness (*see* Point III, *infra*).  Federal had no obligation under the policy to pay for the salvage of the vessel.  Accordingly, Federal is entitled to recover the costs incurred in the salvage operation.  *See Northfield Ins. Co. v. Berlow*, 983 F.Supp. 1376, 1384 (N.D.Fla. 1997) (allowed insurer's claim for restitution against insured for costs incurred on insured's claim where policy was voided *ab initio* due to insured's material misrepresentations).

The salvage effort was initially undertaken to remove the capsized vessel from the shipping lanes, where it was a hazard to navigation, and to remove her fuel as a potential source of pollution.  These expenses would have been covered under the Protection and Indemnity (liability) portion of the policy.  (Ex. 81, Mitchell Dep. at 36, 41-42, 45; Ex. S, Corteselli Dep. at 50-51; Ex. N, Richard Dep. at 153-54, 156-57, 329).  A professional salvor, Overseas Salvage and Maintenance Ltd. ("Overseas Salvage"), was retained to mark the wreck, ward off other vessels, and to tow the vessel and any debris into protected waters. (Ex. 81, Mitchell Dep. at 35-36).  The reasons for removing the wreck was to clear the shipping lanes and to determine if there was any salvage value for the engines. (*Id.* at 41-42).  Although an eventual cause and origin investigation was contemplated, the motivating purpose of the salvage operation was to remove the capsized wreck from traffic lanes where it constituted a hazard to navigation and to remove it as a potential pollution source. (*Id.* at 45, 60; Ex. N, Richard Dep. at 153-54).  The salvor could not simply sink the vessel to remove it as a hazard to navigation due to the foamed-in bottom of the hull. (Ex. 81, Mitchell Dep. at 137-38; Ex. S, Corteselli Dep. at 52).  Moreover,

the vessel had to be towed to a sheltered location and uprighted in order to remove all of the fuel trapped in the fuel tanks. (Ex. 81, Mitchell Dep. at 81; Ex. CC, Schmahl Dep. at 56-57).

Defendants seek to belittle the value of the expenses incurred by deliberately misleading the Court as to the facts surrounding the salvage efforts. Overseas Salvage is an experienced marine salvage company (Ex. CC, Schmahl Dep. at 20-21). Indeed, it is the only company in the Bahamas with the equipment necessary to perform the job (*Id.* at 35). Contrary to defendants' assertion (Defendants' MOL, p. 9), Marcus Mitchell and Matthew Schmahl did explain why the capsized yacht was towed to protected waters upside down and stern first. It would have taken too long to tow the crane barge used to turn the yacht right side up to the wreck's position (*Id.* at 56-57) and it would have been unsafe to use the crane barge in the wind and waves of the open ocean (Ex. 81, Mitchell Dep. at 25). The yacht had to be moved to protected waters before she could be turned right side up. In the upside down position, the strongest part of the hull was the rudder stocks, therefore the tow lines were connected to the rudder stocks to avoid damaging the hull (Ex. 81, Mitchell Dep. at 151-152). Further, if the upside down yacht were towed bow first, the movement forward would have generated pressure pushing the bow down, increasing the possible chances of further damaging the yacht and tearing the bow away (Id. at 151). The assertion that the method of tow "blew out a large portion of the vessel's superstructure and destroyed evidence" (Defendants MOL at 9, Moore Aff. In Support of Defendants' Motion, ¶ 24) is blatantly false. (Ex. 81, Mitchell Dep. at 47). By the time the tug arrived in the vicinity of the yacht, the superstructure had already separated from the hull (*Id.* at 39-41) and a large piece of the side of the hull had been torn away (*Id.* at 41, 151). The tow to protected waters was performed at an average speed of about 1.5 knots (*Id.* at 47-48). When it became clear that the wrecked yacht could not be lifted onto a barge in a single piece, Federal obtained specific written

authority from PGG/Ashkenazy's representative to cut the yacht into two pieces (Ex. 94, Anderson Dep. at 117, 124-25; Ex. 95, E-mail 2/24/06 [HA 01833]).

Federal is entitled to recover from the defendants the cost incurred in removing the PRINCESS GIGI as a hazard to navigation and a possible source of pollution.

### CONCLUSION

Based upon the foregoing, Plaintiff Federal Insurance Company respectfully requests that this Court issue an Order denying Defendants PGG Realty, LLC and Ben Ashkenazy's Motion for Partial Summary Judgment in its entirety, and for such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          December 1, 2006

                              NICOLETTI HORNIG CAMPISE & SWEENEY
                              Attorneys for Plaintiff
                              FEDERAL INSURANCE COMPANY

          By:    _____
                              Thomas M. Rittweger (TR-6796)
                              Wall Street Plaza
                              88 Pine Street, 7th Floor
                              New York, New York 10005-1801
                              (212) 220-3830
                              (FILE NO.:  25000011 JAVN/TMR)

TO:

WEG & MYERS, P.C.
Attorneys for Defendants
PGG Realty and Ben Ashkenazy
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210
Attention:   Dennis D'Antonio, Esq.

X:\Public Word Files\25\111\LEGAL\DRAFTS\Memorandum of Law Opposition PGG SJ Motion (FINAL) 12.1.06.mm.doc