06-112

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL INSURANCE COMPANY,      )
                                        )   06 CV 2455 (JSR)

        Plaintiff,              )

        -against-              )

PGG REALTY, LLC, BEN ASHKENAZY     )
and KEYBANK NATIONAL ASSOCIATION,   )

        Defendants.           )

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

WEG AND MYERS, P.C.
Attorneys for Defendants
PGG REALTY, LLC
and BEN ASHKENAZY
52 Duane Street
New York, New York 10007
(212) 227-4210

On the Brief:

Dennis T. D'Antonio, Esq.
Joshua L. Mallin, Esq.
William H. Parash, Esq.
Patrick M. Leathem, Esq.

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES**………………………………………………… *iii*

**PRELIMINARY STATEMENT**………………………………………….. 1

**COUNTER-STATEMENT OF FACTS AND
SUMMARY OF ARGUMENT** …….…………………………………. 2

**ARGUMENT** ……………………………………………………… 13

## POINT I

**PLAINTIFF MAY NOT ASSERT A THEORY THAT THE CREW
WAS INCOMPETENT, THUS RENDERING THE YACHT
UNSEAWORTHY, AS NO SUCH CLAIM WAS ASSERTED BY
PLAINTIFF WHEN IT DENIED THE CLAIM AND NO SUCH
ASSERTION IS SET FORTH IN PLAINTIFF'S PLEADINGS** ………… 13

    A. Plaintiff May Not Assert A Basis for Denial That Was Not
       Contained In Its Denial Letter ……………………………….... 14

    B. Plaintiff May Not Assert a New Theory Outside of their Pleadings... 16

    C. Plaintiff's Newly Asserted Theory Is Precluded On Grounds Of
       Procedural Due Process ………………………………………….. 17

## POINT II

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT MUST
BE DENIED BECAUSE THERE EXISTS NO COMPETENT
EVIDENCE TO SUPPORT PLAINTIFF'S CLAIM THAT
DEFENDANTS DID NOT SATISFY THEIR DUTY UNDER
THE DOCTRINE OF UTMOST GOOD FAITH** ………………………….. 17

    A. Nearly All Of The Items Plaintiff Claims Were Undisclosed
       Were In Fact Disclosed By The Patton Survey Provided To
       Plaintiff So As To Sufficiently Call To The Attention Of The
       Underwriter The Condition of the Yacht …………………….. 19

1.  Knowledge of All Conditions Identified in the Patton Survey is Imputed to Plaintiff because Defendants provided the Patton Survey to Plaintiff's Agent ..................................... 19

2.  Defendants' Disclosure of the Existing Condition of the Yacht Sufficiently Disclosed Any Condition That Plaintiff Might Have Required Be Addressed Before Covering the Yacht .......................... 21

    a.   Repair Windows of 90 and 120 Days ...... 21

    b.   Other Surveys ................................ 22

    c.   Other versions of the Patton Survey ........ 22

## POINT III

**AS A MATTER OF LAW, PLAINTIFF HAS NOT MET ITS BURDEN OF PROOF TO SHOW THAT DEFENDANTS BREACHED ANY ABSOLUTE WARRANTY OF SEAWORTHINESS** .................................................................. 23

A.   Plaintiff Cannot Bear Its Burden Of Proof To Demonstrate That The Yacht Was Unseaworthy At The Inception Of Coverage ............................................... 23

B.   It Is Plaintiff's Burden To Prove Unseaworthiness, And Plaintiff's Memorandum Of Law Contains No Relevant Evidence On The Issue Of Seaworthiness At The Inception Of The Policy ..................................................... 24

## POINT IV

**PLAINTIFF HAS NOT BORNE ITS BURDEN OF PROVING THAT DEFENDANTS BREACHED A NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS BECAUSE OF THE CONDITION OF THE VESSEL** ................................................ 25

**POINT V**

**PLAINITFF HAS NOT BORNE ITS BURDEN OF
PROVING THAT DEFENDANTS BREACHED A
NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS
BECAUSE OF THE CONDITION OF THE CREW** ……………………….. 26


**CONCLUSION**………………………………………………………… 30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*American States Insurance Company v. McGuire,*
510 So.2d 1227, 1229 (Fla. App. 1st Dist. 1987) ............................................................. 15

*Austin v. Servac Shipping Line,*
794 F. 2d 941, 945 (5th Cir. 1986) .......................................................................... 23

*Benjamin Shapiro Realty Co. v. Agricultural Ins. Co.,*
287 A.D.2d 389, 731 N.Y.S.2d 453 (1st Dept. 2001) .............................................. 15

*Comeaux v. Coil Tubing Servs., LLC,*
172 Fed. Appx. 57 (5th Cir. 2006) ......................................................................... 28

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,*
982 F. Supp. 310, 313 (S.D.N.Y. 1997) ...................................................... 18, 19, 21

*Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,*
944 F. Supp. 986, 1003 (D.Mass.1996)................................................................. 19, 21

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia),*
952 F. Supp. 1046, 1070 (S.D.N.Y. 1997), affd 134 F.3d (2d Cir. 1998)......................... 25, 28

*Contractors Realty Co., Inc. v. Insurance Co. of North America,*
469 F. Supp. 1287, 1294 (D.C.N.Y. 1979).................................................... 18, *passim*

*Crane v. Diamond Offshore Drilling, Inc.,*
743 So.2d 780 (La. App. 5th Cir. 1999); .................................................................. 28

*Farr Man Coffee Inc. v. Chester,*
1993 WL 248799 at *34 (S.D.N.Y. 1993) .............................................................. 15

*Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.,*
19 F.2d 493, 495 (5th Cir. 1927)............................................................................ 24

*Folger Coffee Co. v. Olivebank,*
201 F.3d 632, 638 (5th Cir. 2000) .......................................................................... 25

*Guberman v. William Penn Life Ins. Co. of New York,*
146 A.D.2d 8, 11; 538 N.Y.S.2d 571, 573; (2nd Dept. 1989)................................. 15

*Harper v. Falrig Offshore, Inc.,*
  776 So.2d 620 (La. App. 3d Cir. 2000) .................................................................................... 28

*Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,*
  376 U.S. 315, 322 (1964) ......................................................................................................... 23

*Johnson Bros. Boat Works v. Conrad,*
  156 A.2d 175 (N.J. Super. 1959) ............................................................................................. 24

*Knight v. U.S. Fire Ins. Co.,*
  804 F.2d 9, 13 (2d Cir. 1986), cert. denied,
  480 U.S. 932, 107 S.C. 1570, 94 L.Ed.2d 762 (1987) ....................................................... 18, 22

*Mathis v. Hanover Ins. Co.,*
  192 S.E.2d 510 (Ga. Ct. App. 1972) ........................................................................................ 24

*Morton v. Berman Enterprises, Inc.,*
  669 F.2d 89, 92 (2d Cir. 1982) ................................................................................................. 23

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.,*
  779 F.2d 866, 871 (2d Cir. 1985) ....................................................................................... 17, 18

*Royal Ins. Co. of America v. Cathy Daniels, Ltd.,*
  684 F. Supp. 786, 792 (S.D.N.Y. 1988) ................................................................................... 19

*Speer v. Rand McNally & Co.,*
  123 F.3d 658, 665 (7th Cir. 1997) ............................................................................................ 17

*State of New York v. Amro Realty Corp.,*
  936 F.2d 1420, 1431 (2d Cir. 1991) ......................................................................................... 15

*Thornton v. Deep Sea Boats,*
  399 F. Supp. 933, 935 (S.D. Ala. 1975) ................................................................................... 23

*Usner v. Luckenbach Overseas Corp.,*
  400 U.S. 494, 91 S.Ct. 514 (1971) ........................................................................................... 27

*Vendetto v. Sonat Offshore Drilling Co.,*
  725 So. 2d 474 (La. 1999) ........................................................................................................ 28

*World Book, Inc. v. International Business Machines Corp.,*
  354 F. Supp. 2d 451, 454 (S.D.N.Y. 2005) .............................................................................. 16

*Wright v. Ernst & Young LLP,*
  152 F.3d 169, 178 (2nd Cir. 1998) ........................................................................................... 16

**Treatises**

2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, §19-14, at p. 312-14 (4th ed. 2004)

## PRELIMINARY STATEMENT

Defendants PGG Realty, LLC ("PGG") and Ben Ashkenazy ("Ashkenazy") (collectively referred to herein as "Defendants"), by their attorneys, Weg and Myers, P.C., submit this memorandum of law, together with the Declaration of Dennis T. D'Antonio ("D'Antonio Decl."), the affidavits of Charles Papa ("Papa Aff.") and Roy Shorter ("Shorter Aff."), affidavits of Robert Moore dated November 17, 2006 ("11/17/06 Moore Aff.") and December 1, 2006 ("12/1/06 Moore Aff.") and December 1, 2006 Robert Moore ("Moore Aff."), and the Declaration of David Kriss ("Kriss Decl."), in opposition to the motion of Plaintiff Federal Insurance Company which seeks an Order, pursuant to Fed. R. Civ. P. 56(c), granting it summary judgment.

It is not disputed that on December 12, 2005, PGG REALTY spent over $7 Million Dollars to purchase a luxury personal yacht that had been built seven or eight years earlier at a cost is excess of $12 Million Dollars.

The prior owner had a full time crew and captain maintaining the yacht which had sailed from Miami, Florida through the Panama Canal, Mexico, up to Alaska and back. Every person involved in this case who was aboard this vessel described her as a beautiful well maintained vessel that was a seaworthy, a good boat and fit for her intended purpose. (See, Riley, Moore, Connell, Papa, Lovell and Chamberlain testimony cited below).

It is further undisputed that the vessel encountered severe weather condition on the evening of February 5, 2006 described as 10-15 foot seas on top of 25-30 foot swells and winds excess of 25 mph. (Exhibit "L" Schmahl p. 190-191; Exhibit "M" and "N"). By all accounts plaintiff's witnesses admitted that this storm front was responsible for numerous emergencies in the area of the Bahamas.

1

After 36 hours without a problem the vessel began to take on water. The bilge pumps were operating perfectly to keep up with the water when the Princess GiGi was rammed by a 300 foot cargo ship that had come alongside to assist and instead did considerable structural damage (Plaintiff Ex. "79" Gorin p. 77-83). Thereafter the crew was forced to abandon ship. The Princess GiGi was spotted the next morning, still afloat before ultimately capsizing and becoming a total loss. (Ex. "C" Richard p. 250)

As set forth in detail below, not only is Plaintiff's instant motion filled with both factual irrelevancies and misrepresentations in support of its motion but it also relies upon inadmissible hearsay to support untenable legal positions. Finally, and perhaps most tellingly, plaintiff has chosen in its summary judgment papers to set forth for the first time a "new theory" in support of declination that was (a) not contained in its declination letter to defendants, (b) not identified in the Declaratory Judgment Action that Plaintiff initiated and (c) not identified as a basis for denial by Plaintiff's FRCP 30(b)(6) witness or for that matter any other witness that the Plaintiff has produced in discovery.

## COUNTER-STATEMENT OF FACTS AND SUMMARY OF ARGUMENT

In support of its motion for summary judgment, Plaintiff has also attempted to confuse the issue by ignoring the uncontroverted testimony that the Yacht was seaworthy by the following disinterested non-party witnesses: Captain Charles Papa, Kent Chamberlain, Robert Riley, Robert Connell, Trace Lovell, Ray Shorter, all of whom have sailed aboard the vessel and were fully qualified to declare her to be seaworthy. In fact, not a single witness who was on the boat has testified that she was unseaworthy. Instead Plaintiff relies upon the recent testimony of Drew Hains who was a for a short time an employee of Trident Shipworks, Inc. ("Trident")

2

which had initially undertaken to construct the Princess GiGi[1]. Mr. Hains' was one of 1,200 people employed by Trident from August 1997 to December 1998, in what was his first full time job out of college.[2] (See Plaintiff's Ex. "33", Hains p. 72). In fact the yacht construction was not completed until 2002.   His only involvement in the subject boat was to periodically conduct a weight estimate calculation. (Plaintiff's Ex. "33", Hains p. 85). At the time of his termination of employment at Trident, the superstructure (i.e. that portion of the yacht above the hull) had not been attached to the boat, nor had the watertight bulkheads been installed. (Plaintiff's Ex. "33", Hains p.80-82) Moreover, the yacht had not yet even been placed in the water but was still maintained in a construction shed. (Plaintiff's Ex. "33", Hains p.83). Mr. Hains admittedly possessed no personal knowledge of the condition of the boat at the time of its completion nor any of the modifications completed on the vessel after the prior owner, took possession of the boat. (Plaintiff's Ex. "33", Hains p. 101, 108) Nor was Hains ever aware of the fact that the prior owner completed the construction of the boat and traveled in excess of 38,000 miles with it without any problems. (Plaintiff's Ex. "33", Hains p. 125-126)  In fact, Hains was never on or inside the yacht after its completion. (Plaintiff's Ex. "33", Hains p. 126). Hains was also unaware that following his departure in 1998, another $6 million was spent to complete the construction of the vessel including the addition of 13.5 metric tons of ballast to her keel over the next two years. *See* Plaintiff's Ex. "33", Hains p. 103;  Plaintiff's Ex. "39", Lovell p. 56-57; Plaintiff's Ex. "35", Moore p. 42).

---

[1] While Mr. Hains was served with a subpoena as a fact witness, it was disclosed during cross-examination that counsel for Plaintiff had hired the witness and agreed to compensate him at a rate to be agreed at a later time.  Further, the witness met with counsel before the deposition of which he was also promised compensation. (Plaintiff's Ex. "33", Hains Dep. p. p. 89-91).
[2] The owner of the boat, Trace Lovell, who built the boat, referred to Drew Hains as a low level employee of Trident  whom he had no dealings with. (Plaintiff's Ex. "39", Lovell Dep. p. 70).

3

However, contrary to the scenario posited by Plaintiff, once the vessel was taken back by Mr. Lovell, he completed the construction and in the process spent an additional $6 million dollars eliminating any issues regarding weight and stability before sailing her from Miami, Florida through the Panama Canal to Mexico up to Alaska and back without any problem. (Plaintiff's Ex. "39", Lovell p. 26-30, 54-55 and 58-62). After a stability test had been performed in June of 2001, an additional 13.5 metric tons of ballast was added to further enhance the stability of the vessel. (Plaintiff's Ex. "39", Lovell p.57; Plaintiff's Ex. "35", Moore p. 42 ) This work had actually exceeded the design criteria. (Plaintiff's Ex. "39", Lovell p.58) Additionally, the most sophisticated stabilization system available at the time was installed on the boat to also augment the stability of the vessel. (Plaintiff's Ex. "39", Lovell p.62).

Plaintiff also alleges that the stability test done for the former owner was done by an "unlicensed" naval architect. The basis of this statement is the uncorroborated and hearsay statement of Mr. Hains that Barbeito was not licensed in Florida. Hains was unaware of whether he was licensed in any other state. In fact, there was no Florida statute in 2001 requiring marine stability tests to be done by a licensed naval architect or engineer. Moreover the vessel was not required to be tested under Det Norske Veritas ("DNV") Rules for Classification as the subject yacht was a pleasure yacht not designed to be built to class. (See Plaintiff's Ex. "41", Connell p. 181-182; Plaintiff Ex. "14", p. 16. Plaintiff's Ex. "39", Lovell p. 68). The stability test undertaken by Mr. Barbeito is just one of many examples of Plaintiff attempting to create a factual issue where none exist. Moreover, Captain Robert Moore testified that such further comprehensive tests were not necessary in that the yacht traveled in excess of 38,000 nautical miles and that after the ballast had been added she was tested at the sea trial and deemed stable. Thereafter she traveled 38,000 nautical miles and was surveyed as a "good boat" by Patton

4

Marine after the Patton Marine surveyors did a sea trial. (Plaintiff's Ex. "35", Moore p. 31, 51;

Plaintiff's Ex. "39", Lovell p. 60-62).  According to Patton if the yacht did have stability

problems, they would have manifested themselves during the conditions encountered at the sea

trial. (Plaintiff's Ex. "51", Riley p. 151).  In fact Riley testified that the weather conditions at the

time of the sea trial consisted of 18 knot winds and 8 foot seas and that there was no indication

that the boat was in any way unstable. (See Plaintiff's Ex. "51", Riley p. 150-151).  The evidence

of seaworthiness is not controverted by anything other than argument.

Plaintiff also infers that there was a stability issue because of a discussion Captain Moore

had at the 2004 Ft. Lauderdale Boat Show with Murray & Associates.  Plaintiff alleges that a

further stability test was sought because of ongoing stability issues.  This is a demonstrably false

inference.  Both Robert Moore and Lovell, the prior owner, testified that the only reason for

discussion with Murray & Associates regarding a further stability test on the Princess GiGi, was

that the prior owner was seeking to obtain a commercial registry (which would have required a

further test) while the boat was for sale so as to allow the boat to be chartered for commercial

use. (Plaintiff's Ex. "33", Hains p. 119; Plaintiff's Ex. "39", Lovell p. 68).  Mr. Lovell's yacht

broker, Mr. McConville recommended that it would be a good marketing tool for prospective

purchasers if the boat were registered for commercial charters. (Plaintiff's Ex. 39, Lovell p. 69-

70).  However this was never done because the boat was sold to PGG in December 2005

obviating the need for the commercial registration as a marketing tool. (Plaintiff's Ex. "39",

Lovell p. 70).

Subsequent to the Purchase Agreement being executed between Seller, SeaQuest and

PGG on November 15, 2005, Ben Ashkenazy, the managing member of PGG, through his broker

Kent Chamberlain, hired Patton Marine, Inc. to perform a marine condition survey of the vessel

which took place over the course of three (3) days and included not only a detailed and thorough inspection and analysis of the vessel, but also a sea trial. (See Plaintiff's Ex. "61", Ashkenazy p. 62-63; Plaintiff's Ex. "14" Patton Survey ; Plaintiff's Ex. "15" Patton Recommendations). Plaintiff's underwriter admitted that the Patton firm was respected and relied upon in the past by Federal (Ex. "20" Sullivan p. 37-39. At the conclusion of this survey, Patton issued a report and list of recommendations for the vessel. (Plaintiff's Ex. "14"; Plaintiff's Ex. "15"). It is interesting to note that Plaintiff refers to Patton's list of recommendations as a list of "deficiencies". (*Id.*) However, nowhere in Patton's reports, or, the testimony of the individuals at Patton, Robert Riley and Robert Connell, are the recommendations listed as, or, referred to as, "deficiencies". (*Id.*) Rather, the list of recommendations specifically sets forth a legend which states that the "items marked with a *star*.... should be taken care of for [the Yacht's] safe operation and/or insurability." (Plaintiff's Ex. "15", p. 1). Most noteworthy is the fact that Robert Riley and Robert Connell, the Patton surveyors, chose *not* to place a "star" next to any of the items listed in their report's conclusion or subsequent recommendations. (Plaintiff's Ex. "51", Riley p. 129-130). In fact, Robert Riley specifically testified that none of the items listed were items related to the safety or seaworthiness, but in fact were placed in the category of maintenance and upgrades to the vessel or in order to make the boat better than new. (Plaintiff's Ex. "51", Riley p. 127, 129-130, 169). Notwithstanding the above, the list of recommendations was not used to negotiate a price reduction as Plaintiff suggests. (See Commission Agreement, annexed to D'Antonio Decl. as Exhibit "A"; Plaintiff's Ex. "61", Ashkenazy p. 209-210).

Plaintiff also makes reference to "three other surveys performed" by PGG that were allegedly never identified or otherwise given to Plaintiff. However this is another instance of Plaintiff providing a disingenuous description of the events that took place. The Ward's Electric

6

survey and the Griffin engine survey were done in conjunction with and at the same time as the
Patton survey. In fact, both of these surveys are referenced in Patton's Report and List of
Recommendations. (Plaintiff's Ex. "14", Patton Survey p. 1, 6; Plaintiff's Ex. "15", Patton
Recommendations, p. 9). The Patton personnel were present during the Wards survey and
discussed their findings. (Plaintiff's Ex. "51", Riley p. 13-14). Plaintiff cites to the Ward's
Marine electrical survey that consists of a list of recommended repairs with an "X" indicating
hazardous items. However, once again the Court must look to the entire record, specifically the
testimony of Scott Albers, the author of this report. Mr. Albers actually testified that his survey
of the subject yacht was performed to specify deviations from the American Boat and Yacht
Council ("ABYC") promulgated standards, which is a marine association setting forth voluntary
building guidelines. (See Plaintiff's Ex. "30", Albers p.8). Moreover, Albers testified that most
yacht builders do not manufacture yachts in accordance with ABYC standards. (Plaintiff's Ex.
"30", Albers p. 113). It is undisputed that the Princess GiGi was a pleasure yacht that was not
built to, or, intended to be built to ABYC specifications or class. (Plaintiff's Ex. "41", Connell p.
185-186) nor was she represented to plaintiff's underwriter as a class built boat. Had she been
built to a class registry, she would have been insured accordingly. Such a classification is used
as an enhancement which would only affect the pricing of the vessel. (Plaintiff's Ex. "41",
Connell p. 185-186). Nor was it common that yachts of this size were built according to a class
registry. (Plaintiff's Ex. "41", Connell p. 187-188) Mr. Albers of Ward Electric also testified that
the designation of an "X" on his survey is not necessarily meant to classify the item as hazardous
or dangerous, but rather denotes that the item is not in compliance with ABYC standards.
(Plaintiff's Ex. "30", Albers p. 148-149). More importantly, Mr. Albers testified that he met
with the Patton surveyors and discussed his findings and opinions as noted in his report and in

7

the Patton survey (Plaintiff's Ex. "30", Albers p. 129) which was given to plaintiff on December 12, 2005. It is uncontroverted that Plaintiff's insurance company had in its possession knowledge of Wards electrical survey because the Patton survey specifically cites the Wards survey. All Plaintiff had to do was to inquire of PGG or Patton or Wards. Instead, it elected to insure the vessel, as surveyed, and, should not be allowed to avoid liability based upon the facts it had access to long before a claim was made.

The A1 Survey is similarly mischaracterized by Plaintiff. The A1 Survey was a survey that was performed only in order to obtain a commercial registry to charter for hire the Princess GiGi in St. Vincent & Grenadines. (See Plaintiff's Ex. "62", Chamberlain p. 132-134). The survey document itself specifically limits its scope at page 1, "In order to comply with St Vincent Commercial Registry for Pleasure Yachts, the following findings will have to be addressed". (See Plaintiff's Ex. "71", A1 Survey p. 1). However, Plaintiff again in relying on the survey to attempt to avoid liability ignores the fact that the sole purpose of this survey was to identify items to comply with the St. Vincent Commercial Registry for Pleasure Yachts for chartering purposes. There contains no testimony in the record by anyone with personal knowledge the vessel was unseaworthy. All of the evidence is to the contrary. [3]

Plaintiff's more egregious mischaracterizations of the testimony in this matter is on page 4 of Plaintiff's brief wherein counsel states "Patton specifically declined to declare the yacht seaworthy," referring to the report of Robert Riley, annexed to Plaintiff's motion as Exhibit "51", at page 173-174, purposely ignoring the full record and testimony of Mr. Riley. Mr. Riley actually testified that this generalized language is boilerplate language inserted into every Patton

---

[3] The A-1 Surveyor Roy Shorter has provided an affidavit attached hereto where he states that his survey was limited to identifying steps to qualify the yacht for commercial registry and more importantly "I witnessed no condition that would indicate that the yacht was unfit for its intended purpose, i.e. unseaworthy."

8

survey which is intended to state that the report is an expression of opinions based upon skill and judgment, not a guarantee or warranty of anything that would create a legal liability on Patton's part. (Plaintiff's Ex. "51", Riley p. 176). He testified that the vessel was "seaworthy" and clearly states that if that was not the case his report would have been asterisked. (Plaintiff's Ex. "51", Riley p. 151). Riley further stated that the conditions at the sea trial were rough waters and high winds and were such that if there were any stability issues with the Princess GiGi, they would certainly have evidenced themselves at that time. (Plaintiff's Ex. "51", Riley p. 151-152; Moore Aff. ¶19.) Plaintiff ignores the fact that the surveyors from Patton Marine unequivocally testified that they found the boat to be a "seaworthy". (Plaintiff's Ex. "51", Riley p. 151) Additionally, there existed no items listed in his report or the list of recommendations that were required to be remedied that affected the safety or insurability of the vessel. (Plaintiff's Ex. "51", Riley p. 129). In fact the Patton Survey report expressly states:

> "FULL BLOOM" is a good yacht with good gear and equipment. <u>Once her</u> few safety and asterisk "RECOMMENDATIONS" (there are none) have been complied with, and <u>her structural and stability documents presented</u>, she should be considered a good marine risk for the East Coast of the United States, coastwise waters and inland waters, the Gulf Coast of Mexico, US. Waters coastwise and inland waterways, and the Bahamas in fair weather cruising.

(Ex. "13 " Patton Survey p. 31)(emphasis added). Moreover, Robert Moore testified that the structural and stability documents had been presented. (12/1/06 Moore Aff. ¶ 6-7).

Plaintiff also makes reference to the megayacht worksheet and misleadingly states that PGG "advised that a single survey report existed….." (Plaintiff's Memo of Law, p.5) in an effort to suggest that something was concealed. This could not be more untrue. Truth be told, the megayacht worksheet filled out by and submitted to Plaintiff's own by its own authorized agent, the William Kelly Agency, simply states:

**Survey Available: (✓ ) Yes  ( ) No**

9

(See, Plaintiff's Ex. "6", Megayacht Worksheet p. 2). The application was correctly marked with a check in the "Yes" category. Plaintiff ignored this information.

Plaintiff attempts to create issues of fact by alleging that the conditions contained within the surveys reveal that the Princess GiGi was unseaworthy. This argument fails for two reasons. Firstly, the authors of the Patton survey when deposed reject Plaintiff's theory. In fact, it cannot be disputed that each of the individuals with personal knowledge of the construction and subsequent modifications to the yacht as well as the condition of the yacht at the time of the purchase and the time it set sail, have testified that the Princess GiGi was a seaworthy vessel and fit for its intended purpose. (Plaintiff's Ex. "39", Lovell p. 56; Plaintiff's Ex. "51", Riley p. 151; Moore Aff. ¶ 18; Shorter Aff. ¶ 7; Plaintiff's Ex. "62", Chamberlain p. 219). Secondly, it has been established as a matter of law that the survey was given to Plaintiff. Plaintiff had actual and constructive knowledge of its content before it bound coverage on December 16, 2005 (Turnbull Ex. "B", p. 4-5 and 117-119). For both reasons, Plaintiff has now had to invent a new theory to attempt to retroactively justify their breach of contract.

In a newly fabricated theory, Plaintiff in its motion papers attempts for the first time to depict the crew of the Princess GiGi as incompetent and reckless, which it asserts is equivalent to unseaworthiness. This new approach contradicts Plaintiff's own investigators, experts and lawyers. In fact, the Chubb lawyers who investigated the loss deposed the crew over the course of several days as to their credentials, their actions, the ship, and the events leading up to the loss. Thereafter, they wrote a letter two weeks before denying the claim based on the Patton survey commending the crew. (See Valcourt letter annexed to Papa Aff. as Ex. "A").

10

Apparently and in light of the overwhelming and uncontroverted evidence discrediting Plaintiff's reason for its decision to deny the claim, as set forth in Plaintiff's denial letter dated March 29, 2006; its pleadings, and, during the testimony of the FRCP Rule 30(b)(6) witnesses that the Princess GiGi was unseaworthy based upon the Patton Marine Survey, Plaintiff's lawyers have now at the eleventh hour, attempted to invent a new theory described as when all else fails, "Blame the Crew". For reasons more fully set forth below, Plaintiff should be estopped from alleging any grounds for avoiding its contractual liability other than those reasons set forth in the March 29, 2006 denial letter; its pleadings in the case; the testimony of its FRCP Rule 30(b)(6) witness Paul Richard; and the witness it most recently produced on November 7, 2006 as the "decision maker."

From the inception of the denial of PGG's claim and through the entire discovery period of this declaratory judgment action, Plaintiff has shrouded its bad faith breach of its contractual and financial obligations to PGG and Defendant KeyBank, upon the alleged failure to disclose the Patton Marine Survey (*uberrimae fidei*) and that the Patton Survey allegedly revealed that the Princess GiGi was unseaworthy. Its theory of unseaworthiness was based upon specific physical conditions described in the Patton survey that were discredited in discovery by every witness and by this Court when it found that Kelly was an agent and consequently Plaintiff had knowledge of these physical characteristics described in the Patton survey.

As late as November 7, 2006 Plaintiff, pursuant to Court Order, produced William C. Turnbull, the corporate vice president in charge of world wide claims as the decision maker that denied the subject claim. Turnbull testified that the only reason he denied the claim was that the investigation led him to conclude that the yacht was unseaworthy solely on the basis of three items: 1) the opening in the garage of the vessel that allowed water into the engine room; 2) the

11

bilge pumps were not adequate in terms of their capacity; and 3) that areas of the vessel were not watertight. (See D'Antonio Decl. Ex. "B", Turnbull p. 77-81, 189-190). Consistent with these reasons, all of Plaintiff's witnesses who were involved in the claim testified similarly from the outset of this case. (See D'Antonio Decl. as Ex."C", Richard p. 197-200, 302-304; D'Antonio Decl. Ex."D", Corteselli p.148-149 ; See Plaintiff's Ex."E" Calandriello p. 125-126, 134-136, 156-159).

Only after the close of discovery and after these reasons were conclusively discredited as a matter of uncontroverted fact has a new theory been invented in a brazen attempt to avoid summary judgment. However Plaintiff's newly minted theory is based upon argument not evidence.

Be that as it may, the crew was fit. PGG's principal, Ben Ashkenazy, hired Captain Papa who has been a licensed Captain since 1988 and has over 25 years of experience. The captain had the responsibility of hiring his own crew. (Plaintiff's Ex. "61", Ashkenazy p. 268-268; see Plaintiff's Ex."77", Papa p. 5). This was certainly a prudent delegation of authority since Mr. Ashkenazy had no experience in the running of a megayacht. Moreover, Papa hired only certain individuals that had either worked under his command before or whom he knew to be experienced. While Plaintiff argues that the crew was not licensed, it is noteworthy to mention, that not only does the crew, with the exception of the captain, not have to be licensed, but Plaintiff also did not require it. The only information on the crew that Plaintiff requested and which was provided was the resume of Captain Papa. (Plaintiff's Ex. "6", Megayacht Worksheet p. 2)

It is undisputed that the Princess GiGi left Ft. Lauderdale on February 4, 2006. The yacht left with 6 crew members and two guests. (Plaintiff's Ex. "77", Papa p. 49-50) There is no

12

admissible testimony that Papa had encountered problems prior to setting sail as Plaintiff alleges. See, Plaintiff's Ex."81" Mitchell p. 171, 175. In fact Papa denies that any such statements were ever made or that there were any problems with the vessel since he was hired. (Ex. Papa Aff. ¶ 22; Plaintiff's Ex. "77", Papa p. 28). Mitchell's testimony is inadmissible hearsay and irrelevant in that it is too vague to be meaningful. Captain Papa testified that he would never take a vessel out into the sea without making sure the boat was safe, since it was his responsibility to ensure the safety of the vessel and the people on board including his wife and crew. (Plaintiff's Ex. "77", Papa p. 33).

As set forth below, if Plaintiff wishes to avoid its contractual obligation, it must prove the cause of the capsizing of the Princess GiGi. Plaintiff must also prove that the vessel was unseaworthy and that it had no prior knowledge of such condition. Interestingly, Plaintiff does not cite a single case wherein an insurance company with a pre-loss survey in hand avoids liability on the basis of unseaworthiness. The reasons are self-evident.

**ARGUMENT**
**POINT I**
**PLAINTIFF MAY NOT ASSERT A THEORY THAT**
**THE CREW WAS INCOMPETENT, THUS RENDERING THE YACHT**
**UNSEAWORTHY, AS NO SUCH CLAIM WAS ASSERTED**
**BY PLAINTIFF WHEN IT DENIED THE CLAIM**
**AND NO SUCH ASSERTION IS SET FORTH IN PLAINTIFF'S PLEADINGS**

In what can only be deemed as an implicit acknowledgment that all of its other grounds for declination are baseless and without legal or factual support, Plaintiff in the instant motion, offers for the first time a new theory to base its decision to disclaim coverage—unseaworthiness based upon crew incompetence. While such a legal theory does exist, it was neither identified as a basis for disclaimer, (see Plaintiff's Ex. "26" declination letter dated 3/29/2006), nor identified in its Declaratory Judgment Complaint as a basis upon which this Court should declare that Plaintiff has no obligation to indemnify Defendants for their loss. See D'Antonio Decl. Ex. "F",

13

at ¶ 62-69 (unchanged from ¶ 58-65 of original Complaint). Moreover, after taking at least a dozen party witnesses depositions, not a single witness produced by Plaintiff ever alluded to crew incompetence as the basis for declination herein, including the Rule 30 (b) witness Paul Richard. Such a legal strategy was further underscored by the fact that Plaintiff's witnesses admitted that if the loss was caused by crew negligence, then the loss is covered. (D'Antonio Decl., Ex. "D", Corteselli p. 94; D'Antonio Decl., Ex. "E", Calandriello p. 199-122). Even Plaintiff's insurance expert stated unequivocally that if the loss was caused by the "mistakes, negligence or stupidity" of the crew, then the Defendants' rights under the Policy would not be invalidated. See Plaintiff's Ex."25", p. 199-201. A decision to reject advancing such a disclaimer theory must have also been influenced by the fact that the only resume Plaintiff requested before binding was that of Captain Papa, a document Plaintiff received. (See Plaintiff's Ex. "4" Kelly p.79; Plaintiff's Ex. "20" O'Sullivan p. 135.). Plaintiff did not seek the resumes of any other members of the crew. Moreover, following the loss all crew members cooperated in Plaintiff's investigation and testified under oath on February 9, 2006 prior to Plaintiff's decision to disclaim coverage. As further proof that this newly invented theory is orchestrated, the Court is directed to a citation that Plaintiff issued to Captain Papa on March 13, 2006, extolling as the captain of the yacht. A copy of the commendation letter sent by Plaintiff's investigator to Captain Papa is annexed to the Papa Aff. as Ex. "A".

A. Plaintiff May Not Assert A Basis for Denial That Was Not Contained In Its Denial Letter

As set forth above, declination as a result of crew incompetence rendering the Yacht unseaworthy was never identified in the Declination letter Plaintiff issued to Defendants. (Plaintiff's Ex. "26", Denial Letter; D'Antonio Decl. Ex. "F.", Second Amended Complaint, at ¶ 62-69 (corresponding to ¶ 58-65 of original Complaint)) While the Second Circuit has

14

acknowledged that an insurer's denial of coverage based upon specified grounds waives only
defenses based upon the alleged violation of a condition precedent to coverage (*see State of New
York v. Amro Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991); *see also Farr Man Coffee Inc. v.
Chester*, 1993 WL 248799 at *34 (S.D.N.Y. 1993)), New York state courts have not declined to
find such a waiver of substantive defenses. "[I]n New York, as well as most other states, the
general rule is that an insurer which denies liability on a specified ground may not thereafter shift
the basis for its disclaimer to another ground known to it at the time of its original repudiation."
*Guberman v. William Penn Life Ins. Co. of New York*, 146 A.D.2d 8, 11; 538 N.Y.S.2d 571, 573;
(2nd Dept. 1989). "A notice of disclaimer must provide a claimant with a very specific ground
upon which the disclaimer is predicated …. A ground not raised in the letter of disclaimer may
not later be asserted as an affirmative defense." *Benjamin Shapiro Realty Co. v. Agricultural Ins.
Co.*, 287 A.D.2d 389, 731 N.Y.S.2d 453 (1st Dept. 2001). Florida law is consistent with New
York State's approach. *See American States Insurance Company v. McGuire*, 510 So.2d 1227,
1229 (Fla. App. 1st Dist. 1987).

State insurance regulations also reflect that the carrier provide its insured with the
specific explanation of grounds for denial. Under New York Insurance regulations, an insurer
must "inform the claimant in writing as soon as it is determined that there was no policy in force
or that it is disclaiming liability because of a breach of policy provisions by the policy holder.
The insurer must also explain its specific reasons for disclaiming coverage." NYCRR § 216.6(d).
Florida law provides a cause of action against an insurer for "[f]ailing to promptly provide a
reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to
the facts or applicable law, for denial of a claim or for the offer of a compromise settlement"
Fla. Stat. Ann..§ 626.9541(i)(3)(f). It is undisputed that the Plaintiff knew the crew's

15

qualifications in that it had their own investigators and attorneys take the crews' sworn testimony

in February 2006 within three days after the loss, thus having such knowledge when it denied the

claim and filed suit, without asserting any alleged unfitness of the crew, and any attempt to

disclaim coverage on such grounds should have been made specifically at the time of denial.

Accordingly, Plaintiff has waived its ability to disclaim on such a ground at this time.

B.   Plaintiff May Not Assert a New Theory Outside of their Pleadings

Plaintiff is also precluded as a matter of procedural law from asserting a new theory

outside its complaint, unseaworthiness based upon the competency of the crew, for the first time

in its opening brief, when discovery has already been completed and the issue virtually

unexplored. *World Book, Inc. v. International Business Machines Corp.*, 354 F. Supp. 2d 451,

454 (S.D.N.Y. 2005)(Plaintiff precluded from advocating a theory not contained in its complaint

but articulated for its first time in its motion papers); *Wright v. Ernst & Young LLP,* 152 F.3d

169, 178 (2nd Cir. 1998).

In the fourth claim of its Second Amended Complaint plaintiff asserts:

65.   At all times the M/Y PRINCESS GIGI departed Fort Lauderdale,
Florida for the voyage during which it capsized, defendants and/or their
representatives were aware of the yacht's deficiencies as stated in the Patton
Marine report or otherwise existing. [emphasis added]

66.   At the time the M/Y PRINCESS GIGI departed Fort Lauderdale,
Florida for the voyage during which it capsized, defendants and/or their
representatives knew that there were several areas of the hull, including the
engine room, which were not watertight and knew of other deficiencies which
needed correction; some of which were identified in the Patton Marine report and
some of which if not all were the proximate cause of the capsizing. [emphasis
added]

(D'Antonio Decl., Ex. "F", Second Amended Complaint) Nowhere in the complaint is there a

single reference to the "crews' deficiencies".

16

C.     Plaintiff's Newly Asserted Theory Is Precluded On Grounds Of Procedural Due
       Process

Plaintiff's new theory is also precluded by basic considerations of procedural due

process. As a result of Plaintiff's failure to identify unseaworthiness based upon crew

incompetence as a basis for declination, Defendants have been denied their right to fashion its

discovery to challenge such an assertion. Moreover, as set forth above, Defendant painstakingly

deposed every possible witness of Plaintiff who played a role in declining coverage. Not a single

witness ever referenced crew incompetence when pressed as to their basis for declination.

Accordingly, to permit Plaintiff to add a new theory, after the close of discovery "would not only

be grossly inefficient, but would be patently unfair" to Defendants. *Speer v. Rand McNally &

Co.*, 123 F.3d 658, 665 (7th Cir. 1997).

## POINT II

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT MUST BE
### DENIED BECAUSE THERE EXISTS NO COMPETENT EVIDENCE
### TO SUPPORT PLAINTIFF'S CLAIM THAT DEFENDANTS DID NOT
### SATISFY THEIR DUTY UNDER THE DOCTRINE OF UTMOST GOOD FAITH

As this Court has pointed out previously, the doctrine of *uberrimae fidei* is an

anachronistic notion. S*ee Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 982 F.

Supp. 310, 313 (S.D.N.Y. 1997).  The doctrine as developed requires that parties to an insurance

contract owe each other the duty of utmost good faith.  Under *uberrimae fidei,* "the party seeking

insurance is required to disclose all circumstances *known to him* which materially affect the

risk." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985) (emphasis added).

"There is a reciprocal duty on the part of the insurer to deal fairly, to give the assured fair notice

of his obligations, and to furnish openhandedly the benefits of a policy of "all risks" insurance.

Insurance obligations must not be construed so as to render the coverage mere gossamer."

*Contractors Realty Co., Inc. v. Insurance Co. of North America*, 469 F. Supp. 1287, 1294 (D.C.N.Y., 1979)

An insured's failure to disclose a fact that is both known to him and material to the risk can void the Policy, but "the principle of *uberrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Puritan Ins. Co.*, 779 F.2d at 870.

The materiality of a particular fact is determined from the point of view of the insured: "The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material.... To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)(internal citation omitted). Plaintiff's statement that a fact is material if it "could possibly influence" an underwriter's decision, relying on an 11th Circuit case, simply misstates the law in this Circuit.

A carrier asserting this defense to avoid its coverage obligations bears the burden of proving both of two forms of reliance: first, that the undisclosed information would have induced a reasonable, prudent underwriter to issue a policy or insure at a particular premium (the objective test); and second, that the undisclosed information did, in fact, induce its underwriter to issue a policy or insure at a particular premium (the subjective test). 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-14, at p. 312-14 (4th ed. 2004).

"A minute disclosure of every material circumstance is not required." *Puritan*, 779 F.2d at 872. Rather, as explained by the Court in *Commercial Union*:

> "The assured complies with the rule [of *uberrimae fidei*] if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it." [Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir.1985)]. See [*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9,

18

13 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762
(1987)]; *Contractors Realty Co., Inc. v. Ins. Co. of North America*, 469 F. Supp.
1287 (S.D.N.Y. 1979). Commercial Union had its own good faith duty to read
what it had requested, especially when the insurance coverage for the individual
licensees was expressly made subject to their provision of such requested
documents... See also *Compagnie de Reassurance d'Ile de France v. New
England Reinsurance Corp.*, 944 F. Supp. 986, 1003 (D.Mass.1996) ("The duty of
*uberrimae fidei* is a reciprocal one"); *Royal Ins. Co. of America v. Cathy Daniels,
Ltd.*, 684 F. Supp. 786, 792 (S.D.N.Y. 1988).

982 F. Supp. at 314.

    A.    Nearly All Of The Items Plaintiff Claims Were Undisclosed Were In Fact
        Disclosed By The Patton Survey Provided To Plaintiff So As To Sufficiently Call
        To The Attention Of The Underwriter The Condition of the Yacht

    1.    Knowledge of All Conditions Identified in the Patton Survey is Imputed to
        Plaintiff because Defendants provided the Patton Survey to Plaintiff's <u>Agent-</u>

        That the Kelly Agency was Plaintiff's agent has already been determined by this Court.

See Order dated September 13, 2006, annexed to D'Antonio Decl. as Exhibit "H". Plaintiff

cannot succeed on a theory that the Patton Survey, sent to its agent on December 12, 2005, could

not have been read before Plaintiff agreed to bind coverage. Admissions and records produced

by Plaintiff after the close of discovery indicate that the date of binding of coverage was

December 16, 2006. (D'Antonio Dec., Ex. "B", Turnbull p. 4-5, 117-119).

        Moreover, such an argument masks the true reality of a situation. The fact of the matter is

that Plaintiff's Underwriter, testified that she was aware of the existence of a survey performed on

the Yacht when she reviewed the Megayacht Worksheet Application. (See Capiga, Plaintiff's Ex.

"16" p. 128-129)(Plaintiff's moving papers as Ex. "6"). Plaintiff admittedly let the Patton

Survey "fall through the cracks," and neglected to request it from their agent. (Plaintiff's Ex.

"16", Capiga p. 132-136). Moreover, after the inception of coverage, the Policy was ratified by

modifications, amendments and endorsements to the Policy as late as Jan. 12, 2006, less than a

month before the loss, without anyone asking for a survey or otherwise restricting coverage. (Plaintiff's Ex. "16", Capiga p. 179-182) In fact, Plaintiff was free to cancel the policy at any time prior to the loss. (Plaintiff's Ex. "16", Capiga 173-175). Ms. Capiga also testified that it was Plaintiff's fault that the survey wasn't obtained. (Plaintiff's Ex. "16", Capiga 174-175).

Plaintiff next argues, however, that it first requested a survey from Plaintiff back on November 30, 2005 when they provided an insurance quote for the Yacht to its own agent, the Kelly Agency. However, (Plaintiff's Memorandum of Law p. 5) However a review of the "quote", attached to the D'Antonio Decl.. as Ex. "J", indicates that the "request for a survey" was merely a generic preprinted word on a document. This understanding was further confirmed by Capiga when asked about this "request" at her deposition. See Plaintiff's Ex. "16", Capiga Dep. p. 190-191. The bankruptcy of this argument is further underscored by the fact that the quote upon which the submission of a survey was conditioned, was never accepted by Defendants. See Plaintiff's Ex. "20", O'Sullivan p. 176-178.

On December 12, 2005 Defendants volunteered to provide any information that Plaintiff might want, and reasonably relied on Plaintiff's agent, the Kelly Agency, who never requested no additional information. (Kriss Decl, E-mail). On December 14, 2005 the Kelly Agency asked Plaintiff to bind coverage. ( Plaintiff's Ex. 20 ,O'Sullivan 109-110; See D'Antonio Ex. "I" Request to Bind E-Mail)   Accordingly, Plaintiff complied with its duty of utmost good faith, because "insurer's agent, acting with knowledge and with authority to recommend cancellation of a policy when material facts are disclosed, waived any right of the defendant to withhold or avoid the policy on the ground of nondisclosure by issuing the policy in suit to the plaintiff." *Contractors Realty Co., Inc. v. Insurance Co. of North America*, 469 F. Supp. 1287, 1294 -1295 (D.C.N.Y. 1979).

2.   Defendants' Disclosure of the Patton Survey Sufficiently Disclosed Any
     Condition That Plaintiff Might Have Required Be Addressed Before Covering the
     Yacht

Plaintiff's memorandum of law concedes that the Patton Survey was fully disclosed.

(Plaintiff's Memo of Law p. 13-15)  As knowledge all of these conditions is imputed to Plaintiff,

whose agent had the Patton Survey four days before Plaintiff agreed to bind and almost two

months before a claim was made, none of these constitutes a breach of the duty of *uberrimae*

*fidei*, or, a valid ground to thereafter deny liability.

The disclosures in the Patton Survey are sufficient, at a minimum, "to call the attention of

the underwriter in such a way that, if the latter requires further information, he can ask for it."

*See Commercial Union*, 982 F. Supp. at 314. As *Commercial Union*, 982 F. Supp. at 314,

*Puritan*, 779 F.2d at 870, and *Knight,* 804 F.2d at 13, recognize, the duty requires no more.  Nor

should it, in light of an insurer's own duty of *uberrimae fidei* to review the information

disclosed, and the harsh consequences for an insured who has not complied with their duty. *See*

*Compagnie de Reassurance*, 944 F. Supp. at 1003; *Royal Ins.*, 684 F. Supp. at 792.[Emphasis

Added].

     a.   Repair Windows of 90 and 120 Days

Plaintiff's argument that the non-disclosure of 120-day and 90-day windows provided to

complete certain Patton Survey recommendations was a breach of the duty of utmost good faith

must fail as a matter of law.

Plaintiff cannot prove the requisite elements of subjective or objective reliance on the fact

that certain Patton recommendations would be done earlier than 90 or 120 days.  Plaintiff could

not have assumed that recommendations not affecting safety or insurability would be done in any

particular time frame.  Rather, Plaintiff had the ability to review the Patton Survey and to

21

condition coverage upon compliance with recommendations, or refuse to cover the risk.
Defendants' disclosures were sufficient to enable the Plaintiff to do its diligence, and decide if it
wished to cover the Yacht. Defendants thus complied with their duty of utmost good faith.

      b.    Other Surveys

Plaintiff's reference to "three other surveys performed" by PGG that were never
identified or otherwise given to Plaintiff is just another instance of Plaintiff providing a
disingenuous description of the events that took place. The Ward's electrical survey and the
Griffin engine survey were performed in conjunction with and at the same time as the Patton
survey. In fact, both of these surveys are reference in Patton's Report and List of
Recommendations. (Ex. F. FED 00048, FED 00053, FED 00048). The Patton personnel were
present during the Wards survey and discussed their findings.(Plaintiff's Ex. "51", Riley Dep. p.
13-14).

      c.    Other versions of the Patton Survey-Smoke Screen

Nor did Plaintiff breach the duty of utmost good faith by not providing every iteration of
the Patton Survey report and recommendations as there were no material differences with the
final December 7th survey provided to PGG and sent to Plaintiff. Further, the conditions that
were set forth in all of the survey iterations were conditions that were in the final and as such
were known to the insurer. *Contractors Realty,* 469 F. Supp. at 1295. Plaintiff has not alleged
that any material facts in other versions of the Patton Survey were not disclosed in the version
provided to Plaintiff, nor put forth evidence to sustain its burden to show that any difference
from the final version would be something a reasonable person in the assured's position would
know would control an underwriter's decision to insure. *Knight*, 804 F.2d at 13.

## POINT III

### AS A MATTER OF LAW, PLAINTIFF HAS NOT MET ITS BURDEN OF PROOF TO SHOW THAT DEFENDANTS BREACHED ANY ABSOLUTE WARRANTY OF SEAWORTHINESS

A.    Plaintiff Cannot Bear Its Burden Of Proof To Demonstrate That The Yacht Was Unseaworthy At The Inception Of Coverage

Plaintiff cannot sustain its burden of proof to demonstrate that the Yacht was unseaworthy either when insurance attached or when the Yacht left port for its last voyage. "The law presumes that every vessel is seaworthy until the contrary is proved, and the burden of proving unseaworthiness lies with the insurance company." *Austin v. Servac Shipping Line*, 794 F. 2d 941, 945 (5th Cir. 1986). As the United States Supreme Court has stated, "The standard [for seaworthiness] is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 322 (1964) (emphasis added)(citations omitted). "[A]lthough unseaworthiness is a broader form of liability than negligence,.. ... it does not impose a duty of perfection on shipowners." *Morton v. Berman Enterprises, Inc.*, 669 F.2d 89, 92 (2d Cir. 1982). "The insured's warranty of seaworthiness is Not [sic] a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards." *Contractors Realty*, 469 F. Supp at 1293. (emphasis added).

Plaintiff has sought to obscure the standard of seaworthiness by offering ways the Yacht might have been better, rather than ways it was unfit for use as a pleasure boat. However, "[e]ven though a better design might have been achievable, [that] did not render the vessel unseaworthy." *Thornton v. Deep Sea Boats*, 399 F. Supp. 933, 935 (S.D. Ala. 1975). A vessel does not become uninsurable just because it has room for improvement. "It is, of course, true that

23

a given ship, applying for insurance, may be considered a better risk, and better able to withstand even perils of the sea, than another seaworthy ship. But that fact does not preclude the idea that both ships must be seaworthy." *Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.*, 19 F.2d 493, 495 (5th Cir. 1927)(emphasis added). There is no reasonable basis to deny PGG's claim as it cannot be proven that this $7.5 million luxury yacht with 38,000 miles of proven sea trial can be called unseaworthy in the face of overwhelming uncontroverted evidence to the contrary. Simply stated, PGG is entitled to the benefit of its insurance policy for this loss. The Yacht was not unseaworthy, and Defendants have breached no warranty.

Moreover, some courts have rejected the proposition that the absolute warranty of seaworthiness applies to pleasure boats in the first place. *See Contractors Realty,* 469 F. Supp at 1294; *Mathis v. Hanover Ins. Co.*, 192 S.E.2d 510 (Ga. Ct. App. 1972); *Johnson Bros. Boat Works v. Conrad*, 156 A.2d 175 (N.J. Super. 1959). Given the fact that these warranties are implicit and not contained within the policies themselves, these courts have raised grave concerns as to the fairness of imputing knowledge of such warranties to pleasure boat owners who do not share the same expertise or experience as owners of commercial vessels.

> B.   It Is Plaintiff's Burden To Prove Unseaworthiness, And Plaintiff's Memorandum Of Law Contains No Relevant Evidence On The Issue Of Seaworthiness At The Inception Of The Policy

Plaintiff has failed to provide admissible evidence to support its claim of breach of the absolute warranty of seaworthiness. Plaintiff spends four pages of its Memorandum of Law detailing the condition of the Yacht years prior to the inception of coverage and prior to the completion of construction.

In addition, after Defendants received the Patton Survey, Defendants wanted a high quality vessel so the seller and buyer used the Recommendations to improve the Yacht,

24

complying with substantially all of the Recommendations prior to closing. Robert Moore testified and wrote in his expert report that 90% of the work on the Patton Survey preliminary recommendations was done. (Moore 11/17/06 Aff. ¶ 16) Warren Lovell, the seller, testified that almost all of the work was done. (Plaintiff's Ex. "39", Lovell p. 47)  Captain Papa testified that most of the work was done before completing the sale. (Plaintiff's Ex. "77", Papa p. 20-23).

Plaintiff relies on "design defects" to support the claim of unseaworthiness at the inception of coverage. But, "The insured's warranty of seaworthiness is Not [sic] a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards." *Contractors Realty*, 469 F. Supp at 1293. Plaintiff raises the non-watertight design of the garage doors as an unseaworthy condition, but its expert George Randall admitted he could not rule out that whatever water entered the garage did not exit, as the Yacht's designer intended, through the drain in the garage floor and the non-watertight garage doors.  See Plaintiff's Ex."57", Randall p. 206-208).  What Plaintiff ignores in its argument is that the boat was caught in a severe storm that the Coast Guard reserve pilot described as the worst conditions he had ever flown in.

## POINT IV

### PLAINTIFF HAS NOT BORNE ITS BURDEN OF PROVING THAT DEFENDANTS BREACHED A NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS BECAUSE OF THE CONDITION OF THE VESSEL

To establish a breach of the negative implied warranty of seaworthiness, Plaintiff must also prove a proximate causal relationship between the unseaworthy condition and the loss. *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1070 (S.D.N.Y. 1997), *aff'd* 134 F.3d 103 (2d Cir. 1998); *Folger Coffee Co. v. Olivebank*, 201 F.3d 632, 638 (5th Cir. 2000). Not that a freak storm got the best of her.

25

While Plaintiff alleges a "design defect" involving the location of the engine room, assuming arguendo the existence of such a defect, there is absolutely no testimony to tie this "defect" into the capsizing of the Yacht. Further, Plaintiff had the Patton survey which described the vessel and could have declined the risk.

Once Plaintiff's expert, Randall, admitted under oath that he cannot state with a reasonable degree of professional certainty that the 1-5/8 inch penetration was a source of water entering the engine room through the garage, Plaintiff began searching for a new theory before finally inventing a defense. (Plaintiff's Ex. "57", Randall p. 231-232, 302, 306) Randall further stated that the 3x5 inch penetration was reportedly packed with foam and there was insufficient evidence to conclude that water got into the garage through that penetration. (Plaintiff's Ex. "57", Randall p. 215, 216, 231, 306) Randall further admitted he could not rule out that whatever water entered the garage had not exited, as the Yacht's designer intended, through the drain in the garage and the non-watertight garage doors. (*Id.* p. 206-208). In light of these admissions of uncertainty, Randall's opinion is speculative and inadmissible to meet Plaintiff's burdens of proof on unseaworthiness and the cause of loss.

## POINT V

### PLAINITFF HAS NOT PROVEN ITS NEWEST THEORY THAT DEFENDANTS BREACHED A NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS BECAUSE OF THE CREW

Although Plaintiff should be estopped from basing a claim of "unseaworthiness" on the alleged incompetence of the crew onboard the Yacht at the time of the loss, see Point I, *supra*, a review of the case law and the assertions raised by Plaintiff reveals that Plaintiff has failed to grasp the distinction between alleged acts of negligence and crew incompetence. Moreover, the

26

cases relied upon by Plaintiff wherein crew incompetence was found to constitute

"unseaworthiness", contain scenarios wherein either through inadequate training or conditions,

repeated conduct by the crew directly caused the loss in question. Plaintiff's awareness as to the

identity of the individual who was hired to captain the Yacht, prior to Plaintiff's decision to bind

coverage, and Plaintiff's failure to identify any standard or regulation applicable to the sailing of

pleasure crafts that was violated by Defendants causes their argument to fail even if this Court

were to consider a new theory. Plaintiff can neither establish (a) training criteria for the crew, (b)

the existence of poor shipboard conditions causing an otherwise competent crew to perform

incompetently or (c) conduct engaged in by the crew leading directly to the loss at issue. As a

result, Plaintiff's claim of unseaworthiness based upon crew incompetence cannot pass muster.

While Defendants do not dispute the general legal proposition that an <u>incompetent</u> crew

can render a vessel unseaworthy, the United States Supreme Court was careful to not allow those

seeking to avoid liability to isolate acts of negligence allegedly engaged in by the crew. As the

Court stated in *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514 (1971):

> What caused the petitioner's injuries in the present case, however,
> was not the condition of the ship, her appurtenances, her cargo, or
> her crew, but the isolated, personal negligent act of the petitioner's
> fellow longshoreman. <u>To hold that this individual act of</u>
> <u>negligence rendered the ship unseaworthy would be to subvert the</u>
> <u>fundamental distinction between unseaworthiness and negligence</u>
> <u>that we have so painstakingly and repeatedly emphasized in our</u>
> <u>decisions.</u>

*Usner*, 400 U.S. at 500; 91 S.Ct. at 519.[Emphasis Added].

Such a distinction becomes even more significant herein because, as clearly conceded by

Plaintiff's own witnesses, conduct constituting crew negligence resulting in a loss to the Yacht is

clearly covered under the policy. (See D'Antonio Decl., Ex. "C", Corteselli p.94; Ex."D", Calandriello p. 199-122).

Moreover, in order to assess the conduct allegedly engaged in by Defendants crew, the standard is not perfection but merely conduct that is reasonable under the circumstances. *See generally, Comeaux v. Coil Tubing Servs., LLC,* 172 Fed. Appx. 57 (5th Cir. 2006); *Crane v. Diamond Offshore Drilling, Inc.,* 743 So.2d 780 (La. App. 5th Cir. 1999)*.* Accordingly, and consistent with this proposition, the finding of isolated acts of operational negligence will not be sufficient, as a matter of law, to support a finding of unseaworthiness. Rather, such conduct must be pervasive. *Harper v. Falrig Offshore, Inc.,* 776 So.2d 620 (La. App. 3d Cir. 2000); *Crane v. Diamond Offshore Drilling, Inc.,* 743 So.2d 780 (La. App. 5th Circ. 1999); *Vendetto v. Sonat Offshore Drilling Co.,* 725 So.2d 474 (La. 1999)*.* Finally, as with any evidence cited by a party to establish a breach of the negative warranty of seaworthiness, the incompetence alleged must have proximately caused the loss in question. *See Continental,* 952 F. Supp. at 1070 (S.D.N.Y. 1997); *Folger Coffee Co. v. Olivebank,* 201 F.3d 632, 638 (5th Cir. 2000).

Captain Papa has been a licensed yacht captain and master since 1988 and a crewmember on pleasure yachts since 1980. (Papa Aff. at ¶ 4.) Papa hired the crew who was on board the Yacht's second voyage, and all of the crew was fit, competent, appropriately qualified and comparatively skilled in relation to other megayacht crews that he has have worked with. (Papa Aff. at ¶ 11). Moreover, prior to the voyage that resulted in the instant loss, Papa had spent approximately 60 days on the Yacht including a 30 day cruise with the Yacht's former engineer, who demonstrated all of the Yacht's features to Papa. (Papa Aff. at ¶ 7).

In addition, to Captain Papa, Jacob Rese, the engineer, possessed a yacht masters license and has also been the Captain on a 72 foot and 94 foot Ferreti pleasure yachts. (Plaintiff's Ex.

28

"78" Rese p. 4-5). He has had 5 transatlantic crossings and previously been the engineer on a 125 foot and 80 foot vessel. (Plaintiff's Ex. "78" Rese p. 4) While he does not possess an engineering license, one is not required. Over the 5 days prior to the yacht leaving for St. Marteen, Mr. Rese familiarized himself with the various systems on board the vessel and was at all times on board this 124 foot yacht with a licensed captain.. (Plaintiff's Ex. "78" Rese p. 9).

Plaintiff also describes Natalie Gorin as an "unlicensed watch stander". Again, what Plaintiff fails to reveal that a crew member that assists their captain by standing watch on a pleasure yacht does not require licensing. However, Ms. Gorin also possessed many years of experience at sea. She has been at sea for the majority of her life (Plaintiff's Ex. "79" Gorin p. 6-8). She had previously worked on megayachts and also stood watches during her time as part of a crew. (Plaintiff's Ex. "79" Gorin p. 8, 14-15). Moreover, she testified that the Captain was always close by while others were standing watch and his quarters were right next to the bridge.( Papa Aff. ¶ 18) (Plaintiff's Ex. "79" Gorin p. 27). Gorin does testify that while there was allegedly a steering problem that occurred shortly after leaving Ft. Lauderdale, the problem was fixed very quickly. (Plaintiff's Ex. "79" Gorin p. 46) Additionally, Gorin also testified that she knew of nothing any problems with the yachts systems at the time it left port. (Plaintiff's Ex. "79" Gorin p.43).

29

## CONCLUSION

For the foregoing reasons, Defendants PGG Realty, LLC and Ben Ashkenazy

respectfully request that the Court deny the motion of Plaintiff Federal Insurance Company for

summary judgment in its entirety and direct Plaintiff to honor the claim pursuant to the policy

terms and conditions.

Dated: December 1, 2006

WEG AND MYERS, P.C.

By _____

Dennis T. D'Antonio (DD0973)
Attorneys for Defendants
PGG Realty, LLC and Ben Ashkenazy

30