UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

FEDERAL INSURANCE COMPANY,      :

                    :

           Plaintiff,     :      06 Civ. 2455 (JSR)

                    :

           -v-          :      MEMORANDUM ORDER

                    :

PGG REALTY, LLC, et al.,       :

                    :

           Defendants.   :

------------------------------------ x

JED S. RAKOFF, U.S.D.J.

       Following summary judgment motion practice initiated before the close of discovery, the Court, by Order dated September 13, 2006 (the "September 13 Order"): (i) granted the motion of defendant KeyBank National Association ("Key") for partial summary judgment; (ii) granted the motion of defendants PGG Realty, LLC and Ben Ashkenazy (collectively, "PGG") to impute the insurance agent's knowledge of the condition of the yacht to plaintiff Federal Insurance Company ("Federal"); and (iii) otherwise denied PGG's motion.  After discovery closed, PGG moved once again for summary judgment, as did Federal.  By Order dated February 16, 2007 (the "February 16 Order"), the Court denied these motions except for the portion of PGG's motion seeking to dismiss the salvage and wreck removal claim as against Ben Ashkenazy, which was granted.  In addition, the February 16 Order granted Federal's separate motions, made on a separate briefing schedule, to strike PGG's bad faith counterclaim and PGG's jury demand.  This Opinion presumes basic familiarity with the underlying facts and submissions, and explains the reasons for all these prior rulings.

The September 13 Order:

   As both Key and Federal moved for summary judgment before the close of discovery, Federal was entitled to, and did, submit an affidavit, pursuant to Fed. R. Civ. P. 56(f), seeking to deny Key's motion for summary judgment prior to further discovery and stating "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d 414, 422 (2d Cir. 1989). Among other things, Federal's affidavit sought further discovery with respect to (i) "the condition of the PRINCESS GIGI at the inception of the Federal policy and at the commencement of her last voyage"; (ii) "the defendants' knowledge of the condition of the PRINCESS GIGI at the inception of the Federal policy and at the commencement of her last voyage"; (iii) "[w]hether KeyBank had any knowledge of the condition of the PRINCESS GIGI at the inception of the Federal policy and at the commencement of its last voyage"; and (iv) "[t]he nature of the relationship between Federal/Chubb and [The] Kelly [Agency]." See Affidavit of Thomas M. Rittweger Pursuant to Fed. R. Civ. P. 56(f)("Rittweger Aff.") at 1-2. There is, however, no "litmus test [that] determine[s] the exact amount of time needed for discovery in a particular case." See Burlington Coat

Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919, 927 (2d Cir. 1985).  It was Federal who initiated this lawsuit for a declaratory judgment after denying coverage on the policy.  Having done so, Federal cannot stave off summary judgment by "merely restating the conclusory allegations contained in [their] complaint, and amplifying them . . . with speculation about what discovery might uncover."  Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981).  Absent a reasonable basis, Federal's requests for further discovery may be denied as mere "speculation as to what potentially could be discovered."  Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994); see also Nat'l Union Fire Ins. Co. v. Stroh Cos., 265 F.3d 97, 117 (2d Cir. 2001).

Against this background, the record before the Court on the defendants' motions that were the subject of the September 13 Order established the following facts (either undisputed or, where disputed, taken in plaintiff Federal's favor):

On February 6, 2006, the "Princess Gigi," a 124-foot Trident motor yacht, capsized about 130 miles off the coast of San Salvador, sustaining irreparable damage.  See PGG Realty, LLC, and Ben Ashkenazy's Statement Pursuant to Local Rule 56.1 ("PGG 56.1") ¶ 15; Federal's Local Rule 56.1 Statement in Opposition to PGG's Motion for Summary Judgment ("Fed. PGG 56.1") ¶ 15. The Princess Gigi was, at the time of its demise, the property of defendant PGG Realty, whose sole shareholder, defendant Ben Ashkenazy, purchased the yacht in December, 2005 for roughly $7 million, financed by a $5.85 million

mortgage obtained from Key.  See KeyBank's Local Rule 56.1 Statement ("Key 56.1")¶¶ 9-10; Federal's Local Rule 56.1 Statement in Opposition to KeyBank's Motion for Summary Judgment ("Fed. Key 56.1") ¶¶ 9-10.

While PGG was in the process of acquiring the yacht, David Kriss, an attorney working for Ben Ashkenazy, contacted the William E. Kelly Agency (the "Kelly Agency"), an insurance agent, to obtain marine insurance.  See PGG 56.1 ¶ 2; Fed. PGG 56.1 ¶ 2.  Shortly therafter, the Princess Gigi was insured for $7,023,000.00 on an all-risks basis by Federal, in a policy procured by Kelly that took effect December 13, 2005.  See Key 56.1 ¶¶ 7, 11; Fed Key 56.1 ¶¶ 7,11.  The precise moment when coverage was bound remains in dispute.  The instant action was initiated by Federal after it denied coverage on PGG's marine insurance policy.  The circumstances of the Princess Gigi's demise remain uncertain and in dispute.  In its initial papers, Federal offered numerous grounds for denying coverage, alleging that PGG breached the duty of utmost good faith, the absolute implied warranty of seaworthiness, and the negative implied warranty of seaworthiness, and making the further claim that the loss was not fortuitous.  A great many material facts in dispute bear upon these issues and were rightly asserted by Federal to be appropriately the subject of further discovery.  Accordingly, the September 13 Order denied the portion of PGG's motion for summary judgment addressing PGG's coverage under the policy.

The motion of KeyBank was another story.  Federal's policy insuring the Princess Gigi contained a Breach of Warranty endorsement

(the "Warranty Endorsement") in favor of Key as loss payee.  The
Warrant Endorsement, which, in effect, served as a separate policy
between Key and Federal, provided that Key's coverage:

> . . . will not be invalidated by any act or negligence or
> breach of warranty by you or by the owner of the yacht.
> However, will not pay the Loss Payee [i.e. Key] if your act,
> negligence or breach of warranty occurred with the consent or
> knowledge of the Loss Payee. For the Loss Payee to recover
> for breach of warranty, you must bring legal action against
> us to recover under the policy only after we have denied your
> claim. We will then pay up to the oustanding balance of the
> mortgage issued by the loss payee for the yacht shown above,
> but not more than $5,850,000. Our rights are subrogated to
> all rights of the insured and the Loss Payee shall do nothing
> to impair that right.

PGG 56.1 ¶ 9; Fed. PGG 56.1 ¶ 9.  It is not disputed that after this
action was filed by Federal, defendants filed and served their Answer
and Counterclaims, seeking, inter alia, a judgment that Federal must
indemnify Key pursuant to the terms of the Warranty Endorsement.

Centrally at issue in Key's motion was the so-called "Patton
Survey."  It is undisputed that prior to the inception of its policy,
PGG retained Patton Marine, Inc. ("Patton"), a marine surveyor, to
complete a written survey and make recommendations as to the yacht's
condition.  PGG 56.1 ¶ 2; Fed. PGG 56.1 ¶ 2.  On December 7, 2005,
Patton issued its written survey report.[1]  Key 56.1 ¶ 16; Fed. Key
56.1 ¶ 16.  The same day, a broker who was involved in the sale of
the Princess Gigi forwarded a copy of the survey to Key at to Key's

---

[1] Federal asserts that there existed multiple "versions"
(i.e. drafts) of the Patton Report.  That issue is not relevant
to Key's motion, however, because no evidence indicates Key
possessed a version other than the one here described.

office in Ft. Lauderdale, Florida.  Key 56.1 ¶ 17; Fed. Key 56.1 ¶ 17.

The Patton Survey forwarded to Key noted various problems with the condition of the yacht, including its watertight bulkheads, and made recommendations accordingly; however, the survey also stated on its first page that only those items "marked with a star . . . should be taken care of for . . . safe operation and/or insurability" -- and no items in the survey were, in fact, marked with a star.  See Key 56.1 ¶ 30; Fed. Key 56.1 ¶ 30.

After being sent to Key's Ft. Lauderdale office, the Patton Survey was forwarded to Key's office in Cleveland, Ohio where it was reviewed by Jim Boosinger, a Recreational Lending Credit Supervisor in that office.  Key 56.1 ¶ 22; Fed. Key 56.1 ¶ 22.  As explained in Boosinger's declaration, the Patton survey was the only document that Boosinger reviewed that addressed the construction and condition of the Princess Gigi.  See Declaration of James "Jim" Boosinger ("Boosinger Decl.") ¶¶ 10-12.  Boosinger, who is not a marine surveyor, had no other contact with the Patton surveyor regarding the condition of the ship, nor did Frank Ramos, the Florida-based employee of Key who received and gathered preliminary information from PGG (but never actually saw the Princess Gigi in person).  See Boosinger Decl. ¶ 219; Declaration of Frank Ramos ("Ramos Decl.") ¶¶ 10,11.  No one in Key's Cleveland Recreational Lending Group, the group responsible for reviewing marine surveys, was a marine surveyor.  See Boosinger Decl. ¶¶ 6,15.

On December 12, 2005, _i.e._ the day before the effective date of the policy, Peter Kelly, an owner of the Kelly Agency, sent an email to Kriss, a lawyer for PGG, to say that while he eventually needed a copy of the Patton survey, "it is not a requirement of binding [coverage]." See PGG 56.1 ¶ 6; Fed. PGG 56.1 ¶ 6. Nonetheless, later that evening, Kriss emailed a copy of the Patton Survey to Kelly.  PGG 56.1 ¶ 6; Fed. PGG 56.1 ¶ 6.  As with the Patton Survey that was sent to Key, the version Kriss emailed to Kelly contained no starred entries.  See Key 56.1 ¶ 22; Fed 56.1 ¶ 22.  Having received the survey the next morning, Kelly did not forward it to Federal's underwriters, though there is no evidence anyone at Federal later asked him to do so.

At all times relevant, an "Agency Agreement" existed between Federal and Kelly that referred to Kelly as "the 'Agent' or 'you'" and Federal as "the Company." PGG 56.1 ¶ 10; Fed. PGG 56.1 ¶ 10. Although purporting to also characterize Kelly as an "independent contractor," the Agency Agreement imposed on Kelly various duties of loyalty, and provided that, subject to certain limitations, Federal would rely on Kelly's "experienced underwriting judgement [sic] to select qualified risks." PGG 56.1 ¶¶ 10-11; Fed 56.1 ¶ 10-11.

On the basis of the foregoing, Key's motion for summary judgment, which seeks the unpaid balance of the mortgage, must be granted because the express terms of the Warranty Endorsement require such payment absent Key's "consent or knowledge" as to the grounds on which coverage was denied. Even accepting, arguendo, that Federal had one or more valid grounds for denying coverage with respect to

7

PGG, no admissible evidence in the record could reasonably support an inference that Key knew of or consented to any such grounds.

Indeed, Federal's primary argument for denying coverage to Key does not concern the issue of Key's "knowledge or consent," but rather asserts Key violated the duty of utmost good faith ("uberrimae fidei"), an ancient rule of maritime insurance requiring the insured to disclose all information material to the insurer lest the policy be voided ab initio.  See generally Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l, 85 F.3d 68, 80-82 (2d Cir. 1996).  Federal claims that Key's failure to provide Federal with its copy of the Patton Survey as well as its subsequent failure to apprise Federal of the status of repairs made to the Princess Gigi pursuant to that survey's recommendations constituted a breach of the duty of utmost good faith.  The argument is unpersuasive, however, for several reasons:

First, the doctrine of utmost good faith, a rule peculiar to marine insurance law, arose in the context of contracts between the insured and the insurer and has rarely, if ever, been applied to marine mortgagees in Key's position.  Cf. Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985) ("Under . . . uberrimae fidei, the party seeking insurance is required to disclose all circumstances known to him which materially affect the risk.").  The doctrine, which dates back centuries, takes as its premise that the "assured is in the best position to know of any circumstances material to the risk [and] must reveal those facts to the underwriter . . . ."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986).  Such a premise would not be served by extending the same

obligation to one in Key's position who, in the usual case, could be expected to know even less about the relevant risks than the insured. To the extent that Federal seeks to place such a burden on Key, its vehicle for doing so must be the contract itself.

Second, even assuming, _arguendo_, that _uberrimae fidei_ were to apply to Key in some fashion, it would not require Key's disclosure of any information "presumed . . . known to the underwriter."  <u>See generally</u> <u>Gulfstream Cargo, Ltd. v. Reliance Ins. Co.</u>, 409 F.2d 974, 980 (5th Cir. 1969).  Accordingly, there was here no violation of the duty of utmost good faith as Key had every reason to assume that all of the information it had received from PGG, including the Patton Survey and the recommendations contained therein, had also been disclosed to Federal in similar or the same form.  Were the rule as Federal asserts, a marine mortgagee in Key's position would have no choice but to forward to the insurance company every document ever generated in the course of doing business, a system leading to massive redundancy and waste.

Federal's remaining arguments, predicated on the language of the Warranty Endorsement itself, are entirely without merit.  Federal first argues that Key can only recover to the extent that PGG's actions did not void the policy <u>ab initio</u>.  Such an argument would, of course, render meaningless the protection of the Endorsement.  <u>See</u> <u>Thomas v. NASL Corp.</u>, 2000 U.S. Dist. LEXIS 16761, at *26 (S.D.N.Y. 2000).  Additionally, Federal argues that quite aside from the duty of good faith, an inference that Key was aware of the unseaworthy

condition of the ship, and therefore the alleged breach by PGG, must be drawn from evidence that after Key's employees reviewed the Patton Survey, they agreed to grant PGG a modest extension from the typical deadline to complete the prescribed repairs.  Far from supporting Federal's claim, however, this evidence merely confirms Key was sufficiently unconcerned with the Patton Surveys's recommendations to go ahead with the financing of the purchase.

Nor is there merit to Federal's final contention that for purposes of the Warranty Endorsement, Key should be charged with constructive knowledge of the unseaworthy condition of the yacht on the basis of conditions described in the Patton Survey.  As an initial matter, constructive knowledge would not by itself present a valid basis for denying coverage.  The Warranty Endorsement is the marine analogue to a standard mortgage clause.  See Ingersoll-Rand Financial Corp. v. Employers Ins. of Wausau, 771 F.2d 910, 913 (5th Cir. 1985).  Its main purpose is to ensure that "the indemnity of the mortgagee is not placed at the whim of his debtor, and is subject only to breaches of which the mortgagee is, himself, guilty."  See United States v. Commercial Union Ins. Co., 821 F.2d 164, 166 (2d Cir. 1987).  Thus, imposing on a mortgagee a "duty of active enquiry and investigation [would] defeat the entire purpose of the . . . clause."  Hartford Fire Ins. Co. v. Morris, 27 F.2d 508, 510 (6th Cir. 1928).

Further, though Federal argues that the import of some of the conditions described therein, particularly the condition of the watertight bulkheads, would have been material to a marine insurer,

10

the survey itself belies this claim since not a single recommendation was marked with a star to indicate it was necessary for either safety or insurability, nor did anyone in Key's office have the expertise to second guess the judgment of the surveyor.  Consequently, Key cannot be fairly charged with having constructive knowledge of the yacht's purported unseaworthiness.

Failing all of the above, Federal argues that it should be entitled to further discovery to pursue the issue of whether any employee at Key had actual knowledge that the yacht was unseaworthy or otherwise consented to PGG's breaching the policy.  But Federal must offer a reasonable basis for these claims to be entitled to further discovery.  See Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) (plaintiff seeking further discovery "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.").  Here, it borders on the absurd for Federal to contend that, having required PGG to obtain a survey as a condition of financing, Key learned from such survey that the yacht was unseaworthy, yet went ahead with financing nonetheless.  Key has now produced affidavits from Boosinger and Ramos, the two most relevant employees, conclusively refuting this unlikely notion.  Consequently, the September 13 Order granted Key's motion for partial summary judgment.

As to the status of the Kelly Agency, even granting that labels are not dispositive and that marine insurance agents are not, in the usual case, agents of the insurer, on this record the Kelly Agency's knowledge of the survey must be imputed to Federal because:

11

(1) by express agreement, Kelly was made Federal's agent for the purpose of binding coverage and giving advice regarding the policy; and (2) Kelly had apparent authority when acting for such purposes.[2]

New York law, which would appear[3] to govern this issue absent an established federal maritime rule, see Ingersoll Milling Machine Co., 829 F.2d at 305, requires only "evidence of some action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred, in order to convert an insurance broker into an agent of the insurer." Matco Products, Inc. v. Boston Old Colony Ins. Co., 104 AD.2d 793, 796, 480 N.Y.S.2d 134, 137 (N.Y. App. Div. 2d Dep't 1984).   In this context, as elsewhere, "an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001) (quoting Meese v. Miller, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (N.Y. App. Div. 4th Dep't 1981)).

Here, Federal's consent is beyond reasonable dispute.   As noted, Federal executed an Agency Agreement authorizing Kelly to "receive applications for [all] insurance risks you [i.e. Kelly] are

---

[2] As the survey Kriss emailed Kelly was, in all material respects, the same document Federal claims Key withheld, this conclusion provides further support for granting Key's motion.

[3] Although the parties did not brief the choice-of-law issue for this motion, New York is the location of most of the relevant events related above.  Moreover, as set forth below, New York law governs the comparable issues raised in subsequent motions. Finally, even were the law of another state to govern, the same basic agency principles would apply.

licensed to solicit (as authorized in addenda attached to this agreement) and submit them to us [i.e. Federal] for approval." See PGG Ex. D ("Agency Agreement") at 1.  The Addendum here relevant provided only that "an underwriter must be contacted for a watercraft with an agreed value" exceeding $1,000,000.00.  Id.  By negative implication, therefore, Kelly was duly authorized to "receive applications for insurance risks" on a yacht such as the Princess Gigi, i.e. a yacht whose value exceeds $1,000,000, provided that Kelly first contacted an underwriter at Federal, which he did.  The requirement of "benefit and control" is likewise met, as the Agency Agreement conferred both, obligating Kelly to act "in good faith, with loyalty and honesty, and in accordance the conditions in this Agreement," all classic terms of agency.  Accordingly, since Kelly received the survey as Federal's agent, his knowledge must be imputed to Federal.  See N.Y. Marine & Gen. Ins. Co., 266 F.3d at 123; Contractors Realty Co. v. Ins. Co. of North America, 469 F. Supp. 1287, 1294-1295 (S.D.N.Y. 1979)(finding the "insurer's agent, acting with knowledge and with authority to recommend cancellation of a policy when material facts are disclosed, waived any  right of the defendant to . . .  avoid the policy on the ground of nondisclosure by issuing the policy . . . to the plaintiff.").

Additionally, even were Kelly acting outside his express or implied authority at various points, he was most certainly acting with apparent authority, which "exists entirely apart from the principal's manifestations of consent to the agent." Towers World Airways, Inc. v. PHH Aviation Systems, Inc., 933 F.2d 174, 177 (2d

13

Cir. 1991).  A "principal, creates apparent authority through words or conduct that, reasonably interpreted by a third party . . . indicate that the [putative agent] acts with the [principal's] consent."  Id.  Here, in approaching Kelly about the survey, Kriss was simply doing what the policy told him to do.  As noted, the insurance policy instructed PGG to direct any inquiries to Kelly, stating "If you have any questions, please contact [the] William E. Kelly Agency / 447 Boston Post Rd / Mamaroneck, NY 10543."  In the policy, Kelly is referred to as "Agent No.: 2-63077."  PGG 56.1 ¶¶ 7-8; Fed. PGG 56.1 ¶¶ 7-8.  Furthermore, at oral argument, it was conceded that, in issuing marine polices, Federal does not deal directly with prospective customers, instead relying on so-called "independent" insurance agents.  See Tr., 8/31/06, at 67. Given this, and given that the contract itself advised PGG to discuss the policy with Kelly, it would work an obvious injustice to now treat such a discussion as a non-disclosure that voids the policy.  See American Nat'l Fire Ins. Co. v. Kenealy, 72 F.3d 264, 267 (2d Cir. 1995) (concluding, based on similar facts, that an insurer had "created an unmistakable impression that [the agent] was [its] agent.")

    Finally, to make an injured party whole, "pre-judgment interest should be awarded in admiralty cases absent exceptional circumstances."  Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 593 (2d Cir. 1998).  Accordingly, the Court awards Key pre-judgment interest, but does so in the amount of 6.39%, the rate provided for under the terms of the loan, rather than the 9% rate sought by Key.

<u>The February 16, 2007 Order</u>:

After the close of discovery, both PGG and Federal moved for summary judgment.  The facts at issue for purposes of these motions were largely, though not entirely, consistent with those before the Court at the time of the earlier motions.  Although each party had the benefit of further discovery, there remained a great deal of uncertainty as to what caused the yacht's demise.

Once again, Federal took the position that PGG had breached the duty of utmost good faith, this time in no fewer than four ways: (1) by failing to disclose the Patton Survey (or parts or versions thereof); (2) by failing to disclose the fact that Key modified its standard contract, granting PGG an extension of its time to complete certain repairs; (3) by failing to disclose the deficiencies identified in the "A-1 Report"; and (4) by failing to disclose the findings of the "Wards Report."  However, the only evidence Federal offered that such purported nondisclosures were material came in the form of a single conclusory affidavit from Donna Capiga, Federal's own underwriter.  These kind of "conclusory statements by an insurance company employee . . . are insufficient to establish [materiality] as a matter of law."   <u>See</u> <u>Carpinone v. Mut. of Omaha Ins. Co.</u>, 265 A.D.2d 752, 755, 697 N.Y.S.2d 381, 384 (N.Y. App. Div. 3d Dep't 1999). Indeed, the Court views Capiga's assertions as particularly suspect given that, by her own admission, Capiga did not bother to look at the Patton Survey before binding coverage.

Moreover, it would appear to the Court, based on this record, that PGG may well have fulfilled in full its duty of good faith since

PGG did more than simply disclose the existence of the Patton Survey. Kriss emailed the entire Survey to the Kelly Agency, who acted as Federal's agent in this transaction, even after being told that this was not at all necessary for binding coverage.  Further, while Federal continues to maintain that there are multiple versions of the Patton Survey and that Federal failed to disclose these other "versions," nowhere do their papers even begin to offer evidence that PGG possessed (or even knew about) materially different versions of the Patton Survey other than the one version actually disclosed.

Nonetheless, the Court reluctantly must conclude that triable issues of fact remain, if barely, on the question of whether PGG fully complied with the duty of utmost good faith.  There remains, for example, a triable issue as to whether PGG's disclosures were "sufficient to call [them to] the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it."  Puritan Ins. Co., 779 F.2d at 871 (quoting 2 M. Mustill & J. Gilman, Arnould's Law of Marine Insurance and Average § 646, at 493 (16th ed. 1981)).  Also, genuine issues remain as to Federal's assertion that PGG breached the implied warranty of seaworthiness. Specifically, Federal has adduced evidence that the bulkhead problems identified in the Patton Survey rendered the ship "unseaworthy" at the policy's inception.  In particular, Federal's expert, James L. Dolan, states in his report that "any breach of a watertight bulkhead is a serious defect, which in the undersigned's opinion, represents

an unsafe and unseaworthy vessel." See Report of James L. Dolan dated August 11, 2006 ("Dolan Rep.") at 5.[4]

Accordingly, the February 16 Order denied both Federal's and PGG's motions for summary judgment as to the issue of coverage. However, PGG's motion to dismiss the towing and salvage claim with respect to the individual defendant Ben Ashkenazy was granted. Even assuming that Federal prevails in demonstrating that the policy was voidable, it was PGG, and not Federal, who was a party to the policy just as it was PGG, and not Federal, who, as the yacht's lawful owner, would have directly benefitted from Federal's recover efforts. Federal failed to offer any evidence or theory for extending liability to Ashkenazy personally in these circumstances. Accordingly, the claim against Ben Ashkenazy was dismissed.

_____

[4] Federal also argues that a reasonable factfinder could conclude that the capsizing of the yacht was not fortuitous given its purported structural defects. In making this argument, Federal points primarily to engineering faults that were allegedly introduced during the various renovations made to the ship while it was owned by SeaQuest. Although it need not reach the issue on the present record, the Court is doubtful that Federal's time would be well spent further pursuing this argument at trial given that PGG's "burden of demonstrating fortuity is not a particularly onerous one." See Morrison Grain Co. v. Utica Mut. Ins. Co., 632 F.2d 424, 430 (5th Cir. 1980). Specifically, the law places only a nominal "burden . . . upon the insured to prove that a loss occurred and that it was due to some fortuitous event or circumstance," and the insured has no burden to prove the exact cause of the loss. Id. PGG has come forward with ample evidence that the storm, the failure of power and subsequent events caused the loss in the broad sense even if, with the benefit of hindsight, there were also certain structural failings that may have rendered the yacht more susceptible this sort of predicament. In such circumstances, Federal's objection that an encounter with stormy weather was in some fashion foreseeable does not foreclose a finding that the loss stemmed from a "peril of the sea." See Continental Ins. Co. v. Lone Eagle Shipping (Liber.), 952 F. Supp. 1046, 1061 (S.D.N.Y. 1997).

Other Motions:

In a separate motion, Federal moves to strike PGG's jury demand on the ground that "[t]here is no right to a jury in actions instituted in admiralty . . . ." See generally In re Dammers & Vanderheide & Scheepvaart Maats Christina B.V., 836 F.2d 750, 755 (2d Cir. 1988). As Federal notes, its original complaint, as well as its first and second amended complaints, invoked admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and Fed. R. Civ. P. 9(h).

In its Amended Answer and Counterclaims PGG likewise invoked this Court's admiralty jurisdiction but claimed nonetheless that "Defendants are entitled to a jury trial of this action pursuant to Fed. R. Civ. P. 38(e)." Rule 38(e), however, states unambiguously that it "shall not be construed to create a right to a trial by jury of the issues in an admiralty or maritime claim within the meaning of Rule 9(h)." Indeed, it is hornbook law that a Rule "9(h) election for admiralty cannot be undone by the opposing party's jury demand." See Concordia Co. v. Panek, 115 F.3d 67, 72 (1st Cir. 1997); Insurance Co. of North America v. Virgilio, 574 F. Supp. 48, 50 (S.D. Cal. 1983) ("The impact of the 9(h) election is that all claims are tried by the court, rather than the jury.") (citing 9 Wright & Miller, Federal Practice & Procedure § 2315 p. 76 (1971)).

PGG, in its answering papers, also makes a belated cross motion to amend its answer to assert, instead, diversity jurisdiction as a basis for its counterclaims, arguing that the presence of diversity jurisdiction would create a right to jury trial at least with respect to some of PGG's counterclaims. That this motion is

being made now, after the close of discovery and the briefing of
summary judgment, makes it prejudicial in the extreme to Federal, and
PGG has offered no persuasive reason justifying its delay.

Furthermore, even were this untimely motion to amend to be
granted, PGG would still not be entitled to a jury trial in this
circumstance.  By electing to proceed under 9(h) rather than by
invoking diversity jurisdiction, "the plaintiff may preclude the
defendant from invoking the right to trial by jury which may
otherwise exist."  Harrison v. Flota Mercante Grancolombiana, S. A.,
577 F.2d 968, 986 (5th Cir. 1978).  The argument that a defendant
asserting counterclaims in a maritime action is entitled to a jury
trial over at least those claims that would otherwise be tried to a
jury, though supported by a lone decision from the Ninth Circuit, has
been rejected by the overwhelming majority of courts outside the
Ninth Circuit, including several in this district.  See Royal Ins.
Co. of Am. v. Deep Sea Int'l, 2004 U.S. Dist. LEXIS 5948, at *29-*32
(S.D.N.Y., March 15, 2004); St. Paul Fire and Marine Ins. Co. v.
Holiday Fair, Inc., 1996 U.S. Dist. LEXIS 3931 (S.D.N.Y., April 2,
1996); see also Camrex (Holdings) Ltd. v. Camrex Reliance Paint Co.,
90 F.R.D. 313, 317-18 (E.D.N.Y. 1981); Norwalk Cove Marina, Inc. v.
SS/V Odysseus, 100 F. Supp. 2d 113, 114 (D. Conn. 2000) ("The
majority of courts hold that the plaintiff electing to sue in
admiralty has the right to determine the character of the action,
which should not be disturbed by the defendant's counterclaims.").
Accordingly, Federal's motion to strike the jury demand was properly
granted.

Finally, Federal's motion to dismiss with prejudice PGG's bad faith counterclaim must be granted because the bad faith counterclaim here being asserted has no counterpart under New York law, so that PGG's claim would only lie were this action governed by Florida law, which it is not.[5]

In interpreting a marine insurance policy, such as the one at issue here, federal courts sitting in admiralty apply state law absent a conflicting federal statute or rule (neither of which is asserted here). See Commercial Union Ins. Co. v. Flagship Marine Servs., 190 F.3d 26, 30 (2d Cir. 1999) (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 319-21 (1955)).  To determine which state law to apply in situations where the contract does not otherwise specify, a court must "ascertain[] and value points of contact between the transaction [giving rise to the cause of action] and the states or governments whose competing laws are involved." See Advani Enters. v. Underwriters at Lloyds, 140 F.3d 157, 162 (2d Cir. 1998) (quoting Lauritzen v. Larsen, 345 U.S. 571, 582 (1953)). Specifically, in interpreting an insurance contract, the Court should consider "(1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place

---

[5] Federal concedes, as it must, that no federal admiralty rule would preempt defendant's state law bad faith counterclaims. See, e.g., Pace v. Ins. Co. of N. Am., 838 F.2d 572, 579-80 (1st Cir. 1988); P.T. Tugs, Inc. v. United States Fire Ins. Co., 796 F, 2d 125, 127-28 (5th Cir. 1986).

of incorporation, and place of business of the parties." <u>Advani</u>
<u>Enters.</u>, 140 F.3d at 162.

Although the contract does not contain a choice-of-law
provision, an examination of the remaining <u>Advani</u> factors indicates
the contract should be governed by the law of New York, not Florida.

The second factor, which looks to the place of negotiation,
issuance and execution, strongly favors New York law.  Ashkenazy, a
New York resident, negotiated the contract with the William Kelly
Agency in New York, and was represented in those negotiations by a
New York attorney, David Kriss.  PGG a Delaware entity, is domiciled
in New York.  Though the principal place of business of Federal is
New Jersey, its principal office for marine insurance is also in New
York.  Finally, Kelly issued the binder in New York.

As to the third factor, which requires examination of the
place of performance, while the yacht sank in waters in the Atlantic
near the Bahamas, the first notice of claim was sent by Kriss, in his
New York office, to the Kelly Agency in New York, advising Federal
that the yacht was sinking.  Additionally, the premiums were billed
to PGG in New York, and therefore any claims would have been paid
from Federal's office in New York to Ashkenazy in New York.  Although
PGG counters that the yacht was primarily located in Florida, this
fact is offset by the fact that the policy was not so limited,
covering the yacht in both the Atlantic and Pacific Oceans, as well
as the Gulf of Mexico.

As to the fourth factor, which looks to the location of the
subject of the contract, that factor would plainly favor Florida law

if the issue were where the boat was typically moored. However, as noted above, the contract does not require the boat to remain moored in Florida and therefore this factor is of diminished importance.

Finally, the fifth factor, which looks to the locations of the parties to the contract, likewise favors New York law as the relevant parties are either domiciled in New York (the location of PGG, Ashkenazy, Kelly, Kriss, and Federal's principal marine office) or states other than Florida (Federal, an Indiana corporation, has its principal office is in New Jersey).

In sum, the Court finds that New York has the most numerous and most significant contacts with the policy, and therefore that New York law should govern this action.

Furthermore, though PGG argues that Federal's decision to file suit in this district was motivated by a desire to avoid Florida law, it appears a Florida state court would likewise have applied New York law to this action.  Florida courts follow the rule of lex loci contractus, which dictates that an insurance contract is governed by the law of the state in which it was made – in this case, New York. Consequently, federal courts in Florida, sitting in diversity, have not hesitated to apply the law of other states to claims that an insurer acted bad faith where such claims were predicated on an out-of-state insurance contract.  See Allstate Ins. Co. v. Clohessy, 32 F. Supp. 2d 1328, 1331 (M.D. Fla. 1998); Pastor v. Union Cent. Life Ins. Co., 184 F. Supp. 2d 1301, 1308 (S.D. Fla. 2002).  Rejecting expressly PGG's argument that Florida law should govern a bad faith counterclaim even where the law of another state is found to govern

the underlying policy, one district court noted that "Florida's rule of <u>lex loci contractus</u> seeks to avoid such a fragmented result." <u>Pastor</u>, 184 F. Supp. 2d at 1308.

The parties are reminded that the trial in this case is firmly set to begin at 9:00 a.m. on May 14, 2007.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       April 15, 2007

23