UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FEDERAL INSURANCE COMPANY,          06 CV 2455 (JSR)(JCF)

          Plaintiff,

   - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

          Defendant.

-------------------------------------------------------------X

## WRITTEN SUMMATION OF
## PLAINTIFF FEDERAL INSURANCE COMPANY

Respectfully submitted,

NICOLETTI HORNIG & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

Of Counsel
    John A.V. Nicoletti (JN-7174)
    Terry L. Stoltz (TL-7650)
    Thomas M. Rittweger (TR-6796)
    Val Wamser (VW-0511)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

OVERVIEW ...................................................................................................................... 1

WITNESS CREDIBILITY ................................................................................................ 2

GROUNDS FOR COVERAGE DENIAL ........................................................................ 4

    First Cause of Action ............................................................................................ 4

    Second Cause of Action ........................................................................................ 5

    Third Cause of Action ........................................................................................... 6

    Fourth Cause of Action ......................................................................................... 7

PGG BREACHED ITS DUTY OF UTMOST GOOD FAITH ....................................... 7

PGG BREACHED THE ABSOLUTE
IMPLIED WARRANTY OF SEAWORTHINESS ........................................................ 18

    Design Defects Created An Unseaworthy Condition ......................................... 22

    Unseaworthy Condition of Watertight Bulkhead Penetrations .......................... 24

    Inadequate Bilge Pumps Created An Unseaworthy Condition ........................... 27

    Hazardous Electrical Conditions Made The Vessel Unseaworthy ..................... 28

    Vessel Instability Created An Unseaworthy Condition ...................................... 29

PGG BREACHED THE NEGATIVE
IMPLIED WARRANTY OF SEAWORTHINESS ........................................................ 31

    Unseaworthy Conditions at the Commencement of the Voyage ........................ 32

    PGG/Ashkenazy Had Knowledge of the Unseaworthy Conditions ................... 37

    Proximate Cause of the Capsizing ..................................................................... 39

PGG HAS FAILED TO SUSTAIN ITS
BURDEN OF PROOF UNDER THE ALL RISK POLICY .........................................................43

PGG'S PERSONAL EFFECTS CLAIM.......................................................................................48

FEDERAL IS ENTITLED TO RECOVERY OF "SALVAGE" EXPENSES.............................49

CONCLUSION.............................................................................................................................51

## **TABLE OF AUTHORITIES**

### **CASES**

*Allendale Mut. Ins. Co. v. Excess Ins. Co.*,
  992 F.Supp. 278 (S.D.N.Y. 1998) ................................................................ 15

*Ashphalt Int'l. v. Enterprise Shipping Co.*,
  514 F.Supp. 1111 (S.D.N.Y. 1981) .............................................................. 2

*Atlantic Ridgefield Co. v. Interstate Oil Trans. Co.*,
  1985 WL 529 (S.D.N.Y. 1985) .................................................................... 28

*Blue Cross of Cent. N.Y., Inc. v. Wheeler*,
  93 A.D.2d 995, 461 N.Y.S.2d 624
  (N.Y. App. Div. 4th Dep't 1983) ................................................................. 50

*The CALEDONIA*,
  157 U.S. 124 (1895) ............................................................................... 18, 19

*Certain Underwriters at Lloyd's v. Johnston*,
  124 F.Supp.2d 770 (D.P.R. 1999) .............................................................. 19

*Christiania General Ins. Corp. v. Great American Ins. Co.*,
  979 F.2d 268 (2d Cir. 1992) ....................................................................... 15

*Cigna Property and Cas. Ins. Co. v. Polaris Pictures, Corp.*,
  159 F.3d 412 (9th Cir. 1998), *cert. denied*, 528 U.S. 815 (1999) .................... 7

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*,
  190 F.3d 26 (2d Cir. 1999) ......................................................................... 20

*Commercial Union v. Lord*,
  2007 WL 841621 (2d Cir. 2007) ................................................................. 15

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*,
  952 F.Supp. 1046 (S.D.N.Y. 1997) ................................... 19, 20, 31, 43, 50

*Continental Oil Co. v. Pennzoil Corp.*,
  706 F.2d 1365 (5th Cir. 1983) ............................................................... 38, 43

*Crane v. Diamond Offshore Drilling, Inc.*,
  743 So.2d 780 (La. App. 5th Cir. 1999) ..................................................... 35

*Electric Ins. Co. v. Travelers Ins. Co.*,
  124 A.D.2d 431, 507 N.Y.S.2d 531
  (N.Y. App. Div. 3d Dep't 1986) ........................................................ 50

*Employers Ins. of Wausau v. Occidental Petroleum Corp.*,
  978 F.2d 1422 (5th Cir. 1992), *cert. denied*, 510 U.S. 813 ................ 18, 20, 32

*Formosa Plastics Corp. v. Arthur Collwyn Sturge*,
  684 F.Supp. 359 (S.D.N.Y. 1987).......................................................... 43

*Generali v. Rothschild*,
  744 N.Y.S.2d 159 (1st Dept. 2002) ...................................................... 4

*Hercules Carriers, Inc. v. Claimant State of Fla.*,
  768 F.2d 1558 (11th Cir. 1985) ............................................................ 35

*HIH Marine Services, Inc. v. Fraser*,
  211 F.3d 1359 (11th Cir. 2000) ............................................................ 7

*Hill Patrick Marine Piling v. Fireman's Fund Ins. Co.*,
  795 F.2d 940 (11th Cir. 1986) .............................................................. 8

*Ingersoll Milling Mach. Co. v. M/V BODENA*,
  829 F.2d 293 (2d Cir. 1987).................................................................. 43

*Ins. Co. of N.A. v. Board of Commissioners*,
  733 F.2d 1161 (5th Cir. 1984) .............................................................. 35

*In Re Johnson*,
  2006 WL 38043 (S.D.Ala. 2006).......................................................... 28

*In the Matter of Koala Shipping and Trading, Inc.*,
  1983 WL 638 (S.D.N.Y.)...................................................................... 2

*Keen v. Overseas Tankship Corp.*,
  194 F.2d 515 (2nd Cir. 1952)................................................................ 35

*Knight v. U.S. Fire Ins. Co.*,
  804 F.2d 9 (2d Cir. 1986) .................................................................... 8

*M.P. Howlett, Inc. v. Tug MICHAEL MORAN*,
  425 F2d 619 (2d Cir. 1970)................................................................... 42

*Magnifico v. CS Global Mariner Ltd.*,
  2000 WL 23244 (S.D.N.Y. 2000)......................................................... 28

*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers, Ltd.*,
    190 F.3d 64 (2d Cir. 1999) .......................................................................... 28

*Morrison Grain Co. v. Utica Mut. Ins. Co.*,
    632 F.2d 424 (5th Cir. 1980) ...................................................................... 43

*Mullett v. Sabine Transp. Co.*,
    2004 WL 1381240 (D.Mass. 2004) ............................................................ 42

*Neubros Corp. v. Northwestern Nat'l Ins. Co.*,
    359 F.Supp. 310 (E.D.N.Y. 1972) .............................................................. 18

*The NORDPOL*,
    84 F.2d 3 (2d Cir. 1936) .............................................................................. 42

*The OREGON*,
    158 U.S. 186 (1895) ..................................................................................... 42

*Orient Mid-East Lines, Inc. v. S.S. ORIENT TRANSPORTER*,
    496 F.2d 1032 (5th Cir. 1974) .................................................................... 35

*Place v. Norwich & New York Transp.*,
    118 U.S. 468 ................................................................................................... 2

*Puritian Ins. Co. v. Eagle S.S. Co.*,
    779 F.2d 866 (2d Cir. 1985) ......................................................................... 8

*Reliance Nat'l Ins. Co. v. Hanover*,
    246 F.Supp.2d 126 (D.Mass. 2003) ..................................................... 7, 19

*Ronalds v. Leiter*,
    109 F. 905 (2d Cir. 1901) ........................................................................... 19

*Rule v. Brine, Inc.*,
    85 F.3d 1002 (2d cir. 1996) ........................................................................ 50

*Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*,
    242 F.2d 385 (5th Cir. 1957) ...................................................................... 31

*In re Seaboard Shipping Corp.*,
    449 F.2d 132 (2d Cir. 1971) ....................................................................... 42

*Sisson v. Ruby*,
    497 U.S. 358 (1990) ..................................................................................... 19

*Son Mut. Ins. Co. v. Ocean Ins. Co.*,
  107 U.S. 485 (1883)..................................................................................... 8

*Underwriters at Lloyd's v. Labarca*,
  260 F.3d 3 (1st Cir. 2001)............................................................................. 19

*Universal City Studios, Inc v. Nintendo Co., Ltd.*,
  797 F2d 70 (2d Cir.), *cert. denied*, 479 U.S. 987 (1986)................................ 50

*Verdin v. C&B Boat Co., Inc.*,
  1986 WL 15241 (W.D. La. 1986).................................................................. 35

*In re Worldcom, Inc.*,
  No. 02-13533, 2007 WL 1933575
  (Bankr. S.D.N.Y. July 5, 2007)..................................................................... 50

*Youell v. Exxon Corp.*,
  48 F.3d 105 (2d Cir. 1995)............................................................................ 43

## STATUTES

46 C.F.R. § 91.10-11.......................................................................................... 20

## SECONDARY SOURCES

*The American Heritage Dictionary of the English Language*, 1982 ed. p. 255 ................................ 20

**OVERVIEW**

The rules for placing marine hull insurance and the implied warranties of seaworthiness which are read into these policies serve the paramount function of protecting the lives of passengers and crew and the property of third parties traveling upon waterborne craft, whether they be commercial vessels, large pleasure yachts or small watercraft.  The rules are the same for all watercraft that sail upon navigable waters.

A key point is that a yacht owner will be less concerned with the condition of the yacht and, therefore, the safety of the people and property aboard, if he can successfully collect the proceeds of the hull insurance, even though the owner misrepresented the condition of the yacht at the time of the application for insurance.  This premise gives rise to the doctrine of utmost good faith, which requires the owner to disclose to the underwriter the true nature of the risk involved with his yacht or be deprived of insurance proceeds if he fails to do so.  The rule is stringently applied in this Circuit because the owner, not the underwriter, is in the best position to know the conditions which affect that vessel's safe operation.

To allow PGG Realty, LLC ("PGG") and Ben Ashkenazy to recover under the instant hull policy would defeat the goal of protecting people and property and will encourage ignorant or unscrupulous owners to understate, by omission or misrepresentation, the risks associated with their vessels when applying for insurance.  It is so important for an owner to ensure his vessel is safe for the intended use, that even an innocent non-disclosure or misrepresentation by the owner in his solicitation for insurance will deprive him of the benefits of the hull proceeds, which would otherwise be payable under the hull policy.

It is this same economic incentive, i.e. the loss of the hull proceeds, which compels an owner to only use his vessel within her design capabilities, i.e. for the intended purpose, and to properly

maintain the vessel while in operation.  The law imposes a non-delegable duty upon a yacht owner to provide a seaworthy vessel to his passengers and crew and to maintain that vessel in a seaworthy condition during its operation.  The law imposes these obligations upon a yacht owner because the owner is in the best position to keep the vessel fit for its intended use and to thereafter maintain it. To grant PGG recovery under the policy issued by Federal Insurance Company ("Federal") will only serve to encourage this and other owners of vessels to avoid their obligations to safeguard passengers and crew.[1]

## WITNESS CREDIBILITY

To properly evaluate and weigh the evidence in this trial, it is necessary to assess the motivation behind each witness' testimony to determine their truth or veracity.  Those who have gained financially by the sale of the yacht or those who might be subjected to liability if the hull insurance claim is denied are more likely to color their testimony to protect their own personal and financial interests and are less likely to testify truthfully.

Obviously, Warren Lovell has much to gain and nothing to lose if the insurance claim is paid. Lovell benefits by having the sale of the FULL BLOOM (renamed PRINCESS GIGI ("GIGI") consummated as he recouped $7,000,000.00 of his $12,000,000.00 investment in this "white elephant" yacht.[2]  If the hull claim is not paid, it is likely that Lovell will be sued by PGG for

---

[1] Hull insurance proceeds are not included in the hull value when an owner seeks the benefit of Limitation of Liability for injury or faulty wrongful death to his passengers or crew.  If the yacht owner lacks privity or knowledge of the faulty or unseaworthy conditions which caused the casualty, he can keep the hull insurance proceeds and leave the injured and dead with limited recourse.  *Place v. Norwich & New York Transp.*, 118 U.S. 468, 493; *In the Matter of Koala Shipping and Trading, Inc.*, 1983 WL 638 (S.D.N.Y.); *Ashphalt Int'l. v. Enterprise Shipping Co.*, 514 F.Supp. 1111, 1114, fn 3 (S.D.N.Y. 1981).

[2] Lovell spent some six years building this yacht, ending with the installation of a lead keel in January, 2002 in an attempt to correct the yacht's inherent instability.  He operated her for about a year before putting her up for sale in January, 2003.  The yacht remained unsold from January, 2003

misrepresenting the condition of the yacht at the time of sale.

Robert Moore claims credit for completing the design and build of this megayacht.  His marine consulting business will be seriously impaired if it comes to light that the GIGI had trim, stability issues and design defects with regard to its watertight integrity.  Accordingly, Moore is more than inclined to err on the side of praising the build of this yacht, as opposed to honestly testifying about her true deficiencies, particularly those deficiencies in the areas of her build and design in which he was involved, but which were beyond Moore's competence, such as the garage doors and engineroom exhaust system.

Kent Chamberlain had much to gain by the sale of this yacht as he earned in excess of $225,000.00 in commission plus a one week charter upon the completion of the sale (Px. 109).[3] Furthermore, he will be exposed to liability if this Court finds that the condition of this yacht was misrepresented to PGG/Ashkenazy and, in fact, had serious design and manufacturing defects.

The Patton surveyors hired by Chamberlain rely upon being employed on a regular basis by yacht brokers, such as Chamberlain.  To the extent the Patton surveyors colored their survey and "soft pedaled" this yacht's deficiencies to encourage PGG/Ashkenazy to purchase the yacht, it was advantageous to both Chamberlain and Patton.  Chamberlain earned a huge commission and the surveyors earned a lucrative surveying fee, with the expectation of future appointments by Chamberlain.  Accordingly, the Patton surveyors' testimony must be examined in the light of their motivation in having the sale close and to avoid liability in those instances where their reports are less than complete, honest and accurate.

---

until Ashkenazy purchased it in December, 2005 or almost 3 years (Lovell, Tr.  1649-50, 1711-12, 1731-32).

[3] "Px." denotes the Plaintiff's Trial Exhibits; "Dx." denotes Defendant's Trial Exhibits; "Cx." denotes the Court's Exhibits; "Tr." denotes the Trial Transcript; and "PTO" denotes the Pre-Trial Order.

## GROUNDS FOR COVERAGE DENIAL

On March 29, 2006, Federal declined the claim by PGG for the loss of the GIGI and other damages under Federal Policy No. 0037007407 (the "Policy") by commencing a Declaratory Judgment Action with the filing of a Complaint[4] (Px. 1).  In that initial pleading, Federal set forth five causes of action against PGG[5] and a separate sixth cause of action against Defendant KeyBank.[6]

### First Cause of Action

In the first cause of action, Federal declined the claim for the hull damage to the GIGI on the ground that PGG breached its duty of utmost good faith by presenting the risk to the Plaintiff on the basis of misrepresentations and/or non-disclosure of material facts.  Federal specifically pleaded that "the condition of the hull structure, including but not limited to the watertight integrity of the hull of the subject yacht, was and is a material fact to the underwriting of the hull insurance policy."  (Px. 1 at ¶ 48).  Plaintiff also plead:

> [H]ad defendants disclosed to Federal the actual hull condition of the M/Y PRINCESS GIGI, as stated in the Patton Marine report, or otherwise existing prior to Federal's issuing the Policy; all of which showed, *inter alia*, a problem with the watertight integrity of the hull…, Federal's underwriters would not have issued the subject 'yacht' Policy and/or would have not issued said Policy on the same terms and/or for the same premium… (Px. 1 at ¶ 49) (emphasis added).

Federal did not limit PGG's nondisclosures and/or misrepresentations to factual information contained in the Patton report and specifically expanded the Defendant's misrepresentation and/or omissions to encompass all questionable conditions of the yacht.  During the course of pretrial discovery, Federal first learned of additional misrepresentations and/or nondisclosures by PGG in its

---

[4] Commencement of a declaratory judgment action constitutes notice of disclaimer.  *Generali v. Rothschild*, 744 N.Y.S.2d 159 (1st Dept. 2002).
[5] The fifth cause of action based on the navigational limits has been withdrawn by Federal.
[6] The Declaratory Judgment Complaint was amended on or about August 28, 2006 and restated the initial six causes of action but added a seventh cause of action against PGG and Ashkenazy to recover the amounts expended by Federal to limit potential liabilities by way of collisions with the capsized hull of the GIGI and to prevent potential pollution damages.

application for the Policy.[7]   As part of the legal requirements for avoiding the Policy, Federal

tendered the return of premium to PGG (Px. 1 at ¶ 51).

**Second Cause of Action**

In the second cause of action, Plaintiff declined liability under the Policy for the subject

casualty on the ground that "the capsizing of the [GIGI] was not caused by a fortuitous event."  (Px.

1 at ¶ 54).   Once again, Federal did not limit the lack of fortuity defense to the conditions and

recommendations set forth in the Patton report.

During the course of pre-trial discovery, it was learned that the capsizing of the GIGI was

caused by the unseaworthy conditions of the megayacht which existed at the inception of the Policy.

The proximate or effective cause of the capsizing of the GIGI was ingress of water into her hull

which was solely attributable to unseaworthy conditions.  The lack of watertight integrity of the aft

garage doors coupled with the penetrations by the I-beam and a "mousehole" through the forward

_____

[7] Those misrepresented and/or omitted disclosure of material facts were identified in the PTO as
follows: (1) Improper hull form design for a tri-deck motoryacht creating trim and stability issues
(PTO ¶¶ 63-67 at 16); (2) The incorporation of aft garages and forward placement of the engineroom,
creating trim and stability issues (PTO ¶¶ 68-69 at 16); (3) Failure by Trident Shipworks, Inc.
("Trident"), the initial manufacturer, and all involved thereafter to perform appropriate weight
estimates and stability calculations (PTO ¶¶ 70-74 at 17); (4) Trident's failure to complete the vessel
in accordance with the underlying build contract which delayed its launch until July 2000 and
completion until (at the earliest) 2001 (PTO ¶¶ 78-79 at 18); (5) Trident's failure to properly build
those portions of the yacht, which were constructed under its supervision and failure to complete the
manufacture of the yacht (PTO ¶¶ 80, 85); (6) Seaquest International, Inc. ("SQI"), a company
formed by Lovell, managed the construction of the GIGI from June 1999 through completion of the
build, sometime in 2001 which resulted in, among other things, the defective design of the
engineroom exhaust vent and the lack of watertight integrity of the aft garage doors (PTO ¶ 99 at 20);
(7) Legal actions between SQI/Lovell and Trident and its underwriters (PTO ¶ 195 at 33) concerning
deficiencies surrounding the build of the GIGI (PTO ¶¶ 138, 139, 141, 142 and 144 at 26 and 27); (8)
PGG, through the broker Kent Chamberlain, was in possession of a survey by A-1 Marine, which
raised issues concerning the vessel's structural integrity (PTO ¶¶ 23, 24, 150 at 11 and 29,
respectively); (9) PGG allowed SQI a 90-day window for SQI to comply with the Patton
recommendations, including sealing the penetrations in the engineroom bulkheads (PTO ¶¶ 186, 187
at 32); and (10) KeyBank allowed PGG a 120-day window to comply with all but 5 of Patton's
safety recommendations (PTO ¶¶ 190).

bulkhead of the port garage allowed water into the engineroom.  The defective design of the engineroom exhaust vent, placing it too low along the aft port quarter of the hull, permitted water ingress directly into the engineroom in following seas (Raguso, Tr. 565-67).  The lack of watertight integrity of the forward engineroom bulkhead on the port side "masked" the volume of water flowing into the engineroom by allowing water to flow into forward compartments (Taylor, Tr. 349-50) before spilling over into the center bilge area and setting off the high water alarm.

**Third Cause of Action**

In the third cause of action, Federal denied coverage on the ground of PGG's breach of the absolute warranty of seaworthiness at the inception of the Policy.  Federal specifically pleaded that "defendants warranted the seaworthiness of the M/Y PRINCESS GIGI at the time of the attachment of the risk under the Federal policy."  (Px. 1 at ¶ 58).  Plaintiff alleged that "the M/Y PRINCESS GIGI was not in a seaworthy condition by reason of, among other things, the lack of watertight integrity of the yacht's hull, including but not limited to the engineroom."  (Px. 1 at ¶ 59).  Federal did not limit the basis for Defendant's breach of the absolute implied warranty to conditions set forth in the Patton report.  During the course of pretrial discovery, and as set forth in the PTO, Federal became aware of additional conditions concerning the GIGI which established that the vessel was unseaworthy at the time Federal agreed to bind the Policy.[8]

---

[8] These newly discovered unseaworthy conditions include:  (1) The GIGI had ongoing trim and stability issues (PTO ¶¶ 7-11 at 9); (2) The vessel's structural integrity remained in question and required further investigation (PTO ¶¶ 21-24 at 10, 11; PTO ¶¶ 63-69 at 16); (3) The watertight bulkheads in the engineroom of the GIGI had been penetrated/compromised by various cut-throughs and other penetrations, including an I-beam penetration (PTO ¶¶ 236-248 at 38-40) and the built-in permanent mousehole in the port garage (PTO ¶¶ 249, 250 at 40); (4) The watertight integrity and safety of the engineroom was further compromised by the engineroom exhaust vent (PTO ¶¶ 261-264, 275 at 41-43); and (5) The aft garage doors were non-watertight, which coupled with the I-beam penetration and the mousehole, creating another downflooding point into the engineroom (PTO ¶¶ 78, 281, 286, 287, 288 at 43-45).

**Fourth Cause of Action**

In the fourth cause of action, Federal declined coverage for the GIGI casualty on the basis of PGG's breach of the implied, negative warranty of seaworthiness (Px. 1 at ¶ 64).  Federal stated that "at the time the M/Y PRINCESS GIGI departed Fort Lauderdale, Florida for the voyage during which it capsized, Defendants and/or their representatives were aware of the yacht's deficiencies as stated in the Patton Marine report <u>or otherwise existing.</u>"  (Px. 1 at ¶ 65) (emphasis added).  Federal also pleaded:

> [D]efendants and their representatives knew that there were several areas of the yacht, including the engineroom, which were not watertight and knew of other deficiencies which needed corrections, <u>some of which were identified in the Patton report</u> and some of which, if not all, were the proximate cause of the capsizing.  (Px. 1 at ¶ 66) (emphasis added).

Federal did not limit its factual basis to those items stated in the Patton report.  During the course of pre-trial discovery, and as set forth in the PTO, Federal for the first time became aware of additional conditions concerning the GIGI which established that the vessel was unseaworthy at the time it broke ground on its final voyage from Ft. Lauderdale to St. Maarten.[9]

### PGG BREACHED ITS DUTY OF UTMOST GOOD FAITH

The doctrine of utmost good faith requires an insured to <u>fully</u> and <u>voluntarily</u> disclose to the insurer all facts material to the calculation of the insurance risk, <u>whether or not inquired into by the insurer</u>[10] because "…the insured is in the best position to know any circumstances material to the risk, [therefore] the insured must reveal those facts to the underwriters, rather than wait for the

---

[9] These newly discovered unseaworthy conditions, in addition to those identified in support of the breach of the absolute warranty, are: (1) The lack of a DC powered fuel transfer pump (PTO ¶¶ 260, 379, 381); (2) An incompetent (i.e. improperly trained) crew (PTO ¶¶ 46, 327-371).

[10] *See HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000); *Cigna Property and Cas. Ins. Co. v. Polaris Pictures, Corp.*, 159 F.3d 412, 420 (9th Cir. 1998), *cert. denied*, 528 U.S. 815 (1999); *see also Reliance Nat. Ins. Co. v. Hanover*, 246 F.Supp.2d 126, 137 (D.Mass. 2003)(The obligation to disclose material facts extends to facts which the insured "should have known").

underwriter to inquire."[11]  A fact is material if it could "possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk."[12]  The insured is obligated:

> [T]o place the underwriter in the same situation as himself; to give him the same means and opportunity of judging the value of the risks; and when any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy.[13]

This doctrine of utmost good faith has been fully embraced by the Second Circuit.[14]

On November 15, 2005, Ashkenazy entered into an agreement with SQI for the purchase of the yacht (Px. 82).  As the purchase of the yacht was subject to surveys, Chamberlain, on behalf of PGG/Ashkenazy, retained Patton to conduct a pre-purchase/value/damage/insurance survey which was reduced to writing in a report dated December 7, 2005 (Px. 179, 180).  Patton retained two surveyors, Robert Riley and Robert Connell, to conduct the survey, which took place on November 21, 22, 23 and December 1, 2005.  Chamberlain also retained the services of Ward's Marine Electric ("Ward's"), Frank Griffin, Inc. and A-1 Marine Surveyors ("A-1 Marine") for electrical, engine and regulatory surveys, respectively (Px. 127, 92; Chamberlain, Tr. 1756, 1760, 1767-69).

The Court has imputed the information contained in the December 7, 2005 Patton Marine Survey Report ("Report") (Px. 179) and separate Recommendations ("Recommendations") (Px. 180) to Federal.  However, the information contained in the Patton documents does not identify or disclose: Use of an improper hull form for this tri-deck motoryacht; Issues with the yacht's build history or her questionable trim and stability; Questions concerning the yacht's longitudinal structural integrity, as noted in the A-1 Marine survey; Prior legal battles between Trident and SQI/Lovell concerning the negligent building of the yacht or the completion of the yacht's build

---

[11] *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986).
[12] *Hill Patrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 942 (11th Cir. 1986).
[13] *Son Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510-511 (1883).
[14] *See Puritian Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 870 (2d Cir. 1985).

under the management of someone other than Trident; Defective design of the engineroom exhaust vent; Lack of watertight integrity of the aft garage doors;[15] or the I-beam penetration or mousehole in the forward part of the port garage, both of which, when coupled with the lack of watertight integrity of the garage doors, created downflooding points into the engineroom.  The Patton survey, although listing some other surveyors who inspected the yacht, does not disclose the A-1 Marine survey, which raised the issue of the vessel's structural integrity (Px. 100).  Finally, there is no reference in the Patton survey to the 90-day repair window given to SQI to comply with the Patton recommendations or the 120-day window given to PGG by KeyBank to complete most of the safety recommendations (*See* Px. 179, 180).

The Patton survey itself is replete with misrepresentations.  The Patton Report states " the FULL BLOOM is a custom built 124' tri-deck motoryacht originally designed by Mr. Cudalo [sic] and built by Trident Shipyards in Tampa, Florida."  (Px. 179 at 3).  In truth, the yacht was not designed by Cutalo; he had <u>only</u> designed a hull form for a 2½ deck, raised pilothouse yacht.  Trident used the older Cutalo 2½ deck, raised pilothouse hull form for the construction of the tri-deck FULL BLOOM (Hains, Tr. 780-81; Lovell, Tr. 1623-24).  Thereafter, Cutalo was retained to design a false bow to correct the trim problem created by using the incorrect hull form (Moore, Tr. 2289-90).  Even with the false bow, Cutalo specifically cautioned about stability problems on the GIGI due to the heavy materials used on the topsides in her construction (Px. 91).  Further, Trident was not the sole manufacturer of the yacht, having filed for bankruptcy in 1999, during the build (Px. 76 at 4).  The completion of the yacht was left to SQI, which managed the yacht's build by other subcontractors under the supervision of Lovell and Moore (Lovell, Tr. 1626-27; Moore, Tr. 2285,

---

[15] It is not surprising that Patton does not address the unseaworthy conditions found in the port garage or the lack of watertight integrity of the garage doors because Connell, one of the Patton surveyors, admitted that neither surveyor inspected the garages during their survey.  (Riley Cx. 2 at 102).

2287), neither of whom had any naval architecture or marine engineering background (Lovell, Tr. 1611-12; Moore, Tr. 2239-40).

Patton also misrepresents the yacht's trim and stability.  The Patton Recommendations state the "addition of a new false bow has been molded and built over the original structure in an effort to provide more buoyancy forward.  Consequently, a reported 11 tons of lead trim ballast has been installed in the aft end of the keel" (Px. 180 at 1).  However, there was no linkage between the false bow, added for trim purposes, and the 11 ton lead keel, added for stability.  The Patton surveyors were advised that the lead keel was installed to correct the stability problem (Moore, Tr. 2319-20, 2347-48), as reflected in the Barbieto incline stability analysis (Dx. SSSS at 3).  Moore gave the Patton surveyors the Barbieto memorandum of June 4, 2001 (Moore, Tr. 2348), which shows an ongoing bow-down trim problem and cautions about the yacht's stability (Dx. SSSS, at 3).  Notwithstanding possessing this information, Patton makes no reference to the ongoing trim problem in its report, but rather infers that the false bow corrected the original bow-down trim issue (Px. 179 at 5).  Furthermore, the Barbieto memorandum references the need for additional ballast to compensate for severe wind and sea conditions (Dx. SSSS at 3).  The Patton surveyors were also shown drawings, including Barbieto Drawing No. S01, which states:

> Due to the fact that there is very little structural information on this vessel, it is not possible to perform a thorough and complete structural analysis to ascertain residual longitude strength of the hull…, therefore, Arthur & Barbieto and Associates cannot assume responsibility for internal structural failure.

(Px. 50; Moore, Tr. 2319-21).  Notwithstanding having this information in their possession, the Patton surveyors, as agents of Ashkenazy and PGG, failed to report Barbieto's reservations concerning the vessel's stability and longitudinal structural strength.  The Patton Recommendations misleadingly states that "no evidence of structural analysis or sign off was seen regarding validation of bending or local structural load reinforcements by qualified engineers regarding these

modifications and ballast added" (Px. 180 at 1) presenting this as a benign issue which may require follow up.  They failed to note the existence of documentation specifically placing into question the yacht's structural integrity (Px. 50).  Unlike Patton, the A-1 Marine survey did report Barbieto's reservations (Px. 100 at 3).  That survey was never disclosed to Federal.

Federal has established that it has a complete defense to payment of the hull claim because PGG failed to disclose material facts and, in some instances, made affirmative misrepresentations of material facts in its application form and subsequent additional submissions when purchasing the Policy.  A party applying for marine insurance is obliged to disclose to the insurer, without any inquiry from the insurer, all facts which may affect the judgment of the insurer in: (1) Accepting the risk; (2) The terms and conditions upon which the insurance will be written; or (3) The premium which will be assessed.  PGG knew, or should have known, of material facts (whether true or untrue is irrelevant) that should have been disclosed to Federal's underwriters to permit them to fully investigate and assess the risk.  By not disclosing or misrepresenting information, PGG did not accurately describe the risk, which Federal's underwriters ultimately agreed to insure.

In early November, 2005, Ashkenazy became interested in purchasing GIGI, and early on, Ashkenazy received information concerning an issue with "hull flexing" of this megayacht (Px. 91).  This information was obviously "material" to Ashkenazy, because he asked Chamberlain to investigate whether there was a serious structural deficiency in the yacht.  On November 14, 2005, Chamberlain Yachts responded to Ashkenazy's inquiries (Px. 91).  In that November 14th e-mail, Ashkenazy was informed:

> [T]he boat was built for the current owner Tracey Lovell.  The boat was scheduled to launch in 1997 but was [tied] up in legal issues between the parties involved.  Four years later and $4.5 million over budget, the boat was completed….In somewhat of a vendetta, Mr. Lovell made it a priority to bring the Trident yard to its demise and was successful.

(Px. 91).  The e-mail and this information was never disclosed to Federal's underwriters (O'Sullivan, Tr. 1038-39; Capiga, Tr. 1164).  If this information had been presented with PGG's application for insurance or at any time prior to the binding of insurance, Federal would not have released a quote and ultimately would not have bound the Policy without additional information on the issues raised in that email (O'Sullivan, Tr. 1045-46; Capiga, Tr. 1166-68).

This was no immaterial, benign omission.  If PGG had disclosed the legal dispute between Lovell and Trident, further inquiry by Federal would have revealed a Federal Court Bench Order (Px. 76).  In that Order, the Court found that Trident negligently constructed some 77 separate areas or systems in the partial build of the GIGI (Px. 76 at 8-13).  The items which were negligently manufactured or constructed by Trident were far from minor.[16]  The total amount of money required to remediate the specific negligently manufactured items was $1,262,436.22 (Px. 76 at 8-15).

The Bench Order further identifies six deficiencies in the manufacture of that yacht which were caused by Trident's intentional misconduct to avoid cost or to cover other defects.[17]  For these deficiencies, SQI was award $739,509.00 (Px. 76 at 13).

Significantly, the Bench Order also held that Trident failed to complete the manufacture of GIGI and specifically found twelve items which fell within this category (Px. 76 at 14, 15).  These

---

[16] They included: A misshaped bow (Item 1); Flotation and trim repairs (Item 2); Fuel and fresh water tank replacement and repairs (Item 3 and 4); A weakened floor grading in the tender garages (Item 10); Insufficient structural support in the overhead of the engineroom (Item 12); Insufficient support in the upper deck (Item 20); Rewiring the electrical systems on the yacht (Items 27 and 55); Engine shaft strut misalignment (Item 53); Re-shoot of engine alignment (Item 75); Reinforcement of lower deck supports for engine beds to carry the weight of the machinery (Item 78); Insufficient camber of the decks (Item 86); and Additional structural support for the transom (Item 90) (Px. 76 at 8-15).

[17] These deficiencies in the yacht included: The painting system utilized on the boat (Item 60); and Lamination "print through" (Item 81) (Px. 76).

incomplete items included some of the most significant defects with the yacht.[18]  The total cost awarded for completing these additional items was $421,830.00 (Px. 76 at 14, 15).

Finally, the Bench Order found that Trident failed to complete construction of the yacht, as claimed by SQI.  These items, upon completion, would cost an additional $3,963,649.40 (Px. 76 at 15).  The Bench Order establishes that this is not a Trident manufactured and constructed yacht.  If PGG/Ashkenazy had advised Plaintiff's underwriters of the litigation between Trident and its underwriters and SQI, these details would have come to light and this disclosure would have prevented Federal's underwriters from quoting the risk and precluded binding of coverage (O'Sullivan, Tr. 1046-49; Capiga, Tr. 1166-68).[19]

The Chamberlain November 14th e-mail further advised Ashkenazy that "Sergio Cutalo, a well reputed world renowned naval architect, was the designer of FULL BLOOM".  The e-mail also reports that Cutalo took note that the "materials used during the construction were heavier than proposed and might lead to stability issues" (Px. 91).  This "stability issue" was never disclosed to the Federal underwriters (O'Sullivan, Tr. 1046; Capiga, Tr. 1164, 1170).  Whether real or fictional, if the stability issue had been disclosed to Federal's underwriters, they would not have issued a quote or bound the Policy absent further investigation (O'Sullivan, Tr. 1045-46; Capiga, Tr. 1166-68).

Indeed, the stability issue was not a "red herring".  It was revealed during pretrial discovery to be an ongoing problem with this yacht.  Even a cursory investigation would have revealed that there was only one actual weight and stability calculation performed by Cutalo which took place in October, 1999 (Px. 63).  From its date, it is obvious that the weight study performed by Cutalo came

---

[18] These deficiencies were: The engineering of the aft garage doors (Item 61); Completing the aft engineroom bulkhead closeout (Item 63); and Stability issues concerning the additional keel (Item 94) (Px. 76).

[19] Even if the negligently constructed items were fully remediated, the prior existence of these deficiencies is sufficient to prompt inquiry by the underwriter before issuing a quote or binding a policy.

well before the yacht was fully constructed.   The accuracy of the weight estimates is critical to accuracy of the study (Hains, Tr. 787-88, 795-797).   There is no evidence attesting to the accuracy of the weights which are integral parts of Cutalo's calculations (Moore, Tr. 787-88, 793, 795-797) and, therefore, the weight and stability calculation is not reliable (Hains, Tr. 796-797).

Even accepting Cutalo's calculation at face value, it showed an aft draft of 1.573 meters and a forward draft of 1.836 meters under a "light displacement" condition.   Although the Patton survey states that Cutalo designed a solution to the trim problem, the Barbieto incline stability analysis of June 4, 2001 shows that the down-by-the-bow trim problem had not been corrected, even after the installation of the false bow (Dx. SSSS at 3).   The June 4, 2001 Barbieto memo shows the bow draft at 2.009 meters and the stern draft at 1.689 meters.   The yacht was still bow heavy and trimmed down-by-the-bow by .320 meters (12.48 inches) which is far greater than the 1 inch bow-down trim, claimed by Lovell (Lovell, Tr. 1655, 1678, 1720-21).   Importantly, the June 4, 2001 Barbieto memo, which shows that the false bow did not fully correct the trim problem, was given to Ashkenazy and the Patton surveyors (Moore, Tr. 2348).   The Barbieto memo also states that even with the installation of 13.5 MT of ballast in the keel to meet minimum DNV criteria, additional ballast may be needed to compensate for severe wind or sea conditions (Dx. SSSS, at 3).   None of these material facts were disclosed to the Federal underwriter in the Patton documents or otherwise (Px. 166, 179 and 180).

On November 28, 2005, PGG made application to Federal through Kelly Agency (Px. 166). The application for insurance was submitted on a megayacht worksheet; a form developed and authored by Debbie O'Sullivan, Federal's Worldwide Yacht Underwriting Manager (O'Sullivan, Tr. 1004).   O'Sullivan developed the form for purposes of soliciting information from prospective insureds which Federal deemed material to the assessment and underwriting of a yacht risk

(O'Sullivan, Tr. 1009-1012, 1015-1021).   Where the insurer specifically inquires as to a fact, the insured is on notice that the insurer considers it material and, therefore, is under a duty of inquiry.[20]

Pursuant to questions set forth in the megayacht worksheet, PGG represented, *inter alia*, that the GIGI was built in 2001; was manufactured by Trident; and was of a tri-deck design.   In the worksheet, PGG also represented that the yacht would be crewed by six persons, including a full-time captain, first-mate and engineer (Px. 166).

In the application, PGG also requested navigational limits for the East Coast of the United States and Eastern Caribbean, not south of Grenada.   The Eastern Caribbean is an extended navigational limit which, in part, represented that the GIGI would be transiting in open waters outside of coastwise navigational limits (O'Sullivan, Tr. 1017-18).   By requesting extended navigational limits, PGG was representing that the GIGI was fit for open ocean cruising.   The application also indicated the possibility that the yacht would be chartered out for up to eight weeks (Px. 166).   By providing this information, PGG was representing that the vessel was suitable for chartering.[21]

As noted earlier, PGG's application misrepresented that the yacht was manufactured by Trident.[22]   The yacht was not fully manufactured by Trident.   The yacht was only 25% complete at the end of January, 1999, when Trident filed for bankruptcy (Hains, Tr. 808-09; Px. 60, 76 at 4).   From February, 1999 through June, 1999, at best, Trident was jointly constructing the yacht with Naval Consulting Services, Inc., retained by SQI/Lovell (Moore, Tr. 2168-69, 2285, 2287) and from

---

[20] *Christiania General Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992); *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 992 F.Supp. 278, 282 (S.D.N.Y. 1998).

[21] This representation is belied by the A-1 survey report (Px. 100).

[22]   *See Commercial Union v. Lord*, 2007 WL 841621 (2d Cir. 2007)(holding that material misrepresentations in policy application concerning the vessel manufacturer violated the insured's duty of utmost good faith and the insurer bore no responsibility to infer the truth or to further investigate the situation).

15

June, 1999, Trident had no further involvement with the construction of the GIGI (Moore, Tr. 2287). It is undisputed that two of the most glaring deficiencies in this yacht -- the lack of watertight integrity of the garage doors and the low placement of the engineroom exhaust vent only some 4½ feet above the waterline -- were designed and manufactured after Trident (Moore, Tr. 2335, 2338). Further, the installation of a false bow to attempt to fix the bow-down trim problem was accomplished under Moore's supervision (Moore, Tr. 2296-97).  Finally, the inherent instability of the GIGI was only discovered after Trident's involvement (Moore, Tr. 2299-2300, 2308).   The attempted corrective measures were not performed until January, 2002, with the installation of the lead keel by Megayacht Services (Moore, Tr. 2310-12; Dx. SSSS).

If Federal's underwriters had known the yacht was not manufactured by Trident, no quote would have been issued by Federal and the Policy would have not been bound or issued (O'Sullivan, Tr. 1033-34).  The materiality of the misrepresentation concerning the identity of the manufacturer is demonstrated by Federal's list of manufacturers which rates manufacturers on a scale of "A" to "D". Based on Federal's experience with Trident from insuring other Trident yachts without any problems (O'Sullivan, Tr. 1012, 1014-15), Trident was rated as an "A" or "B" manufacturer (O'Sullivan, Tr. 1012).

At the time of the application, the Patton survey had been completed with the exception of the haul out (Px. 179 at 1).  On November 22, 2005, Chamberlain prepared and presented to Ashkenazy a "survey review for FULL BLOOM" (Px. 93; Chamberlain Tr. 1779-80).  The survey review noted that the bulkheads were not watertight (Px. 93 at 4, Item 21).  Despite having significant information concerning the yacht's build history and deficiencies prior to making the application, none of these items were disclosed on the application, except for innocuously advising that a survey was available (O'Sullivan, Tr. 1038-39; Capiga, Tr. 1157).

As noted above, at the time of the application PGG knew that there was extensive litigation between Lovell/SQI and Trident and Trident's insurer which delayed the completion of the yacht (which as originally scheduled for 1997 launch) until 2001 (Px. 91).  Ashkenazy was also aware that the naval architect, Sergio Cutalo, had questioned the actual stability of the yacht while under construction (Px. 91).  However, these facts were not revealed to Federal's underwriters in the application or otherwise disclosed (O'Sullivan, Tr. 1038-39, 1046; Capiga, Tr. 1157, 1164, 1170).

At the time of the application, the Patton surveyors, PGG's agents, were aware of questions involving the longitudinal structural integrity of the GIGI as noted in the Barbieto plans which were presented for their review during the survey (Moore, Tr. 2319-21).  They were also aware of the June 4, 2001 Barbieto memorandum which set forth draft readings evidencing, a bow-down trim problem (even after the installation of the false bow) and warning that severe wind or sea conditions could require additional ballast even after the installation of the lead keel (Moore, Tr. 2315-16, 2348; Dx. SSSS).  Again, none of these facts concerning the trim and stability problems with the GIGI were ever revealed in the application or otherwise disclosed to Federal's underwriters (O'Sullivan, Tr. 1046; Capiga, Tr. 1164, 1170).

On December 1, 2005, Chamberlain retained the services of A-1 Marine to determine what was required to allow PGG/Ashkenazy to charter the GIGI (*See* Px. 166 at 2).  On December 2, 2005, A-1 Marine reported that the GIGI required an incline experiment and noted, in bold, the information contained in the Barbieto drawings questioned the vessel's structural integrity (Px. 100). This material information was never provided to Federal's underwriters prior to their quoting, binding, and issuing the policy or even prior to the capsizing (O'Sullivan, Tr. 1046; Capiga, Tr. 1164, 1170).

After the close of business on December 12, 2005, PGG finally forwarded to the Kelly

Agency a copy of the Patton Report and Recommendations (Px. 179, 180).  However, Kelly had already issued a binder to PGG's maritime attorney in Florida and to KeyBank, which allowed the purchase of the yacht to proceed on December 13, 2005.  Kelly only actually received and saw the Report and Recommendations after the inception of the policy at 12:01 am on December 13, 2005 (Kelly, Tr. 927-28).

As part of the sale closing, PGG, with the consent of KeyBank, granted SQI 90 days after the closing to comply with the Patton Recommendations (Px. 106).  Further KeyBank granted PGG 120 days to complete most of Patton's safety recommendations (Px. 143) (Item 34).  If these extended repair windows had been disclosed to Federal's underwriters, the yacht would have been placed on port risk only cover, which would have precluded the yacht from leaving port until all the recommendations were remediated and Federal received confirmation that the repairs were completed (O'Sullivan, Tr. 1053).

**PGG BREACHED THE ABSOLUTE
IMPLIED WARRANTY OF SEAWORTHINESS**

The absolute implied warranty of seaworthiness[23] requires that a vessel be, in every respect, fit to encounter the normal hazards of maritime travel at the time insurance is procured.[24]  The purpose of the implied warranty of seaworthiness is to protect lives.  If a vessel is unseaworthy, people may die.[25]  The imposition of this warranty is justified because the insured is in the best position to know both the condition and the intended use of the vessel during the period of

---

[23] "Seaworthiness is a relative term.  '[I]t expresses a relation between the state of the ship and the perils it has to meet in the situation it is in.'  It is the fitness in design, structure and condition to perform the task for which the vessel is [intended]."  *Neubros Corp. v. Northwestern Nat'l Ins. Co.*, 359 F.Supp. 310, 316 (E.D.N.Y. 1972)(citations omitted).

[24] *The CALEDONIA*, 157 U.S. 124, 131 (1895).

[25] *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422 (5th Cir. 1992), *cert. denied*, 510 U.S. 813 ("The warranty is intended to take 'away all temptation to expose life and property to the dangers of the seas in vessels not fitted to encounter or avoid them.").

insurance.[26]

The warranty of seaworthiness is implied in every marine insurance policy.[27]  Federal courts have consistently held that the protection of maritime commerce:

> [C]annot be fully vindicated unless all operators of vessels on navigable waters are subject to uniform rules of conduct.  The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial.[28]

Any suggestion that the warranty does not apply to pleasure craft is based upon inapplicable state authority that is inconsistent with current admiralty jurisprudence.

Moreover, the warranty of seaworthiness is implied at the moment the policy attaches[29] and is an absolute and non-delegable duty owed to the insurer which encompasses the integrity of the vessel's physical structure, as well as its equipment and working procedures.[30]  The insurer does not need to demonstrate that the insured had knowledge or was somehow at fault in not discovering the unseaworthy condition.  It is enough that the vessel was not seaworthy at the time the policy attached.[31]

---

[26] *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1067 (S.D.N.Y. 1997).

[27] *The CALEDONIA*, 157 U.S. at 132.

[28] *Sisson v. Ruby*, 497 U.S. 358, 367 (1990)(emphasis added).  *See also*, *Ronalds v. Leiter*, 109 F. 905, 907-08 (2d Cir. 1901)(stating that the insurance policy was presumptively avoided because the yacht, which was chartered for a pleasure cruise, was unseaworthy); *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 9 (1st Cir. 2001)(insured breached implied warranty of seaworthiness due to faulty equipment aboard sport fishing yacht).

[29] *Wausau*, 978 F.2d at 1431; *Continental*, 952 F.Supp. at 1067.

[30] *Reliance Nat'l Ins. Co. v. Hanover*, 246 F.Supp.2d 126 (D.Mass. 2003 (citing *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir. 2001)).

[31] *The CALEDONIA*, 157 U.S. at 131 (holding that if the vessel is unseaworthy at the time the policy attaches, there is no contract of insurance because the policy was wholly void); *Wausau*, 978 F.2d at 1436; *Certain Underwriters at Lloyd's v. Johnston*, 124 F.Supp.2d 770, 771 (D.P.R. 1999)(holding that an insurance policy will be deemed void where the insured failed to reveal to the insurer that a survey found the vessel unseaworthy and repairs were not performed); *Continental*, 952 F.Supp. at 1068; *Reliance Nat'l*, 246 F.Supp.2d at 136 ("a finding of unseaworthiness is not dependent upon an owner's negligence or fault").

The effect of an insured's breach of the absolute warranty of seaworthiness is that the insurance is voided *ab initio*.  It does not matter whether there is a causal connection between the breach and the damages for which coverage is claimed.[32]  In order to succeed in asserting this implied warranty, the insurer need only demonstrate that the vessel is in fact not seaworthy at the inception of the policy.[33]

PGG relies upon the Patton survey as evidence of seaworthiness (Px. 179, 180).  However, nowhere in the Patton survey is there any statement that the GIGI was "seaworthy" (Riley, Cx. 2 at 173-74).  In fact, Patton conducted a limited survey, not a full condition survey (Connell, Cx. 15 at 76).  Moreover, Patton endorsed the yacht as a "good marine risk" for coastwise waters only (Connell, Cx. 15 at 104-05; Px. 179 at 31).  Riley concurred that Patton's endorsement of the GIGI as a "good marine risk" was conditioned upon her use in coastwise waters (Riley, Cx. 2 at 110).  Although Patton never defines "coastwise"[34] in its report, its surveyor admitted that the USCG requires coastwise vessels to stay within 20 miles of the shoreline[35] (Connell, Cx. 15 at 109-10).

Patton further restricted the vessel's usage to "fair weather cruising"[36] (Riley, Cx. 2 at 117; Px. 179 at 31).  The forecast before the GIGI sailed from Fort Lauderdale on February 4, 2006 called for winds in excess of 20 knots and "rough" seas of 6-8 feet (Raguso, Tr. 596).  This was not the

---

[32] *Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 190 F.3d 26, 32 (2d Cir. 1999)("[C]ompliance with the warranty is a condition precedent to liability [under the contract of marine insurance] and afforded a complete defense irrespective of any question of causation")(quoting *Levine v. Aetna Ins. Co.*, 139 F.2d 217, 218 (2d Cir. 1943) ("If there is any breach of a warranty the policy is null and void and…the underwriters are relieved of their liability notwithstanding the loss is not connected with the breach or the breach is cured prior to the loss.")).

[33] *Wausau*, 978 F.2d at 1428; *Continental*, 955 F.Supp. at 1070 ("a breach of a warranty of continuing seaworthiness, whether express or implied…voids the policy altogether").

[34] The ordinary meaning of the term "coastwise" is "following the coast" or "by way of or along the coast."  *The American Heritage Dictionary of the English Language*, 1982 ed. p. 255.

[35] *See* 46 C.F.R. § 91.10-11.

[36] Under the universally recognized Beaufort Scale winds of 28-33 knots are described as a "moderate gale" and seas of 5-8 feet are described as "rough."

"fair weather cruising" for which the yacht was deemed fit by Patton.  Moreover, the weather/sea conditions encountered by the GIGI were not exceptional.  The USCG helicopter pilot described the nighttime sea conditions as 20-30 foot swells[37] (Cx. 6 at 31).  Another pilot, Mitchell, noted that it is very difficult to estimate wave heights from the air and the helicopter pilot's description was probably "slightly extravagated" (Mitchell, Tr. 661) especially since merely six hours later, the sea conditions at the wreck site were 4-7 foot swells with a 1 foot chop (Mitchell, Tr. 622, 23).  A life-long Bahama resident, Mitchell stated that he has never seen a 30 foot swell dissipate in six hours (Mitchell, Tr. 623).  Indeed, it is not possible for the GIGI to have experienced 30 foot swells because the winds needed to generate that magnitude swell were not present (Raguso, Tr. 604-05; Px. 208).  The more likely explanation is that the 20-30 foot swell actually refers to the maximum wave because it is that wave that the pilot is concerned about hitting the helicopter (Randall, Tr. 1566-57, 1572).

According to Captain Papa, the weather/sea conditions at the time of the casualty were 8-10 foot following seas (Cx. 15 at 51-2) which is consistent with his contemporaneous description of "…a swell in the starboard side 6-8 foot" as recorded in the USCG SAR (Dx. E at 3).  The sea conditions described by Captain Papa are consistent with the expert weather analysis (Raguso, Tr. 568; Px. 208) and these weather and sea conditions encountered are expectable in that area of the Atlantic Ocean in any February (Raguso, Tr. 570-72).  Indeed, Papa has admitted that the weather was not the cause of the sinking (Cx. 15 at 83).

If the GIGI was not fit for use outside coastwise or inland waters (Riley, Cx. 2 at 115), then the vessel was unseaworthy for its intended use.[38]  The request for extended navigation limits in the

---

[37]  Swells are long, rolling, gentle waves upon which vessels ride up and down (Christian, Tr. 2072).
[38]  For example, the prior owner planned to sail the FULL BLOOM across the Atlantic Ocean to the Mediterranean until family considerations intervened (Lovell, Tr. 1650).

application (Px.166) establishes that PGG's intended use of the GIGI was not limited to "coastwise" usage in "fair weather". Likewise, the evidence establishes that the vessel was unseaworthy for open seas sailing at the inception of the insurance Policy due to design defects, non-watertight bulkheads, inadequate bilge pumps, hazardous electrical conditions, and inherent vessel instability.

**Design Defects Created An Unseaworthy Condition**

The GIGI was unseaworthy due to inherent design defects. Specifically, the garage doors were not designed to keep seawater out of the garages, the engineroom exhaust ventilation ducting was too close to the vessel waterline and the megayacht lacked an essential DC powered fuel pump.

The garage doors on the GIGI were not watertight (Lovell, Tr. 1713; Christian, Tr. 2061-62) which allowed seawater to get into the two aft garages (Taylor, Tr. 138). The design was defective because the bottom edges of the garage doors lacked seals and there was a 1" drain hole that communicated directly to the sea (Randall, Tr. 1353; Christian, Tr. 2062; Px. 8A at 462, 693). In effect, the watertight boundary was the interior of the garages, not the hull of the ship (Taylor, Tr. 138; Px. 230 at 20; Px. 8A at 31, 351). The engineroom/garage bulkhead effectively became the "skin" of the ship (Taylor, Tr. 139). This defect could easily have been remedied by installing a rubber gasket along the lower edge of the garage doors and eliminating the drain holes or greatly improving the drain hole capabilities so that any water that entered the garages could freely flow out and not accumulate (Randall, Tr. 1376-77).[39] This design defect was exacerbated by the fact that if there was a problem with seawater leakage into the garages, there was no way of knowing about it, because the crew could not enter the garages while underway (Papa, Cx. 15 at 38). Indeed, the weight of water in the garages during the final voyage caused the engineroom exhaust ducting to be even closer to the waterline (Papa, Cx. 15 at 90).

---

[39] Captain Charles Papa testified that water accumulated in the garages during the voyage because "…the garage was heavy, already full of water." (Cx. 15 at 90).

The engineroom exhaust ducting was too close to the waterline (Papa, Tr. 1506-07; Papa, Cx. 15 at 44; Rese, Cx. 13 at 39) and resulted in a "rather obvious defect"[40] (Randall, Tr. 1347).  The engineroom exhaust exits the aft port side of the vessel approximately 4½ feet above the waterline (Taylor, Tr. 171-72, 175; Moore, Tr. 2158).   By virtue of its low placement, this ducting is a downflooding point[41] on the port side of the vessel (Taylor, Tr. 181).   Internal inspection of the exhaust ducting reveals no features, geometries or arrangements which would prevent seawater from entering through the louvered hull openings, collecting and flowing straight through the fan into the engineroom (Randall, Tr. 1349; Px. 224A at 28, 29, 54-59).   This arrangement too easily allows seawater into the ship under ordinary operational conditions (Randall, Tr. 1377-78) and was, in effect, an open porthole directly into the engineroom from the outside (*Id.*).   In fact, every crewmember witnessed seawater entering the ship via the engineroom exhaust ducting.[42]   Randall reviewed the original construction plans for the vessel and determined that  there were three viable alternatives to remedy this defect, including routing the ventilation ducting up high, inboard on the port side of the vessel and/or making arrangements inside the ductwork to first trap and then drain any water that might enter (Randall, Tr. 1590-91).   Indeed, the engineroom exhaust ventilation ductwork was originally designed to exhaust higher up on the main deck of the vessel, about waist high (Hains, Tr. 889; Px. 67).   Moore admitted that there had been earlier designs for the

---

[40] Although the engineroom exhaust ducting was visible to anyone inspecting the vessel, it was not mentioned in the Patton survey because Riley did not inspect the FULL BLOOM's garages as part of his survey (Cx. 2 at 102).

[41] "Downflooding point" is a point in the watertight boundary of the vessel where, if outside water rises to that point, it can flow into the ship (Taylor, Tr. 223).

[42] "The only part that I saw water coming in myself was from the fan because water splashed in my face" (Papa, Tr. 1474).  The vessel was taking in a lot of water through the port exhaust ventilation ducting because of the list and with every wave, water would pour in through it (Rese, Cx. 13 at 39). Water was coming out of the engineroom exhaust fan sporadically, "like it was being hit by a wave" (Fudge, Cx. 11 at 29).  Gorin also saw water coming in through the engineroom ventilation ducting (Cx. 8 at 58-60).

engineroom exhaust ducting that included a catch basin and drains, but they were not included in the final design (Moore, Tr. 2346-47; Randall, Tr. 1457). PGG's only expert, Michael Christian, did not offer any opinion as to whether the design of the engineroom air exhaust vent was proper, but he did admit his original expert report opined that water from the engineroom exhaust vent flooded the engineroom and led to the capsizing (Tr. 2074).

Another design defect is the absence of a DC powered fuel transfer pump. In the event of loss of AC generators, neither of the two AC fuel transfer pumps would be operational (Taylor, Tr. 216). Moreover, the Alpha Laval purifier, which can provide a constant feed of fuel to the daytank, is also AC powered (Taylor, Tr. 216). However, the GIGI was not equipped with a DC powered fuel pump (Taylor, Tr. 201-02). This is a critical defect because without a DC fuel transfer pump, the crew would be unable to pump vital fuel to the daytank in the event both AC generators fail (Taylor, Tr. 201).

These three design defects made the GIGI unseaworthy at Policy inception on December 13, 2005.

**Unseaworthy Condition of Watertight Bulkhead Penetrations**

Watertight bulkheads prevent water communication between spaces which, if it occurs, can put the vessel at risk (Dolan, Tr. 1230). If seawater enters a vessel and starts migrating between watertight compartments the potential for vessel instability problems is created (Dolan, Tr. 1230-31).

The three critical watertight bulkheads aboard an oceangoing vessel are the forward collision bulkhead and the forward and after engineroom bulkheads (Dolan, Tr. 1266-67). The vessel drawings show that the GIGI was originally designed with these three watertight bulkheads in order to keep water from going from one watertight space into another (Connell, Cx. 7 at 51-55; Dolan, Tr. 1232).

24

Patton concurs that this vessel "…probably should have had watertight bulkheads for the purposes of its construction and design" (Connell, Cx. 7 at 169-76).  However, the Patton survey indicates that there were penetrations and unfilled cut-throughs in all three watertight bulkheads aboard the GIGI.[43]  By virtue of numerous holes[44] in all three watertight bulkheads (Dolan, Tr. 1232-33) when Patton conducted its surveys in November/December, 2005, the vessel did not comply with the naval architect's design (Connell, Cx. 7 at 176-77).

Among the numerous holes in all three watertight bulkheads, Federal focuses upon these specific bulkhead penetrations:  (1) The I-beam penetration through the aft engineroom bulkhead; (2) A 1⅝" "mousehole" through the aft engineroom/garage watertight bulkhead; and (3) Engineroom forward bulkhead penetrations.

The opening in the aft engineroom bulkhead around the I-beam would allow water to communicate from the port garage into the engineroom (Taylor, Tr. 150; Px. 8A at 428).  During Papa's tenure aboard the GIGI[45] the rail (I-beam) was never changed in the port garage (Papa, Tr. 1505).  Moreover, "new rails for the jet skis in the port garage" were never installed (Papa, Tr. 1504).  The engineer noted that "for some reason or other, when they built the boat, that I-beam actually protruded through the [aft engineroom/garage] bulkhead" (Rese, Cx. 13 at 42).  Indeed, a continuing lack of watertight integrity in the aft engineroom bulkhead existed at the time of the February 4th voyage as evidenced by water leaking through this I-beam penetration (Cx. 13 at 41-2; Cx. 11 at 35-6; Px. 8A at 420, 426-28).

---

[43] The Patton Marine recommendation provides in pertinent part:
>    According to drawings, there are three watertight compartments on the yacht.  All watertight bulkheads (forepeak, forward and aft engineroom) have been compromised by plumbing penetrations and unfilled cut-throughs.  Verify a proper seal at all penetrations on both sides of these bulkheads.  (Px. 180 at 2).

[44]  The Patton Recommendations refer to 60-70 penetrations in the watertight bulkheads (Moore, Tr. 2206).

[45] Charles Papa was hired by Ashkenazy just before the vessel closing (Tr. 1496).

In addition to the I-beam penetration, there was a 1⅝" round hole -- commonly referred to as a "mousehole" -- through the aft engineroom/garage watertight bulkhead  (Px. 8A at 420-21, 441-42, 640, 678).   It is not common to have any bulkhead penetrations like a mousehole into the engineroom (Taylor, Tr. 149).  In addition to being uncommon, the mousehole was very difficult to see from the engineroom (Taylor, Tr. 151; Px. 8A at 402).  This is why the engineer told Taylor that he had never seen the mousehole before and did not know its purpose (Taylor, Tr. 269-70). Notwithstanding Moore's testimony concerning a plug for that mousehole, there was no plug in the port garage mousehole at the time of vessel delivery on December 13, 2005 (Papa, Tr. 1512). Moreover, utilizing a rubber plug is not an industry standard or acceptable closure for making a bulkhead watertight (Dolan, Tr. 1238-39).

SQI was responsible to repair the bulkhead penetrations referenced by Patton (Lovell, Tr. 1731).  Expandable foam was utilized in an effort to repair some 80% of the bulkhead penetrations sighted by Patton[46] (Chamberlain, Tr. 1765; Px. 119).  However, expandable foam is not the correct way to seal a watertight bulkhead penetration (Dolan, Tr. 1253-54) and would not be considered a permanent repair (*Id.* at 1239).   PGG's representative never verified these alleged repairs (Chamberlain, Tr. 1765, 1775) and Patton was never requested to return to the vessel in order to verify proper repair of these bulkhead penetrations (Riley, Cx. 2 at 118-9; Connell, Cx. 7 at 119-20).

PGG's claim that the GIGI was seaworthy at policy inception is premised upon the mistaken belief that all the Patton Recommendations had been complied with prior to closing (Christian, Tr. 2092-93).  In fact, the Patton Recommendation items were not "completed" until about six weeks after the delivery of the boat (Moore, Tr. 2214).  Moreover, the vessel acceptance documents (Px. 106, 107) establish that the deficiencies sighted by Patton were not fixed before the sale of the vessel

---

[46] Anything less than 100% repair of the bulkhead penetrations would render the vessel unseaworthy.

on December 13, 2005.  Indeed, this is why SQI negotiated a 90-day, post-sale, repair window (Chamberlain, Tr. 1777; Px. 106) and also left the previous engineer aboard the vessel in order to continue working on the Patton Recommendations (Papa, Tr. 1511; Cx. 15 at 22).

The engineroom forward watertight bulkhead also suffered from non-watertight penetrations below the deckplate level (Taylor, Tr. 194-95).  The salvor confirms that there were 4-5 pipes which penetrated the engineroom forward bulkhead below the deckplate that were not properly sealed because air space was visible surrounding this piping (Darville, Tr. 501-02).  These penetrations in the engineroom forward bulkhead created an unseaworthy condition (Randall, Tr. 1400-01) which existed at the time of vessel construction (Darville, Tr. 502).

The effect of non-watertight bulkheads is that there was full and open communication of water between all compartments which rendered the GIGI unseaworthy (Dolan, Tr. 1233).  This is significant because when an unseaworthy vessel puts to sea, it could sink and the crew could lose their lives (Dolan, Tr. 1231).

**<u>Inadequate Bilge Pumps Created An Unseaworthy Condition</u>**

All vessels are designed and fitted with a means to pump out bilges to remove unwanted water which can cause electrical shorts, flooding and loss of vessel stability (Px. 209 at 6).  Patton recommended that automatic float switches be installed on the three engineroom DC bilge pumps and their capacities increased (Riley, Cx. 2 at 89-90; Px. 180 at 2).  Automatic float switches allow the bilge pumps to turn on and off automatically when water reaches a pre-set level (Connell, Cx. 7 at 63-4).  Generally, automatic float switches are put on battery operated bilge pumps when the engineroom is not manned (Riley, Cx. 2 at 89-90).  Automatic bilge pumps are necessary in an unmanned engineroom such as on the GIGI (Riley, Cx. 2 at 65; Px. 209 at 6).  However, Moore made the determination that automation of the manual DC bilge pumps was not necessary and it was

not done (Tr. 2205; Chamberlain, Tr. 1765-66).

In addition, at the time of the Patton survey, four bilge pumps on the vessel were inoperable and the three engineroom DC bilge pumps were only capable of manual operation (Px. 209 at 6). This lack of bilge pumping capability renders the GIGI unfit to go to sea and therefore unseaworthy (Dolan, Tr.1243; Px. 209 at 6).

**Hazardous Electrical Conditions Made The Vessel Unseaworthy**

Electrical conditions aboard a vessel can constitute an unseaworthy condition.[47]

Chamberlain retained Ward's Electric to conduct a electrical inspection of the GIGI. Patton did not know whether Ward's found any electrical hazards aboard the vessel (Connell, Cx. 7 at 137). Following the electrical inspection, Ward's prepared a handwritten worklist for the vessel in which "Item[s] with an X are most likely hazzard [sic] items" (Px. 128 at 1); 18 of the 37 items were annotated by Ward's with an "X", (Px. 128). The term "hazard" means more important than other items and would be considered something dangerous (Albers, Cx. 14 at 138-39) which were potentially physically hazardous to people or possibly hazardous to the vessel itself (Albers, Cx. 14 at 31-2).

Utilizing the worklist, Ward's prepared an estimate for necessary electric repairs to the vessel (Px. 131). The Ward's estimate accurately described what needed to be repaired aboard the GIGI (Albers, Px. 14 at 167). Although it would cost only $22,000.00 in order to correct the Ward's survey items (Chamberlain, Tr. at 1763) Ward's was never requested to perform the necessary

---

[47] *See Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers, Ltd.*, 190 F.3d 64, 68 (2d Cir. 1999)(vessel unseaworthy due to jury-rigged electrical system); *Magnifico v. CS Global Mariner Ltd.*, 2000 WL 23244 (S.D.N.Y. 2000)(factual issue existed regarding whether vessel unseaworthy due to charged electrical cable that injured mate); *Atlantic Ridgefield Co. v. Interstate Oil Trans. Co.*, 1985 WL 529, (S.D.N.Y. 1985)(barge rendered unseaworthy due, in part, to non-marine approved electrical appliances and uninspected lighting system); *In Re Johnson*, 2006 WL 38043 (S.D.Ala. 2006)(defective wiring can constitute unseaworthy condition).

repairs set forth in its estimate (Albers, Cx. 14 at 161).   These unrepaired hazardous electrical conditions made the GIGI unseaworthy at the time of Policy inception.

**Vessel Instability Created An Unseaworthy Condition**

Sergio Cutalo was the hull designer[48] for a 2½ deck raised pilothouse motoryacht, without aft garages, named the LADY FLORENCE (Hains, Tr. 780-82).   Trident later utilized this same hull form for the FULL BLOOM, a tri-deck motoryacht with aft garages (Hains, Tr. 781).   Because of these garages, the engineroom and heavy main engines of the FULL BLOOM were placed further forward than the LADY FLORENCE (Hains, Tr. 832) which moved significant weight forward resulting in two problems: (1) an unacceptable forward trim; and (2) questionable vessel stability (Hains, Tr. 846-47).

These problems caused SQI/Lovell to demand arbitration with Trident.   The arbitration panel, which included Connell, found for SQI because the vessel did not float properly and "it was down by the bow probably two feet" (Connell, Cx. 7 at 56).   The arbitration panel also found that the FULL BLOOM had stability problems (Connell, Cx. 7 at 57-8).   Following Trident's bankruptcy, SQI filed suit against the manufacturer's insurer.   In the ensuing litigation, the Court identified some 82 items on the vessel that were either negligently constructed or defective as a result of Trident's intentional misconduct (Px. 76 at 8-13).

Sergio Cutalo redesigned the bow to create extra buoyancy forward in an effort to correct the ongoing vessel trim problem (Connell, Cx. 7 at 59; Riley, Cx. 2 at 82-3).   Following the addition of the false bow, no further effort was made to correct the trim issue.   In Spring, 2001, Arthur Barbeito conducted an incline experiment to assess ongoing stability issues with the FULL BLOOM.   Significantly, Barbeito's analysis reveals a continuing one foot trim down-by-the-bow (Dx. SSSS

---

[48] The hull design is important because it creates the buoyancy to support the vessel weight and determines the stability characteristics of the vessel (Hains, Tr. 784, 787-88).

at 3).

Barbeito recommended installation of some 13.5 MT of lead ballast in the form of a new keel (Dx. SSSS at 3) which was considered "a lot" (Connell, Cx. 7 at 61).  Adding lead ballast was intended to "stiffen" the vessel and make it "less tender, less rolly" (Riley, Cx. 2 at 83).  The purpose of the addition of the new ballast keel was to meet <u>minimum</u> stability criteria (Lovell, Tr. 1636-37; Dx. SSSS at 3).  Barbeito admitted that, because he did not have the necessary construction drawings,[49] his analysis did not address the "severe wind and rolling criteria" which would require <u>additional</u> ballast (Dx. SSSS at 3).

No further stability analysis was ever performed after the new lead keel was installed aboard the FULL BLOOM (Moore, Tr. 2213, 2184-85).  In order to confirm that the yacht was suitable for open seagoing service as originally designed, A-1 Marine required that an incline experiment be performed and drawings and calculations be provided by a qualified naval architect to show that the structural integrity of the hull was not comprised by the hull modification and the addition of the ballast (Px. 100 at 1, 3).  By virtue of his prior arbitration experience, Connell informed his fellow Patton surveyor, Riley, that the FULL BLOOM suffered from trim and stability problems as a result of her construction (Riley, Cx. 2 at 36).  Indeed, if only a minor amount of water caused the vessel to capsize, then the only explanation is that the vessel suffered from significant stability problems (Taylor, Tr. 307).  Otherwise, a stable and seaworthy vessel would be expected to survive the

---

[49] Barbeito also noted in a plan:

> Due to the fact that there is very little structural information on this vessel, <u>it is not possible to perform a thorough and complete structural analysis to ascertain residual longitudinal strength of the hull</u>….Therefore, Arthur M. Barbeito & Associates cannot assume responsibility for internal structural failure.  (Dx. SSSS at 3)(emphasis added).

unexceptional weather conditions encountered by the GIGI without capsizing[50] (Randall, Tr. 1396-97).

The preponderance of the trial evidence establishes that the GIGI was unseaworthy at the inception of the Policy in breach of the implied absolute warranty of seaworthiness.  This megayacht was designed for the open sea, not merely coastwise service.   However, at the time of Policy inception, the vessel was unseaworthy by virtue of admitted designed defects including non-watertight garage doors, engineroom exhaust ducting that was too close to the waterline and the lack of an essential DC fuel pump.   All the vital watertight bulkheads aboard the vessel were compromised as evidenced by the unsealed I-beam and mousehole penetrations through the aft engineroom/garage bulkhead as well as penetrations in the forward engineroom bulkhead.   The vessel's unseaworthy conditions further included inadequate bilge pumps, hazardous electrical conditions and inherent vessel instability which manifested itself in the loss of the vessel in unexceptional seas.  The uncontroverted evidence establishes that the GIGI was unseaworthy at the time of Policy inception in breach of the absolute implied warranty of seaworthiness.

### PGG BREACHED THE NEGATIVE
### IMPLIED WARRANTY OF SEAWORTHINESS

The negative implied warranty of seaworthiness applies after the attachment of the risk and requires the vessel owner to refrain from allowing the vessel to leave port in an unseaworthy condition.[51]   Under the negative implied warranty, an insured may not knowingly send a vessel to sea in an unseaworthy condition.[52]   To prevail, Federal must establish that: (1) GIGI was

---

[50]  PGG's only expert was unable to offer an opinion on this issue (Christian, Tr. 2114).  Indeed, according to Christian "we may never know exactly what caused the PRINCESS GIGI to go down" (Tr. 2079).

[51]  *See Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957).

[52]  *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1070 (S.D.N.Y. 1997).

unseaworthy; (2) When she sailed from Ft. Lauderdale on February 4, 2006; and (3) PGG/Ashkenazy had knowledge that the vessel was unseaworthy and yet allowed her to sail anyway.[53]  If PGG/Ashkenazy breached the negative implied warranty, they may not recover for any damages proximately caused by the unseaworthy condition.[54]

**Unseaworthy Conditions at the Commencement of the Voyage**

At the time that GIGI sailed from Ft. Lauderdale on February 4, 2006, the yacht was unseaworthy, *inter alia*, due to: (A) Improper design of the engineroom air exhaust vent; (B) Improper design of the non-watertight garages; (C) Lack of watertight integrity of the engineroom bulkheads; (D) Lack of a DC powered fuel transfer pump; and (E) Lack of a properly trained, competent crew.

(A) Improper Design of the Engineroom Air Exhaust Vent:  The engineroom air exhaust vent was a design defect which allowed water to flow into the engineroom (Randall, Tr. 1377-78).  The design was defective because the overboard penetration was too low and there was nothing in the tunnel (such as a catch basin, drains or baffles) to prevent the water from flowing directly into the engineroom (Randall, Tr. 1346-47, 1349).  Moore admitted that there had been earlier designs for the air exhaust tunnel that included a catch basin and drains, but that they were not included in the final design (Moore, Tr. 2346-47; Randall, Tr. 1457).  This design defect rendered the vessel unseaworthy (Randall, Tr. 1395).

Defendants' only expert, Michael Christian, did not offer any opinion as to whether the design of the engineroom air exhaust vent was proper, but he did admit his original expert report opined that water from the engineroom exhaust vent flooded the engineroom and led to the capsizing of the GIGI (Tr. 2074).  However, both Papa and Rese agreed with Randall that the vent was "too

---

[53] *Id.*
[54] *Id.*; *Employers Ins. Of Wausau*, 978 F.2d at 1432.

low" (Papa, Cx. 15 at 44; Rese, Cx. 13 at 39).  Every member of the crew saw water pouring into the

engineroom through the exhaust vent (Papa, Tr. 1474, 1477, 1507, Cx. 15 at 92; Rese, Cx. 13 at 39-

40; Fudge, Cx. 11 at 27-29; Gorin, Cx. 8 at 59-60, 180-81).

(B) <u>Improper Design of the Non-Watertight Garages</u>:  It is undisputed that the garages were

not designed to be watertight (Christian, Tr. 2061-62).  The non-watertight garage doors were

designed defectively, allowing water to accumulate in the garages (Randall, Tr. 1375-76).  The

design was defective because the bottom edges of the garage doors did not have seals and there was

a drain hole in the floor of each garage which allowed water to flow directly into the garages

(Randall, Tr. 1353).  Further, there was no effective means for removing the water that flowed into

the garages (Randall, Tr. 1376).  This design defect rendered the vessel unseaworthy (Randall, Tr.

1395).

The fact that water had accumulated in the port garage on the final voyage of GIGI is

established by the fact that the crew observed water pouring from the garage into the engineroom

through the opening around the I-beam (Rese, Cx. 13 at 41-42; Fudge, Cx. 11 at 35-36) and Papa's

observation that the way the yacht handled indicated to him that the port garage was full of water

(Cx. 15 at 90-91).

(C) <u>Lack of Watertight Integrity of the Engineroom Bulkheads</u>:  The forward engineroom

bulkhead had penetrations on both the port and starboard side.  During the first day of dewatering the

yacht, Ray Darville had to plug the penetration in the starboard forward bulkhead in order to dewater

the engineroom (Darville, Tr. 501-02).  Then, he left the vessel for the night with an idling pump in

the center bilge of the engineroom and was pleasantly surprised when he returned to the vessel the

next morning to find that water had been pumped out of the forward end of the yacht through the

port forward bulkhead penetrations (Darville, Tr. 503-04).

The aft bulkhead had at least three unsealed penetrations; the gap around the I-beam (Taylor, Tr. 147; Px. 8A at 428, 441, 678) and the 1⅝" mousehole (Taylor, Tr. 146, Px.8A at 442, 678) in the way of the port garage and the cable run penetration in the way of the central alleyway bilge (Taylor, Tr. 118, 134-35; Px. 8A at 845, 933).   The crew testified to observing water pouring in around the gap in the I-beam (Rese, Cx. 13 at 41-42; Fudge, Cx. 11 at 35-36).   The mousehole and the cable run penetration existed and had not been permanently sealed.   To be sure, Moore testified that there was an expandable plug available which should be installed in the mousehole when the yacht went to sea (Moore, Tr. 2208).   A typical plug found on the yacht (although too large to fit in the mousehole) was black and yellow, plastic and rubber, with a wing nut (Px. 11 at 175-82).   Papa is the only witness to claim that a plug was in place at the commencement of the last voyage (Tr. 1476); significantly, the mate, who secured the garage in anticipation of the voyage, did not say anything about installing a plug (Fudge, Cx. 11 at 19-21).   Further, Papa described it as a white, metal plug (Tr. 1506), just like the one in the starboard garage bulkhead (Tr. 1506).   However, there is no mousehole – or plug – in the starboard garage bulkhead (Taylor, Tr. 167; Px. 8A at 615-17).   Before the last voyage, the crew painted the inside of the port garage (Papa, Tr. 1506; Fudge, Cx. 11 at 14). There are no marks in the paint indicating that a plug was in place in the mousehole during the painting (compare painted area around rectangular opening which had been covered when the paint was applied with painted area around the mousehole in Px. 8A at 677).   Furthermore, there are no signs of scrapes or scratches on the interior or the edges of the mousehole to indicate that the plug had been forced out of the hole.   Finally, Papa and Fudge reported hearing water flowing into the engineroom in the vicinity of the rear bulkhead, but Papa never determined where the water was coming from (Px. 232, sub- exh. marked as Randall Depo. Exh. 17, p. 2; Papa, Cx. 15 at 58-59, 61-62).   When a water test was performed on the mousehole in April 2007, Randall could hear the water

running into the engineroom (Randall, Tr. 1594-95).   The evidence does not establish that the mousehole was plugged at the commencement of the final voyage.   If the hole was not plugged, when the water in the garage was at a level where it flowed through the gap around the I-beam, it would also have flowed through the mousehole (Taylor, Tr. 381).

The penetrations in the engineroom bulkheads made the yacht unseaworthy at the commencement of the voyage (Dolan, Tr. 1233, 1239-40; Randall, Tr. 1400-01).

(D) Lack of a DC Powered Fuel Pump:   The vessel was not equipped with a DC powered fuel pump (Taylor, Tr. 201-02).   This is a critical defect.   Without a DC pump, the crew is unable to pump fuel to the daytank if the generators fail (Taylor, Tr. 201).

(E) Lack of a Properly Trained, Competent Crew:   A shipowner has a non-delegable duty to provide a competent crew for its vessel.[55]   An incompetent crew constitutes an unseaworthy condition.[56]   "[A] vessel crew that is inadequately trained, that is not instructed in the use of the equipment, or that engages in unsafe methods of work, can constitute unseaworthiness."[57]

The crew on board when the vessel sailed on February 4, 2006 had very little familiarity with the yacht.   The captain and the mate had only made one prior short voyage to the Bahamas, with the prior owner's engineer continuing to work on the yacht (Papa, Cx. 15 at 22).   The engineer, the deckhand and unlicensed watchstander Gorin were all serving on their first voyages (Rese, Cx. 13 at 7; Papa, Cx. 15 at 48; Gorin, Cx. 8 at 29).

More critically, Rese, was not a licensed engineer; had no formal training as an engineer (Cx. 13 at 4); and had only signed on for a single trip, and not as a permanent engineer (Cx. 13 at 7).   He

---

[55] *See Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1565 (11th Cir. 1985).

[56] *See Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 517-18 (2nd Cir. 1952).

[57] *Crane v. Diamond Offshore Drilling, Inc.*, 743 So.2d 780 (La. App. 5th Cir. 1999) (citations omitted); *see also Orient Mid-East Lines, Inc. v. S.S. ORIENT TRANSPORTER*, 496 F.2d 1032, 1040 (5th Cir. 1974); *Verdin v. C&B Boat Co., Inc.*, 1986 WL 15241 (W.D. La. 1986); *Ins. Co. of N.A. v. Board of Commissioners*, 733 F.2d 1161 (5th Cir. 1984).

only joined the crew on January 30, 2006, a mere 5 days prior to departure (Cx. 13 at 7).  The prior owner's engineer had already left the yacht so there was no engineer-to-engineer turnover or explanation of the vessel's systems (Cx. 13 at 10).   The time that Rese could devote to his engineering duties was limited because he also stood watches in the pilothouse (Cx. 13 at 8).

Rese was not familiar with the fuel transfer system aboard the GIGI.   Rese had the computank system available to him to monitor the amount of fuel in the daytank (Taylor, Tr. 221).  Additionally, it was possible to use the centrifuge pump in the Alfa Laval purifier to provide a constant feed to the daytank (Moore, Tr. 2360-61).  Instead, Rese made an estimate of the fuel being used and manually replenished the daytank every two to three hours (Rese, Cx. 13 at 30-31; Papa, Cx. 15 at 56, 71-72; Px. 26 at 24).  However, there was no sight glass on the daytank to verify the actual level of the fuel (Rese, Cx. 13 at 30).  Not surprisingly, the GIGI ran her daytank dry (Papa, Tr. 1478-79; Cx. 15 at 97-98; Fudge, Cx. 11 at 33).  Then, Rese failed to replenish the daytank because he was unaware that he could gravity feed the daytank from fuel tanks 7 and 8 (Cx. 13 at 29).

Although Rese observed water pouring into the engineroom from the exhaust vent (Cx. 13 at 39), he had never been trained that there was a manual release on the fire damper in the exhaust duct. Therefore, he never closed the fire damper.

In summary, Rese was not trained or licensed as an engineer and he was never provided proper instructions on the systems aboard GIGI to off-set this shortcoming.

Gorin, who previously worked on another yacht with Papa as a hostess (Cx. 8 at 11), was hired to work aboard GIGI as an unlicensed watchstander, despite having absolutely no watchstanding training (Cx. 8 at 17-18, 25).  Papa did not provide Gorin with any training in either watchstanding or radar observation (Cx. 8 at 34) and he never conducted any onboard training, such

as fire, flooding, lifeboat or abandon ship drills (Gorin, Cx. 8 at 38-39). The watches aboard GIGI were completely disorganized (Gorin, Cx. 8 at 26, 30); Gorin never stood watch with the same person twice (Cx. 8 at 26, 31-33). Indeed, her second watch was with the cook, another unlicensed watchstander (Cx. 8 at 32-33). Moreover, the three watches were organized on three hour shifts (Gorin, Cx. 8 at 27; Papa, Cx. 15 at 37), rather than the normal four hours.[58] This leads to sleep deprivation issues because the crew members cannot establish a consistent sleep routine.

**PGG/Ashkenazy Had Knowledge of the Unseaworthy Conditions**

Ashkenazy hired Chamberlain Yachts to assist him with the purchase of the GIGI (Ashkenazy, Tr. 2405, 2429, 2439, 2442-43; Chamberlain, Tr. 1742). Chamberlain arranged for the yacht to be surveyed by: Patton (Chamberlain, Tr. 1794-95); Ward's (Tr. 1760); Griffin (Tr. 1756); and A-1 Marine (Tr. 1760); forwarded all the survey reports to Ashkenazy (Chamberlain, Tr. 1756, 1760, 1770, 1803); and made sure to explain the reports to him (Tr. 1803). Significantly, PGG gave the prior owner 90 days to comply with many of the Patton recommendations (Px. 106, ¶3) and obtained from KeyBank a 120-day window to correct all but 5 of Patton's safety recommendations (Kline, Cx. 3 at 23-24), instead of the normal 30 days (Px. 151 at 11, ¶34).

PGG/Ashkenazy hired Papa and delegated to him the responsibility for hiring the balance of the crew (Ashkenazy, Tr. 2444; Papa, Tr. 1493) and for maintenance and upkeep of the vessel (Ashkenazy, Tr. 2445). Papa hired Rese to serve as the engineer, even though he never asked to see Rese's alleged engineering license (Papa, Tr. 1494) and he did not know if Rese had ever served as an engineer on a boat like GIGI (Papa, Tr. 1494). As PGG delegated authority to Papa to make decisions for the corporation, his lack of due diligence in hiring Rese to serve as the engineer and

---

[58] There are 6 four-hour watches in a 24-hour period. Therefore, each of the three watches stands two shifts a day, always at the same time. However, there are 8 three-hour watches in a 24-hour period, which means that two of the three shifts will stand three watches in a 24-hour period and the time on watch is constantly shifting.

any failure on Papa's part in properly maintaining the vessel is imputed to PGG.[59]  In any event, Papa advised Ashkenazy of everything aboard the yacht (Cx. 15 at 23-4).

The improper location of the engineroom air exhaust vent was immediately visible to anyone looking at the yacht (Randall, Tr. 1345).  Indeed, Papa admitted that the exhaust vent was too low to the water (Cx. 15 at 44), as did Rese (Cx. 13 at 39).  Papa knew that the garage doors were not watertight (Cx. 15 at 90).  Papa also knew that the crew was inexperienced on the vessel (Cx. 15 at 18) and that the engineer had not had a proper engineer-to-engineer turnover of the yacht.  He was familiar with the equipment on the boat, having been shown around by the prior owner's engineer (Papa, Tr. 1497), and he knew they could not transfer fuel once the generators went off line (Papa, Cx. 15 at 61), so he knew that there was no DC fuel pump.  Further, he knew that Rese was not using the computank system to monitor the fuel in the daytank and was not using the centrifuge pump in the Alfa Laval purifier to maintain a constant feed to the daytank because Papa was personally participating in the manual transfer of fuel to the daytank (Papa, Tr. 1509; Cx. 15 at 56).

Most importantly, Papa admitted to the rest of the crew that the GIGI was not ready to sail, but the owner told him to get to St. Maarten so the sailing schedule was set (Gorin, Cx. 8 at 106-07).  Papa also admitted to Mitchell that he had advised Ashkenazy that there were problems with the systems aboard the yacht and that more repairs were required before she should sail from Ft. Lauderdale (Mitchell, Tr. 622).  However, Ashkenazy insisted that the yacht sail so as to arrive in St. Martin by the scheduled time (Mitchell, Tr. 622) to meet the Ashkenazys because their children were only off from school for President's Week (D. Ashkenazy, Tr. 2396).  Papa now denies that he ever had such a conversation with Mitchell (Tr. 1489-90) and further denies Gorin was even a

_____

[59] *See, e.g., Continental Oil Co. v. Pennzoil Corp.*, 706 F.2d 1365, 1377 (5th Cir. 1983) (knowledge of the master, who was delegated general management of the vessel, was imputed to the corporate owner).

crewmember (Tr. 1495).  However, the conversation took place within hours of Papa abandoning his vessel at the time when he would be understandably upset and needed to talk to someone.  When Papa needed a reference for possible future employment who could explain that the capsizing was not the fault of the captain/crew (Tr. 1490), he approached Mitchell for the reference because PGG/Ashkenazy would not give him one (Papa, Tr. 1490).  How would Mitchell have known that if he was not told by Papa?  Furthermore, Mitchell has no motivation to fabricate such a story; on the other hand, Papa, who as recently as December 2006 had been a guest of Ashkenazy aboard another vessel Ashkenazy was considering purchasing or chartering (Papa, Tr. 1485-86), has every reason to try to assist his former employer, especially if he wanted Ashkenazy to reverse his position and actually give Papa a recommendation for future employment (Papa, Tr. 1490).[60]

The events aboard the vessel verify the accuracy of the condition of the yacht as Papa described them to Mitchell and Gorin.  While the yacht was still in sight of the Florida coast, Rese had a heated argument with Papa about returning to port (Gorin, Cx. 8 at 46-47, 49).  In a voyage that lasted only some 36 hours, the yacht suffered stabilizer problems and the steering gear malfunctioned due to a faulty cooling pump (Rese, Cx. 13 at 10-11; Gorin, Cx. 8 at 43-45).  Indeed, the watches were "constantly disorganized because of alarms of all kinds" (Gorin, Cx. 8 at 53).

Papa, and Ashkenazy, knew about the unseaworthy conditions aboard the yacht before she sailed from Ft. Lauderdale.

**Proximate Cause of the Capsizing**

The proximate cause of the capsizing was the accumulation of water in the port garage and the flooding of the engineroom (Randall, Tr. 1341) which resulted from the unseaworthy conditions

---

[60] Papa demonstrated his willingness to lie to assist PGG/Ashkenazy.  Because he thought the insurance only covered a 6 person crew (Gorin, Cx. 8 at 92), he told two of the 8 crew members on the yacht to tell the authorities that they were only passengers (Gorin, Cx. 8 at 91-92) and that is what he told Federal (Valcourt, Tr. 1927; Px. 26 at 21-22).

caused by the design defects in the engineroom air exhaust vent and the lack of watertight integrity in the garage doors (Randall, Tr. 1395).   The accumulation of water in the port garage had two significant effects on the capsizing.   First, the accumulated water poured into the engineroom through the penetrations in the bulkhead, contributing to the flooding of that compartment (Papa, Tr. 1474, 1477, 1507, Cx. 15 at 92; Rese, Cx. 13 at 39-40, 41-42; Fudge, Cx. 11 at 27-29, 35-36; Gorin, Cx. 8 at 59-60, 180-81).   Second, the accumulation added to the port list, which in turn caused the exhaust vent overboard opening to be closer to the water and more susceptible to the ingress of water.[61]

The engineroom compartment was flooded by water from the exhaust vent and the penetrations in the aft bulkhead of the engineroom in way of the port garage (Randall, Tr. 1341-42, 1350, 1350-52; Taylor, Tr. 381, 382-83; Christian, Tr. 2074-75, 2088).   The crew testified to water pouring into the engineroom from these sources (Papa, Tr. 1474, 1477, 1507, Cx. 15 at 92; Rese, Cx. 13 at 39-40, 41-42; Fudge, Cx. 11 at 27-29, 35-36; Gorin, Cx. 8 at 59-60, 180-81).

At various times, PGG has suggested other sources for the water flooding into the engineroom.   However, investigation eliminated the:  AC bilge priming line (Taylor, Tr. 45-46; Tr. 363; Randall, Tr. 1358-59, 1364); Main engine cooling system siphon pipe (Taylor, Tr. 366-67; Randall, Tr. 1365; 1367-68); Shaft seals (Taylor, Tr. 269-70; Randall, Tr. 1373); Surface crack in the main engine low pressure exhaust pipe (Taylor, Tr. 95-96; 368-69; Randall, Tr. 1370); Cracks in the hull (Randall, Tr. 1354 ; Taylor, Tr. 42); Leaking porthole (Randall, Tr. 1374-75); Backed-up shower drain (Randall, Tr. 1375); and Collision with the cargo ship (Randall, Tr. 1355-58; Papa, Tr. 1481-82); as possible sources of flooding into the engineroom.

The penetrations in the forward bulkhead also contributed to the capsizing.   Water pouring

---

[61] In contrast, PGG's only expert opines "we may never know exactly what caused the PRINCESS GIGI to go down" (Christian, Tr. 2079).

into the engineroom from the port garage and the engineroom exhaust vent accumulated in the port bilges, and only set off the high water alarm in the center bilges when the accumulated water was sufficient to slop over the stringers between the port and center bilges.  However, because of the penetrations in the forward bulkhead of the engineroom, the accumulating water was allowed to flow forward out of the engineroom before rising to the level where it would spill into the center bilge (Randall, Tr. 1596-97).   Therefore, the amount of water collected was much greater than comprehended by the crew, contributing to a greater port list of the vessel bringing the overboard for the air exhaust vent closer to the waterline.

Federal rejects PGG's contention that the collision with the cargo vessel severely damaged the yacht, contributing to the casualty.  The contact was apparently so minimal that no member of the crew mentioned it during their examinations under oath taken just three days after the capsizing (*see* Papa, Cx. 15; Rese, Cx. 13; Fudge, Cx. 11).  Indeed, even at trial Papa denied that there was a serious collision between the cargo vessel and the yacht (Tr. 1481-82).  The pictures of the yacht taken that morning laying over with her starboard side up do not show any structural damage (Randall, Tr. 1355-56; Px. 8A at 12, 37, 40).  Indeed, they do not show any signs of rust which would have rubbed off the side of the cargo ship if there had been a significant contact (Randall, Tr. 1355).  Further, the reported contact was up high, well above the waterline, and would not have caused flooding (Randall, Tr. 1357-58).  In any event, any leak in the hull would have been forward of the engineroom.  Therefore, it could not have contributed to the flooding of the engineroom, and the ultimate capsizing of the yacht, if the penetrations in the forward bulkhead had not allowed the water to flow back to the engineroom.

Federal also rejects PGG's contention that loss of power was a cause of the capsizing (Randall, Tr. 1396-97, 1410; Taylor, Tr. 383).  However, if the Court accepts that the loss of power

was a cause of the capsizing, then the lack of a DC powered fuel pump was a contributing cause. Even after the generators failed because the daytank ran dry, a DC pump would have allowed the crew to replenish the daytank (Taylor, Tr. 201) and be in a position to restart the generators and the main engines.  Thus, this unseaworthy condition is a contributing cause of the capsizing.

Similarly, the fact that the daytank ran dry was not the result of negligence, but rather the lack of proper training (i.e. incompetence) of Rese.[62]  He did not have proper training in the fuel transfer system; therefore he did not use the computank system to monitor the level of the fuel in the daytank; and did not use the centrifuge pump on the Alfa Laval to constantly feed fuel to the daytank. Further, he did not know that he could have replenished the daytank by gravity feeding fuel from tanks 7 and 8 (Rese, Cx. 13 at 29, 32).

Finally, there is no evidence that Rese was trained that the fire damper in the engine air exhaust duct could be manually closed from outside the engineroom to stop the flooding through the exhaust vent.  However, if the court finds that Rese was competent, then his failure to close the damper was not negligence.  He was *in extremis*, and overlooking the fire damper does not rise to the level of negligence,[63] particularly when there would have been no way to re-open the fire damper if the main engines were re-started (Taylor, Tr. 379, 387).

The design defects in the garages and engineroom air exhaust vent made the vessel

---

[62] A seaman who does not know what to do because he is not properly licensed or trained is incompetent.  A seaman who knows what to do but does not do it is negligent.  *See Mullett v. Sabine Transp. Co.*, 2004 WL 1381240 (D.Mass. 2004).

[63] "[T]he judgment of a competent sailor cannot be impugned."  *The OREGON*, 158 U.S. 186, 204 (1895); *see also In re Seaboard Shipping Corp.*, 449 F.2d 132, 137 (2d Cir. 1971) (an error made *in extremis* is not chargeable as fault); *The NORDPOL*, 84 F.2d 3, 5 (2d Cir. 1936) (same).  Instead, "[t]he question of negligence must be resolved in the light of the circumstances, and 'when faced with an emergency, negligence does not flow from mere errors in judgment.'" *M.P. Howlett, Inc. v. Tug MICHAEL MORAN*, 425 F2d 619, 623 (2d Cir. 1970) (citations omitted).  "The standard of judging the exercise of prudent seamanship [*in extremis* is] tempered by the requirement for decision under difficult, abnormal circumstances and the error, if there [is] error, [is] not negligence." *Id.*

unseaworthy (Randall, Tr. 1395).   Papa, and therefore PGG/Ashkenazy,[64] was aware of these conditions, but the yacht sailed from Ft. Lauderdale anyway, breaching the negative implied warranty of seaworthiness.   Since these unseaworthy conditions were the proximate cause of the capsizing (Randall, Tr. 1341), PGG's claim under the Policy was properly denied by Federal.

**PGG HAS FAILED TO SUSTAIN ITS
BURDEN OF PROOF UNDER THE ALL RISK POLICY**

Under an all risk policy, the insured bears the burden of proving that a loss was fortuitous (unforeseen and unanticipated).[65]   To sustain its burden, an insured must prove that the loss did not result from an inherent defect, ordinary wear and tear, or intentional misconduct.[66]

PGG has failed to establish two of the three necessary elements for recovery under the Federal yacht policy, which is in the nature of an "all risk" cover.   To effect recovery under this form of insurance policy, PGG must establish that the subject matter was: (1) In good order and condition at the time of the Policy attachment; (2) Damaged during the Policy period; and (3) The cause of loss was fortuitous.[67]   Under the facts proven at trial, PGG cannot establish that the GIGI was in good order on the date of attachment as demonstrated by reason of her unseaworthy condition for the intended open ocean cruising.   This is proven by, *inter alia*, that the capsizing was a result of inherent defects in the seaworthiness of the GIGI; was not a result of any fortuitous event including, but not limited to, the alleged vessel collision, loss of power and/or the ingress of water from something other than the unseaworthy conditions which have been previously discussed.

PGG attempts to establish the good order of the yacht at the inception of the Policy by the

---

[64] *Continental Oil Co.*, 706 F.2d at 1377.
[65] *See Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 307 (2d Cir. 1987); *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980).
[66] *See Youell v. Exxon Corp.*, 48 F.3d 105, 110 (2d Cir. 1995); *Ingersoll*, 829 F.2d at 307; *Continental Ins. Co. v. Lone Eagle Shipping Ltd.*, 952 F.Supp. 1046, 1060 (S.D.N.Y. 1997).
[67] *Formosa Plastics Corp. v. Arthur Collwyn Sturge*, 684 F.Supp. 359, 365 (S.D.N.Y. 1987).

alleged uneventful history of the yacht as she cruised between 20,000 and 30,000 miles, including a coastwise roundtrip from Florida to Alaska.  In the first instance, any cruising on the original bottom (without the lead keel) between her launch/completion in 2001 and the installation of the new lead keel in January, 2002, must be discounted because she was operating under very restricted sailing conditions, requiring her to cruise with a minimum of 4,200 gallons of fuel to prevent her from capsizing (Lovell, Tr. 1700-01; Px. 47; Dx. SSSS).  No reasonable finder of fact can find the vessel to be in good order while sailing under such restrictions, which effectively reduced her overall sailing range by at least 50% (Lovell, Tr. 1700-01).  It should also be noted that during these limited cruises the vessel remained coastwise or within 3 hours sailing time of a port of refuge and was principally used for daytime cruising between ports (Lovell, Tr. 1701-02).

After the installation of the lead keel, the vessel cruised to Alaska but, again, was piloted on a coastwise path, staying within 50 miles of the coast with one minor exception (Lovell, Tr. 1701-03, 1707).  In addition, there was no report of the vessel having encountered any kind of sustained, severe weather conditions (Lovell, Tr. 1706-07) in following seas such as that encountered on the final voyage (Raguso, Tr. 565-67).  Importantly, an experienced crew would know how to load the yacht's consumables, i.e. fuel and freshwater, to temporarily correct the deficiencies in both trim and stability (Moore, Tr. 2350).  Nonetheless, after the yacht's return from the Alaska trip, additional lead was placed in the engineroom under the starboard shaft (Moore, Tr. 2178-79) presumably to further compensate for the port list, and the boat was almost immediately listed for sale.

As is customary, the yacht was not used much after being listed for sale (Moore, Tr. 2180-81).  To the extent the yacht was used after the Alaska trip, she cruised on day trips to the Bahamas, between southern ports of Florida or for dinner cruising (Lovell, Tr. 2350).  There are no reports that the vessel encountered severe weather during this limited cruising.  Once again, the yacht's inherent

trim and stability problems could be offset by the loading of consumables (Moore, Tr. 2350).

In a last effort to show the yacht to be seaworthy or in good order, PGG desperately relies upon the three-hour sea trial, which was part of the Patton survey (Px. 179 at 6-7).  That sea trial, itself, was conducted mostly in the protected waters of Biscayne Bay, and the yacht only sailed some one or two miles offshore for a limited one hour period in which it encountered seas of 6-8 feet (Riley, Cx. 2 at 56-7).  Most importantly, the yacht was "tricked out" for the sea trial by the loading of consumables in such a fashion as to "mask" her down-by-the bow trim problem and her port list instability[68] (Px. 179 at 6).  Moore admitted in his testimony that the yacht's trim and list can be significantly affected by the manner in which her consumables are loaded (Moore, Tr. 2350).

It has been established beyond dispute that the GIGI had ongoing bow-down trim problems and ongoing stability issues for its intended use in open waters.  It has been further established, without dispute, that the GIGI suffered from multiple unseaworthy conditions including, design defects in its garage doors, engineroom exhaust system and the lack of watertight integrity in both its

---

[68] During the sea trials, the two forward centerline (keel) tanks, No. 1 and 2, contained only 1,145 gallons of fuel oil.  In contrast, the aft centerline (keel) tanks, No. 5 and 6, contained 1,776 gallons with a further 309 gallons being placed in the aft daytank.  In total, the GIGI carried 815 gallons more fuel oil toward the stern of the vessel than in the bow.  845 gallons of fuel, at 7 pounds per gallon, is 5,705 pounds (almost 3 tons) of additional weight which would have the effect of lowering the stern and raising the bow, thus masking her ongoing trim problem (Moore, Tr. 2353-56).  The yacht's stability, or listing to port problem, was also masked by the manner in which her consumables were loaded.  In the forward section of the vessel where the forward wing tanks were located, the No. 3 starboard fuel tank contained 941 gallons of fuel oil while No. 4 port fuel tank only contained 43 gallons.  This net differential of 898 gallons of fuel oil results in 6,286 pounds (3 tons) more weight on the starboard side than the port side.  This situation was compounded by the loading of the freshwater.  On the port side aft, the freshwater tank contained 193 gallons while on the starboard side aft, the freshwater tank contained 800 gallons, which is a net differential of 607 gallons.  Each gallon of water weighs approximately 7½ pounds, which results in 4,552 pounds (over 2 tons) more weight on the starboard side.  By loading fuel and water on the starboard side of this vessel, some 5 additional tons more weight was added to the vessel's starboard side to mask its port side list (Px. 179 at 6).  The Patton surveyors attempt to dismiss this improper distribution of consumables, by claiming "it is not unusual since the galley is located there with marble and equipment."  (Px. 179 at 7).

forward and aft engineroom bulkheads.  All of these conditions existed at the time the Policy incepted and demonstrate that the vessel was not to be in good order.  According to Robert Taylor, who is both a cause and origin and naval architect expert, the capsizing of the GIGI was due to either her inherent instability or ingress of a large amount of water, the latter creating an instability problem to the portside (Taylor, Tr. 307).

First, the Barbieto incline test established that this vessel's stability was not fit for the open water transit which PGG intended for the GIGI.  Second, the ingress of water into the hull was solely due to design defects in the engineroom exhaust and garage doors which was compounded by the penetrations through the forward and aft engineroom bulkheads.  According to Randall, a second cause and origin and naval architect expert, the cause of the capsizing was the lack of watertight integrity in the garage doors and the design defect of placing the engineroom exhaust vent too low to the water for open ocean transit (Randall, Tr. 1340-42, 1346-47, 1349, 1375-78, 1395, 1400-01, 1419).

Although the loss of power may have expedited the capsizing of the GIGI, it was not the proximate or efficient cause.  The loss of power, with the accompanying loss of AC bilge pumping capability, would have been insignificant if water was not entering the hull through these unseaworthy design defects (Taylor, Tr. 383).  The vessel should have been able to survive in a deadship condition (Randall, Tr. 1396-97).  She did not because of the flooding of water through the unseaworthy conditions in the aft garage doors and engineroom exhaust (Randall, Tr. 1341-42, 1350, 1350-52; Taylor, Tr. 381, 382-83; Christian, Tr. 2074-75, 2088).

PGG has proffered multiple alternatives to the ingress of water into the hull, including: A cracked engine exhaust pipe in the aft bilge; An open AC bilge prime line; An open inductor valve; and Certain through-hull openings.  Taylor's cause and origin investigation put to rest these possible

areas of water ingress.  He found that there was insufficient leakage from the engine exhaust pipe to account for this quantity of water entering the vessel (Taylor, Tr. 381-83).  Assuming water entered into the garage bilge, the water would have to flood into the engine room from the bilge area under the lazzarette, which would have been seen by the crew, working around the daytank during this event (Taylor, Tr. 118-19).  This was not reported by the crew.  Taylor discounted the AC prime line, as he found that to be in a closed position upon his inspection (Taylor, Tr. 45-46, 193-194, 363).  He also discounted an open inductor valve, which he similarly investigated and found to be in a closed position (Taylor, Tr. 366-67).  As for the through-hull fittings, Taylor found that none of these openings, which were all connected to internal piping in the way of the engineroom, were sources of any outside water ingress into the hull (Taylor, Tr. 41-2).

Lastly, PGG attempts to make a minor contact between the GIGI and a cargo vessel into an outright collision, which somehow breached the hull and allowed water ingress into the starboard side of the vessel, even though Papa denies it (Tr. 1481-82).  First, the actual contact between the GIGI and the cargo vessel was at the upper level of the third deck of the GIGI (Gorin, Cx. 8 at 78-9).  Second, there was no visible evidence of any contact with, or breach in, the GIGI's hull as shown in the aerial photographs taken by the salvor, Mitchell (Px. 38 at 12, 37, 40; Randall, Tr. 1355).  Third, any area that would have been damaged on the starboard side by the alleged collision would have been above the waterline on the starboard side, which was steadily raised out of the water by the vessel's increasing port list (Randall, Tr. 1357-58).  Fourth, the crew inspected the GIGI post-collision and found no leakage from that contact (Gorin, Cx. 8 at 81-3).

As for PGG's allegation that the crew was negligent in running the daytank dry, resulting in a loss of power, the power failure was not the proximate cause of the casualty (Randall, Tr. 1395-97). The power loss was due to crew incompetence, in not being properly trained in either the automatic

fuel transfer systems or the gravity feed system from the aft wing tanks in the event of loss of AC power (Moore, Tr. 2360-61).  As for the crew's failure to use the fire damper to limit the ingress of water through the engineroom exhaust vent, there is no evidence that the crew was trained on how to trigger that manual closure device. Furthermore, the crew cannot be faulted for negligence in failing to take action under such extreme conditions.  The fire damper's purpose was to extinguish engineroom fires, not to act as a watertight closure device.  Further, Taylor specifically noted that the deployment of the fire damper in an effort to stop the water ingress was problematic as there was no way to re-open the damper if the crew restarted the engines and generators.  Faced with that dilemma, compounded by the lack of familiarity with the vessel, the crew cannot be faulted for failing to appreciate the perceived advantage of closing the fire damper to limit the ingress of water *vis-a-vis* the disadvantage of a closed fire damper while trying to restart the engines.

The claim under this all risk Policy fails because: (1) PGG cannot establish that the vessel was in good order at the time of Policy attachment, particularly for its intended use, i.e. open water cruising; and (2) PGG has failed to demonstrate that the proximate cause of this capsizing was a fortuity, i.e. something other than the unseaworthy conditions of the vessel.

### PGG'S PERSONAL EFFECTS CLAIM

If the Court finds that Federal properly declined coverage under the subject Policy, PGG cannot recover for personal effects lost when the vessel capsized.

Pursuant to the clear and unambiguous Personal Effects endorsement[69], the term "personal

---

[69]  The Personal Effects endorsement provides:
> We cover your personal effects and those of your guests and crew while they are on board your yacht….
> We will pay the reasonable cost to repair or replace covered personal effects with like kind and quality, up to $200,000.00 for each occurrence….
> "Personal effects" means sports equipment, clothing, computer hardware kept and used exclusively on board your yacht for your own personal use, and other personal

effects" is defined and does not equate to vessel contents.   Further, personal effects claims are subject to a $200,000.00 limit.

The "you" referred to in the personal effects clause is the insured.   The Court has already held in dismissing Federal's claim for reimbursement of salvage expenses against Ashkenazy that only PGG is the insured.   The only way the Ashkenazys can be covered by this clause are as "guests", since they certainly were not members of the crew.   However, as guests, their personal effects are only insured against loss when the Ashkenazys are actually aboard the yacht.   Because they were not on the vessel when it capsized, they cannot recover for the loss of any personal effects.

Personal effects aboard the GIGI would include the Ashkenazys' and crewmembers' clothing and luggage.   They would not include housewares items remaining aboard the boat (D. Ashkenazy, Tr. 2401) such as dishes, flatware, furniture, linen, bedding, appliances, liquor or food.[70]   Indeed, china, silver, stemware, bedding, furniture, electronics, etc. were included with the purchase of the vessel (Chamberlain, Tr. 1809).

Federal has also received personal effects claims from the crewmembers who were on the yacht during the ill-fated voyage.   Those claims total $83,483.00 (Px. 250).   In the event the Ashkenazys' claim for personal effects[71] is granted and approaches $200,000.00, the claim should, at a minimum, be prorated along with the crewmembers' personal effects claims.

**FEDERAL IS ENTITLED TO RECOVERY OF "SALVAGE" EXPENSES**

Federal seeks to recover from PGG the sums paid to Overseas Salvage for the removal of the wreck from the navigation lanes and the prevention of pollution of the marine environment.   The

---

property.   It does not include legal tender, bank notes, stored value cards, bullion, gold, silver, platinum, tokens, checks, credit, debit or bank cards, valuable papers, passports, jewelry, watches, furs, fine arts, fishing tackle, or firearms.  (Px. 4 at 7).

[70] A substantial portion of PGG's personal effects claim include housewares related items (D. Ashkenazy, Tr. 2401; Dx. WWWWWW at 1-4, 9).

[71]  Debra Ashkenazy came up with personal effects values based solely upon her opinion (Tr. 2386).

sums were expended pursuant to the Wreck Removal clause of the Policy before Federal investigated the underlying circumstances of the capsizing and determined that there was no coverage.

PGG, as the owner of GIGI, would have been liable for any damage to other vessels that collided with the wreck or for any resulting pollution to the marine environment.  Indeed, it might well have been required by the Bahamian government to remove the wreck itself.  By undertaking to remove the hazard to navigation and the possible source of pollution, Federal conferred a benefit on PGG.[72]

Under the doctrine of unjust enrichment, Federal must show that PGG was enriched at Federal's expense, and that equity and good conscience dictate that PGG should reimburse Federal.[73]

On the morning of February 6, 2006, Mitchell flew over GIGI and found her laid over with her starboard side up (Mitchell, Tr. 623; Px. 40 at 12, 37, 40).  Federal promptly retained Overseas Salvage to tow the remains of the yacht to the nearest safe harbor she could enter in order to remove her as a hazard to navigation in the heavily traveled traffic way and to take steps to prevent pollution to the marine environment (Richard, Tr. 1826-27; Schmahl, Tr. 410; Mitchell, Tr. 625; Darville, Tr. 481-82).

Overseas Salvage took the upside-down hull in tow (Darville, Tr. 489) and, without causing any further damage to the wreck (Darville, Tr. 497), towed it to Cat Island.  With the assistance of a

---

[72] Under New York law, "[a] person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit.  He receives a benefit where his debt is satisfied or where he is saved expense or loss."  *Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 93 A.D.2d 995, 995, 461 N.Y.S.2d 624, 626 (N.Y. App. Div. 4th Dep't 1983); *see also In re Worldcom, Inc.*, No. 02-13533, 2007 WL 1933575, at *3 (Bankr. S.D.N.Y. July 5, 2007); *Electric Ins. Co. v. Travelers Ins. Co.*, 124 A.D.2d 431, 432, 507 N.Y.S.2d 531, 532 (N.Y. App. Div. 3d Dep't 1986).

[73] *Universal City Studios, Inc v. Nintendo Co., Ltd.*, 797 F2d 70, 79 (2d Cir.), *cert. denied*, 479 U.S. 987 (1986); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d cir. 1996); *Continental Ins. Co.*, 952 F.Supp. at 1071-72.

crane barge from Mowbry, the wreck was righted (Darville, Tr. 497-98, Px. 38 at 382-392) and pumped out (Darville, Tr. 500-01, 503-04).  Then the vessel was cleaned up (both as to possible oil pollution and debris on board the vessel) (Darville, Tr. 505-06, 509-10).  When it came time to remove the wreck from the water, it was, with the approval of PGG's attorney (Px. 30), cut in half and placed on the Mowbry barge (Darville, Tr. 507-08).  Eventually, the two halves of the wreck were landed at Bradford Marine's yard in Freeport, Grand Bahamas, where it remains to this day.

Admittedly, a side benefit to Federal of Overseas Salvage's efforts was to allow a cause and origin investigation to take place.  This investigation had the effect of minimally extending the time it took Overseas Salvage to complete the clean-up of the wreck at Cat Island.  This meant that the salvage vessels AMAZING GRACE and VICTORIA were on hire for perhaps as much as one extra day (Darville, Tr. 510-11).

Overseas Salvage invoiced Federal $753,172.58 for its services (Px. 40C), which was duly paid by Federal (Mitchell, Tr. 630).  Subtracting from the payment the expenses for one extra day for the salvage vessels AMAZING GRACE ($15,000) and VICTORIA ($5,500) (*see* Px. 26 at 27), the amount due to Federal to prevent the unjust enrichment of PGG is $732,672.58.

## CONCLUSION

Federal has proven by a preponderance of the evidence four separate grounds which require the denial of PGG's claim; any one of which is sufficient for the entry of judgment in plaintiff's favor.  At this trial, the preponderance of the evidence showed: (1) PGG failed to disclose material information and misrepresented other material information concerning the risk presented to Federal to be insured under the Policy.  By virtue of these non-disclosures and misrepresentations, the Federal Policy is void *ab initio*, denying PGG any recovery under the contract of insurance; (2) Federal has conclusively shown that the GIGI was unseaworthy at the time the Policy attached on

December 13, 2005, which is a breach of PGG's absolute implied warranty of seaworthiness under the Policy.  By virtue of that breach, the Federal Policy is void *ab initio*, denying PGG of any recovery under the insurance contract; (3) Federal has conclusively shown that the GIGI was unseaworthy at the time she broke ground on her fateful voyage from Florida on February 4, 2006. Those unseaworthy conditions caused the capsizing of the yacht, which is a breach of PGG's negative implied warranty of seaworthiness.  By virtue of that breach, the Federal Policy does not respond for this hull loss, denying PGG of any recovery under the insurance contract; (4) PGG has failed to satisfy its burden of proof by showing the subject matter of the insurance, the yacht, was in good order and condition for its intended use on the date the Policy attached and further failed to show that her capsizing was the result of a fortuitous event.   Such a failure of proof mandates the denial of PGG's claim for hull damages under the insurance contract.

In addition to the above, Federal has an affirmative claim for the recovery of costs in connection with removing the capsized yacht, which was a danger to navigation and to avoid possible pollution emanating from the vessel's fuel and lubricating oils, which, by virtue of the Policy being void *ab initio*, were not payable by Federal under the Policy or otherwise.  Federal is entitled to recover those monies as those expenditures unjustly enriched PGG.

Dated:  New York, New York
July 18, 2007

NICOLETTI HORNIG & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY

By: _____s/ John A.V. Nicoletti_____
John A. V. Nicoletti (JN-7174)
Wall Street Plaza, 88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830
(OUR FILE:  25000011 JAVN/TLS/TMR)