06-112

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL INSURANCE COMPANY,  )
  )        06 CV 2455 (JSR)
    Plaintiff,  )
  )
    -against-  )
  )
PGG REALTY, LLC, BEN ASHKENAZY  )
and KEYBANK NATIONAL ASSOCIATION,  )
  )
    Defendants.  )
  )
  )

--------------------------------------------------------------------------------

## DEFENDANTS' POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

--------------------------------------------------------------------------------

WEG AND MYERS, P.C.
Attorneys for Defendants
PGG REALTY, LLC
and BEN ASHKENAZY
52 Duane Street
New York, New York 10007
(212) 227-4210

On the Brief:

Dennis T. D'Antonio, Esq.
William H. Parash, Esq.
Patrick M. Leathem, Esq.

## **TABLE OF CONTENTS**

Page

**TABLE OF AUTHORITIES** ................................................... *i*

**PRELIMINARY STATEMENT** ............................................... 1

**ARGUMENT** ................................................................... 9

I.  Defendants Have Proved Their Entitlement to Recovery
    under the Policy ........................................................ 9

II.  Plaintiff Has Failed to Prove any Violation of the Duty of
     *Uberrimae Fidei* that Would Allow It to Avoid the Policy ............. 9

     A.  The Scope of the Duty ......................................... 9

     B.  PGG Satisfied Its Duty of Utmost Good Faith
         by Providing the Patton Survey and Recommendations.. 11

     C.  Plaintiff Waived the Right to Void Coverage
         Based on Nondisclosure of Information Outside
         the Survey When It Issued the Policy Without
         Objection After Receiving the Survey ...................... 18

     D.  Regardless of Waiver, Information Not Disclosed by the
         Survey Was Immaterial in That a Reasonable Insured
         in PGG's Position, Having Been Told by Plaintiff's
         Agent That Further Information Was Not Needed,
         Would Not Have Known That Undisclosed Information
         Would Control the Decision to Bind Coverage .............. 21

     E.  Plaintiff Failed to Prove that Its Underwriters Subjectively
         Relied on the Nondisclosures Testified to at Trial in
         Deciding to Bind Coverage ..................................... 24

III.  Plaintiff Has Failed to Prove That the Loss Was Not Fortuitous ............. 28

IV.  Plaintiff Failed to Prove a Breach of the Absolute Implied
     Warranty of Seaworthiness ...................................... 31

A.   Plaintiff is Estopped from Relying on Conditions Disclosed in the Patton Report as Evidence of Unseaworthiness at the Inception of the Policy, or When the Yacht Left the Dock on Its Last Voyage . 31

B.   The Standard of Seaworthiness is not One of Perfection, but Reasonable Fitness ……………………………………………….. 33

C.   All Evidence Shows that the Yacht Was Reasonably Fit For Its Intended Use at the Inception of Coverage …………………… 35

D.   Plaintiff's Experts Should Be Struck or Given Minimal Weight … 39

V.   Plaintiff Failed to Prove that Defendants Breached the Negative Implied Warranty of Seaworthiness ……………………………..   40

A.  The Standard ……………………………………………… 40

B.  There Is No Evidence That the Yacht Had any Known Unseaworthy Condition When It Left the Dock ……………….. 40

C.  There Is Strong Evidence That Weather, Loss of Power and the Collision With a Cargo Ship Combined to Cause The Loss, and These Are Covered Perils as the Court Has Found It Is an All-Risk Policy …………………………….   43

D.  Plaintiff Did Not Complete a Proper Cause and Origin Investigation and Has Not Ruled Out Numerous Other Sources of Water ……………………………………….   46

E.  Plaintiff Is Estopped from Arguing the Crew Incompetence Defense ………………………………………………..   47

F.  Plaintiff Failed to Establish that the Crew Was Not Adequately Trained and Qualified or to Show that Crew Incompetence, Rather than Mere Negligence Caused the Loss ………………   49

CONCLUSION …………………………………………………   52

## TABLE OF AUTHORITIES

**Federal Cases**

*Albany Ins. Co. v. Wisniewski,*
    579 F. Supp. 1004 (D. R.I. 1984) ................................................................. 11

*American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation,*
    269 F. 768, 770 (2d Cir. 1920) ................................................................. 32

*The Anthony D. Nichols,*
    49 F.2d 927, 933 ................................................................. 31

*Austin v. Servac Shipping Line,*
    794 F. 2d 941, 945 (5th Cir. 1986) ................................................................. 34, 40

*Christiania General Ins. Corp. of New York v. Great American Ins. Co.,*
    979 F.2d 268, 279 (1992) ................................................................. 25, 26

*City of Burlington v. Indemnity Ins. Co. of North America,*
    332 F.3d 38, 49 (2d Cir. 2003) ................................................................. 9, 28

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,*
    982 F. Supp. 310, 313 (S.D.N.Y. 1997) ................................................................. 9, 10, 12, 20

*Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.,*
    277 U.S. 66, 78, 48 S.Ct. 459, 462 (1928) ................................................................. 29, 32, 33

*Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,*
    944 F. Supp. 986, 1003 (D. Mass. 1996) ................................................................. 12

*Compania Transatlantica Centro-Americana, S A, v. Alliance Assur. Co.,*
    50 F. Supp. 986 (D.C.N.Y. 1943) ................................................................. 29, 30

*Continental Ins. Co. v. Lone Eagle Shipping (Liber.),*
    952 F. Supp. 1046, 1061 (S.D.N.Y. 1997) ................................................................. 28, 31, 40

*Continental Ins. Co., Inc. v. Viesta,*
    1990 WL 127509 (D. Conn. 1990) ................................................................. 19, 20

*Contractors Realty Co., Inc. v. Insurance Co. of North America,*
    469 F. Supp. 1287, 1294 (S.D.N.Y. 1979) ................................................................. passim

*Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.,*
    19 F.2d 493, 495 (5th Cir. 1927) ................................................................. 34

*Freeman v. Continental Gin Co.,*
    381 F.2d 459, 469 (5th Cir. 1967) ................................................................. 47

*Gulfstream Cargo Ltd. v. Reliance Insurance Co.,*
409 F.2d 974, 982 (5th Cir.1969) ................................................................................ 20

*Henry's Marine Service, Inc. v. Fireman's Fund Ins. Co.,*
193 Fed. Appx. 267, 276, 2006 WL 1439393 at *6 (5th Cir. 2006) ...................... 47

*In re Balfour MacLaine Intern. Ltd.,*
85 F.3d 68, 77-78 (2d Cir. 1996) .................................................................................. 9

*Janet Nav. Inc. v. Sturge*
711 F. Supp. 119 ................................................................................ 45, 49, 50

*Jimerson v. United States,*
2003 WL 25190 (W.D.N.Y. 2003) ........................................................................ 49

*King v. Aetna,*
54 F.2d 253 (2d Cir. 1931) ................................................................................ 10, 11

*King v. Allstate Ins. Co.,*
906 F.2d 1537 (11th Cir. 1990) ................................................................................ 21

*Knight v. U.S. Fire Ins. Co.,*
804 F.2d 9, 13 (2d Cir. 1986),
cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) ...................... 10, 11,12, 21

*Kumho Tire Ltd. v. Carmichael,*
526 U.S. 137, 152 (1999) ................................................................................ 40

*Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd.,*
780 F.2d 1082, 1091-1092 (2d Cir. 1986) ........................................................ 19, 47

*Morrison Grain Co. v. Utica Mut. Ins. Co.,*
632 F.2d 424, 430 (5th Cir. 1980) ................................................................... 28

*Morton v. Berman Enterprises, Inc.,*
669 F.2d 89, 92 (2d Cir. 1982) ................................................................................ 34

*Navegacion Goya, S.A v. Mutual Boiler & Machinery Ins. Co.,*
411 F. Supp. 929 (S.D.N.Y. 1979) ........................................................................ 10

*Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,*
376 U.S. 315, 322 (1964) ................................................................................ 34

*New York, New Haven and Hartford Railway Co. v. Gray,*
240 F.2d 460, 464-465 (2d Cir. 1957) ................................................................... 30

*Pacific Queen Fisheries v. Symes,*
    507 F.2d 700 (9th Cir. 1962) ........................................................................... 10

*Pacific Resources, Inc. v. Oswego Shipping Corp.,*
    1984 WL 928 (S.D.N.Y. 1984) ...................................................................... 10,11

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.,*
    779 F.2d 866, 870 (2d Cir. 1985) ............................................................... passim

*Robinson v. United States Bureau of Prisons,*
    244 F. Supp. 2d 57, 64-65 (N.D.N.Y. 2003) ...................................................... 49

*Speer v. Rand McNally & Co.,*
    123 F.3d 658, 665 (7th Cir. 1997) ...................................................................... 49

*Thornton v. Deep Sea Boats,*
    399 F. Supp. 933, 935 (S.D. Ala. 1975) ............................................................. 36

*Union Planters Nat. Leasing v. Woods,*
    687 F.2d 117, 121 (5th Cir. 1982) ...................................................................... 47

*Usner v. Luckenbach Overseas Corp.,*
    400 U.S. 494, 500, 91 S.Ct. 514, 519 (1971) .................................................... 49

*Wills v. Amerada Hess Corp.,*
    379 F.3d 32, 48 (2d Cir. 2004) .......................................................................... 40

*Windsor Mount Joy Mut. Ins. Co. v. Giragosian,*
    57 F.3d 50, 55 (1st Cir. 1995).......................................................................... 20

*World Book, Inc. v. International Business Machines Corp.,*
    354 F. Supp. 2d 451, 454 (S.D.N.Y. 2005) ........................................................ 48

*Wright v. Ernst & Young LLP,*
    152 F.3d 169, 178 (2nd Cir. 1998) .................................................................... 48

**State Cases**

*Carpinone v. Mutual of Omaha Ins. Co.,*
    265 A.D.2d 752, *755 (3d Dept. 1999)............................................................. 26

*Crane v. Diamond Offshore Drilling, Inc.,*
    743 So.2d 780 (La. App. 5th Circ. 1999) .......................................................... 50

*Harper v. Falrig Offshore, Inc.,*
    776 So.2d 620 (La. App. 3d Cir. 2000) ............................................................. 50

*Johnson Bros. Boat Works v. Conrad,*
    156 A.2d 175, 179 (N.J. Super. 1959)............................................................... 35

*Mathis v. Hanover Ins. Co.*,
   192 S.E.2d 510, 511-512 (Ga. Ct. App. 1972) ........................................................ 37

*Reynolds v. Canton Ins. Office, Ltd.*,
   98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917)........................................................ 32, 33

*Sonkin Associates, Inc. v. Columbian Mut. Life Ins. Co.*,
   150 A.D.2d 764, 765 (2d Dept. 1989)........................................................ 28

*St. Paul Fire & Mar. Ins. Co. v. Christiansen Marine, Inc.*,
   893 So. 2d 1124 1133-1134 (Ala. 2004) ........................................................ 33

*Thebaud v. Great Western Ins. Co.*,
   155 N.Y. 516, 524 (N.Y. 1898)........................................................ 32, 33

*Vendetto v. Sonat Offshore Drilling Co.*,
   725 So.2d 474 (La. 1999)........................................................ 53

Other Authorities
Stephen A. Cozen and Richard C. Bennett, Fortuity: The Unnamed Exclusion, 20 FORUM 222
   (1985) ........................................................ 29

2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-14, (4th ed. 2004) ................. 11, 24

CJS *Insurance* § 828........................................................ 19, 21, 32

## Preliminary Statement

On March 29, 2006, Federal Insurance Company ("Plaintiff") commenced this action seeking a declaration of the respective rights and obligations of the parties under an all-risk insurance policy, numbered 0037007407 (the "Policy") (Ex. 4), which insured the 125-foot motor yacht M/Y "Princess GiGi" f/k/a Full Bloom (the "Yacht") for $7,023,000 plus $200,000 for personal property. The genesis of this action was the capsizing of the Yacht on February 6, 2006, 50 miles off of the coast of San Salvador in the Bahamas. Defendant PGG Realty, LLC ("PGG") was the owner of said Yacht and the only named insured under the Policy. Defendant Ben Ashkenazy ("Ashkenazy") was PGG's principal. Defendant KeyBank National Association ("KeyBank") was listed as a loss payee on the Policy and held a $5,850,000 mortgage on the Yacht. The Policy contained a Breach of Warranty endorsement (the "Warranty Endorsement") in favor of KeyBank as loss payee, which provided that KeyBank would be indemnified even if the insured's claim were denied. (Ex. 4 p. FED0004)

Plaintiff framed its pleadings in such a way which would enable it to avoid liability to all Defendants in spite of the Warranty Endorsement. Plaintiff's first ground for denial of PGG's claim was that PGG and KeyBank both breached the antiquated duty of *uberrimae fidei*, an anachronistic doctrine that holds that an insured is in the best position to know any circumstances that affect the risk, and has the duty to put the insurer in the same position as himself to evaluate the risk. Initially, Plaintiff based its defense upon the idea that the insured's pre-purchase survey of the Yacht (the "Patton Survey") conducted by Patton Marine Inc. ("Patton") had not been provided to Plaintiff. However, it had been received by the William F. Kelly Agency (the "Kelly Agency") prior to the binding of insurance. Notwithstanding Plaintiff's insistence that the Kelly Agency was not its agent, the Court ruled that the Kelly Agency was Plaintiff's agent, and that knowledge of the contents of the Patton Survey was

imputed to Plaintiff. At the same time, the Court awarded KeyBank summary judgment against Plaintiff for the amount of its loan.

Plaintiff's remaining claims against PGG and Ashkenazy were alleged breaches of the absolute implied warranty of seaworthiness and the negative modified warranty of seaworthiness.   As to both warranties, Plaintiff alleged that the Patton Survey issued on December 7, 2005 described unseaworthy conditions existing at the inception of coverage, and that those conditions caused the loss, enabling Plaintiff to escape liability.  During discovery Plaintiff's 30(b)(6) witness Paul Richard, the ultimate decision-maker William Turnbull, and all other employees involved in denial of the claim testified that the basis for the allegations of unseaworthiness were the lack of watertight garage doors, a "mousehole" in the aft engine room bulkhead, a 3 by 5 inch rectangular hole in the bulkhead, and the lack of pumping capacity in the bilge. Discovery gave lie to those allegations as the surveyors from Patton who inspected the Yacht testified that the survey revealed no conditions affecting its insurability or safety.  (Court Ex. 2 p. 149 -151; Court Ex. 7 p. 216-217, 223).   These claims withered further as it was revealed that most of the recommendations made by the Patton Survey had been implemented in preparation for the sale and finished before inception of coverage. (Trial Tr. p. 1496, 1511, 1754, 2189)

Plaintiff also claimed that the loss to the vessel was non-fortuitous, on the basis that it "was caused by the defendants intentional failure and/or neglect and/or omission to correct the deficiencies in the 'Yacht' as recommended by Patton Marine." (Ex. 1 p. 13)  Plaintiff further alleged a violation of the Policy's navigational limits.[1]  Lastly, Plaintiff alleged that PGG and Ashkenazy must pay for the costs of its post-loss investigation and salvage.[2]

---

[1] Plaintiff has since withdrawn the claim of violation of the Policy's navigational limits.
[2] The Court, by Order dated February 16, 2007, dismissed that portion of the Complaint as it related to Ben Ashkenazy.

2

At trial, Plaintiff's case dramatically changed as it was initially pled from the outset, as Plaintiff's defenses have, to put it charitably, "evolved" from those presented as grounds for the denial. As set forth below, in a first-party insurance coverage action such as the one prematurely brought by Plaintiff, the grounds given for denying a loss are extremely relevant.  As the insurer owes the insured a reciprocal duty of utmost good faith under a marine policy of insurance, Plaintiff was required to fully investigate the loss <u>before</u> denying coverage.  Plaintiff violated its duty of *uberrimae fidei* by bringing suit on the basis that the Patton Survey had only been provided to the Kelly Agency, and not Plaintiff, while at all times Plaintiff knew Kelly to be its authorized agent.

After the Court ruled that the contents of the Patton Survey were imputed onto Plaintiff, Plaintiff shifted the emphasis of its claims of a breach of *uberrimae fidei* to other documents that it alleges were important to the underwriting of the risk. However, as clearly demonstrated at trial, the Patton Survey disclosed all material information that Plaintiff now relies on in these other documents, or at the very least put Plaintiff on inquiry notice of these other facts.  To the extent that any fact was not disclosed, it has not been proven to be material.

Receipt of the Patton Survey by Plaintiff fulfilled PGG's obligation of *uberrimae fidei*, as it is comprehensive in scope and PGG is only required to disclose such that to call an underwriter's attention so that it can ask for more information if it requires so.  PGG paid over $30,000 for a comprehensive survey and sea trial to be performed by Patton Marine, Inc., with specialized surveys to be performed by Wards Marine Electric and Frank Griffin, Inc. and incorporated into Patton's final survey report and recommendations.  (Trial Tr. p. 2440; Ex. 179 p. 1)  Patton's surveyors remained on the Yacht for four days from November 21-23, and December 1, 2005, including a sea trial and meeting with these sub-surveyors.  (Ex. 179 p. 1; Court Ex. 2 p. 43-44)  The Patton Survey revealed that the Yacht had no conditions that would

3

affect safety or insurability, but suggested upgrades and routine maintenance. (Court Ex. 2 p. 126-127) PGG's attorney David Kriss then provided the Patton Survey to Plaintiff with a cover note stating "Let me know if you need anything else," and never received a response, lulling PGG into the belief that no further information was required. (See Ex. 173; Ex. 179; Ex. 180)

At trial Plaintiff moved the emphasis of its *uberrimae fidei* claims to four other pieces of information that it claimed were material to the underwriting: (1) a survey prepared by A1 Marine Surveyors (the "A1 Survey")(Ex. 100); (2) a November 14, 2005 email sent to Ashkenazy by Chamberlain Yachts employee Jennifer Dubois (the "Dubois Email")(Ex. 91); (3) the fact that KeyBank did not require compliance with certain Patton Recommendations for 90 and 120 days; and (4) the fact that SeaQuest International Inc. ("SeaQuest") finished the Yacht's construction, as opposed to Trident Shipworks. Adequate disclosure of the material facts relating to each of these issues were provided by PGG in the form of the Patton Survey. To the extent that anything was not disclosed, Plaintiff waived such nondisclosure by knowingly choosing not to review the Patton Survey or is otherwise estopped from relying on it to void the policy.

In any event, the duty of *uberrimae fidei* only extends to information that a reasonable insured would know would control the decision to bind coverage. Plaintiff's own litigation strategy demonstrated that that these four alleged non-disclosures were immaterial. Under *uberrimae fidei*, Plaintiff bears the burden to prove that the non-disclosure is material, and it also bears the burden to prove a breach of the two implied warranties of seaworthiness. Nevertheless, Plaintiff did not provide testimony from Roy Shorter, Jennifer Dubois or Arthur Barbeito relating to the A1 Survey, the Dubois Email, or the structural integrity of the vessel, respectively.

The A1 Survey contained no undisclosed material information. In 2005 Ashkenazy had

4

employed yacht broker Kent Chamberlain to help him find a yacht, and settled on the Full Bloom. Chamberlain also sought to persuade Ashkenazy to charter the Yacht and employ him as charter agent. (Trial Tr. p. 1781, 2445-2447) Toward this end, Chamberlain, on his own, hired A1 Marine Surveyors to perform a survey of what requirements would be needed to satisfy the exacting requirements of St. Vincent's Commercial Registry for chartered vessels. PGG did not review the A1 Survey, did not know of its existence, and has no duty to reveal unknown information. (Trial Tr. p. 2432) The A1 Survey was not performed as a valuation or insurability survey, and did not produce any information that was not disclosed by the Patton Survey.

As demonstrated at trial, the Dubois Email also contained no undisclosed material information. Ashkenazy had heard unfounded rumors about the Yacht, but after his broker Chamberlain performed due diligence, Ashkenazy was assured via email that the rumors were unfounded. (Ex. 91; Trial Tr. p. 1747-1748) Chamberlain's inquiries revealed that during its initial construction, the Yacht's owner and builder got into a legal dispute that caused the Yacht to be completed four years late. (*Id.*) The Yacht had "potential" stability issues that had been corrected by spending millions of dollars above the contract price and adding 11 tons of ballast. (Ex. 91; Trial Tr. p. 1743-1744) Chamberlain assured Ashkenazy that the inspection and Survey would reveal any remaining problems, and, indeed, the Patton Survey and sea trial revealed that any problems associated with its construction had been remediated. (Ex. 91; Trial Tr. p. 1747-1748) Moreover, the prior owner Warren Lovell and his Captain Robert Moore both testified that the stability problem had been remediated (Trial Tr. p. 1640-1643, 1650-1651, 2175-2178)

The Barbeito statement on a drawing quoted in the A1 Survey was clearly reviewed and reported by Patton's surveyors, based on the similarities between the quote and the Patton Survey's statements about hull modifications. (See Ex. 100 p. 3; Ex. 180 p. 1-2) Furthermore,

it is immaterial since it did not reveal any findings or opinions of Barbeito concerning the Yacht's structural integrity. (Ex. 180)

The final two alleged non-disclosures, the 90 and 120 day repair window for certain recommendations and the involvement of SeaQuest, were also fully disclosed by the Patton Survey, in compliance with the insured's duty to disclose information sufficiently to enable an underwriter to make further inquiries if he wished.  As to the former, knowing that the recommendations had been made, Plaintiff could have asked when they would be completed. (Ex. 180) As to the latter, the Patton Survey names SeaQuest as the builder. (Ex. 179 p. 3)

As to seaworthiness, Plaintiff's allegations as to the absolute implied and negative modified warranty of seaworthiness have been dismantled, as all of the testimony at trial revealed that the conditions that Patton's surveyors reported and Plaintiff relied upon were remediated in the month between the execution of the contract of sale and the closing. (Trial Tr. p. 1496, 1511, 1754, 2189)  As these conditions in the Patton Survey did not exist at the inception of coverage, PGG has not violated the absolute implied warranty. PGG has similarly not violated the negative modified warranty of seaworthiness as Patton's recommendations had been addressed before the vessel left dock on its last voyage.  In any event, Plaintiff is estopped from claiming that anything disclosed in or discoverable from the Patton Survey is unseaworthy, on the basis that Plaintiff insured the risk while knowing that there was a survey, and with imputed knowledge of all conditions therein.

Plaintiff then turned to the engine room exhaust vent and garage door design alleging design defects as its primary evidence of unseaworthiness at the inception of coverage, but once again there existed no evidence that the design contained any latent defects.  Plaintiff's alleged proof of design defects are belied by the Yacht's performance in over 38,000 miles of sailing without the incursion of water in similar sea conditions. (Trial Tr. p. 1645-1646, 2166) Further,

the designs for each had multiple features designed to prevent the unintentional entry of water. The garages were a common self-bailing design, sloping to the aft so water would be flow back out under the doors or down drains. (Trial Tr. p. 2061-2063) The exhaust vents had directional louvers on the outside, dampers which were found shut after the loss, and were angled upward to 5 feet above the waterline, so water would have to flow upward against a heavy duty fan to reach the engine room. (Trial Tr. p. 340-341, 1714, 2162, 2167)

Plaintiff's other allegation regarding the breach of the absolute warranty of seaworthiness is that the Yacht lacked adequate bilge pumping capacity. However, Plaintiff's expert never assessed the capacity of the Yacht's two primary pumps, and Defendants' designated experts Michael Christian and Robert Moore, as well as Plaintiff's own investigator Robert Taylor agreed that the pumps would have been able to deal with the amounts of water that entered the vessel on its last voyage. (Trial Tr. p. 381-382, 1507, 1583-1584, 1994, 2005, 2230-2231) This demonstrates that there was adequate pumping capacity at the inception of coverage. Once again Plaintiff failed to meet its burden of proof.

Plaintiff also failed to prove any violation of the negative modified warranty of seaworthiness as that imposes a burden on an insurer to demonstrate that the insured knowingly allowed the vessel to leave the dock in an unseaworthy condition, and that that condition proximately caused the loss. Plaintiff again cannot carry this burden as the record is replete with evidence the proximate cause was any of several factors that would not allow the insurer to deny coverage: (1) severe weather; (2) loss of power due to fuel contamination (3) loss of power due to fuel starvation; or (4) damage caused by a collision with a nearly 500 foot steel hulled cargo ship. Plaintiff's only evidence was alleged statement by Captain Charles Papa to salvor Marcus Mitchell, which was never revealed to Plaintiff's investigators throughout their cause-and-origin investigation, but was categorically denied by Papa, and refuted by both Ben

and Debra Ashkenazy. (See p. Trial Tr. p. 657-660, 1488, 1493, 2395-2397) Plaintiff was also unable to establish the proximate cause of the loss due to its decision to terminate its lead investigator prematurely, in order to file a preemptive suit against its customer in New York, when it later admitted to Florida insurance regulators by letter dated May 26, 2006 that the cause of loss had yet to be determined as of the date of suit. (Ex. UUU)

Plaintiff is also estopped from advancing its theory, asserted only after the dismissal of KeyBank and the close of discovery, that the crew was incompetent and caused the loss. Plaintiff knew everything there was to know about the crew's qualifications and involvement in the loss by February 9, 2006 when it unilaterally took the crews' examinations under oath. (See Court Ex. 11 p. 1; Court Ex. 13 p. 1; Court Ex. 15 p. 1) By March 20, 2006, Plaintiff's investigator Robert Taylor had also toured the wreck with Engineer Jacob Rese and reported to Andrew Anderson that the loss occurred because the crew had not made a required fuel transfer and the day tank ran dry. (Trial Tr. p. 297, 308, 381-382) Despite this, the complaint and denial letter contained no allegations of crew negligence, as pleading so might weaken its case against loss payee KeyBank, who was owed $5.8 million of the Policy's value. For months discovery proceeded without any hint that Plaintiff would blame the crew for the loss, even after the Court granted KeyBank summary judgment. Plaintiff then changed its theory after the close of discovery to assert that crew incompetence was a cause of loss on summary judgment, as KeyBank was out of the case. Even if Plaintiff is allowed to assert its theory, it is clear that the crew was competent.

Furthermore, if the loss of power is due to crew error, crew negligence is covered under the Policy. The United States Supreme Court has drawn a sharp division between crew negligence and crew incompetence, and the actions of the crew do not amount to incompetence, particularly in the difficult circumstances that the crew faced.

8

## ARGUMENT

I.   **Defendants Have Proved Their Entitlement to Recovery under the Policy**

Defendants have sufficiently proved that they are entitled to judgment on their counterclaims. In order to recover under an "all-risk" policy, the burden of proof is on the insured to prove: 1) that a policy was issued; 2) that the insured suffered a fortuitous loss in which it had an insurable interest; and 3) that the loss was an event that fell within the terms and conditions of coverage. *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 77-78 (2d Cir. 1996). It is undisputed that the Policy was issued.  (See Ex. 4)  PGG has shown a loss in the full amount of the Policy's agreed value for the hull, and a loss of its personal effects and those of its guests valued in excess of the $200,000 Policy limit. (See Ex. WWWWWW; Trial Tr. p. 2386) Defendants have shown that the loss was fortuitous, as shown below, but do not have the burden to establish the exact cause of loss. *City of Burlington v. Indemnity Ins. Co. of North America*, 332 F.3d 38, 49 (2d Cir. 2003).  Finally it is undisputed that the loss fell within the terms and conditions of coverage, as long as no exception to coverage applies.

II.   **Plaintiff Has Failed to Prove any Violation of the Duty of *Uberrimae Fidei* that Would Allow It to Avoid the Policy**

A.   The Scope of the Duty

Plaintiff has failed to prove any violation of the duty of *uberrimae fidei* that would allow it to void the Policy. (See Ex. 4)  In marine insurance contracts, the insurer and insured owe reciprocal duties of *uberrimae fidei*, or utmost good faith. *See Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 982 F. Supp. 310, 313 (S.D.N.Y. 1997).

Under *uberrimae fidei*, "the party seeking insurance is required to disclose all circumstances *known to him* which *materially* affect the risk." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985) (emphasis added).  "There is a reciprocal duty on the part

of the insurer to deal fairly, to give the assured fair notice of his obligations, and to furnish openhandedly the benefits of a policy of "all risks" insurance. Insurance obligations must not be construed so as to render the coverage mere gossamer." *Contractors Realty Co., Inc. v. Insurance Co. of North America*, 469 F. Supp. 1287, 1294 (S.D.N.Y. 1979).

"A minute disclosure of every material circumstance is not required." *Puritan*, 779 F.2d at 872. Rather, as explained by the Court in *Commercial Union*:

> "The assured complies with the rule [of *uberrimae fidei*] if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it." [*Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985)]. See [*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)]; *Contractors Realty Co., Inc. v. Ins. Co. of North America*, 469 F. Supp. 1287 (S.D.N.Y. 1979).

*Commercial Union*, 982 F. Supp. at 314. An insured "need only disclose the relevant facts, rather than the entire reports, opinions, or recommendations which they may have … commissioned or otherwise obtained." *Pacific Resources, Inc. v. Oswego Shipping Corp.*, 1984 WL 928, *7 -8 (S.D.N.Y. 1984) "[A] survey itself, where the underlying conditions it reported were known to the insurer or were immaterial to the risk, [is] not material to the risk, and the failure to disclose it is not a ground for avoidance of the policy." *Contractors Realty*, 469 F. Supp. at 1295.

An insured's failure to disclose a fact that is both known to him and material to the risk can void the Policy, but "the principle of *uberrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Puritan Ins. Co.*, 779 F.2d at 870. The requirements of materiality and reliance, in practice, limit the frequency of application of the potentially sweeping doctrine to extreme cases of nondisclosure, as noted by the court in *Pacific Resources, Inc. v. Oswego Shipping Corp.*:

> Though not a common practice, courts have on occasion voided policies on the ground that the assured failed to disclose facts material to the risk. *King v. Aetna*,

10

54 F.2d 253 (2d Cir. 1931) (valuation of vessel at sixteen times cost made risk speculative); *Pacific Queen Fisheries v. Symes*, 507 F.2d 700 (9th Cir. 1962) (increased carrying capacity of ship and extrahazardous methods of carriage held to be material risk); *Albany Ins. Co.* [*v. Wisniewski*], 579 F. Supp. 1004 [D. R.I. 1984] (failure to disclose price paid along with 'veritable cavalcade of wilful misrepresentations as to condition of vessel' held to void policy). Compare, e.g., *Navegacion Goya*, [*S.A v. Mutual Boiler & Machinery Ins. Co.*], 411 F. Supp. 929 [S.D.N.Y. 1979] (change of flag not material to risk of insurer).

*Pacific Resources, Inc. v. Oswego Shipping Corp.*, 1984 WL 928 at *7 -8 (S.D.N.Y. 1984) (emphasis added).

The materiality of a particular fact is determined from the point of view of the insured: "The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material.... To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986) (internal citation omitted).

Besides materiality, a carrier asserting this defense to avoid its coverage obligations bears the burden of proving another form of reliance: that the undisclosed information did, in fact, induce its underwriter to issue a policy or insure at a particular premium (a subjective test). 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-14, at p. 311-14 (4th ed. 2004).

B.    PGG Satisfied Its Duty of Utmost Good Faith by Providing the Patton Survey and Recommendations

PGG satisfied its duty of utmost good faith by providing the Patton Survey and Recommendations to the Kelly Agency on December 12, 2005, as the disclosures of material information therein were complete or "sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it." *Puritan*, 779 F.2d at 871. Even assuming that Plaintiff did not otherwise waive its entitlement to assert non-disclosure, PGG's disclosures satisfied this standard with regard to any information that a reasonable assured would consider material.

11

PGG's attorney David Kriss not only provided the Patton Survey on December 12, 2005, but asked whether additional information would be needed, writing "Let me know if you need anything else." (Ex. 173; Trial Tr. p. 927-928)  Plaintiff never responded. (*Id.*)  The standard of materiality is one of reasonableness, and an assured would reasonably believe that it had provided all information that it was obliged to provide after providing such a detailed survey and being asked for no further information.

Once the Patton Survey was received, Plaintiff's entire premise for the doctrine of *uberrimae fidei* – that the assured was in the best position to evaluate the risk – no longer applied.  *See Knight*, 804 F.2d at 13. While the doctrine may place the onus on an insured to provide information, it does not privilege an insurer with a right to disregard information once provided. Plaintiff had its own good faith duty to read the survey and an opportunity to inquire about any fact that its underwriters needed to know, placing it in a position superior to the insured. *See Commercial Union*, 982 F. Supp. at 314; *see also Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 944 F. Supp. 986, 1003 (D. Mass. 1996) ("The duty of uberrimae fidei is a reciprocal one.").

Plaintiff's failure to request other information, once placed on inquiry notice, violated the "reciprocal duty on the part of the insurer to deal fairly [and] to give the assured fair notice of his obligations." *See Contractors Realty*, 469 F. Supp. at 1294. Even before giving a quote, Plaintiff knew a survey was available but offered to bind coverage without reviewing it anyway. (Ex. 166; Trial Tr. p. 1069, 1161) After receipt of the Patton Survey through its agent the Kelly Agency, Plaintiff failed to ask for any other information beyond what was disclosed therein. (Trial Tr. p. 969-970, 1071-1072) It was Plaintiff's practice not to communicate directly with insureds, but to operate through its agent. (Trial Tr. p. 969, 1100)  Nor did Plaintiff request a copy from its agent.  (Trial Tr. p. 1188)  Any and all information requested from the insured

was provided. (Trial Tr. p. 969-970)  PGG satisfied its duty of utmost good faith fully, even if Plaintiff did not.

Plaintiff's World Yacht Underwriting Manager Deborah O'Sullivan admitted that coverage was not bound until or after Dec. 14, 2005, well after Plaintiff had received the Patton Survey. (Trial Tr. 1067, 1132-1136; Ex. 173; Ex. 199 p. FED 00217) Even if the Patton Survey had been provided afterwards, Plaintiff knowingly waived any nondisclosure by choosing to issue the Policy without reviewing the survey, and then not only failing to cancel the Policy, but issuing new endorsements without reviewing the survey. (Trial Tr. p. 1099, 1102-1104)

Plaintiff appears to have abandoned its contention that it did not have knowledge of the contents of the Patton Survey and Recommendations.[3]  (Ex. 179; Ex. 180)  Instead Plaintiff relied primarily on an alleged non-disclosure never raised before trial, and documents whose actual materiality is best demonstrated by the fact that Plaintiff did not call any of their authors to the stand.  At trial, the new contentions of non-disclosure on which Plaintiff's underwriters testified were: (1) the fact that SeaQuest, not Trident was a builder, (2) information in the A-1 Survey (Ex. 100) which was carried out solely to determine steps to be taken to achieve commercial registry,  (3) information in Jennifer Dubois' November 14, 2005 email dispelling unfounded rumors (Ex. 91), and (4) the fact that KeyBank had allowed 90 and 120 days for

---

[3] The Patton Survey disclosed information including the following: as of the time of the inspections that ended December 1, 2005, "All watertight bulkheads … have been compromised by plumbing penetrations and unfilled cut-throughs.  Verify a proper seal at all penetrations on both sides of these bulkheads." (Ex. 180, p. 2); the Yacht was not built to any Classification Society (Ex. 179, p. 3, 16); the hull design had a floatation and trim problem and was modified by the addition of a false bow and weighted keel that provided 11 tons of ballast (Ex. 179 p. 5; Ex. 180 p. 1-2); electrical and engine sub-surveys were available from Wards Marine Electric and Frank Griffin, Inc. (Ex. 179, p. 1, 23; Ex. 180 p. 9); the surveyor had not seen stability test results (Ex. 179, p. 5, Ex. 180, p. 2); there were no proven low-fuel alarms (Ex. 179, p. 10; Ex. 180, p. 6); a DC bilge pump was not working (Ex. 179, p. 17; Ex. 180, p. 2); engine room bilge pumps were not automatic (Ex. 179, p. 19); a possible hull structure issue existed with the lateral stiffener (Ex. 180, p. 3); and the fuel cleaning system was unproven. (Ex. 180, p. 6)

perform certain specified Recommendations (all of which were done much sooner).

Accepting arguendo that the identity of the builder was material, Plaintiff cannot validly assert, as it did for the first time at trial, that the fact that SeaQuest completed construction of the Yacht was not disclosed. The takeover of construction was fully disclosed before coverage was bound in the Patton Survey, which stated clearly: "Name and Address of builders: SeaQuest International Inc., Tampa". (Ex. 179 p. 3)

The A1 Survey (Ex. 100) was not required to be disclosed as Ashkenazy did not even know about its existence until after the loss, and the duty of *uberrimae fidei* extends only to known information. (Trial Tr. p. 2432) Plaintiff cannot meet its burden to show that PGG had any knowledge of the survey where Ashkenazy denied receipt and Chamberlain does not know whether it was given to PGG. (*See id.*; Trial Tr. p. 1769)

Nor is knowledge of the contents imputable to PGG, as Chamberlain was pursuing his own interest in being charter agent when it was unlikely that the Yacht would be chartered commercially. (Trial Tr. p. 1781, 2445-2447)  While Kent Chamberlain may have acted as Defendant's Yacht broker in connection with Defendant's purchase of the Yacht, this hardly makes Chamberlain Defendants' agent for all purposes. There is no evidence of an agency relationship with respect to Chamberlain for insurance matters. Consequently Chamberlain's knowledge of the survey is not imputed to Defendants.

However, if the Court finds that any of PGG's agents had knowledge of the A1 Survey that is imputed to PGG, any material information therein was disclosed in the Patton Survey. Chamberlain believed that the A1 Survey was not material. (Trial Tr. p. 1780-1781)  Had the A1 Survey contained any new material information, Chamberlain would have used it to negotiate down the purchase price, but it contained none. (Trial Tr. p. 1804-1805) O'Sullivan testified that A1 Survey items 1 and 8 would have caused her to revoke the quote issued. (Trial

14

Tr. p. 1148-1149) Item 1 states: "An incline experiment requires to be carried out and a stability book provided"; Item 8 states: "An International Load Line is not presently marked. A load line survey requires to be carried out after the stability booklet is produced." (Ex. 100) These Recommendations provide the buyer and insurer no more information than the Patton Survey's General Recommendation 1. (Ex. 180 p. 1-2) Patton's surveyors also wrote that they had not seen stability results from incline tests in connection with the hull modifications. (Ex. 179 p. 5) Despite the possible absence of stability results, Plaintiff did not decline coverage or cancel the Policy after it received this information on December 12, 2005 through its agent. (Trial Tr. p. 1102-1104)

The foregoing items of the Patton Survey also adequately disclosed the remaining allegedly material portion of the A1 Survey. O'Sullivan said that the following passage from the A1 Survey would have caused her to revoke the quote:

> In an effort to increase buoyancy forward, the yacht was modified approximately four years ago. A false bow has been added and built over the original structure.
>
> Furthermore, 22,172 pounds of lead ballast was added to the aft keel section and a further 4,828 pounds were added to an area on the starboard side between frames number 28 and number 29.
>
> The following statement concerning these modifications was cited aboard. **Arthur Barbeito & Associates, Incorporated, drawing number SO1 dated 10/10/01 states:- Due to the fact that there is very little structural information on this vessel, it is not possible to perform a thorough and complete structural analysis to ascertain residual longitudinal strength of the hull. It has been assumed that the new bottom is providing some longitudinal and local strength. Therefore, Arthur M. Barbeito & Associates cannot assume responsibility for internal structural failure.**
>
> Calculations supported by drawings must be provided by a qualified naval architect and submitted to the technical committee of St. Vincent Commercial Registry for approval.
>
> These drawings and calculations should show that the structural integrity of the hull has not been compromised by these modifications and the yacht is suitable for open seagoing service.

(Ex. 100 p. 3) (emphasis in original).

The Patton Survey sufficiently disclosed the issues in the preceding quote from the A1 Survey to enable Plaintiff to request further information before covering the risk. The first two paragraphs are so similar in content to Patton's General Recommendation No. 1 that it may reasonably be inferred that Patton was reporting from the same onboard drawing viewed by Shorter, the A1 Surveyor.   (Ex 100 p. 3; Ex. 180 p. 1-2; see also Ex. 179, p. 3, 5)   That Recommendation indicated that a false bow had been added to increase buoyancy forward and that 11 tons of ballast (22,000 lbs.) had been added to correct stability problems.  *Id.*

Further, any material information in the paragraph containing the boldfaced quote from Barbeito was adequately disclosed in Recommendation No. 1, which stated that that the surveyors had not had an opportunity to review "structural analysis" validating bending or local structural load reinforcements regarding incline test and stability test results after the addition of the weighted keel.  (Ex. 180 p. 1-2)   It also recommended that naval architects be contacted and calculations and drawings be presented verifying the structural integrity, i.e., strength, of the Yacht after the hull modifications.  (*Id.*)

The information in the final two paragraphs quoted above was adequately disclosed by the same Recommendation, but did not have to be disclosed, as they state that incline tests would be required as a requirement of commercial registry, not an indication of seaworthiness. (Ex. 100 p. 2)  Plaintiff claims it is one of the top insurers of chartered pleasure yachts.  If such commercial registry survey results, are actually considered by Plaintiff in its normal course of business, Plaintiff must be aware of the requirement that owners of older non-classed Yachts present drawings and incline test results.  Commercial registry requirements are "part of 'the course and incidents of the trade [and] must necessarily be imputed to the underwriters.'" *Contractors Realty*, 469 F. Supp at 1295.

16

Plaintiff's recent reliance on the Barbeito quote must also be considered in light of the fact that Plaintiff failed to take the deposition of Arthur Barbeito to determine what his disclaimer actually meant.   Barbeito, like Plaintiff's paid witness Drew Hains, is located in Florida and could have been deposed.   Despite bearing the burden of establishing whether Barbeito's statement actually indicated that there was any structural problem, Plaintiff has chosen to leave that open to speculation.   Moreover, Plaintiff sent its experts to inspect the Yacht as late as April 2007, while having exclusive control of the Yacht, but never conducted any tests or analysis to indicate whether there was a problem with the Yacht's longitudinal strength.   Once again it chose to rely on pure speculation and innuendos.

Similarly, Defendants did not breach their duty of *uberrimae fidei* by not providing the Dubois E-mail (Ex. 91), which attested to the excellent performance history and seaworthiness of the Yacht, to Plaintiff, as all material information that PGG might have known from that email was disclosed to Plaintiff in the Patton Survey.   Deborah O'Sullivan testified that she found it "interesting" that completion of the Yacht took four years, cost an additional $4.5 million, and that Lovell wanted to bring the yard down.   (Trial Tr. p. 1039-1040)   However the standard of disclosure is whether information is material to the risk, not whether it stokes non-professional curiosity, and the circumstances surrounding the takeover of construction discussed in Ex. 91 were fully, if less dramatically, disclosed in the Patton Survey. The Patton Survey stated that the Yacht was originally to be delivered in 1999 but was delivered late after structural modifications. (Ex. 179, p. 1, 3; Ex. 180 p. 1)   This delay and need for modifications would have alerted an underwriter to the existence of construction issues and enabled them to ask for further information. *See Puritan*, 779 F.2d at 871. The existence of litigation itself is not material where the underlying facts have been disclosed, as was done here.   *See Contractors Realty*, 469 F. Supp at 1295.

17

The 120 and 90-day windows to take care of selected Recommendations were also sufficiently disclosed.  Plaintiff knew about the conditions addressed by the Patton Survey Recommendations. Plaintiff had sufficient information to enable them to could ask when or even if they would be addressed, condition coverage upon following the Recommendations, or place the Yacht on port risk only until they were complied with.  The duty of uberrimae fidei requires no more. *Puritan*, 779 F.2d at 872.

    C.    Plaintiff Waived the Right to Void Coverage Based on Nondisclosure of Information Outside the Survey When It Issued the Policy Without Objection After Receiving the Survey

Assuming, *arguendo*, that the Patton Survey failed to "to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it," in relation to any material information (*see Puritan*, 779 F.2d at 871), the Policy would still not be voided, as a lesser standard of disclosure applies in this case. As a preliminary matter, a lesser standard of uberrimae fidei applies to pleasure yacht owners, as noted by the First Circuit, which stated:  "Whatever the exact extent of the applicability of the strict uberrimae fidei standard, we cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage."  *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*  57 F.3d 50, 55 (1st Cir. 1995).

Secondly, Plaintiff's underwriters' issuance of the Policy, knowing that a survey existed, without reviewing the survey that had been sent to its agent, waived Plaintiff's right to avoid the Policy based on inadequate disclosure. As stated in Corpus Juris Secundum:

> The issuance of the policy by the company is, according to the generally accepted rule, a waiver of a known ground of invalidity, at least where the acts of insured are not fraudulent or insured does not know that the agent has exceeded his authority. It would be a fraud on insured to permit an insurance company to accept the premium and to issue a policy pretending to insure, but which could be avoided after a loss by a reliance on such a breach of condition.

18

CJS *Insurance* § 828. In a stunning admission, Plaintiff's underwriter O'Sullivan testified that it is her company's practice not to review surveys before issuing coverage, based on the belief that it is better to ignore the existence of a survey than to risk losing a customer:

> THE COURT: So, if there is a survey available why don't you want to see it before you bind the insurance?
>
> THE WITNESS: In the interest of time, it would actually be impossible to physically review surveys for every single submission that we receive, and that's where we go back and rely on what is our history with a particular manufacturer.
>
> THE COURT: When you say in the interests of time, let me see if [I] understand what you're saying.
>
> You're saying that you[']re making a business judgment that it would be better for the insurance company to be able to go ahead and enter into the contract rather than have to ask people to wait a week or a month or whatever that it took to thoroughly study every survey, at which point you might lose the customer to somewhat of a competitor?
>
> THE WITNESS: It does become a customer service issue. If this is a new purchase, they could be looking to close within a day of making the submission to us.

(Trial Tr. p. 1023)

It is clear that insurers can waive the defense of *uberrimae fidei*, as the Second Circuit has held that an insurer may forfeit the right to void a policy for non-disclosure of material facts where the insurer had post-loss constructive notice of the non-disclosure but did not assert the defense in denying the claim. *Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd.*, 780 F.2d 1082, 1091-1092 (2d Cir. 1986).

Although there is a split of authority, courts including District Courts in the Second Circuit have held that an insurer may waive its entitlement to full disclosure by failing to inquire about facts of which it has inquiry notice. For instance in *Continental Ins. Co., Inc. v. Viesta*, 1990 WL 127509 (D. Conn.), the Court wrote:

> The absolute right of an insurance underwriter to demand disclosure of material

19

facts in an application may be waived by the neglect of the underwriter to make inquiries concerning facts where a basis for inquiry is raised by the information which was communicated and where the facts disclosed are such as are calculated to put any reasonable and prudent underwriter on notice to conduct further inquiry. *Gulfstream Cargo Ltd. v. Reliance Insurance Co.*, 409 F.2d 974, 982 (5th Cir.1969).

1990 WL 127509 at *4.

In *Contractor's Realty*, a case with very similar facts, the Court refused to allow an insurer to avoid a policy. "The insurer's agent, acting with knowledge and with authority to recommend cancellation of a policy when material facts are disclosed, waived any right of the defendant to withhold or avoid the policy on the ground of nondisclosure by issuing the policy in suit to the plaintiff." *Contractors Realty Co. v. Ins. Co. of No. America*, 469 F. Supp at 1294-1295 (S.D.N.Y. 1979).

In *Commercial Union*, this Court refused to allow an insurer to escape liability based on facts it knew or should have known, stating:

> "The assured complies with the rule [of uberrimae fidei] if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it. ... Commercial Union had its own good faith duty to read what it had requested, especially when the insurance coverage for the individual licensees was expressly made subject to their provision of such requested documents."

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 982 F. Supp. 310, 314 (S.D.N.Y. 1997). In the case at bar it is likewise uncontested that Plaintiff's underwriters bound coverage, knowing that a survey existed, but without reading it. (Trial Tr. p. 1068-1070) However Plaintiff and its agent, in their haste to secure business regardless of the nature of the risk, did not honor the "reciprocal duty on the part of the insurer to deal fairly [and] to give the assured fair notice of his obligations." *See Contractors Realty*, 469 F. Supp. at 1294. No provision of the Policy nor anything represented to PGG by the Kelly Agency would have given boating novice PGG notice (a) that further information was needed or (b) that failure to provide other

information would void the Policy.

By not asking for the surveys disclosed on the Megayacht Worksheet, or additional information before or even after coverage was bound, Plaintiff led PGG to believe that the required disclosures had been made, and "issue[d] a policy pretending to insure, but which could be avoided after a loss by a reliance on" the surveys not being provided. *See* CJS *Insurance* § 828.

> D. Regardless of Waiver, Information Not Disclosed by the Survey Was Immaterial in That a Reasonable Insured in PGG's Position, Having Been Told by Plaintiff's Agent That Further Information Was Not Needed, Would Not Have Known That Undisclosed Information Would Control the Decision to Bind Coverage

PGG was not required to disclose further information after providing the Patton Survey, because a reasonable insured would not have believed other information was material. The materiality of a particular fact is determined from the point of view of the insured: "The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material.... To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986).

Plaintiff's agent Peter Kelly said that he did not even need the Patton Survey to bind coverage, but PGG's attorney David Kriss provided it anyway. (Ex. 173; Trial Tr. p. 927-928) The cover email stated "Let me know if you need anything else." (*Id.*) As the Kelly Agency had been Plaintiff's agent for 25-30 years, and Peter Kelly had been its agent for 15 years, he certainly knew what Plaintiff's underwriters required. (Trial Tr. p. 937-938) An insurer can consent to receipt of less information than *uberrimae fidei* normally requires, as Plaintiff's agent did in this case. *See King v. Allstate Ins. Co.*, 906 F.2d 1537 (11th Cir. 1990). Plaintiff's agent intended to and did convey that no further information was needed, and Defendants relied on

this representation.

In addition, the Patton Survey indicated that if there were conditions affecting insurability, the applicable Recommendations would be starred. (Ex. 180 p. 1) No Recommendation was starred. (*Id.*) Thus any alleged non-disclosure relating to topics touched on by the Patton Survey would not be considered material by a reasonable insured in PGG's position. PGG would not have known that the information in the A1 Survey or Dubois Email discussed above was material because a "survey itself, where the underlying conditions it reported were known to the insurer or were immaterial to the risk, [is] not material." *Contractors Realty*, 469 F. Supp. at 1295.

The A1 Survey was a survey that was performed for the limited purpose of exploring a commercial registry to charter for hire the Princess GiGi in St. Vincent & Grenadines, as specifically stated at page 1: "In order to comply with St Vincent Commercial Registry for Pleasure Yachts, the following findings will have to be addressed". (Ex. 100 p. 1)  It was patently clear that the sole purpose of this survey was to identify items that the new owner would have to address to comply with the St. Vincent Commercial Registry for Pleasure Yachts for chartering purposes, not for pre-purchase, insurability or safety purposes that were addressed by the Patton Survey. (Trial Tr. p. 1773)

The portion of the A-1 Survey that Plaintiff claims should have been disclosed contains no material information not disclosed by the Patton Survey.  In the above quoted section of the A-1 Survey that O'Sullivan read into the record (Trial Tr. p. 1048), it is beyond dispute that the information in the first two paragraphs was fully disclosed in the Patton Survey. (See Ex. 100 p. 3; Ex. 180 p. 1-2).  The remainder was also sufficiently disclosed, but to the extent that Plaintiff still asserts that the part quoted below was not disclosed, a reasonable insured would not consider it to be material:

The following statement concerning these modifications was cited aboard. **Arthur Barbeito & Associates, Incorporated, drawing number SO1 dated 10/10/01 states:- Due to the fact that there is very little structural information on this vessel, it is not possible to perform a thorough and complete structural analysis to ascertain residual longitudinal strength of the hull. It has been assumed that the new bottom is providing some longitudinal and local strength. Therefore, Arthur M. Barbeito & Associates cannot assume responsibility for internal structural failure.**

Calculations supported by drawings must be provided by a qualified naval architect and submitted to the technical committee of St. Vincent Commercial Registry for approval.

These drawings and calculations should show that the structural integrity of the hull has not been compromised by these modifications and the yacht is suitable for open seagoing service.

(Ex. 100 p. 3) (emphasis in original).  While attention-grabbing, it is self evident that boldface is used to indicate that that section is used to indicate a quotation, and not used to emphasize the importance of the statement.  Context ("The following statement…") and the absence of an indented block quote or quotation marks, clearly indicate that the author used bold to distinguish the quote seen onboard from the surveyor's own comments.  (*Id.*)

As testified by Warren Lovell, Barbeito had no role in regard to longitudinal strength or hull structure, making such exculpatory language devoid of any probative value.  (Trial Tr. 1668-1669)  Rather it is pure disclaimer language typically used on naval drawings. (Trial Tr. p. 1786-1787, 1791-1792)  Chamberlain spoke directly to the A1 surveyor Roy Shorter about this section and confirmed that no action was needed (Trial Tr. p. 1785-1787)  Plaintiff chose not to depose Shorter, leaving open to guesswork Shorter's intention or purpose.

Nor was information in the Dubois email (Ex. 91) material.  A reasonable person in Defendants' position would not have known that the information in the email was material, where the Patton Survey had been disclosed and PGG had been told by its broker that any issues discussed in the email would be revealed in the survey.  (See Ex. 91)  A reasonable insured

further would not have believed that "unfounded rumors" would control the decision to bind coverage at a particular premium. (*See id.*) The email, in fact, negated any belief that PGG may have held that the rumors discussed therein would have controlled the underwriter's decision to bind coverage; it assured PGG that the rumors were untrue, and that any problems would be revealed in the Patton Survey. (*See id.*) A reasonable insured in those circumstances would not have considered the material therein to control the risk.

E.    Plaintiff Failed to Prove that Its Underwriters Subjectively Relied on the Nondisclosures Testified to at Trial in Deciding to Bind Coverage

The area in which Plaintiff's proof of a breach of *uberrimae fidei* fails most spectacularly is with regard to establishing that Plaintiff's underwriters were induced by asserted nondisclosures into binding coverage at a particular premium. "This issue, inducement, differs from the materiality point: it concerns the actual underwriter rather than the imaginary "reasonable" or "prudent" underwriter." 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-14, at p. 312-14 (4th ed. 2004) (emphasis in original).    "Virtually all the American admiralty cases require inducement, but the opinions often do not clearly distinguish between the materiality and inducement issues." *Id.* at p. 314.

Plaintiff cannot prove actual reliance or inducement, because its underwriters chose not to request any surveys from the Kelly Agency, despite knowing of their existence, before binding coverage at the agreed premium. (Trial Tr. p. 1069) Had other surveys containing that information been provided to the Kelly Agency, they would not have been reviewed by the underwriters, because in its 25 years of dealing with Plaintiff, the Kelly Agency only provides such surveys when requested by the insurer. (See Trial Tr. p. 936-937, 941-942, 982)

At the time coverage was bound, Plaintiff did not bother to review a survey because it wanted to secure Defendants' business and not lose a wealthy customer to Zurich or other

competitors bidding to take the risk. (Ex. 199 at FED 00220; Trial Tr. p. 960, 1059-1061) This was a business judgment. "[M]ateriality must be assessed as of the time the contract was entered into." *Christiania General Ins. Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268, 279 (1992). Plaintiff's actions at that time demonstrate that it did not consider any surveys to be material to the decision to bind at a particular premium, where a competitor was eager to take on the same risk. (Ex. 199 at FED 00220; Trial Tr. p. 1059-1061) That Plaintiff elected not to read the Patton Survey proves that the premium would not have changed—even if the Patton Survey explicitly included all of the details Plaintiff claims were not disclosed.

Further, Plaintiff failed to cancel the Policy, and even went on writing new endorsements after coverage had been bound without a survey. (Trial Tr. p. 1102-1104) This behavior objectively proves that Plaintiff was not relying on the content of any survey or other information when it bound coverage at the agreed premium.

To meet its burden to prove inducement, Plaintiff would have had to show that absolutely undisclosed material information, standing alone, would have controlled the underwriter's decision. Thus, the Court must first make the threshold determinations of which alleged evidence, if any, was (1) absolutely undisclosed, (2) material from the point of view of a reasonable insured, and (3) material from the point of view of a reasonable underwriter (as discussed below). Then the Court must consider whether Plaintiff's underwriters' testimony reliably establishes what the underwriters would have done, if: (1) the material, undisclosed information had been disclosed, and (2) the underwriters actually knew everything that the Patton Survey disclosed or raised inquiry notice about. Such testimony would be inherently speculative and unreliable since the underwriters now have the benefit of hindsight.

Plaintiff's underwriters' testimony fails to establish that there is any alleged non-disclosure that would have changed their decision to cover the Yacht even if they had been

willing to underwrite after reviewing the Patton Survey. Plaintiff's counsel's questioning was insufficiently precise for the Court to discern what information would have affected the underwriters' decision to bind coverage, where they have been deemed as a matter of law to have been satisfied with the Patton Survey. The underwriters testified that they would have denied coverage based upon documents containing a mish-mash of (1) allegedly undisclosed information, (2) information known from the Patton Survey, and (3) information that did not have to be disclosed because a reasonable assured or reasonable underwriter would not consider it material.

In the ordinary case an underwriter's conclusory hindsight statements that coverage would have been denied due to non-disclosure are entitled to little weight. *See Carpinone v. Mutual of Omaha Ins. Co.*, 265 A.D.2d 752, *755 (3d Dept. 1999) ("[C]onclusory statements by an insurance company employee, which are not supported by documentary evidence, are insufficient to establish that plaintiff's misrepresentations were material as a matter of law."); *Sonkin Associates, Inc. v. Columbian Mut. Life Ins. Co.*, 150 A.D.2d 764, 765 (2d Dept. 1989); *Christiania General Ins. Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268, 279 (2d Cir. 1992). In the present case, Plaintiff has failed to introduce underwriting guidelines or evidence of other situations where a survey explicitly finding no conditions affecting insurability was supplied and coverage was denied anyway.

A further reason to grant little or no weight to the underwriters' testimony is that they did not, and still do not, understand or have familiarity with the contents of marine surveys. O'Sullivan and Capiga's testimony demonstrated a serious lack of understanding about the significance of the alleged non-disclosures, and whether or how those would affect the risk.[4]

---

[4] Plaintiff's underwriters did not satisfy the burden to explain how the alleged non-disclosures might affect the risk other than that they were "interesting," would "raise questions," might indicate "there is something not right," "would make me curious," were "not language we're

26

(Trial Tr. 1039-1041, 1044, 1165-1166, 1170) Had alleged non-disclosures been made, O'Sullivan said she would have needed Patton's surveyors or someone else to explain them to her:

> I'm not a naval architect; I don't build boats, That would certainly lead me to say, what happened here, and somebody has to explain to me that this is okay and normal practice.

(Trial Tr. p. 1042) Her decision not to read the Patton Survey prevented her from asking the surveyors whether the items that they claimed should be disclosed would impact the risk; if she had, she would have learned--as Plaintiff did at the Connell and Riley depositions--that the conditions reported did not affect insurability. (See generally, Court Exs. 2 and 7) Patton surveyor Connell was the arbitrator of the Seaquest-Trident dispute, thus he would have been singularly able to reassure O'Sullivan that his inspection and the sea trial showed that the prior conditions had been remediated and did not affect the risk. (Court Ex. 7 p. 55-56)

Capiga's testimony is not credible and shows a lack of understanding of even her own employer's underwriting practices. Capiga said that Plaintiff would not have taken the risk based on some of the disclosures, but her superior O'Sullivan said that they might have taken the risk after receiving more information.  (Trial Tr. p. 1041-1042, 1053, 1168)  Further, Capiga lacked authority to decline a risk so her testimony doesn't establish what Plaintiff would have done abut the disclosures.  (Trial Tr. p. 1181) Capiga also said she would have been concerned about the need for an incline experiment—even though she doesn't know what it is. (Trial Tr. p. 1166-1167) Capiga finally stated that she doesn't believe that the insurer would have any further interest in the Yacht based upon the A1 Survey, without seeking further information even though O'Sullivan would have sought more information. (1168, 1180-1182)

---

accustomed to reviewing," contained "unusual language," or hinted that "there's a question out there." (Trial Tr. 1039-1041, 1044, 1165-1166, 1170)

As noted above, the underwriters did not testify to how the alleged non-disclosures would have affected their judgment, in light of their imputed knowledge of the Patton Survey. In fact, their lack of understanding of the terminology in the alleged nondisclosures, signifies their inability to distinguish which conditions were identified in the Patton Survey, possibly in different terms, from those which were not. Plaintiff has therefore failed to prove that any nondisclosure would have controlled the decision to bind.

**III.    Plaintiff Has Failed to Prove That the Loss Was Not Fortuitous**

Defendants have sustained their modest burden of proving that the loss was fortuitous, and need not establish the exact cause of loss. As stated by the Court in its April 15, 2007 memorandum order:

> PGG's "burden of demonstrating fortuity is not a particularly onerous one." *See Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980). Specifically, the law places only a nominal "burden . . . upon the insured to prove that a loss occurred and that it was due to some fortuitous event or circumstance," and the insured has no burden to prove the exact cause of the loss. *Id.* PGG has come forward with ample evidence that the storm, the failure of power and subsequent events caused the loss in the broad sense even if, with the benefit of hindsight, there were also certain structural failings that may have rendered the yacht more susceptible to this sort of predicament. In such circumstances, Federal's objection that an encounter with stormy weather was in some fashion foreseeable does not foreclose a finding that the loss stemmed from a "peril of the sea." See *Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp. 1046, 1061 (S.D.N.Y. 1997)."

(April 15, 2007 Order at p. 17 n.4) The Second Circuit has defined a fortuitous event as:

> an event which *so far as the parties to the contract are aware*, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, *provided that the fact is unknown to the parties*.

*City of Burlington v. Indemnity Ins. Co. of North America*, 332 F.3d 38, 49 (2d Cir. 2003) (emphasis in original) (quotation omitted). Commentators have noted that the standard is a subjective one, tied to the knowledge of the particular insured:

> It matters not whether loss was a physical certainty, but only whether the insured

28

was aware that that loss would occur. [T]his is a completely subjective standard. The court's inquiry is limited to the knowledge of the named insured at bar; it makes no difference whether a reasonable and prudent insured would have been aware that loss was imminent.

Stephen A. Cozen and Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 FORUM 222 (1985). Thus, in determining whether an insurance loss is fortuitous, the Court must gauge its inevitability by standing in the shoes of the parties at the time the contract of insurance is made.

In its Second Amended Declaratory Judgment Complaint (the "Second Amended Complaint") (Ex. 1), Plaintiff seeks a declaration that the loss was not fortuitous because it occurred <u>because of the conditions noted in the Patton Survey</u>, not the garage doors and exhaust vents, which were not addressed in the survey. The Second Amended Complaint states:

> The capsizing of the M/Y PRINCESS GIGI on or about February 6, 2006 was not caused by a fortuitous event, and/or did not arise out of an insured event under the Federal Policy, but rather was caused by the defendants intentional failure and/or neglect and/or omission to correct the deficiencies in the "Yacht" as recommended by Patton Marine.

(Ex. 1, p. 54)

Plaintiff's expert Randall claims that the loss was caused by sea water entering the engine room air exhaust vent, but it was not reported to be unsafe in the Patton Survey, the Dubois email, or any other survey that might have put the insured on notice. Nor according to Captain Robert Moore and Warren Lovell was it a source of water on prior voyages despite experiencing rough weather. (Trial Tr. p. 1645-1646, 2166) Moore captained the Yacht in seas as high as 12-15 feet, and Lovell sailed the Yacht in 10-12 foot seas with larger waves, yet the vent was not a source of water, proving it was not a latent defect. (*Id.*) As such any loss caused by entry of water through the vent was not known to the parties to be inevitable, and was thus fortuitous. Pertinent to the case at bar is the Court's holding in *Compania Transatlantica Centro-Americana, S A, v. Alliance Assur. Co.*, 50 F. Supp. 986 (D.C.N.Y. 1943) wherein it

held that the unintentional incursion of water into a vessel constitutes a fortuitous loss:

> I think the casualty was the result of a fortuitous entry of the sea water; that it was an event which might and did happen, not one which must happen. The very fact that the vessel had been voyaging without mishap attributable to the valve, whereas the defect of the valve as testified by respondents' witnesses, must have affected it for a long time, is proof positive that the casualty was in the realm of the possibilities and not of the inevitabilities.

> True it is that neither storm nor abnormal wave nor weather contributed to the disaster. But these are not the only perils of the sea. Small waves are likewise 'of the sea.'

*Id.* at 991; *see also New York, New Haven and Hartford Railway Co. v. Gray*, 240 F.2d 460, 464-465 (2d Cir. 1957)

Similarly, Plaintiff claims that the loss of power would not have happened absent crew negligence, a contributing event that would clearly be understood by the parties to be fortuitous, not inevitable. As Taylor admitted at trial under the Court's questioning, the pumps would have been sufficient to dewater the Yacht and prevent the capsize had the Yacht not lost power. (Trial Tr. p. 381-382) Taylor also admitted that the loss of power placed the Yacht at increased risk. (Trial Tr. p. 297)

Finally, any contribution to the loss from the impact of the 50-meter steel-hulled cargo vessel Searan Trader, while coming to the unexpectedly unpowered Yacht's aid, could not have been anticipated and is a textbook fortuitous event. Plaintiff cannot establish that the structural damage caused by the collision and described by Natalie Gorin is not the cause of loss. (Court Ex. 8 p. 82-83; Trial Tr. p. 2036-2038; Ex. 38 Photo 37) The impact of the 150-meter steel-hulled ship may have done immeasurable damage. (Trial Tr. p. 2036-2045, 2052-2054, 2100)

**IV.** **Plaintiff Failed to Prove a Breach of the Absolute Implied Warranty of Seaworthiness**

    A.    Plaintiff is Estopped from Relying on Conditions Disclosed in the Patton Report as Evidence of Unseaworthiness at the Inception of the Policy, or When the <u>Yacht Left the Dock on Its Last Voyage</u>

Much of the testimony of Plaintiff's experts' James Dolan, George Randall, and Robert Taylor (to the extent that Taylor offered opinion testimony) as to seaworthiness is inadmissible, because Plaintiff insured the Yacht with full knowledge of the risk as described in the Patton Survey. The predicate facts underlying Plaintiff's experts' opinions as to the seaworthiness of the Yacht at the inception of coverage, which is the time the absolute warranty of seaworthiness attaches (*see Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1066 (S.D.N.Y. 1997)) relate to the conditions contained in the Patton Survey and Recommendations. In particular, the conclusions in Dolan's report (Ex. 209) are entirely based upon the notion that the Patton Survey, which Plaintiff possessed, showed the Yacht to be unseaworthy.

However, because the Patton Survey and Recommendations were in the possession of Plaintiff prior to the inception of the Policy, and Plaintiff chose to insure the risk regardless of the information therein, Plaintiff's experts may not rely on the Patton Survey and Recommendations as evidence of unseaworthiness to establish a breach of either the absolute or negative warranty of unseaworthiness.  An insurance company is estopped from asserting the invalidity of a policy for the violation of any condition in that policy if, at the time it was issued, the carrier or its authorized agent had knowledge of that condition, and subsequently accepted the premium. *The Anthony D. Nichols*, 49 F.2d 927, 933 (S.D.N.Y. 1930); *St. Paul Fire & Mar. Ins. Co. v. Christiansen Marine, Inc.*, 893 So. 2d 1124 1133-1134 (Ala. 2004) ("[T]he absolute nature of the warranty does not insulate an insurer from the ramifications of its own conduct.");

*Reynolds v. Canton Ins. Office, Ltd.*, 98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917); CJS *Insurance* § 828.

Plaintiff's agent, after receipt of the Survey, bound coverage without any limitations or warranties. In reliance, the insured entered an insurance contract that Plaintiff now claims was void from its inception; and in reliance the insured paid premiums and allowed the Yacht to go to sea, never suspecting that Plaintiff would deem the Patton Survey and Recommendations as evidence of the Yacht's unseaworthiness. "[T]o permit [Plaintiff], after receiving the premium, to defeat a recovery, on the ground that she was not seaworthy in consequence of alleged defects of construction, known to it at the time of taking the risk, would scarcely be consistent with commercial morality." *Thebaud v. Great Western Ins. Co.,* 155 N.Y. 516, 524 (N.Y. 1898). *See also Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.*, 277 U.S. 66, 78, 48 S.Ct. 459, 462 (1928) ("The Mackey was undoubtedly very old and somewhat decayed, but her condition, her history and all the facts regarding her were fully known to the company at the time the policy was executed, a written record stating all the particulars being on file with the company.")(citation omitted); *American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation*, 269 F. 768, 770 (2d Cir. 1920).

Plaintiff's experts' testimony that the conditions identified in the Patton Survey indicate unseaworthiness must be precluded, because Plaintiff had the opportunity to decline coverage or wait to review a survey, but instead bound coverage with actual knowledge that a survey existed and was available, and with imputed knowledge of its contents. *See Compania de Navegacion*, 277 U.S. at 78; *Thebaud,* 155 N.Y. at 524; *Reynolds*, 98 Wash. at 427. Plaintiff made a business judgment that the value of securing a lucrative customer outweighed the risk that the Patton Survey, which they chose not to read, might indicate conditions that would make the Yacht unseaworthy. (*Id.*) Because the law does not allow Plaintiff to escape liability on the

Policy because of a known condition, Plaintiff's experts may not now rely on the information that was known to the insurer at the time it accepted the risk to attempt to establish a violation of the Policy.

The Patton Survey Recommendations disclosed clearly that all watertight bulkheads were compromised and proper seals should be verified.  (Ex. 180 p. 2)  The Patton Survey also disclosed clearly that the Yacht had a non-working DC bilge pump and non-automatic engine room bilge pumps.[5]  (Ex. 179, p. 17, 19; Ex. 180, p. 2)  The Patton Survey further revealed the existence of the Wards and Griffin Surveys.  (Ex. 179 p. 1, 23; Ex. 180 p. 9)

Nor may purported cause and origin expert Randall testify as to his opinion on breach of the negative implied warranty of seaworthiness to the extent that conditions disclosed by the Patton Survey underlie his opinion.  Randall's opinion as to unseaworthiness and the cause of loss centers on an alleged lack of watertight bulkhead integrity, represented by the gap around the I-beam, and lack of pumping capacity, and issues with these were disclosed in the Patton Survey. (Ex. 179, p. 17, 19; Ex. 180, p. 2)   It is well settled that where a covered cause of loss acts concurrently with non-covered causes of loss, the loss is covered. Plaintiff cannot disclaim coverage based on conditions that were disclosed in the Patton Survey and thereby known to it. *See Compania de Navegacion*, 277 U.S. at 78; *Thebaud,* 155 N.Y. at 524; *Reynolds*, 98 Wash. at 427.   As the alleged lack of watertight bulkheads and alleged lack of pumping capacity are alleged by Randall to be causes of loss, but were known to the insurers, these conditions are covered.  Because Randall's conclusions based upon the survey are inextricably intertwined with his opinion as to other conditions, his testimony must be precluded in its entirety.

B.    The Standard of Seaworthiness is not One of Perfection, but Reasonable Fitness

Plaintiff has failed to prove a breach of the absolute warranty of seaworthiness, as a

---

[5] These recommendations nonetheless were complied with and remedied prior to the closing of the sale.

vessel need not be perfect--merely reasonably fit--to be seaworthy. "The law presumes that every vessel is seaworthy until the contrary is proved, and the burden of proving unseaworthiness lies with the insurance company." *Austin v. Servac Shipping Line*, 794 F. 2d 941, 945 (5th Cir. 1986). As the United States Supreme Court has stated, "The standard [for seaworthiness] is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 322 (1964) (citations omitted). "[A]lthough unseaworthiness is a broader form of liability than negligence … it does not impose a duty of perfection on shipowners." *Morton v. Berman Enterprises, Inc.*, 669 F.2d 89, 92 (2d Cir. 1982). "The insured's warranty of seaworthiness is Not [sic] a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards." *Contractors Realty*, 469 F. Supp at 1293.

While Plaintiff's experts have testified as to ways that they claim that the Yacht might have been designed or constructed in a better manner, this is of no moment. "Even though a better design might have been achievable, [that] did not render the vessel unseaworthy." *Thornton v. Deep Sea Boats*, 399 F. Supp. 933, 935 (S.D. Ala. 1975). *See also Contractors Realty*, 469 F. Supp at 1293. A vessel does not become uninsurable just because it has room for improvement. "It is, of course, true that a given ship, applying for insurance, may be considered a better risk, and better able to withstand even perils of the sea, than another seaworthy ship. But that fact does not preclude the idea that both ships must be seaworthy." *Fireman's Fund Ins. Co. v. Compania de Navegacion, Interior, S.A.*, 19 F.2d 493, 495 (5th Cir. 1927).

Plaintiff attempts to impose a standard that would render most pleasure boat coverage illusory. The standard of seaworthiness required of pleasure boats, as opposed to classed

commercial vessels with which Plaintiff's experts have experience, is so different that courts have held that the implied warranty of seaworthiness does not even apply to pleasure boats. *See Contractors Realty v Insurance Co. of North America*, 469 F. Supp 1287, 1294 (S.D.N.Y. 1979); *Mathis v. Hanover Ins. Co.*, 192 S.E.2d 510, 511-512 (Ga. Ct. App. 1972) ("The most that the applicant for [yacht] insurance can be said to warrant is that the boat is presently afloat (if in the water) and that he presently knows of no reason why it should sink. … If insurers want more than this, they can insist upon inspecting a boat before issuing a policy."); *Johnson Bros. Boat Works v. Conrad*, 156 A.2d 175, 179 (N.J. Super. 1959) ("The court has grave doubts that an implied warranty of seaworthiness should be applied in a case such as the present one where the boat is a pleasure craft.").

      C.    All Evidence Shows that the Yacht Was Reasonably Fit For Its Intended Use at the Inception of Coverage

The evidence overwhelmingly demonstrates that the Yacht was seaworthy at the inception if the Policy. Before the sale, the Yacht traveled 38,000 miles with a single day out of service. (Trial Tr. p. 1642-1643, 1645)  To determine the Yacht's condition, PGG spent approximately $30,000 to employ Patton Marine Inc. to conduct inspections and a sea trial and issue a written report. (Trial Tr. p. 2440)  Patton's surveyors spent four days inspecting the Yacht. (Ex. 179 p. 1) Chamberlain testified that Patton's reputation for reliability is such that it is easier to obtain financing and insurance when they are the survey company.  (Trial Tr. p. 1796) Plaintiff's underwriters rely on Patton.  (Trial Tr. p. 1186)

The Patton Survey explicitly stated that there were no conditions affecting the seaworthiness of the Yacht. Nevertheless, Chamberlain and Captains Moore and Papa all testified that substantially all of the Patton Recommendations had been addressed in the month between the signing of the sale contract and the inception of coverage. (Exs. 179 and 180; Trial

Tr. p. 1496, 1511, 1754, 2189) Defendants' expert Christian reviewed the Patton Survey and determined that the vessel was seaworthy. (Trial Tr. p. 2054-2055)  PGG's broker Chamberlain testified that there was nothing out of the usual and nothing he could use to negotiate price down. (Trial Tr. p. 1804-1805)  Plaintiff did not establish that any bulkhead penetrations existed at the time of the inception of coverage that would make the Yacht unseaworthy.   Captains Papa and Moore testified that all penetrations noted in the survey had been sealed. (Trial Tr. p. 2206-2208, 2210, 1474, 1476-1477)  The penetrations were too high to affect seaworthiness anyway. (Trial Tr. p. 1268)  The 3 by 5 inch rectangular hole was properly sealed with a foam soft patch and block.  (Trial Tr. p. 2207) The mousehole was equipped with a mechanical plug. (Trial Tr. p. 2207-2208) Randall could not conclude otherwise.  (Trial Tr. p. 1418, 1430)  There is no evidence that the I-beam hole existed at the inception of coverage, before the port garage winch was changed to accommodate two jet skis, and it was so tiny and easily closed that it was not unseaworthy.  (Trial Tr. p. 1503-1504; Court Ex. 11, p. 35-36)  After towing, Salvor Ray Darville did not see any holes in the bulkhead of the port garage other than the 3 by 5 that was filled with form.  (Court Ex. 10 p. 159-160)

Plaintiff has failed to show any nexus between trim and stability problems recognized early in construction and the Yacht's condition at the inception of coverage.  Drew Hains testified that the Yacht was only 35% complete when he left Trident.  (Trial Tr. p. 798) Warren Lovell testified that after Hains' minor involvement ended in January 1999 he spent millions to create the Yacht he wanted. (Trial Tr. p.1672-1673)  A Koopnautic Stabilizer and other systems were installed as they had opportunity to upgrade two steps above prior technology. (Trial Tr. p. 1656)  Moore intentionally flooded a bilge with a hose without problem.  (Trial Tr. p. 2199) Lovell attested to the trim and stability of the Yacht and the fact that the only reason it had been sold was that it had served him so well that there was no place new to go without going to

Europe. (Trial Tr. p 1651-1655)  Defendants' expert Michael Christian testified that sailing 38,000 miles is proof of seaworthiness.  (Trial Tr. p. 2060-2061)  The Patton Survey sea trial revealed no instability.  (Trial Tr. p. 2217-2218; Ex. 179 p. 6-8)    Moore testified that an additional pig of lead was added only to compensate for the fact that large heavy-duty expedition boat was being removed when the Yacht was put up for sale.  (Trial Tr. p. 2179) In response to the plethora of evidence that the Yacht was stable, Plaintiff offers no rebuttal evidence of instability, only red herrings and speculation that additional tests could have been done even though everyone felt that the problems were solved.

Nor does the Bench Order (Ex. 76) indicate that the Yacht was otherwise defective when completed.  Lovell testified that his dissatisfaction was not about safety but misrepresentations and delays.  (Trial Tr. p. 1621, 1623) A perfectionist owner's personal dissatisfaction does not render a vessel unseaworthy. *Contractor's Realty*, 469 F. Supp. at 1293-1294. The conditions in the Bench Order were remediated by Captain to Moore. (See Ex. 76; Trial Tr. p. 2152)

Plaintiff did not establish that the garage doors' design rendered the vessel unseaworthy. In fact garages were part of the original design. (Trial Tr. p. 2155) The garage doors were not designed to be waterproof, just a cosmetic cover keep the tenders and jet skis clean. (Trial Tr. p. 2061-2063)  It was self-bailing, angled so any water would run out under the gasketless bottom of the back doors and scupper drain.  (*Id.*)  The design of garage doors was very common. (Trial Tr. p. 2056, 2062)

Plaintiff did not establish that the engine room exhaust vent was unseaworthy.  The vent was built at an incline and the bottom of the chase was five feet above the waterline. (Trial Tr. 1714, 2167)  The louvers were angled to keep out spray while moving forward.  Operating the Yacht in up to 15-20 foot seas, neither Moore nor Lovell ever observed water entering the engine room. (Trial Tr. p. 1646, 2166)  There is an overpressure of air in the engine room and a

37

powerful fan which expels any water coming through the louvers with extreme force. (Trial Tr. p. 2162)  The exhaust vent was equipped with a damper that could be employed to completely shut out water, and the damper was found closed.   (Trial Tr. p. 340-341, 1714)   The configuration is quite common and cannot be higher due to sound and odor issues. (Trial Tr. p. 2161) Had the height of the exhaust vents been so obviously dangerous it would have been obvious to the Patton surveyors, the A1 surveyor or any other observer. (See Trial Tr. p. 1346-1348) It also would have revealed itself during prior voyages, but did not in over 38,000 miles of sailing for Lovell, even in bad weather. (Trial Tr. p. 1646) This indicates that the vents were fine until they met 30 foot swells and loss of power, that prevented the captain from steering the bow into the waves. (Trial Tr. p. 1478)

Plaintiffs have put on no evidence that the bilge pumping capacity made the Yacht unseaworthy. The Yacht had adequate pumping capacity in its AC bilge pump and engine powered bilge pumps.  (Trial Tr. p. 1994, 2055)  The AC bilge pump could dewater at 90 gallons per minute, and had been serviced before the voyage.  (Trial Tr. p. 1507, 2230-2231) The engine powered eductor dewatered at 460 gallons per minute.  (*Id.*)  The pumping capacity was shown to be adequate on the final voyage as the pumps were keeping up until the loss of power.  (Trial Tr. p. 1507)  In addition, the Yacht had a portable gasoline powered emergency dewatering pump that could have been used without power, but was left in the garage on the last voyage, where the crew could not reach it after the power loss. (Ex. 180 p. 2; Court Ex. 15, p. 74-75)  As Taylor admitted, the pumps would have been sufficient to prevent the capsize had the Yacht not lost power. (Trial Tr. p. 381-382)  Randall did not calculate the AC and engine powered pumps' capacity.   (Trial Tr. 1583-1584)  Instead, he only calculated the actual and nominal pumping capacity of hand-sized DC stripping pumps used for clean-up. (Trial Tr. p. 1408, 1581-1583)

D.    Plaintiff's Experts' Testimony Should Be Struck or Given Minimal Weight

The Court should also led little credence, if any, to the testimony of Plaintiff's experts Randall and Dolan, neither of whom is qualified to testify as to the seaworthiness of a private pleasure craft.  Both attempt to apply requirements of classed commercial vessels, as that is where their expertise lies, but the Yacht is only required to be fit for its intended use. (See Trial Tr. p. 1238, 1247, 1412)  The Princess GiGi, like most pleasure craft, is not built to class.  ((Ex. 179, p. 3, 16; Trial Tr. p. 1412)  Randall has never sailed on a megayacht.  (Trial Tr. p. 1413) Dolan only did one pleasure yacht survey in the last four or five years.  (Trial Tr. p. 1247) Dolan testified that the Yacht was not required to have watertight bulkheads, and does not testify that a lack of watertight bulkheads renders a vessel unseaworthy, just that it was not in accordance with the drawings he saw.  (Trial Tr. p. 1263) Dolan is a professional litigation consultant who has frequently been given business by Nicoletti, possibly more than a half dozen times, and knew that the insurer was looking for reasons to support the earlier denial of the claim. (Trial Tr. p. 1272-1274)

Randall is a professional insurance company witness. (Trial Tr. p. 1415)  His discussion of the broken marble after the collision is directly contradicted by testimony and statement about structural damage. (Trial Tr. p. 1555)   As the statement of Nathalie Gorin that was provided to Randall but withheld from Defendants stated unequivocally:

> As soon as he got away from us we had a fast tour of the boat to report what was damaged.  The second deck sliding doors could not close anymore, the kitchen marble floor got broken, the starboard navigation lights were exploded, the structure of the boat certainly got damaged.

Ex. 189 at HA000171.  His testimony showed other instances of him picking and choosing which crew testimony to rely upon, always crediting the testimony that helped Plaintiff.  (Trial Tr. p. 1555; 1565-1566) He ignored Lt. Wong's report and testimony that the rescue helicopter

was 80 feet up--50 feet above the heaving yacht; this showed that 30 feet was the average wave height, or else the helicopter would not have been 50 feet away as he testified. (See Ex. VVVVV; Ex. VVVVV1) Randall similarly testified that he discredited Wong's testimony because it described conditions that would be "off the charts" even though Wong was reporting the conditions based both on his eyes and instruments. (Trial Tr. p. 1565-1566) Clearly Randall was not employing the same intellectually rigorous methodology he would use in non-litigation work in the courtroom. *Kumho Tire Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004).

**V.     Plaintiff Failed to Prove that Defendants Breached the Negative Implied Warranty of Seaworthiness**

     A.     <u>The Standard</u>

Plaintiff failed to prove that Defendants breached the negative implied warranty of seaworthiness. Plaintiff always bears the burden of showing that a vessel was unseaworthy. *Austin*, 794 F.2d at 945. To show a breach of the negative implied warranty of seaworthiness, Plaintiff must also prove an owner's knowledge of the unseaworthy condition and a proximately causal relationship between the unseaworthy condition and the loss. *Continental Ins. Co.*, 952 F. Supp. at 1070.

Thus, even if Plaintiff meets its burden to show "(1) that the vessel was unseaworthy; (2) when it 'broke ground'-or went to sea; and (3) that the owner had knowledge that the vessel was unseaworthy and yet allowed it to sail anyway[,] the consequence of a violation of this 'negative' burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness." *Id.*

     B.     There Is No Evidence That the Yacht Had any Known Unseaworthy Condition <u>When It Left the Dock</u>

Plaintiff cannot prove that any known unseaworthy condition existed when the Yacht

left the dock—the only time when the negative implied warranty can be breached.  Much like the vessel in *Contractor's Realty*, "[f]rom the date of delivery, the yacht continuously underwent all necessary maintenance and repair, and any condition that possibly might have had an impact on the safety of the craft was always cured by immediate corrective action." *Contractor's Realty*, 469 F. Supp. at 1293.  The Patton Survey Recommendations were used as a punchlist and dealt with before or soon after the closing, when Lovell's engineer remained onboard for a month. (Ex. PPPP; Trial Tr. p. 2189, 1511)  Papa had an open checkbook to do whatever he needed. (Trial Tr. p. 1469, 2434)  About ten people were working on the boat every day in port.  (Trial Tr. p. 1469-1472; Court Ex. 8 p. 168-170;  see generally Court Exs. 9 and 10)  Papa complied with the Recommendations and made whatever other improvements he thought to make the Yacht perfect.  (Trial Tr. p. 1469; Ex. LLLL; Exs. PP through Ex. III)  The Yacht performed with no problems on its month-long first voyage to the Bahamas and had no problems when Rese came on board.  (Trial Tr. p. 1483; Court Ex. 13 p. 8; Court Ex. 11 p. 9)

There is no evidence that water entered from the port garage through the aft engine room bulkhead.  Penetrations in the bulkheads noted in the Patton Survey were dealt with immediately. (Trial Tr. p. 2206-2207)  The I-beam gap was not known to the crew or PGG before this voyage, has not been proven to have existed at departure, and was leaking so little that it was easily sealed by stuffing it with rags when there was little water in the bilge. (Court Ex. 11 p. 35-36; Court Ex. 13 p. 41-42)  The mouse hole was filled with a mechanical plug. (Trial Tr. p. 1476-1477, 2208, 2225)  The 3 by 5 inch rectangular hole over the I-beam was filled with expandable foam, which is an acceptable sealant under the circumstances.  (Trial Tr. p. 2055)  Had either of these been a source of water it would have been seen by the crew stuffing plastic bags around the I-beam.  (See Ex. 8A Pictures 402, 420, 428; Trial Tr. p. 150)  No crew members saw any such leaks from the 3 by 5 inch hole or mousehole as they were

properly sealed.  Meanwhile the salvor Ray Darville reported that water was still entering from engine room through unknown source five days after the vessel was righted, so there is an unexplained source of water that is not necessarily due to an unseaworthy condition existing when the Yacht left port. (Trial Tr. p. 547, 548, 551)

Papa was not rushed into leaving with any projects undone, contrary to the unsupported accusation of Marcus Mitchell.  (Trial Tr. p. 1488, 1493)  Bolstering Papa's contention, Debra Ashkenazy said the family was going for Presidents Day week; the Court may take judicial notice that the holiday is always the third Monday in February, *i.e.*, Feb 16, 2006, a full 12 days after the departure.   (Trial Tr. p. 2395-2397)  The Ashkenazy family was to be onboard, so Defendants would not have let it sail in an unsafe condition.

Other allegedly unseaworthy conditions have been shown not to be unseaworthy in the preceding discussion of the absolute warranty.  As set out above, any condition that Plaintiff could have learned about from the Patton Survey cannot be a basis for the denial of coverage due to estoppel, but the Patton Survey indicated no unseaworthiness in any event.

Water entering through the exhaust vents was not the proximate cause of the loss.  Plaintiff's witness Taylor concluded that the exhaust vents were not a significant source of water until the crew was abandoning ship, after six hours.  (Trial Tr. p. 342-343) In the closed position in which the damper was found, it would have nearly completely kept all water out of the engine room.  (Trial Tr. p. 341-342)  The crew reported that when abandoning ship the Yacht was listing no more than 15 or 20 degrees, and Taylor stated that it would have to be more than 20 degrees for significant flooding to set in.  (Trial Tr. p. 342, 344-345,1477; Ex. 9A, Typed Notes)

C.    There Is Strong Evidence That Weather, Loss of Power and the Collision With a Cargo Ship Combined to Cause The Loss, and These Are Covered Perils as the Court Has Found that the Policy Is an All-Risk Policy

Plaintiff has failed to satisfy its burden of showing that a known unseaworthy condition proximately caused the loss.  There is strong evidence that the proximate cause was weather, loss of power and/or the damage caused by the collision, without any of which the Yacht might have survived without capsizing.  Further it has not been proven whether the loss of power was due to fuel exhaustion or contamination.

> [w]here two causes exist, the court should properly look for the cause which rendered the loss inevitable, distinguishing between the proximate cause and the remote cause.

*Lone Eagle*, 952 F. Supp. at 1062.

The loss was primarily caused by the extreme weather that overtook the Yacht.  (Trial Tr. p. 2002-2003)  Loss due to weather is the classic peril of the sea and covered under the subject Policy of insurance.  The Coast Guard rescue co-pilot Marcus Wong reported that the weather was "very unusual" for the Bahamas. (Court Ex. 6 p. 13)  Relying on his precision instruments, Lt. Wong reported that the weather featured swells of 25-30 feet with 10-12 foot seas and 25-30 knot winds.  (Court Ex. 6 p. 16-17; Ex. VVVVV; Ex. VVVVV-1)  Unlike the self-serving interpretation by George Randall that waves of that height would only occur every few hours, the report specifically states the height at which the copter hovered while attempting the hoist as being 80 feet above the sea and 50 feet above the heaving Yacht, leaving a difference of 30 feet. (Court Ex. 6 p. 27; Ex. VVVVV; Ex. VVVVV-1) Had the vessel not been going up 30 foot swells, this altitude would make no sense.  (*Id.*)   In addition, Natalie Gorin reported that the seas were so rough that they could see the propeller of the adjacent cargo ship when it dove into the waves. (Court Ex. 8 p. 79-80; Ex. 189 p. HA000171)

Captain Papa described the weather as "very rough and strong."  (Trial Tr. p. 1466)

These swells were not anticipated in the pre-departure forecast. (Trial Tr. p. 597, 599) Papa told Mitchell 20 ft. swells and 8-10 foot seas. (Trial Tr. p. 660) Christian testified that without power the Yacht could have survived dead in the water, but not in this weather.  (Trial Tr. p. 2002-2003, 2007-2008, 2073-2074)  In previous voyages with lesser swells and waves, the Yacht never took in water through the exhaust vents.  (Trial Tr. p. 1646, 2166)  In addition, without the severe weather, the cargo ship that came to render assistance should have been able to come alongside safely instead of smashing into the heaving Yacht. (Trial Tr. p. 2023, 2028-2029)

The loss of power was undoubtedly a major factor in the loss. As Plaintiff's original investigator Taylor reported before he was dismissed, without power the Yacht was at increased risk, and "if there had not been a loss of power, such leaks as were occurring could have been dealt with without the vessel capsizing." (Trial Tr. p. 297, 381-382)  The loss of power was likely due to fuel contamination, rather than fuel exhaustion, and while neither source would allow Plaintiff to deny coverage, fuel contamination cannot be claimed to have been caused by crew incompetence.  (See Trial Tr. p. 1995) Taylor was unable to rule out fuel contamination. (Trial Tr. p. 310)  Rese and Fudge suspected that the source of the power loss was fuel contamination, saw the fuel was dirty, changed the filters and got the starboard generator running again briefly.  (Court Ex. 11 p. 40-42; Court Ex. 13 p. 24-25, 27)  Salvors reported evidence of fuel contamination, and Plaintiff's investigators were also aware of it.  (Trial Tr. 680-682) Salvors also found the unusual condition that one of the engines, but not the other had seized. (Trial Tr. p. 537-539, 677-679)  Plaintiff never had the fuel samples tested to rule fuel contamination out. (Court Ex. 1 p. 251-252; Trial Tr. p. 297)  It was too late to do a fuel contamination analysis by the time Defendants' experts were retained in September 2006 as the engines had been irretrievably altered by "pickling," and as algae could have been growing in the diesel for months. (Trial Tr. p. 536, 2134-2135)

44

Even if the loss of power was not due to fuel contamination, loss of power due to crew negligence is a covered peril. All-risk policies protect owners from this type of mishap, as stated in *Janet Nav. Inc. v. Sturge* 711 F. Supp. 119 (S.D.N.Y. 1989):

> In sum, there is no evidence of any misconduct or any sufficiently negligent conduct on Janet's part to contradict van Grieken's conclusion that the casualty was attributable to crew negligence. It is precisely this sort of event-the destruction of the owner's property caused by negligent handling of it by the owner's employees-for which an insurance policy is written. The court therefore concludes that the fire was an insured event for which Janet is entitled to recover.

711 F. Supp. at 130. As acknowledged by Taylor, the power loss put the Yacht at increased risk. (Trial Tr. p. 297) Without propulsion, the Yacht could not be steered toward shore or away from the waves hitting the exhaust vents as Papa had been doing. (Trial Tr. p. 1478, 1989, 2008-2009) Without generators the AC bilge pump was lost. (Trial Tr. p. 1991, 1994-1995) Without engines, the eductor pump was lost. (*Id.*) The power loss caused the crew to seek the assistance of the cargo ship, but without propulsion the Yacht could not maneuver and a collision occurred. (Ex. E p. 2; Ex. 232 –relevant portion also at Ex. 189 at HA000171; Court Ex. 8 p. 79-80; Trial Tr. p. 2012-2013, 2022-2023)

The collision also cannot be ruled out as the proximate cause as Plaintiff never conducted a proper investigation of collision damage, and Defendants' experts couldn't conduct one as they only learned about the collision after providing their reports, and as the area struck broke away during the capsize. (See Court Ex. 8 p. 76-83) A 150-meter steel-hulled ship would have crushed the fiberglass Yacht, breaking fixed items midship, without damage visible on the outer surface because dents snap back out. (Trial Tr. p. 2036-2045, 2052-2054, 2100) A marble floor was cracked all of the way across the ship, and the aft sliding door could not close again because of structural damage. (Court Ex. 8 p. 82-83; Trial Tr. p. 2036-2038; Ex. 38 Photo 37) The collision happened right at a spot peppered with pipes and hull-throughs for laundry,

45

bathrooms, and these would have allowed water into the vessel. (Ex 67; Trial Tr. p. 2100-2103) When the Yacht was righted, it was found that the deck hatch within the starboard garage had popped off with scalloping damage at its edges. (Ex. 38 Photos 461, 463; Trial Tr. p. 517) If that happened as a result of the collision, that would have enabled water to enter the shared garage bilge from a larger source than any other that has been offered. (*See id.*)

Even Plaintiff's expert Randall admitted that the collision caused damage. (Trial Tr. p. 1545, 1548) Randall's claim that the inability to close the door contributed to the loss was based on the idea that the sliding door was amidships, but it was actually aft. (Trial Tr. p. 1557, 2038; Ex. 38 Photo 37) Randall's claim that the stabilizer would have been damaged in any damaging collision is clearly untrue, as the stabilizer would hit the dock every time it pulled into port if it extended as far as claimed by Randall. (Ex. 38 Photo 166; Trial Tr. p. 2068-2069) Nor would the vessel necessarily have rust marks after a collision. (Trial Tr. p. 2098-2099)

D.     Plaintiff Did Not Complete a Proper Cause and Origin Investigation and Has Not Ruled Out Numerous Other Sources of Water

Plaintiff did not complete a proper cause and origin investigation before filing suit. Plaintiff's investigators informed insurance regulators that on the date of suit, they were still trying to figure out the cause of loss (Ex. UUU; Court Ex. 5 p. 134-136) Taylor was dismissed upon revealing that the loss occurred because the Yacht ran dry of fuel, as this contradicted the litigation strategy to blame conditions in the Patton Survey and escape liability to KeyBank. (Trial Tr. p. 308-309)

Cause and origin investigator Christopher Karentz's memos indicated several possible sources of water that Plaintiff's experts had not ruled out, including shaft seals, as late as March 20. (See Ex. DDDD and EEEE; Trial Tr. p. 1538-1543). Water was still entering the engine room through an unknown source five days after the vessel was righted. (Trial Tr. p. 551)

Salvors had to seal a different leak by the forward stabilizer when the vessel was righted, and it is unknown whether it existed during the voyage.  (Trial Tr. p. 546)

      E.       <u>Plaintiff Is Estopped from Arguing the Crew Incompetence Defense</u>

As set out in greater detail in Defendants' Motion in Limine to Preclude Evidence of Crew Unseaworthiness, Plaintiff is estopped from arguing a crew unseaworthiness defense. Declination as a result of crew incompetence rendering the Yacht unseaworthy was never identified in the declination letter Plaintiff issued to Defendants, nor in the Complaint, nor in (Ex. 163; Ex. 1)  Plaintiff may waive defenses even with constructive knowledge of a defense (*Luria Bros.*, 780 F.2d at 1091-1092 (2d Cir. 1986)) and here Plaintiff was told by its own investigator Taylor that loss of power was responsible for the loss.  (Trial Tr. p. 308, 381-382)

Plaintiff may not come to the court seeking a declaration of the parties' respective rights and obligations under a given set of facts and then continuously plead new theories without amending the Complaint.  By doing so it would be essentially asking the Court for a series of advisory opinions.    As one Court has stated, even if Plaintiff had asserted the crew incompetence theory on a motion to amend after the first set of summary judgment motions were decided, it would be too late:

> "A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469 (5th Cir. 1967). "Further, after summary judgment has been granted, the court has 'even more reason for refusing to allow amendment.' " *Union Planters Nat. Leasing v. Woods,* 687 F.2d 117, 121 (5th Cir. 1982) (quoting *Freeman,* 381 F.2d at 469). In *Freeman,* we held that "a district court does not abuse its discretion in refusing to allow amendment of pleadings to change the theory of a case if the amendment is offered after summary judgment ... and no valid reason is shown for failure to present the new theory at an earlier time." *Id.* at 470.

*Henry's Marine Service, Inc. v. Fireman's Fund Ins. Co.*, 193 Fed. Appx. 267, 276, 2006 WL 1439393 at *6 (5th Cir. 2006).  Here there was no reason to belatedly assert the theory.

It is undisputed that the Plaintiff knew the crew's qualifications, in that it had their own

investigators and attorneys take the crews' sworn testimony in February 2006 within three days

after the loss.    (See Court Ex. 11 p. 1; Court Ex. 13 p. 1; Court Ex. 15 p. 1) Plaintiff, having

such knowledge when it denied the claim and filed suit without asserting any alleged unfitness

of the crew, should have specifically made any attempt to disclaim coverage on such grounds at

the time of denial.  Accordingly, Plaintiff has waived its ability to disclaim on such a ground at

this time.  Plaintiff was also fully aware of Rese's familiarity with the vessel and any of his

actions that might have contributed to the loss by February 20, 2007. (Trial Tr. p. 73-74; Ex.

9A)

Plaintiff is also precluded as a matter of procedural law from asserting a new theory

outside its complaint, unseaworthiness based upon the competency of the crew, after discovery

had already been completed and the issue left virtually unexplored. *World Book, Inc. v.*

*International Business Machines Corp.*, 354 F. Supp. 2d 451, 454 (S.D.N.Y. 2005); *Wright v.*

*Ernst & Young LLP,* 152 F.3d 169, 178 (2nd Cir. 1998).

In the fourth claim of its Second Amended Complaint plaintiff asserts:

> 65.    At all times the M/Y PRINCESS GIGI departed Fort Lauderdale,
> Florida for the voyage during which it capsized, defendants and/or their
> representatives were aware of the yacht's deficiencies as stated in the Patton
> Marine report or otherwise existing. [emphasis added]

> 66.    At the time the M/Y PRINCESS GIGI departed Fort Lauderdale,
> Florida for the voyage during which it capsized, defendants and/or their
> representatives knew that there were several areas of the hull, including the
> engine room, which were not watertight and knew of other deficiencies which
> needed correction; some of which were identified in the Patton Marine report and
> some of which if not all were the proximate cause of the capsizing. [emphasis
> added]

(Ex. 1) Nowhere in the complaint is there a single reference to anything resembling the alleged

"crews' deficiencies". (*Id.*)

As a result of Plaintiff's failure to identify unseaworthiness based upon crew

incompetence as a basis for declination, Defendants were prejudiced and denied their right to fashion their discovery to challenge such an assertion. Moreover, as set forth above, Defendant painstakingly deposed every possible witness of Plaintiff who played a role in declining coverage. Not a single witness ever referenced crew incompetence when pressed as to their basis for declination. Accordingly, to permit Plaintiff to submit evidence in support of its new theory, after the close of discovery "would not only be grossly inefficient, but would be patently unfair" to Defendants. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997).

     F.     Plaintiff Failed to Establish that the Crew Was Not Adequately Trained and Qualified or to Show that Crew Incompetence, Rather than Mere Negligence Caused the Loss

Plaintiff failed to prove that the Yacht's crew was not adequately trained and qualified, much less that the crew's deficiencies rose to the level of unseaworthiness. First of all Plaintiff failed to carry its burden to establish the proper standard of care for a pleasure yacht crew, as Plaintiff did not designate an expert on crew unseaworthiness. *See Jimerson v. United States*, 2003 WL 25190 (W.D.N.Y. 2003); *Robinson v. United States Bureau of Prisons*, 244 F. Supp. 2d 57, 64-65 (N.D.N.Y. 2003). Further, as the standard of seaworthiness is not perfection, Plaintiff has attempted to blur the distinct line between ordinary negligence and unseaworthiness. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500, 91 S.Ct. 514, 519 (1971) ("To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions.").

Plaintiff bears the burden of showing that the crew was unfit and here is no testimony that the Yacht required a more qualified crew, or even establishing what the standard for crew requirements might be. *Janet Nav. Inc.*, 711 F. Supp. at 130. Papa's resume was approved by Capiga, and Plaintiff was not concerned about the qualifications of any other crew members.

(See Ex. 199 p. FED 0242-0244; Trial Tr. p. 1019-1020) Plaintiff's attorneys issued Papa a commendation letter saluting his conduct in the crisis.  (Ex. XXXXX; Ex. 254)  First Mate Fudge, Papa and Rese are all licensed masters.  (Trial Tr. p. 1465; Court Ex. 13, p. 4-5; Court Ex. 11, p. 6; Ex. 199 p. FED 0242)  Papa is also a licensed engineer and was himself on watch when the high water alarm sounded. (Ex. 199 p. FED 0242; Trial Tr. p. 1465, 1495-1496)

Nor was the crew inadequately familiar with the vessel.  Papa and Fudge spent a month on the Yacht on its first voyage, and had Lovell's engineer along as a courtesy.  (Trial Tr. p. 1497-1498, 1501; Court Ex. 11 p. 7-8)  Plaintiff's pretrial allegations that there was no turnover was wrong, as Lovell's engineer Ian taught Papa and Fudge the ship's systems including the gravity feed and they, in turn, taught Rese.  (Trial Tr. p. 1497-1500)  Papa even described the gravity feed mechanism, so he would have employed it had the tanks that could gravity feed been full.  (Trial Tr. p. 1497-1500)

Rese spent a week onboard familiarizing himself with the systems before the departure. (Court Ex. 13 p. 7-10; Court Ex. 11 p. 12)  This was adequate.  Rese did not testify under oath, nor do Taylor's handwritten notes indicate that he said he was not sufficiently familiar with the Yacht' systems, or did not know about the mousehole.  (Court Ex. 13; See Ex. 9A)  Rese was correct when he testified that he could not gravity feed the day tank after the power loss, as Papa testified that the gravity-feed capable tanks had been expended.  (Trial Tr. p. 1498-1501)

Even if the crew contributed to the loss, the behavior at most reflects isolated negligent conduct contributing to the loss, and Plaintiff has already admitted that crew error is covered under the policy. (Court Ex. 4, p. 94; Court Ex. 3, p. 199-122) *See Usner*, 400 U.S. 494 at 500. Isolated acts of operational negligence do not constitute unseaworthiness. *Janet Nav.*, 711 F. Supp. at 130; *Harper v. Falrig Offshore, Inc.*, 776 So.2d 620 (La. App. 3d Cir. 2000); *Crane v. Diamond Offshore Drilling, Inc.*, 743 So.2d 780 (La. App. 5th Circ. 1999); *Vendetto v. Sonat*

*Offshore Drilling Co.,* 725 So.2d 474 (La. 1999).

The apparent failure to refuel the day tank was simple negligence at worst, as the weather conditions, the high water alarm and possibility of fuel contamination in the port generator combined to create a sense of emergency that distracted the crew from the schedule for fuel replenishment.

Plaintiff bears the burden of proving the proximate cause of the loss to establish a breach of the negative implied warranty, but it offers mutually exclusive theories that the loss was caused by power loss due to crew incompetence rising to unseaworthiness, and the theory of their cause-and-origin expert that the power loss was not a factor at all. Plaintiff tries to have it both ways, but if Randall were correct, crew unseaworthiness was not the proximate cause, and does not allow Plaintiff to escape liability for the loss. PGG has no similar burden of proof as to an exact cause of loss as it holds an all-risk insurance policy.

Plaintiff has proved neither that the dampers were left open nor that failure to close them was incompetent. The exhaust damper was found closed. (Trial Tr. p. 340-341, 389) No one asked the crew if they closed it. (See Trial Tr. p. 378) Even if the crew did not close it, the crew believed that the amount of water entering through the vent could not account for all of the water entering. (See Ex. 9A; Trial Tr. p. 1436) Taylor contended that the crew would want the vent open to restart the engines. (See Trial Tr. p. 387) Accepting Taylor's contentions that a crew would want to keep the damper open to attempt to get the engines and generators restarted and regain power, and would not realize how much water was entering through the vent, leaving the damper open would not represent incompetence, and gave rise to no breach of warranty.

51

## CONCLUSION

For the foregoing reasons, Defendants PGG Realty, LLC and Ben Ashkenazy respectfully request that the Court enter judgment in favor of their counterclaims and dismiss all of Plaintiff's claims, along with such other and further relief as this Court deems just and proper.

Dated: July 18, 2007

WEG AND MYERS, P.C.

By                                     
Dennis T. D'Antonio (DD0973)
William H. Parash (WP9711)
Patrick M. Leathem (PL8700)
Attorneys for Defendants
PGG Realty, LLC and Ben Ashkenazy
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210