UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FEDERAL INSURANCE COMPANY,                          06 CV 2455 (JSR)(JCF)

                    Plaintiff,

         - against -

PGG REALTY, LLC, BEN ASHKENAZY,
and KEYBANK NATIONAL ASSOCIATION,

                    Defendants.

-------------------------------------------------------------X

**PLAINTIFF FEDERAL INSURANCE COMPANY'S**
**<u>WRITTEN REBUTTAL SUMMATION</u>**

Respectfully submitted,

NICOLETTI HORNIG & SWEENEY
Attorneys for Plaintiff
FEDERAL INSURANCE COMPANY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

Of Counsel
         John A.V. Nicoletti (JN-7174)
         Terry L. Stoltz (TL-7650)
         Thomas M. Rittweger (TR-6796)
         Val Wamser (VW-0511)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... iii

COUNTER PRELIMINARY STATEMENT ................................................................1

FEDERAL IS NOT BARRED BY EITHER
WAIVER OR ESTOPPEL FROM DENYING
COVERAGE ON THE BASIS OF DEFENDANTS'
BREACHES OF UTMOST GOOD FAITH
OR THE SEAWORTHINESS WARRANTIES ...........................................................3

    WAIVER ..........................................................................................................3

    ESTOPPEL ......................................................................................................3

    Utmost Good Faith:  Waiver by Written Agreement .......................................4

    Utmost Good Faith: Waiver at Time of Declination .......................................4

    Utmost Good Faith: Waiver by Conduct or Estoppel .....................................5

    Warranties of Seaworthiness:  Waiver by Contract .........................................9

    Warranties of Seaworthiness: Waiver at Time of Declination .......................10

    Warranties of Seaworthiness: Waiver by Conduct or Estoppel .....................10

    Federal is not Estopped from Raising the Crew's Incompetence ...................12

DEFENDANTS BREACHED THE
DUTY OF UTMOST GOOD FAITH ........................................................................12

    The Patton Documents Did Not Fully Disclose The Risk ..............................13

    The Patton Documents Misrepresented the Condition of the GIGI ...............15

    The Patton Documents Did Not Disclose the Design Defects .........................18

    The Misrepresentations and Non-Disclosures Were Material .........................19

PGG BREACHED THE ABSOLUTE IMPLIED
WARRANTY OF SEAWORTHINESS ............................................................22

    The GIGI Was Not Reasonably Fit For Her Intended Use ................................22

PGG BREACHED THE NEGATIVE IMPLIED
WARRANTY OF SEAWORTHINESS ............................................................25

    Evidence of Unseaworthy Conditions Known to PGG/Ashkenazy ..................25

    Proximate Cause of the GIGI Casualty ...........................................................27

    Federal's Experts Can Rely Upon the Patton Documents ................................30

    The GIGI Crew was Incompetent ....................................................................31

THE CAPSIZING OF THE GIGI WAS NOT FORTUITOUS....................................32

CONCLUSION............................................................................................................34

APPENDIX A ............................................................................................................ A-1

# TABLE OF AUTHORITIES

## CASES

*Albany Ins. Co. v. Horak*,
    1993 WL 269620 (E.D.N.Y. 1993) ........................................................... 21

*Allendale Mut. Ins. Co. v. Excess Ins. Co.*,
    992 F. Supp. 278 (S.D.N.Y. 1998) .......................................................... 14

*American Home Assur. Co. v. Master's Ship Mgmt.*,
    423 F.Supp.2d 193,
    *aff'd*, 489 F.3d 497 (2d Cir. 2007) ...................................................... 21

*American Merchant Marine Ins. Co.  v. Margaret M. Ford Corp.*,
    269 F. 768 (2d Cir. 1920) ...................................................................... 11

*The ANTHONY D. NICHOLS v. Hartford Fire Ins. Co.*,
    49 F.2d 927 (S.D.N.Y. 1930) ........................................................ 5, 6, 11

*The CALEDONIA*,
    157 U.S. 124 (1895) ............................................................................... 22

*Certain Underwriters at Lloyd's v. Johnson*,
    124 F.Supp.2d 763 (D.P.R. 1999) ........................................................ 21

*Certain Underwriters at Lloyds v. Giroire*,
    27 F.Supp.2d 1306 (S.D. Fla. 1998) ................................................. 5, 21

*Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.*,
    389 F.Supp.2d 1145 (D.Alaska 2005) ................................................. 21

*Christiania General Ins. Corp. of N.Y. v. Great Am. Ins. Co.*,
    979 F.2d 268 (2d Cir. 1992) ................................................................. 14

*City of Burlington v. Indemn. Ins. Co. of N. Am.*,
    332 F.3d 38 (2d Cir. 2003) .................................................................... 32

*Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*,
    982 F.Supp. 310 (S.D.N.Y. 1997),
    *rev'd on other grounds*, 190 F.3d 26 (2d Cir. 1999) ........................ 5, 6

*Commercial Union Ins. Co. v. Lord*,
    392 F.Supp. 2d 402 (D.Conn. 2005),
    *aff'd*, 224 Fed. Appx. 41 (2d Cir. 2007) .......................................... 20

*Compania Transatlantica v. Alliance Assur.*,
    50 F.Supp. 986 (S.D.N.Y. 1943) ................................................................ 33

*Companie de Navegacion v. Fireman's Fund Ins. Co.*,
    277 U.S. 66 (1928) ...................................................................................... 11

*Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*,
    952 F.Supp. 1046 (S.D.N.Y. 1997) ............................................................ 10

*Continental Ins. Co. v. Viesta*,
    1990 WL 127509 (D.Conn. Aug. 13, 1990) ............................................. 5, 6

*Contractors Realty Co.. v. Ins. Co. of N. Am.*,
    469 F.Supp. 1287 (S.D.N.Y. 1979) ..................................................... 5, 7, 22

*Crane v. Diamond Offshore Drilling, Inc.*,
    743 So.2d 780 (La. Ct.App. 1999) ............................................................. 32

*Employers Ins. of Wausau v. Occidental Petroleum Corp.*,
    978 F.2d 1422 (5th Cir. 1992),
    *cert. denied*, 510 U.S. 813 ................................................................... 9, 10

*Farmers' Feed Co. v. Ins. Co. of N. Am.*,
    162 F. 379 (S.D.N.Y. 1908),
    *aff'd*, 166 F. 111 (2d Cir. 1908) ............................................................... 11

*General Motors Acc. Corp. v. Clifton-Fine Cent. Sch. Dist.*,
    623 N.Y.S.2d 821 (N.Y. 1995) ..................................................................... 3

*Gibbs v. Carnival Cruise Lines*,
    314 F.3d 125 (3d Cir. 2002) .......................................................................... 3

*Gilbert Frank Corp. v. Federal Ins. Co.*,
    525 N.Y.S.2d 793 (N.Y. 1988) ..................................................................... 3

*Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040 (4th Cir. 1979) ............ 30

*Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*,
    1966 A.M.C. 385 (S.D. Fla. 1965),
    *aff'd*, 409 F.2d 974 (5th Cir. 1969) ................................................ 5, 8, 13, 14, 19

*Hadden v. Consolidated Edison Co. of N.Y.*,
    410 N.Y.S.2d 274 (N.Y. 1978) ..................................................................... 3

*Henry Marine Service, Inc. v. Fireman's Fund Ins. Co.*,
    193 Fed.Appx. 267 (5th Cir. 2006) ................................................................ 12

*HIH Marine Serv., Inc. v. Fraser*,
    211 F.3d 1359 (11th Cir. 2000) ..................................................................... 5

*Ins. Co. of N. Am. v. Bd. of Comm.*,
    733 F.2d 1161 (5th Cir. 1984) ....................................................................... 32

*John Jovino Co. v. Fireman's Fund Ins. Co.*,
    1992 WL 176956 (S.D.N.Y. 1992) ................................................................ 21

*Johnson Bros. Boat Works v. Conrad*,
    156 A.2d 175 (N.J.Super. 1959) ................................................................... 22

*King v. Allstate Ins. Co.*,
    906 F.2d 1537 (11th Cir. 1990) ..................................................................... 4

*Knight v. U.S. Fire Ins. Co.*,
    804 F.2d 9 (2d Cir. 1986) .............................................................................. 20

*Luria Bros. & Co. v. Alliance Assur. Co.*,
    780 F.2d 1082 (2d Cir. 1986) ................................................................... 4, 12

*Marc Rich & Co. v. Portman*,
    [1996] 1 Lloyd's Rep. 430 (Q.B.) .................................................................. 8

*Mathis v. Hanover Ins. Co.*,
    192 S.E.2d 510 (Ga. Ct.App. 1972) .............................................................. 22

*Mellon v. Federal Ins. Co.*,
    14 F.2d 997 (2d Cir. 1926) ............................................................................ 32

*Neubros Corp. v. Northwestern Nat'l Ins. Co.*,
    359 F.Supp. 310 (E.D.N.Y. 1972) ................................................................ 22

*New Orleans, T. & M. Ry. Co. v. Union Marine Ins. Co.*,
    286 F. 32 (5th Cir. 1923) .............................................................................. 9

*New York, New Haven & Hartford R.R. Co. v. William Strange Gray*,
    240 F.2d 460 (2d Cir. 1957) .......................................................................... 33

*Northfield Ins. Co. v. Barlow*,
    983 F.Supp. 1376 (N.D.Fla. 1997) ............................................................... 20

*Orient Mid-East Lines, Inc. v. S.S. ORIENT TRANSPORTER*,
   496 F.2d 1032 (5th Cir. 1974) ..................................................... 32

*Parks Real Estate Purchasing Group v. St. Paul F&M Ins. Co.*,
   472 F.3d 33 (2d Cir. 2006) ........................................................ 30

*Port Distrib. Corp. v. Pflaumer*,
   880 F. Supp. 204 (S.D.N.Y.), *aff'd*, 70 F.3d 8 (2d Cir. 1995) ..................... 3

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.*,
   779 F.2d 866 (2d Cir. 1985) ................................................... 7, 20

*Reynolds v. Canton Ins. Office, Ltd.*,
   98 Wash. 425, 167 P. 1115 (Wash. 1917) ................................... 5, 6, 11

*Royal Ins. Co.  v. Cathy Daniels, Ltd.*,
   684 F.Supp. 786 (S.D.N.Y. 1988) ................................................. 21

*Sisson v. Ruby*,
   497 U.S. 358 (1990) .............................................................. 22

*Snare & Triest Co. v. St. Paul F&M Ins. Co.*,
   258 F. 425 (2d Cir. 1919) ........................................................ 14

*St. Paul F&M Ins. Co. v. Christiansen Marine, Inc.*,
   893 So.2d 1124 (Ala. Sup.Ct. 2004) .............................................. 11

*Sundance Cruises Corp. v. American Bureau of Shipping*,
   7 F.3d 1077 (2d Cir. 1993) ....................................................... 24

*Thebaud v. Great Western Ins. Co.*,
   155 N.Y. 516 (1898) ............................................................. 11

*Throgs Neck Bagels, Inc. v. GA Ins. Co. of New York*,
   671 N.Y.S.2d 66 (1st Dept. 1998) ................................................ 30

*Tropical Marine Products, Inc. v. Bd. of Comm. of the Port of N.O.*,
   247 F.2d 116 (5th Cir. 1957) ...................................................... 9

*Verdin v. C&B Boat Co.*,
   1986 WL 15241 (E.D. La. 1986) .................................................. 32

## <u>RULES</u>

Fed. R. Evid. 702 .................................................................................................................. 31

## <u>SECONDARY SOURCES</u>

T. Schoenbaum, *Admiralty & Maritime Law* § 19-14 at p.319 (4th ed. 2004).................................... 6

*Black's Law Dictionary* (8th ed. 2004)................................................................................. 8

## COUNTER PRELIMINARY STATEMENT

In their post-trial submission, PGG/Ashkenazy have failed to address their: (1) Personal effects claim (Third Counterclaim); (2) Improper salvage claim (Seventh Counterclaim); and (3) Claim for legal fees arising out of Federal's alleged bad faith (Px. 2).[1]  Defendants have therefore abandoned these claims.

PGG argues that Federal's case "dramatically changed" from what was initially pled (D. Sub. 3-8).  However, in its Complaint, Federal pled, *inter alia*, four defenses: (1) Utmost good faith; (2) Lack of fortuity; (3) Absolute implied warranty of seaworthiness; and (4) Negative implied warranty of seaworthiness (Px. 1).   Discovery revealed additional factual support for these defenses, including: Yacht was not built by Trident (P. Sum. at 9, 15); Barbieto's incline test, detailing the continuing trim and stability problems (P. Sum. at 10, 14, 29-30); Chamberlain Yachts' email, documenting hull flexing rumors (P. Sum. at 11-13); Ward's survey, documenting hazardous electrical conditions aboard the vessel (P. Sum. at 8, 28-9); A-1 report, documenting vessel stability and longitudinal strength problems (P. Sum. at  8, 10-11, 17); 90-120 day vessel repair windows (P. Sum. at  18); Crew incompetence (P. Sum. at  35-7); and Pre-existing design defects (P. Sum. at  22-4, 32-3).

The lack of trial testimony from non-party witnesses is not dispositive and cannot be construed against Federal, as argued by PGG (D. Sub. at 4-5).   Jennifer Dubois, author of the November 14, 2005 email (Px. 91), was an employee of PGG's broker, Chamberlain Yachts.  Her email was in written response to Ashkenazy's request for Chamberlain to look into rumors of hull flexing.  Kent Chamberlain participated in the "due diligence" review (Chamberlain, Tr. 1814-15)

---

[1]  "Px." denotes the Plaintiff's Trial Exhibits; "Dx." denotes Defendants' Trial Exhibits; "Cx." denotes the Court's Exhibits; "Tr." denotes the Trial Transcript; "PTO" denotes the Pre-Trial Order; "P. Sum." denotes the Written Summation of Plaintiff Federal; and "D. Sub. denotes Defendants' Written Submission.

and oversaw the email (Chamberlain, Tr. 1743-44). The email's existence proves, without any testimony from Dubois, the materiality of the rumors that should have been disclosed to Federal. A-1 surveyor Roy Shorter was hired by PGG to perform a survey (Px. 100), pursuant to Chamberlain's suggestion to Ashkenazy (Tr. 1767). The A-1 survey was "probably" provided to Ashkenazy (Tr. 1769-70). In any event, knowledge of the A-1 survey is imputed to Ashkenazy because Chamberlain was PGG's agent. Notwithstanding PGG's claims that the A-1 survey was not material because PGG did not charter GIGI, PGG advised Federal it intended to charter the GIGI (Px. 166) and in fact did so (Px. 109). Arthur Barbieto was hired by Lovell/SQI and authored a stability letter (Dx. SSSS). PGG admits that Patton reviewed the Barbieto materials (D. Sub. at 5), which further reinforces Patton's misrepresentation of the actual condition of the vessel. Both the A-1 report and Barbieto's stability letter, without additional testimony, prove the ongoing trim and stability issues with the GIGI, which were not disclosed to Federal. If any party should have called Dubois, Shorter or Barbieto to try to explain these documents, it was PGG. Dubois and Shorter were more accessible to PGG than Federal, and Barbieto was at least as accessible to PGG as Federal.

PGG/Ashkenazys' post-trial submission is replete with mischaracterizations of the trial record, including reliance upon stricken testimony. While page limitations prevent Plaintiff from pointing out each and every erroneous citation, Federal sets forth defendants' more egregious violations in the annexed Appendix A. Plaintiff addresses the remainder of PGG's Preliminary Statement in the appropriate portions of this Reply.

## FEDERAL IS NOT BARRED BY EITHER WAIVER OR ESTOPPEL FROM DENYING COVERAGE ON THE BASIS OF DEFENDANTS' BREACHES OF UTMOST GOOD FAITH OR THE SEAWORTHINESS WARRANTIES

### WAIVER

Waiver, under New York law,[2] is an intentional relinquishment of a known right which should not be lightly presumed.[3]  A waiver must be clear, unmistakable, and unambiguous.[4]  It may be accomplished by an express agreement, or by an affirmative act or a failure to act so as to evince intent not to claim the purported advantage.[5]

The cases cited by PGG/Ashkenazy address waiver in three different scenarios:  (1) Waiver by contractual agreement; (2) Waiver by failure to assert a known defense at the time of the declination; and (3) Waiver by conduct inconsistent with the asserted defense.  Federal submits that the last scenario is in effect an argument for estoppel.

### ESTOPPEL

According to federal maritime law, . . . the doctrine of equitable estoppel operates to preclude a party who has made representations of fact through his words or conduct from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right.[6]

---

[2] In the absence of a federal admiralty rule, this case is governed by New York law.  Opinion dated April 15, 2007 at 21 (Docket #126).

[3] *Gilbert Frank Corp. v. Federal Ins. Co.*, 525 N.Y.S.2d 793, 795 (N.Y. 1988).

[4] *Port Distrib. Corp. v. Pflaumer*, 880 F. Supp. 204, 211-12 (S.D.N.Y.), *aff'd*, 70 F.3d 8 (2d Cir. 1995).

[5] *General Motors Acc. Corp. v. Clifton-Fine Cent. Sch. Dist.*, 623 N.Y.S.2d 821, 823 (N.Y. 1995); *Hadden v. Consolidated Edison Co. of N.Y.*, 410 N.Y.S.2d 274, 276 (N.Y. 1978).

[6] *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 133 (3d Cir. 2002) (quotations and citations omitted).

In order to sustain a claim of estoppel under federal maritime law, a party must show (1) "that it relied in good faith" (2) "on a misrepresentation of another party," and (3) "that this reliance caused it to change its position for the worse."[7]

**Utmost Good Faith:  Waiver by Written Agreement**

An insurer can agree in the policy to modify an insured's obligations under the duty of utmost good faith.[8]  However, PGG/Ashkenazy do not refer to any provision in the Policy (Px. 4) which allegedly amends or waives their obligations under the doctrine of *uberrimae fidei*.  Indeed, the Policy does not contain any provision waiving the duty of utmost good faith (Px. 4).

**Utmost Good Faith: Waiver at Time of Declination**

An insurer can only waive a breach of an insured's obligations under the duty of utmost good faith at the time of the declination if it had knowledge of the facts establishing the breach at the time of the declination.[9]  There was no waiver in this case.  Federal asserted PGG's breach of the *uberrimae fidei* doctrine as a ground for denying coverage (Px. 1 at ¶¶ 48-49).  Contrary to defendants' contentions, Federal never limited the defense to only those conditions of the hull disclosed in the Patton Survey and Recommendations ("Patton Documents") (Px. 1 at ¶ 49).  During discovery, Federal learned of additional misrepresentations and nondisclosures by the defendants which breached the duty of utmost good faith (P. Sum. at 5, n. 7).  PGG/Ashkenazy have not offered any legal support for the extraordinary contention that Federal, in particular, and insurers, as a class, are barred from relying on additional facts developed during pre-trial discovery.

---

[7] *Id*. at 128.
[8] *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1540 (11th Cir. 1990) (insurer agreed to limit its right to void policy to only intentional misrepresentations)
[9] *Luria Bros. & Co. v. Alliance Assur. Co.*, 780 F.2d 1082, 1090 (2d Cir. 1986).

**Utmost Good Faith: Waiver by Conduct or Estoppel**

"*[U]berrimae fidei* does not permit the use of the principles of waiver and estoppel to provide coverage where there has been a material misrepresentation on the application."[10]  "The obligation of the assured to disclose could not be waived by implication nor can the failure of the [insurer] to make inquiry excuse the failure of the [insured] to disclose."[11]  The policy behind the duty of utmost good faith, which is to protect the passengers, crew and the property of third-parties traveling on waterborne craft, would not be vindicated if the duty could be inadvertently waived by implication or estoppel.

Admittedly, PGG/Ashkenazy have cited cases which simply assumed, without actually deciding, that the duty of utmost good faith could be waived by conduct or estoppel.  However, in those cases, the discussion of the waiver was at most *dicta* because either there was no nondisclosure[12] or the misrepresentation was not material to the insurers' decision.[13]  Some of the

---

[10] *Certain Underwriters at Lloyds v. Giroire*, 27 F.Supp.2d 1306, 1310 (S.D. Fla. 1998); *see also HIH Marine Serv., Inc. v. Fraser*, 211 F.3d 1359, 1362 n.2 (11th Cir. 2000).

[11] *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 1966 A.M.C. 385, 389 (S.D. Fla. 1965), *aff'd*, 409 F.2d 974 (5th Cir. 1969).

[12] *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 982 F.Supp. 310, 314 (S.D.N.Y. 1997), *rev'd on other grounds*, 190 F.3d 26 (2d Cir. 1999) (insurer failed to read surveys in its possession setting forth the condition of the vessel); *Contractors Realty Co.. v. Ins. Co. of N. Am.*, 469 F.Supp. 1287, 1294-95 (S.D.N.Y. 1979) (insurer knew of the condition of the vessel by virtue of a survey conducted on its behalf before the policy was issued); *The ANTHONY D. NICHOLS v. Hartford Fire Ins. Co.*, 49 F.2d 927, 933 (S.D.N.Y. 1930) (insurer had knowledge that the schooner would be carrying gas at the time it delivered the policy and accepted the premium); *Reynolds v. Canton Ins. Office, Ltd.*, 98 Wash. 425, 167 P. 1115 (Wash. 1917) (underwriter knew that assured had already set sail on a voyage intending to go to Cook's Inlet when it issued the policy containing a navigational limit endorsement which did not allow that voyage).

[13] *Continental Ins. Co. v. Viesta*, 1990 WL 127509 at *3 (D.Conn. Aug. 13, 1990).

cases were decided under state, rather than admiralty, law.[14]  One commentator has noted that "[t]his type of waiver…is exceedingly rare."[15]

Even assuming that the insured's duty of utmost good faith can be waived by conduct or estoppel, Federal is not barred from voiding the policy *ab initio*.  PGG tries to neutralize the utmost good faith doctrine and sweep away its own nondisclosures and misrepresentations by claiming that the Patton Documents (Px. 179, 180), which were finally disclosed to Kelly after the binder was issued and the Policy incepted (Px. 173), provided sufficient information to give rise to the insurer's reciprocal duty to make inquiry, which inquiry allegedly would have revealed the non-disclosed information or would have corrected the misrepresentations.[16]  However, the authorities cited by PGG do not establish guidelines for the type or quantity of information that must be disclosed in order to give rise to a duty of inquiry.  One case merely states the unremarkable requirement that an insurer is under a duty to review the materials actually in its files.[17]  In another, the insurer was suspicious as to the material disclosed, but did not bother to investigate before binding coverage.[18]

---

[14] *Reynolds*, 98 Wash 427 (Washington law); *The ANTHONY D. NICHOLS*, 49 F.2d at 933 (New York law).

[15] T. Schoenbaum, *Admiralty & Maritime Law* § 19-14 at p.319 (4th ed. 2004).

[16] If we follow PGG's logic, an insured satisfies the obligation of full disclosure even if it misrepresents material facts as long as the misrepresentation gives rise to the insurer's reciprocal duty to inquire.  This is an absurd legal position as it condones the insured's misrepresentation of the risk in the first instance.

[17] *Commercial Union v. Flagship*, 982 F.Supp. at 314.  The court referenced the reciprocal duty, but found that the insurer had within its files, but did not read, the information claimed to be withheld.  In the instant case, the information contained in the Patton Documents, even if accurate, was only produced to Kelly after binding and inception and was never forwarded to Federal.  It is one thing to impute knowledge within the possession of an agent to the principal, but is quite another to then utilize that imputed knowledge as a basis for further inquiry (Tr. 950-52).  None of the cases cited by PGG involve an agent's knowledge being imputed to the principal and then giving rise to the insurer's duty to make further inquiry.

[18] *Continental v. Viesta*, 1990 WL 127509 at *4.  The reciprocal duty was discussed, but was not central to the court's decision because the information not disclosed was not material.  The court noted that the underwriters (particularly the placing underwriter who had less than three (3) months of job experience) didn't believe the information contained in the application was accurate, but

In another, although there was a discussion of the insurer's reciprocal duty of good faith, there was no mention of an inquiry duty.[19]  Admittedly, in *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*,[20] the Court of Appeals upheld, as not clearly erroneous, a finding that if an insurer failed to inquire as to the amount of a loss, once the insurer was belatedly informed of the loss, then the amount of the loss could not be material.[21]  However, as noted in the dissent:

> Concededly, an underwriter's absolute right to demand disclosure of material facts may be waived by its neglect to investigate certain facts when a basis for inquiry is raised by the information communicated.  But this does not mean that an applicant for marine insurance can knowingly disclose incomplete information – in breach of its duty of complete good faith and full disclosure – hoping that the insurer will not investigate further into the amount or circumstance of a particular loss.  The duty of

---

issued the policy in any event.  In contrast, Federal's underwriters believed and relied upon the information set forth in the megayacht worksheet (Px. 166) and specifically relied upon the identity of the manufacturer in concluding that the risk was acceptable (O'Sullivan, Tr. 1012, 1014-15, 1033-34).

[19] *Contractors Realty*, 469 F.Supp at 1294.  The court referred to the reciprocal duty, but concluded that the non-disclosed/misrepresented information in the application was either immaterial (relating solely to cosmetic deficiencies such as peeling paint, leaking windows, and malfunctioning toilets), or the information was actually disclosed (such as the owner's dissatisfaction with the yacht and the intent to bring suit for breach of warranty against the manufacturer) to the agent.  In contrast, the deficiencies in the GIGI were material to its fitness for use and, therefore, its insurability.  Also, the non-disclosed lawsuit on the GIGI centered around the poor design and deficient construction of the yacht, not merely the subjective expectations of the owner for a high end vessel.

[20] 779 F.2d 866 (2d Cir. 1985).  This is the only cited case where the insurer's duty to inquire was applied, but no standard was set forth as to when that duty arises.  The vessel owner did not disclose a loss involving the vessel IRINIO.  Just prior to binding, the owner disclosed the loss but not the amount.  The insurer claimed that the loss amount was material.  The district court found that the disclosure of the loss was sufficient to give rise to a duty on the underwriter to inquire if the amount of the loss was material.  These facts make *Puritan* inapplicable to the case at bar.  Losses may or may not be material, depending upon their amount.  Once the loss is disclosed, the underwriter decides if the dollar amount should be requested as part of his underwriting considerations.

Judge Cardamone, in a dissenting opinion, specifically warned of the consequences of applying a duty to inquire where the owner's disclosures are incomplete.  He stated "[o]n balance, upholding the district court in this case will allow those seeking marine insurance to present incomplete information initially and to repeat the process when correcting prior misinformation. Once some disclosure is made – even if intentionally incomplete – the majority rules that the insurer must forage on its own for more information or risk being found *not* to have relied on any omissions or inaccuracies contained in the applicant's disclosure.  Such a rule seems to me impractical and unworkable." *Id.* 874.

[21] *Id.* at 871.

full disclosure, especially a disclosure to correct prior misrepresentations, falls on the insured.  To shift that burden in the name of non-materiality merely contradicts the strict duty of utmost good faith that underlies marine insurance.[22]

Other courts have recognized that the disclosure of one survey report, while withholding another survey report which indicates that a vessel is unseaworthy, does not give rise to a duty of inquiry[23] or that the partial disclosure that an insured was having demurrage[24] problems in some ports, did not give rise to the insurer's duty to inquire as to the insured's actual demurrage experience.[25]

    PGG's application made the material misrepresentation that the yacht was manufactured by Trident (Px. 166),[26] when it is undisputed that the construction was completed by SQI.  Despite, this misrepresentation, PGG contends that the material in the Patton Documents gave rise to a duty of inquiry on Federal's part.  The Patton Documents also misrepresented that the yacht was designed by Sergio Cutalo, when in fact all he had designed was a hull form for a 2½ deck, raised pilothouse yacht, not a tri-deck yacht.  The Documents also misrepresented that Patton had not seen the vessel's stability information when, in fact, they had been presented Barbieto's stability report which did not take into account severe wind and waves and disclosed that the vessel was still down-by-the-bow.  Although the Patton Report disclosed the existence of the Ward's survey (Px. 179 at 1), Patton's electrical Recommendations (Px. 180 at 9) did not disclose that 18 of 37 items were identified by Ward's as hazardous (Px. 128).  Further, the Patton Documents did not identify or disclose:  The existence of the A-1 survey (Px. 100) raising questions concerning the yacht's longitudinal structural integrity; Prior legal battles between Trident and SQI/Lovell; Defective design of the engineroom

---

[22] *Id.* at 874 (emphasis added) (internal citation omitted).

[23] *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 1966 A.M.C. 385, 389 (S.D. Fla. 1965), *aff'd*, 409 F.2d 974 (5th Cir. 1969).

[24] Demurrage is the money paid by a charterer for detention of the vessel beyond the time allowed in the charter for loading and discharging the cargo.  *Black's Law Dictionary* (8th ed. 2004).

[25] *Marc Rich & Co. v. Portman*, [1996] 1 Lloyd's Rep. 430, 442-43 (Q.B.).

[26] If the Federal underwriters had known that the yacht was not fully manufactured by Trident, they would not have quoted the risk (O'Sullivan, Tr. 1033-34).

exhaust vent; Lack of watertight integrity of the aft garage doors;[27] or The I-beam penetration and mousehole in the forward bulkhead of the port garage.  Finally, there is no reference in the Patton Documents to the 90-day repair window given to SQI to comply with the Patton Recommendations or the 120-day window given to PGG by KeyBank to complete most of the safety items (Px. 179, 180).

Since Federal, even charged with knowledge as to the contents of the Patton Documents, had every right to expect that PGG had fully disclosed all material information in their possession – which it obviously had not done – Federal had no reason to inquire as to any of the above items which were not disclosed in the Patton Documents.  Further, even if Federal had made inquiry to the Patton surveyors, they would have been advised that there were no problems with the yacht (Connell, Cx. 7 at 212-17; Riley, Cx. 2 at 128-30; 147).

Federal has not forfeited its right to void the policy *ab initio* because of PGG/Ashkenazys' breaches of the doctrine of *uberrimae fidei*.

**<u>Warranties of Seaworthiness:  Waiver by Contract</u>**

"In policies where the law will imply generally a warranty of seaworthiness, it can only be excluded by terms in writing in the policy in the clearest language."[28]  However, PGG/Ashkenazy do not refer to, and the Policy does not contain, any clause which waives or modifies the warranties of seaworthiness (Px. 4).

---

[27] Neither Patton surveyor inspected the garages during the survey (Riley Cx. 2 at 102).

[28] *New Orleans, T. & M. Ry. Co. v. Union Marine Ins. Co.*, 286 F. 32 (5th Cir. 1923) (citing Arnould on Marine Insurance, §686); *see also Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1439 (Liner Negligence Clause "effected at least a partial waiver of the absolute warranty of seaworthiness"); *Tropical Marine Products, Inc. v. Bd. of Comm. of the Port of N.O.*, 247 F.2d 116, 119 (5th Cir. 1957) (Inchmaree Clause "markedly affects the warranties of seaworthiness between Shipowner and Underwriter.").

**Warranties of Seaworthiness: Waiver at Time of Declination**

As with the doctrine of *uberrimae fidei*, at the time of declination, Federal asserted that PGG/Ashkenazy breached both the absolute and negative implied warranties of seaworthiness (Px. 1 at ¶¶ 58-59, 64-65). Federal did not limit the breaches to only those conditions set forth in the Patton Documents and pre-trial discovery has disclosed additional factual bases for establishing breaches of the warranties (*see* P. Sum. at 6, n.8 & 7, n.9).

**Warranties of Seaworthiness: Waiver by Conduct or Estoppel**

PGG attempts to have it both ways, utilizing the Patton Documents as both a shield and a sword. PGG alleges that Patton discloses no conditions affecting the seaworthiness of the oceangoing vessel (D. Sub. at 35), but also claims that all material conditions were disclosed in the Documents (D. Sub. at 3, 33). PGG is caught in the jaws of a dilemma. Either the Patton Documents disclosed unseaworthy conditions, which breached the absolute and negative implied warranties of seaworthiness, or the Patton Documents did not disclose unseaworthy conditions, in which case Federal cannot waive what it does not know.[29]

The absolute warranty focuses on the condition of the vessel at the time of policy inception.[30] Contrary to PGG's assertion (D. Sub. at 31), the Patton Documents were only received by Federal's agent more than eight hours after Policy inception at 12:01 a.m. on December 13, 2005 (Kelly, Tr. 928; Px. 4). There can be no waiver or estoppel of the absolute implied warranty of seaworthiness when a vessel survey is received <u>after</u> policy inception.

---

[29] Even if the Patton Documents had been received by the Federal underwriters and inquiry made, Patton would have represented (*albeit* incorrectly) that there were not any items material to the safety of the yacht (Connell, Cx. 7 at 212-17; Riley, Cx. 2 at 128-30, 147).

[30] *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1431 (5th Cir. 1992), *cert. denied*, 510 U.S. 813; *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp. 1046, 1067 (S.D.N.Y. 1997).

The case law cited by PGG[31] (D. Sub. at 31-33), actually supports Federal because of the common fact pattern which emerges:  (1) Insurer hires marine surveyor who reports to underwriter; (2) Surveyor inspects vessel and drafts report, which in many cases notes that risk is undesirable; and (3) Insurer has <u>actual knowledge</u> of the vessel's condition and recognizes the extra-hazardous risk by charging additional premium.  In contrast: (1) Patton was hired by PGG, who did not report to Federal; (2) The Patton Documents represent that there are no safety or insurability related items, i.e. no stars (Px. 180); and (3) Federal was not aware of the extra-hazardous risk or unseaworthy conditions and did not charge additional premium for the GIGI risk.

---

[31] *Companie de Navegacion v. Fireman's Fund Ins. Co.*, 277 U.S. 66 (1928)(tug designed for inland waters (*id.* at 70); underwriters' two surveyors inspected the vessel and made recommendations for ocean towage which were complied with (*id.* at 71); underwriters' surveyors certified that the vessel was seaworthy for ocean towage (*id.*); and "Because of the extrahazardous risk involved…the premiums were much increased by the underwriters" (*id.*)); *American Merchant Marine Ins. Co. v. Margaret M. Ford Corp.*, 269 F. 768, 770 (2d Cir. 1920)(insurers' surveyor inspected vessel and wrote in his report "keep off"; insurer admitted knowing vessel was unseaworthy and charged a higher premium); *The ANTHONY D. NICHOLS*, 49 F.2d 927 (S.D.N.Y. 1931)(insurance companies' surveyor performs vessel inspection (*id.* at 929); survey report is received three days before binding (*id.* at 933); insurance agent admits to knowledge of specific unseaworthy condition, i.e. gasoline aboard vessel (*id.* at 931)); *Farmers' Feed Co. v. Ins. Co. of N. Am.*, 162 F. 379 (S.D.N.Y. 1908)(insurer hired a surveyor to inspect the vessel (*id.* at 379); survey report states "[f]or a hull risk not recommended" (*id.* at 380); insurer knew the vessel was an undesirable hull risk and refused to quote, instead issuing only a cargo policy for grain carriage (*id.* at 381-82)), *aff'd*, 166 F. 111, 112 (2d Cir. 1908)(insurer knew it was "…taking more than the ordinary hazard and they guarded themselves against it by charging more than the ordinary premium"); *Thebaud v. Great Western Ins. Co.*, 155 N.Y. 516, 519 (1898)(insurer was provided with the vessel construction plans which were reviewed by its marine engineer; insurer thereafter decided to write the risk, "but exacted therefor double the usual premium"); *St. Paul F&M Ins. Co. v. Christiansen Marine, Inc.*, 893 So.2d 1124 (Ala. Sup.Ct. 2004)(decided pursuant to Alabama law (*id.* at 1126); insurer retained own surveyors to conduct a loss investigation (*id.* at 1128); insurer issued policy after loss investigation concluded (*id.*)); and *Reynolds v. Canton Ins. Office, Ltd.*, 98 Wash. 425 (1917)(decided under Washington law (*id.* at 427); a navigation warranty was at issue, not the absolute warranty of seaworthiness (*id.* at 430); and the insurance agent knew that the vessel was going to be used beyond the navigation limits in the policy (*id.* at 427)).

**Federal is not Estopped from Raising the Crew's Incompetence[32]**

Federal's Complaint alleged that PGG/Ashkenazy had breached the negative implied warranty of seaworthiness, but it did not limit the breaches to solely those items set forth in the Patton Documents (Px. 1 at ¶¶ 64-65).  Upon the receipt of PGG's expert report, Federal learned that Moore considered that the capsizing was caused by the "inexperience of the crew."[33]  This conclusion was further supported by the testimony of Gorin (Cx. 8).[34]  "[A]n insurer cannot waive a defense by asserting another defense as grounds for declination if it had no knowledge of the facts giving rise to the unasserted defense."[35]

Federal is not barred from relying upon its rights under the implied warranties of seaworthiness in the policy.

**DEFENDANTS BREACHED THE
DUTY OF UTMOST GOOD FAITH**

PGG argues that Federal has failed to prove PGG's breach of its obligation of utmost good faith when purchasing the Policy[36] (D. Sub. at 9-28).  However, PGG does not dispute that

> [C]ontracts of marine insurance are *uberrimae fidei* and there is an obligation <u>voluntarily</u> to disclose all facts and circumstances which are material to the risk and not within the knowledge of both parties.…  It is immaterial that information received

---

[32] This issue had been addressed more fully in Federal's Opposition to Defendants' Motion *In Limine* to Preclude Plaintiff from Introducing Evidence of Unseaworthiness Due to Crew Incompetence (Docket # 176).

[33] Defendants' suggestion that the crew's incompetence was "virtually unexplored" during discovery (D. Sub. at 48), is belied by their own expert's opinion.

[34] PGG's suggestion that Federal is not allowed to raise the issue of crew incompetence after the first summary judgment motions were made is ludicrous.  The motions were made before hardly any discovery had been conducted and were resisted by Federal, at least in part, on the basis that discovery was required (Docket # 38 at 8-9).  If PGG's argument was accepted, then all discovery in this case was taken for no reason.  In *Henry Marine Service, Inc. v. Fireman's Fund Ins. Co.*, 193 Fed.Appx. 267, 276 (5th Cir. 2006), the plaintiff was not allowed to amend its claim after summary judgment had been granted.  In this case, summary judgment was denied and discovery was allowed to continue.

[35] *Luria Bros.*, 780 F.2d at 1090.

[36] The "antiquated" doctrine of utmost good faith is alive and well in the Second Circuit (Tr. 985).

12

by insured is in fact untrue, and the policy is avoided if he, without knowledge of its untruth, failed to disclose it.

* * *

[T]he duty attaches at the time of effecting the insurance,…for the effect of a concealment in avoiding the policy is to determined not by its eventual relation to the nature of the risk, but with reference to its immediate influence on the judgment of the underwriter.[37]

Further, PGG does not seriously dispute that it failed to disclose to Federal numerous material facts relative to the yacht risk, such as: (1) Trident was not the sole manufacturer of the yacht; (2) The litigation involving the defective design and poor construction of the yacht; (3) The ongoing issues with the vessel's down-by-the-bow trim and stability; (4) The unseaworthy condition of the non-watertight aft garage doors; (5) Penetrations through the forward bulkhead of the port garage into the engineroom; (6) The inherent design defect of the engineroom exhaust vent which included placing of the opening too near the waterline and lack of appropriate internal protections, such as a catch basin with drains; (7) The failure to fully disclose the nature of the vessel's dangerous electrical problems; (8) The failure to disclose a survey by A-1 raising questions concerning the yacht's structural integrity; and (9) The consent by KeyBank to the completion of certain significant repairs some 90-120 days after the inception of the Policy.

**The Patton Documents Did Not Fully Disclose The Risk**

PGG contends that it satisfied its duty of full disclosure by submitting the Patton Documents because there was sufficient information in the Documents to give rise to the underwriters' duty to inquire into the vessel's condition and fitness for use (D. Sub. at 11).[38]  However, the effect of a non-disclosure in voiding the policy is to be determined, not by its eventual relation to the nature of the

---

[37] *Gulfstream Cargo Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 n.20 (5th Cir. 1969) (emphasis added).
[38] *See* pp. 6-9, *supra*, for discussion of the duty to inquire.

risk, but by reference to its immediate influence on the judgment of the underwriter.[39]  Therefore, one cannot view the Patton Documents in a vacuum, but must factor in its temporal relationship to the application process.

PGG applied to Federal on November 29, 2005 (Px. 166).  The application contained an outright misrepresentation identifying Trident as the manufacturer.  The fact that the application seeks the identity of the manufacturer establishes that this information is material.[40]  If Federal's underwriters had known that Trident had not completed the manufacture of this yacht, they would have not released the quote and would not have bound the Policy (O'Sullivan, Tr. 1033-34; Capiga, Tr. 1166-68).

In addition, at the time of the application, PGG had knowledge of the Dubois email (Px. 91). The email advised that litigation between Lovell/SQI and Trident related to the poor design and construction of the yacht.  Yet, PGG did not disclose the troubled build history of this yacht to Federal. If Federal had known of the litigation involving the construction of the yacht, no quote would have been released and, therefore, no Policy bound (O'Sullivan, Tr. 1045-46).  In addition, the email reported that Cutalo had concerns about the stability of the yacht because of its topside weight.  What makes this nondisclosure even more striking is that PGG knew about the Barbieto stability analysis (Dx. SSSS)[41] which showed that the down-by-the-bow trim problem had not been corrected by adding the false bow and that the incline stability test did not take into account "severe

---

[39] *Gulfstream*, 409 F.2d at 981 n.20.

[40] *Christiania General Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992) ("Where the insurer specifically inquires as to a fact, the insured is thereby on notice that the insurer considers it material, and therefore is under a duty of inquiry."); *Snare & Triest Co. v. St. Paul F&M Ins. Co.*, 258 F. 425, 427 (2d Cir. 1919) ("[W]here the underwriter requests the information, which when given amounts to a representation, such answer to a specific question is conclusively presumed to be material to the risk."); *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 992 F. Supp. 278, 282 (S.D.N.Y. 1998).

[41] The Barbieto documents were presented to either Ashkenazy or Chamberlain (Moore, Tr. 2314).

wind and rolling criteria."  If Federal's underwriters had been advised of this information, no quote would have been released and, therefore, no Policy bound (O'Sullivan, Tr. 1045-46; Capiga, Tr. 1166-68).

Furthermore, shortly after the application, A-1 surveyed the GIGI (Px. 100).[42]  The A-1 survey reported on the need for an incline experiment and a stability book.  It also contained the notation concerning Barbieto drawing SO1 raising questions concerning the longitudinal strength of the GIGI's hull (Px. 100).  None of this information was disclosed to Federal.  If it had been, the underwriters would have withdrawn the quote before it was accepted by PGG (O'Sullivan, Tr. 1047-49; Capiga, Tr. 1166-68).

As of December 3, 2005, before the Patton Documents were sent to Kelly, Federal would not have underwritten this risk if PGG had fulfilled its obligation of utmost good faith and made the timely disclosures outlined above (Capiga, Tr. 1166-68).  Therefore, the Patton Documents are irrelevant.

## The Patton Documents Misrepresented the Condition of the GIGI

In any event, the Patton Documents are misleading.  Patton failed to star significant items although it promised to do so.  Therefore, Patton actually misrepresented the yacht's condition.  Federal's agent flipped through the Patton survey, after binding and Policy inception, to ensure that it was complete and contained no stars (Kelly, Tr. 965-66).  Patton succeeded in dissuading further inquiry by not starring "safe operation and/or insurability" items (Px. 180 at 1).

---

[42] Although PGG argues that Chamberlain did this for his own account, the Dubois email (Px. 91) notes the benefits of commercial charter to PGG.  The A-1 survey was conducted for that purpose.  Regardless, Chamberlain was PGG's agent charged with the responsibility of determining the suitability of the yacht for purchase by PGG.  This included the condition and seaworthiness of the GIGI for open ocean cruising.  Any information that Chamberlain received concerning the yacht's condition fell within the scope of his agency and, therefore, his knowledge is imputed to PGG.

Patton states that the yacht was a custom, 124 foot tri-deck motoryacht built by Trident (Px. 179 at 3).  This is false.[43]  It is undisputed that SQI completed building the yacht.

The Report also states that "the yacht was originally to be delivered in the year 1999, but underwent modifications to its structure and was delivered in early 2000" (Px. 179 at 3).  There is nothing which advises that the modification was made because of a down-by-the-bow trim problem.  In the Recommendations, the trim issue is finally identified, but diffused by the assertion that "the yacht was modified before final acceptance and delivery" (Px. 180 at 1).  What final acceptance and delivery?  The yacht was already under the control of the owner.  There was no final acceptance from Trident or any other shipyard.

The Patton Report states that "the original hull was designed by Dr. Cutalo" (Px. 179 at 5).  This is at best a half-truth, which is a complete lie.  Cutalo designed a hull form only and then only for a 2½ deck raised pilothouse yacht, not the tri-deck GIGI.  The additional topside weight caused both trim and stability problems.  The trim issue was noted in the Patton Documents, but falsely said to be corrected (Px. 179 at 5).  Patton states that "to correct a floatation problem, the naval architectural firm of Arthur Barbieto & Associates was employed for drawings and inclination test to get more flotation in the bow area."  This is a further misrepresentation because it was Cutalo, not Barbieto, who designed the false bow to correct the flotation problem.  However, Cutalo noted that the topside weight raised questions about the vessel's stability.  This is why Barbieto was retained.  These material facts were not disclosed in the Patton Documents which do not provide sufficient information to require the insurer to make further inquiry.

---

[43] Buried in the minutia of the registration information is an entry concerning the builder, identified as SQI (Px. 179 at 3).  This is at odds with the narrative.  The failure of Patton to note the distinction between a manufacturer and a builder is a slight-of-hand by Patton.  In any event, inquiry into this item would have received the response that SQI was the builder and Trident was the manufacturer (Lovell, Tr. 1626-27), thus continuing the misrepresentation.

The Patton Documents misrepresent that the stability results were not seen by the surveyor (Px. 179 at 5) when in fact the Barbieto inclination test (Dx. SSSS at 3) was provided to Patton (Moore, Tr. 2348).  The Barbieto letter revealed that the inclination test did not take into account severe wind and wave conditions.  The Patton surveyors did not make any reference to this document or its adverse statements in their Documents.

In only one instance do the Patton Documents discuss a specific issue concerning the condition of the hull, where it is noted that there are three watertight bulkheads on the yacht and all three had been compromised (Px. 180 at 2).  However, they do not specifically refer to the gap around the I-beam or the mousehole.  They also do not advise that there are any openings in the bulkhead between the port garage and the engineroom, which was, in effect, the outside skin, or the watertight envelope, of the yacht (Taylor, Tr. 139).

Patton further misrepresented the electrical conditions aboard the GIGI.  Patton benignly states that Ward's conducted an electric survey (Px. 180 at 9), but not that hazardous electrical conditions were found aboard the vessel.  In fact, Patton did not know whether Ward's found any electrical hazards aboard the vessel (Connell, Cx. 7 at 137).  Patton's Documents list innocuous electrical conditions aboard the vessel, but does not make reference to the hazardous electrical conditions documented by the Ward's survey, reinforcing Patton's misrepresentation of the GIGI's actual condition.

Patton also misrepresented the amount and reason for the lead ballast addition, tying the weight added to vessel trim problems and ignoring the ongoing stability issue with the GIGI (Px. 180 at 1).  Even PGG admits that the GIGI suffered from: (1) Unacceptable forward trim; and (2) Vessel stability problems (Hains, Tr. 846-47) as built, but claims that these deficiencies were remediated prior to Policy inception (D. Sub. at 36).  Barbieto recommended the installation of 13.5

metric tons of lead ballast, not merely 11 tons as reported by Patton, for the purpose of meeting minimum stability criteria (Lovell, Tr. 1636-37; Dx. SSSS at 3) which had nothing to do with ongoing trim problems.[44]  Even with the addition of the 13.5 tons of ballast, Barbieto admitted that his analysis did not address the "severe wind and rolling criteria" which would require additional ballast (Dx. SSSS at 3).  Significantly, no further stability analysis was ever performed (Moore, Tr. 2213, 2184-85).

Any items in the Patton Documents which might have raised a concern were defused in the Patton Summary section which states:

> "FULL BLOOM is a good yacht with good gear and equipment
>
> * * *
>
> [O]nce her few safety and asterisked Recommendations [there were none] have been complied with, and structural modifications and stability documentation presented, she should be considered a good marine risk….  Any extended limits and extensions would have to be set by an arrangement with the underwriters" (Ex. 179 at 31).

The reference to structural modification and stability documentation is benign at best.  But in reality, it is a misrepresentation because the documents were presented to the Patton surveyors (Moore, Tr. 2348).  Patton failed to note the reservations which were contained both in the Barbieto drawings[45] and the stability letter.  There is nothing in this language which would give rise to further inquiry concerning the vessel's fitness for use.

**The Patton Documents Did Not Disclose the Design Defects**

The GIGI was unseaworthy due to inherent design defects.  Specifically, the garage doors were not designed to keep seawater out of the garages (Lovell, Tr. 1713; Christian, Tr. 2061-62; Taylor, Tr. 138-9; Randall, Tr. 1353; Px. 230 at 20; Px. 8A at 31, 351); the engineroom exhaust

---

[44] Following the addition of a false bow, no further effort was made to correct the trim issue. Barbieto's post-bow-addition stability analysis revealed a continuing 1 ft. trim down-by-the-bow (Dx. SSSS at 3).

[45] The reservations in the Barbieto drawings were quoted in the A-1 report (Px. 100).

ventilation ducting was too close to the vessel waterline (Papa, Tr. 1506-07; Cx. 15 at 44; Rese, Cx. 13 at 39; Taylor, Tr. 181; Randall, Tr. 1347-9, 1377-78; Px. 224 at 28, 29, 54-59); and the megayacht lacked an essential DC powered fuel pump (Taylor, Tr. 201-02, 216).   However, the garage doors and the engineroom exhaust ducting were not mentioned in the Patton Documents (Px. 179, 180) because Riley did not inspect the vessel's garages as part of his survey (Cx. 2 at 102). Moreover, the lack of a DC fuel pump is likewise not mentioned in the Patton Documents (Px. 179, 180).

**The Misrepresentations and Non-Disclosures Were Material**

PGG claims that the information which was not disclosed and/or misrepresented was not material to the risks insured under the Policy and, therefore, Federal would have issued the Policy even with full disclosure and/or no misrepresentations (D. Sub. at 24-5).   However, PGG did not attempt to rebut Federal's underwriters' testimony on materiality.   The underwriters testified that the knowledge that: Trident did not build this vessel (O'Sullivan, Tr. 1033-34; Capiga, Tr. 1166-68); Ongoing trim and stability problems as set forth in both the Barbieto and A-1 documents (O'Sullivan, Tr. 1045-46); The Dubois email (*Id.*); and The 90-120 day repair windows (O'Sullivan, Tr. 1053); were each, individually, material to their decision to underwrite the GIGI risk in the first instance (O'Sullivan, Tr. 1033-34, 1045-49; Capiga, Tr. 1166-68), as well as the decision to provide coverage without restriction, such as port risk only cover (O'Sullivan, Tr. 1053).   There is no evidence to rebut the fact that the nondisclosures and misrepresentations concerning the condition of the yacht (particularly its fitness for intended use as an open ocean cruising yacht) were material to the underwriting of a hull risk.[46]

---

[46] *See Gulfstream Cargo, Ltd.* 409 F.2d at 980.

Defendants argue that Federal's underwriters are not credible and possessed no documentary support for their testimony concerning the materiality of the misrepresentations and non-disclosed information (D. Sub. at 24).   PGG also questions their decision not to quote, assuming Federal received full disclosure and accurate information (*Id.*).   PGG again focuses upon the Patton Documents and constantly reiterates the proposition that Federal's failure to request the Patton Documents makes the misrepresentations in the application and the nondisclosure of other material information irrelevant to the underwriters.

Turning to the alleged lack of documentary evidence, the application itself requests the identity of the manufacturer, establishing that this information was material to Federal's underwriters.[47]   Thus, the application is documentary support for the Federal underwriters' testimony.

In any event, PGG's argument regarding lack of documentary support for the underwriting decision is grounded in New York State law which is inapplicable in this admiralty litigation.   Under federal maritime law, courts define materiality in the subjective context of the effect on the particular underwriter's decisions.[48]   A fact is material if it could possibly influence the underwriter's: (1) Decision in determining whether to accept the risk and under what terms and conditions; (2)

---

[47] *Commercial Union Ins. Co. v. Lord*, 392 F.Supp. 2d 402, 406 (D.Conn. 2005) *aff'd*, 224 Fed. Appx. 41, 43 (2d Cir. 2007)(The district court correctly concluded that the insureds made material misrepresentations in the marine insurance policy application, a violation of the doctrine of *uberrimade fidei* including, facts surrounding when and where the vessel was built and by whom).

[48] *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985)("A fact is not material unless it is 'something which would have controlled the underwriter's decision")(quoting *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir. 1931)); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)(same, and affirming grant of summary judgment to insurer); *Northfield Ins. Co. v. Barlow*, 983 F.Supp. 1376, 1380 (N.D.Fla. 1997)("The standard for what information qualifies as material is very broad, and in the case of marine insurance a fact is material if it might have a bearing on the risk to be assumed by the insurer…").

Evaluation of the risk; or (3) Determination of the premium to be charged.[49]   Therefore, the testimony of the underwriter is sufficient to establish the effect of the misrepresentation or non-disclosure on the underwriter's decision to accept the risk, evaluate the risk, or determine the premium to be charged.  The doctrine of utmost good faith does not require underwriters to present documentary evidence concerning underwriting practices as may be required under New York law. Under federal maritime law, the underwriter's testimony is all that is required.[50]   As Federal's underwriters' testimony is undisputed, it is sufficient to support ruling in Federal's favor.

---

[49] *John Jovino Co. v. Fireman's Fund Ins. Co.*, 1992 WL 176956, *7 (S.D.N.Y. 1992)(materiality in insurance context is whether fact or omission could reasonably have affected the insurer's decision to enter into the contract, or its evaluation of the degree or character of the risk, or its calculation of the premium); *Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.*, 389 F.Supp.2d 1145, 1163 (D.Alaska 2005)("The parties also agree that to be material the fact must impact the underwriter's decision to either (1) accept the risk or (2) in setting the premium.").

[50]  *Albany Ins. Co. v. Horak*, 1993 WL 269620, *8 (E.D.N.Y. 1993)(granted summary judgment for the insurer on the basis of the underwriter's affidavit); *Royal Ins. Co.  v. Cathy Daniels, Ltd.*, 684 F.Supp. 786, 791 (S.D.N.Y. 1988)(granted judgment in favor of the insurer on the basis of the underwriter's testimony); *American Home Assur. Co. v. Master's Ship Mgmt.*, 423 F.Supp.2d 193, 206 (granted judgment in favor of insurers on the basis of the testimony of the underwriters; rejected the argument "that some underwriters or their agents did not have written guidelines prohibiting the underwriting of singletons."), *aff'd*, 489 F.3d 497 (2d Cir. 2007); *Certain Underwriters at Lloyd's v. Giroire*, 27 F.Supp.2d 1306, 1312-13 ("'materiality' is defined as 'that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk'" and granting summary judgment on the basis of the underwriter's affidavit); *Certain Underwriters at Lloyd's v. Johnson*, 124 F.Supp.2d 763, 770 (D.P.R. 1999)(verdict for insurer based on unrebutted testimony of underwriter); *Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.*, 389 F.Supp.2d 1145, 1166-68 (D.Alaska 2005)(the uncontradicted testimony of the underwriter was sufficient to compel summary judgment).

## PGG BREACHED THE ABSOLUTE IMPLIED
## WARRANTY OF SEAWORTHINESS

### The GIGI Was Not Reasonably Fit For Her Intended Use

Seaworthiness is a relative term[51] that means fitness for intended use.[52]  The intended use of the GIGI was for open seas sailing, not merely coastwise sailing.  This is why A-1 required the presentation of stability documentation showing that "the yacht is suitable for open seagoing service" (Px. 100 at 3).  PGG concedes that the prior owner was contemplating sailing to Europe (D. Sub. at 36-37; Lovell, Tr. 1650).  PGG's request for extended navigation limits in the megayacht application establishes that PGG intended to sail the GIGI on the open seas (Px. 166).

In contrast, Patton conditions its endorsement of the GIGI as a "good marine risk" for "coastwise" sailing in "fair weather" (Px. 179 at 31; Connell, Cx. 15 at 104-05; Riley, Cx. 2 at 110, 117).  Patton never states that the vessel was seaworthy or that she was a good marine risk for open seas sailing (Riley, Cx. 2 at 115, 173-74; Px. 179, 180).  However, if the GIGI was not fit for use outside coastwise or inland waters (Riley, Cx. 2 at 115), then the vessel was unseaworthy for its intended use in the open seas.

PGG argues for the creation of two separate seaworthiness standards: one for classed, commercial vessels and a second, sub-standard for private pleasure craft[53] (D. Sub. at 34-5).  This bifurcated approach was rejected by *Sisson*.[54]  Moreover, non-classed, pleasure craft encounter the

---

[51] *Neubros Corp. v. Northwestern Nat'l Ins. Co.*, 359 F.Supp. 310, 316 (E.D.N.Y. 1972).

[52] *The CALEDONIA*, 157 U.S. 124, 131 (1895).

[53] PGG further questions the applicability of the absolute warranty of seaworthiness to pleasure craft by relying upon *Contractors Realty v. Insurance Co. of N. Am.*, 469 F.Supp. 1287, 1294 (S.D.N.Y. 1979); *Mathis v. Hanover Ins. Co.*, 192 S.E.2d 510, 511-12 (Ga. Ct.App. 1972); and *Johnson Bros. Boat Works v. Conrad*, 156 A.2d 175, 179 (N.J.Super. 1959).  However, these cases were decided before the U.S. Supreme Court decision in *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) which unequivocally held that uniform rules of maritime conduct and liability extend to pleasure craft.

[54] 497 U.S. at 367 (discussing the need for uniform rules regardless of whether vessels are commercial or non-commercial).

same sea conditions as classed, commercial vessels.  Mother Nature does not differentiate between pleasure and commercial or between non-classed and classed vessels.  Indeed, the commercial vessel SEARAN TRADER encountered the same sea conditions as the non-classed, pleasure vessel GIGI.  Likewise, credentialed marine surveyors[55] and naval architects[56] (Px. 209A, 228), versed in the seaworthiness requirements for open seas sailing, are qualified to opine on the seaworthiness aspects of pleasure craft plying those same waters.  The methodology for conducting a commercial vessel survey is the same as that for conducting a pleasure craft survey (Dolan, Tr. 1225-26).  The evidence established that the GIGI was unseaworthy, both at the time of Policy inception (Dolan, Tr. 1233, 1239-40, 1243; Px. 209 at 8) and at the start of the final voyage (Randall, Tr. 1395, 1400-01) by virtue of undisclosed design defects (Randall, Tr. 1395; Taylor, Tr. 201-02); hazardous electrical conditions (Albers, Cx. 14 at 31-2, 138-39; Px. 128); vessel instability (Randall, Tr. 1396-97; Taylor, Tr. 307; Px. 209 at 10); penetrations in the watertight bulkhead (Dolan, Tr. 1233; Px. 209 at 5) and inadequate bilge pumps (Dolan, Tr. 1243; Px. 209 at 6).  In short, the GIGI was unseaworthy for open seas sailing.

Although not disclosed by Patton as affecting the seaworthiness of the vessel, the numerous breaches in all three watertight bulkheads constitutes a serious safety issue for seagoing vessels (Dolan, Tr. 1230-33).  If seawater enters a vessel and begins migrating between watertight compartments, the vessel is put at risk because the potential for vessel instability problems is created (Dolan, Tr. 1230-31).  The height of bulkhead penetrations is irrelevant (D. Sub. at 36) because even

---

[55] The Court took note of Jim Dolan's impressive resume (Tr. 1224).

[56] The Court noted that Federal's experts possessed long experience in cause-and-origin investigations and had substantial credentials (Tr. 2264).  In contrast, PGG's sole expert lacked formal education in the engineering and naval architecture disciplines (Christian, Tr. 1962); had relatively little background in performing cause-and-origin investigations (Tr. 1963-4); and as the Court noted, it was "difficult to ascertain from [Christian's] report exactly what methodology he used in reaching many of his conclusions…" (Tr. 1977).

high holes in watertight bulkheads can cause a vessel to sink.[57] Patton concurs that this vessel "probably should have had watertight compartments for the purposes of its construction and design" (Connell, Cx. 7 at 169-76).   However, by virtue of some 60-70 penetrations through all three watertight bulkheads (Moore, Tr. 2206), the vessel did not comply with the naval architect's design when Patton conducted its surveys in November/December, 2005 (Connell, Cx. 7 at 176-77).

Contrary to PGG's assertion (D. Sub. at 35), the Patton Recommendations were not corrected before Policy inception on December 13, 2005.   The vessel acceptance documents (Px. 106-107) establish that the deficiencies sighted by Patton were not fixed before the sale of the vessel.   Indeed, this is why SQI negotiated a 90-day, post-sale, repair window (Chamberlain, Tr. 1777; Px. 106) and also left the previous engineer aboard the vessel in order to continue working on the Patton items (Papa, Tr. 1511; Cx. 15 at 22).   At best, the Patton Recommendation items were not "completed"[58] until about six weeks after the delivery of the boat (Moore, Tr. 2214).   However, PGG's expert's opinion that the GIGI was seaworthy at Policy inception is premised upon the mistaken belief that all the Patton Recommendations had been corrected prior to closing (Tr. 2092-93).

The GIGI was unseaworthy at the inception of the Policy in breach of the absolute implied warranty of seaworthiness.   She was designed for the open seas, not merely coastwise service. However, at the time of Policy inception, the vessel was unseaworthy by virtue of design defects, including non-watertight garage doors (P. Sum. at 22), engineroom exhaust ducting that was too close to the waterline (P. Sum. at 23-4) and the lack of an essential DC fuel pump (P. Sum. at 24). All the vital watertight bulkheads aboard the vessel were compromised (P. Sum. at 24-6) as

---

[57] *Sundance Cruises Corp. v. American Bureau of Shipping*, 7 F.3d 1077, 1079-80 (2d Cir. 1993).

[58] The evidence indicates that some items were never corrected, such as the I-beam penetration (Papa, Tr. 1504-05; Rese, Cx. 13 at 41-42; Fudge, Cx. 11 at 35-6; Px. 8A at 420, 426-28); mousehole (Papa, Tr. 1512; Dolan, Tr. 1238-39; Px. 8A at 420-21, 441-42, 640, 678); and lack of bilge pumping capacity (Moore, Tr. 2205; Chamberlain, Tr. 1765-66; Px. 209 at 6).

evidenced by the unsealed I-beam (P. Sum. at 25) and mousehole penetrations (P. Sum. at 26) through the aft engineroom/port garage bulkhead as well as penetrations in the forward engineroom bulkhead (P. Sum. at 27).   The vessel's unseaworthy conditions also included inadequate bilge pumps (P. Sum. at 27-8), hazardous electrical conditions (P. Sum. at 28-9) and inherent vessel instability (Taylor, Tr. 307; P. Sum. at 29-31) which manifested itself in the loss of the vessel in unexceptional seas (Randall, Tr. 1396-97; P. Sum. at 31).

**PGG BREACHED THE NEGATIVE IMPLIED
WARRANTY OF SEAWORTHINESS**

**Evidence of Unseaworthy Conditions Known to PGG/Ashkenazy**

Federal has established that at the time the GIGI broke ground from Ft. Lauderdale on February 4, 2006, the yacht was unseaworthy due to: The improper designs of the engineroom air exhaust vent (P. Sum. at 32-33) and non-watertight garage doors (P. Sum. at 33); Lack of watertight bulkheads in the engineroom (P. Sum. at 33-35); Lack of a DC powered fuel pump (P. Sum. at 35); and Lack of a competent crew (P. Sum. at 35-37).   Federal has also established that Ashkenazy, either directly, or through the imputed knowledge of Papa, was aware of these unseaworthy conditions (P. Sum. at 39).

PGG's attempt to compare its actions to the vessel owner in *Contractor's Realty*[59] (D. Sub. at 41) founders.   Although PGG claims that the Patton Recommendations were used as a checklist (D. Sub. at 41), it is obvious that Moore's assertion that the bulkhead penetrations were sealed before the sea trials (Tr. 2206), is wrong.   It is indisputable that the gap around the I-beam was never filled (Rese, Cx. 13 at 41-42; Fudge, Cx. 11 at 35-36), even though SQI had left is engineer on the yacht after the sale (Papa, Tr. 1511; Cx. 15 at 22).   Patton was never asked to verify that the repairs had been completed (Riley, Cx. 2 at 118-9; Connell, Cx. 7 at 119-20).   The myth of the "open

---

[59] 469 F.Supp. at 1293

checkbook" (D. Sub. at 41) is also unsubstantiated.  In fact, Papa was only sent $192,000 (Px. 164, 253), from which he paid crew wages and purchased provisions (Ashkenazy, Tr. 2445).  Other than installing a second AC powered fuel transfer pump,[60] the work ordered by Papa was either related to the navigation systems on the yacht or were cosmetic in nature (Papa, Tr. 1469-72).  The invoices submitted by Broward Marine and Nautitech confirm this (Dx. PP, III).[61]

PGG's assertion that no water entered the engineroom from the port garage through the bulkhead (D. Sub. at 41) is absolutely false.   The crew saw water pouring in through the gap around the I-beam (Rese, Cx. 13 at 41-42; Fudge, Cx. 11 at 35-36).  Further, Papa and Fudge heard water flowing into the engineroom in the vicinity of the rear bulkhead, but never determined where the water was coming from (Px. 232, sub-exh. marked as Randall Depo. Exh. 17, p. 2; Papa, Cx. 15 at 58-59, 61-62).[62]  Similarly, the assertion that the gap in the I-beam did not exist at the start of the voyage (D. Sub. at 41) is without foundation.  No work was ever done on the I-beam after the yacht was purchased, so the same condition existed throughout (Papa, Tr.  1504-05).

PGG's contention that Papa was not rushed into leaving while the yacht still required work (D. Sub. at 42) must be rejected.  Papa told the crew that GIGI was not ready to sail, but the owner insisted the yacht sail to St. Maartin as scheduled (Gorin, Cx. 8 at 106-07) and he repeated this the morning after the abandonment (Mitchell, Tr. 622).

---

[60] The money would have been better spent installing a DC powered fuel transfer pump (P. Sum. at 24).
[61] Dx. QQ through HHH are merely duplicates of the Nautitech invoices contained in Dx. III.
[62] When a water test was performed on the mousehole in April 2007, water could be heard running into the engineroom (Randall, Tr. 1594-95).

**Proximate Cause of the GIGI Casualty**

The proximate cause of the capsizing was the accumulation of water in the port garage and the flooding of the engineroom (Randall, Tr. 1341) which resulted from the unseaworthy conditions caused by the design defects in the engineroom air exhaust vent and the lack of watertight integrity in the garage doors (Randall, Tr. 1395).   PGG's contention that the exhaust vent was not a significant source of water (D. Sub. at 42) must be rejected.   In fact, the "slurping" through the exhaust vent would have resulted in some 1500 gallons of water per hour flooding into the engineroom, where it then spread out through the port bilge and through the penetrations in the forward bulkhead before spilling into the center bilge and rising to the level where the bilge alarm sounded (Randall, Tr. 1448).

The other causes which PGG asserts might be the proximate cause of the loss must all be rejected.

The weather and sea conditions encountered by the GIGI were not exceptional. At the time of the casualty, the GIGI was in 8-10 foot following seas (Papa, Cx. 15 at 51-2) which is consistent with the contemporaneous description of "a swell in the starboard side 6-8 foot" as recorded in the USCG SAR (Dx. E at 3).   These sea conditions are consistent with the expert weather analysis (Raguso, Tr. 568; Px. 208) and are expectable in that area of the Atlantic Ocean in any February (Raguso, Tr. 570-72).   Indeed, Papa has admitted that the weather was not the cause of the sinking (Cx. 15 at 83).

Although the USCG helicopter pilot described the nighttime sea conditions as 20-30 foot swells[63] (Cx. 6 at 31), it is very difficult to estimate wave heights from the air and the helicopter pilot's description was probably "slightly exaggerated" (Mitchell, Tr. 661).   After all, a mere six

---

[63]  Swells are long, rolling, gentle waves upon which vessels ride up and down (Christian, Tr. 2072).

hours later, the sea conditions at the wreck site were 4-7 foot swells with a 1 foot chop (Mitchell, Tr. 622, 23) and a 30 foot swell does not dissipate in 6 hours (Mitchell, Tr. 623).  Indeed, it was not possible for the GIGI to have experienced 30 foot swells because the winds needed to generate that magnitude swell were not present (Raguso, Tr. 604-05; Px. 208).  The more likely explanation is that the 20-30 foot swell actually refers to the maximum wave encountered because it is that wave that the pilot is concerned about hitting the helicopter (Randall, Tr. 1566-57, 1572).  Indeed, it was conceded at trial that the weather was not so severe that it should have overcome the GIGI (Tr. 1309-11; Christian, Tr. 2007-08, 2079-80).  The weather and sea conditions were not the proximate cause of the sinking.

Similarly, although the loss of power may have expedited the capsizing of the GIGI, it was not the proximate or efficient cause.  The loss of power, with the accompanying loss of AC bilge pumping capability, would have been insignificant if seawater was not entering the hull through these unseaworthy design defects in the first instance (Taylor, Tr. 383).  The vessel, if seaworthy, should have been able to survive in a deadship condition (Randall, Tr. 1396-97).  She did not survive because of the water flooding through the unseaworthy conditions in the aft garage doors and engineroom exhaust (Randall, Tr. 1341-42, 1350, 1350-52; Taylor, Tr. 381, 382-83; Christian, Tr. 2074-75, 2088).

Finally, the contact from the alleged "collision" was so minimal that no member of the crew mentioned it during their examinations under oath taken just three days after the capsizing (*see* Papa, Cx. 15; Rese, Cx. 13; Fudge, Cx. 11).  Indeed, even at trial Papa denied that there was a serious collision between the cargo vessel and the yacht (Tr. 1481-82).  The pictures of the yacht taken that morning laying over with her starboard side up do not show any structural damage (Randall, Tr. 1355-56; Px. 8A at 12, 37, 40).  They do not show any signs of rust which would have rubbed off the

side of the cargo ship if there had been a significant contact (Randall, Tr. 1355).  Further, the

reported contact was up high, well above the waterline, and would not have caused flooding

(Randall, Tr. 1357-58).  This was confirmed by the inspection of the yacht after the contact which

confirmed that she was not taking on water (Gorin, Cx. 8 at 82-3).[64]  The only conclusion can be that

the contact with the cargo vessel was not the proximate cause of the sinking.

PGG seeks to avoid this conclusion by wildly speculating that the collision may have lead to

the loss of the deck hatch in the starboard garage (D. Sub. at 46).  Even PGG's expert did not

suggest that the damage from the collision was anywhere except in the forward section that had torn

away in the capsizing (Christian, Tr. 2101-02, 2108).  If this unsupported speculation were true, it

would have been immediately apparent to the crew in the engineroom.[65]

In fact, any leak in the hull caused by the contact would have been forward of the

engineroom.  Therefore, it could only have contributed to the flooding of the engineroom, and the

ultimate capsizing of the yacht, because the penetrations in the forward bulkhead allowed water to

flow back into the engineroom.  The unseaworthiness of the forward bulkhead was, therefore, the

final contributing cause of the casualty.  Under admiralty law, where there are concurrent causes of a

loss, one of which is insured and the other of which is excluded, coverage will only be triggered if

---

[64] If defendants place such great weight on Gorin's testimony to establish the severity of the collision, they must also accept her testimony that: (1) The inspection after the contact did not reveal any water leaking into the yacht (Cx. 8 at 82-3); (2) Papa told the crew the yacht was not ready to sail from Ft. Lauderdale (Cx. 8 at 106-07); (3) There was an argument between Papa and Rese when Rese asked that the yacht return to Florida while it was still in sight of the coast (Cx. 8 at 43-50); (4) The watches were disorganized and constantly interrupted by various alarms (Cx. 8 at 25-32); (5) Papa never performed any training drills (Cx. 8 at 38-9); and (6) Papa left the vessel with a large sum of cash removed from the safe (Cx. 8 at 88-9).

[65] The loss of the deck hatch would have flooded the bilge under the starboard garage, which would in turn have flooded the bilge under the lazarette.  The water would then have flowed into the engine room through the unsealed cable penetration and poured out right in front of the crew working on refilling the daytank (Taylor, Tr. 118, 134-37; Randall, Tr. 1372-73; Px. 8A at 845, 933).

the covered cause is the predominant efficient cause of the loss.[66]

PGG's own expert opined that once the vessel was without power and lying with a port list, she was "lost" due to the flooding through the exhaust vent (Christian, Tr. 2088-89). Therefore, at most, any flooding that may have occurred as a result of the contact with the cargo ship only accelerated the inevitable capsizing. However, the proximate cause of the loss was the flooding through the unseaworthy conditions of the yacht.

**Federal's Experts Can Rely Upon the Patton Documents[67]**

The premise of defendants' argument is that by agreeing to bind coverage after receipt of the Patton Documents, Federal agreed to insure the unseaworthy conditions set forth in those Documents.[68] However, Federal contends that the Patton Documents were not provided to Kelly until after the binder was issued and the Policy incepted. Therefore, the premise of PGG's argument is defective.

In any event, Dolan's evidence was that despite the lack of a star, the conditions set forth in the Patton Documents established that the oceangoing yacht was unseaworthy (Px. 209). This is particularly relevant testimony in light of the Patton surveyor's admission that he believed in light

---

[66] *Goodman v. Fireman's Fund Ins. Co.* 600 F.2d 1040, 1042 (4th Cir. 1979)("When two or more causes combine to cause a loss, one of which is insured against while the other is not, the loss is not insured unless the covered cause is the predominant efficient cause of the loss."). The same is true under New York law. *See Parks Real Estate Purchasing Group v. St. Paul F&M Ins. Co.*, 472 F.3d 33, 48 (2d Cir. 2006)("In a case where a covered and excluded peril combine to cause a covered loss, courts typically apply the efficient proximate cause rule – meaning, that the insured is entitled to coverage only if the covered peril is the 'predominate cause of the loss or damage.'"); *Throgs Neck Bagels, Inc. v. GA Ins. Co. of New York*, 671 N.Y.S.2d 66 (1st Dept. 1998)("In determining whether a particular loss was caused by an event covered by an insurance policy where other, noncovered events operate more closely in time or space in producing the loss, the question of whether the covered event was sufficiently proximate to the loss to require that the insurer compensate the insure will depend on whether it was the dominant efficient cause.")

[67] This issue had been previously addressed in Federal's Opposition to Defendants' Motion *In Limine* to Preclude the Testimony of George Randall (Docket # 175 at 6-7, 13-14)

[68] Of course, this argument is contrary to defendants' contention that the Patton Documents established that the yacht was seaworthy.

starring and that if there was any question as to whether a condition presented a safety issue, he would not star the item (Riley, Cx. 2 at 20).

Furthermore, it is a mischaracterization of Randall's testimony to allege that all of his opinions are "inextricably intertwined" with his opinions concerning the conditions disclosed by the Patton Documents (D. Sub. at 33). Randall's opinion on proximate cause was that the cause of the capsizing was the flooding of the engine room and the port garage (Tr. 1341) because of the design defects in the engineroom exhaust vent and the non-watertight garage doors (Tr. 1395). This opinion is obviously not "intertwined" with the Patton Documents as those areas are not even addressed in the Documents. Similarly, Randall's opinions concerning the limited effects of the contact with the cargo vessel are not in any way based on the Patton Documents.

The opinions of Dolan and Randall are credible and of assistance to the Court in understanding the evidence and determining the facts in dispute. Therefore, they are properly admissible under Fed.R.Evid. 702.

## The GIGI Crew was Incompetent

If this Court finds that loss of power was the proximate cause of the capsizing, it resulted from a lack of fuel in the daytank. This was the result, not of negligence, but rather lack of training. Rese did not use the computank system to monitor the level of fuel in the daytank and did not use the Alfa Laval centrifuge pump to constantly feed fuel to the daytank. Further, Rese did not know that the daytank could be replenished by gravity feeding fuel from tanks 7 or 8 (Cx. 13 at 29, 32). Federal has established that the crew was incompetent (P. Sum. at 35-37).

Defendants assert that plaintiff has not proved that the fire damper was left open (D. Sub. at 51), but counsel admitted at trial that the damper was open (Tr. 2232-33). There is no evidence that Rese was trained to deploy the fire damper and so he was incompetent in the use of the fire damper.

31

However, if the Court finds him competent, it was not negligence to overlook, the fire damper as he was *in extremis* (*See* P. Sum. at 36; 42, fn. 63).

The lack of an expert witness in this discipline is not fatal to Federal's position.   The definition of an incompetent crew is straightforward:  "[a] vessel crew that is inadequately trained, that is not instructed in the use of the equipment, or that engages in unsafe methods of work, can constitute unseaworthiness."[69]  The Court is perfectly capable of applying this standard without the aid of an expert witness.

Federal has established that PGG/Ashkenazy breached the negative implied warranty of seaworthiness.  Federal is entitled to a declaratory judgment that it is not liable to defendants under the Policy.

## THE CAPSIZING OF THE GIGI WAS NOT FORTUITOUS

Whether a loss is fortuitous does not depend upon the insured's subjective knowledge as argued by PGG (D. Sub. at 28).   Neither federal maritime nor New York law has adopted this expansive standard.[70]   For example, a loss arising from a latent design or manufacturing defect (absent any insuring terms bringing that type of loss within the coverage) is never known by the insured and yet not covered, because a loss arising from such defects – not being from an external source – is not fortuitous in nature.[71]

PGG argues that the ingress of water through the aft garage doors and the engineroom exhaust was fortuitous because these conditions were not known prior to the loss (D. Sub. at 29).

---

[69] *Crane v. Diamond Offshore Drilling, Inc.*, 743 So.2d 780, 790 (La. Ct.App. 1999); *see also Orient Mid-East Lines, Inc. v. S.S. ORIENT TRANSPORTER*, 496 F.2d 1032, 1040 (5th Cir. 1974); *Verdin v. C&B Boat Co.*, 1986 WL 15241 at *5 (E.D. La. 1986); *Ins. Co. of N. Am. v. Bd. of Comm.*, 733 F.2d 1161, 1166 (5th Cir. 1984).

[70] Defendants cite *City of Burlington v. Indemn. Ins. Co. of N. Am.*, 332 F.3d 38, 40 (2d Cir. 2003)(considered under Vermont law; involved latent, not readily observable defects).

[71] *Mellon v. Federal Ins. Co.*, 14 F.2d 997, 1003 (2d Cir. 1926)(insured denied coverage for latent defect in starboard boiler).

PGG cannot deny the obvious.  The aft doors were not watertight and any inspection would have revealed that deficiency.  How can PGG deny knowledge of the I-beam protruding through the forward bulkhead of the port garage, directly into the engineroom?  Further, low placement of the engineroom exhaust vent was "immediately visible" (Randall, Tr. 1345, 1347-48), known to the crew (Papa, Tr. 1506-07, Cx. 15 at 44; Rese, Cx. 13 at 39), and resulted in flooding in unexceptional sea conditions.[72]

The proximate cause of the loss was the ingress of water into the hull through design defects in the aft garage doors and the engineroom exhaust vent (Randall, Tr. 1431).  All other possible sources of water into the hull have been precluded (P. Sum. at 40).  All other contributing factors, such as weather, loss of power, and the cargo vessel "collision" have been shown not to be the proximate cause of the GIGI's capsizing.  (*See* Proximate Cause Section, *supra*, at 27-30).  The lack of the watertight integrity of the garage doors and the low placement of the exhaust vent which were the sources of the flooding, were open and notorious conditions which were, or should have been, known by PGG/Ashkenazy (Randall, Tr. 1345-1348).  PGG has failed to prove that the GIGI's capsizing was proximately caused by a fortuity.

---

[72] PGG cites to *Compania Transatlantica v. Alliance Assur.*, 50 F.Supp. 986, 989-90 (S.D.N.Y. 1943)(the ingress of water through a "jammed" check valve and not through a design defect, was a fortuity, absent improper maintenance); *New York, New Haven & Hartford R.R. Co. v. William Strange Gray*, 240 F.2d 460, 463 (2d Cir. 1957)(the ingress of water through some loose rivets and a hole of unknown origin in the bow of the barge, and not from a design defect, was fortuitous absent intentional acts on the part of the owner).

## CONCLUSION

Federal is entitled to a judgment declaring that it is not liable to PGG/Ashkenazy under the Policy because: (1) PGG breached its duties under the doctrine of *uberrimae fidei*; (2) The GIGI was unseaworthy at the inception of the Policy and at the commencement of the last ill-fated voyage; and (3) The loss was not the result of a fortuitous event.  Also, Federal should be awarded judgment in the amount of $732,672.58 on its affirmative claim for reimbursement of recovery costs.

Dated:  New York, New York
        August 8, 2007

                    NICOLETTI HORNIG & SWEENEY
                    Attorneys for Plaintiff
                    FEDERAL INSURANCE COMPANY

By:   /s/ John A. V. Nicoletti                
                    John A. V. Nicoletti (JN-7174)
                    Wall Street Plaza, 88 Pine Street, 7th Floor
                    New York, New York 10005-1801
                    (212) 220-3830
                    (OUR FILE:  25000011 JAVN/TLS/TMR)

**APPENDIX A**

**PGG/ASHKENAZYS' STATEMENTS LACK EVIDENTIARY SUPPORT**

The following is a list of the most egregious statements made in Defendants' Post-Trial Submission with no evidentiary support:

| Page No. | Statement | Comment |
|---|---|---|
| 7 | However, Plaintiff's expert never assessed the capacity of the Yacht's two primary pumps, and Defendants' designated experts Michael Christian and Robert Moore, as well as Plaintiff's own investigator Robert Taylor agreed that the pumps would have been able to deal with the amounts of water that entered the vessel on its last voyage (Trial Tr. p. 381-382, 1507, 1583-1584, 1994, 2005, 2230-2231). | Neither Moore nor Christian testified that the pumps were sufficient. Christian testified that he did not know the yacht's pumping capacity (Tr. 1994-95). |
| 14 | Plaintiff cannot meet its burden to show that PGG had any knowledge of the [A-1] survey where Ashkenazy denied receipt and Chamberlain does not know whether it was given to PGG (See id. [p. 2432]; Trial Tr. p. 1769) | Chamberlain testified at trial that the A-1 Survey was "probably" provided to Ashkenazy (Tr. 1769) after testifying at depositions that it was given to Ashkenazy (Tr. 1770). |
| 14 | Had the A-1 Survey contained any new material information, Chamberlain would have used it to negotiate down the purchase price, but it contained none (Trial Tr. p. 1804-1805). | The testimony cited concerns the Patton Marine survey, not the A-1 Survey. |
| 27 | Capiga said that Plaintiff would not have taken the risk based on some of the disclosures, but her superior O'Sullivan said that they might have taken the risk after receiving more information (Trial Tr. p. 1041-1042, 1053, 1168). | O'Sullivan's testimony about seeking more information related to the Dubois email (Px. 91) and the Patton Documents (Px. 179, 180)(Tr. 1041-42, 1053). O'Sullivan and Capiga agreed that they would have revoked the quote if they had received the A-1 report (Tr. 1047; 1166-68). |
| 36 | The penetrations were too high to affect seaworthiness anyway (Trial Tr. p. 1268) | Testimony does not refer to all the penetrations. Dolan testified that he would "assume" that the single penetration on the forepeak bulkhead was above the |

|  |  | waterline, but that he has not measured it and does not know.  He never testified it would not affect seaworthiness. |
|---|---|---|
| 37 | Lovell testified that his dissatisfaction was not about safety but misrepresentations and delays (Trial Tr. p. 1621, 1623). | Lovell testified that the issues with Trident's construction of the yacht were that the hull was not designed to carry the weight forward on the vessel and was not designed for Lovell's yacht.  He never said these did not concern safety. |
| 38 | This indicates that the vents were fine until they met 30 foot swells and loss of power, that prevented the captain from steering the bow into the waves (Trial Tr. p. 1478) | Testimony only establishes that captain had steered into the waves.  No reference to vents. |
| 41 | Had either of these been a source of water it would have been seen by the crew stuffing plastic bags around the I-beam (See Ex. 8A Pictures 402, 420, 428; Trial Tr. p. 150). | Testimony only identifies inconclusive photos.  Taylor testified that whether crew could see mousehole depended on how they stuffed the mousehole (Tr. 272-73). |
| 42 | Meanwhile the salvor Ray Darville reported that water was still entering from engine through unknown source five days after the vessel was righted, so there is an unexplained source of water that is not necessarily due to an unseaworthy condition existing when the Yacht left port (Trial Tr. p. 547, 548, 551). | Darville testified that this was residual water that was trapped in the bilge of the port garage (Tr. 551). |
| 44 | The loss of power was likely due to fuel contamination, rather than fuel exhaustion, and while neither source would allow Plaintiff to deny coverage, fuel contamination cannot be claimed to have been caused by crew incompetence (See Trial Tr. p. 1995). | Judge Rakoff precluded Christian's testimony concerning fuel contamination. (*See* Tr. 1996-2002). |
| 44 | Salvors reported evidence of fuel contamination, and Plaintiff's investigators were also aware of it (Trial Tr. 680-682). | Mitchell testified that there was creamy sludgy oil under the valve cover but he never said it was evidence of fuel contamination.  He never testified that Plaintiff's investigators were aware of this. |

| 45-46 | The collision happened right at a spot peppered with pipes and hull-throughs for laundry, bathrooms, and these would have allowed water into the vessel (Ex. 67; Trial Tr. p. 2100-03). | The cited testimony does not support the statement, which, is actually based on the Christian's direct testimony about leaking hull-throughs which was stricken by the Court (Tr. 2051-52). |
|---|---|---|
| 46 | Even Plaintiff's expert Randall admitted that the collision caused damage (Trial Tr. p. 1545, 1548). | Randall further testified that the damage did not contribute to the flooding (Tr. 1545). |
| 46 | Randall's claim that the inability to close the door contributed to the loss was based on the idea that the sliding door was amidships, but it was actually aft (Trial Tr. p. 1557, 2038; Ex. 38 Photo 37). | Randall testified that the sliding door was on or near the center line of the vessel forward of an open deck (Tr. 1556-57). Christian agreed the doors were on the centerline (Tr. 2038). |
| 46 | Taylor was dismissed upon revealing that the loss occurred because the Yacht ran dry of fuel, as this contradicted the litigation strategy to blame conditions in the Patton Survey and escape liability to KeyBank (Trial Tr. p. 308-309). | No evidence to support this speculation.  Taylor was never dismissed (Tr. 308-09). |
| 46 | Water was still entering the engine room through an unknown source five days after the vessel was righted (Trial Tr. p. 551). | Darville testified that this was residual water that was trapped in the bilge of the port garage (Tr. 551). |