06-112

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL INSURANCE COMPANY,　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　) 　　06 CV 2455 (JSR)

　　　　　　Plaintiff,　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　)

　　　　　-against-　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　)

PGG REALTY, LLC, BEN ASHKENAZY　　　　　)

and KEYBANK NATIONAL ASSOCIATION,　　　)

　　　　　　　　　　　　　　　　　　　　　　　)

　　　　　　Defendants.　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　　　　　　)

-------------------------------------------------------------------------------------------------------------------

## DEFENDANTS' WRITTEN REBUTTAL SUMMATION

-------------------------------------------------------------------------------------------------------------------

WEG AND MYERS, P.C.
Attorneys for Defendants
PGG REALTY, LLC
and BEN ASHKENAZY
52 Duane Street
New York, New York 10007
(212) 227-4210

On the Brief:

Dennis T. D'Antonio, Esq.
William H. Parash, Esq.
Patrick M. Leathem, Esq.

## *TABLE OF CONTENTS*

Page

**TABLE OF AUTHORITIES** …………………………………….. *iii*

**PRELIMINARY STATEMENT** ……………………………… 1

**ARGUMENT** ………………………………………………… 5

**I.    PLAINTIFF FAILED TO SATISFY ITS BURDEN
       TO PROVE A BREACH OF THE DUTY OF UTMOST
       GOOD FAITH** ……………………………………… 5

**II.   PLAINTIFF FAILED TO SATISFY ITS BURDEN TO
       PROVE A BREACH OF THE ABSOLUTE IMPLIED
       WARRANTY OF SEAWORTHINESS** ……………………… 7

   A.    The Patton Survey Is Not Evidence of Unseaworthiness …… 7

   B.    The Yacht Had No Design Defects …………………………… 10

   C.    Plaintiff Failed To Prove That The Yacht Had
         Unseaworthy Bulkhead Penetrations At The Inception
         Of Coverage ……………………………………………….. 12

   D.    Plaintiff Has Not Proven That a Lack Of Automatic Engine
         Room Bilge Pumps Was An Unseaworthy Condition ………. 13

   E.    Plaintiff Has Not Proved That the Yacht Was Unseaworthy
         Due to Electrical Conditions …………………………………. 14

   F.    Plaintiff Has Not Proved That The Yacht Was Unstable
         At The Inception Of Coverage ………………………………. 15

**III.  PLAINTIFF FAILED TO SATISFY ITS BURDEN TO PROVE
       A BREACH OF THE NEGATIVE IMPLIED WARRANTY OF
       SEAWORTHINESS** ……………………………………………. 17

   A.    The Standard …………………………………………………. 17

   B.    Plaintiff Failed to Prove the Requisite Knowledge of PGG …. 18

   C.    Plaintiff Failed to Prove that the Loss Was Proximately
         Caused by a Known Unseaworthy Condition ……………….. 20

*i*

D.  Plaintiff's Expert Concluded that the Loss Was
    Proximately Caused by Conditions that Would Not Justify
    Denial of the Claim ……………………………………….. 23

E.  Plaintiff Cannot Prove that The Yacht Was Unseaworthy at
    Departure …………………………………………………….. 24

F.  Plaintiff Failed to Prove That the Alleged Design Defects
    Were Either Known or Unseaworthy ………………………….. 24

G.  There Is No Proof that the Other Bulkhead Penetrations
    Were Unsealed at Departure, Unseaworthy or Sources of
    Water ………………………………………………………… 24

H.  The Lack of a DC Fuel Pump on the Last Voyage Neither
    Made the Yacht Unseaworthy Nor Proximately Caused the
    Loss …………………………………………………………. 27

I.  Plaintiff Cannot Prove that the Proximate Cause of
    the Loss Was Crew Incompetence or Due to Their Lack
    of Qualifications …………………………………….………. 27

IV.  PGG HAS SUSTAINED ITS PRIMA FACIE BURDEN ……… 31

A.  Plaintiff Deliberately Misstates PGG's Minimal Burden of
    Proof of Fortuity……………………………………………..… 31

B.  PGG Has Proved that the Loss Was Fortuitous, as PGG
    Reasonably Believed That a Loss Was Not Inevitable
    at the Inception of Coverage ………………………………… 32

C.  Plaintiff Cannot Shift the Burden to PGG to Prove the
    Yacht's Stability, or the Absence of Other Deficiencies to
    Prove Its Prima Facie Case ……………………………………… 34

V.  DEFENDANTS ARE ENTITLED TO RECOVER FOR
    PERSONAL EFFECTS …………………………………………. 35

VI.  PLAINTIFF IS NOT ENTITLED TO PAYMENT OF
    ITS INVESTIGATION COSTS…………………………………… 36

CONCLUSION ………………………………….………………………... 37

## *TABLE OF AUTHORITIES*

### Cases

*Allied Van Lines Intern. Corp. v. Centennial Ins. Co.,*
  685 F. Supp. 344, 345-346 (S.D.N.Y. 1988) ..................................................................... 31, 32

*American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation,*
  269 F. 768, 770 (2d Cir. 1920) .................................................................................................. 8

*Chase Manhattan Bank v. New Hampshire Ins. Co.,*
  193 Misc. 2d 580, 588, 749 N.Y.S. 2d 632, 638 (N.Y. Sup. 2002) ......................................... 32

*City of Burlington v. Indemnity Ins. Co. of North America,*
  332 F.3d 38, 49 (2d Cir. 2003) ................................................................................................. 32

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,*
  982 F. Supp. 310, 314 (S.D.N.Y. 1997) ................................................................................. 5, 6

*Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.,*
  277 U.S. 66, 78, 48 S.Ct. 459, 462 (1928) ................................................................................ 8

*Continental Ins. Co. v. Lone Eagle Shipping (Liber.),*
  952 F. Supp. 1046, 1070 (S.D.N.Y. 1997) ........................................................... 17, 18, 19, 20

*Contractors Realty Co., Inc. v. Ins. Co. of North America,*
  469 F. Supp. 1287 (S.D.N.Y. 1979) ............................................................................... 6, 7, 27

*Formosa Plastics Corp. (U.S.A.) v. Sturge,*
  684 F. Supp. 359, 365 (S.D.N.Y. 1987) .................................................................................. 32

*Gregoire v. Underwriters at Lloyds, Combined Cos.,*
  559 F. Supp. 596, 599 (D. Aka. 1982). ................................................................................... 18

*In re Balfour MacLaine Intern. Ltd.,*
  85 F.3d 68, 78 (2d Cir. 1996). ................................................................................................ 32

*Ingersoll Milling Machine Company v. M/V Bodena,*
  829 F.2d 293, 307 (2d Cir. 1987) ........................................................................................... 31

*International Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76, 83 (2d Cir. 2002) ................................................................................................. 31

*Janet Nav. Inc. v. Sturge*,
711 F. Supp. 119, 130 (S.D.N.Y. 1989) ................................................................................... 29

*Jimerson v. United States*,
2003 WL 25190 (W.D.N.Y. 2003) ........................................................................................... 30

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762
(1987) ......................................................................................................................................... 6

*McCluskey v. County of Suffolk*,
2005 WL 2205750 at \*5 (N.Y. Sup. 2005) .............................................................................. 37

*Morrison Grain Co. v. Utica Mut. Ins. Co.*,
632 F.2d 424, 430 (5th Cir. 1980) ..................................................................................... 31, 32

*Pan American World Air., Inc. v. Aetna Casualty & Surety Co.*,
505 F.2d 989, 999 (2d Cir. 1974) ............................................................................................ 32

*Paramount Film Distributing Corp. v. State*, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 698, 334
N.Y.S.2d 388, 393 (N.Y. 1972)................................................................................................ 36

*Puritan Ins. Co. v. Eagle S.S. Co. S.A.*,
779 F.2d 866 (2d Cir. 1985) ...................................................................................................... 5

*Reynolds v. Canton Ins. Office, Ltd.*,
98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917) ............................................................. 10

*Rice v. N.A.A.C.P.*,
103 A.D.2d 801, 802, 477 N.Y.S.2d 434, 435 (2d Dept. 1984)................................................. 7

*Robinson v. United States Bureau of Prisons*,
244 F. Supp. 2d 57, 64-65 (N.D.N.Y. 2003) ........................................................................... 30

*Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*,
242 F.2d 385, 388 (5th Cir. 1957)........................................................................................... 17

*St. Paul Fire & Mar. Ins. Co. v. Christiansen Marine, Inc.*,
893 So.2d 1124, 1133-1134 (Ala. 2004) ................................................................................... 9

*St. Paul Fire & Marine Ins. Co. v. General Injectables & Vaccines, Inc.*,
2000 WL 270954 at \*3 (W.D. Va.. 2000) ............................................................................... 32

*Texaco, Inc. v. Universal Marine, Inc.*,
  400 F. Supp. 311, 324-325 (D. La. 1975)................................................................................. 18

*The Anthony D. Nichols,*
  49 F.2d 927, 933 (S.D.N.Y. 1930); ........................................................................................ 11

*Thebaud v. Great Western Ins. Co.,*
  155 N.Y. 516, 524 (N.Y. 1898)................................................................................................ 8

*Tymchuk v. City of Rochester*,
  43 Misc.2d 98, 105, 250 N.Y.S.2d 202, 209 (N.Y. Sup. 1964) ................................................. 7

*Van Arsdale v. Metropolitan Title Guaranty Co.*,
  103 Misc.2d 104, 106, 425 N.Y.S.2d 482, 484 (N.Y. Dist. Ct. 1980) ....................................... 7

## Treatises

2 Thomas J. Schoenbaum, *Admiralty & Maritime Law*, § 19-10, at 434 (2d ed. 1994) ..........21

## **PRELIMINARY STATEMENT**

The written summation of Plaintiff Federal Insurance Company ("Plaintiff") is remarkably devoid of the affirmative evidence that Plaintiff would need to carry the burden of proof on its causes of action. Plaintiff is in a drastically different position than PGG Realty, LLC ("PGG", and collectively with Ben Ashkenazy ("Ashkenazy") ("Defendants")), as PGG procured an all-risk insurance contract from Plaintiff to insure against unexplained losses, and bears a minimal burden of proof. Plaintiff is seeking to avoid its contractual obligations and thus bears the burden of proof as to the cause of loss and issues of seaworthiness.

Instead of meeting this burden of proof with expert opinion predicated upon tests and calculations scientifically proving seaworthiness issues, Plaintiff instead has asked the Court to infer from documents describing the Yacht's early condition, as well as conclusory and unsupported expert opinions, that the Yacht was unseaworthy, notwithstanding its proven 38,000 mile sailing history and the testimony of every witness with personal knowledge of the Yacht that it was seaworthy.

Insofar as Plaintiff retrieved the hull at great expense and exclusively controls the Yacht to this day, it would be expected that in order to meet its heavy burden of contradicting the aforementioned testimony to prove its unseaworthiness claim, Plaintiff would have presented scientific evidence to support its claims of instability and other unseaworthy conditions alleged to have existed at the inception of coverage, but it did not do so.[1]   In addition, the credentials of

---

[1] Plaintiff's expert George Randall, who has next to no experience with fiberglass pleasure yachts, offered no weight calculations, measurements, or other objective scientific evidence to counter the overwhelming direct evidence that the Yacht was seaworthy. Plaintiff's expert James Dolan also failed to offer any scientific reason other than his opinion to conclude that the Yacht was unseaworthy. Both of these experts were hired after this litigation began with knowledge of the conclusions that Plaintiff desired they reach, and thus lack credibility.

Plaintiff's experts do not disguise the fact that they offered mutually exclusive theories about the loss and unscientific suppositions.[2]

Plaintiff lacks direct evidence of unseaworthiness, so it asks the Court to draw inferences that run directly counter to all of the direct evidence on the issue. At trial Plaintiff placed great reliance on a single statement of Arthur Barbeito that was printed on a diagram that was quoted by the A1 Survey. (See Ex. 50; Ex. 100) It is evident that this statement is essentially a "non-opinion," in the sense that it states that Barbeito was not providing any analysis regarding the longitudinal and local strength of the hull—indeed, he was not asked for an opinion on those topics—but if Plaintiff wanted the Court to draw the inferences that the Barbeito excerpt indicated unseaworthiness, Plaintiff needed to provide trial or deposition testimony to meet its burden.[3] (See Trial Tr. p. 1668-1669; 2362-2363)

Unable to evade the fact that all of the crew testified that the water from the I-beam and exhaust vents were insufficient to flood the Yacht, Plaintiff's summation twists Randall's response to a hypothetical question into an expert conclusion that the Yacht had unsealed forward bulkhead penetrations that delayed the high water alarm. (See Trial Tr. p. 1596-1597)

Plaintiff also makes an outrageous new claim in its summation that the Patton Survey was full of misrepresentations, impugning surveyors that Plaintiff itself has relied upon in the past. Even assuming, *arguendo*, that a description was not fully accurate, Plaintiff has provided

---

[2] For instance, Plaintiff's original cause-and-origin expert Robert Taylor's claim that fuel contamination had been ruled out as the cause of the loss of power, even though the fuel samples taken have inexplicably never been analyzed. (Trial Tr. p. 401-404). Plaintiff's experts refute one another as Taylor found that the loss of power was the critical factor in the loss, but Randall claims it was not a factor at all. (Trial Tr. p. 381-382, 1587) Similarly, Plaintiff claims that leaving the exhaust vent damper open was either proof of gross incompetence or not even mere negligence, all the while ignoring two crucial facts: the damper was found closed and no crew member ever testified or reported that it was not closed. (Trial Tr. p. 340-342, 378)

[3] Barbeito complied with a document subpoena from Plaintiff and was likely available to testify.

no testimony (a) from the underwriters that such inaccuracies would have changed their assessment of the risk, (b) that PGG knew that the survey was inaccurate, or (c) that a reasonable insured in PGG's position would have considered that information material. Furthermore, minute errors would not change the fact that the information given was sufficient to place Plaintiff on inquiry notice, and an    inquiry would have produced the correct information.

Given the undisputed law that the negative implied warranty of seaworthiness is not breached unless a known unseaworthy condition proximately caused the loss, Plaintiff's expert Randall failed to establish a breach by testifying that the only sources of water were the miniscule I-beam gap and the engine room exhaust vent.  There no evidence that either of these conditions were known before departure, and all witnesses said these were insufficient to have proximately caused the loss.  The crew saw "just a small bit" of water through the miniscule gap around the I-beam passing through aft engine room bulkhead before it was closed.  (Trial Tr. p. 1351, 1503-1504; Court Ex. 11, p. 35-36; Court Ex. 13 p. 41-42)  The crew saw water "occasionally slurping" through the engine room exhaust vent, "but not enough to be the problem."  (Ex. 9A p. 2; Trial Tr. p. 1436)

Plaintiff's evidence of breaches of the absolute and implied warranties of seaworthiness further fails because, as set out in Defendant's written summation and motions in limine, Plaintiff is barred from offering conditions disclosed in the Patton Survey as evidence of such breaches.  Plaintiff accepted the risk with knowledge of those conditions, and issuance of a policy with knowledge of grounds of invalidity waives the right to rely on those grounds to void the policy.

3

Plaintiff is also barred from arguing that the loss was caused by crew incompetence, as the Complaint contained no such allegations and none of Plaintiff's employees testified during discovery or at trial that this was a ground for denial. Plaintiff denied Defendants the opportunity to conduct meaningful discovery on the issue by waiting until the close of discovery to spring this defense, despite knowing all relevant facts at or near the time suit was filed.

In recognition that it cannot sustain its burden of proof, Plaintiff baldly misstates the law in an attempt to shift the burden to Defendants. Having filed this lawsuit without having completed a proper cause-and-origin investigation (see Ex. UUU), Plaintiff now seeks to have the Court save its case by attempting to impose onerous burdens of proof on PGG, rather than itself. Plaintiff first claims that there is a burden on PGG to prove "good order," as if PGG had insured a shipment of goods and had to prove they were not damaged before being shipped. There is ample proof that the Yacht was in good order in that it sailed 38,000 miles without incident and was found to be worth over $7 million in the Patton Survey. (Trial Tr. p. 1645-1646; Ex. 179 p. 32)

The second burden that Plaintiff seeks to impose is an unduly onerous burden of proof of fortuity, where case law recognizes that the insured bears a minimal burden. PGG's burden is simple: to prove that as far as it was subjectively aware, the loss was not inevitable. Plaintiff has failed to satisfy its burden to prove that the Yacht was unseaworthy, so its summation attempts to impose a burden on PGG to disprove its unsupported conjecture and innuendo. Notwithstanding such rhetoric, the plain fact remains that Defendants have carried their modest burden to prove fortuity, which does not require them to prove the exact cause of loss.

4

Plaintiff also attacks the credibility of Warren Lovell[4], Robert Moore[5], Kent Chamberlain[6], and Patton's surveyors[7] Robert Riley and Robert Connell, but its allegations are based purely on speculation and conjecture with no support in the record.

## ARGUMENT

## I.   PLAINTIFF FAILED TO SATISFY ITS BURDEN TO PROVE A BREACH OF THE DUTY OF UTMOST GOOD FAITH

Plaintiff ignores the Second Circuit's formulation of the duty of utmost good faith except to claim that *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866 (2d Cir. 1985) indicates the Second Circuit's full embrace of the doctrine. In fact that case shows that an insurer has a duty of inquiry upon receipt of information, stating that a "minute disclosure of every material circumstance is not required." *Puritan*, 779 F.2d at 872 (2d Cir. 1985). Rather, as explained by the Court in *Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 982 F. Supp. 310, 314 (S.D.N.Y. 1997):

---

[4] The attack on Lovell is particularly egregious, because by claiming that he falsified testimony that the Yacht was seaworthy, Plaintiff implies that he knowingly endangered the lives of his wife and family by subjecting them to 38,000 miles of sailing on an unseaworthy Yacht. Lovell's use of the Yacht clearly corroborates his testimony that the Yacht was seaworthy.

[5] The attack on Moore is based on pure speculation. Plaintiff asks the Court to assume that Moore risk his own life and those of his crew by personally captaining an unseaworthy yacht in 12 to 15 foot seas. Moore's punchlist provides contemporaneous corroboration of testimony about the pre-sale work performed on the Yacht. Moore also voluntarily provided the Yacht's drawings to Plaintiff's investigators Christopher Karentz and Taylor, showing he did not believe that the designs were defective. Further, Moore has never claimed to be a naval architect or taken credit for the design of the Yacht, and no claims have been made that his workmanship was faulty, as opposed to Trident's.

[6] There is not a shred of evidence that Chamberlain had a motive to testify falsely or to induce Patton to "soft-pedal" any condition of the Yacht, nor that Patton depends on his business.

[7] Plaintiff's outrageous claim that the Patton Survey contains misrepresentations is unfounded and absurd. The record is replete with references to Patton Marine as the most reputable and best marine survey firm in the business, with a reputation so good that it is easier to obtain financing and insurance by using their services. Plaintiff admittedly relies on their surveys. It is absurd to speculate that its surveyors would downplay a yacht's deficiencies, not only in a survey report but under oath.

> "The assured complies with the rule [of *uberrimae fidei*] if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it." [*Puritan*, 779 F.2d at 871]. *See* [*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)]; *Contractors Realty Co., Inc. v. Ins. Co. of North America*, 469 F. Supp. 1287 (S.D.N.Y. 1979).

*Commercial Union*, 982 F. Supp. at 314.

Plaintiff cannot escape the fact that the Patton Survey adequately disclosed all material facts[8], and enabled Plaintiff's underwriters to ask why the hull modifications noted therein had been needed. (See Ex. 179 p. 5; Ex. 180 p. 1-2) Patton's surveyor Robert Connell arbitrated the SeaQuest-Trident dispute and told his co-surveyor Robert Riley about it. (Court Ex. 7 p. 55-56; Court Ex. 2 p. 35-36) Plaintiff's underwriters only had to read the Patton Survey and reach out to the surveyors, as they regularly do, to ask about the hull modifications, and they would have learned the Yacht's litigation and construction history if they cared about it. (Trial Tr. p. 1112) Plaintiff cannot prove its burden to show that all of the alleged non-disclosures were not sufficiently disclosed because Plaintiff had imputed knowledge of the Patton Survey.

PGG only had the obligation to disclose known information, and there is no evidence that PGG knew that the Patton Survey contained any inaccurate information. Assuming *arguendo* that the Patton Survey contained any misrepresentations, or that they were material, Plaintiff has provided no testimony from the underwriters that such inaccuracies were material to the risk. Nor has Plaintiff presented evidence that PGG knew that the survey was inaccurate, or that a reasonable insured in PGG's position would have considered that information material. Without such proof Plaintiff cannot establish a breach.

---

[8] In their own written summation, Defendants have already addressed the litany of allegedly undisclosed or misrepresented facts listed in the footnote on Page 5 of Plaintiff's summation, but it should be noted in particular that SeaQuest was identified as the Yacht's builder in the Patton Survey (Ex. 179 p. 3) and that there is no proof that PGG had any knowledge of most of these claimed non-disclosures and misrepresentations.

PGG did not know about and therefore had no duty to disclose the A1 Survey, which Chamberlain, hoping to gain commissions as a charter agent, ordered in excess of his limited authority as purchase broker. (See Ex. 109; Trial Tr. p. 1781, 2445-2447) Chamberlain testified that he ordered the A1 Survey but may never have shown it to Ashkenazy, and that he, Chamberlain, had a vested interest in making the boat available for charter. (Trial Tr. p. 1769, 1771, 1781) "A person employed by another for a particular purpose, and who is acting under limited and circumscribed powers, is a special agent. The rule is well settled that a special agent cannot bind his principal in a matter beyond the authority conferred upon him." *Tymchuk v. City of Rochester*, 43 Misc.2d 98, 105, 250 N.Y.S.2d 202, 209 (N.Y. Sup. 1964) (citations omitted) *See also Rice v. N.A.A.C.P.*, 103 A.D.2d 801, 802, 477 N.Y.S.2d 434, 435 (2d Dept. 1984); *Van Arsdale v. Metropolitan Title Guaranty Co.*, 103 Misc.2d 104, 106, 425 N.Y.S.2d 482, 484 (N.Y. Dist. Ct. 1980). The survey was not part of the purchase and cannot be imputed to PGG.

## II.  PLAINTIFF FAILED TO SATISFY ITS BURDEN TO PROVE A BREACH OF THE ABSOLUTE IMPLIED WARRANTY OF SEAWORTHINESS

Plaintiff hails the implied warranty of seaworthiness as a life protecting deterrent, saying that it deters boat owners from allowing life-threatening conditions at the cost of their coverage. This is nothing short of revisionist history, because pleasure boat owners do not even know that these implied warranties exist until after a loss is suffered, as Plaintiff chooses not insert explicit warranties of seaworthiness into its pleasure boat policies.  If the purpose of the warranty was to protect passengers and crew members--and not insurers--the warranty would be made explicit. Leaving the warranty implicit ensures that it is not a deterrent, but allows insurers to collect premiums and then escape their obligations, violating their duty "to give the assured fair notice of his obligations." *Contractors Realty Co., Inc. v. Insurance Co. of North America*, 469 F. Supp. 1287, 1294 (S.D.N.Y. 1979).

7

A.    The Patton Survey Is Not Evidence of Unseaworthiness

The Patton Survey provides no evidence of unseaworthiness, but rather provides prima

facie evidence of seaworthiness, which Plaintiff has no basis to contradict. Plaintiff cannot rely

on the Patton Survey to meet its burden of proof[9] for several reasons. Firstly, Plaintiff agreed to

cover the risk with imputed knowledge of all conditions that the Patton Survey disclosed or

gave inquiry notice.[10]

Secondly, Plaintiff cannot escape the fact that no Recommendations were starred to

indicate that the Recommendations affect safety or insurability.  (Ex. 180 p. 1)  Nor can Plaintiff

escape the fact that Patton's surveyors repeatedly testified that the Yacht was fit for its intended

use for Ashkenazy family getaways. (Court Ex. 2 p. 149-151; Court Ex. 7 p. 216-217, 223; Trial

Tr. p. 2445) Plaintiff attempts to cast the Patton Survey as portending doom, when any marine

person would recognize it as describing an excellent luxury vessel that might benefit from some

enhancements and routine maintenance.  (Court Ex. 2 p. 43-44; Court Ex. 7 p. 92)

Thirdly, the Patton Survey did not condition its endorsement of the Yacht as a good risk

upon use within 20 miles of shore, which is allegedly one definition of "coastwise."[11]

---

[9] Plaintiff is entitled to no presumption of unseaworthiness to aid it in meeting its burden, because Courts only apply the presumption where there is clear and calm weather. *See*, *e.g.*, *Texaco, Inc. v. Universal Marine, Inc.*, 400 F. Supp. 311, 324-325 (D. La. 1975). The presumption is not available in the weather conditions that the Yacht experienced, even assuming *arguendo* that the conditions were expectable. (*Id.*)

[10] *See Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co.*, 277 U.S. 66, 78, 48 S.Ct. 459, 462 (1928); *American Merchant Marine Ins. Co. v. Margaret M. Ford Corporation*, 269 F. 768, 770 (2d Cir. 1920); *The Anthony D. Nichols*, 49 F.2d 927, 933 (S.D.N.Y. 1930); *Thebaud v. Great Western Ins. Co.*, 155 N.Y. 516, 524 (N.Y. 1898); *St. Paul Fire & Mar. Ins. Co. v. Christiansen Marine, Inc.*, 893 So.2d 1124, 1133-1134 (Ala. 2004) ("[T]he absolute nature of the warranty does not insulate an insurer from the ramifications of its own conduct."); *Reynolds v. Canton Ins. Office, Ltd.*, 98 Wash. 425, 427, 167 P. 1115, 1116 (Wash. 1917); CJS *Insurance* § 828.

[11] Plaintiff's selectively cited testimony as to the meaning of "coastwise" is deceptive unless read with other portions of the transcripts of Riley and Connell.  The terms "coastal" and

8

Fourthly, the Yacht is not restricted to use in "fair weather," which as used by the surveyors means something short of "gale force winds," "very disturbed seas" and accompanying bad weather. (Court Ex. 2 p. 109; Court Ex. 7 p. 99-100) The vessel was in rough weather during the sea trial but performed well. (Trial Tr. p. 2217-2218; Ex. 179 p. 6-8) The weather that the Yacht experienced on its last voyage was far beyond ordinary, as reflected by Lt. Marcus Wong's contemporaneous report and subsequent testimony. (Ex. VVVVV; Ex. VVVVV; Court Ex. 6 p. 13, 16-17)[12] Plaintiff mischaracterizes Papa's testimony about the storm, when he only said that he didn't believe that weather caused the *initial* flooding, but he said the weather continually deteriorated. (See Court Ex. 15 p. 83)

Finally, Plaintiff's allegations based on the Patton Survey as to the absolute implied warranty of seaworthiness fail because there is simply no evidence or logical reason to believe that the parties to this multimillion dollar sale contract did not complete virtually all of the

---

"coastwise" was not intended to be a limitation based on fitness, because in Patton's verbiage anything short of transoceanic is "coastwise," and this Yacht could not hold enough fuel to travel across the ocean. (Court Ex. 7 at 99-107, 109-110; Court Ex. 2 p. 28-31, 109, 115-116) Connell clarifies that the Yacht is fit for more than 200 mi. offshore and that the Patton Survey does not employ a Coast Guard definition of 20 mi. when using the term "coastwise". (Court Ex. 7 p. 106-107, 109)

[12] Plaintiff's weather expert Robert Raguso's testimony relied on a plot based on a dead reckoning, but conceded that there is no reason to believe that the Yacht took his track. (Trial Tr. p. 573-574, 579, 582) Even then, the buoy relied on by Raguso closest to the last position of the Yacht was 130 miles away. (Trial Tr. p. 574) It is uncontested that Lt. Wong was onsite with precise instruments that indicated as even Randall admitted that the weather was "off the charts" rather than normal. (Trial Tr. p.1565-1566) Lt. Wong is an uninterested serviceman whose account has never changed and is entitled to greater credibility than that of a paid expert like Raguso or a paid salvor like Marcus Mitchell who does repeat business for insurance companies. "Bahama resident" Mitchell's lay opinion about the duration of swells is entitled to no weight. More importantly, his credibility was destroyed by his uncorroborated allegations about Captain Papa that were rebutted by Papa and both Ashkenazys. (See p. Trial Tr. p. 657-660, 1488, 1493, 2395-2397) If Mitchell were to be believed, he took over $700,000 from Plaintiff and then withheld crucial information from the investigators he worked with and shuttled around for weeks. He is not a credible witness.

9

Patton Recommendations as agreed before the inception of coverage.[13]  Contemporaneously produced documents including Robert Moore's two punchlists and Kent Chamberlain's copy of the Preliminary Recommendations reflect that the Recommendations were addressed. (See Ex. PPPP; Ex. 119) Further, no testimony contradicts that of Myra Escobar of Jones Boatyard, and others that people were working day and night to ensure that the Patton Survey recommendations had been completed. (Court Ex. 10 p. 68; Court Ex. 11 p. 7-9; Court Ex. 8 p. 169-179; Ex. PPPP; Ex. 119; Trial Tr. p. 1765)

B.      The Yacht Had No Design Defects

Plaintiff cannot prove that the Yacht's garage design was defective, as it was a common design in widespread use with features to prevent accumulation of water.[14]    Plaintiff's experts never testified that the garage design was uncommon, nor did they prove that it was not self bailing.  The garages were not a source of water on previous voyages. (Court Ex. 15 p. 46)  As Plaintiff knew through the Patton Survey, the hull's watertight boundary was the interior of the garages, and not the doors, which were a cosmetic shell. (Trial Tr. p. 2061; Ex. 180 p. 2)[15]  The self-bailing garages were an integral part of the Yacht's original design. (Trial Tr. p. 2335) Further, any water in the garages would not have brought the exhaust vent close to the waterline, as water in the identical starboard garage would have balanced out any water in the port garage.

---

[13] Of course the surveyors indicated that none of the conditions they noted would have made the Yacht unseaworthy even if they had not been addressed.

[14] The garages were a common self-bailing design, sloping to the aft so water would be flow back out under the doors or down drains. (Trial Tr. p. 2061-2063, 2093) The aft engine room bulkhead was watertight, and installation of a bottom gasket would have trapped water unnecessarily while expanded drains might have allowed water entry. (Trial Tr. p. 2206-2208)
[15] The "watertight bulkheads [were those in the] forepeak, forward and aft engineroom." (Ex. 180 p. 2)

10

Plaintiff has further failed to prove that the engine room ducting was so close to the waterline as to make it unseaworthy. The vents had several features to keep out water.[16] Randall's failure to acknowledge any of these features demonstrates that he is simply giving the opinion that Plaintiff paid for when it hired him to replace Plaintiff's investigator Taylor, who testified at trial that "the engine room exhaust vent duct work was not a source of significant water infiltration until after the crew abandoned ship." (Trial Tr. p. 342-343, 1349) The vent was never a source of water on previous voyages. (Trial Tr. p. 1645-1646, 2166) Hired witness Drew Hains' testimony does not establish why any alternate design wasn't used after he departed Trident. The vent may have been placed there for safety reasons, but Plaintiff never subpoenaed any of the licensed architects who had any design role after Hains' brief unlicensed tenure even though they are still in Florida. The fact that the duct allowed minor water infiltration that the damper would have stopped completely does not make the Yacht unseaworthy.

Plaintiff bears the burden of proof of proving the "absence" of a DC powered fuel at the inception of coverage, and this has never been established. Moore's expert report made clear that the Yacht had a portable DC fuel pump when sold. Nevertheless, the Yacht would not have been unseaworthy without a DC fuel pump, as the Yacht had other backup systems. First, the Yacht had two tanks that could gravity feed in the event of a loss of power. Second, only one generator was used to provide full AC power to the Yacht at a time, with the other in reserve to power the bilge pumps and other systems in case of a breakdown. (Trial Tr. p. 290) Only in the

---

[16] The safety features included: directional louvers on the outside; dampers which would completely shut out water and were found shut after the loss; ducts that were angled upward to 5 feet above the waterline, so water would have to flow upward; and a positive over-pressure of air and a downward angled heavy duty fan to force water out before it could reach the engine room. (Trial Tr. p. 340-341, 1714, 2162, 2167)

11

event of a loss of both generators would the ability to pump fuel into the day tank be lost. Plaintiff cites no Coast Guard regulations or other requirements that a DC fuel pump be aboard a pleasure yacht. In fact, the DC fuel pump was redundant in light of having a second generator onboard and gravity feed capability.

C.     Plaintiff Failed To Prove That The Yacht Had Unseaworthy Bulkhead Penetrations At The Inception Of Coverage

Even though Plaintiff's expert James Dolan, Robert Connell and Robert Riley all testified that the Yacht was not required to have watertight bulkheads, all testimonial and documentary evidence indicates that any bulkhead penetrations had been properly sealed by Robert Moore and his crew in the month before the closing. (Trial Tr. p. 1263, 2206-2208; Court Ex. 7 p. 53-55; Court Ex. 2 p. 54-55) Patton's experienced pleasure yacht surveyors' recommendation was merely to verify a proper seal around plumbing penetrations and unfilled cut-throughs. (See Ex. 180 p. 2) Plumbing penetrations and wiring cut-throughs must pass through bulkheads by necessity, and the design only requires a proper seal around them.[17]

Moore made verifying proper seals on the bulkheads a high priority, and it was done in advance of the sea trial. (Trial Tr. p. 2206) Moore addressed this recommendation immediately and even flooded a compartment to ensure a proper seal. (See Trial Tr. p. 2206, 2199) The December 8, 2005 Acceptance of Vessel does not prove that any Recommendations were not completed before coverage incepted on or after December 14, 2005.[18] (See Ex. 106) The December 12, 2005 Amendment to that document lists "items on the survey checklist that were

---

[17] Plaintiff's expert Randall inspected the vessel twice, but the only bulkhead penetrations that he testified were unsealed were those that were visibly open at the time. From this it can be assumed that the sealants used were proper. Meanwhile, Plaintiff's expert Dolan could not assess the strength of the foam sealant in that he did not know its makeup.

[18] The Acceptance of Vessel also does not identify when the lawyers drafted it, so the conditions may have been addressed before December 8, 2005. (Ex. 106)

12

incorrectly marked," not incomplete at the inception of coverage. (See Ex. 107) Plaintiff flatly misrepresents that Exhibit 119 and Chamberlain state that 80% of the bulkhead penetrations were sealed with expandable foam. (See Ex. 119; Trial Tr. 1765, 2206-2208)

D.     Plaintiff Has Not Proven That a Lack Of Automatic Engine Room Bilge Pumps Was An Unseaworthy Condition

Based upon its summation, Plaintiff has apparently abandoned one of the main reasons for denial of the claim--a lack of adequate bilge pumping capacity--except to the extent that the vessel lacked automatic pumps in the engine room or any pump was not tested by Patton. Plaintiff's expert Randall showed his lack of yachting knowledge when he mistook tiny cleaning pumps for dewatering pumps and did not check the pumping capacity of the vessel's primary dewatering pumps. (Trial Tr. p. 1408, 1581-1584)

The absence of automatic pumps in the engine room did not diminish the Yacht's seaworthiness in any way. (Trial Tr. p. 1765-1766, 2062-2063) The Yacht had proven working high-water alarms to alert the crew to water in the engine room bilge. (Trial Tr. p. 291; Court Ex. 2 p. 90, 167-168). Upon such an alarm, the crew only needed to turn on the Yacht's primary pumps, which Defendants' expert Michael Christian and Robert Moore, as well as Plaintiff's own investigator Robert Taylor, agreed would have been able to deal with the amounts of water in the engine room bilge on the last voyage. (Trial Tr. p. 381-382, 1507, 1583-1584, 1994, 2005, 2230-2231; see also Court Ex. p. 167) Patton did not list the absence of automatic pumps in the "Safety" category because the Yacht was manned. (Court Ex. 2 p. 167) The engine room was toured regularly and watched on a video camera with directional zoom feature. (Trial Tr. p. 1476-1477) Moreover, there should not be automatic bilge pumps in an engine room, because as the A-1 Survey noted, it is illegal under federal law to pump oil-contaminated bilge water

13

overboard in the event of a fuel leak, and there is a $25,000 per day penalty. (Ex. 100 p. 2; Trial Tr. p. 2062-2063)

Nor is there any proof that any pump was inoperable at the inception of coverage. Plaintiff's expert Dolan disingenuously claimed that "[o]bviously" there were four "inoperable" bilge pumps at the time of the Patton Survey, falsely characterizing the three manual DC stripper pumps as "inoperable" because they were not automatic. (Ex. 209 p. 6) There is no evidence that the fourth pump that the Patton Survey actually recommended be serviced and tested was not fully functional weeks later at the inception of coverage. (*See id.*; Trial Tr. p. 2197)

To the extent that Plaintiff has not abandoned the allegation that the Yacht's primary pumping capacity was inadequate, its own expert Taylor concluded otherwise. (Trial Tr. p. 381-382) The crew also stated that the pumps were adequate even in the severe conditions that the Yacht faced. Papa twice testified that he activated the AC bilge pump and eductor pump and they were working very well until the loss of the generators and engines. (Trial Tr. p. 1478; Court Ex. 15 p. 59-60) Jacob Rese told Taylor that the pumps were keeping up with the incoming water until the loss of power. (Trial Tr. p. 293-294) All evidence is that the Yacht's bilge pumping capacity was adequate at the inception of coverage.

E.      Plaintiff Has Not Proved That the Yacht Was Unseaworthy Due to Electrical Conditions

Plaintiff disingenuously offers the Ward's survey as indicating unseaworthiness despite that none of its experts and investigators say that this was so. This survey simply showed that the Yacht was not built in compliance with voluntary classification society standards. Its findings were presented to Patton's surveyors for incorporation into the Patton Survey. (Ex. 131 p. 1; Ex. 93; Ex. 179 p 1; Ex. 180 p. 9) The use of the word hazardous does not indicate a safety

14

risk, just that the surveyor Scott Albers considers it more important than other conditions. (Court Ex. 14 at 139, 161) There is no evidence that needed work was not done, as Lovell was not required to pick Ward's to fix the electrical problems identified in the survey, particularly where Ward's was recommending unnecessary work based on classification society standards.

F. Plaintiff Has Not Proved That The Yacht Was Unstable At The Inception Of Coverage

Plaintiff has failed to identify any evidence to satisfy its burden and establish that any stability problem that the Yacht may have had while under construction still existed at the inception of coverage. Every witness with any personal knowledge of the Yacht testified to its stability.[19] The fact that Trident did not use the custom hull designed by Lovell's world-renowned designer Sergio Cutolo is of little event because from the moment that this was discovered, Cutolo himself took charge, did the weight studies and redesign that fully remediated the forward trim problem. (Trial Tr. p. 1622-1623)

Plaintiff fails to offer any of the sort of evidence of stability that neutral accident investigators would have used to determine what caused the loss. Knowing that the Yacht was modified to resolve any stability issues, and that everyone agrees that the Yacht was far more stable afterwards, Plaintiff only offers evidence about the corrected conditions.

The SeaQuest/Trident litigation process identified everything wrong with the Yacht at that time, allowing Lovell to address any deficiencies, and he spent $12 million to do so. (Ex. 91; Trial Tr. p. 1670-1673, 1731-1732, 1743-1744) Prior owner Trace Lovell first obtained an arbitration award from Trident for $700,000 as for correction of a lack of forward floatation evident from weight studies by Cutolo and Trident. (Trial Tr. p. 1620, 1625; Ex. 76 p. 4) After

---

[19] This includes Warren Lovell, Robert Moore, Kent Christian, Robert Riley, and Robert Connell. (Trial Tr. p. 1640-1643, 1650-1651, 1811-1812, 2217-2218, 2175-2178; Court Ex. 2 p 150-151; Court Ex. 7 p. 82, 223)

15

Trident's bankruptcy, its insurer sued SeaQuest for a declaratory judgment that the losses incurred due to Trident's failure to complete the Yacht on time[20] and correctly were not covered by Trident's policy. (Ex. 76 p. 4-6) Robert Moore prepared a list of incomplete or improperly completed items, and the Court awarded damages for many of those items in a bench order (the "Bench Order").[21] (Ex. 76 p. 7-8) The adversary process thus identified all items not properly constructed on the Yacht so they could be remediated, and Lovell testified that they were so remediated. (Trial Tr. p. 1670-1673) The Bench Order, therefore, does not describe, and is not probative of the Yacht's condition at the inception of coverage.

There is no proof that the addition of the false bow and weighted keel did not remedy any stability issues, so Plaintiff misrepresents the evidence. Plaintiff blatantly misquotes Exhibit SSSS on page 30 of its written summation and in a footnote on that page. The document says that severe wind or sea conditions may require additional ballast according to optional DNV classification standards, but does not specify how severe, and there were no plans for the Yacht to be taken out in a hurricane. (Ex. SSSS) Exhibit SSSS contains no reference to the Yacht's longitudinal strength, which was never in question and which Barbeito was not hired to address. (*Id.*; Trial Tr. 1668-1669) Plaintiff offers no expert testimony that the Yacht was down by the bow at the inception of coverage or why that would be significant. Plaintiff also quotes Connell out of context as saying that "a lot" of ballast was added to the Yacht, when he testified that virtually every yacht he has ever surveyed has ballast added and that other Yachts had four times as much ballast added. (Court Ex. 7 p. 61-62)

---

[20] The Bench Order notes that the insurer argued that for some items nothing was done wrong, rather "Trident had simply not completed construction and probably intended to go back and finish the work." (Ex. 76 p. 22)

[21] Some of the deficiencies noted in the bench order merely did not comply with Lovell's chosen plans, which violated the construction contract but does not indicate unseaworthiness. (Ex. 76 p. 2, 8; Trial Tr. p. 1621)

16

Plaintiff cannot sustain its burden of showing instability by saying that further analysis could have been done after the keel was added, while failing to offer post-loss stability analysis of its own. The record is replete with evidence that the keel's addition resolved any instability issues. Plaintiff mischaracterizes the A1 Survey, which stated what was needed for optional compliance with charter regulations, not for "open seagoing service," as Plaintiff claims. (Ex. 100) Nor can Plaintiff satisfy its burden by claiming that the capsize is *ipso facto* proof of instability at the inception of coverage  Plaintiff relies on an early theory of Taylor that he admits was based on no stability analysis, when he actually believed it was as likely that that water ingress eventually created instability. (Trial Tr. p. 307-308)  Taylor never concluded that the Yacht was unstable (Trial Tr. p. 324, 338-339)

## III.   PLAINTIFF FAILED TO SATISFY ITS BURDEN TO PROVE A BREACH OF THE NEGATIVE IMPLIED WARRANTY OF SEAWORTHINESS

### A.   The Standard

Plaintiff's recitation of the elements of the negative implied warranty of seaworthiness omits a crucial element that it must, but cannot prove: proximate cause.   The implied warranty provides that:

> the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness.

*Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F. Supp. 1046, 1070 (S.D.N.Y. 1997) *quoting Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385, 388 (5th Cir. 1957). Thus, even if an owner knows the vessel to be unseaworthy in some regard, an insurer must still pay where a different, unknown unseaworthy condition caused the loss, or, even if the known unseaworthy condition contributed to the loss, but was not the proximate cause. Actual

17

knowledge is required, even if the owner should have been on notice. *Lone Eagle*, 952 F. Supp. at 1070 (no knowledge even if vessel was in "openly evident corroded condition"); *Gregoire v. Underwriters at Lloyds, Combined Cos.* 559 F. Supp. 596, 599 (D. Aka. 1982). As there is no evidence that Plaintiff's expert's asserted causes of loss (the I-beam and engine room exhaust vent) were unseaworthy, let alone known to be unseaworthy, and as several other causes of loss cannot be ruled out, Plaintiff cannot carry its burden.

B.    Plaintiff Failed to Prove the Requisite Knowledge of PGG

PGG did not knowingly allow the vessel to sail in an unseaworthy condition, and imputed knowledge would not suffice to establish a breach.    *See Texaco, Inc. v. Universal Marine, Inc.*, 400 F. Supp. 311, 324-325 (D. La. 1975). Plaintiff's citation of commercial cases under the Limitation of Liability Act of 1851, 46 U.S.C. § 183, *et seq.*, to claim that Papa's knowledge must be imputed to PGG is inapposite to the private pleasure yacht case at hand. PGG was not a distant absentee corporate owner as in those cases. Instead its principal was a frequent passenger.

There is absolutely no evidence to satisfy Plaintiff's burden of proof that PGG knew that the allegedly defectively designed exhaust vents or garage doors might be unseaworthy at the beginning of the voyage. Assuming *arguendo* that the Court even finds these items to be latent defects, all evidence is that these defects were unknown to PGG. The vents and garages did not admit water on the first voyage. (Court Ex. 11 p. 49) Patton's surveyors and the A1 surveyor Roy Shorter did not identify the vent as too low or garages as unseaworthy. (Ex. 179; Ex. 180; Ex. 100) The Bench Order did not include the garage or vent designs of Trident's architects as being defective. (Ex. 76) Papa and Rese did not testify that they believed the vent was too low

18

before departure, and any realization subsequent to departure would not allow Plaintiff to claim breach of warranty.

PGG did not know of any unsealed bulkhead penetrations at the time of departure. Not even Dolan goes so far as to say that even sealed bulkhead penetrations would inherently render a Yacht unseaworthy. (Trial Tr. p. 1259) Although PGG knew that Patton recommended that proper seals needed to be verified at the time of the inspection, there is no evidence that PGG knew of any bulkhead penetration that was not sealed by Lovell's crew according to the sale contract. Actual, not constructive, knowledge is the standard, and simple knowledge that it was recommended over two months earlier that proper seals be verified is insufficient. *See Lone Eagle*, 952 F. Supp. at 1070. There is no proof that PGG knew of the obscure I-beam gap or any allegedly unsealed forward bulkhead penetration.[22] Further, knowledge of the obscure I-beam gap or of the two sealed penetrations--the mousehole and the 3 by 5 inch rectangular hole--is not relevant unless those specific conditions proximately caused the loss. Randall ruled out the 3 by 5 hole as a water source and could not conclude that the mousehole was not plugged. (Trial Tr. p. 1418-1430, 1446-1447)

There is no evidence that PGG knew that the DC fuel transfer pump was not aboard when the Yacht left the dock. Further, there is no evidence that this would have been known to be an unseaworthy condition at departure, as the gravity feed tanks were available in case of a loss of power. (See Trial Tr. p 1498-1501) The DC fuel pump was therefore a backup system for a backup system.

---

[22] Even if Darville noticed open forward bulkhead penetrations after the Yacht was towed 100 miles and righted (while full of water so any leak would be obvious), Randall did not discover any even after the loss, so there is no way that PGG knew about them and the time of the departure.

19

Plaintiff's allegation that crew incompetence proximately caused the loss is that the Yacht lost power because Rese was incompetent, but assuming *arguendo* that were true, there is no evidence that PGG, or even Papa, knew that at the start of the voyage. The standard of seaworthiness is reasonable fitness. Rese was a 54-year old captain and lifelong sailor, with on the job training in the role of engineer, who had a week to familiarize himself with the vessel. (Court Ex. 13 p. 3-7, 9-10, 44) Rese received a turnover over from Papa and Fudge, who spent weeks working with Lovell's engineer. (Trial Tr. p. 1497-1500) Papa testified twice under oath and submitted an affidavit with no indication that he believed Rese was unfit. There is no proof that PGG knew of the alleged incompetence that Plaintiff claims proximately caused the loss.

C.   Plaintiff Failed to Prove that the Loss Was Proximately Caused by a Known Unseaworthy Condition

Plaintiff has not carried its burden of proof to establish that the proximate cause of the loss was an unseaworthy condition. Plaintiff has admitted that it had not completed a proper cause-and-origin investigation before denying the claim and filing suit in order to avoid Florida Courts. (Ex. UUU; Court Ex. 5 p. 134-136) Before cutting its investigation short, Plaintiff did, however, learn from its investigator Robert Taylor that if not for the loss of power, the Yacht's pumps would have been able to dewater the bilge and the capsize would have been prevented. (Trial Tr. p. 381-382) Power loss, weather, and collision damage are more likely to be the proximate cause than any cause offered by Plaintiff, therefore it cannot sustain its burden of proof.

The ingress of water was not the proximate cause, but the loss of power preventing dewatering was. "Where two causes exist, the court should properly look for the cause which rendered the loss inevitable, distinguishing between the proximate cause and the remote cause." *Lone Eagle*, 952 F. Supp. at 1062 (*quoting* 2 Thomas J. Schoenbaum, *Admiralty & Maritime*

20

*Law*, § 19-10, at 434 (2d ed. 1994)). Whether water entered through the hull-throughs damaged by the collision, exhaust vent, the garages or a bulkhead penetration, the proximate cause would have been the loss of power. Defendants' expert Captain Michael Christian and Captain Robert Moore concurred that the capsize would never have happened if the generator powered AC bilge pump or the engine-powered eductor pump had had power. (Trial Tr. p. 1994, 2005, 2230-2231) Even Plaintiff's designated cause-and-origin expert Randall never concluded that the Yacht's primary pumps could not have dewatered the Yacht.[23]

If the loss of power was caused by fuel contamination, then unseaworthiness certainly was not the cause of loss. Taylor was unable to rule out fuel contamination, nor were tests performed even after evidence of fuel contamination was found and fuel samples were taken. (Trial Tr. p. 310, 677-682, 1858; Court Ex. 1 p. 251-252; Ex. 233A) Fuel contamination had not been ruled out when Plaintiff brought suit. (Trial Tr. p. 1859) If a salvage tug used some fuel that had been onboard, that does not mean that the daytank fuel was not contaminated. (*See id.*) Fuel and water separate by density, so a hose can be positioned to draw from a level where there was only fuel, and not a mix.

Although Defendants need not prove the proximate cause, if the proximate cause was not the loss of power it was likely the extreme weather, without which no water could have entered the garages or the exhaust vent. Christian testified that without power the Yacht could have survived dead in the water, but not in the weather that the Yacht encountered. (Trial Tr. p. 2002-2003, 2007-2008, 2073-2074) The Coast Guard rescue co-pilot Marcus Wong reported that the weather was "very unusual" for the Bahamas. (Court Ex. 6 p. 13) Lt. Wong reported

---

[23] Randall's failure to attempt to calculate the pumping capacity of the AC bilge pump and eductor pump after visiting the wreck twice shows that he is not credible, whether it is due to bias, his lack of expertise with pleasure yachts, or both.

21

swells of 25-30 feet with 10-12 foot seas and 25-30 knot winds using his instruments and observations. (Court Ex. 6 p. 16-17, 30-31; Ex. VVVVV; Ex. VVVVV-1) These swells were not anticipated in the pre-departure forecast. (Trial Tr. p. 597, 599) In addition, Natalie Gorin reported that the seas were so rough that they could see the propeller of the adjacent cargo ship when it dove into the waves. (Court Ex. 8 p. 79-80; Ex. 189 p. HA000171) Captain Papa too described the weather as "very rough and strong." (Trial Tr. p. 1466)    Plaintiff's expert Randall admitted that the reported conditions were almost "off the charts," and its adjuster admitted there were numerous vessels in distress due to the weather in the area. (Trial Tr. p. 1565-1566, 1851-1853)

Without the weather conditions noted above, Plaintiff's alleged proximate causes, in and of themselves, could not have caused the Yacht to capsize. Even in "terrible storms," or in 12-15 foot seas numerous times, the Yacht never took in water through the exhaust vents before these conditions, according to Lovell and Moore. (Trial Tr. p. 1645-1646, 2166, 2366-2367) Additionally, without a following sea causing waves to break on the garage doors, no water could have entered the self-bailing garages even briefly. (See Trial Tr. p. 2130-2132)

In addition, Plaintiff cannot account for the structural damage caused by the collision and described by Natalie Gorin, and the effect of that collision on the loss. (Court Ex. 8 p. 82-83; Trial Tr. p. 2036-2038; Ex. 38 Photo 37) The impact of the 150-meter steel-hulled ship may have done immeasurable damage. (Trial Tr. p. 2036-2045, 2052-2054, 2100) The collision explains the unknown source of water, as the impact occurred at a spot peppered with pipes and hull-throughs that would have allowed water into the vessel, and the area would not have otherwise ripped away at the chine. (Ex 67; Trial Tr. p. 2100-2103)   A contemporaneous statement from Papa shows that the collision harmed the vessel. (Ex. E; Trial Tr. p. 2123-2124)

Plaintiff's experts admit damage occurred. (Trial Tr. p. 1545, 1548) Damage was observed as marble floor was cracked on the other side of the ship, and the aft sliding door could not close again because of structural damage. (Court Ex. 8 p. 82-83, 196; Trial Tr. p. 2036-2038; Ex. 38 Photo 37) While the crew examinations under oath that Plaintiff selected for transcription do not discuss the collision, that is because the crew only answered the questions put to them. (See Court Ex. 11; Court Ex. 13; Court Ex. 15) We do not know what the testimony of Gorin and other crew that Plaintiff inexplicably failed to transcribe and produce indicated about the collision, but it is reasonable to infer that any information that helped Plaintiff would have been transcribed.

With so many alternate explanations for the unexplained water seen by the crew, Plaintiff cannot establish that the loss was caused by an allegedly "unseaworthy" condition.

D.     Plaintiff's Expert Concluded that the Loss Was Proximately Caused by Conditions that Would Not Justify Denial of the Claim

Plaintiff has failed to sustain its burden to prove that the ingress of water was caused by any allegedly unseaworthy bulkhead penetrations. Plaintiff's cause and origin investigator Randall concluded that the water that flooded the vessel came to the engine room exhaust vent and the I-beam gap, and ruled out any other sources of water. (Trial Tr. p. 1418, 1430, 1446-1447) No evidence indicates that either the I-beam gap or the engine room exhaust vent was known before the final voyage. Thus even if either of these were the proximate cause, Plaintiff must pay PGG's claim.

Nevertheless, the engine room exhaust vent and I-beam were insufficient water sources to be the proximate cause of the loss. (Court Ex. 13 p. 40-42; Court Ex. 11, p. 35-36)     Rese told Taylor that water was "occasionally slurping" through the vent, "but not enough to be the problem." (Ex. 9A p. 2; Trial Tr. p. 1436)     Plaintiff blatantly mischaracterized the leak from

23

the I-beam gap as "pouring" through, when Fudge and Rese testified that it was "just a small bit". (Court Ex. 11, p. 35-36; Court Ex. 13 p. 41-42) Randall disregarded the testimony of all of the witnesses that the water coming from these two areas was insufficient to cause the loss. (Trial Tr. p. 1444-1447; Court Ex. 13 p. 41-42; Court Ex. 11 p. 49; Court Ex. 15 p. 97) Moreover, Randall did not have any personal knowledge of the amount of water in the garages. It was admittedly an assumption that he relied upon to come to his ultimate conclusion that water was coming through the garage. (Trial Tr. p. 1419-1420)

E.     Plaintiff Cannot Prove that The Yacht Was Unseaworthy at Departure

Whatever conditions PGG did know about were not such as to render the vessel unseaworthy. Most of Plaintiff's allegations that the Yacht was unseaworthy at departure involve the same conditions that Plaintiff alleged made the Yacht unseaworthy at the inception of coverage. These allegations fail because, as set out in the discussion of the absolute warranty of unseaworthiness, Plaintiff could not even prove unseaworthiness at the inception of the Policy. If anything, proof of any alleged unseaworthiness at departure is weaker, because by then PGG had given an open checkbook for improvements. (Trial Tr. p. 1469, 2434)

F.     Plaintiff Failed to Prove That the Alleged Design Defects Were Either Known or Unseaworthy

Plaintiff failed to prove that the alleged design defects were either known or made the Yacht unfit for its intended use when it left the dock. The engine room air exhaust vents and garage door design were not unseaworthy, as set out in the discussion of the absolute warranty of unseaworthiness. Each had several features to prevent the ingress of water, and the crew concluded that the combined water observed from these sources would not explain the rising water in the bilge. (Trial Tr. p. 340-341, 1714, 2061-2063, 2093, 2162, 2167)

24

G.    There Is No Proof that the Other Bulkhead Penetrations Were Unsealed at Departure, Unseaworthy or Sources of Water

Plaintiff also cannot sustain its burden of proof by offering sources of flooding other than the I-beam and exhaust vents, when none of its experts or investigators determined that such sources were involved in the loss. In fact, Plaintiff's own expert Randall concluded that the 3 by 5 hole was sealed, and could not conclude that the mousehole was plugged or that the I-beam leak continued after it was remedied by the crew. (Trial Tr. p. 1429-1430, 1418, 1430) Plaintiff's cause and origin investigator Christopher Karentz also ruled out the mousehole as the cause of loss before Randall was enlisted. (Court Ex. 1 p. 272-273)

Moreover, Taylor's own interview with Rese confirmed that there was very little water coming from the garage and vent, but the bilge pumps were properly managing the small quantities of water entering until the vessel lost power. (Ex. 9A; Trial Tr. p. 293-294) No crew member reported observing any water coming through the 3 by 5 inch hole or the mousehole, even though anyone stuffing rags around the I-beam a foot away would have seen if water were penetrating there. (See Ex. 8A Pictures 402, 420, 428; Trial Tr. p. 150, 1434) The only witnesses asked specifically about the mousehole, Moore and Papa, both testified that it was sealed with a mechanical plug. (Trial Tr. p. 1476, 2207-2208) Christian determined that the 3 by 5 inch rectangular hole was properly sealed with foam and not a source of water. (Trial Tr. p. 2207)

Captains Papa and Moore testified that all penetrations noted in the survey had been sealed. (Trial Tr. p. 2206-2208, 2210, 1474, 1476-1477)  After towing, salvor Ray Darville did not see any holes in the bulkhead of the port garage other than the 3 by 5 that was filled with foam. (Court Ex. 10 p. 159-160)

25

In coming to the realization that its attempts to prove unseaworthiness have failed, Plaintiff now switches tracks to focus on the forward bulkhead, notwithstanding the lack of any evidence pre-loss that water flowed through this component of the vessel.

Plaintiff's new allegations about the forward engine room bulkheads are entirely without merit. Had Plaintiff's investigators found unsealed penetrations in the forward bulkhead during the post-loss inspections or they would have photographed them along with the thousands of photographs taken by salvors investigators and experts. (See Trial Tr. p. 1401-1403) There are no such photos.

Randall clearly did not testify that a forward bulkhead penetration caused the loss. He actually responded to a hypothetical posed by Plaintiff's counsel by saying that if the bulkhead was not watertight due to a hypothetical unsealed penetration that was located at the front of the port bilge at a level below the height at which the port bilge flows over into the center bilge, then the alarm would have taken longer to sound. (Trial Tr. p. 1442-1443) He did not testify that he found such a penetration. (*Id.*) Randall never testified that he saw the forward penetrations mentioned by Darville, that he concluded that they existed prior to the capsize, break-up and sawing-apart of the Yacht, nor that it was impossible that the penetrations had been sealed. (*See id.*) Randall further was unable to testify or produce a photo showing that any unsealed forward bulkhead penetration was below the height of the high water alarm or spillover level, so as to have kept the water from reaching the alarm level mere inches from the hull bottom. (*See id.*) The bilges are deep enough for a man to stand in and the penetrations mentioned by Darville were right below the deck, feet above the alarm. (Court Ex. 13 p. 45; Trial Tr. p. 501-502) Although it would have been a simple experiment, Randall never filled the port bilge with water to determine whether any water would have passed through any

26

forward bulkhead penetrations, and whether or how long how long this would have delayed the alarm.

There is also no evidence that the "cable run" was unsealed at departure, or a cause of loss. Taylor never said that he believed it had been an actual source of water, and Randall determined from his inspection that it was not a source of flooding. (Trial Tr. p. 118, 134, 135, 1446-1447) Like the 3 by 5 hole, the foam or other sealant around the wires would have been dislodged during the towing.

H.   The Lack of a DC Fuel Pump on the Last Voyage Neither Made the Yacht Unseaworthy Nor Proximately Caused the Loss

Although the Yacht did not have a DC fuel pump onboard, there is no testimony that this made the Yacht unseaworthy. "The insured's warranty of seaworthiness is not a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards." *Contractors Realty*, 469 F. Supp at 1293. The fact that the Yacht might have been better off with a DC fuel pump onboard does not establish that the Yacht was unseaworthy when it departed, and no expert opinion was provided to the contrary. The negative implied warranty of seaworthiness, to be breached, requires that the Yacht leave the dock with a known unseaworthy condition. However, when the Yacht left the dock, the Yacht had a backup system to feed the day tank in the event of AC power loss: the gravity feed from tanks 7 and 8. (See Trial Tr. p 1498-1501) The fact that the fuel in the gravity feed tanks had already been utilized while at sea does not change the fact that the Yacht was fit when it left the dock. (See Trial Tr. p 1498)

I.   Plaintiff Cannot Prove that the Proximate Cause of the Loss Was Crew Incompetence or Due to Their Lack of Qualifications

27

Plaintiff further has asked this Court to take a leap from ruling that any negligence of the crew had risen to the level of incompetence. However, this argument must fail as well.

While Plaintiff should be estopped from arguing that the crew was incompetent, even assuming that the Court reviews Plaintiff's argument, the allegation of such incompetence is nothing more than a "Hail Mary" devised after discovery was completed. It is patently clear that Paul Richard and William Turnbull testified that the crew's incompetence was not a basis for the denial. 1317-1320, 1867-1868) Corteselli and Calandriello did the same at their depositions. (Court Ex. 5 p.148-149; Court Ex. 4 p. 125-126, 134-136, 156-159) Such conclusions are not surprising given the fact that a loss due to crew negligence is covered under the Policy. (Court Ex. 5 p. 94; Court Ex. 4, p. 199-122)

The loss of power was not due to crew incompetence, even if it occurred due to fuel starvation and not contamination, since it resulted from the conditions triggered by the simultaneous high water alarm and failure of the port generator, which diverted the crew from making the fuel transfer in the hour and a half in which they still had the starboard generator. (Court Ex. 13 p. 46-47; Court Ex. 11 p. 59) Plaintiff does not account for these events and explanations, which in and of themselves, negate any findings of incompetence. In fact, in its own summation, Plaintiff admits that the crew could not be faulted for its actions.

Had Rese used the Alfa Laval system to pump fuel, the risk of fuel exhaustion would have been no lower. As Taylor testified, the Alfa Laval fuel purifier is not the Yacht's normal fuel pumping system, which Rese was correct to use. (Trial Tr. p. 200-201) Plaintiff has attempted to portray the Alfa Laval as an automated system that provides constant fuel without the need for crew involvement. However, the Alfa Laval does not automatically switch from one storage tank to another. Thus the crew has to switch the Alfa Laval every few hours from

28

one storage tank to another, or else the day tank would run dry when the selected storage tank did. In addition, there is no evidence that the daytank would not overflow if the rate of feed were faster than the rate of consumption. Plaintiff has not proved it would have been safer to use the Alfa Laval, much less that use of the normal manual fuel pump was unreasonable or evidenced crew incompetence.

Additionally, there is no evidence that the crew was inadequately trained or incompetent. Rese was a 54-year old captain and lifelong sailor, with on the job training in the role of engineer, who had a week to familiarize himself with the vessel. (Court Ex. 13 p. 3-7, 9-10, 44) Rese was not required to have a license. (Trial Tr. p. 1494) Rese received a proper turnover, instructions and training over from Captain Papa and First Mate William Fudge, who spent weeks working with Lovell's engineer. (Trial Tr. p. 1497-1500) Papa and Fudge had over two months more experience than Rese on the Yacht, but accepted and assisted with Rese's method of refueling. (Trial Tr. p. 1509) It is typical in the marine industry for delivery captains or day captains to run a Yacht with as little as a day or two onboard, much less time than Rese had. (Court Ex. 2 p. 139-141) There is no evidence that Rese did not know about the damper. There is also no evidence that the crew did not eventually deploy the damper, which was found closed. (Trial Tr. p. 340-342) Plaintiff continues to apply a negative presumption without any evidence to support its statements.

Plaintiff has failed to satisfy its burdens to show that the crew was incompetent, or that such a condition proximately caused the loss. Crew negligence is covered under the Policy. *Janet Nav. Inc. v. Sturge*, 711 F. Supp. 119, 130 (S.D.N.Y. 1989) ("It is precisely this sort of event-the destruction of the owner's property caused by negligent handling of it by the owner's employees-for which an insurance policy is written."). Significantly, Plaintiff cannot prove that

incompetence, rather than negligence, caused the loss, as there was never any expert testimony elicited establishing the standard of professional care that should have been exercised by the crew or what constitutes reasonably required training. *See Jimerson v. United States*, 2003 WL 25190 (W.D.N.Y. 2003); *Robinson v. United States Bureau of Prisons*, 244 F. Supp. 2d 57, 64-65 (N.D.N.Y. 2003). Because Plaintiff did not designate an expert on crew qualifications or standards, there is no evidence to support a finding of lack of coverage on this ground. (*Id.*)

Plaintiff cannot sustain its burden to show that crew incompetence caused the loss when Randall has testified that the loss would have occurred whether or not the gravity feed had been used or fuel had been transferred on schedule. (Trial Tr. p. 1587) Plaintiff alternately claims that closing the engine room exhaust damper would have saved the yacht or doomed it, and that the crew was either incompetent or prudent in not closing it—ignoring the fact that the damper was found closed. (Trial Tr. p. 340-342, 378, 387)

Finally, Plaintiff has cited no evidence that any crew member lacked a required license and has not even tried to explain how the lack of a license for watchstanding might be relevant to the loss. The Megayacht Worksheet only showed interest in the Captain's resume and qualifications. (Ex. 166)    The negative testimony offered about the crew's competence is from non-crew member Nathalie Gorin was hoping to have her claim paid by Plaintiff, and whose statements about Captain Papa evidence that she still bears anger and an obvious grudge against him. (Court Ex. 8 p. 106, 112, 173-177; Trial Tr. p. 1495)[24]    In contrast, Captain Papa has assisted Plaintiff, Defendants and the Court in this case to help them find the facts, even making himself available to testify by phone immediately after losing his father. Gorin was not a crew

---

[24] Conveniently, Plaintiff would have this Court accept the truth of Gorin's statements about the crew, but ironically ignores her statements regarding damage caused to the Yacht when it collided with the Searan Trader.

member but agreed to sail for one voyage and help out because she needed to get her visa renewed. (Trial Tr. p. 1495) Nevertheless it is uncontroverted that Papa was always nearby when she stood watch, even though Gorin was a lifelong sailor. (Trial Tr. p. 1496)

## IV. PGG HAS SUSTAINED ITS PRIMA FACIE BURDEN

### A. Plaintiff Deliberately Misstates PGG's Minimal Burden of Proof of Fortuity

Stated simply, PGG has sustained its burden of proof incumbent on all "all-risk" policy holders. In insurance cases, the insured bears the initial burden to make a prima facie case by establishing: "(1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property." *International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (citations omitted); see also *Allied Van Lines Intern. Corp. v. Centennial Ins. Co.*, 685 F. Supp. 344, 345-346 (S.D.N.Y. 1988) ("In order to recover under an all-risk policy, the insured must prove only the existence of the policy and a fortuitous loss of the covered property.").

The Court has previously decided that the Policy is all-risk,[25] and PGG's interest is not disputed, but Plaintiff unwisely disregarded the Court's advice not to waste its time trying to prove that the loss was not fortuitous.[26] In so doing Plaintiff also ignored the Second Circuit's clear decisions on fortuity and misrepresented the holding of a District Court case in attempting to shift the burden onto PGG. The "burden of demonstrating fortuity is not a particularly onerous one." *See Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980). While the insured must prove the loss is fortuitous, has no burden to prove the cause of the loss. *Ingersoll Milling Machine Company v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir. 1987); *Pan American World Air., Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 999 (2d

---

[25] See April 15, 2007 Order at p. 5.

[26] See April 15, 2007 Order at p. 17 n.4.

31

Cir. 1974); *Morrison Grain*, 632 F.2d at 430. Rather it is the burden of the carrier to establish the existence of an applicable exclusion. *Pan American*, 505 F.2d at 999-1000; *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 78 (2d Cir. 1996); *Allied*, 685 F. Supp. at 346.

Plaintiff desperately cites *Formosa Plastics Corp. (U.S.A.) v. Sturge*, 684 F. Supp. 359, 365 (S.D.N.Y. 1987) in an attempt to claim that PGG had an additional burden of showing that the Yacht was in "good order and condition" at the inception of the Policy. The insured's burden in that case was "the initial burden of proving a loss by showing that the cargo of urea was in good condition when the policy attached and in damaged condition when unloaded from the vessel." *Id.* There is no question at bar, however, that the Yacht's pre-loss condition was significantly different from its condition after it capsized, thereby triggering PGG's loss.

B.   PGG Has Proved that the Loss Was Fortuitous, as PGG Reasonably Believed That a Loss Was Not Inevitable at the Inception of Coverage

The Second Circuit and its sister Circuits have made clear that fortuity depends on the subjective knowledge of the parties. A fortuitous event is "an event which *so far as the parties to the contract are aware*, is dependent on chance." *City of Burlington v. Indemnity Ins. Co. of North America*, 332 F.3d 38, 49 (2d Cir. 2003) (emphasis in original). "[F]ortuity is judged from the outset of the policy." *Chase Manhattan Bank v. New Hampshire Ins. Co.*, 193 Misc. 2d 580, 588, 749 N.Y.S. 2d 632, 638 (N.Y. Sup. 2002). "[F]ortuity should not be viewed from a 'hindsight' perspective…. Instead, the proper focus is on whether the parties knew at the time they entered the contract that the loss was inevitable." *St. Paul Fire & Marine Ins. Co. v. General Injectables & Vaccines, Inc.*, 2000 WL 270954 at *3  (W.D. Va.. 2000) (citation omitted)

PGG has overwhelmingly established that the capsize of the Yacht was fortuitous. The intended usage of the Yacht on this voyage, i.e., the Ashkenazy family's intended use of the

32

Yacht for a President's Day vacation, demonstrates that PGG did not view its capsize as inevitable. (Trial Tr. p. 2396, 2445)

It is absurd that Plaintiff has undertaken dozens of depositions, conducted multiple post-loss inspections, produced and obtained hundreds of documents never reviewed by PGG, and taken a month of trial just to attempt to prove what caused the loss, but alleges that novice boat owner PGG knew that a loss was inevitable from its pre-purchase due diligence. The fact that PGG spent $7.5 million on the Yacht for family vacations proves, to the contrary, that the loss was fortuitous--an event which so far as PGG was aware was dependent on chance. *City of Burlington*, 332 F.3d at 49.

Ignoring the fact that even a "certain loss" is fortuitous if it was not known to be a "certain loss" by the parties, it is clear that the capsize had external causes, including weather, the collision and/or fuel contamination. Without such severe weather, the Yacht could have survived dead in the water. (Trial Tr. p. 2002-2003, 2007-2008, 2073-2074) The Coast Guard rescue co-pilot Marcus Wong reported that the weather was "very unusual" for the Bahamas. (Court Ex. 6 p. 13) Lt. Wong reported swells of 25-30 feet with 10-12 foot seas and 25-30 knot winds using his instruments and observations. (Court Ex. 6 p. 16-17; Ex. VVVVV; Ex. VVVVV-1) These swells were not anticipated in the pre-departure forecast. (Trial Tr. p. 597, 599) Many other vessels in the area were in distress due to the weather, showing it was a major factor. (Trial Tr. 1851-1853)

As indicated earlier, without the weather, Plaintiff's alleged proximate causes could not explain the loss. As Lovell and Moore testified, even in rough weather the Yacht never took in water through the exhaust vents on prior occasions. (Trial Tr. p. 1646, 2166) Without a following sea, no water could have entered the garages even briefly. (Trial Tr. p. 2130-2132)

The severe weather led to another fortuitous cause of loss, as the cargo ship that came to render assistance should have been able to come alongside safely instead of colliding with the heaving Yacht. (Trial Tr. p. 2023, 2028-2029)

Finally, power loss due to fuel contamination is an external cause that was never ruled out and would have made the loss fortuitous. (Trial Tr. p. 310, 677-682, 1858-1859; Court Ex. 1 p. 251-252; Ex. 233A)

C.    Plaintiff Cannot Shift the Burden to PGG to Prove the Yacht's Stability, or the Absence of Other Deficiencies to Prove Its Prima Facie Case

Recognizing that there is not sufficient evidence to support a finding of unseaworthiness, Plaintiff attempts to mask the deficiencies of its case by shifting the burden of proof to PGG to show a lack of instability or other unseaworthiness as part of its prima facie case. This is a desperate attempt made necessary because Plaintiff's experts disagree as to what caused the loss, precluding Plaintiff from establishing its proximate cause. Plaintiff's expert Taylor testifies that the capsize would not have occurred without the loss of power, while Plaintiff's expert Randall said that the loss of power played no role in the loss. (Trial Tr. p. 381-382, 1587)

Plaintiff also claims that PGG was required to prove that the Yacht was stable, recognizing that it cannot prove the contrary. Issues of stability were eliminated early in the Yacht's history but Plaintiff is still trying to rely on the condition of the Yacht pre-completion and pre-launch. While Plaintiff continues to possess the hull, it has never undertaken a structural analysis of the Yacht, instead relying on pure conjecture and innuendos in its desperate attempt to create evidence of unseaworthiness. The Yacht performed "flawlessly" at the sea trial and there is no testimony that the Yacht's fuel tanks had to be manipulated for the Patton sea trial, nor expert testimony as to how much of a difference that may have made. (Trial Tr. p. 2218) Taylor testified without doing calculations that if the Yacht was ever unstable, it

34

was likely rendered unstable by the ingress of water that would have been pumped out if not for the loss of power, rather than inherently unstable. (Trial Tr. p. 381-382)

## V. DEFENDANTS ARE ENTITLED TO RECOVER FOR PERSONAL EFFECTS

PGG has shown a loss in the full amount of the Policy's agreed value for the hull, and a loss of its personal effects and those of its guests valued in excess of the $200,000 Policy limit.[27] (See Ex. WWWWWW; Ex. 4; Trial Tr. p. 2386) Debra Ashkenazy prepared a list detailing personal property lost in excess of the $200,000 Policy limit, and stopped listing items when she had passed the Policy limits. (See Ex. WWWWWW; Trial Tr. p. 2386) Most of the records of the personal property onboard including the jet skis and tender went down with the Yacht. (Trial Tr. p. 2425-2426)    All of the housewares bought for the Yacht are PGG's personal property, as only furniture is defined as part of the "yacht" (Ex. 4 "Page 1")

The Policy's Personal Effects endorsement (Ex. 4 p. 7) makes it clear that PGG's personal effects are covered at all times.    However the Personal Effects endorsement also extends coverage to the personal effects of PGG's "guests and crew while they are on board your yacht." (*Id.*) The pronoun "they" in this provision refers to the personal effects, not the guests, and provides coverage of guests' property while the property is on board until taken ashore. If this is not the intended meaning of this clause, then at the very least the provision is ambiguous and must be construed against the insurer, thus providing coverage for the Ashkenazys' personal effects.

---

[27] The Personal Effects Endorsement provides in pertinent part:

> We will cover your personal effects and those of your guests and crew while they are on the Yacht….

(Ex. 4 p. 7)

There is no reason for the Court to pro-rate Defendants' personal effects recovery, because Plaintiff did not seek a declaratory judgment for such relief. (See Ex. 1) Nor does any provision of the Policy require such an outcome. (See Ex. 4) The validity of the crews' claims was not placed before this Court and Plaintiff did not even mention the crew members' claims until the very last day of trial. Plaintiff has not established any reason that PGG's recovery should be subject to proration.

## VI. PLAINTIFF IS NOT ENTITLED TO PAYMENT OF ITS INVESTIGATION COSTS

Plaintiff voluntarily undertook the towing of the Yacht in order to investigate whether the loss was covered or whether Plaintiff could pursue subrogation against third parties. Plaintiff has been asked for and failed to identify any legal authority supporting its claim for recovery of the investigation and purported salvage costs.

This salvage was not undertaken on PGG's behalf, as Matt Schmahl had ordered the Yacht towed and righted when it was clear that it was a total loss. (Trial Tr. p. 69-70, 435-436, 1872-1873) Plaintiff was responsible for the costs it paid to investigate a loss. (Trial Tr. p. 1867) The costs incurred by Plaintiff were routine costs of its investigation. (Trial Tr. p. 1866-1867) "The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film Distributing Corp. v. State*, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 698, 334 N.Y.S.2d 388, 393 (N.Y. 1972). "Generally, courts will look to see … whether the defendant's conduct was tortious or fraudulent." *Id.* (citation omitted). Plaintiff can show no such inequitable or unconscionable conduct here, especially where Plaintiff benefited, as it would not have had enough evidence to have survived a Rule 12(b)(6) motion without the post-loss inspection.

Further, Plaintiff would not be able to recover the amount of the costs sought, which Plaintiff's claims manager Corteselli recognized early on to be excessive. (Trial Tr. p. 105-106) Plaintiff may not recover the price of its contract with Mitchell as it was excessive in comparison to the value provided, and therefore unreasonable. *See McCluskey v. County of Suffolk*, 2005 WL 2205750 at \*5 (N.Y. Sup. 2005)

## CONCLUSION

For the foregoing reasons, Defendant PGG Realty, LLC respectfully requests that the Court enter judgment in favor of its counterclaims and dismiss all of Plaintiff's claims, along with such other and further relief as this Court deems just and proper.

Dated: August 8, 2007

WEG AND MYERS, P.C.

By _____

Dennis T. D'Antonio (DD0973)
William H. Parash (WP9711)
Patrick M. Leathem (PL8700)
Attorneys for Defendant
PGG Realty, LLC
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210

37