UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
FEDERAL INSURANCE COMPANY,           :
                                     :
            Plaintiff,               :        06 Civ. 2455 (JSR)
                                     :
            -v-                      :        FINDINGS OF FACT AND
                                     :        CONCLUSIONS OF LAW
PGG REALTY, LLC, et al.,             :
                                     :
            Defendants.              :
----------------------------------- x

JED S. RAKOFF, U.S.D.J.

        In the early morning hours of February 6, 2006, the megayacht

"Princess Gigi" capsized off the coast of the Bahamas.  There was no

loss of life, but the vessel was beyond salvage.  The yacht was

insured for $7,023,000.00 for the hull and $200,000.00 for certain

personal property.  On March 22, 2006, the yacht's owner, PGG Realty,

LLC ("PGG"), through its sole shareholder, Ben Ashkenzy, filed a

Proof of Loss with the yacht's insurer, Federal Insurance Company

("Federal"), asserting losses up to, and indeed, in excess of these

amounts.  Def. Ex. B.[1]  By way of response, Federal, on March 29,

2006, filed the instant action, seeking a declaratory judgment that

it was not liable for any part of the loss.  Pl. Ex. 1.  PGG (and co-

defendant Ashkenazy), in turn, filed counterclaims for breach of

contract and the like.  Also, a third defendant, KeyBank National

Association ("KeyBank"), which had financed PGG's purchase of the

vessel, filed a counterclaim against Federal and a cross-claim

---

[1] "Def. Ex." refers to defendant PGG's trial exhibits; "Pl.
Ex." refers to plaintiff Federal's trial exhibits; "Ct. Ex."
refers to Court exhibits at trial, and "Tr." refers to the trial
transcript.

against PGG -- both of which claims were subsequently resolved in KeyBank's favor as a matter of law.  <u>See</u> Order dated 9/13/06, Memorandum Order dated 4/15/07, and  Memorandum Order dated 1/9/08.

Following extensive discovery and motion practice that eliminated certain claims and clarified others, <u>see</u> Order dated 9/13/06, Order dated 2/16/07, and Memorandum Order dated 4/15/07, a bench trial of the remaining claims between Federal and PGG/Ashkenazy commenced on May 14, 2007 and lasted for sixteen days.  The Court received hundreds of exhibits and heard testimony from twenty-two witnesses, including Ben Ashkenazy; his wife Debra Ashkenazy; Donna Capiga, a senior underwriter at Federal; Kent Chamberlain, PGG's yacht broker; Michael Christian, a marine surveyor and marine consultant; James Dolan, an expert marine surveyor; Drew Hains, a former employee of Trident; Peter Kelly of the William Kelly Agency (an insurance agency); David Kriss, Ashkenazy's attorney; Warren ("Trace") Lovell, the former owner of the Princess Gigi (then known as the "Full Bloom"); Captain Joseph Robert Moore; Deborah O'Sullivan, an underwriting manager at Federal; Captain Charles Papa, who testified telephonically because he was otherwise abroad and unavailable; Robert Raguso, a weather expert; George Randall, an expert casualty investigator; Paul Richard, a claims adjuster for Federal; various individuals who were involved in the salvage of the Princess Gigi including Matthew Schmahl of TMS National and Ray Darville and Marcus Mitchell of Overseas Salvage; Robert Taylor, a marine casualty investigator; William Turnbull, Jr., a property

2

manager at Federal; and Matthew John Valcourt, an attorney for
Federal.  Also entered into evidence were portions of the depositions
of crew members William Fudge, Natalie Gorin and Jacob Rese (as well
as deposition testimony of Captain Papa supplementing his telephonic
testimony); Patton Marine Surveyors Robert Connell and Robert Riley;
Ward's Marine Electric surveyor Scott Albers; Jack Brunier, Vice
President of Nauti-tech; Andrew Calandriello, former global marine
claims manager for Federal; Vincent Corteselli, senior claims
examiner for Federal; Mayra Escobar, comptroller at Jones Boat Yard;
Doreen Kline, operations manager for the KeyBank Luxury Yacht Lending
Group; Mac McLaughlin, Chief Financial Officer of Broward Marine; and
Coast Guard rescue pilot Lt. Marcus Wong.  In July and August of this
year, the parties submitted post-trial memoranda, and the Court heard
oral summations on August 29, 2007.

     Having now carefully reviewed all of this voluminous
material, the Court hereby denies Federal's claim for a declaratory
judgment and grants PGG's counterclaim for breach of contract, based
on the findings of fact and conclusions of law set forth below.

     By way of background, in 1996 a company named SeaQuest
International ("SeaQuest") commissioned the construction by Trident
Shipworks ("Trident") of the original vessel, the Full Bloom, based
on a design by Donald Starkey and a hull design by marine architect
Sergio Cutolo.  Tr. 1612, 1618-21.  Differences between Trident and
SeaQuest that eventually led to litigation also caused SeaQuest to
terminate Trident and, with the aid of subcontractors complete

3

construction of the Full Bloom on its own, in the course of which various modifications were made to the original design.  Following completion, the Full Bloom was used by SeaQuest's principal, Warren ("Trace") Lovell, for voyages of over 38,000 miles to destinations including Maine, Alaska, Panama, Costa Rica, and the Bahamas.

Meanwhile, Ashkenazy, a prominent New York real estate investor, and his wife, decided that they, too, wanted a mechayacht and accordingly, in December 2005 Ashkenazy, through PGG, purchased the Full Bloom, (which he renamed the Princess Gigi) for $7,535,400. Ashkenazy was represented in the transaction by broker Kent Chamberlain and various attorneys, including Michael Moore and David Kriss.  The purchase was financed with a $5.85 million loan from KeyBank.

In connection with the purchase, Ashkenazy retained Patton Marine, Inc. ("Patton") to conduct a detailed survey of the condition and valuation of the yacht.  A preliminary survey was issued on November 25, 2005, Pl. Ex. 98, followed by a final survey (the "Patton Survey") on December 7, 2005, Pl. Exs. 179, 180.  Although the Patton Survey made various recommendations for improvements of the vessel, it also stated that none of the improvements was necessary to ensure the safety or insurability of the yacht and that the yacht was a good marine risk.  Pl. Ex. 179, 180.  Also, although KeyBank's standard form for its Marine Note and Security Agreement would have required PGG to implement all the material recommendations contained in the Patton Survey within 30 days of closing, Pl. Ex. 151, KeyBank extended the window to 120 days.

Around the same time, three more particularized surveys of the vessel were also performed.  Mr. Frank Griffin performed an engine survey; Scott Albers of Wards Electric ("Wards") performed an electrical survey; and Roy Shorter of A-1 Marine Surveyors ("A-1") performed a survey to determine what would be required to obtain a commercial registration for the vessel from the government of St. Vincent & Grenadines.  To a large extent, these surveys were duplicative of the Patton Survey.  For example, the Griffin Survey, not discussed in further detail below, listed a number of recommendations but noted that the "vessel ran well on sea trial; all gauge readings were in normal range."  Pl. Ex. 92 at 10.

Shortly before the closing on the purchase of the vessel, Ashkenazy approached Peter Kelley of the William E. Kelly Agency, Inc. (collectively, "Kelly") to obtain insurance for the yacht. Kelly filled out the application form used to place coverage with Federal, known as a "megayacht worksheet," and submitted it to Federal on November 28, 2005.  Tr. 933, Pl. Ex. 166.  The worksheet noted that a survey had been performed on the yacht.  Although informed by Kelly that Federal's receipt of the survey would not be necessary to obtain coverage, PGG's New York attorney, David Kriss, emailed the Patton Survey to Kelly on December 12, 2005 at 6:35 p.m.

Kelly received an initial quote from Federal on November 30, 2005.  After a series of negotiations, coverage was bound on December 14, 2005, retroactively effective to December 13, 2005 at 12:01 a.m.

Tr. 1132-36.[2]  Thereafter, on January 4, 2006, Federal issued a
formal policy, effective December 13, 2005, to insure the hull of the
yacht on an all-risks basis for $7.023 million.  The policy also
included coverage of up to $200,000 for the personal property on
board the yacht of PGG, its crew, and its guests.

Meanwhile, PGG hired an experienced captain, Charles Papa, to
captain the Princess Gigi.  Captain Papa took over the yacht on
December 13, 2005 and began preparing it for an Ashkenazy family
vacation that was to take place over the Presidents' Day period in
February, 2006.  During this time, Captain Papa sailed the yacht,
without the Ashkenazy family on board, on a month-long voyage to the
Bahamas.  No problems arose.  Tr. 1483.

At 8:30 a.m. on Saturday morning, February 4, 2006, the
Princess Gigi departed from Fort Lauderdale, bound for St. Martin,
where the Ashkenazy family planned to come aboard.  On board were
Captain Papa, seven crew members, and Papa's wife.  At approximately
8:30 p.m. on February 5, 2006, seawater was discovered in the
engineroom bilges.  Ct. Ex. 13 at 19-23.  Over the course of the next
few hours, the port side generator shut down, the starboard generator
failed, and both engines died.  In the early morning hours of

---

[2] Although Kelly may have initially been acting as PGG's
agent at the time he solicited the initial quote from Federal,
see Howard Fuel v. Lloyd's Underwriters, 588 F. Supp. 1103, 1108
(S.D.N.Y. 1984), he acted as Federal's agent in explaining to PGG
what Federal needed, or did not need, to bind the policy, as well
as in receiving the Patton Survey, binding the coverage, etc.  As
the Court determined prior to trial, "by express agreement, Kelly
was made Federal's agent for the purpose of binding coverage and
giving advice regarding the policy."  See Memorandum Order dated
4/15/07 at 11-14.

February 6, 2006, after the yacht had taken on a significant amount of water and was perilously listing to port without power, Lt. Wong of the U.S. Coast Guard convinced Captain Papa to abandon the vessel. The Coast Guard was able to save the entire crew via helicopter rescue shortly before the vessel capsized.

Even after extensive investigation by both sides, a completely satisfactory explanation for the capsizing of the Princess Gigi remains somewhat elusive. The Court finds, however, that the two factors that loomed largest were bad weather and loss of power.

As to the weather, Coast Guard rescue pilot Marcus Wong testified that the weather conditions were "very unusual" for the Bahamas. Cx. 6 at 13. He orally reported seven foot seas, heaving to about 30 feet in the swells, and 20-30 knot winds, id. at 16-17, and his written report recorded 8-10 foot seas and 25-30 foot swells. Def. Ex. VVVVV. Captain Papa told salvager Mitchell that there were 8-10 foot sees and 20 foot swells, TT 660, and described the seas as "very strong and very rough". TT 1466. While plaintiff's weather expert, Robert Raguso, sought through a reconstruction to suggest that these reports were exaggerated, the Court is far more inclined to credit the testimony of eyewitnesses like Papa, and, especially, Wong, a disinterested party who, at the time in issue was in a helicopter directly above the yacht, rescuing the crew, and whose reports were made more or less contemporaneously with his observations. The Court therefore finds that extreme weather was a major factor in the yacht's capsize.

Yet, even with the extreme weather, it is doubtful that the vessel would have capsized without loss of power.  See, e.g., Tr. 297, 383 (testimony of Robert Taylor).  Without power, Captain Papa could not steer the yacht into the waves, Tr. 1482, 1989, and the AC bilge pump stopped functioning.  Although assistance was sought from a nearby cargo ship, without steering, Captain Papa could not maneuver the yacht and a collision occurred, thereby only compounding the problems.  Cx. 8 at 78-79; Def. Ex. E; Tr. 1481-82.  Thus, the Court concludes, it is reasonably certain that it was the combination of the bad weather and loss of power that led to the vessel's demise. As discussed <u>infra</u>, however, the reasons for the loss of power remain problematic.

Against this background, the Court turns to the four independent grounds on which Federal seeks to deny coverage: (1) PGG's alleged breach of the duty of utmost good faith; (2) PGG's alleged breach of the absolute warranty of seaworthiness; (3) PGG's alleged breach of the implied negative warranty of seaworthiness; and (4) PGG's alleged failure to satisfy its burden of proof under the all risk policy.[3]

<u>PGG's alleged breach of the duty of utmost good faith.</u>  The doctrine of utmost good faith, or <u>uberrimae fidei</u>, provides that "the parties to a marine insurance policy must accord each other the highest degree of good faith."  <u>Knight v. U.S. Fire Ins. Co.</u>, 804

_____

[3] Federal originally alleged a fifth ground relating to PGG's alleged exceeding of required navigational limits, but this ground was subsequently withdrawn.  See Joint Pretrial Consent Order dated May 8, 2007 at 6-7; Tr. 970-71.

F.2d 9, 13 (2d Cir. 1986).  The doctrine traces back to the earliest
days of maritime insurance, when "sailing ships in faraway seas were
insured in London by underwriters who could get no information except
from the shipowners." Stecker v. Am. Home Fire Assurance Co., 299
N.Y. 1, 6-7 (1949).  But it is still good law. See, e.g., N.Y.
Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 123 (2d
Cir. 2001).

Under the doctrine of utmost good faith, the party applying
for marine insurance must "disclose all circumstances known to him
which materially affect the risk." Puritan Ins. Co. v. Eagle S.S.
Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985).  To be material, a fact
must be something "which would have controlled the underwriter's
decision to accept the risk," Knight, 804 F.2d at 13 (quoting Btesh
v. Royal Ins. Co., 49 F.2d 720, 721 (2d Cir. 1931)), or which "would
influence the judgment of a prudent insurer in fixing the premium, or
determining whether he will take the risk." Albany Ins. Co. v.
Wisniewski, 579 F. Supp. 1004 (D.R.I. 1984) (internal quotation marks
omitted).  The test for materiality is an objective one: "whether a
reasonable person in the assured's position would know that the
particular fact is material." Knight, 804 F.2d at 13.

It is important to bear in mind that the insurer is not
placed on a duty of inquiry; rather, "the insured is bound to
communicate every material fact within his knowledge not known or
presumed to be known to the underwriter, whether inquired for or
not." Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974,
980-81 (5th Cir. 1969).  Nor need the insurer prove that the

insured's omission was the product of bad faith. Rather, "[i]f the insured fails to disclose a material fact that the insurer relied upon in approving coverage, then the policy is void," Thomas v. NASL Corp., 2000 WL 1725011 *4 (S.D.N.Y. Nov. 20, 2000), regardless of whether the misrepresentation or omission was intentional or was the result of accident or mistake.  See Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA, 599 F. Supp. 405, 426 (S.D.N.Y. 1984); see also Gulfstream Cargo, Ltd., 409 F.2d at 981 n. 20.

Here, Federal asserts that PGG violated its duty of uberrimae fidei in six different ways: (1) by failing to forward to Federal the survey prepared by A-1 Marine Surveyors ("A-1 Survey"); (2) by failing to forward to Federal a November 14, 2005 email sent to Mr. Ashkenazy by Chamberlain Yachts' employee Jennifer Dubois (the "DuBois Email"), which revealed litigation between Trident and SeaQuest as well as ongoing trim and stability issues; (3) by misrepresenting in effect that the yacht was manufactured entirely by Trident rather than partly by SeaQuest; (4) by failing to notify Federal that Keybank gave PGG an extension of 120 days within which to comply with the recommendations in the Patton Survey; (5) by failing to disclose the allegedly unseaworthy conditions caused by non-watertight garage doors, penetrations through the forward bulkhead of the port garage into the engineroom, placement of the engine room exhaust vent, and certain electrical problems; and (6) by failing to disclose that the Patton Survey was misleading in failing to "star" certain problems.  See Plaintiff Federal Insurance

10

Company's Written Rebuttal Summation ("Plaintiff's Rebuttal") at 13, 15.

At the outset, it must be noted that Federal has failed to convince the Court that its own underwriters considered any of the alleged misrepresentations or nondisclosures to be material, a fact that, while not dispositive, plainly bears on the determination of what an objective insurer and an objective insured would have considered material.  Although the two Federal employees who approved the underwriting, Deborah O'Sullivan and Donna Capiga, testified in a largely conclusory fashion that Federal would not have bound coverage on the yacht had PGG disclosed certain of the above-listed items, the Court does not credit this testimony, not least because of what the same witnesses' other testimony revealed about Federal's underwriting practices.  For example, with respect to the failure to provide the A-1 Survey, Ms. O'Sullivan, Federal's worldwide yacht underwriting manager, testified that in most cases surveys are not attached to insurance applications and are only received by Federal after coverage is bound.  Tr. 1022-23, 1052.  The following colloquy is illustrative:

> THE COURT: Now, a survey would tell you a lot more about the boat than those few little items that you had in the first sheet, yes?
>
> THE WITNESS:  Absolutely.
>
> THE COURT:  So, if there is a survey available why don't you want to see it before you bind the insurance?
>
> THE WITNESS:  In the interest of time, it would actually be impossible to physically review surveys for every single submission that we receive, and that's where we go back and rely on what is our history with a particular manufacturer.

THE COURT:  When you say in the interests of time, let me see if I understand what you're saying.  You're saying that you're making a business judgment that it would be better for the insurance company to be able to go ahead and enter into the contract rather than have to ask people to wait a week or a month or whatever that it took to thoroughly study every survey, at which point you might lose the customer to somewhat of a competitor?

THE WITNESS:  It does become a customer service issue.  If this is a new purchase, they could be looking to close within a day of making the submission to us.

Tr. 1022-23.

Ms. O'Sullivan further testified that she told her immediate subordinate, Donna Capiga, that Capiga could bind coverage on the Princess Gigi without waiting for the Patton Survey, Tr. 1021-22, 1069, and that at no time did anyone at Federal request that that survey be supplied, Tr. 1101-03, even though the megayacht worksheet indicated that a survey was available.  Pl. Ex. 166.  Peter Kelly, an experienced agent who had a direct contractual relationship with Federal, likewise told PGG that, while he would need a copy of the Patton Survey, supplying a copy of the survey was not necessary to bind coverage.  Tr. 941, Pl. Ex. 168.  Nonetheless, PGG sent Kelly a copy of the Patton Survey prior to Federal's binding coverage, Tr. 970, Pl. Ex. 173, but Kelly, although Federal's agent for these purposes, did not see the need to forward it to Federal.  Tr. 928, 936-37.  As this entire practice illustrates, even the Patton Survey, which dealt comprehensively with the vessel, was of no material interest to Federal in determining whether or not to write the insurance.

In any event, regardless of Federal's failure to prove that its own underwriters considered any of the alleged non-disclosures material, it has more importantly failed to prove that a reasonable underwriter would have considered them material, let alone that a reasonable insured would have known that these were material to a reasonable underwriter.  Therefore, PGG did not breach its duty of utmost good faith in failing to disclose each of the eight items here in issue.

(1) With regard to the A-1 survey, PGG itself never received a copy, so there was nothing to disclose.  Tr. 2432.  Rather, the Court finds, the A-1 survey was commissioned by Kent Chamberlain for his own purposes, as part of his abortive effort to convince PGG to charter the yacht and employ him as the charter agent, Tr. 1780-81, 2445-46.  To that end, the A-1 surveyors determined what would be needed to satisfy the requirements of St. Vincent's Commercial Registry for chartered vessels, Tr. 1767; Pl. Ex. 100 at 1, which is in no way material to the insurability or safety of the yacht.

Moreover, even if one were to assume, contrary to the Court's finding, that Chamberlain's knowledge of the A-1 Survey could be imputed to PGG, nothing in the survey would have led a reasonable insurer to deny coverage.  O'Sullivan and Capiga testified that, had the A-1 Survey been disclosed, items 1 and 8 of the survey, as well as a passage regarding hull modification, would have led Federal to decline coverage, Tr. 1047-48, 1166-68; but, as previously noted, the Court does not credit their self-serving and largely conclusory testimony.

Furthermore, the items in question were hardly material on their face.  Item 1 states: "An incline experiment requires [sic] to be carried out and a stability book provided."  Item 8 states: "An International Load Line is not presently marked.  A load line survey requires to be carried out after the stability booklet is produced." Pl. Ex. 100.  Page three explains that the yacht had been modified, with a false bow added, to increase buoyancy forward, and that 22,172 pounds of lead ballast were added to the aft keel section.  Pl. Ex. 100 at 3.  It also quotes from a statement from Arthur Barbeito & Associates, Inc., found onboard the yacht, which states, "Due to the fact that there is very little structural information on this vessel, it is not possible to perform a thorough and complete structural analysis to ascertain residual longitudinal strength of the hull . . ." Id.[4]  Even though Federal is among the premier insurers of megayachts and its practices may therefore be assumed to be at least at the level of a reasonable insurer, neither Capiga nor O'Sullivan had the technical expertise to draw further inferences from any of this modest information, nor would it have been consistent with Federal's underwriting process for them to have done so.  Tr. 1008, 1052, 1080-82, 1149, 1177-78.  Taken in that context, the Court finds that the failure to disclose the A-1 Survey was not material.  See Pacific Res., Inc. v. Oswego Shipping Corp., Marine Transp. Lines,

---

[4] Although the Barbeito statement continues that "Therefore, Arthur M. Barbeito & Associates cannot assume responsibility for internal structural failure," the testimony at trial established that, in context, this last statement was likely nothing more than a boilerplate disclaimer typically used on naval drawings. Tr. 1786-87, 1791-92.

1984 WL 928 *7-8 (S.D.N.Y. Sept. 26, 1984) (insured "need only disclose the relevant facts, rather than the entire reports, opinions or recommendations which they may have been commissioned or otherwise obtained").

Further still, even if one were to assume, arguendo, that the A-1 survey would otherwise have been material, PGG disclosed to Federal functionally identical information, and more, when it made available to Kelly, who was Federal's agent for these purposes, a copy of the Patton Survey.  See Contractors Realty Co. v. Ins. Co. of N. Am., 469 F. Supp. 1287, 1295 (S.D.N.Y. 1979) ("The survey itself, where the underlying conditions it reported were known to the insurer or were immaterial to the risk, was not material to the risk, and the failure to disclose it is not a ground for avoidance of the policy"). Specifically, the text of the Patton Survey stated that the hull design had a flotation and trim problem and had been modified by the addition of a false bow and 11 tons (or 22,000 lbs) of ballast.  Pl. Ex. 179 at 5.  The Patton Survey also stated, "to correct a flotation problem, the naval architectural firm of Arthur Berbetto [sic] and Associates was employed for drawings and inclination tests to get more flotation in the bow area . . . The stability results were not seen by this surveyor, but should be obtained from present owner." Id.  Further, the Patton Survey noted that the yacht had been modified owing to vessel trim problems: it stated that a false bow had been added over the additional structure "in an effort to provide more buoyancy forward" and 11 tons of lead trim ballast had been installed in the aft end of the keel.  Pl. Ex. 180 at 1.  In

addition, "[i]t is recommended that the original naval architects or engineers on this project be contacted, if possible, and calculations and drawings be presented verifying the structural integrity, and enhancements for new ballast loads on the structure." Id. at 1-2. Even O'Sullivan testified that, had she reviewed the Patton Survey, she would have seen that there were hull modifications.  Tr. 1073.

(2) The Court likewise does not credit the testimony of O'Sullivan and Capiga that they would not have bound coverage had they seen the so-called DuBois email.  Tr. 1045-46, 1157-61.  The email in question stated that the "Full Bloom" was originally scheduled to launch in 1997 but that the launch was delayed because of the lawsuit brought by Lovell against Trident Shipworks.  Pl. Ex. 91.  It further explained that Dr. Cutolo, the original designer of the hull, "took note that the materials used during the construction were heavier than proposed and might lead to stability issues."  Id. However, the email went on to note that, according to a former Trident sales representative who was present during the building of the yacht, 22,000 pounds of lead was added as ballast to the keel sometime after launch of the vessel, and "that a stability test was performed after the additional ballast [was added] and was found to correct the problem."  Id.  Furthermore, the email concluded, any rumors Mr. Ashkenazy might have heard about the yacht were "probably unfound [sic] gossip with no factual basis," as the yacht had logged over 22,000 nautical miles with its previous owner in Alaska, Mexico, the Carribean and New England and "would certainly appear to be a proven sea worthy vessel."  Pl. Ex. 91.  If anything, this email, a

16

prelude to Ashkenazy's decision to purchase the yacht, attests to the seaworthiness of the yacht. As such, the Court finds that the email would not have been material to Federal or any reasonable insurer in determining whether to refuse coverage.

Once again, moreover, even if one were to assume, _arguendo_, that the "stability issue" alluded to in the email was material, that very issue was disclosed, more meaningfully, in the Patton Survey and, as testimony at trial established, was corrected many years before PGG approached Federal to insure the Princess Gigi. Pl. Ex. 179 at 5, Pl. Ex. 180 at 1, Tr. 1653-55. As for the prior litigation between Trident and Lovell, while O'Sullivan might have been "curious," and considered it "interesting", Tr. 1039-40, the existence of the litigation itself was not material, and any deficiencies referred to in the order resolving that litigation were fixed long before the DuBois email was written. Pl. Ex. 76, Tr. 1672-73, 2150-51. See Contractors Realty, 469 F. Supp. at 1295 (holding that the fact of a lawsuit by insured against manufacturer of yacht was not material, even where insured himself had made assertions of unseaworthiness in prior suit); see also Ct. Ex. 2 at 39 (Patton Surveyor Riley testified that learning about the prior arbitration and litigation surrounding the Full Bloom did not in any way affect his opinion of the vessel).

(3) Regarding PGG's alleged misrepresentation that the yacht was manufactured (solely) by Trident, O'Sullivan testified that it was important to Federal that Trident was listed as manufacturer on

17

the megayacht worksheet, Pl. Ex. 166,[5] and that, had Federal learned

that the yacht was manufactured by Trident but was finished by the

owner itself (SeaQuest) through the use of subcontractors, Federal

would not have issued a quote.  Tr. at 1014-15, 1033-34.  Once again,

however, O'Sullivan's testimony in this regard was simply not

credible.  For example, though O'Sullivan claimed to attach great

weight to the name Trident, she then revealed that she knew virtually

nothing about the manufacturer -- how big it was, how long it had

been in business, how many yachts it had built, etc.  Tr. 1084.

     In any case, the yacht's construction history was adequately

disclosed in the Patton Survey, which stated: "Name and Address of

builders: SeaQuest International Inc., Tampa."  Pl. Ex. 179 at 3.

O'Sullivan admitted that had she seen the Patton Survey she would

have known that SeaQuest was included as the builder and that the

yacht had not been completed by Trident.  Tr. 1070-71.  More

generally, the Court finds that even assuming, arguendo, that such

information was material, it was adequately disclosed in the contents

of the Patton Survey.

     (4) With respect to the purported withholding of the

information that Keybank granted PGG an extension of time (to 120

days) within which PGG was to comply with certain of the

recommendations in the Patton Survey, the Court finds such a fact was

not material given both the nature of the recommendations at issue

---

[5]Yacht manufacturers are ranked by Federal from "A" to "D,"
with A being the best and D being the worst.  According to
O'Sullivan, Trident was ranked as an A or B manufacturer, Tr.
1012.

(none were marked as important for insurability or safe operation),
Pl. Ex. 180, and the fact that the recommendations themselves were
clearly disclosed in the Patton Survey, which thus provided
sufficient information to enable Federal to take notice of the risks.
See Puritan, 779 F.2d at 871 ("[a] minute disclosure of every
material circumstance is not required.  The assured complies with the
rule if he discloses sufficient to call the attention of the
underwriter in such a way that, if the latter desires further
information, he can ask for it") (internal quotation marks omitted).

        (5) Regarding the allegedly unseaworthy conditions of the
non-watertight garage doors, penetrations through the engineroom
bulkhead, placement of the engineroom exhaust vent, and the
supposedly dangerous electrical conditions, the Court discusses all
of these in depth in the next section and concludes that none
rendered the vessel unseaworthy.  More immediately relevant to the
issue at hand, however, is the failure of Federal to prove that
Ashkenazy or PGG knew about any of these conditions except the
penetrations in the engineroom bulkhead and possibly the allegedly
dangerous electrical conditions.  The penetrations in the engineroom
bulkhead, however, were fully disclosed to Federal in the Patton
Survey.  See Pl. Ex. 180 at 2 ("All watertight bulkheads (forepeak,
forward and aft engine room) have been compromised by plumbing
penetrations and unfilled cut-throughs.  Verify a proper seal at all
penetrations on both sides of these bulkheads").  And none of
Federal's underwriters testified that any of the electrical

conditions would have been material, or even relevant, to their decision to bind coverage on the yacht.

(6) Finally, although Federal asserts that the Patton Survey was itself misleading because it did not "star" (i.e. emphasize) any of its recommendations in a manner that would have caught Federal's notice, in actuality a "star" was required only if the recommendations related to the "safe operation and/or insurability" of the vessel, Pl. Ex. 180, which none did.[6]  Moreover, as noted, Federal's underwriters made plain their total lack of interest in the Patton Survey when, apprised of its existence, they failed to obtain it from their agent Kelly, to whom PGG had provided it even though Kelly had said it was unnecessary to bind coverage.

In reality, the Court finds that PGG took every step a reasonable insured would have taken to fulfill its duty of upmost good faith to the insurer.  Prior to seeking insurance, PGG paid almost $30,000 for a survey by the respected firm of Patton Marine, Inc.  Tr. 1796, 2440-41.  The Patton surveyors remained on the yacht for four days in November and December of 2005.  Pl. Ex. 179 at 1. The written survey was thirty-two pages long and covered every aspect of the yacht's design and opeation.  Pl. Exs. 179 & 180.  Then, even though Peter Kelly, who was Federal's agent for these purposes,

---

[6] Although Federal insists that it was a "complete lie" for the Patton Survey to state that the yacht's hull was designed by renowned naval architect Sergio Cutolo, Plaintiff's Rebuttal at 16, in fact Dr. Cutolo designed the original hull model and then redesigned the Full Bloom's hull to deal with a trim problem, Tr. 767, 1623-25, 1678-79, 2152, so the statement was essentially true.

stated that he did not need the Patton Survey to bind coverage, Tr. 941, Pl. Ex. 168, PGG's attorney, David Kriss, sent it to him anyway, with a cover email stating: "Let me know if you need anything else." Tr. 970, Pl. Ex. 173.  Kriss never heard back because, as Kelly testified, Kelly did not believe that anything else was needed.  Tr. 970.  The survey was sent to Kelly, rather than to Federal itself, because it was Federal's practice not to communicate directly with insureds but, instead, to operate through agents.  Tr. 937, 982-83, 1100-01.  But even though the megayacht worksheet (application form) sent to Federal's underwriters by Kelly stated that a survey of the Princess Gigi was available, the underwriters chose to bind coverage without reviewing it, Tr. 1021-22, 1161, and, instead, at no time ever requested a copy.  Tr. 935, 1102, 1188.  Thus, even if Federal were not bound by Kelly's receipt of the Patton Survey (which it is), the Court would infer from the underwriting process and procedures of such a well-respected company as Federal that a reasonable insured would understand that the providing of such a survey was immaterial to the decision of a reasonable insurer to bind coverage in these circumstances.

PGG's alleged breach of the absolute implied warranty of seaworthiness.  The "warranty of seaworthiness is an absolute duty owed by a ship owner to its crew and, in this case, to its insurer, to provide 'a vessel and appurtenances reasonably fit for their intended use.'"  Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir. 2001) (quoting Mitchell v. Trawler Racer Inc., 362 U.S. 539, 550 (1960)).  The origins of the warranty rest in the belief

that "in order to assess the risk, the underwriter must have the right to assume a certain standard of suitability of the vessel."  2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 19-16, at 337 (4th ed. 2004).  Bespeaking the more rigid legal views of bygone eras, the warranty "is absolute, and its violation voids the policy altogether, regardless of whether unseaworthiness at inception contributed to the loss."  8-XII Benedict on Admiralty § 12.10, at 12-22 (7th ed. 2007). Moreover, the duty is imposed regardless of fault, and the owner's knowledge of the alleged unseaworthy conditions is irrelevant.  See Underwriters at Lloyd's, 260 F.3d at 8 ("[A] finding of unseaworthiness is not affected by whether the owner was or was not negligent or at fault").

The absolute nature of this requirement is somewhat tempered, however, by the fact that the meaning of the term "seaworthy" is relative -- it varies with the vessel involved and the use for which the vessel is intended.  Schoenbaum, Admiralty and Maritime Law § 19-16, at 338.  See also Neubros Corp. v. N.W. Nat'l Ins. Co., 359 F. Supp. 310, 316 (E.D.N.Y. 1972) ("Seaworthiness is a relative term . . . . It is the fitness in design, structure and condition to perform the task for which the vessel is [intended]").  The standard is not perfection but reasonableness.  Not every conceivable defect in a ship's design renders the ship unseaworthy.  "It is, of course, true that a given ship, applying for insurance, may be considered a better risk, and better able to withstand even perils of the sea, than another seaworthy ship.  But that fact does not preclude the idea that both ships must be seaworthy."  Fireman's Fund Ins. Co. v.

Compania de Navegacion, Interior, S.A., 19 F.2d 493, 495 (5th Cir. 1927), rev'd on other grounds by Compania de Navegacion, Interior, S.A. v. Fireman's Fund Ins. Co., 277 U.S. 66 (1928).  "The Standard [for seaworthiness] is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."  Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 322 (1964) (internal quotation marks omitted).  See also Morton v. Berman Enters., Inc., 669 F.2d 89, 91-92 (2d Cir. 1982); Contractors Realty, 469 F. Supp. at 1293; Thorton v. Deep Sea Boats, Inc., 399 F. Supp. 933, 936 (S.D. Ala. 1975).

With exceptions not here relevant, the burden of proving unseaworthiness is on the insurer.  See Schoenbaum, Admiralty and Maritime Law § 19-16, at 338; Austin v. Servac Shipping Line, 794 F.2d 941, 945 (5th Cir. 1986).

Here, Federal claims that the Princess Gigi, notwithstanding that it had previously logged over 38,000 miles of sailing, Tr. 1642-45, was unseaworthy for seven separate reasons.  First, it was only designed for fair weather cruising in coastal waters.  Second, the garage doors were not designed to keep seawater out of the garages, and the engineroom exhaust ventilation ducting was too close to the waterline.  Third, there were numerous holes in the vessel's three "watertight" bulkheads, specifically a "mousehole" through the aft engineroom/garage watertight bulkhead and other holes around the I-beam penetration through the aft engineroom bulkhead.  Fourth, the

vessel lacked an automatic bilge pump.  Fifth, the vessel lacked a DC powered fuel pump.  Sixth, there were "hazardous" electrical conditions.  Seventh, the vessel was unstable.  Plaintiff's Summation at 22-26, Plaintiff's Rebuttal at 24-25.

As to the first claim, it is true that the Patton Survey endorsed the Princess Gigi as a good marine risk for "coastwise," "fair weather" sailing, but it never stated that the vessel was not a good marine risk for open seas or "ocean going" sailing.  Pl. Ex. 179 at 31, Pl. Ex. 180.  More importantly, in the argot of the Patton surveys, "coastwise" means anything short of transoceanic, and a yacht capable of sailing several hundred miles from the shore is therefore fit for "coastwise" sailing.  Ct. Ex. 2 at 33-34; Ct. Ex. 7 at 102-105.  Sailing from Ft. Lauderdale to the Netherland Antilles would fall within the surveyors' understanding of "coastwise," Ct. Ex. 2 at 111; Ct. Ex. 7 at 105, and no evidence was presented at trial to suggest that PGG ever intended to use the yacht for transoceanic, or "non-coastwise" travel.  Riley, the surveyor, also testified that the survey's use of the term "fair weather" cruising meant anything short of "gale force winds" and "very disturbed seas." Cx. 2 at 109.  There is no indication that PGG planned to use the yacht in these types of conditions; indeed, even hours before the Princess Gigi set sail from Fort Lauderdale, the weather reports were predicting conditions that were significantly different from what the Court finds the boat actually encountered before it capsized.  Tr. 596-600, 603-04. Therefore, the yacht was not unfit for the purpose for which it was intended.

As to the second claim, regarding the garage doors and the engineroom exhaust vent, it is true that the garage doors were not watertight.  Instead, they were "weather tight," meaning that while they would keep most water out, some water could get through, but would then drain out through a drain hole.  Tr. 138, 1714, 2061-63.  Although one of Federal's experts, George Randall, testified that this arrangement was defective because in certain circumstances it could lead to water accumulating in the garages, Tr. 1376, 1395, the Court is not persuaded.  In particular, the Court credits the more hands-on testimony of Michael Christian, an experienced captain and surveyor, who testified that the design of the garage doors was a common and popular one in custom-made megayachts and the doors were self bailing, in that they were slanted to allow water to flow back out of the doors and through the drain in the floor.  Tr. 2056, 2061-63.

Federal's objection to the engineroom exhaust vent was that, because it was located only 4.5 feet above the waterline on the aft port side of the vessel, Tr. 171-72, it could, according to Federal's experts, become a "downflooding point," i.e., a point where water might flood into the ship if the vessel were to roll at an angle sufficient to bring the vent down to the water line.  Tr. 181, 1346-49, 1377-78.  There was sharp disagreement among the witnesses, however, as to how serious a risk, if any, was created by this situation.  The exhaust vent design was quite common, Tr. 2161, and was part of Trident's original design for the yacht.  Tr. 2157-58.  Even if the ship were substantially inclined, water could not enter

the vessel through the vent if the electric motors were running,
because air from the engine room was pushed out of the vents by a
powerful fan, thereby blocking the ingress of water.  Tr. 1714, 2162-
63.  Moreover, even if the electric motors were not running, the
exhaust was equipped with a damper that could shut out water
completely.  Tr. 340-41, 1714, 2163.  The Court credits the testimony
of Captain Moore and Warren Lovell, who both testified that the yacht
previously operated in 12 foot seas without any water coming in
through the exhaust vent.  Tr. 1645-46, 2166.  Captain Papa saw no
water coming through the vent on his first, month-long trip to the
Bahamas.  Tr. 1484-85.  Neither the Patton Survey nor the A-1 Survey
said anything about the vents being too low, even though the height
was apparent to the naked eye.  See Tr. 1346-48; Pl. Exs. 100, 179,
180.  Therefore, on balance, and also taking account of the Court's
perception that all the experts in this case were biased and prone to
exaggeration, the Court concludes that the design of the engineroom
exhaust vents did not render the vessel unseaworthy.  See Contractors
Realty, 469 F. Supp. at 1291, 1294 (vessel was not unseaworthy where
installation of yacht's wiring was less than optimal design but was
common on pleasure yachts and was not unsafe or dangerous, and engine
room layout and exhaust system were poorly designed but also common
and not dangerous).

        As to the third claim, the Patton Survey itself stated that
"All watertight bulkheads (forepeak, forward and aft engine room)
have been compromised by plumbing penetrations and unfilled cut-
throughs."  Pl. Ex. 180 at 2.  However, while, predictably, the

witnesses disagreed as to how serious a risk these penetrations presented, see, e.g., Tr. 1233, 1243, 1400-01; Ct. Ex. 7 at 53-55; Ct. Ex. 2 at 54-55; the Court need not resolve these disagreements because it credits the testimony of Captains Moore and Papa that most, if not all, penetrations noted in the Patton survey were sealed prior to the time when coverage was bound. Tr. 1475-76, 1511, 2206. Moore testified, for example, that he had personal knowledge that the 3x5 inch rectangular hole over the I-beam was filled with foam and a backing board, and that the so-called "mousehole" was filled with a mechanical plug. Tr. 2207-08. Any remaining gap around the I-beam itself was immaterial, and the crew saw just a small amount of water passing through the gap before they stuffed it with towels. Ct. Ex. 11 at 35-36, Ct. Ex. 13 at 41-42. Therefore, the Court finds that any penetrations in the watertight aft engineroom bulkhead that remained at the time coverage was bound on the Princess Gigi were trivial and did not render the vessel unseaworthy.

As to the fourth claim, the Court finds that the lack of an automatic bilge pump or automatic float switches on the bilge pumps did not make the yacht unseaworthy. The yacht had an AC bilge pump that could dewater at 90 gallons per minute, and engine-powered pumps that could dewater at 460 gallons per minute. Tr. 2230-2231. The yacht also had a portable gasoline-powered emergency dewatering pump that could have been used without power, but it was stored in the garage and the crew was unable to reach it under the unforeseen situation confronting the Princess Gigi on the night in question. Pl. Ex. 180 at 2, Ct. Ex. 15 at 74-75. Under these circumstances,

the absence of an automatic bilge pump was not sufficient as to render the vessel unseaworthy.

As to the fifth claim, Federal, which has the burden of proof, never introduced any material evidence that the lack of a DC-powered fuel pump rendered the yacht unseaworthy. Moreover, the yacht had two tanks that could gravity-feed fuel in the event of a loss of power, as well as a reserve generator. Tr. 1498-1501. Therefore, the Court finds that the lack of a DC-powered fuel pump did not render the boat unseaworthy.

Similarly, as to the sixth claim, Federal never introduced any material evidence to support the claim that the electrical conditions on the vessel rendered the boat unseaworthy. On the contrary, Scott Albers, the electrical inspector hired by PGG as part of its pre-purchase investigation, testified that none of the electrical items that he tested on the yacht malfunctioned and that everything was working correctly. Ct. Ex. 14 at 156.

As to the seventh claim, regarding vessel instability, while there may have been stability problems with the original design, these were corrected even before PGG purchased the boat. Tr. 1652-55, 1669-72, 2150-52; Pl. Ex. 76. After these corrections were made, Captain Moore operated the yacht and never observed any trim or stability issues. Tr. 2176-80. Patton surveyors Riley and Connell also testified that they observed no stability problems with the yacht whatsoever. Ct. Ex. 2 at 150-51; Ct. Ex. 7 at 223. Therefore, the Court finds that the vessel was not unstable.

Finally, to the extent that Federal is also making the more general claim that the yacht must have been unseaworthy because it would not otherwise have capsized even in high seas, such speculation is not sufficient to carry Federal's burden.  See Underwriters at Lloyd's, 260 F.3d at 3 (presumption of unseaworthiness only arises if vessel sinks in calm waters).  Moreover, the loss was the result, not just of the bad weather, but also various unforeseeable but contributing conditions -- most notably the loss of power -- none of which, the Court finds, has been proved to be the product of defective design.

PGG's alleged breach of the negative implied warranty of seaworthiness.  The negative implied warranty of seaworthiness requires that the "[o]wner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition."  Sask. Gov't Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 388 (5th Cir. 1957).  See also Employers Ins. v. Occidental Petroleum Corp., 978 F.2d 1422, 1431-32 (5th Cir. 1992).  To establish a breach of this warranty, Federal must prove that: (1) an unseaworthy condition existed at the commencement of the voyage; (2) the insured had knowledge of the unseaworthy condition and yet allowed the vessel to sail anyway; and (3) the unseaworthy condition was the proximate cause of the claimed loss.  See Schoenbaum, Admiralty and Maritime Law § 19-16, at 346; Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liber.), 952 F. Supp. 1046, 1070 (S.D.N.Y. 1997).  Actual knowledge of the unseaworthy condition is required.  See Cont'l, 952 F. Supp. at 1070-1 (fact that it was "openly evident"

29

that the vessel was corroded was not sufficient to show knowledge).

"The policy underlying the rule is that an owner should not be able
to allow a vessel which the owner knows is unseaworthy, to leave the
safety of a port for the open sea." Id. at 1071.

As to the first element, Federal argues that, at the time the
Princess Gigi sailed from Ft. Lauderdale in February 2006, the vessel
was unseaworthy in five respects: (1) improper design of the
engineroom exhaust vent; (2) improper design of the non-watertight
garages; (3) lack of watertight integrity of the engineroom
bulkheads; (4) lack of a DC powered fuel pump, and (5) lack of
properly trained, competent crew.[7]  Plaintiff's Summation at 32-37.
As previously discussed, however, Federal has failed to show that any
or all of the first four of these five conditions, if they were
defects at all, rendered the vessel unseaworthy.  Nor does Federal
allege that anything about these conditions worsened between the time
that coverage was bound and the time that the vessel set sail from
Ft. Lauderdale.  Indeed, even if, contrary to fact, the Court had
found that any of the purported design defects rendered the boat
unseaworthy at the time coverage was bound, it would not find that

---

[7]PGG argues that Federal is estopped from claiming crew
incompetence because the issue was not identified as a reason for
declining coverage in the declination letter Federal issued to
PGG, was not pleaded in the Complaint, Amended Complaint, or
Second Amended Complaint, and was not an issue during discovery.
Pl. Exs. 1, 163.  However, the Court need not reach the issue of
waiver because it finds that, even if Federal could properly
plead crew incompetence at this late stage of the case, the
evidence at trial was insufficient to prove that the crew was
incompetent, let alone that any incompetence was known to PGG and
was a proximate cause of the loss.

the boat was unseaworthy at the time of the final voyage.  All
significant Patton recommendations were remedied before the first
voyage, with one of Lovell's crew members remaining on board the
Princess Gigi for one week after closing, and another remaining on
board for approximately six weeks.  Tr. 1511, 2194-97.  Captain Papa
had an "open checkbook" from Ashkenazy to do whatever was necessary
to put the boat in perfect shape.  Tr. 1469, 2434.  The yacht
performed with virtually no problems on its month-long voyage to the
Bahamas, Tr. 1483, Ct. Ex. 11 at 9, and Rese testified that when he
came onboard six days before the final journey, he found "just about
no problems whatsoever."  Ct. Ex. 13 at 8.

    As to the fifth allegation, while the lack of a properly
trained, competent crew can constitute an unseaworthy condition, <u>see</u>
<u>Crane v. Diamond Offshore Drilling, Inc.</u>, 743 So.2d 780, 790 (La. Ct.
App. 1999), "an isolated act of operational negligence will not
suffice to create an unseaworthy condition.  Operational negligence
must be 'pervasive' or repeated frequently for it to rise to the
level of an unseaworthy condition."  <u>Id.</u>

    Federal claims that both Jacob Rese, the engineer, and
Nathalie Gorin, a watchstander, were incompetent.  It notes, inter
alia, that Rese was not a licensed engineer, had no formal training
as an engineer, and only joined the crew six days prior to its
departure on the voyage where it capized.  Ct. Ex. 13 at 4, 7.
Federal further notes that Rese did not use the yacht's computerized
fuel monitoring system to monitor the amount of fuel in the daytank,
and instead personally estimated the amount of fuel being used and,

on this basis, arranged for the daytank to be replenished every two to three hours.  Id. at 30-31.  When the daytank ran dry, Rese failed to replenish it by gravity-feeding from tanks 7 and 8, id. at 29, even though Captain Papa testified that he had trained Rese on how to use the gravity feed.  Tr. 1501.

Only the last of these items even smacks of negligence, and comes nowhere near incompetence.[8]  Federal provided no evidence of any requirement that engineers hold specific engineering licenses, rather than a master's license.  Rese was a licensed master and lifelong sailor who had five transatlantic crossings.  Ct. Ex. 13 at 4-5.  He had almost a week to familiarize himself with the Princess Gigi, and was trained by Papa and First Mate Fudge, who had spent a month on the yacht with Lovell's engineer.  Tr. 1497-1500.  No persuasive evidence was adduced that experimental estimating of daytank needs is not a reasonable alternative to reliance on a computerized measurement.  As to the failure to gravity-feed the daytank once it went dry, Rese did manage to replenish the tank with a small amount of fuel by manually pumping fuel with a bilge pump from tank 5.  Ct. Ex. 13 at 33-34, Ct. Ex. 11 at 33-34.  His choice of this alternative in a complicated emergency situation can hardly be considered incompetent, and Federal introduced no expert testimony

---

[8] Consistent with its "any port in a storm" approach to this litigation, Federal, recognizing that crew negligence is covered by its all risk policy in this case, argues that if the Court finds that Rese and Gorin were not incompetent, it should then go to the other extreme and find that they were not negligent either.  As it happens, however, the Court need not even reach this latter issue.

that it was.  The Court finds that Federal has provided insufficient
evidence to show that Rese was incompetent.

     Moreover, even if, for the sake of argument, Rese could
possibly be considered incompetent, PGG had no knowledge of his
incompetence, and therefore could not have breached the negative
implied worthy of seaworthiness.[9]

     Finally, even if the other requirements were met, Federal
itself expressly denies that Rese's alleged incompetence -- in
starving the daytank of fuel and causing the vessel to lose power --
was the proximate cause of the capsizing.  Specifically, although
Federal's witnesses were at diametric odds on this issue -- with
Randall testifying that the proximate cause of the capsizing was the
accumulation of water in the port garage and the flooding of the

---

     [9] The parties disagree about whether the knowledge of
Captain Papa should be imputed to PGG.  Federal argues that PGG
hired Papa and delegated to him the responsibility for hiring the
balance of the crew, so Papa was acting as PGG's agent and his
knowledge should be imputed to it.  See, e.g., Cont'l Oil Co. v.
Bonanza Corp., 706 F.2d 1365, 1377 (5th Cir. 1983) (knowledge of
master, who was delegated general management of vessel, imputed
to absentee corporate owner).  PGG, in response, cites Texaco,
Inc. v. Universal Marine, Inc., 400 F. Supp. 311, 324-25 (E.D.
La. 1975) for the proposition that a master's knowledge of
unseaworthiness at commencement of voyage is not imputed to
owner.  However, the Court need not reach this issue, because
there is no material indication that Papa knew that Rese was
incompetent.  Federal points to testimony from Marcus Mitchell of
Overseas Salvage that Papa told Mitchell that he was having
problems with the vessel and should never have left port before
they were repaired, but that Ashkenazy pressured Papa into
remaining on schedule.  The Court, however, finds Mitchell to be
an unreliable and biased witness. Moreover, even according to
Mitchell's testimony, which Papa vigorously disputes, Tr. 1488,
the alleged problems that Papa referred to were electrical and
mechanical and had nothing to do with crew incompetence.  Tr.
622.

engineroom, rather than the loss of power, Tr. 1341, 1395-97, 1410, and Taylor testifying that the loss of power was a key problem and the flooding of the engine room would not have caused the vessel to capsize without it, Tr. 381-82 -- Federal, in its final submission to this Court, insists that "although the loss of power may have expedited the capsizing of the Gigi, it was not the proximate or efficient cause."  Plaintiff's Rebuttal at 28.  See also Plaintiff's Rebuttal at 33 ("All other contributing factors, such as weather, loss of power, and the cargo vessel 'collision' have been shown not to be the proximate cause of the Gigi's capsizing") (emphasis in original).

In short, the Court concludes that there is insufficient evidence to prove that Rese's alleged starving of the daytank was incompetent, no evidence to suggest that PGG or Captain Papa knew that Rese was incompetent, and no assertion by Federal that any such alleged incompetence was the proximate cause of the loss.

Federal also weakly argues that Nathalie Gorin was incompetent because she was not licensed as a watchstander and had no watchstanding training.  Ct. Ex. 8 at 17-18, 39.  But Federal did not present any evidence that watchstanders must be licensed or trained, let alone any evidence that any aspect of Gorin's conduct had anything to do with the yacht's capsize.

PGG's alleged failure to meet its burden of proof under the all risk policy.  Under federal admiralty law, "all-risk policies in marine insurance contracts only cover losses caused by fortuitous events."  Youell v. Exxon Corp., 48 F.3d 105, 100 (2d Cir. 1995),

34

vacated on other grounds by 516 U.S. 801 (1995).  A loss is not fortuitous if it results from an inherent defect, ordinary wear and tear, or the insured's intentional misconduct.  See Ingersoll Milling Mach. Co. v. M/V BODENA, 829 F.2d 293, 307 (2d Cir. 1987).  On the other hand, losses that arise from acts of nature or the insured's negligence are covered.  See id.; Redna Marine Corp. v. Poland, 46 F.R.D. 81, 87 (S.D.N.Y. 1969) ("It is well established that where negligence, even on the part of the employees of the insured, causes a loss, that loss is fortuitous and within the coverage of all risks insurance").

Only this much seems probable: the Princess Gigi capsized because, in the face of severe weather, its loss of power prevented it from navigating through the storm.  The severity of the weather, the Court finds, was entirely unforeseeable and unpredictable.  The cause of the loss of power remains unproven and largely speculative.

Indeed, Federal's own witnesses presented mutually inconsistent theories, not only of the cause of the loss of power, but also of its significance.  For example, Taylor testified that when he inspected the vessel, the damper on the engine room exhaust vent was in the closed position, which would have nearly completely restricted the flow of water into the engine room, Tr. 340-42, and he therefore believed that the exhaust vent was not a significant source of water into the engine room until after the crew abandoned ship. Tr. 342, 382-83.  While Taylor testified that he was not able to draw an ultimate conclusion, within a reasonable degree of professional certainly, as to why the vessel sank, Tr. 346-48, his best belief was

that the engines failed because the daytank was starved of fuel, and
that although there were some leaks in the vessel due to the
penetrations in the aft engineroom bulkhead, if not for the loss of
power, the leaks that were occurring would not have caused the vessel
to capsize.  Id. at 370-71, 381-82.

Randall, by contrast, opined that the proximate cause of the
capsize was the accumulation of water in the port garage and the
flooding of the engineroom, which resulted from what he took to be
the defective design of the engineroom exhaust vent, the penetrations
in the aft engineroom bulkhead, and the lack of watertight integrity
of the garage doors.  Tr. 1341, 1350-53.  Indeed, in Randall's view,
even if the ship had lost power and encountered 10-12 foot seas with
20-30 foot swells, but did not have the design defects discussed
above, the ship would have survived, Tr. 1396-97.  He concluded that
the loss of power was not the cause of the capsize and was not a
contributing cause of the capsize.  Tr. 1410, 1587.

As between these two, the Court found Randall's testimony
more exaggerated and unreliable, as well as inconsistent with the
facts as adduced by percipient witnesses. For example, Randall
asserted that the inflow of water from the exhaust vent and "some
small contribution by the flow past the I-beam gap until it was
plugged" would have been sufficient to cause the capsize.  Tr. 1418-
19.  This was completely contradicted, not only by Taylor's
testimony, but also by contemporaneous statements of the crew that
(1) the gap around the I-beam was small and there was only a small
amount of water passing through before they stuffed the gap with

36

towels, Ct. Ex. 11 at 35-36, Ct. Ex. 13 at 41-42; and (2) originally, only a small bit of water came in through the exhaust vent, until the vessel began to list, the power was lost, and the water came pouring through.  Ct. Ex. 13 at 15-16, 39.

On the other hand, while the Court credits Taylor's testimony as to the significance of the loss of power, his suggestions as to what caused the loss of power were, as he himself came close to admitting, little more than guesses.

More generally, the Court finds that no one ever presented a coherent theory that was consistent with the facts and that adequately explained why the vessel capsized.  Late in the trial, indeed, counsel were still churning out new theories, such as that the vessel capsized because of the collision with the freighter that was trying to provide help.  Tr. 2009, 2012-2017.  The most that this Court can conclude with any confidence is that the unexpectedly bad weather was a critical condition in the capsizing and that, more probably than not, the loss of power was the key ingredient in the boat's failure to ride out the storm.  But the cause of the loss of power remains a riddle.

Not every accident is explicable; yet accidents still occur.  Which is why people have insurance.  For all the foregoing reasons, the Court concludes that Federal is liable, up to the full limits of the all risks policy, for the loss of the Princess Gigi.

Two other items must be addressed: the personal effects endorsement and the salvage expenses.  As to the former, the contract provides: "We cover your personal effects and those of your guests

and crew while they are on board your yacht . . . 'Personal effects'
means sports equipment, clothing, computer hardware kept and used
exclusively on board your yacht for your own personal use, and other
personal property.  It does not include legal tender, bank notes,
stored value cards, bullion, gold, silver, platinum, tokens, checks,
credit, debit or bank cards, valuable papers, passports, jewelry,
watches, furs, fine arts, fishing tackle or firearms."  Pl. Ex. 4.
Federal argues that the pronoun "they" in the first sentence refers
to the guests, and not to the personal effects, such that a guest's
personal effects would only be covered if the guest, rather than the
personal effects, was on board the yacht; but the Court disagrees.
It would be strange indeed if a guest's personal effects, for
example, a tennis racket, were covered while the guest, but not the
tennis racket itself, was on board the yacht.  Similarly, if the
guest were to leave the yacht for a short afternoon excursion in St.
Barts, but leave his or her tennis racket on board the yacht, it
would render the personal effects clause virtually worthless if the
loss of the tennis racket were no longer covered should the yacht
capsize while the guest was away.  In any case, at the very minimum,
the question of whether "they" refers to the personal effects or the
guests is ambiguous, and must be construed against the drafter of the
policy, in this case Federal.  See Jacobson v. Sassower, 66 N.Y.2d
991, 993 (1985) ("In cases of doubt or ambiguity, a contract must be
construed most strongly against the party who prepared it, and
favorably to a party who had no voice in the selection of its
language").  The Court also credits the testimony of the Ashkenazys

as to the amount of loss of the personal effects here at issue, i.e. well more than $200,000. Thus, PGG is entitled to recover on the lost personal effects of its guests (i.e. the Ashkenazy family) up to the full amount of the endorsement.

Finally, as to salvage expenses, Federal claims that it towed the Princess Gigi "in order to remove her as a hazard to navigation in the heavily traveled traffic way and to take steps to prevent pollution to the marine environment," Federal Summation at 50, and therefore claims it should be able to recover the salvage and towing expenses from PGG because PGG has been "unjustly enriched." The Court finds, however, that Federal's purpose in towing the yacht was at least as much to enable Federal to undertake a cause and origin investigation as to remove her as a hazard. Accordinly, PGG has not been unjustly enriched. See generally Paramount Film Distrib. Corp. v. State, 30 N.Y.2d 415, 421 (1972).

The Court has considered Federal's various other arguments on all the foregoing issues but finds them to be without merit and not to warrant discussion. For all of the foregoing reasons, the Court hereby denies Federal's claim for a declaratory judgment and grants PGG's counterclaim for breach of contract in the sum of $7,223,000.00 plus interest. PGG is directed to submit to the Court by March 19, 2008 a letter specifying the amount of prejudgment interest due through March 28, 2008. Any objections to that calculation must be submitted (in letter form) by Federal by March 26, 2008. The court will then enter final judgment on March 28, 2008.

SO ORDERED.


_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        March 13, 2008